L. Kieran Kieckhefer (SBN 251978)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94105-0921
Telephone: 415.393.8337
Email: KKieckhefer@gibsondunn.com

Robert A. Vincent (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3281
rvincent@gibsondunn.com

Lillian J. Mao (SBN 267410)
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5307
LMao@gibsondunn.com

Ahmed ElDessouki (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2345
AElDessouki@gibsondunn.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WESTERN DIGITAL TECHNOLOGIES, INC., WESTERN DIGITAL IRELAND LTD., SANDISK 3D IP HOLDINGS LTD., SANDISK TECHNOLOGIES LLC, and SANDISK STORAGE MALAYSIA SDN. BHD.<br><br>Plaintiffs,<br><br>v.<br><br>VIASAT, INC.,<br><br>Defendant. | Case No.   4:22-cv-04376-HSG<br><br>**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF** |

Gibson, Dunn & Crutcher LLP

1

**TABLE OF CONTENTS**

2   I.     INTRODUCTION ...................................................................................................1

3   II.    PRINCIPLES OF CLAIM CONSTRUCTION..................................................1

4   III.   BACKGROUND OF THE TECHNOLOGY AND THE ASSERTED PATENTS.................3

5          A.    The '400 Patent...............................................................................................3

6          B.    The '667 Patent...............................................................................................4

7   IV.    DISPUTED CLAIM TERMS OF THE '400 PATENT......................................5

8          A.    "kiosk".............................................................................................................5

9          B.    "portable data storage device" ......................................................................8

10         C.    "authenticate the portable data storage device, using at least the unique
                 identifier" .......................................................................................................9
11
           D.    "provide to the portable data storage device . . . a corresponding access key" ..........11
12
           E.    "public environment"...................................................................................13
13
14  V.     DISPUTED CLAIM TERMS OF THE '667 PATENT......................................14

15         A.    "secure region" .............................................................................................14

16         B.    "receive an indication of the NAS device having a secure region"............17

           C.    "access to the secure region is controlled by the media streaming system"…
17               "control streaming access to the digital content stored on the buffer" .....................19

18  VI.    CONCLUSION...................................................................................................20

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF EXHIBITS**

| Exhibit | Document |
|---------|----------|
| Ex. A | U.S. Patent No. 9,424,400 |
| Ex. B | U.S. Patent No. 10,447,667 |
| Ex. C | Excerpts from Deposition of Kevin Almeroth, Ph.D., April 6, 2024 |
| Ex. D | Declaration of Kevin C. Almeroth, Ph.D. Regarding Claim Construction, March 12, 2024 |
| Ex. E | Reply to Non-Final Office Action for U.S. Patent No. 8,914,634, June 6, 2014 |
| Ex. F | Merriam-Webster, Online Dictionary, 2011, "Portable." (VIASAT_00013566) |
| Ex. G | Almeroth, *Scalable Access Control For Web Services* |
| Ex. H | Free On-Line Dictionary of Computing, "Authentication." (VIASAT_00013577) |
| Ex. I | U.S. Patent No. 8,914,634 |

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 4:22-CV-04376-HSG

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
     340 F.3d 1298 (Fed. Cir. 2003) ...................................................................................... 2

4

5

*Apple Inc. v. Wi-LAN Inc.*,
     25 F.4th 960 (Fed. Cir. 2022) ...................................................................................... 13

6

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
     512 F.3d 1338 (Fed. Cir. 2008) ...................................................................................... 7

7

8

*Bell Communications v. Vitalink Communications*,
     55 F.3d 615 (Fed. Cir. 1995) ...................................................................................... 6

9

*Bio-Rad Laboratories v. Int'l Trade Comm'n*,
     998 F.3d 1320 (Fed. Circ. 2021)................................................................................... 19

10

11

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
     783 F.3d 1374 (Fed. Cir. 2015) .................................................................................... 16

12

*Board of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
     533 F.3d 1362 (Fed. Cir. 2008) .................................................................................... 10

13

14

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
     958 F.3d 1348 (Fed. Cir. 2020) ...................................................................................... 5

15

*Cordis Corp. v. Medtronic AVE, Inc.*,
     339 F.3d 1352 (Fed. Cir. 2003) ...................................................................................... 8

16

17

*Diamond Coating Techs., LLC v. Hyundai Motor Am.*,
     No. 13-1480, 2014 WL 5698445 (C.D. Cal. Aug. 25, 2014).................................... 11, 14

18

*DSS Tech. Mgmt., Inc. v. Apple, Inc.*,
     No. 14-CV-05330-HSG, 2018 WL 6421870 (N.D. Cal. Dec. 6, 2018)........................ 15

19

20

*Eaton Corp. v. Rockwell Intern. Corp.*,
     323 F.3d 1332 (Fed. Cir. 2003) ...................................................................................... 6

21

*Embrex, Inc. v. Serv. Eng'g Corp.*,
     216 F.3d 1343 (Fed. Cir. 2000) ...................................................................................... 2

22

23

*Gart v. Logitech, Inc.*,
     254 F.3d 1334 (Fed. Cir. 2001) ...................................................................................... 2

24

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
     755 F.3d 1367 (Fed. Cir. 2014) .................................................................................... 13

25

26

*Decisioning. com, Inc. v. Federated Dept. Stores, Inc.*,
     527 F.3d 1300 (Fed. Cir. 2008) .........................................................................15, 18, 19

27

*Intertrust Techs. Corp. v. Microsoft Corp.*,
     275 F. Supp. 2d 1031 (N.D. Cal. 2003), *as amended* (July 7, 2003)........................... 16

28

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 4:22-CV-04376-HSG

*j2 Glob. Commc'ns, Inc. v. Vitelity Commc'ns, LLC*,
No. 11-CV-07904-DDP, 2013 WL 5220173 (C.D. Cal. Sept. 13, 2013) ..................................... 14

*James Davidson Enterprises, LLC v. Bolt Star, LLC*,
2023 WL 415103 (E.D. Cal. Jan. 25, 2023) ..................................... 11

*Johnson Worldwide Assocs. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) ..................................... 2

*In re Johnston*,
435 F.3d 1381 (Fed. Cir. 2006) ..................................... 8

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ..................................... 15, 18, 19

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996)..................................... 2

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ..................................... 13

*Morpho Detection, Inc. v. Smiths Detection Inc.*,
2012 WL 5194076 (E.D. Va. Oct. 19, 2012)..................................... 8, 12

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ..................................... 2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................... 1, 2, 7, 8

*Profectus Tech. v. Huawei Techs. Co.*,
823 F.3d 1375 (Fed. Cir. 2016) ..................................... 8

*Sorensen v. Int'l Trade Comm'n*,
427 F.3d 1375 (Fed. Cir. 2005) ..................................... 6

*Tessenderlo Kerley, Inc. v. Or–Cal, Inc.*,
2012 WL 3276981 (N.D. Cal. Aug. 9, 2012) ..................................... 9, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ..................................... 2

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 4:22-CV-04376-HSG

## I.    INTRODUCTION

Plaintiffs Western Digital Technologies, Inc., Western Digital Ireland Ltd., SanDisk 3D IP Holdings Ltd., SanDisk Technologies LLC, and SanDisk Storage Malaysia Sdn. Bhd. (collectively "Plaintiffs") assert that all identified terms of U.S. Patent Nos. 9,424,400 (the "'400 Patent") and 10,447,667 (the "'667 Patent") should be given their plain and ordinary meaning and do not warrant construction.

By contrast, Defendant Viasat, Inc. ("Defendant" or "Viasat") proposes nine constructions that each violate canons of claim construction.  For example, Viasat proposes constructions that rely on extrinsic evidence and contradict the intrinsic record.  Viasat also improperly limits the claims to particular embodiments while excluding other embodiments.  In another example, Viasat improperly transforms optional features described in the specification into requirements of the claims.  Violating the doctrine of claim differentiation, Viasat construes terms to require limitations that are expressly disclosed in the dependent claims.  And, for some terms, Viasat replaces clear terms that are used throughout the specification with different, ambiguous terms that appear nowhere in the claims and inject confusion into otherwise straightforward claim language in a transparent attempt to bolster its non-infringement arguments.

Unlike Viasat, Plaintiffs believe the terms should be given their plain and ordinary meaning as would be easily understood to a person of ordinary skill in the art in light of the claims, specification, and prosecution history.  Plaintiffs do not seek to impermissibly broaden terms,  introduce limitations, or change the meaning of any of the terms.  Accordingly, Viasat's proposals should be rejected, and the terms of the '400 and '667 Patents should be given their plain and ordinary meaning.

## II.    PRINCIPLES OF CLAIM CONSTRUCTION

The methodology for construing claim terms is governed by the Federal Circuit's *en banc* decision in *Phillips*.  "[T]he words of a claim are generally given their ordinary and customary meaning … to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (internal quotation and citations omitted).  "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent" (*id*. at 1321)—that is,

Gibson, Dunn & Crutcher LLP

the specification, including the claims and written description (*id*. at 1314-17). Claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)). Generally, the words, phrases, and terms in patent claims should receive their ordinary and accustomed meaning. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (noting a "heavy presumption in favor of the ordinary meaning of claim language."). The strong presumption in favor of the ordinary meaning may be overcome only when the patentee "clearly set[s] forth a definition for a claim term in the specification." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003) (citing *Johnson Worldwide Assoc.*, 175 F.3d at 989–90).

Courts construe claims as a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). When construing claims, courts first consult the intrinsic record, which includes the patent specification (written words and accompanying figures) and the prosecution history (the written record of proceedings before the USPTO). *Phillips*, 415 F.3d at 1315–17. As with the specification, any "clear and unambiguous disavowal of claim scope" by the patentee during prosecution (for example, to secure a patent by distinguishing its invention from the prior art) will be enforced to "narrow[] the ordinary meaning of the claim." *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-26 (Fed. Cir. 2003) (internal quotations omitted). In addition to the intrinsic record, the Court may also consult "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314. Examples of extrinsic evidence include "expert and inventor testimony, dictionaries, and learned treatises." *Id*. at 1317. But extrinsic evidence is "less reliable" for claim construction purposes than the intrinsic record. *Id*. at 1318. "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("[E]xpert testimony . . . may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification.") (citation omitted).

### III.    BACKGROUND OF THE TECHNOLOGY AND THE ASSERTED PATENTS

#### A.    The '400 Patent

The '400 Patent is directed to a digital rights management ("DRM") system, which includes a "kiosk for provisioning secure media content to a plurality of portable data storage devices." Ex. A, ("'400 Patent") at 2:21-26, 22:42-44. The system enables the "secure copying or transfer of content . . . from one storage device to another storage device," which is "brokered by a trusted server that is authenticated and trusted by both sets of storage." *Id.* at 2:49-54. The system includes two interfaces: the first is "configured to communicate with a portable data storage device," and the second is "configured to communicate, over a network, with a remote trusted server." *Id.* at 22:45-48; *see also id.* at Figs. 7, 7C (showing a download server 300 / kiosk 106' communicating with both a storage device 402 and a key server 200). The system also includes a processor that "obtain[s] a unique identifier from the portable data storage device," "authenticate[s] the portable data storage device . . . by communicating with the remote trusted server," and "provide[s] the portable data storage device an encrypted first [] media content and a corresponding access key." *Id.* at 22:49-60. In example embodiments, the data storage device and a server establish a secure session to communicate with one another. *Id.* at 12:48-13:67, 18:56-20:7; *see also id.* at Figs. 7, 7C. After establishing the secure channel, the data storage device and server then exchange keys with one another via the secure channel, including a "content key 700" that the server obtains from a "key server 200" (*id.* at 14:1-15:5, 20:8-64), and the server "provides encrypted content 704 to the storage device 112" (*id.* at 20:15:6-13, 20:65-67). *See also id.* at Figs. 7 and 7C.

Independent Claim 1 of the '400 Patent recites:

> 1. A ***kiosk*** for provisioning secure media content to a plurality of portable data storage devices, the ***kiosk*** comprising:
>
>> a first data interface configured to communicate with a ***portable data storage device***;
>>
>> a second data interface configured to communicate, over a network, with a remote trusted server; and
>>
>> a processor configured to:
>>
>>> obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

3

1

2

***authenticate the portable data storage device, using at least the unique identifier***, by communicating with the remote trusted server over the second data interface; and

3

4

in response to the authentication, ***provide to the portable data storage device*** an encrypted first media content and ***a corresponding access key.***

5

*Id.* at 22:43-60 (emphasis added to emphasize disputed terms).

6

### B.   The '667 Patent

7

8

9

10

11

12

13

14

The '667 Patent is directed to a media streaming system having a "network attached storage (NAS) device operating on a local area network (LAN)," which acts as a buffer for streaming media (*e.g.*, media obtained from a stream provider via the Internet), to another device (*e.g.*, a smart television) on the local network. Ex. B ("'667 Patent") at 10:63-11:4, Fig. 3. The media is stored in a "secure region" of the NAS device, and "access to the secure region is controlled by the media streaming system." *Id.* at 11:1-5. As the '667 Patent explains, the system allows for "control over content while ensuring that content can be viewed without deterioration due to throttling through the use of a [NAS] device having a secure portion for buffering streaming content." *Id.* at 2:29-37.

15

Independent Claim 1 of the '667 Patent recites:

16

1. A media streaming system comprising:

17

18

a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and

19

one or more hardware processors configured to:

20

21

22

***receive an indication of the NAS device having a secure region*** comprising a buffer for streaming media on a separate display device on the local area network, wherein ***access to the secure region is controlled by the media streaming system***;

22

23

transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and

24

transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.

25

*Id.* at 22:43-60 (emphasis added to emphasize disputed terms).

26

27

28

4

## IV.    DISPUTED CLAIM TERMS OF THE '400 PATENT

### A.    "kiosk"

| Terms | "kiosk" |
|---|---|
| Claims | '400 Patent, Claims 1, 2, 6, 8-10, 13, 17 |
| Plaintiffs' Proposed Construction | Non-limiting preamble, in the alternative, plain and ordinary meaning. |
| Defendant's Proposed Construction | "a device whose user interface is used by consumers" |

This term involves two disputes: (1) whether the claim preamble—the only place where the term "kiosk" appears—is limiting, and (2) whether a "kiosk" as used in the '400 Patent requires a "user interface . . . used by consumers."  Regarding the first dispute, the body of the claim sets forth a structurally complete invention (a fact Viasat's expert does not dispute), and Viasat cannot overcome the presumption that the preamble is not limiting.  Regarding the second dispute, Viasat commits two errors—importing a limitation into an independent claim that is already required by a dependent claim and transforming what are explicitly described as optional features of disclosed embodiments, like a "user interface," into claim requirements.  Viasat also improperly adds a requirement—that the user interface is "used by consumers"—which is found nowhere in the intrinsic record.  "Kiosk" does not require construction, both because it appears only in the non-limiting preamble, and because it will be understood by the jury in light of the specification, which states that a kiosk may be "any device used to access and distribute content provided by the system."  '400 Patent at 6:36–37.

***The preamble is not limiting.***  Here, the preamble—"[a] kiosk for provisioning secure media content to a plurality of portable data storage devices" ('400 Patent, cl.1)— is not limiting because the body of claim 1 [1] (reproduced above) "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." [2]  *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1354 (Fed. Cir. 2020) (citation omitted).  Although there

---

[1] The other independent claim, claim 9, is substantively similar.

[2] Notably, Viasat's expert, Dr. Almeroth, did not offer "any opinion one way or the other" about whether a preamble is generally not limiting when the claim's body recites a structurally complete invention. Ex. C ("Almeroth Tr.") at 27:5–12.

Gibson, Dunn &
Crutcher LLP

are some situations "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, [and] then the preamble may act as a necessary component of the claimed invention," that is not the case here. *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Claim 1's preamble is not necessary to understand any term in the claim's body, nor does it provide antecedent basis for any term. And Viasat's expert did not opine otherwise. Ex. C ("Almeroth Tr.") at 36:19–37:9. Indeed, the claim body does not reference a "kiosk" at all, and it recites "media content" and "portable data storage device" without reference to or reliance on those terms as they appear in the preamble.

Viasat's expert argues that the preamble is limiting based on prosecution history—not the prosecution history of the '400 Patent, but rather of its parent, U.S. Patent No. 8,914,634 (the "'634 Patent"). Ex. D ("Almeroth Decl."), ¶¶ 47–51. As Dr. Almeroth notes, during that prosecution, the applicant cancelled the pending claims and submitted new claims in response to an Office Action rejecting the previously pending claims in view of a prior art reference called Bauchot. *Id.*; *see also* Ex. E (6/6/2014 Reply to Non-Final Office Action). The applicant distinguished the new claims over Bauchot on multiple grounds, including that "Bauchot fails to even mention use of a kiosk." Ex. E at 6–7. From that single sentence from the prosecution of the '634 Patent, Viasat's expert argues that a "kiosk" is a required limitation of the '400 Patent claims. *See* Almeroth Decl. ¶¶ 47–51. But whether a preamble is limiting depends on the specific claims at issue. *Bell Communications v. Vitalink Communications*, 55 F.3d 615, 621 (Fed. Cir. 1995) ("[O]ne cannot determine a preamble's effect except by reference to the specific claim of which it is a component."); *see also* Almeroth Tr. 28:2–17 ("[T]o determine whether or not the preamble is limiting or not, I – I would say you would have to look at the claims."). This statement—from the prosecution of different claims of a different patent—fails to provide a "clear and unmistakable" indication that the patentee was surrendering claim scope sufficient to overcome the presumption that the preamble is non-limiting. *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378–79 (Fed. Cir. 2005) (prosecution disclaimer must be "clear and unmistakable").

**Viasat's "user interface . . . used by consumers" requirement is contradicted by the claims and specification.** Viasat's construction also improperly imports a limitation into the independent

claims that is only required by the dependent claims, *and* it improperly reads certain embodiments into the claims, while excluding other embodiments.

The term "user interface" does not appear anywhere in the independent claims, and no element of the independent claims requires that a "kiosk" have a user interface.  Unlike the independent claims, dependent claims 3 and 11 first introduce "a user interface" as a new, additional requirement.  '400 Patent, cl. 3 ("The kiosk of claim 2, *further comprising a user interface* . . .."); *id.* cl. 11 ("The method of claim 10, *further comprising*: receiving, on *a user interface* . . ..").[3]  Under the doctrine of claim differentiation, the requirement of "a user interface" in the dependent claims creates the presumption that "a user interface" *is not* required in the independent claims.[4]  *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").  Moreover, the dependent claims confirm this optionality by referring to the "kiosk" as including "*a* user interface" as opposed to "*the* user interface."  *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (use of definite articles "the" or "said" in a claim refer back to terms previously introduced with "a" or "an").  Viasat can point to nothing in the intrinsic record to overcome that presumption.

In fact, the specification confirms that Viasat is violating another canon of claim construction by reading certain embodiments into the claims, while excluding others.  The term "user interface" appears only once in the specification, as an optional feature in certain embodiments, not all.  '400 Patent at 6:41–43 ("The kiosk 106 *may* comprise various user interface equipment, such as a keyboard, display, etc. to allow use of the kiosk 106'.") (emphasis added).  The specification makes clear that a "user interface" is not a required feature of the "kiosk."  *Id.* at 6:36–37 (a kiosk "may be *any* device used to access and distribute content provided by the system.").  Further, the specification never describes a user interacting with a user interface on a kiosk as necessary to perform the claimed invention.  *See id.* at 6:44–7:13, 8:29–10:15, 18:44–20:67, Figs. 4, 7C; *see also* Almeroth Tr. at 82:2–84:23 (admitting that these descriptions do not mention a user interface).  Thus, the patentee clearly

---

[3] Emphases added throughout unless otherwise noted.

[4] Viasat's expert admitted that he did not consider these dependent claims or claim differentiation in his analysis of "kiosk."  Almeroth Decl. ¶¶ 45–58; Almeroth Tr. at 20:19–21:25, 68:22–78:22.

Gibson, Dunn &
Crutcher LLP

did not intend that a "kiosk" must have a "user interface." *Morpho Detection, Inc. v. Smiths Detection Inc.*, 2012 WL 5194076, at *7 (E.D. Va. Oct. 19, 2012) ("Use of the permissive word[] 'may' . . . clearly suggest[s] . . . that the patentee did *not* limit the claimed invention, *in all embodiments* . . . .") (*citing Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003)); *see also In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("As a matter of linguistic precision, optional elements do not narrow the claim because they can always be omitted.").

Not only does Viasat's proposal improperly import optional features from the specification, it also improperly includes limitations that the specification never mentions *at all*—i.e., that the "user interface" be "used by consumers," as opposed to some other type of user. The word "consumer" never appears in the claims or specification. Viasat's attempt to limit the claims to "consumer"-based implementations has no intrinsic support and should also be rejected.

Having no support in the intrinsic record, Viasat can only rely on extrinsic evidence—the expert testimony and dictionary definitions it cites (Dkt. 95, App'x 1 at 1). However, extrinsic evidence cannot be used to contradict the meaning imparted by the intrinsic record. *E.g.*, *Profectus Tech. v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" (quoting *Philips*, 415 F.3d at 1324)); *In re Johnston*, 435 F.3d at 1384 ("It is well established that dictionary definitions must give way to the meaning imparted by the specification."). The specification is clear that a "kiosk" may be "any device used to access and distribute content provided by the system." '400 Patent at 6:36–37. Because Viasat's proposal conflicts with the plain meaning of this term in light of the claims and specification, it should be rejected.

### B.    "portable data storage device"

| Terms | "portable data storage device" |
|---|---|
| Claims | '400 Patent, Claims 1, 9 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "a storage device that can be easily carried or moved about by its user" |

Gibson, Dunn &
Crutcher LLP

The term "portable data storage device" is clear, easy to understand, and requires no construction. Viasat's proposed claim construction improperly introduces indefiniteness and unnecessary confusion to a term that should be given its plain and ordinary meaning. First, the specification provides no special meaning for the term "portable," does not define it as Viasat proposes, and does not support Viasat's construction. Second, Viasat's proposal *deviates* from the plain meaning purportedly shown by its own extrinsic evidence. Viasat's dictionary defines "portable" as "capable of being carried or moved about"—there is no mention of "easily." Ex. F (Merriam-Webster, Online Dictionary, 2011, "Portable."). In fact, nothing in the intrinsic or extrinsic record supports a construction requiring that the portable data storage device be "*easily*" carried or moved about. Third, Viasat's construction creates ambiguity as to what any one person may consider "easy" to move, and is thus further improper. *See Tessenderlo Kerley, Inc. v. Or–Cal, Inc.*, 2012 WL 3276981, at *3 (N.D. Cal. Aug. 9, 2012) (rejecting defendants' construction because "[a] purpose of claim construction is to remove ambiguity. Here, construing the term [as proposed by defendants] would add ambiguity . . . ."). Finally, Viasat's construction reads out the word "data," such that the construction could, quite literally, be read on a cardboard box, which is clearly not a "portable data storage device." There is no reason to construe this easily understood term, and certainly not in the way Viasat has proposed. Viasat's construction should be rejected, and the term should have its plain and ordinary meaning.

## C. "authenticate the portable data storage device, using at least the unique identifier"

| Terms | "authenticate the portable data storage device, using at least the unique identifier" |
|---|---|
| Claims | '400 Patent, Claims 1, 9 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "confirming that the portable data storage device is trusted using at least the unique identifier" |

Viasat seeks to construe another term—"authenticate"—that is also clear on its face and will be understandable to a jury without further construction. Even worse, Viasat's proposal conflates two concepts—authentication (*i.e.*, to verify an entity's identity) and authorization (*i.e.*, to confirm that an entity is permitted to access specific content)—that both the intrinsic and extrinsic evidence confirm

9

Gibson, Dunn &
Crutcher LLP

1  are distinct, and it does so using terms that its own expert cannot define. Accordingly, this term does

2  not need construction, and Viasat's proposal should be rejected.

3  Viasat's expert opines that "a POSITA would understand that the term 'authenticat[e/ing]'

4  refers to a process by which one entity verifies the identity of another entity in order to confirm that

5  the entity is trusted/authorized prior to the exchange of secure communications or information between

6  the two entities." Almeroth Decl. ¶ 61; *see also id.* ¶ 65 ("[A]uthentication of an entity" involves

7  "confirmation that the entity is authorized/can be trusted. And as described above, confirming trust

8  requires not just identification of an entity but also verification of the entities' identity and

9  authorizations."). But contrary to Viasat's expert's view, the specification consistently and expressly

10 *distinguishes* between the concepts of "authenticate" and "authorize"/"confirm trust." For example:

11 • "In this embodiment, a trusted server that is ***authenticated and trusted*** by both storage
   devices brokers the transfer of content." '400 Patent, Abstract.

12 • "In this embodiment, the transfer of the content and the content metadata is brokered by a
13 trusted server that is ***authenticated and trusted*** by both sets of storage devices." *Id.* at 2:51–
   54.

14 • "In one embodiment, the entities of the DRM system employ public key certificates, i.e.,
   digital certificates for ***authentication*** of their identity ***and*** determine ***authorization*** for
15 various uses of their content." *Id.* at 3:38–41.

16 • "For example, the storage device may be an intelligent device that is configured to actively
   ***authenticate and establish a trust relation*** with a playback device or download server 104
17 based on a full two-way authentication." *Id.* at 7:50–54.

18 This distinction is carried into the claims. While independent claim 9 requires "authenticating" the

19 portable data storage device, dependent claim 15 (which depends from claim 9) further requires

20 "authorizing copying of the content . . . ," confirming that the patentee considered "authentication" and

21 "authorization" to be distinct concepts, using different terms for each. *See Board of Regents of the*

22 *Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms

23 are presumed to have different meanings.").

24 Viasat's extrinsic evidence—as well as an article by its own expert—confirms that

25 "authenticate" and "authorize" are distinct concepts. Consistent with the intrinsic use of these terms,

26 an article co-authored by Viasat's expert expressly distinguishes between "***authentication*** (identity

27 verification)" and "***authorization*** (access provided to user)." Ex. G (Almeroth, *Scalable Access*

28 *Control For Web Services*) at 1; *see also id.* at 3 ("Each network client and URL rewriter service is

issued an ***identity*** certificate, signed by an identity certificate authority (CA) known to all clients and servers.  Additionally, each client is issued a set of ***authority*** certificates by an administrative CA server.").  And other extrinsic evidence offered by Viasat confirms that "authentication" is simply the process of verifying an entity's identity.  *See* Ex. H (VIASAT_00013577) (defining "authentication" as "[t]he verification of the identity of a person or process"); Almeroth Decl. ¶ 62 ("The standard, ISO/IEC 9798 (2010), specifies an authentication model and general requirements and constraints for entity authentication mechanisms where '[t]he goal . . . is to establish whether the claimant of a certain identity is in fact who it claims to be.'") (citing VIASAT_00013400–17 at VIASAT_00013404).

Moreover, the use of the word "trusted" in Viasat's proposal muddies, rather than clarifies, the scope of the claims.  While the claims require a "remote trusted server," they do not require that the portable data storage device be "trusted."  Even Viasat's expert could not explain what "trusted" means in the context of the term at-issue, and he could not explain whether it had any relation to "authorization."  Almeroth Tr. at 111:10–112:4.  Claim construction proposals that further require additional construction, which even the proposing party's expert cannot define, are unhelpful to the jury and risk causing further confusion.  *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, No. 13-1480, 2014 WL 5698445, at *11 (C.D. Cal. Aug. 25, 2014) (rejecting "[u]nnecessary language" that "may inject ambiguity in the [c]ourt's construction or invite the trier of fact to interpret the court's construction, thus defeating the purpose of claim construction."); *see also James Davidson Enterprises, LLC v. Bolt Star, LLC*, 2023 WL 415103, at *4 (E.D. Cal. Jan. 25, 2023).  Accordingly, Viasat's proposal should be rejected.  The term should be given its plain and ordinary meaning.

### D.    "provide to the portable data storage device . . . a corresponding access key"

| Terms | "provide to the portable data storage device . . . a corresponding access key" |
|---|---|
| Claims | '400 Patent, Claims 1, 9 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "provide to the portable data storage device . . . a key for the portable data storage device to decrypt the first media content" |

Gibson, Dunn &
Crutcher LLP

Viasat's proposal for this term again seeks to improperly read certain embodiments into the claims, while simultaneously reading out other embodiments. The plain reading of the claims is sufficient, and accordingly it needs no construction.

The plain language of the claims simply requires that the access key (1) "correspond[]" to an encrypted first media content and (2) be provided to the portable data storage device "in response to the authentication" of said portable data storage device. '400 Patent, cl. 1. Viasat's proposal attempts to inject (at least) two requirements not found in the claims: (1) that the first media content be decrypted, and (2) that the (unclaimed) decryption be performed by the portable data storage device. But the claims do not recite a decryption function at all, let alone require that the portable data storage device itself (as opposed to some other component) decrypt the first media content. Indeed, such a requirement would read out disclosed embodiments. For example, the specification states that the portable data storage device may be connected to a separate playback device that can decrypt the media content. '400 Patent at 5:9–18, 9:24–30. There is no basis in the claims or specification to require decryption, let alone decryption by the portable data storage device.

Moreover, it appears that Viasat is attempting to narrow the claims even further than that. Viasat's expert opines that Viasat's proposal—"provid[ing] a key for the portable data storage device to decrypt the first media content"—actually means "providing a key specific to both the portable data storage device and the first media content." Almeroth Decl. ¶ 68. Nothing in the claims requires the access key to be "specific" to the portable data storage device, and the claims only require that the access key "correspond[]" to the first media content, not that the access key is "specific" to the first media content. Indeed, the specification states that "the content *may*"—not must—"be uniquely bound to specific devices, such as an intelligent storage device, based on the configuration of the access key." '400 Patent at 3:4–6. *Morpho Detection*, 2012 WL 5194076, at *7 (permissive language indicates an intent not to limit the claims).

Viasat's expert improperly relies on this permissive embodiment to argue that the access key must be "composed of two components: 'a binding key that is unique to the storage device on which the content is stored' and 'a content key that is unique to the content." Almeroth Decl. ¶ 69 (quoting '400 Patent at 3:4–13). He claims that "the only access key described in any embodiment, including

12

Gibson, Dunn & Crutcher LLP

the kiosk embodiments, is composed of those two components." *Id.* But "[e]mbodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's 'words or expressions of manifest exclusion or restriction.'" *Apple Inc. v. Wi-LAN Inc.,* 25 F.4th 960, 967 (Fed. Cir. 2022) (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014)). If the patentee intended to claim that the access key is composed of a "binding key" unique to the data storage device and a "content key" unique to the content, the patentee could have done so.

In fact, the patentee *did* do so, in the claims of the parent to the '400 Patent, U.S. Patent No. 8,914,634 ("'634 Patent"). The claims of the '634 Patent, unlike the '400 Patent, expressly require that the "access key" is generated based on a "binding key" that is "unique to the portable data storage device" and a "content key associated with the first media content." Ex. I ('634 Patent), cl. 1. Moreover, claim 2 of the '634 Patent expressly requires that the first media content be "decrypt[ed] . . . using the . . . access key." *Id.*, cl. 2. As Viasat's expert admitted, the "explicit requirements around how the access key is generated and how a binding key is obtained" are not present in the '400 Patent. Almeroth Tr. at 121:10–123:15. The patentee knew how to claim these concepts, and it did so in the '634 Patent. That it did not do so in the '400 Patent indicates that those limitations are not present. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) ("[W]e cannot endorse a construction analysis that does not identify 'a textual reference in the actual language of the claim with which to associate a proffered claim construction.'").

### E. "public environment"

| Terms | "public environment" |
|---|---|
| Claims | '400 Patent, Claims 8, 17 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "a location accessible by the general public" |

The term "public environment" is plain English, and easily understandable. Viasat's attempt to read in the words "accessible" and "general" to the term is unhelpful to the jury and unnecessarily introduces vagueness. *Tessenderlo*, 2012 WL 3276981, at *3. As such, the term should not be

Gibson, Dunn &
Crutcher LLP

construed. First, it is unclear what an "accessible" location means in the context of the claims. A location may only be accessible at certain times of the day. For example, stores and restaurants have operating hours, and are closed to non-employees beyond those time periods. Accessibility may also be conditional. Parts of the National Parks may be closed off due to winter conditions such as snow or rain. To the extent Viasat argues that such environments are not "public" at certain times or on certain conditions, there is no support in the specification for such temporal or conditional restraints.

Likewise, it is unclear how the "general" public is different than simply "public," and Viasat's unsupported modifier adds more confusion about the scope of this claim limitation. For example, a movie theater, while open to the "public," allows access only to patrons, and then can restrict access based on a patron's age. Thus, it is unclear whether Viasat would consider a movie theater to be accessible by the "general public." These examples illustrate how difficult it would be for a factfinder to reliably apply Viasat's proposed construction. Viasat's proposal does nothing more than add additional terms that need further construction, and it should be rejected. *Diamond Coating*, 2014 WL 5698445, at *11.

## V.    DISPUTED CLAIM TERMS OF THE '667 PATENT

### A.    "secure region"

| Terms | "secure region" |
|---|---|
| Claims | '667 Patent, Claims 1, 4-7, 11-16 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "a portion of an NAS device not freely accessible by users" |

No construction is needed for the jury to understand what it means to be "secure" in the context of the claims. In attempting to construe a readily understood term, Viasat's proposal violates basic principles of claim construction by excluding embodiments explicitly recited in the specification. In addition, Viasat's proposal imposes ambiguity on a claim term where none exists. The Court should reject Viasat's improper attempt to add "unnecessary verbiage" that is "likely to confuse the jury, and, thus, frustrate one of claim construction's chief purposes." *j2 Glob. Commc'ns, Inc. v. Vitelity Commc'ns, LLC*, No. 11-CV-07904-DDP, 2013 WL 5220173, at *6 (C.D. Cal. Sept. 13, 2013).

*Viasat's construction excludes embodiments.* The '667 Patent specification provides several examples of what constitutes a "secure region," several of which would be *excluded* by Viasat's improper construction. Viasat's construction would require the "secure region" be a region that is "not freely accessible by users." But the specification describes several embodiments of the "secure region," some of which involve user inaccessibility, and others which do not:

- In one example, the secure region is completely inaccessible to the user. '667 Patent at 3:23–25 ("For example, the secure region may be a *non-user accessible* area on a hard drive, SSD, or other data storage device.").

- In another example, the secure region may be accessible to the user only on certain conditions. *Id.* at 3:32–33 ("The secure region may be *inaccessible* by the user *without permission from the content provider*.").

- By contrast, in another example, the "secure region may [instead] be *hidden* from the user." *Id.* at 3:33–34; *see also id* at 7:50–51 ("The secure region of the NAS device may be, for example, *hidden* from the user.").

- In yet other examples, the secure region may be secured "using *encryption* that secures the streamed content to the secure region," (*id.* at 3:38–40, 7:52–57), or alternatively by physical means such as using "a Shingled Magnetic Record (SMR) zone" (*id.* at 5:31–40).

Viasat's proposal focuses on "user inaccessibility" to the exclusion of other disclosed embodiments. For this reason alone, Viasat's proposed construction should be rejected. *See, e.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *Decisioning. com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1309 (Fed. Cir. 2008) (rejecting proposed construction that would exclude "alternate embodiments").

That the proposed construction would exclude several embodiments of the "secure region" is confirmed by claim differentiation. Dependent claims 4 and 13—which depend from claims 1 and 11, respectively—are directed to the "*inaccessible*" embodiments. '667 Patent, cl. 4 ("[T]he secure region is *inaccessible* by a user of the NAS device without permission from the media streaming system."). Because independent claims 1 and 13 do not include this limiting language, they necessarily must have a broader scope because "an independent claim should not be construed as requiring a limitation added by a dependent claim." *DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 14-CV-05330-HSG, 2018 WL 6421870, at *3 (N.D. Cal. Dec. 6, 2018) (Gilliam, J.) (rejecting proposed construction of claim 1 that

1   required certain limitations which did not appear in claim 1 but were "written into dependent claims
2   that depend on claim 1").

3       ***Viasat's construction injects ambiguity.***   Viasat's proposal also needlessly injects ambiguity
4   into the claims.   Viasat's proposal—"not *freely* accessible by users"—is vague and ambiguous, and
5   entirely divorced from the specification and prosecution history.   In particular, the modifier "freely" is
6   a term of degree that could be interpreted in a number of ways, with no guidance from the intrinsic
7   record.  *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) ("When a 'word
8   of degree' is used, the court must determine whether the patent provides 'some standard for measuring
9   that degree.'").   At no point did the patentee describe the "secure region" as a region that is "not *freely*
10  accessible," despite extensive discussion of the "secure region."

11      Viasat's proposal imposes an ambiguous change on the scope of the claims.   The claim language
12  already requires that "access to the secure region is controlled by the media streaming system."  '667
13  Patent, cl. 1.   To the extent "freely accessible" simply means that access is "controlled," then Viasat's
14  proposal is confusingly redundant and unnecessary.   If "freely accessible" means something different,
15  then Viasat's proposal is both indefinite and unsupported by the intrinsic record.   For example, would
16  partial inaccessibility to a portion of the NAS device satisfy the "secure region" limitation, because
17  that portion is "not freely accessible"?   Would a portion of the NAS device that provides read-only
18  access satisfy the "secure region" limitation?   Viasat's proposed construction would obligate the jury
19  to guess at the meaning of the construed term.   For this additional reason, Viasat's proposal should be
20  rejected.  *See, e.g.*, *Intertrust Techs. Corp. v. Microsoft Corp.*, 275 F. Supp. 2d 1031, 1072 (N.D. Cal.
21  2003), *as amended* (July 7, 2003) (rejecting a construction that "adds nothing in the way of clarification
22  to the definition of the term and may in fact confuse the jury").

23
24
25
26
27
28

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 4:22-CV-04376-HSG

**B.   "receive an indication of the NAS device having a secure region"**

| Terms | "receive an indication of the NAS device having a secure region" |
|---|---|
| Claims | '667 Patent, Claims 1, 11 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "receive an indication of the presence of a secure region within the NAS device" |

Viasat's proposal improperly reads in an extra requirement that excludes disclosed embodiments—a clear violation of claim construction rules.  The claims are directed to a "media streaming system" comprising "a network interface adapter configured to transmit digital content . . . to a network attached storage (NAS) device," as well as one or more hardware processors configured to (among other things):

> receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system.

'667 Patent, cl. 1.  Viasat argues that the processor must receive an indication, not merely "of the NAS device," but also that the NAS device "ha[s] a secure region."  In other words, it is insufficient in Viasat's view that the NAS device has a secure region and that the processor receives an indication "of the NAS device"; the indication *itself* must convey to the processor "the presence of a secure region within the NAS device."  But this reading is contrary to the plain meaning of the claims as well as the specification.

**Viasat's construction is incompatible with the claims.**  Notably, Viasat seeks to construe only a portion of this limitation—"receive an indication of the NAS device having a secure region"—because Viasat's construction makes no sense when placed in context with the remainder of the limitation.  Instead of the indication being simply "of the NAS device"—where that NAS device has certain claimed characteristics, as the plain meaning provides—Viasat seeks to require that the indication explicitly include one (and only one) of those characteristics:  that it "ha[s] a secure region."  But the full limitation requires **(1)** that the NAS device "ha[s] a secure region," **(2)** that this secure region "compris[es] a buffer for streaming media," **(3)** that this media is streamed "on a separate display

Gibson, Dunn &
Crutcher LLP

device," **(4)** that the display device is "on the local area network," **and (5)** that "access to the secure region is controlled by the media streaming system."  There is no basis for Viasat's proposal to arbitrarily require that the "indication" in the claim include just *one* of these requirements—the "presence of a secure region"—and there is no support in the claims or specification for requiring that the "indication" include any—or all—of this additional information.  The claimed NAS device must have all these characteristics, to be sure.  But the "indication" need only be "of the NAS device," not all its characteristics.

  *Viasat's construction is incompatible with the specification.*  Because Viasat's proposal arbitrarily imposes requirements on the claims, it results in exclusion of claimed embodiments.  For instance, the '667 Patent describes an embodiment of "a computer assisted method of receiving, at an NAS device, receiving [*sic*] content from a remote content provider."  '667 Patent at 7:22–8:23, Fig. 6.  This example is performed by an NAS device "*having . . . a secure region*" that "negotiates with the remote content provider to receive instructions for receiving and storing content from the remote content provider."  *Id.* at 7:24–30.  Notably, "[s]uch negotiation may . . . be initiated by the remote content provider after it has been informed of *the presence of the NAS device*."  *Id.* at 7:32–34.  In this example, the content provider (*i.e.* the recipient of the "indication") is informed *only* of "the presence of the NAS device," and *not* that the NAS device "ha[s] a secure region."  *See id.*  This is confirmed in the very next sentence: "The remote content provider may, for example, *receive an indication of the NAS device* from a display device coupled to the NAS device, *and/or* may discover *the presence of an NAS having secure storage* in a different manner."  *Id.* at 7:34–38.  Just as written in the claims, the NAS device "ha[s] a secure region," but the "indication" is only "of the NAS device."  Viasat's proposal would exclude this embodiment and should be rejected.  *Decisioning.com*, 527 F.3d at 1309; *Liebel-Flarsheim*, 358 F.3d at 913.

Gibson, Dunn &
Crutcher LLP

### C. "access to the secure region is controlled by the media streaming system"… "control streaming access to the digital content stored on the buffer"

| Terms | "access to the secure region is controlled by the media streaming system"… "control streaming access to the digital content stored on the buffer" |
|---|---|
| Claims | '667 Patent, Claims 1, 11 |
| Plaintiffs' Proposed Construction | Plain and ordinary meaning |
| Defendant's Proposed Construction | "access to the secure region is managed by the media streaming system"/"manage streaming access to the digital content stored on the buffer" |

As it does with other terms, Viasat seeks to construe a term that has a readily understood meaning—in this case, "control"—and replace it with a term that will only serve to confuse the jury. Viasat's proposal seeks to replace the words "control"/"controlled"—which appear **50 times** in the '667 Patent—with the words "manage"/"managed"—which appear only **once**. There is no basis to overrule the patentee's word choice, especially to introduce a new, undefined term into the claims. *Bio-Rad Laboratories v. Int'l Trade Comm'n,* 998 F.3d 1320, 1331 (Fed. Circ. 2021) ("Inventors are masters of their claims, and the words they use to describe and claim their invention are decisive and binding.").

It is a core facet of the '667 Patent that "access to the secure region of the storage for the NAS device may be **controlled** based on instructions received from a remote content provider." '667 Patent at 3:25–27. The Background section of the specification explains that "[s]treaming content providers prefer to stream the content to the user in order to maintain **control** over the content." *Id.* at 1:34–38. The invention of the '667 Patent includes methods for allowing content providers to "maintain control over content." *Id.* at 2:29–31 ("Aspects presented herein provide a way to maintain smaller sizes of buffers on display device and **to maintain control over content** . . ."").

The specification describes a variety of ways in which this "control" may be maintained. In some embodiments, "[c]ontrol of the media may be maintained by the stream content provider through the security employed by the secure portion of the storage device, . . . e.g., by designating the media as private." *Id.* 2:46–50. In other embodiments, content provider "may maintain control of their content by providing smaller amounts at a time to the display device." *Id.* at 4:11–14. The content provider

Gibson, Dunn &
Crutcher LLP

may also control "the type of encryption used to store streaming content in the secure region" of the NAS device. *Id.* at 6:63–67.

The sole instance of the term "managed" in the specification refers to one specific embodiment in which "[t]he secure region of the NAS device may be ***managed***, e.g., between an NAS device application, DRM controls and the remote content provider." *Id.* at 5:61–63. To the extent Viasat contends that "manage" means something different than "control," then Viasat's proposal would improperly limit the claims to this single disclosed embodiment. *Decisioning.com*, 527 F.3d at 1309; *Liebel-Flarsheim*, 358 F.3d at 913. To the extent there is no difference in meaning between "manage" and "control," then Viasat's arbitrary attempt to replace the patentee's word choice should be rejected. Either way, there is no support for Viasat's construction.

## VI.    CONCLUSION

For the reasons stated above, the Court should reject Viasat's proposed constructions, and find that the terms of the asserted patents should have their plain and ordinary meaning.

DATED: April 25, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ L. Kieran Kieckhefer*
L. Kieran Kieckhefer
Robert A. Vincent
Lillian Mao
Ahmed ElDessouki

*Attorneys for Plaintiffs*