# EXHIBIT C

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   WESTERN DIGITAL TECHNOLOGIES,)
     INC., WESTERN DIGITAL IRELAND)
 5   LTD., SANDISK 3D IP HOLDINGS )
     LTD., SANDISK TECHNOLOGIES   )
 6   LLC, and SANDISK STORAGE     )
     MALAYSIA SDN. BHD.,          )
 7                                )
        Plaintiff,                )
 8                                ) Case No.
     v.                           ) 5:22-cv-4376
 9                                )
     VIASAT, INC.,                )
10                                )
        Defendant.                )
11
12
13
14
15
16    VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF:
17              EXPERT KEVIN C. ALMEROTH, PH.D.
18              MONDAY, APRIL 8, 2024
19              8:06 A.M. PACIFIC TIME
20
21
22
23
24
     Reported by:  PAULA A. PYBURN
25               CSR 7304, RPR, CLR
```

```
 1              MS. FELICE:  Objection.  Calls for a legal
 2    conclusion.
 3              THE WITNESS:  I don't recall that I've
 4    offered an opinion with respect to lexicography in
 5    the context of this declaration.  So, again, as to
 6    what the legal requirements are, I don't have an
 7    answer for you.
 8    BY MR. VINCENT:
 9        Q    Okay.  Understood.
10              Do you have any understanding about the --
11    whether or not permissive language used in the
12    specification can be limiting on a particular claim
13    term?
14              MS. FELICE:  Same objection.
15              THE WITNESS:  I think that would get into
16    legal interpretation as well, and I don't have an
17    answer for the legal requirements.
18    BY MR. VINCENT:
19        Q    Okay.  So can you tell me one way or the
20    other whether or not, when a specification
21    articulates that a feature, you know, may be part of
22    the invention, whether that permissive language,
23    like "may" or "can," is limiting on the claims?
24              MS. FELICE:  Objection.  Calls for
25    speculation and a legal conclusion.
```

```
                                                Page 20
```

1            THE WITNESS:  In a general sense, it would

2    potentially depend on the context.  If there's some

3    technical aspect that I think is relevant and that I

4    can offer opinions about, I might.  As to the legal

5    requirements in the more general sense, I don't have

6    an answer for you.

7    BY MR. VINCENT:

8        Q    Okay.  Anything else that you can tell me

9    about what -- in your -- based on your

10   understanding, what the import of permissive

11   language in the specification is on the requirements

12   of the claims?

13           MS. FELICE:  Objection.  Vague.  Calls for

14   speculation and a legal conclusion.

15           THE WITNESS:  The best I can say is, the

16   extent to which I've offered any opinions, they'd be

17   in the declaration.

18   BY MR. VINCENT:

19       Q    Okay.  You begin your -- on paragraph 31,

20   you talk about the two types of claims, independent

21   claims and dependent claims.

22           You see that?

23       A    I do.

24       Q    Have you heard of a principle called claim

25   differentiation?

Page 21

1      A    Yes.

2      Q    What's your understanding of that?

3      A    I don't know that I can give you a good

4    description off the top of my head.  Let's see.  I

5    don't recall it being addressed in the declaration.

6    I don't know that I could give you a good synopsis

7    off the top of my head.

8      Q    Okay.  So it's fair to say you didn't offer

9    any opinions in your declaration regarding claim

10    differentiation to the extent it was relevant at all

11    to your opinions?

12          MS. FELICE:  Objection.  Misstates prior

13    testimony.

14          THE WITNESS:  I don't -- I don't have the

15    declaration memorized, and whether or not there's

16    portion of the declaration that would fall within

17    that characterization, it's hard for me to say.  I

18    mean, I think the declaration speaks for itself as

19    to what the opinions I'm offering are.

20    BY MR. VINCENT:

21      Q    Okay.  Sitting here today, do you recall

22    giving any opinions about claim differentiation as

23    part of your opinions in this case?

24      A    I don't recall sitting here now.  I defer

25    to what the declaration says.

Page 22

1      Q    Okay.  When is the last time you reviewed

2    your declaration before today?

3      A    Yesterday.

4      Q    Okay.  And you don't recall seeing anything

5    then when you reviewed it?

6           MS. FELICE:  Objection.  Asked and

7    answered.

8           THE WITNESS:  I don't recall.  I don't have

9    the declaration memorized.

10   BY MR. VINCENT:

11     Q    Okay.  So you see on paragraph 31, where

12   you're talking about the differences between

13   independent and dependent claims?  You see the last

14   sentence in that paragraph states (as read):

15              I understand that a dependent

16           claim includes all the limitations

17           that it recites in addition to all

18           of the limitations recited in the

19           claim or claims from which it

20           depends.

21           Did that I read that correctly?

22     A    I believe so.

23     Q    So is it fair to say -- again, based on

24   your understanding -- that a dependent claim

25   includes all the elements of the parent claim, the

```
                                            Page 26
 1    statement for -- to constitute disclaimer would have

 2    to be both clear and unmistakable?

 3              MS. FELICE:  Objection.  Calls for

 4    speculation.  Asked and answered.

 5              THE WITNESS:  I have heard those words used

 6    before, but ultimately what's required I think

 7    becomes a legal question.

 8    BY MR. VINCENT:

 9         Q    And you did not, I guess, apply any such

10    standard in your analysis, at least in your

11    declaration?

12              MS. FELICE:  Objection.  Misstates prior

13    testimony.

14              THE WITNESS:  I don't recall offering any

15    legal conclusions around disclaimer.  As I've

16    testified, I believe there might be portions of my

17    declaration that would support an argument.  But I

18    don't think I've ultimately reached the legal

19    conclusion.

20    BY MR. VINCENT:

21         Q    Okay.  If you look at page 13 of your

22    declaration, you've got a couple of paragraphs, 37,

23    38, that talk about preambles?

24         A    Yes.

25         Q    Is that -- the understanding that's listed
```

Page 27

1    there, that's described there, is that the

2    understanding you applied in your analysis in this

3    case?

4        A    It is.

5        Q    Would you agree that a preamble generally

6    is not limiting when the body of the claim describes

7    a structurally complete invention?

8            MS. FELICE:  Objection.  Calls for a legal

9    conclusion.

10           THE WITNESS:  That seems to get into a

11   legal question.  I don't have an opinion one way or

12   another on that one.

13   BY MR. VINCENT:

14       Q    Okay.  Do you have an opinion one way or

15   the other about whether in general a preamble limits

16   the invention if it recites essential structures or

17   steps?

18           MS. FELICE:  Same objection.

19           THE WITNESS:  From a general sense, I think

20   that gets into a legal question.  Specifically, the

21   analysis I did with respect to the preamble

22   involving the kiosk term I think is set forth in the

23   declaration.  That's -- that's about as specific of

24   the analysis as I got.

25   ///

Page 28

```
 1   BY MR. VINCENT:
 2       Q    Okay.  Would you agree that whether or not
 3   a preamble is limiting depends on the particular
 4   claims at issue?
 5            MS. FELICE:  Objection.  Vague.  Calls for
 6   a legal conclusion.
 7            THE WITNESS:  If -- if what you're asking
 8   is you have to look at the claims to determine
 9   whether or not the preamble is limiting or not, I --
10   I would say you would have to look at the claims.
11   BY MR. VINCENT:
12       Q    Okay.  The specific claim -- claims at
13   issue?
14       A    It seems logical that, if you're going to
15   look at a claim and assess whether or not the
16   preamble is limiting, you would have to look at the
17   claim.
18       Q    And I believe all of your opinions are
19   directed to the '400 patent?
20       A    Yes, with -- there's -- there's probably
21   one exception.  I think the level of ordinary skill
22   in the art mentions that it's for each of the
23   asserted patents.
24       Q    Okay.  Thank you for that clarification.
25            Other than that, you are not providing any
```

1     opinions about the meaning of any terms in any other

2     patents besides the '400 patent; is that fair?

3         A    I think that's fair.

4         Q    If you turn to paragraph -- I guess page 15

5     of your declaration, there's a table with the terms

6     for which you've provided opinions.

7         A    Yes.

8         Q    And this table sets forth the parties' kind

9     of competing constructions of these terms?

10        A    I think that's right.

11        Q    Do you recall when you were first consulted

12    about -- on the meaning of these terms?

13            MS. FELICE:  Objection.  Vague.

14            THE WITNESS:  My recollection is it was

15    fairly early in the process, around the time the

16    terms were being identified for potential

17    construction.

18    BY MR. VINCENT:

19        Q    Okay.  Do you -- was it Defendants that

20    came up with this construction, or did you come up

21    with the construction yourself?

22        A    I don't specifically recall.  I think there

23    was discussion with the attorneys at Quinn Emanuel.

24    I don't know if it's Choice 1 or Choice 2 that you

25    identified, that it was either one of those.  It was

```
                                              Page 35
 1              structure and a condition that

 2              defines the system?

 3              Do you see that?

 4      A      Yes.

 5      Q      Anything else besides what you've just

 6   discussed as the basis for that -- let me strike

 7   that.

 8              What do you mean by "structure" in that

 9   sentence?

10      A      Essentially just what that means.  Gives

11   structure in a condition that defines the system,

12   helps a person of skill in the art understand what

13   the claim is describing.

14              Its role in -- in each of the claims with

15   respect to either what steps of the method are being

16   performed or, in the context of claim 1, describing

17   aspects of functions or capabilities that the kiosk

18   would have.

19      Q      Yeah.  You see, if you flip back to

20   page 15, you've got claim 1 listed there?

21      A      Yes.

22      Q      And it begins (as read):

23              A kiosk for provisioning secure

24              media content to a plurality of

25              portable storage data devices.
```

Page 36

1          Do you see that?

2      A      I do.

3      Q      Is -- is it your opinion that that's not

4    identifying the intended purpose of the elements of

5    claim 1?

6              MS. FELICE:  Objection.  Vague.

7              THE WITNESS:  There is the discussion that

8    begins with the prepositional phrase "for

9    provisioning secure media content," and then it goes

10   on from there.

11             The concept of a kiosk though, as, say,

12   distinctive over a client system, I think is

13   something that's -- that's different and would have

14   a -- a particular meaning to a person of skill in

15   the art in the context of both -- for claim 1, what

16   the functionality of the claim is, and then how

17   "kiosk" is described in the specification.

18   BY MR. VINCENT:

19     Q      You don't provide any opinions that any

20   term in the body of the claims relies on the

21   preamble for antecedent basis; correct?

22             MS. FELICE:  Objection.  Vague and calls

23   for a legal conclusion.

24             THE WITNESS:  I don't recall offering that

25   opinion in the declaration.  I don't think there's

Page 37

1   one there, but I stand by the opinions that are in

2   the declaration.

3   BY MR. VINCENT:

4       Q    Do you have an opinion one way or the other

5   about whether or not one of ordinary skill would

6   understand the limitations of the body of the

7   claims, claims 1 and 9, without the preamble?

8       A    I don't know that I offered that specific

9   opinion.  I think, again, I'm not sure of the scope

10  of that characterization; so it's hard for me to

11  apply it to the declaration.

12          Ultimately, I think, in the context of what

13  those limitations are, a person of skill in the art

14  would understand the particular aspect of those

15  limitations in the context of a kiosk as it's

16  described in the specification and differentiated

17  over just a client system that's described there.

18      Q    Okay.  If you'll turn to page 16 of your

19  declaration, you start your analysis here with a

20  discussion of the prosecution history of the '634

21  patent; is that right?

22      A    I do.

23      Q    What's the '634 patent?

24      A    It's the parent application of the '400

25  patent.

Page 38

1      Q    And you say during prosecution that the
2  applicant canceled the pending claims of the '634
3  patent and then submitted new claims that included
4  the term "kiosk."
5           Is that fair, based on your understanding?
6           MS. FELICE:  Objection.  Document speaks
7  for itself.
8           Go ahead, Dr. Almeroth.  Sorry about that.
9           THE WITNESS:  I'm good.
10           I think that's generally what the
11  declaration says; that's my general recollection of
12  at least part of the process in the prosecution of
13  the '634 patent.
14  BY MR. VINCENT:
15      Q    Do you know one way or the other about
16  whether the applicant in the '634 patent prosecution
17  amended any claims to add the term "kiosk"?
18           MS. FELICE:  Objection.  Vague.
19           THE WITNESS:  I'm not sure how that
20  characterization differs from what happened; so I --
21  I think whether you draw a distinction between
22  amending or cancelling and including claims that
23  were -- had similar language but used additional
24  words, I guess you can characterize it however you
25  like.  The record speaks for itself what was done;

Page 67

1    I think about it -- I understand it's not quite the

2    question you've asked, but, in my mind, in thinking

3    about how to answer that question, I think about the

4    mirror, which is, is there a way that you could

5    implement a system where you didn't need a user

6    interface.  And so -- because really some of those

7    steps or those capabilities are tied to having a

8    user interface.

9              So, as to which limitations there are -- I

10   mean, the whole point of being able to exchange

11   media content between devices is described as being

12   based on what users are attempting to do.

13       Q    Are you finished with your answer?

14       A    I am.  And so I might have lost track of

15   your question.

16       Q    That's okay.

17            In your declaration you say that the

18   specification distinguishes between what's called a

19   kiosk versus just a client device.

20            Is that correct?

21       A    I think it's client system 106, and the

22   kiosk is 106'.

23       Q    Okay.  So, if the claims of the '400

24   patent, claims 1 and 9, if, instead of reading "a

25   kiosk" they read "a client system" -- so, instead of

Page 68

```
1    "a kiosk provisioning secure media content," the

2    kiosk comprising it would be a client system.

3            Would any of those elements of the body

4    require user interface?

5            MS. FELICE:  Objection.  Calls for

6    speculation.  Incomplete hypothetical.

7            THE WITNESS:  I would have to give that

8    some thought.  I mean, whether or not you could

9    implement a system of the claims where it had a

10   client system where you could meet all the

11   requirements of a claim and not have a user

12   interface, I'd have to give some thought to -- to

13   that.  That goes more to applying the claims than it

14   does about understanding what terms mean.

15   BY MR. VINCENT:

16        Q    Okay.  Is that your complete answer?

17        A    Yes.

18        Q    If you'll look at the '400 patent --

19        A    Okay.

20        Q    -- and the claims of the '400 patent.

21        A    Okay.

22        Q    And we've talked about the independent

23   claims, which are cited in your declaration or

24   copied/pasted in your declaration.

25            So I'm looking specifically, there's
```

Page 69

1    dependent claims.  Dependent claim 2 you see depends

2    from claim 1?

3          A    I see that.

4          Q    So dependent claim 2 reads (as read):

5                    The kiosk of claim 1, further

6                    comprising a local data storage

7                    storing a plurality of encrypted

8                    media content.

9                    Do you see that?

10         A    I do.

11         Q    So, again, based on your understanding of

12   independent and dependent claims, would you agree

13   that claim 2 includes all of the limitations of

14   claim 1?

15         A    It does.

16         Q    And, in addition to those limitations, the

17   "further compromising" language indicates additional

18   limitations that are not present in claim 1.

19                Is that fair?

20                MS. FELICE:  Objection.  Calls for a legal

21   conclusion.

22                THE WITNESS:  I understand in dependent

23   claims there's supposed to be an additional claim

24   limitation, an additional requirement that

25   potentially narrows the scope of the claims.

1          Beyond that kind of general understanding,

2     I don't have a specific legal analysis to offer.

3     BY MR. VINCENT:

4          Q    Okay.  You'll see claim -- dependent

5     claim 3 depends from claim 2?  Do you see that?

6          A    I do.

7          Q    So where it says "the kiosk of claim 2,"

8     that means that claim 3 includes all of the elements

9     of claim 1 and claim 2; is that correct?

10          A    It does.

11          Q    And then claim 3 states (as read):

12               Further comprising a user

13               interface for receiving a selection

14               of the first media content from the

15               local data storage.

16               Do you see that?

17          A    I do.

18          Q    So you can correct me if I'm wrong, but

19     this is the -- claim 3 is the first time that the

20     term "user interface" appears in the claims; is that

21     fair?

22          A    As those two words specifically, I think

23     that's right.  I think obviously whether it's there

24     by requirement in "kiosk," you would disagree.

25          Q    And I'm just asking about your opinions

1    that you've rendered in your declaration.

2         You don't provide any opinions about

3    claim 3 and the presence of claim 3 of the term

4    "user interface" as it -- as it relates to the

5    understanding of the term "kiosk"; is that correct?

6        A    I -- I don't recall.  I don't have the

7    declaration memorized.

8        Q    Okay.  If you can -- if you had any, you

9    can feel free to point that -- to point it out to

10   me.

11       A    I mean, I can take a look.  It's hard for

12   me to say -- maybe there's something there that

13   would -- would fall within that characterization.  I

14   don't see the word "dependent" come up in the body

15   of the declaration in a -- in a particular way.

16        But it's hard for me to say there isn't

17   some portion that would be relevant, some portion of

18   the declaration that would be relevant.

19       Q    Okay.  If you could -- if you can -- I

20   guess sitting here today you're not able to point to

21   anything specific; is that fair?

22       A    I don't have -- I don't have enough recall

23   of the declaration to be able to point you to

24   something specific.  Maybe there's something there

25   that I don't remember.

```
                                           Page 72
```

1       Q    Okay.  Well, you have the declaration

2    there; so, if you'd like to just skim through

3    your -- your analysis of "kiosk," you're welcome to.

4       A    I'm fine with --

5            (Simultaneous speakers.)

6    BY MR. VINCENT:

7       Q    -- anything there, but if there's something

8    there that you need to talk about, I'd be happy to

9    understand it.

10      A    I'm fine with the declaration as it -- as

11   it stands.  I mean, looking at claim 3, I understand

12   it requires specific feature of a user interface,

13   not just a user interface in general.

14      Q    My asking -- my question is your

15   declaration does not discuss claim 3 and its use of

16   the term "user interface" in terms of what the term

17   "kiosk" means; correct?

18      A    I understand that's where we started, and I

19   explained that I think the declaration speaks for

20   itself.  And whether portions of it would bear on

21   that characterization, it would be hard for me to

22   point you TO something specific --

23      Q    Okay.  Thank you.

24      A    -- given -- given the nature of the

25   question.

```
                                                    Page 73
 1        Q     You say in paragraph 54 -- you say (as
 2    read):
 3              For example, the '400 patent
 4          describes a kiosk as being a, quote,
 5          device used to access and distribute
 6          content provided by the system 100,
 7          end quote.
 8          Do you see that?
 9        A     I do.
10        Q     And you quote column 6, lines 36 to 37, of
11    the '400 patent.
12        A     Yes.
13        Q     Could you turn to that section of the '400
14    patent.
15        A     Okay.  I'm there.
16        Q     There's a part of that quote that's omitted
17    in your declaration.  It's different from that
18    sentence.  It says -- hold on.
19              In fact, it says (as read):
20              The kiosk 106 may be any device
21          used to access and distribute
22          content provided by the system 100.
23          Do you see that?
24        A     I do.
25        Q     Would you -- would you agree with that
```

Page 74

1    statement from the specification?

2        A    I would, with the understanding that the

3    "may be any device" is talking about the variety of

4    different configurations of what the device would

5    look like, but ultimately, whatever configuration of

6    that device, it would have to be used to access and

7    distribute content provided by the system 100.

8        Q    Understood.  You see in that -- later on in

9    that same paragraph -- sorry.

10            In your declaration quoting that same

11   paragraph, you say (as read):

12               The patent further states that

13            the kiosk, quote, may be implemented

14            as a self-service computer terminal

15            and may comprise various user

16            interface equipment, such as a

17            keyboard, display, et cetera, to

18            allow use of the kiosk 106.

19            Do you see that?

20       A    I do see that.

21       Q    So the first of those statements, "The --

22   the patent states that the kiosk may be implemented

23   as a self-service computer terminal" --

24       A    I see that.

25       Q    -- you'd agree that that sentence, along

```
 1   with the next sentence that says, "The kiosk may
 2   compromise various user interface equipment," both
 3   of those sentences use the term "may"; correct?
 4        A    They do.  So they're describing different
 5   ways in which the functionality of the kiosk can be
 6   implemented.
 7        Q    Correct.  So, in your view, however, the
 8   kiosk of the asserted claims must have a user
 9   interface; correct?
10        A    It is something with a user interface.
11             (Reporter interruption for clarification.)
12             THE WITNESS:  It is something that does
13   have a user interface.
14   BY MR. VINCENT:
15        Q    Okay.  So, despite the specification's use
16   of "may," you are using -- you are saying that a
17   user interface is a requirement of the understanding
18   of what a kiosk is?
19        A    Well, take that last sentence.  It says,
20   "The kiosk may comprise various user interface
21   equipment, such as keyboard, display, et cetera, to
22   allow use of the kiosk."
23             So you can have different -- you may have
24   the inclusion of different kinds of user interface
25   equipment to be able to use the kiosk.
```

1          So, I mean, the specification describes a

2     user and, ultimately, specifically a consumer as

3     something where you can use the device.

4          The "may" there is modifying the different

5     kinds of equipment that can be present in order to

6     facilitate that kind of use.

7          I would be careful to take all of these

8     statements that say "may" and ignore them because

9     they are being interpreted as open-ended with no

10    implication as to what a kiosk needs to be as that

11    term is used in the claims.

12         Q    Okay.

13         A    And that's -- again, I think that's --

14    that's all from the perspective of how a person of

15    skill in the art would understand what a kiosk is

16    reading this portion of the specification.

17         Q    Okay.  You argue -- at least you opine in

18    paragraph 55 that (as read):

19              The kiosk 106 is different than

20              the client system 106.

21              Correct?

22         A    That the kiosk 106' --

23         Q    106'.

24         A    -- is distinguished from the client system

25    106.

```
                                                Page 77
 1      Q      Understood.
 2             If you'll turn to column 4, around --
 3      beginning line 18.
 4      A      Okay.
 5      Q      This paragraph is discussing client system
 6      106.
 7             Do you see that?
 8      A      Yes.
 9      Q      And so this is the client system 106 that
10      in your view is distinguished from the kiosk 106';
11      right?
12      A      I think that's the perspective a person of
13      skill in the art would have when the kiosk is being
14      described as 106'.  So it's -- you would have the
15      requirements of a client system, but then also
16      different from a client system.
17      Q      Okay.  You see at the bottom of that
18      paragraph, around line 33, 34, it says (as read):
19                  The client system 106 is further
20                  described with reference to
21                  Figure 4?
22      A      Yes.
23      Q      If you'll turn to the description of
24      Figure 4 in the patent, and that begins, I believe,
25      at column 8, line 29.
```

Page 78

```
 1       A    Okay.  I'm at column 8, line 29.
 2       Q    So feel free to look.  So I see Figure 4's
 3   description begins column 8, line 29, goes on all
 4   the way to column 10, line 15, before the
 5   description of Figure 5 begins?
 6       A    Okay.
 7       Q    Do you see anywhere in that description of
 8   Figure 4 where it uses the term "kiosk"?
 9       A    Let's see.  Sorry, when -- when were you
10   cutting off?
11       Q    I was cutting off at column 10, line 15,
12   because that's when the discussion of Figure 5
13   begins.
14       A    I don't specifically see the mention of
15   "kiosk."  I might have missed it.  I think the
16   patent speaks for it itself, whether it uses the
17   term "kiosk" or 106' in that instance.
18       Q    Well -- okay.  So at least what I see is
19   that every time the -- you know, the indicator 106
20   is used, it's used with "client system 106."
21            Do you see any reason to disagree with
22   that?
23       A    I don't, but I think the document speaks
24   for itself.
25       Q    Okay.  So, based on what we just read back
```

1    on column 4, where it says, "The client system 106

2    is further described with reference to Figure 4,"

3    would you agree that the description in Figure 4 in

4    columns 8 through 10 describes that client system

5    106?

6              MS. FELICE:  Objection.  Vague.

7              THE WITNESS:  I think that's an incomplete

8    characterization.

9    BY MR. VINCENT:

10        Q    Okay.  How would you complete it?

11        A    So there's the description of a client

12    system 106, as you've described, but then it also

13    talks about 106' being the kiosk.  In part, I think

14    we've talked about column 6, line 36.  So it's --

15    it's something that's different than a client system

16    but would have overlapping functionality with a

17    client system.

18              So, I mean, that's in part what it would --

19    the prime in the use of 106 would convey to a person

20    of skill in the art.  It's not the same thing as a

21    client system.  It might do many of the functions of

22    a client system, but would be distinctive over what

23    a client system would be.

24              And so part of the exercise here is to look

25    at the specification, the extrinsic record,

1    of Figure 4, again beginning on column 8, line 29,

2    where it talks about an exemplary client system, how

3    in your understanding is -- is the description here,

4    beginning on, again, column 8, line 29, to column

5    10, line 15, how does that relate to a kiosk?

6            MS. FELICE:  Objection.  Asked and

7    answered.

8            THE WITNESS:  It relates to a kiosk because

9    a kiosk is an example of a client system with

10   additional requirements.

11           So, from the perspective of the

12   specification, the kiosk would be an example of

13   something more specific than a client system that

14   would perform the functions of the client system.

15           So, when it goes through and describes the

16   client system, obviously there's various

17   embodiments, and then ultimately you have to look at

18   the claims with respect to what's required of the

19   client system.

20           But a person of skill in the art would

21   understand that the kiosk as 106' would have to be

22   something more specific than just the client system.

23   And then you get into the exercise of figuring out

24   what that would be.

25   ///

Page 82

1    BY MR. VINCENT:

2        Q    Okay.  So in your -- in your view, when it

3    talks about Figure 4, column 8, line 29, to

4    column 10, line 15, does that provide further

5    details about the kiosk system?

6        A    It provides further details of the client

7    system, of which the kiosk would have to perform

8    those -- would be performing those functions as part

9    of what the kiosk is.

10       Q    Okay.  So this discussion of Figure 4 in

11   your view is relevant to the kiosk embodiment of --

12   of the specification.

13            Is that fair?

14       A    Again, a little bit incomplete.  I think

15   it's pretty clear that you have a client system, and

16   then the kiosk is something more specific than that,

17   but it would perform the functions of what the claim

18   requires for the kiosk.

19            It would be relevant in the context of the

20   specification of what's described for the client

21   system; it just has to be something more than the

22   client system.

23       Q    Okay.  And in the description of Figure 4,

24   again, columns 8 through 10, there's no discussion

25   in that -- there's no mention in that discussion of

Page 83

1   any user interface; is that correct?

2       A    Let's see.

3            I don't see the word "user interface."  I'd

4   probably have to spend some more time to see if it

5   uses some other word.

6            But, ultimately, I mean, Figure 4 is

7   directed to an exemplary client system according to

8   one embodiment, as is described in column 1 around

9   line 55.

10           So the user interface side of it I think

11  actually comes about as the additional requirement

12  of the kiosk.  So it would make sense it's not

13  described in the context of Figure 4 specifically.

14      Q    Okay.  Well, let's talk about Figure 7C,

15  and the discussion of that begins on column 18,

16  line 44.

17           Do you see that?

18      A    Sorry, what column?

19      Q    Column 18.

20      A    Okay.

21           Okay.

22      Q    You see line 44, it says (as read):

23               Figure 7C illustrates an

24           exemplary process flow for

25           provisioning content from the kiosk

Page 84

1              to a storage device.

2              Do you see that?

3      A    I do.

4      Q    This description of Figure 7C for the kiosk

5    embodiment doesn't use the terms "client" --

6    sorry -- doesn't use the term "user interface";

7    correct?

8      A    And you have a bookend?

9      Q    I would put the bookend at probably

10   column 20, line 67.  Because the next line goes on

11   to Figure 8.

12     A    Okay.

13              I sort of skimmed it.  I mean, the part

14   that stands out for me is this portion describes a

15   process flow for provisioning content from the kiosk

16   to a storage device.  The kinds of steps that are

17   described here are more directed to kind of that

18   functionality and not to the user interface aspects

19   of the kiosk.

20              So, even though I skimmed it, I -- I

21   probably wouldn't expect there would be much about

22   the user interface, as least as it's described for

23   this particular figure.

24     Q    Okay.  In your view, the kiosk as it's used

25   in the '400 patent, does the user interface of the

Page 85

1    kiosk have to be physically integrated with the

2    kiosk?

3              MS. FELICE:  Objection.  Vague.

4              THE WITNESS:  Yeah.  I'm not sure what that

5    would mean.  I think it would ultimately go to an

6    application of the construction to determine whether

7    or not a hypothetical device is within scope or not.

8    That I'd probably have to give some thought to.

9    BY MR. VINCENT:

10       Q    Okay.  Do you have any opinions about

11   whether or not a user interface can be connected to

12   the kiosk via a USB interface?

13       A    I think it would be the same kind of

14   answer:  It would depend on what the user interface

15   would be.  It would depend on the details of the

16   hypothetical system.

17       Q    Okay.  If you could turn back to column 6.

18   Again, line 41, where it says (as read):

19              The kiosk 106' may comprise

20              various user interface equipment,

21              such as a keyboard, display, et

22              cetera, to allow use of the kiosk

23              106'.

24              Do you see that?

25       A    I do.

1    said -- I want you to -- "authenticating the

2    portable data storage device," I want you to focus

3    on that language.

4              What do you think that language means?

5        A    I don't have a definition of that language

6    outside of the context of the claims and the claim

7    language in which it appears.  It -- it is a term

8    that is included in the claim, and it includes all

9    of the requirements about how authenticating needs

10   to be, what it needs to include, and so it's all of

11   the words of the claim.

12       Q    So you have no opinion about what

13   "authenticate the portable data storage device,"

14   what that phrase means in the '400 patent claims?

15             MS. FELICE:  Objection.  Mischaracterizes

16   prior testimony.

17             THE WITNESS:  No.  I think I've described

18   what it means in the context of the claim language.

19   And it's important as part of that authenticating to

20   use at least the unique identifier.

21   BY MR. VINCENT:

22       Q    Okay.  So authenticating the portable data

23   storage device in your view means confirming that

24   the portable data storage device is trusted using at

25   least the unique identifier; is that fair?

1      A     If -- if you're asking me what the

2    construction of a term that's not been proposed for

3    construction, that's only part of a term, would be,

4    then I don't have an opinion of what that term in

5    isolation would be.  It's the entirety of the term

6    that I've been asked to construe, and I've made it

7    abundantly clear that part of what has to happen for

8    authenticating is to use at least the unique

9    identifier.

10     Q     Okay.  When you say in your construction

11   that you're confirming that the portable data

12   storage device is trusted using at least the unique

13   identifier, what do you mean by "trusted"?

14     A     I haven't tried to separately construe that

15   term.  It would be the plain and ordinary meaning of

16   the term "trusted" as it's used in the context of

17   the claims and in light of the specification.

18     Q     What does that mean?

19     A     I haven't tried to give a definition to

20   that particular term.

21     Q     Okay.  Does it have any relation to

22   authorization?

23            MS. FELICE:  Objection.  Vague.

24            THE WITNESS:  I have -- I haven't tried to

25   construe it yet.  I'm not sure what that question

```
 1    would entail.  If you're asking me what the
 2    requirements of trust are, I haven't attempted to
 3    provide answers to those kinds of questions in this
 4    declaration.  I'd have to give it some thought.
 5    BY MR. VINCENT:
 6        Q    Okay.  Okay.
 7             I'd like to turn to the third and final
 8    term that you have given opinions about.  And
 9    that's -- begins on page 24, "Providing to the
10    Portable Data Storage Device a Corresponding Access
11    Key."
12        A    Okay.
13        Q    Is it your opinion that the patentee acted
14    as its own lexicographer for this term?
15             MS. FELICE:  Objection.  Calls for a legal
16    conclusion.
17             THE WITNESS:  I think it's going to be
18    similar when you've asked that question before,
19    which is I don't believe I've reached that legal
20    conclusion.  Whether or not there's any portion of
21    this declaration that supports that theory, I would
22    defer to what the declaration says.
23    BY MR. VINCENT:
24        Q    Okay.  In your opinion, do any of the terms
25    in that phrase -- are any of them -- sorry -- do any
```

1    of them mean anything different than the plain and

2    ordinary meaning to a person of ordinary skill?

3        A    I'm not sure how to answer that question.

4    There's again the understanding of what that phrase

5    means in the context of the claims and in light of

6    the specification.  And in some cases, some of those

7    words, like "access key" require context to

8    understand what they are.  And that's part of what

9    I've tried to do in this declaration.

10       Q    Do you think that the patentee, based on

11   your understanding of the intrinsic record,

12   expressed an intent to redefine the term "access

13   key" to something other than its plain and ordinary

14   meaning?

15           MS. FELICE:  Objection.  Lacks foundation.

16           THE WITNESS:  I don't know about

17   redefining, but certainly I think the specification

18   teaches a person of skill in the art what an access

19   key is in the context of how that term is used in

20   these claims.

21   BY MR. VINCENT:

22       Q    You'll look at paragraph 73 of your

23   declaration.

24       A    Yes.

25       Q    And here you are discussing the '400 patent

1              In fact the only access key

2           described in any embodiment,

3           including the kiosk embodiments, is

4           composed of those two components.

5           "Those two components" being a binding key

6    unique to the storage device and a content key

7    unique to the content; is that fair?

8       A    You said the word "unique," so I don't know

9    if you were just reading or if you were also kind of

10   paraphrasing, but I see generally where you were

11   reading.

12      Q    Yeah.  So in paragraph 69 you said (as

13   read):

14              The '400 patent continuously

15           describes the access key as being

16           composed of two components:  A

17           binding key that is unique to the

18           storage device on which the content

19           is stored, and a content key that is

20           unique to the content, which the

21           patent described as uniquely binding

22           content to the specific devices.

23           Do you see that?

24      A    Yes, I do.  Now I'm with you now.

25      Q    And you say (as read):

```
 1              The only access key described in
 2         any embodiment, including the kiosk
 3         embodiments, is composed of those
 4         two components.
 5         Do you see that?
 6    A    I do.
 7    Q    You'd agree in -- you have the '634 patent
 8  claims on paragraph 71?
 9    A    Okay.  I'm there.
10    Q    The '634 patent claims an access key;
11  correct?
12    A    It does.
13    Q    And it explicitly said that access key is
14  generated from the binding key and the content key;
15  correct?
16    A    I see where you're pointing to.
17    Q    So the '634 patent claims specifically
18  recite a binding key that is unique to the portable
19  data storage device; correct?
20    A    Yes.
21    Q    And the '634 patent, claim 1, again talks
22  about a content key -- explicitly claims a content
23  key associated with the first media content;
24  correct?
25    A    It does.
```

Page 122

```
 1      Q    And you'll agree that --
 2           (Reporter interruption for clarification.)
 3   BY MR. VINCENT:
 4      Q    You'll agree that the independent claims of
 5   the '400 patent do not use the terms "binding key"
 6   or "content key"; correct?
 7      A    In the independent claims they use the term
 8   "access key."
 9      Q    They don't talk about generating the access
10   key from a binding key unique to the portable data
11   storage device; correct?
12      A    They don't have the identical limitations
13   of the '634 patent claim.
14      Q    Not just identical, they don't talk about a
15   binding key at all; correct?
16      A    There isn't a separate limitation that
17   talks about a binding key.
18      Q    There's no limitation at all that talks
19   about a binding key; correct?
20           MS. FELICE:  Objection.  Asked and
21   answered.
22           THE WITNESS:  It doesn't include the word
23   "binding key," but certainly it includes the word
24   "access key," and I think a person of skill in the
25   art would attempt to understand what that term
```

Page 123

1    included in the context of the claims in looking at

2    the specification.

3    BY MR. VINCENT:

4        Q    And the independent claims of the '400

5    patent don't contain the term "content key";

6    correct?

7        A    Not those words specifically, but I think,

8    similar to binding key, they're tied to what an

9    access key would be understood to be.

10       Q    Okay.  You'd agree that in the '634 patent,

11   claim 1 at least, those terms are explicitly

12   claimed?

13       A    There are explicit requirements around how

14   the access key is generated and how a binding key is

15   obtained.

16           MR. VINCENT:  All right.  I have no further

17   questions at this time.

18           MS. FELICE:  I have no questions either.  I

19   think we can go off the record.

20           THE VIDEOGRAPHER:  Thank you.

21           This will conclude the deposition of

22   Kevin Almeroth, Ph.D.  The total number of media

23   units used in the deposition today was four and will

24   be retained by Veritext Legal Solutions.

25           We are off the record at 11:17 a.m. Pacific

                                                    Page 124

1      Daylight Time.  Thank you.

2                  (Off video record.)

3                  THE REPORTER:  And I'm supposed to send you

4      both a rough; right?

5                  MR. VINCENT:  Yes.

6                  MS. FELICE:  Yes, that would be great as

7      well.

8                  (The deposition ended at 11:19 a.m.)

9                          -000-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

1                           DECLARATION

2

3

4

5           I hereby declare I am the deponent in the

6      within matter; that I have read the foregoing

7      deposition and know the contents thereof, and I

8      declare that the same is true of my knowledge except

9      as to the matters which are therein stated upon my

10      information or belief, and as to those matters, I

11      believe it to be true.

12

13           I declare under the penalties of perjury of

14      the state of California that the foregoing is true

15      and correct.

16

17           Executed on the ___ day of _____,

18      20_____, at _____,

19      California.

20

21

22                    _____

                      EXPERT KEVIN C. ALMEROTH, Ph.D.

23

24

25

Page 126

1    STATE OF CALIFORNIA        )

2    COUNTY OF RIVERSIDE        )   ss.

3

4        I, Paula A. Pyburn, CSR No. 7304, RPR, CLR, in

5    and for the State of California, do hereby certify:

6        I am the deposition officer that

7    stenographically recorded the testimony in the

8    foregoing deposition;

9        Prior to being examined the deponent was first

10   duly sworn by me;

11       The foregoing transcript is a true record of the

12   testimony given.

13       Before completion of the deposition, review of

14   the transcript [ ] was [xx] was not requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18

19   Dated April 11, 2024

20

21

22   _____

         Paula A. Pyburn, RPR, CLR

23       CSR No. 7304

         Certified Shorthand

24       Reporter for the

         State of California

25