QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Steven Cherny (*pro hac forthcoming*)
  stevencherny@quinnemanuel.com
  Patrick Curran (Bar No. 241630)
  patrickcurran@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:    (617) 712-7100
Facsimile:    (617) 712-7200

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jodie Cheng (Bar No. 292330)
  jodiecheng@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

   *Attorneys for Defendant Viasat, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| WESTERN DIGITAL TECHNOLOGIES, INC., WESTERN DIGITAL IRELAND LTD., SANDISK 3D IP HOLDINGS LTD., SANDISK TECHNOLOGIES LLC, SANDISK STORAGE MALAYSIA SDN. BHD., <br><br> Plaintiff, <br><br> v. <br><br> VIASAT, INC., <br><br> Defendant. | Case No.: 4:22-cv-4376-HSG <br><br> **DEFENDANT VIASAT, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br><br> <u>**Hearing**</u> <br> <u>Date:</u>  July 19, 2024 <br> <u>Time:</u>  2:00 p.m. <br> <u>Judge:</u>  Hon. Haywood S. Gilliam, Jr. <br> <u>Courtroom:</u>  2, 4th Fl. <br>         1301 Clay Street <br>         Oakland, CA 94612 |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF EXHIBITS ............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii

I.      Introduction ................................................................................................................. 1

II.     Disputed Terms ........................................................................................................... 2

    A.      "kiosk" ............................................................................................................... 2

    B.      "portable data storage device" .......................................................................... 7

    C.      "authenticat[e/ing] the portable data storage device, using at least the unique identifier" 9

    D.      "provide to the portable data storage device . . . a corresponding access key" ............... 13

    E.      "public environment" ...................................................................................... 15

    F.      "secure region" ................................................................................................ 17

    G.      "receive an indication of the NAS device having a secure region" ................. 20

    H.      "access to the secure region is controlled by the media streaming system"/ "control streaming access to the digital content stored on the buffer" ........................................... 23

III.    Conclusion ................................................................................................................. 25

## TABLE OF EXHIBITS

| Exhibit | Document |
|---|---|
| 1 | U.S. Patent Publication 2009/0052671 ("Bauchot") |
| 2 | U.S. Patent No. 8,914,634 File History (excerpted) |
| 3 | Excerpts from Deposition of Kevin Almeroth, Ph.D., April 6, 2024 |
| 4 | Random House Webster's College Dictionary, 2000, "Kiosk" (VIASAT_00013614) |
| 5 | Merriam-Webster, Online Dictionary, 2011, "Kiosk" |
| 6 | Merriam-Webster, Online Dictionary, 2011, "Portable" (VIASAT_00013566) |
| 7 | Excerpts from Plaintiffs' Infringement Contentions, March 22, 2024 |
| 8 | ISO/IEC 9798-1, "Entity Authentication" (VIASAT_00013400) |
| 9 | U.S. Patent No. 9,424,400 File History (excerpted) |
| 10 | Microsoft Computer Dictionary, 2002, "Key" (WD-VIASAT_NDCA00002743) |
| 11 | Merriam-Webster, Online Dictionary, 2011, "Public" (VIASAT_00013580) |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Apple Inc. v. Corephotonics, Ltd.,*
  81 F.4th 1353 (Fed. Cir. 2023) ................................................................................................12

*Augustine Med., Inc. v. Gaymar Indus., Inc.,*
  181 F.3d 1291, 50 USPQ2d 1900 (Fed. Cir. 1999) .....................................................................3

*Barrday, Inc. v. Lincoln Fabrics Inc.,*
  No. 2022-1903, 2023 WL 7871688 (Fed. Cir. Nov. 16, 2023) ...................................................1

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
  289 F.3d 801 (Fed. Cir. 2002) ...................................................................................................2

*Deere & Co. v. Bush Hog, LLC,*
  703 F.3d 1349 (Fed. Cir. 2012) .................................................................................................7

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.,*
  815 F.3d 1314 (Fed. Cir. 2016) .................................................................................................1

*Guzik Tech. Enterprises, Inc. v. W. Digital Corp.,*
  No. 5:11-CV-03786-PSG, 2013 WL 6092852 (N.D. Cal. Nov. 19, 2013)..................................2

*Hill-Rom Servs., Inc. v. Stryker Corp.,*
  755 F.3d 1367 (Fed. Cir. 2014) .................................................................................................6

*Hybrid Audio, LLC v. Asus Computer Int'l Inc.,*
  No. 3:17-CV-05947-JD, 2022 WL 3348594 (N.D. Cal. Aug. 12, 2022)....................................1

*O2 Micro Int'l Ltd. V. Beyond Innovation Tech. Co.,*
  521 F.3d 1351 (Fed. Cir. 2008) .................................................................................................6

*Omega Eng'g, Inc, v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003) ..............................................................................................3, 6

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) ...............................................................................................11

*Southwall Techs., Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995) ...................................................................................................6

*Thorner v. Sony Computer Ent. Am. LLC,*
  669 F.3d 1362 (Fed. Cir. 2012) .................................................................................................6

*Wang Lab'ys, Inc. v. Am. Online, Inc.,*
  197 F.3d 1377 (Fed. Cir. 1999) .................................................................................................3

## I.    INTRODUCTION

Plaintiffs assert two patents in this case: the '400 patent, directed to a digital rights management system for securely distributing content from a kiosk to storage devices, and the '667 patent, directed to a media streaming system utilizing a secure buffer for streamed content.[1] Despite knowing that the parties disagree regarding the meanings of numerous terms, Plaintiffs propose no constructions for any terms in either patent. Plaintiffs instead assert that every disputed term be given its "plain and ordinary meaning," but, tellingly, never say what the plain and ordinary meaning of any term *actually is*. Plaintiffs' attempt to punt on claim construction is improper. *See Hybrid Audio, LLC v. Asus Computer Int'l Inc.*, No. 3:17-CV-05947-JD, 2022 WL 3348594, at *3 (N.D. Cal. Aug. 12, 2022) (finding party's failure to say what the plain and ordinary meaning actually is "a bizarre and totally unhelpful approach to claim construction"). When the parties dispute the plain meanings of claim terms, the Court should construe those disputed terms. *See Barrday, Inc. v. Lincoln Fabrics Inc.*, No. 2022-1903, 2023 WL 7871688, at *3 (Fed. Cir. Nov. 16, 2023) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Viasat's proposals are consistent with the words in the claims, the intrinsic evidence in the patents and file histories, contemporaneous dictionaries, and unrebutted expert testimony. A number of Viasat's constructions also have the benefit of being case dispositive. Plaintiffs offer ***no*** constructions, clearly hoping the Court will simply bypass claim construction that could otherwise bring Plaintiffs' retaliatory lawsuit to an end.[2] The Court should not accept Plaintiffs' invitation to let a jury implicitly and improperly construe the disputed terms, nor let this case linger any longer than it already has. Instead, it should adopt Viasat's proposed constructions.

---

[1] U.S. Patent Nos. 9,424,400 ("the '400 patent") and 10,447,667 ("the '667 patent"). *See* Dkt. No. 103, Exs. A ('400 patent) and B ('667 patent). Plaintiffs also asserted U.S. Patent No. 8,504,834, but the Court dismissed that patent under 35 U.S.C. § 101. *See* Dkt. No. 75.

[2] Plaintiffs presumably brought this lawsuit to obtain leverage in a patent infringement lawsuit Viasat filed eight months before Plaintiffs filed this case. *See Viasat, Inc. v. Western Digital Corp. et al.*, No. 21-cv-1230-ADA (W.D. Tex.).

## II.    DISPUTED TERMS

### A.    "kiosk"

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "kiosk" (claims 1 and 9) | Non-limiting preamble; in the alternative, plain and ordinary meaning. | A device whose user interface is used by consumers. |

Claims 1 and 9 each require a "kiosk" for "provisioning secure media content to a plurality of portable data storage devices." Viasat's proposed construction is consistent with the words of the claim, the specification, the file history, and technical literature and dictionaries. Plaintiffs ignore all this evidence. Instead, Plaintiffs argue that "'kiosk' does not require construction, both because it appears only in the allegedly non-limiting preamble, and because it will be understood by the jury in light of the specification, which states that a kiosk may be 'any device used to access and distribute content provided by the system.'" Dkt. No. 103 at 5. Plaintiffs' argument fails for at least four reasons. First, the preamble is limiting. Second, the intrinsic evidence supports Viasat's construction. Third, the extrinsic evidence supports Viasat's construction. And fourth, Plaintiffs' argument is both an improper attempt to have the jury engage in claim construction and an untimely, unsupported lexicography argument masquerading as "plain and ordinary meaning." The Court should reject Plaintiffs' belated proposal and adopt Viasat's construction.

***The preamble is limiting.*** The word "kiosk," which has evolved to have a specific meaning in the computing context (*see* Dkt. No. 103, Ex. D ¶ 59), was added to distinguish claims from prior art and secure allowance, rendering the preamble limiting.[3] The '400 patent's parent application, U.S. Patent No. 8,914,634 (the '634 patent) (Dkt. No. 103, Ex. I), was initially rejected over IBM prior art, U.S. Patent Publication 2009/0052671 ("Bauchot") (Ex. 1). Bauchot recites improved

---

[3] *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention."); *Guzik Tech. Enterprises, Inc. v. W. Digital Corp.*, No. 5:11-CV-03786-PSG, 2013 WL 6092852, at *6 (N.D. Cal. Nov. 19, 2013) ("The preamble may become a limitation when 'reciting additional structure or steps underscored as important by the specification' or when the preamble is used during prosecution to distinguish the claim from prior art.").

"content protection" for "media centers" (*id.*, Abstract) and discloses "media center 200" as "a storage device . . . having storage means . . . for storing files," connected to a "personal computer 240" that provides "commands from the user," and a "TV monitor 235 for video display." Ex. 1 at [0030]-[0032], [0035]-[0036]. The Examiner held Bauchot disclosed each limitation of the then-pending claims, including a "first storage device configured to provide content to a player system for rendering content," ***because Bauchot's "media center" described "a storage device" connected to "a personal computer."*** Ex. 2 at 26-27; Ex. 1 at [0030]-[0032], [0035]-[0036].[4] The applicants then amended the claims to replace the "first storage device configured to provide content to a player system" with "[a] ***kiosk*** for provisioning secure media content to a plurality of portable data storage devices." Ex. 2 at 15. Applicants argued that the new claims were allowable over Bauchot ***because Bauchot (whose "media center" disclosed a "a storage device" connected to "a personal computer") "fail[ed] to even mention use of a <u>kiosk</u>."*** *Id.* at 19. The Examiner thereafter allowed the claims. This shows "kiosk" is not simply a "storage device," such as a "media center" connected to "a personal computer" as in Bauchot—the "kiosk" must be something more than the configuration Bauchot expressly mentioned.[5]

   ***<u>Viasat's construction is consistent with the claims and specification</u>.*** The specification confirms a "kiosk" is a device whose user interface is used by multiple consumers—not merely a storage device connected to another computer. The kiosk in the patent, labeled as "106'" is described

---

[4]  All emphasis is added unless otherwise stated.

[5]  Plaintiffs say this history comes from the '634 patent, not the '400 patent, and therefore does not bind the '400 patent. That is wrong. The '400 patent is a continuation of the '634 patent and claims the benefit of the '634 patent's filing date. The prosecution history of the '634 patent is therefore part of the '400 patents' intrinsic record and informs the meaning of "kiosk" in both patents. *See Wang Lab'ys, Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999) (finding that statement made during prosecution of parent application applied to a continuation-in-part application because the statement related to subject matter common to both patents); *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300, 50 USPQ2d 1900, 1907 (Fed. Cir. 1999) ("[T]he prosecution of a parent application may limit the scope of a later application using the same claim term."). Both patents also share the same specification and both patents' claims use the "kiosk" term, which means that the term should have the same meaning in both the '634 and '400 patents. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[T]he same claim term in the same patent ***or related patents*** carries the same construed meaning.").

as accessible to and used by **multiple consumers or members of the public** as opposed to just one individual. Dkt. No. 103, Ex. A at 6:36-43 ("[T]he kiosk 106' may be implemented as a **self-service computer terminal**," "the kiosk 10' may comprise specialized hardware and software that is designed such that kiosk 106' is **placed in a public environment**," and "[t]he kiosk 106' may comprise various user interface equipment . . . to allow use of the kiosk 106'."). The '400 patent describes various embodiments of this kiosk, including embodiments where it "may be implemented as a self-service computer terminal," and "may comprise various **user interface equipment**, such as a keyboard, display, etc. **to allow use** of the kiosk 106'." *Id.* at 6:37-43. As the specification thus explains, the kiosk is a device for "use" by consumers, whether as a "self-service computer terminal" or in another form, that users can access via "various" forms of "user interface equipment." But the fact that the user interface can be implemented in various ways does not make the existence of a user interface optional; it simply means users can interact with the "kiosk" by employing different types of equipment. Ex. 3 at 75:15-76:11.

Plaintiffs allege claims 3 and 11 mean the "kiosk" of claims 1 and 9 need not include a "user interface." This is not what claims 3 or 11 say—and Plaintiffs make this claim using misleading and incomplete cites that omit the actual text of claims 3 and 11. Those claims actually recite a more specialized user interface to enable more specific user selections—thus narrowing claims 1 and 9 to a specific type of user interface, with specific options a user may select. Claim 3 recites "[t]he kiosk of claim 2, further comprising a user interface **for receiving a selection of the first media content** from the local data storage." Claim 11 recites "[t]he method of claim 10, further comprising: **receiving**, on a user interface, **a selection of the first media content** from the local data storage." As Viasat's expert explained, "looking at claim 3, I understand it requires **specific feature[s] of a user interface, not just a user interface in general**." Ex. 3 at 72:10-13. Claims 3 and 11 thus recite specific user interface features that allow specific types of user selections at the kiosk. They do not suggest the "kiosk" can lack a user interface at all, or lack users at all, in claims 1 or 9.

**_Viasat's construction is consistent with the extrinsic evidence_**. Multiple contemporaneous dictionary definitions of "kiosk" support Viasat's proposal. A "kiosk" refers to a self-service, "interactive computer terminal available for public use, as one with Internet access or site-specific

information: Students use kiosks to look up campus events." Ex. 4 at VIASAT_00013616. Merriam-Webster's Online Dictionary also defines a kiosk as "a small stand-alone device providing information and services on a computer screen" and gives the example of "a museum with interactive kiosks." Ex. 5 at 2. Under both definitions, the kiosk is a device that consumers/members of the public interact with directly to accomplish a variety of tasks; thus, the kiosk must have a means for interfacing with consumers. The applicant chose the specific word "kiosk" for the amended claims. This word had a well-understood meaning. That meaning, memorialized in multiple dictionaries with consistent definitions, accords with the specification and file history. This is the meaning of "kiosk" one of skill in the art would apply after reading the '400 patent.

Viasat's expert, Dr. Almeroth, confirms a POSA would understand "kiosk" as Viasat describes it. Kiosks were well-known in the field as structures "with a means for interfacing with consumers and with which consumers can interact directly to accomplish a variety of tasks." Dkt. No. 103, Ex. D ¶ 52. Notably, Dr. Almeroth's testimony is ***unrebutted***. Despite repeatedly arguing that a "kiosk," like all of the other disputed terms, should have its plain and ordinary meaning, Plaintiffs provided ***no*** evidence—including no expert testimony—to demonstrate that the claim has any plain meaning to a POSA that contradicts Viasat's proposal. The Court should thus credit Dr. Almeroth's unrebutted testimony on the meaning of "kiosk" (and other disputed terms) to a POSA.

***Plaintiffs' new lexicography argument is untimely and meritless***. Prior to their opening claim construction brief, Plaintiffs never proposed any definition of "kiosk," instead claiming only that the term had a "plain and ordinary meaning." Dkt. No. 95 at 5. Yet Plaintiffs' brief now offers the new argument that the '400 patent defines "kiosk" to mean "any device used to access and distribute content provided by the system" and that the term need not be construed because it "***will be understood by the jury in light of the specification***" to have that meaning. Dkt. No. 103 at 5

This express statement that the jury should decide, "in light of the specification," what the claim means is both improper and revealing. Plaintiffs want the jury to construe the claims—this is what Plaintiffs expressly say their "plain and ordinary meaning" proposals will lead to. But that is precisely what the Federal Circuit forbids. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521

1    F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper

2    scope of these claims, the court, not the jury, must resolve that dispute.").

3         Plaintiffs' proposal is also an untimely argument that the patent defines "kiosk" via

4    lexicography. Under the Patent Local Rules Plaintiffs were required to disclose any such position

5    in, at the latest, the March 12, 2024 Joint Claim Construction and Prehearing Statement. *See* Patent

6    L.R. 4-3; *see also* Dkt. No. 86. But Plaintiffs never disclosed this theory during the exchange of

7    preliminary claim constructions on February 15, 2024, or in the Joint Claim Construction and

8    Prehearing Statement. The Court should not consider it. *See* Patent L.R. 4-2, 4-3.

9         Even if this late argument is considered, it fails on the merits. Plaintiffs do not meet the high

10   bar to show the patentee defined "kiosk": "[t]he standards for finding lexicography . . . are exacting,"

11   and "a patentee must clearly set forth a definition of the disputed claim term other than its plain and

12   ordinary meaning" and must "clearly express an intent to redefine the term." *Hill-Rom Servs., Inc.*

13   *v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The '400 patent specification does not do

14   this. It says only that "[t]he kiosk 106' ***may*** be any device used to access and distribute content

15   provided by the system 100." This does not define a "kiosk," but rather states permissively that

16   many embodiments of a "kiosk" are possible. The specification also says many other things "may"

17   be true about the "kiosk"—it "may be implemented as a self-service computer terminal," and it

18   "may comprise specialized hardware and software that is designed such that [it] is placed in a public

19   environment." Dkt. No. 103, Ex. A at 6:35-43. Plaintiffs do not argue that any of these other

20   proposed characteristics of a "kiosk" are also required—yet by Plaintiffs' own logic, if "may" means

21   lexicography, each one of these disclosures about the "kiosk" would also be required definitionally.

22        Finally, Plaintiffs' late proposal also violates black-letter law "preclud[ing] patentees from

23   recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega*

24   *Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Plaintiffs may not broaden claims

25   for infringement purposes after those same claims were narrowed to secure allowance. *Southwall*

26   *Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). This is precisely what Plaintiffs

27   are trying to do here. Plaintiffs now say "*any* device used to access and distribute content" is a kiosk,

28   but Plaintiffs got this patent by telling the Patent Office a "kiosk" is *not* just "*any* device used to

access and distribute content." Bauchot's "media center" was a "device used to access and distribute content," with a "storage device" sending media content to a connected "personal computer." Yet Plaintiffs told the Patent Office the devices in Bauchot, used to access and distribute content, were not a "kiosk"—and using that argument, Plaintiffs secured their patent. Construing "kiosk" to mean "*any* device used to access and distribute content" would recapture the very devices Plaintiffs said were *not* a "kiosk" during prosecution.

**B.    "portable data storage device"**

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "portable data storage device" ('400 patent, claims 1 and 9) | Plain and ordinary meaning | "A storage device that can be easily carried or moved about by its user" |

Both of the independent claims of the '400 patent require a "portable data storage device." For example, independent claim 1 requires "[a] kiosk for provisioning secure media content ***to a plurality of portable data storage devices***" and claim 9 requires "[a] method for provisioning secure media content ***to a plurality of portable data storage devices*** from a kiosk." Viasat's proposed construction for "portable data storage device" tracks the plain meaning of the term, "portable," which is consistent with the way the term is used in the '400 patent.

The plain meaning of "portable" in the context of the '400 patent is "easily carried or moved about by its user." This is evident from the '400 patent's specification, which uses the word "portable" interchangeably with "mobile" to describe devices that can easily be carried or moved about by a user. For example, the '400 patent states that the "client system 106 may be any device used to access content provided by the system 100" including "a portable or mobile device." Dkt. No. 103, Ex. A at 4:18-21. It also lists as examples, "portable video game console[s], such as PlayStation portable or a Nintendo DS," both of which can be easily moved about by their user.[6] *Id.* at 5:23-25. This highlights that a portable device is one that is easily moved about, i.e., mobile.

---

[6]  The patent also uses "portable" as synonymous with "mobile," stating that "the client system 106 may comprise a computer, a television, ***a portable or mobile*** device, a video game console, a portable video game console, as well as associated storage." *Id.* at 4:19-22.

The definition of portable also supports Viasat's construction. *See* Ex. 6 at 2. The word, "portable,' when used to modify the word "device," refers to devices that are easily carried or moved around—not devices like a seatback display or a server that are, even at best, only theoretically capable of being moved around with great effort.

Plaintiffs argue that Viasat's construction "introduces indefiniteness and unnecessary confusion to a term that should be given its plain and ordinary meaning," but it is actually Plaintiffs that seek to introduce unnecessary confusion by ignoring the clear dispute between the parties and improperly arguing that the term "requires no construction." Dkt. No. 103 at 9; *see Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error where the Court instructed the jury that the "portable" and "mobile" claim terms should be given their plain and ordinary meaning despite the clear dispute over whether those terms covered "fixed or stationary products that are only theoretically capable of being moved"). Viasat's proposed construction comports with the specification's description of devices that are portable or mobile. Moreover, a POSA would have no issue understanding, especially in the context of the '400 patent and the prior art, the phrase "easily carried or moved about." *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1360 (Fed. Cir. 2012) (rejecting Defendant's argument that "the subjective term 'easily' renders Claim 6 indefinite" because decks that could be "easily" washed off were known in the prior art and "[t]he availability of known easy-clean decks provides a standard for measuring the scope of Claim 6"). Data storage devices that can be easily carried or moved about were well known in the art and thus there is no ambiguity about what is and is not easy to carry or move about in terms of a data storage device. An enterprise server or mainframe computer are data storage devices that are not portable, while an iPhone is. Plaintiffs seek to introduce confusion and ignore the dispute because Plaintiffs intend to argue that a seatback display—a device with a screen embedded or partially embedded into the seats on an airplane such that they cannot be removed from the seat—somehow is "portable." Ex. 7 at 3. Construction of "portable data storage device" is therefore necessary to make clear that, consistent with Viasat's proposed construction, the intrinsic evidence does ***not*** support defining "portable data storage device" as an embedded TV screen secured in each fixed seat on an American Airlines jet.

Plaintiffs contend (at 14) that "Viasat's construction reads out the word 'data,' such that the construction could, quite literally, be read on a cardboard box." *Id.* This typographical error was not raised previously and obviously was not Viasat's intention; the missing word "data" should be added, so that the term means "a data storage device that can be easily carried or moved about by its user."

**C.    "authenticat[e/ing] the portable data storage device, using at least the unique identifier"**

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "authenticat[e/ing] the portable data storage device, using at least the unique identifier" ('400 patent, claims 1 and 9) | Plain and ordinary meaning | "confirming that the portable data storage device is trusted using at least the unique identifier" |

Independent claim 1 of the '400 patent requires "a processor configured to: . . . ***authenticate the portable data storage device, using at least the unique identifier***, by communicating with the remote trusted server over the second data interface." Independent claim 9 similarly requires "***authenticating the portable data storage device, using at least the unique identifier***, by communicating with the remote trusted server over the second data interface." Viasat's proposed construction is consistent with the ordinary meaning of "authenticate/authenticating" to a POSA in the context of the patent. Plaintiffs again ignore the clear dispute between the parties regarding this construction and contend that the term is "clear on its face and will be understandable to a jury without further construction." Dkt. No. 103 at 9. This argument strains credulity. Clearly, Plaintiffs wish to bypass the Court and have the jury construe this technical term. The term "authenticate" in the context of secure digital transmissions—the context of the '400 patent—is a term of art that requires construction in order to make it understandable to a lay jury. And it is clear from Plaintiffs' infringement contentions that Plaintiffs' understanding of the term is at odds with the meaning of "authenticate[/ing]" in the context of the '400 patent.

The intrinsic evidence supports Viasat. The '400 patent specification describes the purpose of authentication as ***verifying*** the identity of the entities in the system to "***ensure that entities in the system are trusted***." Dkt. No. 103, Ex. A at 3:25-26. For example, the specification describes

authenticating entities in the system using public key infrastructure ("PKI"), which it describes as "provid[ing] an environment in which entities of the DRM system can register their identity ***and establish trust*** with each other." *Id.* at 3:35-37. The '400 patent specification also notes that the use of PKI to "ensure[] that the storage device confirms a ***trust relationship***" is an improvement over "[c]onventional DVD and Blu-ray discs," which "did not contain such features to authenticate or establish trust with a player or download server." *Id.* at 3:31-35. Similarly, the '400 patent describes authentication via "public key certificates, i.e., digital certificates for authenticati[ng] identity and determin[ing] authorization for various uses of [] content." *Id.* at 3:38-41. This type of authentication is used where the kiosk "request[s] a certificate from the storage device," which can be stored in a private, non-user area of the device, and then the "[k]iosk 106 ***verifies the certificate***" by "check[ing] the signature on the certificate" or "communicat[ing] over network 108 with audit system 102 and certificate authority 204 to ***verify the certificate and check revocation status of the certificate***." *Id.* at 18:56-19:7. Thus, in this embodiment, like the other descriptions of authentication throughout the patent, authentication verifies the identity of the portable data storage device in order to confirm that the portable data storage device is trusted by the system.

Viasat's proposed construction of the "authenticat[e/ing]" limitation is also supported by the extrinsic evidence. Indeed, Viasat's expert, Dr. Almeroth explained that "authenticat[e/ing]" would be understood by a POSA consistent with how the term is used in the International Organization for Standardization's ("ISO") and International Electrotechnical Commission's ("IEC") standard for entity authentication. That standard describes the importance of entity authentication to security in systems involving real-time communication. *See* Ex. 8 at VIASAT_00013404 ("[i]n systems involving real-time communication, entity authentication is a fundamentally important security service."); Dkt. No. 103, Ex. D ¶ 62. The standard, ISO/IEC 9798 (2010), specifies an authentication model and general requirements and constraints for entity authentication mechanisms where "[t]he goal . . . is to ***establish whether the claimant of a certain identity is in fact who it claims to be.***" Ex. 8 at VIASAT_00013404. In order to achieve that goal, ISO/IEC 9798 states that "there should be a pre-existing infrastructure which links the entity to a cryptographic secret (for instance a Public Key Infrastructure)." *Id.* The standard also describes "two main models for authentication

protocols": one in which "the claimant and verifier communicate directly in order to establish the authenticity of the claimant identity," and another where "entities establish authenticity of identities using a common trusted third party." *Id.* Like the ISO/IEC 9798, the claims of the '400 patent similarly describe using a unique identifier, which is "specific to the portable data storage device and is concealed by the portable data storage device" (i.e., a cryptographic secret), to authenticate the portable data storage device through communications "with the remote trusted server" (i.e., a common trusted third party).

Contrary to the intrinsic and extrinsic evidence, Plaintiffs imply (both in their brief and in their infringement contentions) that merely *identifying* a system user suffices to accomplish the claimed authentication. *See* Ex. 7 at 4 ("For example, Viasat's Sponsored Access Privacy Notice notes that 'to deliver the Sponsored Access services to you, **we collect a unique identifier associated with the device that you use to access the Services**."). A POSA reading the '400 patent, however, would not understand "authenticat[e/ing]" to mean mere identification. Rather, a POSA would recognize that the '400 patent is directed to a digital rights management system (DRM) that enables secure copying or transfer of content from one storage device to another. Indeed, the '400 patent states that the claimed DRM system is a purported improvement over prior art DRM systems "hav[ing] security weaknesses" that can be "circumvented." Dkt. No. 103, Ex. A at abstract, 1:34-36. In this context, which involves real-time communication between entities (e.g., a kiosk, a portable data storage device, and remote trusted server), as well as content protection and security, a POSA would understand that the term "authenticat[e/ing]" refers to a process by which one entity *verifies* the identity of another entity and *confirms* that the entity is trusted prior to the exchange of secure information between the two entities. Thus, identification is not enough—the identity of the entity must be verified in order for there to be trust between the entities in the system.[7]

---

[7]  "The interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Plaintiffs' argument that "authentication" means "identification" does not comport with the improved DRM system that the inventors purport to have invented.

Plaintiffs take issue with the word "trusted," despite the word being used numerous times in connection with authentication *in the specification*. Dkt. No. 103 at 10-11. Indeed, Plaintiffs themselves cite the portions of the specification that describe "a trusted server that is authenticated and trusted by both sets of storage devices" (Dkt. No. 103, Ex. A at 2:51-54) and a storage device "configured to actively authenticate and establish a trust relation with a playback device." *Id.* at 7:50-54. Nonetheless, Plaintiffs argue that "trusted" and "authenticated" must be different concepts because the applicants chose different words to describe them. This makes no sense. "Trusted" and "authenticated" are, indeed, different words with different meanings, but the point is that the specification routinely uses the words together because authentication is what allows a device in the system to become trusted. This is entirely consistent with Viasat's proposed construction.

Moreover, Plaintiffs argue (at 10) that "confirming that the portable data storage device is trusted" cannot entail determining that the portable data storage device is authorized to receive content because authentication and authorization are distinct concepts. But, reading "authentication" to exclude "authorization" would read disclosed embodiments out of the claim scope, contradict the language of the claims, and conflict with the entire purpose of the invention, which is to "prevent unauthorized copying of digital content." *Id.* at 1:26-28; *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1359 (Fed. Cir. 2023) ("Our caselaw counsels against interpreting the claims in a way that would omit a disclosed embodiment absent clear evidence to the contrary."). For example, the specification states that "[i]n one embodiment, the entities of the DRM system employ public key certificates, i.e., *digital certificates for authentication of their identity and determine authorization for various uses of their content*," which demonstrates that authentication can encompass authorization. *Id.* at 3:38-41. Moreover, the claims themselves state that "*in response to authentication*, provide to the portable data storage device an encrypted first media content and corresponding access key." *Id.* at 22:58-60. That is, the claims disclose that, in response to authentication, access is provided to the content, which Plaintiffs admit is the definition of authorization. *See* Dkt. No. 103 at 10 ("authorization (access provided to user)."). Authorization must therefore be encompassed by the claimed authentication.

Viasat's proposed construction is thus consistent with both the intrinsic evidence and the plain meaning of the term to a POSA in the context of content security. It should be adopted.

**D.    "provide to the portable data storage device . . . a corresponding access key"**

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "in response to authentication, **provide to the portable data storage device an encrypted first media content a corresponding access key**" ('400 patent claims 1 and 9) | Plain and ordinary meaning | In response to authentication, provide to the portable data storage device an encrypted first media content a key for the portable data storage device to decrypt the first media content |

Independent claims 1 and 9 of the '400 patent require that, "in response to authentication," the kiosk provides "to the portable data storage device an encrypted first media content and *a corresponding access key*." As Dr. Almeroth explained, a POSA reading the '400 patent would understand that "provid[e/ing] . . . a corresponding access key" means providing a key for the portable data storage device to decrypt the first media content—that is, providing a key specific to both the portable data storage device and the first media content. Dkt. No. 103, Ex. D ¶ 68. Specifically, the '400 patent continuously describes the access key as being composed of two components: "a binding key that is unique to the storage device on which the content is stored" and "a content key that is unique to the content," which the patent describes as "uniquely binding" content "to specific devices." Dkt. No. 103, Ex. A at 3:4-13 (cleaned up). In fact, the only access key described in any embodiment, including the kiosk embodiments, is composed of those two components. For example, in the kiosk embodiment, "the kiosk 106 generates an access key 706 based on the binding key 606 and the content key 700" by, for example, "employ[ing] a unique algorithm to cryptographically combine the binding key 606 and content key 700 and generate the access key 706." *Id.* at 20:42-46. This makes sense in the context of the '400 patent, which is directed to a DRM system, because the overall strength of the DRM hinges on the security of the key used to access the protected content. As the patent explains, having an access key bound to the portable data storage device and specific to the content makes the "the DRM of system 100 [] more difficult to attack and compromise than existing systems," and also limits the scope of any compromise—it will only affect one copy of the content—should one occur. *See id.* at 2:67-3:3, 9:31-36.

The Examiner understood the access key to be specific to the portable data storage device and rejected the claims of the '400 patent over the '400 patent's parent on double patenting grounds. Among other things, the Examiner explained that the access key limitation would have been obvious over the parent's disclosure of generating an access key "because **the access key** [disclosed in the '400 patent] **dictates whether a device would gain access**, therefore preventing **_any portable device_** entry to the data." Ex. 9 at 10. Thus, the access key prevents *any* portable device entry to the data because it is specific to the portable data storage device to which it is sent.

Plaintiffs' arguments are unpersuasive. Plaintiffs first argue (at 12) that Viasat's proposed construction requires "that the first media content be decrypted" and "that the (unclaimed) decryption be performed by the portable data storage device." This is not true. Viasat's construction does not require decryption. All that Viasat's construction requires is that the portable data storage device receive an access key specific to the media content and the portable data storage device that is capable of decrypting the encrypted media content. And this construction does not read out disclosed embodiments, as Plaintiffs claim (at 12).

The first embodiment that Plaintiffs point to as being read out of the claims states that "content can be downloaded via the network 108 to a portable storage device from client system 106" and "then be played on a playback device, such as a Blu-Ray player, game console, TV, by streaming the content from the storage device." Dkt. No. 103, Ex. A at 5:10-14. There is nothing in that embodiment that requires that the playback device decrypt the content. Instead, the embodiment specifically says that the content is downloaded to the portable storage device and then streamed to the playback device. In this scenario, the portable data storage device could still be the entity decrypting the media content with the access key.

The second embodiment that Plaintiffs point to as allegedly being read out of the claims similarly does not state that only the playback device is provided with an access key capable of decrypting the media content. Rather, that embodiment discloses a scenario where, "once a secure communication channel is established," the playback device requests from the portable data storage device a binding key and content key and the storage device then "send[s] the binding and content keys to the player so that it can generate the access key . . . used to decrypt and render the content."

1    But in this scenario, the storage device also has the binding and content keys that can be used to

2    generate the access key. The fact that the playback device is also able to generate the access key

3    does not mean that only the playback device can generate the access key or that only the playback

4    device can decrypt the content. Nor does it mean that the access key is specific to the playback

5    device as opposed to the portable data storage device. All that it means is that both the storage device

6    and the playback device have the necessary cryptographic module that is able to combine the binding

7    and content keys in order to create the access key. *See id.* at 8:29-44 (explaining that players in the

8    system, like portable data storage devices in the system, can have secure cryptographic hardware

9    that enables playback of the content); *see also id.* at 9:19-23.

10          Plaintiffs also argue that the claimed access key need not be specific to the portable data

11    storage device, but that argument is directly contradicted by the extrinsic evidence to which

12    Plaintiffs cite. Indeed, Plaintiffs cite to the Microsoft Computer Dictionary's definition of "key,"

13    which explains that, in the encryption context, two different types of keys are often used, a public

14    key and a private key, the latter of which is "known only to one person." Ex. 10 at 4. By Plaintiffs'

15    own definition, the private key is known only to the one entity and is therefore specific to that entity.

16          Moreover, the fact that the parent of the '400 patent expressly claims "generat[ing] an access

17    key for accessing the media content based on the binding key and a content key," does not mean, as

18    Plaintiffs' argue (at 13), that the claimed "access key" in the '400 patent is not unique to the data

19    storage device and unique to the media content. As described above, those concepts—i.e., the ways

20    of generating the claimed access key that is unique to the storage device and content—are discussed

21    extensively throughout the specification and thus there is no need to spell them out in the claims as

22    well. The claims disclose an access key and the specification describes how to generate that access

23    key. The claims of the '634 patent have no bearing on this point.

24          Viasat's proposed construction is consistent with the intrinsic evidence, the ordinary

25    meaning of the term to a POSA in the context of the '400 patent, and Plaintiffs' own dictionary

26    definition of the term. The Court should therefore adopt Viasat's proposed construction.

27          **E.      "public environment"**

28

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "public environment" ('400 patent claims 8 and 17) | Plain and ordinary meaning | A location accessible by the general public |

The term "public environment" appears in dependent claims 8 and 17, which recite "[t]he kiosk of claim 1 [or claim 9], wherein the kiosk is located in a public environment." Again, Plaintiffs contend (at 13) that there is no need to construe this term because it is "plain English." But there is a clear dispute over this term as evidenced by Plaintiffs' infringement contentions where they contend that a server located above the ceiling or under the floor of a plane, and thus completely inaccessible to airline customers, is still somehow in a "public environment." Ex. 7 at 5. This is clearly at odds with the meaning of that term generally and in the context of the '400 patent. Thus, the Court should adopt Viasat's proposed construction, "a location accessible by the general public," which is consistent with the intrinsic evidence and the ordinary meaning of "public" to a POSA.

Plaintiffs and Viasat agree that the dictionary definition of "public" is "exposed to general view." *See* Dkt. No. 95 at 6 (showing both parties citing to Merriam-Webster, Online Dictionary, 2011, "Public"); *see also* Ex. 11 at 2. Consistent with the definition, the '400 patent specification states that "the kiosk 106' may comprise specialized hardware and software that is designed such that kiosk 106' is placed in a public environment," which indicates that, in certain embodiments, the kiosk can be placed in a location accessible to the general public as opposed to a private environment accessible to only certain individuals like employees of the company providing the kiosk or kiosk service technicians. Dkt. No. 103, Ex. A at 6:39-41.

Plaintiffs attempt to confuse the issues with irrelevant hypotheticals. For example, Plaintiffs contend that because "stores and restaurants have operating hours, and are closed to non-employees beyond those time periods," it is "unclear what an 'accessible location means in the context of the claims." Dkt. No. 103 at 14. Plaintiffs also state that because "a movie theatre, while open to the 'public,' allows access only to patrons," "it is unclear how the 'general' public is different than simply 'public.'" *Id.* A restaurant, however, is still accessible to the general public during its operating hours and a movie theater is still open to the general public that buys a ticket. These hypotheticals have no bearing on the real dispute between the parties, which is that a "public

environment" in the context of the '400 patent does not encompass a locked equipment compartment on an airplane. That is where the server that Plaintiffs contend is the claimed "kiosk" is located. To use Plaintiffs' hypothetical, the location of Viasat's server would be more akin to the locked projection room of a movie theatre that is accessible to only movie theatre employees, never members of the general public. Just like the projection room of a theatre, the compartment housing the server is an area where the public cannot go, cannot see, and cannot access, regardless of the time. Plaintiffs' effort to capture this private area in the scope of a "public environment" is at odds with the claim language and common sense.

**F.    "secure region"**

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "receive an indication of the NAS device having **a secure region** comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the **secure region** is controlled by the media streaming system"<br><br>"transmit the digital content to the **secure region** within the NAS device for playback by the separate display device from the buffer"<br><br>('667 patent, claims 1, 4-7, 11-16) | Plain and ordinary meaning | A portion of a NAS device not freely accessibly by users |

The term "secure region" appears in claims 1, 4-7, and 11-16 of the '667 patent, which disclose either "the NAS device having a secure region" or "the secure region within the NAS device." Plaintiffs propose that the term should have its plain and ordinary meaning but provide no explanation of what that is in the context of the '667 patent. Viasat's construction, which is "a portion of a NAS device not freely accessible by users," is consistent with the intrinsic evidence and the ordinary meaning of "secure" to a POSA.

Specifically, the '667 patent explains that the disclosed invention is an improvement over prior art systems where "content streamers," like Netflix and Hulu, stream content direct to display devices, which typically have very limited buffers. Dkt. No. 103, Ex. B at 1:28-29, 30. Content streamers prefer this because it allows them to "maintain control over the content, e.g., by controlling the client to which the content is being transmitted and how much content is transmitted

at a time" and because a "limited buffer size also limits content from being misappropriated from the buffer." *Id.* at 1:33-38. The downside of this arrangement is that network providers often intentionally limit a user's upload and download rates on programs such as video streaming in an effort "to regulate network traffic and minimize bandwidth congestion." *Id.* at 1:16-30. This practice, referred to as "throttling" the data transmission, may cause deterioration in the display of the streamed content. *Id.* at 1:15-18. "For example, throttling may cause the end display to hic-up or stall while waiting for the next packet." *Id.* at 1:26-28. The alleged improvement to this issue as disclosed in the '667 patent is to use a "Network Attached Storage (NAS) device having a secure portion for buffering streaming content," which, according to the '667 patent, "maintain[s] smaller size buffers on display device[s] and [] maintain[s] control over content while ensuring that content can be viewed without deterioration due to throttling." *Id.* at 2:29-34.

As is relevant to the claim term, "secure region," the '667 patent explains that "[c]ontrol of the media [content] may be maintained by the stream content provider through the security employed by the secure portion of the storage device," which ensures that content streamers can still maintain control over the content they stream just as they are able to do when streaming directly to a display device. *Id.* at 2:46-48. The '667 patent goes on to explain that the secure portion "may be secured, e.g., by designating the media as private," and that "[a]ccess to the private buffer may be sold on a subscription model to streaming content providers." *Id.* at 2:48-51. Thus, the specification makes clear that the secure portion is not freely accessible to users, but rather is accessible to content streamers who obtain access to that region. Indeed, this security vis-à-vis users is the crux of the alleged invention and is precisely what allows content streamers to prevent deterioration in the display of the streamed content while also maintaining control over the streamed content and therefore preventing "content from being misappropriated from the buffer." *Id.* at 1:33-38.

The figures in the '667 patent also show that the "secure region" is a "[a] portion of a NAS device not freely accessibly by users." As shown in Figures 1 and 3, the NAS device has a portion that is deemed the "user media area," which is accessible by users, and another portion deemed the "secure region" or the "secure streamed content area" where the access to that area is controlled by streaming providers. Moreover, the Figure 1 embodiment is described as including "a user media

area 102 that may be accessible by a user of the local network" and "a secure region 104, e.g., *a secure content media area*, for which access may be controlled by the remote content provider." *Id.* at 3:19-23. The secure region in Figure 1 is further described as being "*a non-user accessible area* on a hard drive, SSD, or other data storage device" that "may be inaccessible by the user without permission from the content provider" or it "may be hidden from the user," which allows the content provider to continue to maintain control of the media content even once it has been pushed to the NAS device." *Id.* at 3:23-25, 32-37. And when describing system disclosed in Figure 3, the specification states that "the NAS device 206 may negotiate with the stream content provider 202 to receive the desired content and to buffer an encrypted stream of the content in the secure region 210" and that "[s]uch negotiation may include, e.g., informing the stream content provider of 30 *a secure region within the NAS device that is not accessible by a user*." *Id.* at 4:24-31.

Plaintiffs argue (at 15) that Viasat's construction is wrong because it purportedly excludes "several embodiments of the 'secure region,' some of which involve user inaccessibility, and others which do not." All of the embodiments to which Plaintiffs cite, however, describe a secure region that is not freely accessible by users, consistent with Viasat's proposed construction. Indeed, the first embodiment Plaintiffs cite states that "*the secure region may be a non-user accessible area* on a hard drive, SSD, or other data storage device." *Id*. at 3:23-25. The second embodiment describes a secure region that "*may be inaccessible by the user* without permission from the content provider." *Id.* at 3:32-33. And the third embodiment discloses a secure region that "may be, for example**, hidden from the user**."[8] *Id.* at 3:33-34, 7:50-51. In each of these embodiments, the secure region is not freely accessible to users. The only thing that varies between embodiments is how that inaccessibility is accomplished. Thus, Plaintiffs provide no explanation as to how Viasat's proposed construction excludes the above-referenced embodiments.

Plaintiffs' argument that claim differentiation demonstrates that Viasat's proposed construction excludes embodiments is similarly unpersuasive. It is Viasat's position that

---

[8]  And the last embodiment that Plaintiffs cite does not even discuss the secure region or accessibility to the secure region but rather the way in which content is stored in the secure region (i.e., the content is encrypted). *See* Dkt. No. 103, Ex. B at 3:38-40, 5:31-40, 7:52-57.

independent claims 1 and 11 include the limitation, "a portion of an NAS device not freely accessible by users." By contrast, dependent claims 4 and 13 recite that "[t]he secure region is inaccessible by a user of the NAS device without permission from the media streaming system." Thus, dependent claims 4 and 13 are still narrower than independent claims 1 and 11 because claims 1 and 11 recite more generically a portion of a NAS device not freely accessible by users whereas claims 4 and 13 recite that the portion of the NAS device not freely accessible by users is, more specifically, inaccessible without permission from the media streaming system.

Viasat's construction also does not "inject[] ambiguity into the claims," as Plaintiffs contend. Dkt. No. 103 at 16. Specifically, the phrase "not freely accessible" is easily understood in the context of the '667 patent as an area that is accessible only under certain circumstances or conditions. *See, e.g.*, Dkt. No. 103, Ex. B at 5:11-14 ("FIGS. 4A and 4B illustrate an example, in which previously buffered content can be purchased by the user and reassigned to the user accessible region 402 of the NAS device."); *id.* at 5:21-40 (In one example, the NAS device 400 may be configured to move a received digital object stored in the secure region 404 to the first region, e.g., 402 along with keys for accessing the digital object based on instruction from the remote content provider."); *id.* at 7:18-21 ("the content provider may instruct the NAS device to allocate to the user accessible region a portion of the secure region."). And the phrase "not freely accessible" is not redundant of the claim limitation, "access to the secure region is controlled by the media streaming system" (Dkt. No. 103 at 16) because while the phrase "not freely accessible" makes clear that the access is controlled and restricted in certain circumstances, the latter claim term specifies the entity (i.e., the media streaming system) that is responsible for such control and restriction/access.

### G. "receive an indication of the NAS device having a secure region"

| Term/Phrase | Plaintiffs | Viasat |
|---|---|---|
| "**receive an indication of the NAS device having a secure region** comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is | Plain and ordinary meaning | Receive an indication of the presence of a secure region within the NAS device |

| Term/Phrase | Plaintiffs | Viasat |
|---|---|---|
| controlled by the media streaming system" ('667 claims 1 and 11) | | |

The term "receive an indication of the NAS device having a secure region" appears in independent claims 1 and 11 of the '667 patent. Consistent with the intrinsic evidence, Viasat's proposed construction of the term makes clear that the media streaming system receives an indication of the presence of a secure region within the NAS device. Plaintiffs again offer no construction of their own but rather argue that Viasat's construction is wrong because the media streaming system allegedly must only receive an indication of the presence of a NAS device, as opposed to the presence of a secure region within the NAS device. Plaintiffs' argument finds no support in the intrinsic record. The Court should thus reject it and adopt Viasat's proposed construction.

Specifically, the intrinsic evidence, as discussed above, establishes that the purpose of the invention disclosed in the '667 patent is to provide a solution to service interruptions caused by network provider throttling, while still allowing content streamers to maintain secure control over their streamed content, which they did in prior art systems by streaming directly to a display device with a limited buffer size. Dkt. No. 103, Ex. B at 1:15-38. In order to accomplish the goal of the claimed invention, the '667 patent discloses the "use of a Network Attached Storage (NAS) device having a secure portion for buffering streaming content." *Id.* at 2:33-34. The secure region of the NAS device is essential to the utility of the claimed invention to a content streamer like Netflix because, without a secure region, the drawbacks of being unable to control the streamed media content and the risk of misappropriation of the streamed content outweigh the benefits of more buffer space and fewer service interruptions due to throttling. And for the content streamer to be sure that it is not risking misappropriation of the streamed content by streaming to a NAS as opposed to directly to a display device, it must know that the NAS device has a secure region that it can control access to. As such, the specification discloses that "once a user requests content from a stream content provider via a display device," the NAS device "negotiates with the stream content

provider," which can include "informing the stream content provider of 30 a secure region within the NAS device that is not accessible by a user." *Id.* at 4:24-31.

Given the importance to the invention of using a NAS device that has a secure region, the specification also describes ways that the content streamer can "discover a secure stream buffer on network attached storage." *Id.* at 5:58-60. For example, "[d]isplay devices may have their application software altered to 'look' for a secure host, e.g., a NAS device having a secure region, within the home network prior to making a connection to the host provider, e.g., stream content provider" so that the display device can then send that information to the content provider "to allow the content provider to make use of the secure network storage." *Id.* at 5:49-55. Thus, "the content provider may be informed of the presence of a NAS device having a secure region that can be used as a secure buffer for a display device that is requesting streaming content." *Id.* at 5:55-58.

The claims themselves also specify that the indication sent to the content streamer is that the NAS device has a secure region. For example, claim 1 recites, *inter alia*: "[a] media streaming system comprising: . . . one or more processors configured to: ***receive an indication of the NAS device having a secure region*** comprising a buffer for streaming media on a separate display device." Claim 11 recites, inter alia, "[a] method of transmitting media content from a media streaming system, the method comprising: . . . ***receiving an indication of the NAS device having a secure region*** comprising a buffer for streaming media on a separate display." Thus, the claims together with the specification make clear that when the claims state that the media streaming system "receive[s] an indication of the NAS device having a secure region," it is receiving an indication not just of the existence of an NAS, but of the presence of a secure region within the NAS device.

Plaintiffs contend (at 17) that Viasat's construction is incompatible with the claims because "Viasat's construction makes no sense when placed in context with the remainder of the limitation. Viasat does not even understand this argument—when its construction is placed into the claim it makes perfect sense: *receive an indication of the presence of a secure region within the NAS device* "comprising a buffer for streaming media on a separate display device on the local area network , wherein access to the secure region is controlled by the media streaming system . . . ." *Id.* at 11:1-5. It is Plaintiff's argument that entirely ignores the language of the claims.

Plaintiffs also argue (at 17) that the claim includes many characteristics of the NAS device ("(1) that the NAS device 'ha[s] a secure region,' (2) that this secure region 'compris[es] a buffer for streaming media,' (3) that this media is streamed 'on a separate display device,' (4) that the display device is 'on the local area network,' and (5) that 'access to the secure region is controlled by the media streaming system'), but that Viasat "seeks to require that the indication include one (and only one) of those characteristics." This makes no sense. The claim states that the "processor[] . . . receive[s] an indication of the NAS device having a secure region." The claim then goes on to explain what that secure region comprises, namely, "a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system." It is clear from the way the claim is worded that the "indication" is of a "secure region." The latter part of the claim simply describes the attributes of that secure region; it does not suggest the claimed "indication" must also include the existence of subsidiary attributes.

Finally, Plaintiffs contend (at 18) that Viasat's proposed construction excludes claimed embodiments like the one stating that the NAS device and the content provider engage in a negotiation after the content provider "has been informed of the presence of the NAS device." *Id.* at 7:32-34. Plaintiffs, however, fail to understand what is being disclosed in that embodiment. Indeed, immediately after the above sentence from that embodiment, the specification explains that "[t]he remote content provider may, for example, receive an indication of the NAS device from a display device coupled to the NAS device, and/or ***may discover the presence of an NAS having secure storage in a different manner***." *Id.* at 7:34-38. This sentence thus clarifies the prior sentence in that when the content provider is informed about the presence of a NAS device, it is actually being informed about the presence of "an NAS having secure storage." *Id.* Viasat's construction is thus consistent with the intrinsic evidence and should be adopted.

**H.    "access to the secure region is controlled by the media streaming system"/ "control streaming access to the digital content stored on the buffer"**

| Term/Phrase | Plaintiffs' Construction | Viasat's Construction |
|---|---|---|
| "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein **access to the secure region is controlled by the media streaming system**"<br><br>"transmit instructions to the NAS device to **control streaming access to the digital content stored on the buffer**"<br><br>('667 claims 1 and 11) | Plain and ordinary meaning | Access to the secure region is managed by the media streaming system/manage streaming access to the digital content stored on the buffer |

Viasat proposes that the term "access to the secure region is controlled by the media streaming system"/"control streaming access to the digital content stored on the buffer," be construed as "[a]ccess to the secure region is managed by the media streaming system/manage streaming access to the digital content stored on the buffer." Plaintiffs again propose only that the term should have its plain and ordinary meaning but provide no insight into what that meaning is. Viasat's proposed construction comports with the intrinsic evidence and should be adopted.

Viasat's proposed construction is consistent with the '667 patent specification, which explains that the content streamer manages the access to the secure region. Indeed, this is precisely how the patent achieves the stated improvement over the prior art of allowing content streamers to maintain control over the content they stream just as they are able to do when streaming directly to a display device. That is, in order to maintain control over the streamed content, "e.g., by controlling the client to which the content is being transmitted and how much content is transmitted at a time," Dkt. No. 103, Ex. B at 1:36-38, the content streamer must be able to continuously manage access to the secure region where the content is stored. Otherwise, users could gain access to the content and misappropriate it, the precise problem the patent is designed to solve. *See id.* at 4:15-23.

Specifically, the specification expressly states that "[t]he secure region may be inaccessible by the user without permission from the content provider" or it "may be hidden from the user" as "[t]his allows the content provider to continue *to maintain control of the media content even once it has been pushed to the NAS device*, e.g., in a user's home." *Id.* at 3:32-37. Similarly, another

embodiment disclosed in the specification notes that "[r]emote content providers can pre-load the secure region of the NAS device without opening themselves up to misappropriation of the content, because they **continue to control the secure portion** of the in-home media storage**, and therefore control access to the media after it is stored at the NAS device**." *Id*. at 6:5-10. Thus, it is evident from these disclosures that the content streamer continuously manages access to the secure region in order to maintain control over the streamed content that has been placed there.

The continuous nature of this management is also exemplified by the embodiments in the specification where, after the content is stored in the secure region of the device, the content streamer can later decide to allow that content to be transferred to a user accessible region. For example, the patent explains that "previously buffered content can be purchased by the user and reassigned to the user accessible region of the NAS device . . . based on instructions from the remote content provider." *Id.* at 5:11-13, 21-25.

Plaintiffs do not appear to disagree with the intention behind Viasat's proposed construction. Indeed, Plaintiffs themselves state that "[t]he specification describes a variety of ways in which" control by the content provider "may be maintained." Dkt. No. 103 at 19. Thus, Plaintiffs agree that the patent and the claims disclose that the content provider maintains control over the content even after it has been pushed to the NAS device. It seems, therefore, that Plaintiffs real dispute then is with the word "manage," but as Plaintiffs recognize, the specification uses this word to describe the maintenance of control encompassed by the claims. *See* Dkt. No. 103, Ex. B at 5:61-63 ("The secure region of the NAS device may be **managed**, e.g, between an NAS device application, DRM controls and the remote content provider. . . . Remote content providers can pre-load the secure region of the NAS device without opening themselves up to misappropriation of the content, because they continue to control the secure portion of the in-home media storage, and therefore, control access to the media after it is stored at the NAS device."). Thus, Viasat's proposed construction is consistent with the language of the patent and should be adopted.

## III.    CONCLUSION

For the reasons set forth above, the Court should adopt Viasat's proposed constructions for the disputed claim terms.

1

2    DATED: May 9, 2024                          QUINN EMANUEL URQUHART &
                                                 SULLIVAN, LLP
3

4

5                                                By  /s/ Patrick Curran

6

7                                                *Attorneys for Defendant Viasat Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2024, a copy of the foregoing document was served via e-mail to all counsel of record who have appeared in this matter.


DATED: May 9, 2024                    By  _/s/ Patrick Curran_
                                          Patrick Curran