Pages 1 - 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam Jr., Judge

```
WESTERN DIGITAL TECHNOLOGIES,    )
INC., ET AL.,                    )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )    NO. 22-CV-04376-HSG
                                 )
VIASAT, INC.,                    )
                                 )
            Defendant.           )
_____  )
```

Oakland, California
Tuesday, August 27, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
        GIBSON, DUNN & CRUTCHER LLP
        2001 Ross Avenue, Suite 2100
        Dallas, TX 75201
    BY:  **ROBERT VINCENT, ATTORNEY AT LAW**

        GIBSON, DUNN & CRUTCHER LLP
        One Embarcadero Center, Suite 2600
        San Francisco, CA 94111-3715
    BY:  **L. KIERAN KIECKHEFER, ATTORNEY AT LAW**

        GIBSON, DUNN & CRUTCHER LLP
        310 University Avenue
        Palo Alto, CA 94301
    BY:  **LILLIAN J. MAO, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                   Official United States Reporter

**APPEARANCES (Continued):**

For Defendant:

        QUINN EMANUEL URQUHART & SULLIVAN
        111 Huntington Avenue, Suite 520
        Boston, MA 02199
      BY:  **PATRICK D. CURRAN, ATTORNEY AT LAW**

        QUINN EMANUEL URQUHART & SULLIVAN
        51 Madison Avenue, 22nd Floor
        New York, New York 10010
      BY:  **NICOLA R. FELICE, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Tuesday - August 27, 2024**          **10:01 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 |     **THE COURTROOM DEPUTY:**  All rise.  This Court is now in |
| 5 | session, the Honorable Hayward S. Gilliam, Jr. presiding. |
| 6 |     You may be seated. |
| 7 |     Your Honor, we're calling CV-22-4376, Western Digital |
| 8 | Technologies, Inc., et al. v. Viasat, Inc. |
| 9 |     Please step forward and state your appearances for the |
| 10 | record, please. |
| 11 |     **MS. KIECKHEFER:**  Kieran Kieckhefer with Gibson Dunn on |
| 12 | behalf of the Western Digital defendants -- Western Digital |
| 13 | plaintiffs. |
| 14 |     **THE COURT:**  Good morning. |
| 15 |     **THE COURTROOM DEPUTY:**  I'm sorry -- oh, never mind. |
| 16 | You stated your name. |
| 17 |     **MR. CURRAN:**  Good morning, Your Honor.  Patrick |
| 18 | Curran, Quinn Emanuel, for Viasat, the defendant.  With me |
| 19 | today is my colleague, Nicola Felice; and with us also, |
| 20 | Dr. Kevin Almeroth; our client, in-house representative, head |
| 21 | of litigation of Viasat, Colin Ward. |
| 22 |     **THE COURT:**  Morning. |
| 23 |     All right.  Claim construction day.  Main topic -- how |
| 24 | long do the parties estimate your presentations will be?  I |
| 25 | know we have three hours set aside.  Don't feel obligated to |

1   use it all.

2       **MS. KIECKHEFER:**  We don't anticipate, Your Honor, that

3   it's going to take 90 minutes on our side.  We're thinking

4   roughly approximately 45 minutes to an hour for our

5   presentation.

6       **THE COURT:**  Fair enough.  Thanks.

7       **MR. CURRAN:**  Same estimate on our part, Your Honor.

8       **THE COURT:**  All right.  Perfect.

9    Let's do this:  My general practice is to just do it term

10  by term; have each side present as to that term and then move

11  on to the next term.  And I will have a bunch of questions as

12  we go through, so everybody should be prepared to have a

13  discussion as we proceed with the argument.  I'm fine with

14  whatever sequence the parties prefer.  Have you talked about

15  that?

16      **MS. KIECKHEFER:**  Yes.  We emailed.  And we were going

17  to go in the order of the briefs, with the plaintiffs starting

18  first, then the defendants, and then back to the plaintiffs for

19  reply.  And if they wanted a surrebuttal -- surreply -- they

20  were going to ask the Court for that.

21      **THE COURT:**  Sounds good.  And I know everyone would

22  prefer to have the last word, but then we would be here all

23  night.  So I generally cut that off at some point.

24      **MR. CURRAN:**  Just one slight amendment to that, Your

25  Honor.  The proposal from Viasat had been what Your Honor's

1   used in the past -- a round robin -- plaintiffs start first, or

2   defendant, and alternate.  If Your Honor would prefer

3   plaintiffs start first, we're happy with that.  But our

4   proposal had been to mix it up a bit.

5           **THE COURT:**  Why don't we just stick with the

6   plaintiff -- well, you know what, why don't we alternate it.

7           **MR. CURRAN:**  Yes, sir.

8           **THE COURT:**  Okay.

9           **MS. KIECKHEFER:**  One -- one brief housekeeping issue,

10  Your Honor.

11          **THE COURT:**  Yes.

12          **MS. KIECKHEFER:**  We are not sure, but we believe we

13  see that an expert is in the room.  And that was not properly

14  disclosed pursuant to your order.  And so we object to -- if

15  Dr. Almeroth is going to be testifying, we would object to that

16  as a violation of your order.

17          **THE COURT:**  I assume he's not.

18          **MR. CURRAN:**  Your Honor, Dr. Almeroth is here.  He

19  submitted a declaration.  He's not planning to testify.  If

20  Your Honor had any questions for him, he's available.  But

21  we're not planning to present any testimony today.

22          **THE COURT:**  Yeah.  I wouldn't -- I wouldn't hear any.

23          **MR. CURRAN:**  Thank you, Your Honor.

24          **MS. KIECKHEFER:**  All right.  Thank you.

25          **THE COURT:**  Okay.  So what -- is the first term

1  "kiosk"?

2       **THE COURTROOM DEPUTY:**  Okay.  So always remember,

3  before you respond, please be at the mic at the podium.

4       **MS. KIECKHEFER:**  Yes.

5       **THE COURT:**  All right.  And before we start with the

6  blow by blow, I have a fundamental, overarching issue that I

7  think I should discuss with both parties.  And this is the not

8  uncommon case where the plaintiff is, across the board,

9  asserting a plain and ordinary meaning.  I would say

10  "construction," but it's not really construction, because it

11  doesn't limit anything at this point, and it seems to me it's

12  essentially a way of kicking the can down the road and leaving

13  options open.

14       We all know what *O2 Micro* says.  You know, one of the

15  terms here is "portable."  You know, the federal circuit, in

16  *Eon Corp.*, reversed the District Court for not construing

17  "portable."  And really -- so the overarching question for the

18  plaintiffs is, how is your just blanket, plain and ordinary

19  meaning assertion resolving what are obviously disputes between

20  the parties as to the meanings of these claims?

21       My concern is that, you know, if I don't resolve that

22  dispute now, I've got to resolve it at some point.  And, if I

23  don't, it essentially leaves claim construction to the jury,

24  which is what *Markman* says they can't do.  So I'm not sure I

25  understand how your proposal is consistent with the

 1 │ requirements of *O2 Micro*.

 2 │         **MS. KIECKHEFER:** Sure.  So, just to begin, you are

 3 │ allowed, even though you're going to interpret -- you're going

 4 │ to look at the claims and evaluate the arguments from both

 5 │ sides -- you have, in the past, given just a plain and ordinary

 6 │ meaning as the definition.  And you're allowed to do that.  And

 7 │ courts have affirmed that at the federal circuit.

 8 │         **THE COURT:** Well, but that -- that's way too

 9 │ high-level.

10 │         **MS. KIECKHEFER:** Yes.

11 │         **THE COURT:** Yeah, of course --

12 │         **MS. KIECKHEFER:** Of course.  You're allowed.

13 │         **THE COURT:** -- if it's a simple term, I can do it.

14 │ But these aren't self-evident, simple terms.  You're not -- I

15 │ don't understand how you're helping me resolve the dispute.

16 │ Obviously, I could come up with my own construction, but that

17 │ seems that it was your job.  How is what you're proposing a

18 │ mechanism for resolving what are the obvious disputes between

19 │ the parties about the meaning of these claims?

20 │         **MS. KIECKHEFER:** Yes, Your Honor.  So these terms,

21 │ generally speaking, are very common English terms.  And we can

22 │ get right to the specific term of "portable," which is a common

23 │ English term.  I understand that *Eon* did analyze it and

24 │ reversed the District Court for not providing specific

25 │ construction there.  The facts in that case and the intrinsic

1    evidence in that record was very different than the case here.

2    And so, on each one, we're kind of going to go through.  And

3    some of these terms -- Viasat is literally proposing switching

4    out one term -- for example, "manage" for "control."

5            THE COURT:  I get it.  That --

6            MS. KIECKHEFER:  Yeah.

7            THE COURT:  Whatever my problem might be with some of

8    their proposed constructions --

9            MS. KIECKHEFER:  Yeah.

10           THE COURT:  -- and I have some -- I -- I have a

11   feeling you're leading me to a place that is not helpful to the

12   job that I have to do.  And I'm probably going to be pressing

13   you on every one of these -- okay, then what is the plain and

14   ordinary meaning in your view -- committing to something.

15           MS. KIECKHEFER:  Understood.

16           THE COURT:  So just understand that.

17           MS. KIECKHEFER:  And --

18           THE COURT:  And if you had done it on paper, that

19   would have been helpful.  Because I could have reviewed it, as

20   I was spending a bunch of time preparing for this hearing.

21           MS. KIECKHEFER:  I understand, Your Honor.  And we

22   did, in fact, think that this might be one of your questions.

23   We are prepared for further elucidation in what we think is the

24   plain and ordinary meaning of the term.  And your point is

25   well-taken that you would have preferred that to have been in

 1   our briefing instead of right now.  But --

 2           **THE COURT:**  Right.  As -- as would opposing counsel,

 3   because now they're going to be responding on the fly to

 4   something they've never heard before.

 5           **MS. KIECKHEFER:**  Understood, Your Honor.

 6           **THE COURT:**  Okay.  Why don't you start with kiosk.

 7           **MS. KIECKHEFER:**  Sure.

 8      So there are three fundamental issues with kiosk.  And I'm

 9   turning to Slide 1 -- Slide 2 -- of our presentation.

10      So the first issue is whether or not the preamble is

11   limiting at all.  And then the second issue -- only if the

12   Court finds that the preamble is limiting -- the second issue

13   is, does kiosk require user interface.  And the third issue is,

14   does kiosk require that the user interface have to be used by

15   consumers.

16      So the term only appears in the preamble.  So I'm turning

17   to Slide 3 of Western Digital's presentation.  So, as you can

18   see in the preamble, it is "a kiosk for provisioning secure

19   media content to a plurality of portable data storage devices."

20   And then it says "the kiosk comprising."

21      The body itself, as you can see, is a structurally

22   complete invention.  The preamble is only being used here to

23   state the purpose of the invention.  The preamble is not

24   necessary to understand any term that follows later in the body

25   of the invention.  And, in fact, even the terms are referenced

in the preamble.  When those terms then appear again in the

body of the invention, they are not referring back to that

preamble in any way.

So, for example, the claims reference media content and

portable storage devices, but they don't refer back to the

preamble.  They don't need the preamble to provide any further

clarity about those terms.  And then as to the preamble

specifically, Viasat's expert did not opine otherwise as to

this issue.

So then under -- it's black-letter law the preamble is not

limiting in these circumstances.  And I would refer you to the

*Cochlear Bone Anchored* case for that.  And --

**THE COURT:**  Let me ask -- I mean, it seems to me,

really, the argument that the defendants are making is that

there's some distinction about this term, but in the context of

a totally different patent prosecution history.  And, I guess,

really, the fundamental question is why would I treat -- even

if I were to assume that they -- that they made some sort of

distinction in that case to obtain the patent -- and I don't

need to decide that -- but why would that transfer to this

patent?

It's almost using the prosecution history of a completely

different patent to make an argument about -- I don't know --

it's almost lexicography or something.  But what's your view of

the law as to whether I would even look there?

1        **MS. KIECKHEFER:** Sure.  You can look at the

2    prosecution history of a parent application in order to simply

3    determine whether or not a claim scope has been limited.  For

4    example, when there is actually clear prosecution history

5    disclaimer.  They're doing it here in a tortured way.  They're

6    using it -- in the way they put it in their brief is to say

7    that the preamble is limiting.

8        There's no case law, whatsoever, that we're aware of, that

9    you can use the application of -- you can use the prosecution

10   history of a parent application in order to determine whether

11   or not a preamble is limiting.  That is totally wrong.  You're

12   required to look at the specific claims at issue to determine

13   whether or not the preamble is limiting for that claim.  But

14   you can look at the prosecution history of a parent in order

15   just to determine whether the claim scope has been limited.

16   But in order to do so, there needs to be a clear and

17   unequivocal disclaimer, which is not the case here.

18        So their citation to the *Bauchot* reference fails for two

19   reasons.  And then I'm moving to the next slide, Slide 4, just

20   to give you further clarity.  It fails for two reasons because,

21   number one, this has nothing to do with whether or not the

22   kiosk in Claim 1 -- the preamble is limiting -- and,

23   number two, this has -- this cannot be clear and unmistakable

24   disavowal of claim language because it simply is just --

25   there's a throwaway term in the patent -- the parent patent --

```
 1   prosecution history that simply says -- and you can see it
 2   larger here -- that Bauchot fails to even mention a kiosk.
 3        And so this just doesn't rise to the level of prosecution
 4   history disclaimer whatsoever.  And so that's why it
 5   shouldn't -- it shouldn't be considered.
 6        THE COURT:  And so if I -- in your view, if I found
 7   that the preamble's not limiting, then I don't even have to get
 8   to defining the term?
 9        MS. KIECKHEFER:  That's correct, Your Honor.
10        THE COURT:  All right.  If I did get there, it seems
11   to me the specification says -- and this is column six, lines
12   36 to 37 --
13        MS. KIECKHEFER:  Yeah.
14        THE COURT:  -- "the kiosk may be any device used to
15   access and distribute content provided by the system."
16        I mean, if I got there and decided I did need to construe
17   it, do you object to that construction?
18        MS. KIECKHEFER:  We do not, Your Honor.
19        And so to your point earlier, that the other side may not
20   have received notice, many of the things that we're using for
21   our pivot, in the event that Your Honor thinks that a
22   construction would be helpful, these are found in the patent.
23   They're aware of this.  Or this is, you know, something their
24   own dictionary definition provided.  But, you know, they're
25   changing the term, and we're saying, well, if it's different,
```

then it would we fine.  Different than what they propose,

consistent with what the dictionary definition proposed.

So they do have notice of everything that we're providing

as example here.  We would be fine with what is identified in

the specification.

**THE COURT:**  I'm not sure they have notice.  But I

guess --

**MS. KIECKHEFER:**  Understood, Your Honor.

**THE COURT:**  -- the federal circuit can decide that

someday.

**MS. KIECKHEFER:**  So just to be clear as to why their

construction is incorrect, their construction is incorrect for

two reasons.  First of all, we would go with what the patent

says.  And their construction is incorrect for two reasons:

Number one, the claims do not require a user interface.  And,

number two, the claims do not require that the user interface

be used by consumers.

So on Slide 5, you can see the claims.  You have Claim 1,

which is a kiosk.  And then Claim 2 is a dependent claim --

excuse me -- Claim 3 is a dependent claim.  And so a kiosk --

there's nothing in Claim 1 that talks, at all, about a user

interface.  And then, when you get to Claim 3, Claim 3 talks

about how a kiosk can then be comprising a user interface.  It

doesn't say "the user interface."  It's not referring back to a

user interface that was previously disclosed.  And this is

1   consistent with what the specification says, which does not

2   require that the kiosk does have a user interface.

3        And another example is the one on Claim 11.  So Claim 9

4   provides kiosk.  And then Claim 11, which depends from Claim 10

5   and then from Claim 9, also says "a user interface" -- "a user

6   interface" -- that's the first time that it's introduced in

7   connection with those claims.

8        And so moving on to the specification, the specification

9   supports this, as well.  This is the part that Your Honor

10  already identified, which is column 6.  And it is -- it

11  identifies that "the kiosk may be any device used to access and

12  distribute content provided by the system 100."  And then it

13  goes on from there.  For -- for example, all of these -- all of

14  the -- the next pieces -- they're all "may" language.  They're

15  all "for example."  They're all proposals.

16       "For example, the kiosk 106'" -- with an -- with a -- 106

17  hyphen [sic] -- "may be implemented as a self-service computer

18  terminal.  In one embodiment, the kiosk 106' may comprise

19  specialized hardware and software that is designed such that

20  kiosk 106' is placed in a public environment."

21       And then the last piece is "the kiosk 106' may comprise

22  various" --

23            **THE COURT REPORTER:**  Can you please slow down?

24            **MS. KIECKHEFER:**  Of course.  And this is on Slide 6 of

25  our presentation.

1    "The kiosk 106' may comprise various user interface

2    equipment, such as a keyboard, display, et cetera to allow use

3    of the kiosk."

4    This build is also important, Your Honor.  So the

5    specification generally describes what kiosk is.  And then it's

6    providing some examples for what may happen.  And it's saying

7    that in the event the kiosk is in a public environment, it may

8    have a user interface, and it may have additional features for

9    that, which is a keyboard, a display to allow the use of the

10    kiosk.  And so this all makes sense in, then, context that,

11    number one, a user interface is not required.

12    And then the second point:  There's nothing in the

13    specification whatsoever that requires the user interface to be

14    used by consumers.  The word "consumer" does not appear

15    anywhere in the specification, period, full stop.  So this is

16    simply interjecting language that doesn't appear at all.  It

17    doesn't have to be used by consumers.  It could be used by a

18    user.  It could be used -- it doesn't have to give that

19    limitation whatsoever.  And there's simply no support for that

20    whatsoever.

21    And so unless the Court has further questions, we do

22    submit that the preamble is not limiting.  To the extent a

23    construction is necessary, Viasat's is not correct.  But we

24    would be okay with the definition that is provided from the

25    specification.

1          **THE COURT:**  All right.  I don't have any further

2   questions.  Thanks.

3          **MS. KIECKHEFER:**  Thank you.

4          **MR. CURRAN:**  Thank you, Your Honor.

5     We have a slide presentation, as well.  This would be

6   Slide 21 of that deck.  We have copies, as well, and paper, if

7   it would be useful for Your Honor.

8          **THE COURT:**  I would prefer paper actually.

9          **MR. CURRAN:**  I think there's actually a lot of

10  agreement between the parties on the nature of the dispute --

11  or kiosk -- and there are really we think three parts to this.

12    As Your Honor's noted, is the preamble limiting?  If it

13  is, how are we going to construe this?  We talked a little bit

14  about claim differentiation.  If the evidence leads us to a

15  construction we'd otherwise pick, is claim differentiation

16  going to lead us away from that construction?  We'll take each

17  of those in turn.

18    First, the argument we've heard is that a kiosk, although

19  it's one of the first words of the claim, isn't limiting

20  because it's in the preamble.

21          **THE COURT REPORTER:**  I'm sorry.  I'm sorry.  Can you

22  get a little closer to the microphone?

23          **MR. CURRAN:**  Yes.  Does this -- this work?

24          **THE COURT REPORTER:**  Yes.  Thank you.

25          **MR. CURRAN:**  Okay.  Thanks.

1          We've heard that a kiosk isn't limiting because it's in

2     the preamble.  But the law isn't that preambles are per se

3     non-limiting.  The preamble is part of the claim if you treat

4     it as part of the claim or if it breathes life, meaning, and

5     vitality -- oh, thank you -- into the claim.  And that's

6     exactly what is happening here.

7          If we look at Slide, for example, 24, this is a recent

8     precedent just from earlier this month with a District Court

9     grappling with a similar issue.  In the District of Delaware,

10    Judge Connolly noting, look, you're giving me a claim that says

11    it is a vaccine.  And it would strain common sense.  And the

12    idea that that doesn't put meaning, life, or vitality into the

13    claims to say when you claim a vaccine, it doesn't have to be a

14    vaccine.  Of course what you're claiming is a vaccine.

15         And the same is true here.  If you're claiming a kiosk,

16    then of course it has to be a kiosk.  And we know that not just

17    because of life, meaning, and vitality, but we know from the

18    file history.  And if we take a look at this file history, Your

19    Honor, this will show -- we can talk -- well, actually, two

20    things, Your Honor.  We spent some time at that last

21    presentation talking about why are we looking at this file

22    history.  We thought that might come up.  And if it's helpful

23    for Your Honor, I can start with that rather than looking at

24    the evidence itself.

25              **THE COURT:**  Well, you know, I mean, I think the

1    baseline question is, you know, what -- what federal circuit

2    authority do you have that says I look at the prosecution

3    history from a different patent to make a determination as to

4    whether a preamble is limiting?

5         **MR. CURRAN:**  Yes, Your Honor.  Can we go to Slide 102,

6    please?  And my colleagues noted, Your Honor, these slides are

7    not actually in the printout.  I apologize.  There's a couple

8    extras here.  If I can hand that up?

9         **THE COURT:**  Sure.

10        **MR. CURRAN:**  Thank you.

11        On Slide 102, we --

12        **THE COURTROOM DEPUTY:**  I'm sorry.  Is there a set for

13   the law clerk?

14        **MR. CURRAN:**  I apologize.  That one, we only had one.

15   I'm very sorry.

16        **THE COURTROOM DEPUTY:**  I just needed to ask.

17        **MR. CURRAN:**  This is a slide showing the *Elkay* case.

18   We saw, in the reply brief, that plaintiffs were contesting

19   what's very black letter.  So there's the federal circuit --

20   one of many cases that establishes that.

21        If we are in the same family, we're all coming from the

22   same application, then the prosecution history within the

23   family -- if it's addressing the same terms -- that's fair

24   game.  That applies to every member of the family if it's the

25   same claim term and if they come from the same application.

1          **THE COURT:**  That's the -- the rub here is that is

2    kiosk a claim term, because the claim, itself, lays out a

3    complete invention and doesn't use kiosk again.  So that's --

4    that's really the point in contention.

5          **MR. CURRAN:**  And I think this case helps us answer

6    that, Your Honor.  So same initial application.  The -- the

7    prosecution history applies with equal force if it's the same

8    limitations.

9          So what are the facts on the ground with that?  If we turn

10   to Slide 103, this is the parent and this is the child.  They

11   are the same application number, 13460805.  So check that box.

12   We know we're in the same -- so far, so good in the federal

13   circuit rules.

14        Next, let's look at the claim language between the two.

15   Are we talking about the same claim language in front of the

16   patent office each time by the applicant?  100 percent.  This

17   is the parent on the left and the child on the right.  And this

18   preamble is word-for-word identical on Slide 104.  The same

19   language at issue.  So we know we have the same application.

20   We know we have the same claim term.

21        And here it's even a little more common sense than that

22   about why we'll look to this.  It was even, if you look on

23   Slide 105, the same patent examiner.  The same person from the

24   patent office looking at these two applications; talking to the

25   same applicant about the exact same language; would understand

1    that language to have that same meaning across family members.

2    It's not just the law, but, again, it factually makes sense.

3        So looking at those facts, we know that we would treat

4    statements in the prosecution history of each just like that

5    examiner did -- looking at the same language as informing what

6    that means.  Is that same language -- if we go back here on

7    Slide 104 -- it's a preamble both times.  It's the same

8    preamble both times.  So is that same preamble they brought to

9    the same examiner twice -- is it limiting?  Well, let's see

10   what they told the patent examiner about that.

11       And, by the way, actually, one other note I'll just --

12   before we move on, if you look to Slide 106, there's also an

13   admission here, Your Honor, that you should be looking at this

14   file history, because the plaintiffs, themselves, have

15   identified it as intrinsic evidence.  So we're all in agreement

16   this is intrinsic evidence, and the law says it should apply.

17       So, now, what does it tell us about this dispute about is

18   the claim term limiting?  Let's go to Slide 23, please -- 25.

19   Okay.  Here's that evidence then.  Does this actually tell us

20   that the preamble is limiting?  And we think the answer's

21   clearly yes.  How did they get the claim that's at issue?

22       They started off by claiming any storage device.  This is

23   what it originally said.  A first storage device -- anything --

24   configured to provide content.  What happened when they tried

25   to get that claim?  Slide 26 -- the patent office said no.

1   Here's an IBM patent where I've got a storage device.  That is

2   already configured to provide content, so you can't have that.

3       So how did they come back?  Slide 27 -- they said, fine, I

4   won't just claim any storage device anymore.  Now I'm going to

5   claim something specific, a kiosk.  And this is where that

6   language -- that same preamble -- comes from.  And what they

7   said was the -- what I'm now claiming is different.  It's a

8   kiosk.  And I'll tell you what that is.

9       And what did they then do with that language?  They didn't

10  just add the amendment.  They talked to that same patent

11  examiner, who looked at both of these patents, and they said to

12  that examiner, "Now my claims are allowable."  This is

13  Slide 28.  Not because there's something else in the claim that

14  makes it different from the prior art.  This is them talking to

15  that examiner when they say now this language -- the same

16  language -- a kiosk for provisioning secure content.

17      **THE COURT:**  Right.  But then -- and where you start

18  blurring it out, at the bottom of the slide, "Second, the

19  system of" -- weren't there a bunch of other distinctions that

20  were --

21      **MR. CURRAN:**  There were, Your Honor.

22      **THE COURT:**  -- described?  And what is the indication

23  that the examiner ultimately relied just on this kiosk line?

24      **MR. CURRAN:**  In fact, Your Honor, there doesn't have

25  to be one.  Because when you make these representations, if you

1  say there are six differences, then you are bound by six out of

2  six.

3      And so when they start by saying that this is a

4  difference, then that applies.  And, also, as a matter, we

5  think, of common sense here, when they say the lead example --

6  they picked the first one to show to the patent examiner -- and

7  they say the first thing I'm going to call your attention to --

8  that's the kiosk.  Level-set patent examiner, the first reason

9  I should get a patent here, because now I'm talking about a

10  kiosk.

11      So we know a kiosk matters.  And we know they got this

12  patent after the examiner saw this amendment and granted it to

13  them.  And it worked so well, they used the same preamble

14  again, with that examiner, for the next patent.  So they can't

15  run from it now by saying, no, that was different.  That was an

16  earlier application.  It's the same family, same examiner, same

17  language.  You're stuck with the same result:  The kiosk is

18  limited.

19      **THE COURT:**  And in that prosecution history, in your

20  view, what is the evidence as to what "kiosk" meant?

21      **MR. CURRAN:**  You know, we think, honestly, Your Honor,

22  this is a term where the specification doesn't say.  It says

23  it's a kiosk.  The specification doesn't really define what a

24  PlayStation Portable is, doesn't define what a laptop is,

25  doesn't define what a kiosk is.  It leaves us to say you can

1    use whatever hardware you're going to use to build one of

2    those.

3         But we'll talk about some evidence that we think does

4    explain -- when they picked that word, out of all the words

5    they could have used -- "kiosk" -- what did that word mean at

6    the time, and what were they trying to explain to the examiner?

7         So how do we construe it?  Your Honor noted there is this

8    permissive statement not that the kiosk is any device, but that

9    it may be any device used.  We think this, Your Honor, is

10   explaining what kind of hardware -- how could you implement

11   something?  It still has to be a kiosk, but can you use any

12   kind of hardware?

13        If the original claims had said this is a vehicle, and

14   then later you narrowed to a motorcycle, the specification

15   might say you could, you know, be using any form of

16   transportation for your motorcycle.  But it's still going to

17   have two wheels.  And that's the situation we're in here.  You

18   can use any hardware, but it's still got to be a kiosk.

19        We also know that a kiosk is different from other types of

20   computers from the specification's embodiments.  Here we have

21   Figure 1B next to Figure 1C.  And I think it's helpful, because

22   it explains to us what's going on.  But some of the funky

23   numbering we see here -- there's a "client system 106" in

24   Figure B.  That's the broader embodiment.  But then there's

25   something called "106 prime," which is pretty unusual -- you're

1    denoting that the subset -- that 106 prime is just this kiosk

2    portion of it.

3        And what do the specs say about those two things?  If we

4    go to Slide 32, the broad example -- the client system 106 --

5    that can be anything.  So when we're talking about 106 full, it

6    can be a laptop, a desktop, a tablet, a set-top box, a video

7    game console, or any other form of electronic device.  You

8    could use those for a client.

9        One of those forms of electronic devices is this subset

10   106 prime -- this kiosk.  It doesn't tell us what it is, but we

11   know that it's -- it's something they could be using.  And it's

12   worth calling out as a separate embodiment, because this is now

13   like a vending machine system.  We've got this kiosk.  We all

14   know what kiosks are.  We'll talk about some of that evidence

15   in a minute.  But this is a separate embodiment where you could

16   be using a kiosk for the client.

17       So what does that tell us about what we're to look at in

18   scope here?  We've got one embodiment that's the client system

19   106 -- 106 full.  That can be all the other things, including

20   other devices.  We've also got 106 prime.  And that subset --

21   that's got to be a kiosk.  It tells us a little bit about the

22   scope of this.  It doesn't tell us necessarily how we're going

23   to define "kiosk."  But I think it's helpful to frame -- when

24   we talk about 106 prime, why is that number there?  Why is --

25   why is that indication of a subset there?

1    It's because we have, between 1B and 1C, these two

2    different ways to look at using the client for things like

3    talking to a download server.  And then 1C -- we have a very

4    special type of client, a kiosk.

5    Still brings us to that important question though:  What's

6    a kiosk?  That word was one they picked consciously.  It's not

7    like a word you stumble over all the time.  It had a very

8    specific meaning.  Had a meaning before computers, where people

9    would go to a kiosk to buy a newspaper.  You'd go there -- a

10    structure -- for a transaction with a consumer.

11    And there's a little word dispute about "consumer."  I

12    want to say we're not tied to that word, Your Honor.  We think

13    it's helpful to explain the context here.  But it could be any

14    human user.  It's just a person consuming something, having a

15    transaction of some sort.  The definitions here explain it

16    could be someone consuming information.

17    **THE COURT:**  Yes.  But that's where the rubber hits the

18    road.  I got to write an order that says here's the definition

19    of the claim.  And it did seem to me they're right; "consumers"

20    comes out of nowhere.  "User interface" seems to come out of

21    nowhere.

22    **MR. CURRAN:**  On that point, Your Honor, I would say

23    two things:  One, I think "consumer" could be too narrow.  I

24    would agree with that.  I think that any human user -- user --

25    you know -- we know that -- that these can't just be computers

 1    talking to computers.  That's not something you'd call a kiosk.

 2    But a kiosk is a place the people go to use a machine.  A

 3    vending machine's a kiosk because many people go to it and use

 4    it.  But some back-end server that talks -- some back-end

 5    server -- nobody calls that a kiosk.

 6        But the one thing that we know that every kiosk has --

 7    because it's got multiple users -- is a user interface.  And I

 8    don't think there's any example we've seen anywhere of a kiosk

 9    that could somehow not have a user interface.  People have to

10    use this.  They have to have an interface to use it.

11        Now, it doesn't have to be a touch interface.  It doesn't

12    have to be even a visual one.  You could have a speech

13    interface.  We're not trying to limit that.  But there's no

14    world where you're going to have multiple users for this system

15    without an interface for them to use it.

16        And the common thread -- and, by the way, Your Honor,

17    here, on Slide 34, Your Honor correctly notes, there needs to

18    be a definition here.  We're trying to be generous and broad

19    with something that has the bare minimum for what would be

20    here.  For example, just there's some way to interact with

21    users and there are users.

22            **THE COURT:**  But I just go back to the specification

23    directly says "may be any device used to access and distribute

24    content provided by the system."

25        If I were to find that a definition is required, what's

 1   wrong with that very obvious one?

 2        **MR. CURRAN:**  I think that -- the problem with that

 3   one, Your Honor, is that it would eliminate kiosk having any

 4   difference from any other type of device.  Because, at that

 5   point, what makes a kiosk, a kiosk?  We know that kiosk -- if

 6   we can go to, for example, Slide 18.

 7        Why are we using the word "kiosk" here?  What's the kiosk

 8   actually doing?  This is a supposedly new system for providing

 9   digital media.  And what's the role of a kiosk in doing that

10   separate from a client, or a server, or a computer, or the

11   other words that are used here?  We know what a kiosk is.  It's

12   something you walk up to and you use.

13        I'm old enough to remember things like Redbox that were

14   replacing, you know, Blockbuster at the time.  Vending

15   machines -- ATMs replaced tellers.  We know what a kiosk is,

16   because we've used them.  And on their definition, you wouldn't

17   actually have to have a computer that anyone uses for any kind

18   of transaction.  It could be any back-end server involved at

19   any step of a long causal chain that no person can ever use,

20   ever see, ever interact with.

21        And that would be the problem with their construction,

22   Your Honor.  It would stop being the kiosk, and it would be in

23   stark contrast to the definitions that we've seen in multiple

24   different --

25        **THE COURT:**  Well, but then the specification right

 1  after that says "the kiosk may compromise various user

 2  interface equipment, such as keyboard, display, et cetera, to

 3  allow use of the kiosk."

 4      Doesn't your proposal import that as a limitation into the

 5  claim?

 6          **MR. CURRAN:**  We'd say no, Your Honor.  Because there's

 7  one important word that the other side hasn't been

 8  acknowledging there.  And that's the word "equipment."

 9      That passage isn't saying, in some embodiments, maybe we

10  have a user interface.  It's saying that -- I think it's

11  assuming -- there's always a user interface.  But we're giving

12  you choice, as you implement this, the equipment that you would

13  use.  It lists keyboard, mouse.  You could use things like a

14  speech -- you know -- like a microphone.  You could use any

15  number of pieces of equipment to develop a user interface.  But

16  there's no world in which noting that different equipment can

17  be used for an interface means that there isn't a user

18  interface.

19      And that's the same trick, Your Honor, that we think we

20  see happen in the briefing on claim differentiation.  Because

21  there's a statement in the briefing suggesting, well, look, you

22  can't have a user interface, because that's what's added in the

23  dependent claims.  That's the difference between the

24  independent claim and the dependent claims.

25      Here, on Slide 39, we're looking at page 3 of the reply

1    brief.  And we think this is not an accurate statement, Your

2    Honor.  Because it's not, in Claims 3 and 11, just adding the

3    idea of a user interface.  That's not what those claims say.

4    Just like in the spec, it doesn't say sometimes you have a user

5    interface and sometimes you don't.  It's just talking about the

6    equipment you would use for it.

7        And if you look at the dependent claims, same sort of

8    thing.  Those claims aren't ripe for claim differentiation

9    because -- first, what is claim differentiation?  It's a

10   doctrine that only applies -- where I got two claims and

11   through claim construction, I'm about to eliminate the only

12   meaningful distinction between them.  If I'm getting rid of the

13   thing that makes them different, well, then, I must be doing it

14   wrong.  That's the doctrine when -- when that limitation is the

15   only meaningful difference between the two claims.

16       So if there was a dependent claim here that said where in

17   the kiosk has a user interface, that's when claim

18   differentiation would apply.  And if the specification said

19   that, that's when that would counsel against us.  Actually what

20   the dependent claims say -- there are an incredible number of

21   differences between Claim 1 and Claims 2 and 3.

22       What 2 and 3 are really doing here, Your Honor -- if we

23   look back at that Figure 1C, there's a little dotted line, and

24   it says "local database" on Figure 1 -- I can bring that figure

25   up if it's helpful -- so 1C.  Can we go to -- to -- it's in

1    here.  There we go.

2        So we take a look at Figure 1C on the right.  There's a

3    little dotted line that says "local storage database" in 1C.

4    That's something you don't have to have, but you can sometimes.

5    And the dependent Claim 2 is saying I'm going to add a local

6    storage database.  Okay.  Then Claim 3 says I'm going to depend

7    from Claim 2.  I'm going to further refine that local storage

8    database.

9        Here we go.  Sorry.

10       On Slide 40, you can see, okay, in Claim 3 now, I'm going

11   to further depend from Claim 2.  I'm going to now have a user

12   interface for a specific task.  Now I'm going to further narrow

13   the user interface that must always have been there.  Now the

14   user interface is to receive a selection from the local

15   storage.  That causes me to encrypt something that was selected

16   from that set.

17       And this makes some sense.  If you have a vending machine,

18   you can either be selling things the vending machine has to

19   fetch or you can be selling things the vending machine already

20   has locally in stock.  These dependent claims are about just

21   the locally stored media and an interface that just lets you

22   pick the local media.  That in no way suggests there wasn't an

23   interface to begin with in the broader dependent claim, because

24   somebody's got to be using the kiosk, and they got to be using

25   it from an interface for that user.

1      Unless Your Honor has further questions, we'll stop there.

2           **THE COURT:**  All right.  Fair enough.

3           **MR. CURRAN:**  Thank you.

4           **THE COURT:**  Thank you.

5      All right.  Portable data storage device.  So are we

6  alternating?  Yeah.

7           **MS. KIECKHEFER:**  Sorry, Your Honor.  Was I going to do

8  a brief reply to the arguments?

9           **THE COURT:**  You get one minute.

10          **MS. KIECKHEFER:**  I get one minute?  Okay.

11     I just want to point the Court to the case law we have

12  cited in our briefing.  There is a presumption that the

13  preamble is not limiting --

14          **THE COURT:**  I definitely know what the law is.

15          **MS. KIECKHEFER:**  Okay.  Great.

16     And then just the precision here -- the *Elkay* case does

17  not address the issue of you have to look at the specific

18  claims.  And they only have the preamble that is the same.  The

19  claim in question here is a different claim than the claim of

20  the prior patent.

21     And so with respect to the claim differentiation, the

22  patent -- in its entirety, we're talking about the

23  specification and we're talking about the claims themselves.

24  They provide that the user interface is not required.  It is

25  something that may be added.  And there are certainly kiosks

1    that can exist that do not require a user interface.  And, in

2    fact, the definition does not specify or require a user

3    interface to be required.  That's it.

4              **THE COURT:**  All right.  Thanks.

5         Next up:  Portable data storage device.

6         And this is another place I admit I need to understand as

7    I talk to the parties.  What's the actual dispute?  You know,

8    because that's what *O2 Micro* is about.  If there's a dispute, I

9    have to resolve it.  But it, at times, was hard to discern,

10   with clarity, exactly what the nub of the dispute is.  So it

11   would be helpful to put a fine point on that.

12             **MR. CURRAN:**  Yes, Your Honor.

13        I think, from Viasat's perspective, the dispute here is

14   the exact same dispute in the *Eon* case.  Eerily similar.  It's

15   about a portable term and whether portable means maybe, in

16   theory, you could move it.  That is we understand Western

17   Digital's position to be.  Or whether it's something that's

18   designed to be easily moved, which is what Viasat's position

19   is.

20        And, in fact, this is actually a little starker than the

21   contract in *Eon*.  Because, in *Eon*, the Court was -- and I

22   believe this is noted in their reply brief at -- could we go to

23   the reply brief at lines (indiscernible) --

24             **THE COURT REPORTER:**  Sorry.  "The reply brief" where?

25             **MR. CURRAN:**  Oh, I apologize.  This is the reply brief

1    of Western Digital at page 5, lines 9 to 11.

2        This is Western Digital's own description of that case

3    where, in that case, the federal circuit was noting that

4    portable, even if it was construed broadly, would still involve

5    the idea of easily.  Something being easily moved, but not that

6    it actually has to move.

7        Well, that's actually Viasat's position.  That something

8    doesn't have to move, but it has to be easily moved to be

9    portable.  It can't be that something like a house, which

10   through great effort and engineering skill, you could maybe

11   move, is a portable house just because somebody might move it.

12       I'm old enough for --

13       **THE COURT:**  Right.  But then the question is -- so

14   what does a jury do with "easily"?  What does "easily" even

15   mean?

16       **MR. CURRAN:**  Yes, Your Honor.

17       **THE COURT:**  So, I mean, it really seems the two -- my

18   read of the nub of the dispute is you need "easily" and you

19   need "by the user."  Those are the two things you seem to be

20   saying should be incorporated into the construction.  And I am

21   interested in where each of those comes from in terms of the

22   patent itself or the intrinsic record.

23       **MR. CURRAN:**  I'll start, Your Honor, with the

24   easier -- well, I'll start with "by the user."  I think that

25   could fall out.  And it wouldn't, from our perspective, change

the meaning of this contradiction.  We think it is helpful for the jury to understand we're talking about something that the user of the device would move.

That's how we commonly understand portable devices. Because we don't want to hear, down the line, that there might be somebody, somewhere, with superhuman strength, for which this is easy.  This is the average user; could they move it easily?  But if that is introducing -- if that's more harmful than helpful, Your Honor, we don't need that to be part of the construction.  But we do think it's useful to head off disputes down the road about "easy to who."  Well, to the -- to the user.

> THE COURT:  Well, even, like, who -- who is the user --

> MR. CURRAN:  Mm-hm.

> THE COURT:  -- in your construction?  Who -- who is that?

> MR. CURRAN:  Yeah.  That would be the user of that portable storage device.  That's the person using the kiosk. And maybe we can take a look -- just to level-set for a moment, if we could look at Slide 17.

Here's that claim.  It's a long claim, but there's really three actors here.  There's the kiosk, which we would suggest -- and, actually, you can look at Slide 18 for just a second.  For me, pictures are a little easier.

 1        What we've really got here is a system where you've got a

 2   kiosk that can be used.  You've got somebody who's using it,

 3   but they have to have a device.  They have -- for example, it

 4   could be a USB stick.  It could be something else with storage.

 5   So there's a user of a kiosk that's got a portable storage

 6   device, and they're going to then bring that to the device.

 7   And the question here -- we'll talk later about how it

 8   communicates and encrypts.  But this is just -- that device --

 9   we're limiting it to a portable storage device.

10        So somebody couldn't wheel up a mainframe, for example,

11   and call that a portable storage device, even if they're really

12   strong and it's easy to move mainframes.

13        If we can go back to 17, please.  So that's who the user

14   would be -- the person who's using this portable data storage

15   device at the kiosk.

16        Now, if we could go to 47, the specification does say a

17   little bit about what "portable" means.  And it gives us -- you

18   know -- as Your Honor's noted, we've got to know -- have some

19   benchmark for "easily."  Well, we have that here.  And,

20   importantly, Your Honor, we have the same kind of objective

21   indicia here -- objective examples -- that the federal circuit

22   also had in *Eon*.

23        So, here, we have, first, the explanation that a portable

24   device -- it's a mobile device.  Every member of that jury has

25   probably used a mobile device.  And they understand the

1    difference between a mobile phone and a non-mobile phone.  And

2    that's an objective benchmark to begin with.  What would we

3    normally consider a mobile device?  But there's more and more

4    specific examples.

5         Turning to Slide 48, the specification specifically draws

6    a distinction between a video game console, on the one hand,

7    and a portable video game console on the other.  And, here, we

8    have illustrations of that from the time period.  A video game

9    console might be a PlayStation.  And it's got a bunch of wires

10   and a bunch of wired controllers.  You can move it.  In fact,

11   it's not that heavy.  But you can't use it that easily.  You

12   can't move it around that easily.

13        But a portable video game console -- like the PlayStation

14   Portable -- that's designed to be portable.  Designed for the

15   person using it to move it around and use it.  And we're not

16   picking these examples out of thin air, Your Honor.  If you

17   look at Slide 49, this is exactly what the specification tells

18   us the portable video game console is.

19        So we know that we have mobile devices, which are like

20   portable devices.  That's iPads, iPods, iPhones.  Those are

21   objective benchmarks.  We know we have portable video game

22   consoles, like a PlayStation Portable, or there's another

23   example here:  A Nintendo DS.  We have pictures of those, as

24   well.  The specification gives us these examples of what a

25   device would be that is portable.

1          **THE COURT:**  Let me ask one thing.  And I'll -- I'll

2     let you -- maybe you can have one of your team look for this.

3     In *Eon*, what was the federal circuit's ultimate construction of

4     "portable" and "mobile"?  It was interesting.  The District

5     Court didn't construe it.  The federal circuit said that that

6     was an error, but then saved the poor District Court from

7     having to deal with it on remand by just construing it itself.

8          And I'm interested to know what the actual ultimate

9     construction was there.  It almost seemed as though -- I'm sure

10    there was one.  I think the idea was that, well, it couldn't be

11    this and it couldn't be that.  But I'm interested.  At any

12    rate, if you all can find it, it would be helpful --

13          **MR. CURRAN:**  Will do, Your Honor.

14          **THE COURT:**  -- if it is in there.

15          **MR. CURRAN:**  And I agree with Your Honor's read, by

16    the way.  I have the same recollection.  It was more ensuring

17    there would not be another trial than maybe clearly elucidating

18    that.  But we'll take a second look at that opinion.

19          I will note, though, that, there, the evidence the Court

20    was looking at were examples of characteristics or of specific

21    features for the monitors that were -- the meters -- the *Eon*

22    case.  The meters that were portable had batteries -- they

23    could operate -- they could be moved.  And so that's enough.

24    Now we'll know what "easily" is.  And that's not unusual.

25          This is actually Slide 52.  The federal circuit has

1   repeatedly upheld the use of the word "easily" in constructions

2   when talking about terms of degree.  "Easily" is not off

3   limits, at all, as long as there's some objective measure in

4   the patent.

5       So this is the *Deere* case.  And this is in the briefings.

6   You know, "the availability of known easy-clean decks."  That

7   provides a standard.  We know what -- some things are

8   easy-clean.  And so we can use that to judge other things if

9   our construction is easily -- easily washed off.

10      Same thing here.  We know what -- some things are

11  portable.  And those are easily moved about.  We can use those

12  examples, like a PlayStation Portable, a Nintendo DS, to judge

13  that.  What we can't do is exactly what Your Honor has

14  correctly noted.  We can't be in the position of the *Eon* case

15  where we know there's a dispute -- this is exactly the same

16  dispute -- we know the word "portable" -- people are wondering

17  is it theoretically capable of being moved or is it easily

18  moved?  That's what we have here.

19      And so we think resolving that now by saying "easily

20  moved, designed just like the examples in the spec."  And

21  although we don't think it's necessary, Your Honor, it could be

22  helpful to note that it's by the user, just so that, later,

23  we're not talking about it's easy for a forklift.  But that's

24  the only reason we'd be specifying by the user for an

25  additional marginal clarity.

1        And, with that, Your Honor, unless there are any

2   questions, we'd rest.  Thank you.

3            **THE COURT:**  I don't.  Thanks.

4            **MS. KIECKHEFER:**  And we do have printed copies, Your

5   Honor.  I'm just going to pass them up.

6            **THE COURT:**  Sure.

7            **THE COURTROOM DEPUTY:**  We just need two.

8            **MS. KIECKHEFER:**  Mm-hm.

9            **THE COURTROOM DEPUTY:**  Thank you.

10       You can flip the screen.

11           **MS. KIECKHEFER:**  To my --

12           **THE COURTROOM DEPUTY:**  If you need this bigger

13   screen -- oh, you're good?  Okay.

14           **MS. KIECKHEFER:**  I just wanted to make sure I had it

15   flipped back to Western Digital's side.  Great.  Thank you so

16   much.

17       So, Your Honor, the key issue here is just whether or not

18   a construction of portable is necessary.  It does seem like

19   Your Honor thinks one is necessary.

20       As to *Eon*, we're double-checking.  But my understanding is

21   that the -- there was not a construction provided.  The federal

22   circuit found that improper and then overturned it and sent it

23   back.  And I --

24           **THE COURT:**  Oh, they actually didn't send it back.

25   They said you should have construed the term "District Court,"

1   but we don't need to send it back because, under any reasonable

2   construction, there could not possibly have been an

3   infringement finding.  That's what they did.

4       But I'm curious as to whether they did something that

5   would be helpful for me, which is say "portable" means "blah"

6   in the context of this patent.  And I don't think they really

7   did.

8       **MS. KIECKHEFER:**  My understanding is that they did

9   not, but we are double-checking that.

10      So Viasat -- just to be clear, Viasat is asking for a

11  plain and ordinary meaning construction.  So they're not asking

12  for something different than that.  It is a plain and ordinary

13  meaning construction that they think would be helpful for the

14  jury.

15      We do believe that portable is clear and easy to

16  understand.  People use it every day.  It's throughout the

17  patent.  There are clues in the patent to help with any

18  guidance that is necessary there.  We do not think that

19  Viasat's plain and ordinary meaning construction is correct.

20  "Easily," as this Court already flagged, just adds more

21  ambiguity and indefiniteness to the term, because it is unclear

22  what it means to be easily carried about.  And who are we

23  deciding it is easily -- who are we deciding is the person who

24  should determine whether or not it can be easily carried or

25  moved about?

1          **THE COURT:**  But, again, how are you resolving the

2    dispute that has been presented with your proposed

3    nonconstruction?

4          **MS. KIECKHEFER:**  Correct, Your Honor.  Given that we

5    did think this is just a, you know, common English term that --

6    I mean, it's throughout the specification -- we didn't think

7    one was needed; however, if you think one is needed, we are

8    fine with the construction of capable of being carried or

9    moved.  And so it's not by a user.  It doesn't introduce the

10   ambiguity of "easily."  It is simply is it capable of being

11   carried or moved.

12         **THE COURT:**  And where -- what's the basis in either

13   the intrinsic record or otherwise that supports that?

14         **MS. KIECKHEFER:**  So the intrinsic record is silent as

15   to what "portable" means, other than it is used.  But it

16   doesn't give -- as you saw from Viasat's own slide deck, it's

17   simply just used throughout the specification.  It doesn't

18   actually give clarity.  It's coming from the dictionary

19   definitions.  And it was capable of being carried or moved

20   about.  That was Exhibit F.  And it's the Merriam-Webster

21   Online Dictionary 2011.

22         **THE COURT:**  So everything on earth is capable of being

23   carried or moved; right?

24         **MS. KIECKHEFER:**  Not everything on earth, Your Honor.

25   I'm not -- we're not trying to get into the situation of *Eon*

```
1   Corp., where all of a sudden it is anything even theoretically
2   possible of being capable [sic] or moved; however, when you add
3   an "easily" to it, you are in a very indefinite and ambiguous
4   situation.  So this is a term that is going to be litigated.
5   Your job, Your Honor, is simply to provide a definition, not to
6   go through every permutation of infringement.
7               THE COURT:  I know.  I know.
8               MS. KIECKHEFER:  Yeah.
9               THE COURT:  Yeah.
10              MS. KIECKHEFER:  So there's only so much you can do.
11  And it is going to be something that the jury -- the fact
12  finder -- is going to need to look at a variety of infringing
13  devices and determine whether they qualify as portable or not.
14  And these are devices that are in an airplane.  And -- for the
15  most part -- these are in an airplane.  There's different
16  mounting mechanisms, and it's a wide variety of permutations
17  that the jury will need to analyze to determine whether it
18  qualifies as portable or not.
19              THE COURT:  I'm just looking at Eon to glean what the
20  federal circuit thought the problem was.  And this is page
21  1319.  "The crucial question was whether, as Silver Spring
22  argued, the term should not be construed so broadly such that
23  they covered 'fixed or stationary products that are only
24  theoretically capable of being moved.'"
25              MS. KIECKHEFER:  Correct.
```

1          **THE COURT:**  How is your proposal different than

2    "theoretically capable of being moved"?

3          **MS. KIECKHEFER:**  Well, I would submit that that -- the

4    issue in *Eon* is this construct -- this lack of construction --

5    really got taken to a place that then became impossible and not

6    what should have been done in that specific situation.  I don't

7    think we're talking about anything that is "theoretically

8    capable of being moved."

9        The construction here that we're proposing, which is from

10   a dictionary definition, is simply is it capable of being

11   carried or moved.  Not theoretically capable of being carried

12   or moved, but simply is the device capable of being carried or

13   moved?  And I --

14         **THE COURT:**  And I take your point that I'm not making

15   an infringement determination right now.  I can look down the

16   road and envision a very interesting trial where the jury's

17   being told that an airplane seat can be moved or a --

18         **MS. KIECKHEFER:**  A plane can be moved.

19         **THE COURT:**  Huh?

20         **MS. KIECKHEFER:**  The plane can move.

21         **THE COURT:**  Right, exactly.  Everything -- the earth

22   is revolving at all times.  We're all moving.  So -- but that's

23   not for today.  I get it.  But --

24         **MS. KIECKHEFER:**  Correct.

25         **THE COURT:**  -- it's kind of goofy.

1          **MS. KIECKHEFER:**  I do -- I totally understand.  I did

2     just want to point out one thing.  That there is much more

3     history in *Eon* about portability.  It was essential to the

4     invention as what was argued.  There was a lot -- there was

5     much more of a discussion about portability that is not in the

6     specification -- in the intrinsic record -- and that's simply

7     not the case here.

8          So this was a much more loaded term.  I understand that

9     this is going to be heavily litigated here.  But there was a

10    lot of discussion within the intrinsic record to -- in terms of

11    figuring out what the terms "portable" and "mobile" mean in the

12    context of the invention.  And that information is not present

13    in the intrinsic record.

14         **THE COURT:**  All right.  I'll -- I'll look at *Eon* and

15    see if I agree with that characterization.

16         **MS. KIECKHEFER:**  Thank you, Your Honor.

17         **MR. CURRAN:**  Your Honor, might we have the same --

18         **THE COURT:**  Yeah, exactly.  Brief rebuttal.  You don't

19    need to repeat your arguments, but just brief rebuttal.

20         **MR. CURRAN:**  Just very quickly, if we can go to Slide

21    48, and address what we just heard, for the first time, as the

22    proposal.

23         What we really heard, Your Honor, is a proposal to vitiate

24    the word "portable."  Because as Your Honor has correctly

25    noted, on that construction, everything is portable.  And the

specification tells us that's not how they viewed this.  There
are two kinds of video game consoles in the world,
specification tells us.  There's video game consoles and,
separately, there's portable video game consoles.  And they
gave us those examples about specific portable consoles.

But if it's just whether something can be moved, a huge
arcade game in an arcade can be moved.  A PlayStation can be
moved.  Everything can be moved.  The word "portable" no longer
exists, and now we're just talking about storage devices.

And that actually does matter for the invention here.  We
heard the claim that it didn't matter; wasn't part of the
invention.  We strongly disagree with that.

We're talking about kiosks.  These are vending machines
people walked up to.  You put them in a place where consumers
or users could get to them.  So what were you bringing?  A
portable storage device.  That meant something when you were
creating these interface terminals for these transactions.

So that was actually part of the invention.  And, at the
end of the day, no matter what the invention is, saying that
"portable" has no meaning would violate a number of claim
construction canons and would essentially vitiate the word
"portable," collapsing a distinction that's clear in the
intrinsic record.

Thank you, Your Honor.

**THE COURT:**  All right.  You're welcome.

1    So then first up would be plaintiffs on the "authenticate"

2    term.

3        MS. KIECKHEFER:  The next term is "authenticate the

4    portable data storage device using at least the unique

5    identifier."  And this really is basically a dispute about

6    "authenticate."  Nothing else about the term is really in

7    dispute.

8        The construction -- Viasat appears to be asking, again,

9    for a plain and ordinary meaning construction.  That's on

10   page 9 of their brief.  And so there are two key issues.

11   Number one, does "portable" require any plain and ordinary --

12   excuse me -- does "authenticate" require any plain and ordinary

13   meaning construction or can it just be plain and ordinary

14   meaning?  And then, number two, if a plain and ordinary meaning

15   construction is required --

16       THE COURT REPORTER:  I'm sorry.  Can you slow down

17   again?

18       MS. KIECKHEFER:  Sure.

19       If a plain and ordinary meaning construction is required,

20   does "authenticate" mean confirming that the portable storage

21   device is trusted?  "Authenticate" is clear on its face.  This

22   is a term that is well-known and will be well-known to the

23   jury.  It's used in everyday life.  Whenever you provide your

24   driver's license, you are -- you're providing authentication of

25   who you are.  I did it this morning when I walked into the

1    courtroom.

2        Importantly, the construction that Viasat is proposing is

3    not correct.  Viasat is proposing inserting the requirement of

4    confirming trust.  So it is confirming that the portable data

5    storage device is trusted.  And this is a concept that is

6    different than "authenticate."  This is a different concept,

7    and a concept that's used in the patent as authorized.  And so

8    these two terms are being conflated by Viasat's construction in

9    a way that's completely impermissible.

10        So confirming trust is known as authorization.  And the

11    terms are used someone interchangeably within the patents.  So

12    we have -- we have "authenticate" and then we have "confirming

13    trust" and "authorize."

14        And, here, you can see the claims are very clear in that

15    they distinguish "authenticate" and "authorize."  So you have

16    Claim 9.  You have it talking about authenticating the portable

17    data storage device using at least the unique identifier.  And

18    then you have Claim 15 with a different limitation, which is

19    "authorizing" and "authenticating" is determining who you are.

20    And "authorizing" is giving you access to a specific set of

21    content.  And those -- that's a two-step process in order for

22    data to be transferred in the secure matter -- manner.

23        So this -- the specification specifically distinguishes

24    "authenticate."  And like I talked about before, basically

25    trust or authorize.  We do flip the colors here, just so you're

 1   clear.  So "authenticated" is in green.  And these are a

 2   variety of basically snippets from the specification.  That's

 3   just showing, number one, that these are two separate things.

 4   And, number one, they're -- they're often used in tandem.

 5       So the first one in this embodiment, "a trusted server

 6   that is authenticated" and then "and trusted by both storage

 7   devices brokers the transfer of content."  And then it

 8   continues.  There's always "authenticated" and then "trusted"

 9   or there's "authenticated" and then determining the

10   authorization.  And those are very similar things.

11       And given the fact that these claims recite these two

12   different concepts and recite them as different concepts,

13   they're supposed to be treated separately.  And that's the

14   *Board of Regents* case that we submitted to the Court.

15       **THE COURT:**  Well, let me ask this:  I mean, it seems

16   to me that in the patent, you know, when the purpose of the

17   invention is being described -- and it's Column 3 -- you know,

18   really, the point is that the authentication is to ensure that

19   entities in the system are trusted and essentially ensure that

20   the storage devices confirm a trust relationship.

21       So is there any embodiment in the specification where

22   authentication is for something other than determining or

23   confirming trust level?

24       **MS. KIECKHEFER:**  So I think -- so there's a two-step

25   process in order to ensure that the data can be transferred.

1   Number one, you have to authenticate who you are giving it to.

2   And then, number two, you have to authorize what you are giving

3   it to.

4       So that has to occur in order for the data to be

5   transferred in a secure manner.  So they're usually used in

6   tandem, but they are two separate concepts.  So even though,

7   ultimately, you want to determine whether or not something is

8   trusted in order to give -- to transfer data -- you have to

9   first authorize, and then you have to authenticate.

10      **THE COURT:**  Right.  But is there any embodiment in

11  which the purpose of the authentication is not determining or

12  confirming trust?

13      **MS. KIECKHEFER:**  So I guess you can just look at the

14  claims, which would reflect an embodiment.  So Claim 9 is only

15  talking about authenticate.  And then Claim 15, which depends

16  on Claim 9, talks about the second step of authorizing.  So

17  Claim 9 is limited just to authenticate.  And Claim 15 provides

18  that second step of authorizing.

19      **THE COURT:**  One more time.  Is there any embodiment in

20  the specification that is described that talks about

21  authentication being done, other than in connection with

22  confirming or determining trust level?

23      **MS. KIECKHEFER:**  I will double-check, Your Honor.

24  But, again, I -- I was just illustrating the claim to

25  illustrate an embodiment, which I understand is broader.  Let

1   me just look really quick.

2        Most of the embodiments that I'm familiar with, at this

3   moment, do talk about both concepts.  They talk about, for

4   example, digital certificates for authentication of the

5   identity and determining authorization for the various uses of

6   the content.

7        So these -- these are usually lumped together throughout

8   the specification.  I'm not aware, but I will double-check if

9   there's an embodiment that basically only talks about

10  authentication, if I'm really understanding your question.

11            **THE COURT:**  That is my question.

12            **MS. KIECKHEFER:**  So -- but just my answer is that

13  usually they are together, but they are separate concepts that

14  are together.

15       Similarly, moreover -- and that previous one was at 338 to

16  '41 -- and, moreover, the claims themselves state that in

17  response to authentication -- so authentication has already

18  occurred -- then you are providing the portable data storage

19  device and encrypted first media content and the corresponding

20  access key.  So, again, these are together.  But, first,

21  authentication has occurred.  And then you are providing the

22  access, which -- and that is at 22, 58 to 60.

23       So, just to be clear, we're not saying they're unrelated.

24  They generally occur together for purposes of the invention.

25  They just are separate concepts, and they should not be

conflated, given both the specification and the claims treat

them as separate concepts, and they have to occur separately.

And then the citations that Viasat provided in their

briefing -- again, this is really clear, if you actually review

the language of it.  There is always an authentication of the

identity.  And then it is followed by an authorization step to

determine the various uses.

And then this -- just our last slide -- and this is

Slide 14 -- Viasat's own expert -- there's a publication that

was provided that Viasat's own expert distinguishes

"authenticate" and "authorize."  This is just very commonly

known.

So, in green, the user authentication is the identity

verification.  And then, in red, there's the second step of

authorization, which is the access that is then provided to the

user.  These are just fundamental concepts for purposes of this

invention.  They're separate concepts for purposes of the

intervention.  And Viasat is improperly trying to conflate them

as one.

**THE COURT:**  But how?  I mean, all they're saying is

that what "authenticate" means is confirmed trust.  I don't get

the access versus authenticate distinction you're drawing.

**MS. KIECKHEFER:**  So --

**THE COURT:**  We're trying to figure out what

"authenticate" means.

1          **MS. KIECKHEFER:**  Right.  And so -- and they're using

2     words that are commonly used with "authorize."  And that is

3     implying that authenticate -- which is only confirming the

4     identity of something -- it is not then going into the

5     authorize step, which is making sure that it is trusted and

6     providing the requisite access.

7          **THE COURT:**  And when you say "confirm the identity,"

8     what does that mean?  Confirm that it is a device?  I mean,

9     what could "authenticate" reasonably mean, in your view?

10         **MS. KIECKHEFER:**  Confirming the identity of the

11    person.  Like, so, for example, when I walked into the

12    courtroom today, I provided my license.  The picture on the

13    license looked like me.  I was able to confirm that I am who I

14    say I am.

15         **THE COURT:**  But the claim language is "authenticate

16    the portable data storage device."

17         **MS. KIECKHEFER:**  Correct.

18         **THE COURT:**  What does that mean, in your view?

19         **MS. KIECKHEFER:**  It is confirming the identity of the

20    storage device.  Who is this -- what is this storage device?

21    It has a unique identifier that could be provided in order to

22    identify who it is.  And then we're going to proceed to the

23    next step, which is what is this data storage device authorized

24    to receive?  What content are they authorized to receive?

25         **THE COURT:**  So you think "authenticate" just means

1    identify?

2          **MS. KIECKHEFER:**  Confirming the identity.  Correct,

3    Your Honor.

4          **THE COURT:**  Okay.

5          **MS. KIECKHEFER:**  If there are any further questions --

6    I'm done.  Thank you.

7          **THE COURT:**  All right.  Thanks.

8          **MR. CURRAN:**  Thank you, Your Honor.

9          On the "authenticate" term, it's still not clear to us

10   precisely -- although I think at the end there was helpful --

11   but it's still not entirely clear to us what the construction

12   really is on the other side.  But we know what the dispute is.

13   We've heard a lot of complaints about the word "trusted."  And

14   that's strange, from our perspective, Your Honor, because, as

15   Your Honor's already noted, authenticate is for the purpose of

16   trust in the spec.  And Column 3 is very clear about this.

17         The patent said we're authenticating using public key

18   infrastructure, PKI.  And we're doing that to ensure that the

19   entities are trusted.  That's -- authentication is to ensure

20   trust.  It's that clear in the spec.  And it doesn't just say

21   it multiple times, like on Slide 56.  Again, this authorization

22   ensures trust.  That's how the specification describes it.  But

23   it goes on to specifically explain why this is the invention,

24   this is the improvement.

25         Later, in Column 3, on Slide 57, they disparage DVD and

1    Bluetooth, saying, look, what you didn't have was a way to

2    authenticate or establish trust.  And that's not just strong

3    distinctions.  It's saying one leads to the other.  DVDs didn't

4    have that, but we do.

5        And so on Slide 58, this, I think, answers Your Honor's

6    question.  How do we use authentication to establish trust?

7    How does authentication establish trust?  Because you register.

8    Before you get to that kiosk, you have actually registered the

9    unique identifier of a portable storage device.

10       You've gone through some process -- and we're not

11   limiting, by the way, with your construction, how you do it.

12   But the patent says we're going to register.  I'm going to know

13   that that's a trusted device.  And you're going to have some

14   handshake with me -- the rest of the claim language talks about

15   this -- you'll be providing a unique identifier that's specific

16   to that storage device so I trust who I'm talking to.  And that

17   happens by preregistering and ensuring I know what device I'm

18   looking at.

19       And it's that last point about ensuring that I know who

20   I'm talking to that establishes the trust.  Because you can't

21   just say -- for example, on Slide 59 -- authentication can't

22   just be introducing yourself -- making a claim of identity.

23   "Hi, I'm this storage device.  Here's a unique identifier that

24   I say is unique.  Trust me."  You have to actually be verifying

25   that identity.  That's why you trust it.  Because you've

registered with me.  I know something about you.  And now
you've proven to me you are who you say you are.  And that's
all this claim's really getting at.  And that's what the
specification uses "trust" to mean.  That's why we've included
"trust" in the specification.  Now -- I'm sorry -- in the
construction.

    What we haven't included in the construction is the word
"authorize."  We're not talking about, in that construction,
are you authorized to receive this specific movie?  Is this a
level of access you say you have?  We're only talking about
authenticating the device.  Are you trusted?

    So do I -- did you never register?  Okay.  I don't know
you.  You're not trusted.  Did I throw you out?  Have you been
trying to knock over kiosks or hack things?  You're on a
blacklist.  You're not trusted.  I'm figuring out who you are.
That's it, though.  The rest of the stuff about authorization
and giving access to specific media -- that's for the rest of
the claims.  And we'll talk about that separately.  At this
point, construing authentication, all we're using is the same
language as the spec, which is trust.

    **THE COURT:**  And do you -- is there -- you may have
cited it in your papers.  But do you think there's a federal
circuit case that's your best authority on that point that I
look to this description of the purpose of the invention?  You
know, what's laid out in the specification to give me guidance

1    as to the meaning of a claim term, even if it's arguably

2    narrowing in a circumstance like this?

3              **MR. CURRAN:**  Yes, Your Honor.

4         I think there are a number of cases that talk about the

5    invention.  I think, if we go to Slide 3, there may be one of

6    them.  I'm sorry, Slide 4.

7         So the interpretation that we should give to a claim

8    should match what the inventors describe as their invention.

9    We should be doing what they say -- they said was the

10   invention.  That's what Column 3 does.  We've just tried to use

11   those words.  And this is one of a number of cases.  I think

12   we'll see some others like this later today that, you know,

13   give us a bit of a guide here.  As we're understanding these

14   words, we don't do it in a vacuum.  We look to the invention.

15        Unless there are other questions, we'd rest on the papers.

16   Thank you, Your Honor.

17             **THE COURT:**  All right.  Thank you.

18        Quick rebuttal, if any.

19             **MS. KIECKHEFER:**  Just briefly, Your Honor.

20        Western Digital's best case citation is the *Board of*

21   *Regents* case.  It's a general case that really stands for the

22   proposition that different claim terms are presumed to have

23   different meanings.  So trust throughout the specification --

24   there is always -- even in every one of Viasat's examples, it

25   was there was a situation of authentication and authorization.

1   And "trust" is just used synonymously with the authorization.

2   And authenticate is a different concept.

3        And by switching "trust" to "authenticate," that is not

4   what the patent's intent was.  That's mixing concepts.  And

5   that's going to cause ambiguity.  It is not creating clarity

6   for the jury.  It is causing ambiguity, particularly given

7   trust is consistently used for -- in combination or in --

8   basically synonymously with "authorization" instead of

9   "authentication."

10        **THE COURT:**  Okay.

11        The next term is provide to the portable data storage

12   device a corresponding access key.

13        **MR. CURRAN:**  Thank you, Your Honor.

14        On this claim limitation -- a lot of words here -- and

15   we've tried to just spotlight the ones that change from the

16   claim language in red.  But I think the dispute here is

17   actually even narrower than this.  What we're really trying to

18   figure out on this claim term -- look at Slide 63 -- is just

19   what does "corresponding" mean?  We know there's an access key

20   here.  So what is the access key corresponding to?

21        And Viasat's tried to be clear, the thrust of the

22   construction here, cutting through all of the words, the access

23   key corresponds to two things:  The device and the media.

24   You've got to be specific to both.  This is a key that only

25   lets you play that one piece of media on that one device.

1    That's the correspondence.

2        And this is something that's, we think, actually clear

3    from the context of the claims themselves.  If we take a look

4    at Slide 64, the corresponding access key we think corresponds

5    to the content and the device.  But we don't think this is

6    something that's easy for a lay jury to see.  We're talking

7    about encryptions and keys.  So we do think this is something

8    that should be construed to make clear that key is for the

9    content and the device.  That's the correspondence.

10        And that tracks exactly what the specification tells us.

11    If we look here at Column 3 -- this is Slide 65 -- the spec

12    helpfully tells us what the access key is.  We've got three

13    keys here.  We've got this access key that's generated from two

14    components.  And the spec tells us exactly what the ingredients

15    are.  The first one is the binding key.  That's unique to the

16    device.  So we're going to bind you to just one device.  If

17    you've got five devices in your household, this key is only

18    going to work on one of them.  And if something goes wrong with

19    the security, this is only going to authorize someone to play

20    on that device.

21        The other key that we're talking about is -- the other

22    ingredient of the access key -- is what's described on Slide 67

23    as the content key.  And that content key is specific to some

24    piece of content.  So, if I have a content key, it would be

25    explaining that's about a particular piece of media.  And I

 1    take those two, and from those two, I make an access key.

 2         And the patent says, over and over again, when we're

 3    talking about access keys, they are specific, actually, to the

 4    kiosk embodiment.  So, here, we're looking at Column 20 on

 5    Slide 68.  When we make an access key, how do we do it?  We use

 6    that binding key -- that was the one for the device -- and the

 7    content key specific to some piece of media -- media content.

 8         That's what our construction is trying to get across.

 9    We're not trying to require that there is any specific

10    decryption.  We're just talking about, what is that access key?

11         Now, the one other point I should note, Your Honor, why

12    does this matter?  Why does it matter the access key is

13    specific to both of these?  Because that was the stated

14    improvement.  And Dr. Almeroth has explained this, as well.

15    But this is in the specification that's cited in the

16    declaration.  This is Slide 70.

17         This was an improvement, because suppose something goes

18    wrong with the DRM system -- the keys are flying around --

19    somebody hacks the keys.  Well, if I get an access key from the

20    kiosk -- I break open a kiosk and I steal some access keys --

21    I'm only compromising one copy of the media.  Because that

22    access key will only let me play, you know, 101 Dalmations on

23    one device.  It's not an access -- it's not a key that's for

24    101 Dalmations anywhere.  I can only play it on one specific

25    device.  That's a smaller attack surface, better security, and

1   a better form of DRM, the patent says.  That's why this

2   correspondence matters.

3         **THE COURT:**  Let me ask this:  The -- so there are

4   essentially a couple parts to your construction.  One is the

5   one you've been talking about.  You're proposing that the

6   construction be -- that it's a key for the portable data

7   storage device to decrypt.  And the question is, what is the

8   basis for reading in that limitation that the portable data

9   storage device itself does the decrypting?

10        **MR. CURRAN:**  Yes, Your Honor.

11        I think, there, we would say the portable data storage

12  device doesn't have to be the one that actually decrypts.

13  We're not saying that this -- you're not going to see a

14  non-infringement argument, Your Honor, where we say, well, that

15  key could be used in this way, but it's not actually used, and,

16  therefore, there was some requirement to do it, and so we don't

17  practice that.

18        We're only trying to note here that that's a key that

19  would only -- would be specific to the binding key for the

20  portable data storage device.  Because we have those two

21  ingredients; right?  We have the device key, the binding key,

22  and we had the media content key.

23        **THE COURT:**  What if the -- what if the construction,

24  or something to the effect, that would provide to the portable

25  data storage device a key to decrypt the first media content

 1  without specifying that it's the portable data storage device

 2  that's doing the decrypting?

 3      Because it did seem like there was some embodiments that

 4  the plaintiffs were pointing to where the playback device was

 5  using the access key.  And I -- the concern is imposing a

 6  construction that reads out embodiments that were discussed in

 7  the specification.

 8      **MR. CURRAN:**  Your Honor, I think the problem with that

 9  modification is would it read out the -- it would actually

10  collapse the distinction between an access key and the content

11  key.  Because a key that can just decrypt the media content --

12  that's the -- that's the content key.  The thing that's

13  different here is a more narrow key where only a particular

14  device could use the key to decrypt the content.

15      So the media -- the media key is a closely held -- this is

16  the unlock code for every copy of 101 Dalmations.  This one

17  gets out, everybody could use it.  But what if I had a narrower

18  key that would only let this one device decrypt that piece of

19  media?

20      And so what we're trying to capture here is that it's a

21  key that would let the same device that had the unique

22  identifier -- it could be the portable storage device -- it

23  could be somebody the portable storage device gives it to.  And

24  there are embodiments, by the way, in Claim 2, I think, or

25  other claims, where you can negotiate scenarios where that

1   other ingredient can to go a device to generate an access key.

2   But what you've got to have is something that limits the

3   surface of playability to one place.

4        That's what we're talking about with the rest of this

5   language.  Just like the correspondence has to be not just to

6   one piece of media, but also to a specific device.

7        **THE COURT:**  But does that specific device have to do

8   the decrypting, or could there be some other component of the

9   system that does the decrypting?

10       **MR. CURRAN:**  There could be, Your Honor, a different

11  component using that key that would do the decrypting.  But

12  this would be a particular -- you know -- a key for a

13  particular device to decrypt the content -- that would be an

14  articulation of this, we think, that might achieve the same

15  objectives if that language is simpler to track.  So --

16       **THE COURT:**  I see a key for a particular device,

17  although, then, I guess, that introduces the ambiguity of what

18  does that mean.  And so just to be clear, is it your position

19  that the portable data storage device itself has to actually do

20  the decrypting or not?

21       **MS. FELICE:**  It's not, Your Honor.

22       **THE COURT:**  Okay.

23       **MR. CURRAN:**  And so this maybe is -- revised

24  version -- although, I agree, Your Honor, it kind of trades one

25  ambiguity for another.  But it would eliminate the idea that

1   there needs to be decryption.  We didn't -- we're not trying to

2   read that in.  And if this would clarify that aspect, it would

3   be acceptable to us that it's just a key for a particular

4   device to decrypt the content.

5           **THE COURT:**  Okay.

6           **MR. CURRAN:**  Thank you, Your Honor.

7           **THE COURT:**  You're welcome.

8       Whenever you're ready.

9           **MS. MAO:**  Good morning, Your Honor.  Lillian Mao for

10  the plaintiffs.

11      The term "provide" to the portable data storage device --

12  a corresponding access key -- as Viasat pointed out, the real

13  focus is not the providing part, but the corresponding access

14  key terminology.

15      I want to point out, first, that this discussion about the

16  access key being specific to the device and specific to the

17  content is not explicitly in the text of the construction that

18  Viasat has proposed, in the sense that they put in the claim

19  construction chart and then the tables in their -- in their

20  brief -- it seems like what they're -- they're kind of

21  providing another layer of interpretation on it, which is that

22  the key has to be specific to both the portable data storage

23  device and the first media content.  And we gave that shown on

24  Slide 17 of our presentation.  But it seems like there's not

25  any dispute that that is kind of what they're trying to get the

 1  language to mean.

 2       You heard their counsel say that -- that this -- the hook

 3  is the word "corresponding."  The problem with that -- first of

 4  all, in general, corresponding doesn't mean "specific to."  You

 5  can have something that corresponds to the first media content

 6  or to the device, but doesn't have to be exclusive just in the

 7  general meaning of the word "corresponding."

 8       Then Viasat follows up with discussion from the patent

 9  itself, that they say shows that, well, this is what was

10  invented, or this is what was required of -- in the context of

11  this invention.  The problem is that all of the portions that

12  they cite use permissive language -- "may be" -- "in one

13  embodiment, this is happening."

14       And so none of those are definitional of the claimed

15  access key or of the term "corresponding."  And, in fact, our

16  disclosed as optional aspects of the invention are optional

17  benefits of the -- of the invention.  And so --

18       **THE COURT:**  Well, let me ask this:  Are there any

19  disclosed embodiments in the specification in which the access

20  key isn't used for the decryption or encryption of the first

21  media content?

22       **MS. MAO:**  I don't believe so, Your Honor.  I think the

23  access key is generally used in the process of encrypting and

24  decrypting the content.  The -- the -- I think the dispute is

25  more focused on, first of all, as you were asking counsel, what

1    is doing the decryption.  And that is not -- there are

2    embodiments where different components are doing that

3    decryption.  And then also whether the access key has to be

4    specific to either the content or the device.  And those --

5    there are different embodiments where it is not limited.

6            THE COURT:  Right.  And so, here, I don't see any way

7    that I could possibly get by with a plain and ordinary meaning

8    description of these terms.  And so what are you -- what is

9    your proposed construction?

10           MS. MAO:  Yes, Your Honor.

11       I must confess that I think before just now, I had thought

12   the concern was more with the -- just the phrase "access key."

13   But it seems like we agree that "access key" is for key for

14   accessing content.  So maybe that is not -- maybe that's not so

15   in dispute.

16       But we would -- we would submit that Your Honor provide to

17   the portable data storage device an access key corresponding to

18   the first media content would -- would clarify to the extent

19   that Viasat believes there's ambiguity in this claim language.

20           THE COURT:  All right.  And so the difference between

21   what you just said and what they're proposing, I think, is that

22   you're taking out the fact that the access key is for the

23   purpose of decrypting the media content?

24           MS. MAO:  That's correct, Your Honor.  That it's

25   not -- let's see -- just double-checking their construction.

1          Yeah.  That it's not necessarily directly used in

2     decrypting.  It may be in that process.  But the specification

3     does talk about you have keys and then you use that to generate

4     other keys for decryption.  And also that it is not specific to

5     or bound to a particular device.  That is a part that we don't

6     believe is -- that the claims are limited to.

7               **THE COURT:**  Okay.

8               **MS. MAO:**  So if you look at their -- the examples that

9     counsel discussed, counsel had put up a quote from Column 20 of

10    the specification talking about how the kiosk uses an access

11    key that is generated from a content key and a binding key.

12    But if you go further up in that discussion -- it's kind of a

13    lengthy discussion -- but if you go back to Column 18, at

14    lines 45 to 46, you would see that that quote came from a

15    section that is describing an exemplary process flow, not

16    anything that -- you know -- there's no language here saying

17    this is the invention.

18         Similarly, in -- counsel talked about the benefit being

19    that if you lose the access key, it doesn't -- you don't have a

20    problem of all the devices now have access, because the access

21    key is specific to the device.  But if you look at that portion

22    in Column 3, starting around line 4, that paragraph begins with

23    "the content may be uniquely bound to the specific devices."

24         And so, yes, that is a benefit of some embodiments of the

25    invention.  But it is an optional benefit or it's a benefit not

1    of necessarily all the embodiments.

2        And even more clearly, at the top of Column 8, at -- just

3    right at the very top of Column 8 -- it talks about an access

4    key that may be derived from a binding key and a content key.

5    So, again, the specification makes clear, over and over again,

6    with non-limiting language, that the access key doesn't have to

7    be bound to the device or specific to the content.

8            **THE COURT:**  All right.  Thank you.

9            **MS. MAO:**  Thank you.

10           **THE COURT:**  Anything further on that one?

11           **MR. CURRAN:**  Very, very briefly, Your Honor.  We would

12   submit that we can't have a construction of access key that

13   would be the same as a content key.  I think, if I tracked it

14   correctly, that's what I just heard as the proposal from

15   Western Digital.  That we'd eliminate any specificity of any

16   device, and it's just a key that's used for content.  We've

17   already got one of those; that's the content key.

18       So we know the access key is different.  We know that that

19   was an important part of this invention.  That was the

20   improvement.  We talked about cases that note that the

21   invention is something we should be looking at.  The patent's

22   description of the invention should inform our constructions.

23   And whether all of those embodiments are listed as permissive

24   or mandatory, here, they're the only embodiments.  Here,

25   they're the only access key we have.  The only invention they

1   can point to is an access key specific to one place and one

2   thing.  One device; one piece of media content.  Every single

3   embodiment has that.

4        And if we could look to Slide 92.

5        Your Honor rightly asked earlier about authority for the

6   idea.  Does the invention matter?  Does the problem to be

7   solved matter?  This is another example -- the *eCVI* case from

8   1997 -- the federal circuit, again, saying we're not going to

9   be blind by the problem that was solved and the way you said

10  you'd solve it.

11       And that's exactly the way specification teaches us here

12  about the access key.  We're going to solve the problems of

13  security by creating a key specific to a device and a piece of

14  content.  Thank you.

15       **THE COURT:**  And so -- you know -- and this is always

16  the challenge in these.  The -- I'm not to read the limitations

17  from the specification into the claims.  But I can look to the

18  specification, essentially, for guidance as to what the claim

19  meaning is.

20       And I think it's undisputed that all of the exemplary

21  embodiments talk about this -- the concept of access that we've

22  been talking about.  How do I avoid running into the argument

23  that I've improperly read those?  Like every patent ever,

24  they're very careful to describe them as exemplary, and "it

25  may," and "it might," and "one way to do it."  How do I avoid

1  running into the argument that I have used that information to

2  incorporate limitations into the claims?

3        **MR. CURRAN:**  I have two responses on that, Your Honor.

4  First, on the -- the point about am I importing limitations.

5  Here, we think this clearly falls on the side of the line where

6  we say -- the federal circuit says here's how we read the

7  claims.  Not I'm cold out of the gate.  But a person of skill

8  would then read the whole specification and would then go to

9  the claims.

10       And, here, where, through repeated and consistent usage, a

11  term like "access key" is described in only one way.  And it's

12  described as something created by both the device and the

13  content.  That a person of skill reading that claim

14  understands, okay, I see the access key.  I know what that is.

15  It corresponds to the device and the content.  That's why the

16  specification is instructive there.

17       But I should also note, Your Honor, it's not just

18  permissive language and permissive embodiments when we talk

19  about this issue.  I believe -- and I would -- apologies, Your

20  Honor.  There -- if we go to the language -- just one moment,

21  Your Honor.

22       There is language in the specification, Your Honor,

23  explaining not just how you may generate an access key, but

24  what the access key is.

25       Actually, if we go back to Slides -- go to Slide 64.

1    There we are.  Your Honor, would the -- if we track this

2    language just quickly, this doesn't say the access key may be

3    generated.  This says the access key is generated.

4        Now, later, it says, in one embodiment, the storage device

5    may generate the binding key.  But when we're talking about

6    this use of an access key, the access key for content is

7    generated from two components.  The first component is a

8    binding key that is unique.  Not that it may be.  That -- that

9    is the ingredient.  That second component is a content key.

10       Now, later in that same paragraph, we see uses of "may."

11   When the binding key is the ingredient, and that binding key

12   might come from some places.  The second component is a content

13   key, and the algorithm may be generated in certain ways.

14       The author of the specification knew the difference

15   between "is" and "may."  And when they -- and they used it

16   intentionally.  And when they talked about what the access key

17   is, we can look to that.  And when they talked about what the

18   ingredients for an access key are, the first one is a binding

19   key; the second one is a content key.  We can look to that as

20   well.

21       Thank you, Your Honor.

22           **THE COURT:**  All right.  Thanks.

23   I can't remember who started on that term.

24           **MR. CURRAN:**  It was Viasat.

25           **THE COURTROOM DEPUTY:**  The court reporter can't hear

 1   or see you.

 2          **MS. MAO:**  Viasat began on that turn, Your Honor.

 3          **THE COURT:**  Okay.  And so we're on to public

 4   environment.

 5          **MS. MAO:**  Your Honor, I know, today, there's been a

 6   recurring theme of, can you go with no construction?  Do we

 7   still need to explain what the plain and ordinary meaning is?

 8      We think this -- the term "public environment" really is a

 9   situation where these are common English terms.  They're used

10   in the specification without any special or technical meaning.

11   These are words that the jury would easily be able to apply.

12      The problem with Viasat's construction is that it doesn't

13   really provide clarity.  It introduces new line drawing

14   problems.  And once you get to that point, you're drawing lines

15   about words that don't appear in the specification, like

16   "accessible" or "general."  And so we -- we really struggle to

17   address Your Honor's concern about trying to provide a

18   construction.  And we really couldn't come up with anything

19   better than the words that the patentee itself chose.

20      Viasat does identify a dispute with respect to this term;

21   however, it is a factual dispute about whether its products

22   infringe or not.  It is not a claim construction dispute.  And

23   because Your Honor knows, the claim construction doesn't need

24   to answer every single question about infringement; doesn't

25   need to provide perfect clarity about whether something

1    infringes or not.  That's something that, with the factual

2    record, the jury will be able to evaluate here.

3        I will note that we're still in the middle of discovery.

4    We haven't received full discovery about how the accused

5    devices are installed on airplane cabins.  I think it's

6    undisputed that they are on airplanes.  But we only, right now,

7    have Viasat's characterization about kind of where in the

8    airplane it may be located.  And then they're saying, because

9    of that, there's a dispute about whether it's in a public

10   environment or not.

11       All of that is premature at this stage.  And so we would

12   submit that this should be just given its plain and ordinary

13   meaning with no construction.

14           **THE COURT:**  Thank you.

15           **MR. CURRAN:**  Thank you, Your Honor.

16       Very briefly on this term, we don't really understand the

17   dispute here.  Because if a public environment isn't a location

18   accessible by the general public, we don't know what it is.  We

19   are trying to articulate the plain and ordinary meaning to

20   determine do we have a dispute here.  And we're genuinely

21   puzzled that there is a fight over the word "general."

22       Because if we look at the joint claim construction

23   statement, both sides are actually in violent agreement about

24   the right dictionary to use.  This is one that both sides point

25   to.  Rarely do we agree.  But, here, we agree.

1    Merriam-Webster's dictionary from 2011 -- that's the one to

2    look to.  And what does it say?  Exposed to general view or

3    open.

4            **THE COURT:**  Well, what's -- what's the difference

5    between public and general public?

6            **MR. CURRAN:**  Well, Your Honor, I think anybody is part

7    of the general public.  And we don't want to hear, down the

8    line, well, that person -- he's part of the public.  So it's in

9    his house.  That's a public environment.  He's part of the

10   public.  That environment's his house.  That's a public

11   environment.  There's a small group of people.  They're part of

12   the general public too.  So wherever that small group of people

13   are, definitionally, that's a public environment.  That's all

14   we're trying to head off there.

15           But, honestly, this definition, Your Honor -- this, alone,

16   also would be, from our perspective, a fine construction.  This

17   seems to be a dictionary both sides agree to.  We tried to

18   articulate, you know, this same concept.  And if the other side

19   would agree that this is a -- what a public environment is --

20   one that's exposed to general view or open -- we'd be fine with

21   that too.

22           But what we can't do is have the word "public environment"

23   just mean it's something we know when we see it, and we'll get

24   to it down the line, and we're going to say that any place

25   people might be, that's a public environment.

1          **THE COURT:**  All right.  But a -- in the spectrum of

2    what's plain and ordinary versus what's construable, these are

3    simple, ordinary, everyday words.  I -- if this isn't plain and

4    ordinary meaning, like, what ever could be?

5          **MR. CURRAN:**  Well, I think, here, Your Honor, we might

6    be in an interesting *O2 Micro* situation.  Because, in *O2 Micro*,

7    the words were "only if."  And those are pretty simple words.

8    But the parties -- and both sides say they were giving the

9    plain meaning -- but they were doing it differently.

10       And so, here, we're concerned that there is an *O2 Micro*

11   situation with words that are admittedly pretty simple words.

12   But if we're sitting here saying we agree with your dictionary

13   definition, and there's still reticence for the other side to

14   just say, yeah, that's -- that is what it means -- then we're

15   very concerned.  There is actually a dispute over claim scope

16   here that we're kicking the can down the road on.

17         **THE COURT REPORTER:**  I'm sorry.  I'm sorry.  Can you

18   slow down a little?

19         **MR. CURRAN:**  I apologize.

20       We are very concerned that there is a dispute over claim

21   scope on "public" that we would just be kicking down the road.

22         **THE COURT:**  I mean, is there anything in the intrinsic

23   record that gets at what you're talking about?

24         **MR. CURRAN:**  Only the use of the word "public," Your

25   Honor.  And I think there -- also, frankly, the common

 1   understanding of where kiosks are actually placed -- not

 2   always -- you know, a kiosk could be in a museum -- but we

 3   often see a kiosk in a space that's just open.  Vending

 4   machines want to be available to as many people as you could

 5   possibly have -- the general public.

 6        So they don't always have to be there.  We're not limiting

 7   that part of the definition of a kiosk.  But you can imagine

 8   why this claim term shows up in connection with kiosk.  The

 9   claim at issue is wherein the kiosk is placed in a public

10   environment.  And we know what types of environments those are.

11   Where -- the places you would put vending machines normally.

12        But, beyond that, it's really just using the word

13   "public."  And, here, Your Honor, we're happy to agree that

14   "public" has the meaning in this dictionary both sides agree to

15   use.  What we can't do is just say plain and ordinary meaning

16   without knowing what it is they mean by that.

17             **THE COURT:**  Okay.

18             **MR. CURRAN:**  Thank you, Your Honor.

19             **MS. MAO:**  Just briefly, Your Honor.

20        We did cite the dictionary definition that counsel points

21   to.  We also cited another dictionary definition as well as the

22   fact that the dictionary -- the Merriam-Webster dictionary --

23   that both parties cite to has multiple definitions of "public."

24        So it's not a situation where we're citing that to say

25   this is the definition of "public" in the context of the

 1   patent, but that "public" is a well-known term.  It's defined

 2   in many, many dictionaries.  The jury has experience with this

 3   word and can apply it.

 4            **THE COURT:**  What is -- what is your definition of

 5   "public environment" within the context of this patent?

 6            **MS. MAO:**  If we -- if pressed, if we had to give one,

 7   we would say an environment accessible to the public.  Don't --

 8   don't worry about this word "general."  You know, we think --

 9   we think it's not perfect.  That the words of the claim are

10   better.  But if we had to give something, that is what we would

11   go with.

12        I will point out that the way that Viasat has used

13   "general" in its proposed construction is not the same as what

14   the dictionary definition is saying, because the dictionary is

15   defining the word "public," yet the word "public" remains in

16   Viasat's construction.  So now they've taken the modifier

17   "general," which, in the dictionary definition was general

18   view," and now attached it to the word "public," which, as you

19   observed, is not entirely clear what that means.

20            **THE COURT:**  Okay.

21        Let's move on to the next term:  Secure region.

22            **MS. FELICE:**  Good afternoon, Your Honor.  Nicola

23   Felice for defendant, Viasat.

24        And if we could start on --

25            **THE COURTROOM DEPUTY:**  Can I just ask you to move

```
 1   the --
 2           MS. FELICE:  Oh, the microphone.  I'm a little bit
 3   smaller.  Oh, the camera.
 4           THE COURTROOM DEPUTY:  Yep.
 5           MS. FELICE:  Yeah.
 6           THE COURTROOM DEPUTY:  The top -- just bring it down.
 7   Perfect, perfect, perfect, perfect.
 8           MS. FELICE:  I thought that might be an issue.  No,
 9   no.  It's my height challenges.
10       If we could start on Slide 74, please.
11       So, Your Honor, for this term "secure region," I think
12   it's helpful to talk a little bit, first, about prior art
13   streaming systems and just put the invention or the alleged
14   invention here in context.
15       And so this is a modified version of Figure 3 from the
16   '667 patent.  And so what came before what's disclosed in the
17   '667 patent is you had stream providers like Netflix and Hulu,
18   and they would stream content to -- directly to a user's
19   device.  And that would be to a buffer -- typically a small
20   buffer -- on a user's device, like a cell phone, a television,
21   a computer.  And they would do that in small portions.  So
22   small bits of content would be streamed over the Internet
23   network to the small buffer that's on the user's device.
24       And the reason for that was so that the stream provider --
25   the content provider -- could maintain control over most of
```

 1    their content, only relinquishing control over little bits at a

 2    time that would then go to the end user's device, a phone, a

 3    television, smart TV.

 4        The issue with that, though, was that you'd get into the

 5    problem of hiccups in the stream.  I think we probably are all

 6    familiar with that.  You're watching a movie or a show, and you

 7    get that notification that it's buffering.  And so there are

 8    these hiccups that occur in the stream to the user's device,

 9    which prevent or deteriorate that stream.  And so this is the

10    context that we're in prior to what the '667 patent says is the

11    invention.

12        And so, here, now, this is Figure 3 from the patent, we've

13    highlighted the network attached storage device.  The patent

14    calls this a NAS, as well.  And so this is what the patent says

15    the invention is.  And it's not -- to be clear, it's not any

16    network attached storage device.  Those have been around since

17    the 1980s.  What it is, is a specific network attached storage

18    device that has the secure region, 324.

19        And the reason that that is important -- and we can look

20    at this next slide, Figure 1 -- is because this region that's

21    highlighted here is -- it's a region where secure stream

22    content is -- it's secure there.  So their access to that

23    region is controlled by the content provider.  And so this then

24    allowed -- according to the '667 patent -- allowed content

25    providers to maintain control over their content, but still put

1   out -- they can push larger pieces of content to this network

2   attached storage device without risking misappropriation, which

3   is always the concern of content providers.  The more that they

4   put out and the more they relinquish control, the greater the

5   likelihood that that's misappropriated by users.

6       And so, now, getting into the term here, "secure region,"

7   so the -- so Viasat's construction is a portion of a NAS device

8   not freely accessible to users.  And I want to point out

9   again -- I know we've been talking about this a lot -- but

10  Western Digital doesn't put forward any construction for this

11  term.  Its plain and ordinary meaning -- and, really, this --

12  maybe even more so than terms in the '400 patent -- we really

13  have no idea what a secure region is or what Western Digital's

14  view on a secure region is.  And this is a term -- I don't

15  think that this is a term that you're confronting in daily life

16  -- "secure region."

17      So we've put forward a definition that we think -- or a

18  proposed construction -- that we think is entirely

19  consistent -- and, in fact, broad -- and consistent with what

20  the claims -- or, sorry -- what the specification is

21  describing.  It's -- all we're doing here is contrasting in the

22  same way that the specification contrasts these two areas.

23      So you have this user media area -- an area that is

24  accessible to users -- and then you have an area 104 that's not

25  accessible.  So it's not freely accessible to users because

 1  access to that region is controlled by the stream provider.

 2  And this is --

 3          THE COURT:  What's the -- what are you intending to

 4  get at by putting in "freely"?  What does the jury look to, to

 5  figure out whether access is free or not?

 6          MS. FELICE:  Yeah.  And understood, Your Honor, on

 7  that term.  We anticipated that that would be a question.  And

 8  I think here -- it's not -- we're not -- freely isn't like

 9  easily.  Everybody knows when something is free there's no

10  cost.  And, similarly, freely accessible -- there are no

11  conditions on access.  You can get any access that you want.

12      So to say something is not freely accessible, all we're

13  trying to encompass here, again, is a relatively broad proposed

14  construction of -- the specification goes through numerous

15  different embodiments of conditions, circumstances in which

16  access to the secure region can be limited.

17          THE COURT:  But does it ever use this term, "freely

18  accessible"?  That just seems to introduce an element of

19  ambiguity that doesn't help the jury get closer to where

20  they're trying to get.  What do you -- what do you mean by

21  "freely accessible," I guess?

22          MS. FELICE:  Understood, Your Honor.

23      And so we're -- and we're not -- I think, here, the only

24  role that "freely" is serving is to say the specification

25  discusses many different possibilities to grant, eventually,

1  access to a user.  So we start in a situation where that access

2  is controlled by the content provider.  But there are

3  circumstances -- and these are in the embodiments -- there are

4  circumstances where, again, for instance, if you pay for the

5  content in that secure region, you can have access to that

6  content in that region.

7      And so we're just trying to encompass with the word

8  "freely" those various different embodiments within this term

9  where there's some access that is allowable at a later point.

10  So that's all that we're doing with "freely."

11      **THE COURT:**  But is it free meaning without cost or

12  free meaning easily done?  I -- what -- or is it both?  That's

13  what I'm grappling with on this --

14      **MS. FELICE:**  Understood, Your Honor.

15      I think when we say "freely," we mean without conditions

16  or without restrictions, is that's really what the patent is

17  getting at here.  And because the patent is putting these

18  conditions or these circumstances -- and they're varied --

19  sometimes it's paying for it, but other times it can be a

20  different scenario where then access is granted.

21      And so we don't want to be limited -- or we don't want to

22  limit this claim.  We don't think that's consistent with the

23  specification to limit it to just, for instance, when a user

24  pays for -- for access.  So we're just trying to encompass what

25  that term -- these conditions or circumstances that are

1    discussed in the specification.

2            **THE COURT:** Okay.

3            **MS. FELICE:** And just to go through that -- so, as I

4    said previously, Western Digital just puts forward the plain

5    and ordinary meaning. And, really, here, they just attack our

6    construction. There's no affirmative representation from them

7    as to what the construction should be. And so we're trying to

8    help the jury here in defining "secure region," which, as I

9    said, it's just -- this is not a term that you're encountering

10   in your daily life.

11           And so what -- and, in doing so, what Western Digital has

12   said is that basically our construction reads out several

13   embodiments. And I just want to -- I think I've kind of said

14   this -- but, just to reiterate, that's not what's happening

15   here. We're actually -- we're trying to be the broad genus or

16   the umbrella term of -- that encompasses these various

17   embodiments.

18           So you have things where, for instance, the first

19   embodiment -- region that is non-user accessible -- that's a

20   user -- that's a region not freely accessible to users. A

21   region that requires content provider permission to access.

22   Again, a region that's not freely accessible to users. A

23   hidden region. Again, a region not freely accessible. And

24   then, finally, an encrypted region. I just want to point out,

25   we're not even sure that that's actually an embodiment

1    described in the patent -- an encrypted region -- but, to the

2    extent it is, it would be, again, essentially like a lockbox.

3    It's not freely accessible to users without the keys.

4        And so all of these are encompassed within our broader

5    genus of freely -- a region that's not freely accessible to

6    users.

7        And just another argument here that plaintiffs put forth

8    on claim differentiation, saying that Claims 4 and 13 -- we're

9    trying to read in these limitations from 4 and 13 into the

10   dependent claim.  That's not what we're doing.  Again, this is

11   an example of one of the embodiments.  In fact, if we go back,

12   it's the second embodiment here, a region that requires content

13   provider permission to access.  And so, again, we're -- that's

14   an example -- an embodiment -- of a region not freely

15   accessible to users.

16       And so we don't -- this -- it's not creating a problem of

17   claim differentiation, because the Claim 1 is still broader

18   than these narrower embodiments.  This is claiming -- 4 and 13

19   are claiming a specific embodiment where it's not freely

20   accessible to users without permission from the media streaming

21   system.

22       And, with that, unless Your Honor has any questions, I'll

23   turn it over to opposing counsel.

24            **THE COURT:**  I don't.  Thanks.

25            **MS. FELICE:**  Thanks.

1          **MR. VINCENT:**  Your Honor, Robert Vincent for

2     plaintiffs.

3          And I would first start off by saying we strongly disagree

4     that the word "secure" is a word that everyday people don't

5     understand and use in their daily life.

6          **THE COURT:**  Well, but, Counsel, come on.  It's not

7     just -- secure region is a specific component of a computer

8     system here.

9          **MR. VINCENT:**  But --

10         **THE COURT:**  It's not -- so it's not just secure.

11    Maybe we'd be having a different debate if it was secure, but

12    it's not.  It's what is this thing called a "secure region"?

13    So I -- you know -- I understand your position, but I'm not

14    persuaded by it.

15         **MR. VINCENT:**  So if you look at what Viasat has

16    proposed is their construction, they've changed -- right --

17    they've changed "region" to "portion."  I'm not sure what --

18    why that is.  But what they're really doing is construing

19    "secure."  The word "secure" they're saying is not freely

20    accessible; right?

21         If we need a construction of this -- again, we think that

22    "secure" is something that people understand -- but we -- you

23    could -- secure region could be construed as a region for which

24    access is controlled by the media streaming system.  That would

25    capture what the invention is talking about is with the secure

1    region.  It's the access is controlled by the media streaming

2    system.  We think that's redundant of what the claim already

3    requires, but that is a construction that is faithful to the

4    words that the patentee chose to describe their invention.

5         The problem here, Your Honor, is that -- Your Honor is

6    right, that our job here today is to resolve disputes.  But,

7    Your Honor, to be fair, I don't know what -- I don't know what

8    the dispute is, because I don't understand why they want to put

9    this word "freely" in there.  Taking a word that the patentee

10   used multiple times -- "secure" -- and changing it to a word

11   that the patentee did not use -- "freely" -- I don't think

12   we're resolving any disputes by doing that.  We're actually

13   inviting disputes down the road.  By adopting their

14   construction, we're inviting future disputes about what

15   constitutes "freely accessible."

16        And, again, I honestly don't know what the purpose of that

17   is.  I don't know what potential argument they want to make

18   down the road.  But I don't think that "secure" is a term that

19   is confusing.  But if we need to construe it, we can construe

20   it as just that:  A region for which access is controlled by

21   the media streaming system.

22             THE COURT:  They sort of essentially came to -- in our

23   discussion about what "freely" meant with your opposing

24   counsel, it essentially sounds like "freely" means without

25   conditions or without restrictions.  So if it's a portion of an

```
 1   NAS device not accessible by users without conditions or
 2   without restrictions, what would be your complaint about that?
 3           MR. VINCENT:  Without conditions -- so, I guess, the
 4   issue that I have -- and they said it in their brief -- and I'm
 5   looking at their brief -- that they're saying that not freely
 6   accessible is accessible only under certain conditions -- or
 7   only under certain circumstances or conditions.  Well, that
 8   implies that there are conditions under which you can access
 9   it.  But that would read out one of these embodiments -- the
10   first one -- where it's completely inaccessible; right?  There
11   are no conditions under which, in this particular embodiment of
12   the secure region, that a user can access it.  There are no
13   such conditions.
14       So, again, it's -- that would -- that would -- again,
15   we're inviting confusion as to whether or not this actually
16   captures the scope of all the different embodiments of the
17   secure region.  I don't see why we need to do that.  I don't
18   understand what dispute we're resolving here.  And I -- what I
19   fear is that we're going to inject language into the
20   construction that the jury's going to look at that is not in
21   the patent anywhere.  That we're then going to have a fight,
22   later on, about what constitutes "freely."
23       I -- it's something I think is unnecessary.  But the
24   patent is clear -- the claims are clear -- about what the
25   secure region is.  It's the region that's -- the access for
```

1    which is controlled by the media streaming system.

2           THE COURT:  So let me just hear your proposed

3    construction one more time if I got there.

4           MR. VINCENT:  Yes, Your Honor.  It's "region for which

5    access is controlled by the media streaming system."

6           THE COURT:  Okay.  Anything further on that one?

7           MR. VINCENT:  No, Your Honor.  I think that's all.

8    Thank you, Your Honor.

9           THE COURT:  All right.  You're welcome.

10          MS. FELICE:  Your Honor, if I may just respond to that

11   very briefly?

12          THE COURT:  Sure.

13          MS. FELICE:  So, actually, it seems like maybe we are

14   in agreement on this one for -- if -- if plaintiffs are willing

15   to do "region of a NAS device for which access is controlled by

16   the media streaming system," defendants have no objection to

17   that.

18          THE COURT:  Is that now no longer in dispute,

19   plaintiffs?

20          MR. VINCENT:  Could I have that repeated, please, Your

21   Honor?

22          MS. FELICE:  Sure.

23       And, again, this is the first time we're hearing this.

24   But -- so we're okay with "a region of a NAS device for which

25   access is controlled by the media streaming system."

1          **MR. VINCENT:**  I don't believe we have an issue with

2     that, Your Honor.

3          **THE COURT:**  All right.  We've accomplished something

4     today.

5          **MS. FELICE:**  Thank you, Your Honor.

6          **THE COURT:**  Let's see.  Next up is "receive an

7     indication term."  I think plaintiffs are up on this one too.

8          **MR. VINCENT:**  Thank you, Your Honor.

9      For this term, what I think the dispute is, is what the

10    indication in these claims has to include -- what the

11    indication has to be of.

12     In our view, the grammar of the claim is clear.  It's

13    indication of the NAS device.  That NAS device has certain

14    claimed attributes and features, to be sure.  That NAS device

15    has to have a secure region.  That region is -- comprises a

16    buffer, et cetera.  Those are attributes of the NAS device.

17    But the indication is of the NAS device.

18     So, in other words, this -- this -- we would read this

19    limitation to say "receive an indication of the NAS device,

20    which has a secure region."  In other words, it is a -- the

21    indication is of the NAS device, and the NAS device,

22    separately, has to have these claimed features.

23          **THE COURT:**  But isn't the whole novelty of this

24    invention the fact that it works with this secure region to

25    function?  How would it make sense for the indication to be

1    just that there is a NAS device, but the system doesn't look

2    any further before proceeding to make sure that the NAS device

3    has a secure region and it might or might not?  How does that

4    make sense --

5              MR. VINCENT:  Well --

6              THE COURT:  -- in the context of what the invention

7    does?

8              MR. VINCENT:  In the context of the invention, what

9    the -- what the claims don't require is that every time that

10   there is a transmittal of -- or a download or a request -- for

11   content, that that request must always say -- for example, Your

12   Honor, let's say I have a NAS device in my home.  I'm streaming

13   content from Netflix.  That system has been put in place.  That

14   media streaming system has been put in place, such that the

15   streaming provider knows that I have a device there.  And when

16   I request -- when I make that request -- that -- that

17   existence -- that system has already -- already been

18   established.

19         Every time I want to watch, you know, a TV show today, I

20   make the request for the TV show, and it sends the content to

21   my device.  The next day, I want to watch a movie.  So I make

22   the request for the movie.  Again, the indication tells me that

23   there's a NAS device on the other end.  But we've already

24   established that this -- there's already a system there

25   established.  The problem is, for example, you've got method

1  claims here.

2      What is not required is that every single time that you

3  make a request for content, that the indication that is claimed

4  must be -- must say that the NAS device explicitly has a secure

5  region.  So the secure region is definitely part of the

6  invention to be sure, but it's not a requirement of the

7  indication.  That's the claim limitation we're dealing with

8  here, is the indication has to explicitly say the NAS device

9  has a secure region.

10      **THE COURT:**  The whole point of this -- the next step

11  is then transmitting the digital content to the secure region.

12  So how can that happen if no indication has been given that

13  there's a secure region?

14      **MR. VINCENT:**  Because the secure region is part of the

15  NAS device.  The NAS device, we talked about, has its own

16  software -- can have its own logic -- to determine where that

17  goes.  And the NAS device can have -- can have ownership of

18  that when it determines, like, where the specific address in

19  storage it goes.  The -- Netflix doesn't need to know that.

20      **THE COURT:**  Well, so, in your view, getting an

21  indication that a NAS device exists -- what happens if that NAS

22  device actually doesn't have a secure region?  How does the

23  invention work?

24      **MR. VINCENT:**  It wouldn't work, because the NAS

25  device -- having a secure region is part of the claim.  That

1    is --

2            **THE COURT:**  Well, but how -- how would the invention

3    try to transmit the content of the secure region without, at

4    some point, being told there's a secure region?

5            **MR. VINCENT:**  Again, you can -- the -- you can set up

6    a media streaming system wherein -- contractually -- right?

7    These media streaming providers can have their own buffers

8    in -- they can send them to the homes.  So they can control

9    them that way.  Or there could be third parties.  These --

10   these NAS devices can be arranged in a number of ways.

11           But the issue we have, Your Honor, is that we don't

12   want -- the claims don't require -- and the specification

13   doesn't require that each time there's an indication, hey, I

14   want to download this show, that there has to be, in that

15   message -- here's a specific area of the NAS device where that

16   show is going to go.  The NAS device can control where that

17   goes.  The streaming provider doesn't need to know that.

18           **THE COURT:**  Okay.

19       Defendants?

20           **MS. FELICE:**  So I don't think I have to do too much

21   with this, Your Honor, because I think we're in agreement with

22   what you said.

23       And, first, I want to talk about the point of the

24   invention, as Your Honor highlighted.  I think the key here is

25   that the whole invention, as alleged by the '667, patent is

1    this secure region.

2        And the only way -- as I mentioned before -- and as we

3    discussed in the broader context -- the only way that Netflix

4    or Hulu is engaging in this streaming and feels comfortable

5    putting more data on a NAS device is if they're aware that

6    there is this secure region where they can control the media

7    that they're pushing out to the NAS device.  Otherwise, this

8    doesn't make sense.  They want to stay in the prior art world

9    where the buffers are small and they're not pushing out a lot

10   of content.

11       So, in our view, of course the content provider needs to

12   know -- has to have an indication of the secure region before

13   they're going to stream the content to the NAS device.  If it

14   was the other way around, this would just be -- they'd be

15   streaming content to any NAS device.  That's just not the

16   invention here.

17       And so our view is that our construction is entirely

18   consistent with the claim.  Receive an indication of a NAS

19   device having a secure region.  What plaintiffs want to do is

20   just read out having a secure region.  And they talk about

21   this -- this idea that the -- the secure region is just one of

22   the attributes.  But that's not how the claim is written.

23       The claim is written, receive an indication of the NAS

24   device having a secure region and then compromising a buffer

25   for streaming.  So the attributes of that NAS device of the

secure region, specifically, are that it comprises a buffer for
streaming media.  So that's the attribute of the secure region.
This makes perfect sense when you look at the claim itself, and
then it makes perfect sense in the context -- in the broader
context -- of what this invention is and the problem that we're
trying to solve.

And so what I -- one other thing I just want to respond to
that I heard plaintiffs saying is that we're somehow requiring
that it needs to -- there needs to be an indication every time.
What the claims say is that the processor needs to be
configured to -- and this is the processor of the media
streaming system -- needs to be configured to receive an
indication of the NAS device having a secure region.

So whether -- and, honestly, I'm not entirely sure, from
listening to the argument, whether there's disagreement on
that.  It seems like, at least at one point, there is an
indication to the media streaming system of a NAS device having
a secure region.  Of a NAS device -- of a secure region on a
NAS device.  That that is a requirement here.  It's necessary
for this claim to function and for the purpose of this entire
invention.

And so it -- this whole idea of it needing be every
time -- that's just not really relevant here in our view.  And
the claim says it just -- the processor just needs to be
configured to receive an indication.  If it's one time, that

```
 1   that's enough.

 2        And I know we had put up this case before, but I just

 3   wanted to put it up again here, because I think it's

 4   relevant --

 5             THE COURT:  I get it.

 6             MS. FELICE:  Okay.  Got it.  Thank you, Your Honor.

 7             THE COURT:  Thanks.

 8        Brief rebuttal and then we'll move to the last claim.

 9             MR. VINCENT:  Your Honor, the problem with what

10   counsel said about it not being required each time is that

11   there's also a method claim.  And the method claim says you

12   receive an indication and you transmit the media content.  So

13   we would agree that the claims don't require the indication of

14   a secure region to be transmitted every time, but their

15   construction would do that.

16        So, for example, Your Honor, let's say you have a NAS

17   device.  You set it up initially.  There's an initialization

18   process that happens with the service provider when you set

19   it -- when you first plug it into your TV; right?  That

20   initialization process will then set up the system.  That's

21   fine.  And that's -- and the system can know that there's a

22   trusted region on that device.

23        What we don't want is that every time that the indication

24   is received that, hey, I want to watch this particular movie,

25   that that message has to say, yeah, remember this
```

1  initialization?  Remember the secure region that you've already

2  established?  That's still there.

3      That's not necessary.  That's not what the invention is

4  claiming.  The secure region is there as part of the system.

5  But we don't think that every time there's an indication, that

6  indication has to explicitly say, again, there's a secure

7  region here.  That has to say there's a NAS device here.  This

8  is the address -- the IP address or whatever -- where you send

9  this content.

10      **THE COURT:**  Okay.  The last claim is access to the

11  secure region is controlled by the media streaming system.

12      Didn't we -- did we resolve this?  Is that -- is that part

13  of the agreement made on the secure region term?

14      **MS. FELICE:**  I don't think so, Your Honor.  I think

15  that there's still this dispute over the meaning of

16  "controlled" so that the access -- what it means for the access

17  to the secure region to be controlled by the media streaming

18  system.

19      **THE COURT:**  All right.  Fair enough.  And in that

20  sense, though, I mean, why are we changing "control" to

21  "manage"?  These really are common words.  And they mean

22  whatever they mean for infringement or non-infringement.  But

23  how does substituting one ordinary word for another ordinary

24  word comport with the principles I have to follow here?

25      **MS. FELICE:**  Understood, Your Honor.

```
 1        And I think we're -- just to be clear, we're not married
 2   to this word "manage."  We think that this adequately or
 3   accurately conveys what is routinely discussed throughout the
 4   patent.  And what it seems actually from reading, again,
 5   through plaintiffs' briefing, that they seem to agree with us
 6   on, that when the -- this is -- the dispute is about the
 7   duration of the control.  So it's the maintaining control,
 8   which this is -- that's the concept that we're trying to
 9   encompass with the term "manage."  That's -- when you manage
10   something, you maintain control over it.  And so that's why --
11   that's why we're using that word "manage."
12        And, I mean, these are just examples.  Many -- there's
13   numerous examples in the specification.  And, actually, both
14   parties cite to these portions of the specification where
15   there's these concepts of -- continues to -- that the secure
16   region -- or, sorry -- the content provider continues to be
17   control -- or continues to control the secure region or the
18   content in the secure region.
19        The secure region, here, again, the content provider
20   continues to maintain control of the media content.  And then
21   how -- another way that we know that the control is continuous
22   or that the control is maintained is this example where it's
23   talking about Figures 4A and 4B, where the previously buffered
24   content can be purchased by the user and then reassigned to the
25   user accessible region.  So this is --
```

 1          **THE COURT:**  All right.  But just, simply, why can't

 2   control mean continuous control?  Just -- I don't understand

 3   how "manage" clarifies this in any regard.

 4          **MS. FELICE:**  Understood, Your Honor.  And, as I said,

 5   we are not -- if plaintiffs are okay with the continuous

 6   control or maintain control, that's all we're trying to get at

 7   here.  But we do think that there is a dispute that control, as

 8   written in the claim, isn't enough just for the reason that we

 9   believe plaintiffs dispute this clear -- what we think is clear

10   from the patent itself.  When the patent uses the word

11   "control," as I just went through, it's talking about

12   maintaining control -- continuous control.

13          And so if plaintiffs are in agreement with us on that

14   meaning of control, then I don't think we have an issue.  But

15   there does appear to be a dispute over whether the control

16   needs to be continuous or maintained.  And so that's all we're

17   trying to do here in solving this dispute prior to the

18   infringement at trial.

19          **THE COURT:**  All right.  I -- this one I think I can

20   cut to the chase.  I think this is a plain and ordinary meaning

21   construction.  And -- but I take -- I hear your points.  I just

22   don't believe that substituting "manage" for "control" is

23   necessary or warranted to resolve whatever dispute there is.

24          **MS. FELICE:**  Understood, Your Honor.

25          **THE COURT:**  All right.

 1      Plaintiffs, do you want to take that win?

 2          **MR. VINCENT:**  Thank you, Your Honor.

 3          **THE COURT:**  Okay.

 4      Let me -- let's -- let me take a very quick just

 5  five-minute break.  I think we're close to done.  But let me

 6  take a quick recess.  And we'll come back and wrap up the

 7  hearing.

 8                  (Recess taken at 12:15 p.m.)

 9          **THE COURTROOM DEPUTY:**  Remain seated.  Come to order.

10  This court is back in session, the Honorable Hayward S.

11  Gilliam, Jr. presiding.

12      Your Honor, we're re-calling the matter of CV-22-4376,

13  Western Digital Technologies, Inc., et al. v. Viasat, Inc.

14      All parties previously identified are back in court.

15          **THE COURT:**  All right.  The -- I think we've gotten

16  through all the terms.  My law clerk pointed out to me -- which

17  was consistent with what I was saying about whether we had

18  resolved the last dispute -- you know -- I think the agreement

19  as to secured -- secure region is helpful.

20      But then if you look at Claim -- you know -- the

21  eighth disputed claim -- you know, from the -- Claim 1 and

22  Claim 11 -- if we incorporate that agreement, then it's just

23  redundant.  Because it would say -- now, it doesn't go to the

24  control issue, and I've resolved that.  But is there any

25  problem, given that -- the way that it's defined -- the way

1  that the jury would actually be instructed on this is where

2  access to the region whose access is controlled by the media

3  streaming system is controlled by the media streaming system.

4  Like, trying to actually explain to them something that would

5  work.  How do we avoid that problem?

6        **MR. VINCENT:**  Your Honor, if the question -- Robert

7  Vincent for plaintiffs.

8     If the question is if we just plug in the construction

9  into the term, I think, oftentimes, that is -- does propose a

10  problem.  I think that proposed -- poses a problem with the

11  freely accessible construction and makes the claim unwieldy.

12     I don't believe that that's -- we have an agreed

13  construction.  I don't believe that's going to be a source of

14  confusion for the jury.  Because what's going to be clear from

15  I believe both parties now is that the -- what the secure

16  region is.  It is the region of the NAS device for which access

17  is controlled.  The -- or, sorry -- the access is controlled by

18  the media streaming system.  The controlling access to I

19  believe captures the secure meaning of the term.  So I'm not

20  envisioning confusion by the jury.

21        **THE COURT:**  Well -- but what I'm saying is, see, we've

22  got to step aside from litigation land and get to trial land,

23  if we ever get here.  What I'm telling them to do is plug in

24  these set of words for that set of words.

25     And the way that we've now defined "secure region" -- it

duplicates what's in the claim itself, wherein access to the

region for which access is controlled by the media streaming

system is controlled by the media streaming system.  That's how

the claim would read.  And, again, I -- maybe we won't get

there, but it just seems problematic because it is circular.

**MS. FELICE:**  Your Honor, Nicola Felice, again, for

defendant, Viasat.

One -- and I see what Your Honor's saying.  Maybe one way

to solve that is to have -- for secure region -- it's a region

of the NAS device to which access is controlled.  And then that

latter portion of the claim, where an access to the secure

region is controlled by the media streaming system, would

answer the question of who is controlling the access.

So you'd have, still, the differentiation between the two.

You'd have just to which access is controlled.  And then that,

you know, could -- it would, in other maybe claims, be

confusing.  But because this claim has that limitation that's

saying it's controlled by the media streaming system, that then

kind of -- it differentiates those two portions and also makes

clear who's doing the access controlling.

**THE COURT:**  Well, here's what I'll do with this one.

I think you all have an agreement in concept.  Why don't you

meet-and-confer and just see if you can come to some language

that captures what you've agreed to but doesn't just totally,

you know, have a redundant, self-referential definition that

1   the jury would get.  And then that way -- you know -- and if

2   you can agree on language, then I'll -- it will be fine with

3   me, given that you're in agreement on -- in concept.

4           **MS. FELICE:**  Understood.

5           **MR. VINCENT:**  Well, Your Honor, I will just say, I

6   think that's a creative solution.  I need to think about it,

7   but I think that probably will solve the redundancy problem.

8           **THE COURT:**  Okay.

9           **MR. VINCENT:**  And we'll get back to Your Honor with

10  that proposal.

11          **THE COURT:**  Fair enough.  Why don't you submit that

12  within, say, a week.

13          **MS. FELICE:**  Great.

14          **MR. VINCENT:**  Thank you.

15          **MS. FELICE:**  Thank you, Your Honor.

16          **THE COURT:**  All right.  I think we can adjourn.

17      Anything further from either side?

18          **MR. CURRAN:**  Not from defendants, Your Honor.

19          **MS. KIECKHEFER:**  Not from the plaintiffs, Your Honor.

20          **THE COURT:**  Okay.  Thanks.

21          **MS. KIECKHEFER:**  Thank you.

22              (Proceedings adjourned at 12:27 p.m.)

23                      ---oOo---

24

25

1

2

3          **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, September 6, 2024

8

9

10   
_____

11                Kendra A. Steppler, RPR, CRR

12            Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25