1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WESTERN DIGITAL TECHNOLOGIES, INC., et al.,

Plaintiffs,

v.

VIASAT, INC.,

Defendant.

Case No. 22-cv-04376-HSG

**CLAIM CONSTRUCTION ORDER**

On July 28, 2022, Plaintiffs Western Digital Technologies, Inc., SanDisk Technologies LLC, SanDisk3d IP Holdings LTD., Western Digital Ireland LTD., and SanDisk Storage Malaysia SDN. BHD. (collectively, "Western Digital" or "WD") filed this patent infringement action against Defendant Viasat, Inc. ("Viasat"). Dkt. No. 1. The parties now seek construction of eight terms found in two patents: U.S. Patent Nos. 9,424,400 and 10,447,667. This order follows claim construction briefing and a claim construction hearing. *See* Dkt. Nos. 103 ("WD Br."), 104 ("Viasat Br."), and 105 ("WD Reply Brief").

I.      **BACKGROUND**

In this case, Western Digital claims that Viasat infringes two Asserted Patents: U.S. Patent No. 9,424,400 (the "'400 Patent") and U.S. Patent No. 10,447,667 (the "'667 Patent"). The '400 Patent is entitled "Digital Rights Management System Transfer of Content and Distribution" and was issued on August 23, 2016. *See* Dkt. No. 103-1. The '667 Patent is entitled "Secure Stream Buffer on Network Attached Storage" and was issued on October 15, 2019. *See* Dkt. No. 103-2. The Accused Products are Defendant's media streaming software, systems, and services, including specifically in-flight entertainment and communication systems for use in commercial and private aviation. *See* Dkt. No. 38 ¶ 2.

**A.      The '400 Patent**

The '400 Patent relates to "digital rights management (DRM) for content that may be downloaded and securely transferred from one storage to another storage."  '400 Patent Abstract. The claimed invention "performs cryptographic operations and provides a root of trust" which "enables secure copying or transfer of content from one storage device to another storage device." *Id.*  Essentially, the '400 Patent claims a system that enables secure copying or transfer of media content (e.g., video streams) to "portable data storage devices" whereby the system authenticates the portable data storage device in question before providing an access key to decrypt the media content.

The '400 Patent has two independent claims—claim 1 and claim 9.  Claim 1 recites:

> A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:
>
> a first data interface configured to communicate with a portable data storage device;
>
> a second data interface configured to communicate, over a network, with a remote trusted server; and
>
> a processor configured to:
>
>> obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;
>>
>> authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface;
>>
>> and in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

'400 Patent cl. 1.  Dependent claims 2–8 of the '400 Patent recite kiosks with additional limitations, including wherein the kiosk comprises "a local data storage," '400 Patent cl. 2, or a "user interface for receiving a selection of the first media content from the local data storage," '400 Patent cl. 3.  Notably for the purposes of claim construction, dependent claim 8 further recites a "kiosk of claim 1, wherein the kiosk is located in a public environment."  '400 Patent cl. 8.  Independent claim 9 recites a *method* for provisioning secure media content to a plurality of

United States District Court
Northern District of California

United States District Court
Northern District of California

1   portable data storage devices from a kiosk, but the limitations are substantially identical to the

2   limitations of claim 1.  Similarly, dependent claims 10–17 are substantially identical to dependent

3   claims 2–8, only they depend on a method rather than system claim.

4   **B.      The '667 Patent**

5   The '667 Patent relates to "[a] network attached storage ["NAS"] device coupled to a local

6   area network and including a network interface configured to receive digital content from a remote

7   content provider outside the local network."  '667 Patent Abstract.  According to the specification,

8   the '667 Patent describes a problem whereby internet service providers are incentivized to throttle

9   download speeds for streaming services (e.g., Netflix, Hulu).  This throttling creates Quality of

10  Service issues for consumers, as display devices often have very limited buffers and streaming

11  services generally prefer limited buffers.  As a solution the '667 Patent claims a novel system and

12  method for buffering streaming media content (e.g., movies, tv shows) that "maintain smaller sizes

13  of buffers on display device and [] maintain control over content while ensuring that content can

14  be viewed without deterioration due to throttling through the use of a Network Attached Storage

15  (NAS) device having a secure portion for buffering streaming content."  *Id.* at 2:30–34.

16  The '667 Patent has three independent claims—claim 1, claim 11, and claim 20.  Claim 1

17  of the '667 Patent recites:

18          A media streaming system comprising:

19          a network interface adapter configured to transmit digital content, via
            a wide area network (WAN), to a network attached storage (NAS)
20          device operating on a local area network (LAN); and

21          one or more hardware processors configured to:

22                  receive an indication of the NAS device +having a secure
                    region comprising a buffer for streaming media on a separate
23                  display device on the local area network, wherein access to
                    the secure region is controlled by the media streaming system;
24
                    transmit the digital content to the secure region within the
25                  NAS device for playback by the separate display device from
                    the buffer; and
26
                    transmit instructions to the NAS device to control streaming
27                  access to the digital content stored on the buffer.

28  *Id.* cl. 1.  Dependent claims 1–9 recite further limitations wherein, e.g., the processors are

configured to cause the NAS device to use encryption that secures the digital content to the secure region (claim 5); provide instructions to the NAS device for controlling an encryption type used in the secure region (claim 7); or provide instructions to the NAS device to reallocate a portion of the secure region storing the digital object to an accessible region (claim 9).  Independent claim 11 recites a method for transmitting media content from a media streaming system, but the limitations are substantially identical to the limitations of claim 1.  Similarly, dependent claims 12–19 are substantially identical to dependent claims 2–8, only they depend on a method rather than system claim.  Independent claim 20 of the '667 Patent is also a system claim, but is drafted in means-plus-function language versus the "processor configured to" language of claim 1.

## II.  LEGAL STANDARD

Claim construction is a question of law to be determined by the Court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted).  Accordingly, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *Id.* at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite fundamental dispute between parties).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.' "  *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)).  There are only two circumstances where a claim is not entitled to its plain and ordinary meaning:  "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  Additionally, "the context in which a claim term is used in the asserted claim can be highly

United States District Court
Northern District of California

instructive." *Id*.  However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313.  The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315.  The scope of the claims must be "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quotation omitted).  Thus, the construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*.  In addition to the claims and the specification, the prosecution history may be used "to provide[ ] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (quotation omitted). The claims, specification, and prosecution history together constitute the "intrinsic evidence" that forms the primary basis for claim construction. *Phillips*, 415 F.3d at 1312–17 (citation omitted).

Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert opinions, if it is "helpful in determining the 'true meaning of language used in the patent claims' " and is not contradicted by the intrinsic evidence. *Id.* at 1318 (quoting *Markman*, 52 F.3d at 980). For example, dictionaries may reveal what the ordinary and customary meaning of a term would have been to a person of ordinary skill in the art at the time of the invention. *Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 722 (Fed. Cir. 2014) ("Terms generally carry their ordinary and customary meaning in the relevant field at the relevant time, as shown by reliable sources such as dictionaries, but they always must be understood in the context of the whole document—in particular, the specification (along with the prosecution history, if pertinent).").  Expert testimony can also help "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

1   *Phillips*, 415 F.3d at 1318.  Extrinsic evidence is, however, "less significant than the intrinsic

2   record in determining the legally operative meaning of claim language."  *Id.* at 1317 (quotation

3   omitted).

4   **III.    DISPUTED TERMS**

5       **A.    "kiosk" ('400 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
| --- | --- |
| Non-limiting preamble, in the alternative, plain and ordinary meaning | "a device whose user interface is used by consumers" |

9       The term "kiosk" appears in the preamble of asserted claims 1, 2, 6, 8-10, 13, and 17 of the

10  '400 Patent.  The parties present two disputes as to the interpretation of the term "kiosk."  First,

11  the parties dispute whether the term "kiosk" in the preamble is limiting—Western Digital argues

12  that the preamble is not limiting, whereas Viasat argues that it is.  *See* WD Br. at 5–6; Viasat Br. at

13  2–3.  Second, if the preamble is limiting, Viasat argues that the term "kiosk" should be construed

14  as "a device whose user interface is used by consumers."  Viasat Br. at 3–5.  Western Digital

15  argues that the plain and ordinary meaning of the word "kiosk" does not include such

16  requirements, and that no construction is necessary.  WD Br. at 6–8.

17      **i.    Whether the Preamble is Limiting**

18      The first threshold issue the Court must resolve is whether the preamble is limiting.

19  "Whether to treat a preamble as a limitation is a determination resolved only on review of the

20  entire patent to gain an understanding of what the inventors actually invented and intended to

21  encompass by the claim."  *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d

22  1362, 1367 (Fed. Cir. 2020) (cleaned up).  "In general, a preamble limits the invention if it recites

23  essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."

24  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting

25  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  "Conversely,

26  a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim

27  body and uses the preamble only to state a purpose or intended use for the invention.' " *Id.*

28  (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)); *see also Neapco Drivelines LLC v.*

United States District Court
Northern District of California

*Am. Axle & Mfg., Inc*., 847 Fed. App'x 856, 858 (Fed. Cir. 2021) (The general rule is that a preamble is not limiting, unless "it recites 'additional structure or steps underscored as important by the specification,' is 'essential to understand limitations or terms in the claim body,' or provides necessary structure absent from the claim body." (quoting *Catalina*, 289 F.3d at 808)). "Moreover, clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Catalina*, 289 F.3d at 808.

Viasat argues that the term "kiosk" in the '400 Patent is limiting because of the prosecution history of the '400 Patent's parent application—U.S. Patent No. 8,914,634 (the "'634 Patent"). During prosecution of the '634 Patent, the claims initially recited a "first storage device configured to provide content to a player system for rendering of the content . . ." Dkt. No. 104-2 at 34. These claims were rejected by the USPTO in view of U.S. Patent Publication 2009/0052671 ("Bauchot"), which the examiner found to disclose each of the then-pending claims. *Id*. The applicant then amended the claims, including replacing phrase ""first storage device configured to provide content to a player system" with "[a] ***kiosk*** for provisioning secure media content to a plurality of portable data storage devices." *Id*. at 15 (emphasis in original). The applicant further argued that Bauchot did not disclose the newly-amended claims, including because "Bauchot fails to even mention use of a kiosk." *Id*. at 19. Viasat argues that this statement represents a clear statement that a ""kiosk' is not simply a 'storage device,' such as a 'media center' connected to 'a personal computer' as in Bauchot—the 'kiosk' must be something more than the configuration Bauchot expressly mentioned." Viasat Br. at 3.

The Court finds that the applicants' statements in the prosecution of the '634 Patent suffice to demonstrate a "clear reliance on the preamble . . . to distinguish the claimed invention from the prior art[.]" *Catalina*, 289 F.3d at 808. Western Digital argues that the Court cannot look at the prosecution history of a related patent to find such clear reliance, but the '634 Patent is the parent application of the '400 Patent. In such cases, the Federal Circuit has repeatedly said that statements made in the prosecution of a parent application are to be treated as intrinsic evidence for the purposes of claim construction. *See E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921

United States District Court
Northern District of California

1    F.3d 1060, 1069 (Fed. Cir. 2019); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed.

2    Cir. 1999) (applying statements from prosecution of a parent application where subject matter was

3    common to the continuation-in-part application); *see also Jonsson v. Stanley Works*, 903 F.2d 812,

4    818 (Fed. Cir. 1990) (affirming claim construction relying on "arguments and remarks" made

5    during the prosecution of a parent application for the same claim term).

6           Accordingly, because the patentee clearly used the term "kiosk" in the preamble as a

7    means to distinguish prior art during the prosecution of the '400 Patent's parent application, the

8    Court concludes that the preamble's use of that term is limiting.

9           **ii.    Construction of "Kiosk"**

10          The Court next turns to the proper construction of the term "kiosk."  Western Digital urges

11   that the Court need not construe the term beyond its "plain and ordinary meaning," which it argues

12   would be understood by the jury in light of the specification as being "any device used to access

13   and distribute content provided by the system."  WD Br. at 6–8 (quoting '400 Patent at 6:36–37).

14   Viasat argues that the term should be construed as "[a] device whose user interface is used by

15   consumers."  Viasat Br. at 3–5.  Because the parties "present a fundamental dispute regarding the

16   scope of [the] claim term[,]" *O2 Micro*, 521 F.3d at 1362, the Court must resolve this dispute with

17   sufficient clarity that the issue is not left for the jury to decide.  Accordingly, the Court will

18   proceed as if Western Digital's proposed construction is "any device used to access and distribute

19   content provided by the system."  *See* Dkt. No. 117 ("Hearing Tr.") at 12:10–18.  The Court finds

20   that construction most supported by the intrinsic evidence here. Western Digital's proposed

21   construction is adopted verbatim from the specification, which expressly states that "the kiosk

22   106' may be *any device* used to access and distribute content provided by the system."  '400

23   Patent at 6:36–37 (emphasis added).  A POSITA, reading such a clear statement in the

24   specification, would understand the patentee's intended meaning for "kiosk" to be broad enough to

25   encompass any such device, and that it need not be limited to a device having a "user interface"

26   that is "used by consumers."

27          In contrast, Viasat's construction improperly imports optional features of the "kiosk" as

28   required elements.  Specifically, the '400 Patent states that the kiosk "*may* be implemented as a

self-service computer terminal" and in other embodiments, *may* be placed in a public environment and "*may* comprise various user interface equipment such as a keyboard, display, etc." '400 Patent at 6:37–43 (emphasis added). The "use of the word 'may' in the specification strongly implies" that such features are not necessarily required. *Game & Tech. Co. v. Wargaming Grp. Ltd.,* 942 F.3d 1343, 1351 (Fed. Cir. 2019). Viasat's intrinsic evidence supporting its "user interface" requirement is all written in such permissive language, such that a POSITA reading the specification would understand that while a "kiosk" may have a user interface, such features are not mandatory. Furthermore, as to whether the "kiosk" must be "used by consumers," Viasat cites to no intrinsic evidence supporting such a requirement, and instead suggests that the plain meaning of a "kiosk" implies such a requirement. *See* Hearing Tr. at 25:5–10 (suggesting that "kiosk" "had a very specific meaning. . . . before computers, where people would go to a kiosk . . . for a transaction with a consumer."). The Court finds this argument insufficient to overcome the strong intrinsic evidence supporting Western Digital's broader proposed construction.[1] Similarly, the Court declines to consider Viasat's extrinsic evidence (e.g., dictionary definitions) in support of its narrow construction. While courts may consider such evidence on claim construction, it "is generally of less significance than the intrinsic record[.]" *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019). Because Viasat's dictionary definitions conflict with the specifications' express statements, the Court concludes that they "do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it." *Phillips*, 415 F.3d at 1322.

The Court finds Viasat's other counterarguments unpersuasive. Viasat also argues that Western Digital's alternative proposal is untimely because it was not disclosed in the parties' exchange of preliminary claim constructions or March 12, 2024 Joint Claim Construction and Prehearing Statement. *See* Viasat Br. at 10. But Viasat cites to no authority suggesting that this failure constitutes a waiver of the argument, and presents nothing to show that it has suffered any real prejudice from such a failure. And in any case, Western Digital disclosed in the Joint Claim

---

[1] Viasat itself conceded at the hearing that this requirement "could be too narrow" and that it was "not tied to that word[.]" Hearing Tr. at 25:11–12, 22–23.

Construction and Prehearing Statement that it intended to rely upon the specification's characterization of "kiosk" as "any device used to access and distribute content provided by the system." *See* Dkt. No. 95 at 4 (Appendix 1 citing '400 Patent at 6:35–51 in support of Plaintiffs' proposed construction for "kiosk"). Any prejudice to Viasat from Western Digital's purported untimeliness is therefore minimal, as Viasat was on notice that, at a minimum, Western Digital intended to rely upon that language in support of its "plain and ordinary meaning" construction.

Viasat next argues that this construction "violates black-letter law 'preclud[ing] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.' " Viasat Br. at 10 (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed Cir. 2003)). This argument does not withstand scrutiny. Viasat essentially argues that when the patentee distinguished Bauchot during the prosecution of the '634 Patent for "fail[ing] to even mention use of a kiosk[,]" it effectively disclaimed the broader construction that Western Digital now proposes. But the '634 Patent shares a specification with the '400 Patent, including the characterization of "kiosk" as "any device used to access and distribute content provided by the system." *See* '634 Patent at 6:28–29. For Viasat's argument to prevail, it would have to demonstrate that the patentee's use of the term "kiosk" in the '634 Patent prosecution history meant *something narrower* than what the '634 Patent's specification expressly stated. The Court sees no evidence of this in the intrinsic record.

Accordingly, the Court adopts the construction "any device used to access and distribute content provided by the system."

### B.    "portable data storage device" ('400 Patent)

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a storage device that can be easily carried or moved about by its user" |

The parties' dispute as to this term boils down to a dispute over the meaning of the word "portable," and is two-fold: Viasat argues that for a "data storage device" to be "portable," it must (1) be *easily* carried or moved around (2) by its user. *See* Viasat Br. at 7–9. Western Digital argues that neither qualification is necessary, that they inject unnecessary ambiguity into the claim

United States District Court
Northern District of California

1    language, and that the term needs no construction.  *See* WD Br. at 9.  Alternatively, Western

2    Digital proposes a construction of "[a storage device] capable of being carried or moved."

3    Hearing Tr. at 41:4–11.  As with the prior term, the Court rejects Western Digital's proposal that

4    no construction is necessary, and instead proceeds with its alternative proposal from the hearing.

5    *See O2 Micro*, 521 F.3d at 1362.

6        The Court turns to the crux of the parties' dispute as to this claim term, beginning with

7    whether a "*portable* data storage device" must be a data storage device that "can be *easily* carried

8    or moved."  Notably, this dispute is almost directly analogous to the claim term at issue in *Eon*,

9    where the Federal Circuit reversed a district court's construction of "portable" and "mobile" terms

10   in the claim language.  In that case, the Federal Circuit held that the district court erred in not

11   construing these terms at claim construction, which permitted the plaintiff to take the position that

12   the terms "portable" and "mobile" "should be broadly interpreted as including, essentially,

13   anything that is theoretically capable of being moved." *Eon*, 815 F.3d at 1321.  In reversing the

14   district court, the Federal Circuit rejected plaintiffs' interpretation as "completely untethered to the

15   context of the invention . . . ." *Id.*

16       Of course, this case is not *Eon*, and this Court must construe the terms in the '400 Patent in

17   accordance with the '400 Patent's intrinsic and extrinsic record.  However, here too, the evidence

18   supports Viasat's position.  First, the '400 Patent specification uses the word "portable" in ways

19   that suggest it means more than being *capable* of being moved or carried.  For example, the

20   specification describes a "client system" in embodiments that "may comprise a computer, a

21   television, a *portable* or mobile device, a video game console, a *portable* video game console, as

22   well as associated storage." '400 Patent at 4:18–22 (emphasis added).  The distinction between

23   "video game console" and "*portable* video game console" suggests that the patentee, when using

24   the word "portable," understood it to mean something beyond the mere capability to be moved or

25   carried.  Similarly, the specification's description of certain devices as "*portable* or mobile

26   device[s]" suggests that a "portable" device is at least similar to, if not synonymous with, a

27   "mobile" device.  This conclusion is later reinforced in the specification, which describes that the

28   "user of client system 106 may then remotely access the content and play it on a mobile device,

such as an iPad, iPod, iPhone, a *portable* video game console, such as PlayStation® portable or a Nintendo DS, etc." '400 Patent at 5:21–25.  The portable and mobile devices described in this list are all small devices, designed to be easily carried or moved about.  Accordingly, by the canon of *noscitur a sociis*, the intrinsic evidence strongly supports Viasat's position that a POSITA would understand that a "portable data storage device" is likewise a storage device that can be *easily* carried or moved about, as opposed to anything (no matter how large, heavy, or ungainly) that is capable of being carried or moved about.

Western Digital argues that Viasat's construction introduces indefiniteness and unnecessary confusion through the use of the word "easily," and that it deviates from plain English dictionary definitions of the word "portable."  *See* WD Br. at 9.  Neither argument persuades.  First, it is well established that terms of degree, such as "easily," are not inherently indefinite. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  Rather, such language "has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."  *Id.*  Here, the '400 Patent's descriptions of exemplary portable devices in the specification are sufficient to enable one of ordinary skill in the art to understand, with reasonable certainty, what it would mean for such a device to be "easily carried or moved about."  Second, as to Western Digital's dictionary definitions, these definitions are extrinsic evidence at best, and thus do not give this Court reason to reject its conclusions as to what the intrinsic evidence—the '400 Patent specification—would inform a POSITA as to the scope of the claim term.  *See Allergan Sales*, 935 F.3d at 1373.

The Court next turns to the second requirement of Viasat's proposed construction, that the "portable data storage device" be "easily carried or moved about *by its user*."  According to Viasat, this requirement is not strictly necessary for its proposed construction, but rather something added to preclude a hypothetical future argument by Western Digital that objects which can be easily carried or moved about by heavy machinery (e.g., a forklift) are nonetheless "portable."  *See* Hearing Tr. at 38:19–25.  To that extent, Viasat admits that this addition would only provide "additional marginal clarity" to the jury.  *Id.*  Here, the Court agrees with Western Digital that this requirement is unnecessary and introduces potential confusion as to who the *user*

is.  The Court sees no indication that Western Digital intends to argue that a device that is easily carried or moved about by heavy machinery is still "portable," and the Court need not "resolv[e] all questions of meaning with absolute, univocal finality." *Eon*, 815 F.3d at 1319; *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) (the Court need construe "only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.").  Because this issue is at best, a hypothetical dispute, the Court declines to adopt Viasat's proposal here.

Accordingly, the Court adopts the construction:  "a storage device that can be easily carried or moved about."

**C.**   **"authenticate the portable data storage device, using at least the unique identifier" ('400 Patent)**

| **Western Digital's Proposed Construction** | **Viasat's Proposed Construction** |
|---|---|
| Plain and ordinary meaning | "confirming that the portable data storage device is trusted using at least the unique identifier" |

The parties' dispute regarding this term relates to the word "authenticate."  Western Digital argues that plain and ordinary meaning of "authenticate" means simply to "confirm the identity" of the portable data storage device, whereas Viasat argues for the additional step of "confirming" that the portable data storage device "is trusted."  *See* WD Br. at 9–11; Viasat Br. at 9–12.

A POSITA would understand that, in the context of the '400 Patent, Viasat's construction is more consistent with the intrinsic record.  The '400 Patent's specification makes it clear that the purpose of the claimed invention is to develop a digital rights management ("DRM") system, which is "used to control the use of digital content and devices" and "prevent unauthorized copying of digital content."  '400 Patent at 1:25–27.  The specification further describes problems with existing DRM systems, which "have security weaknesses and have been circumvented."  *Id.* at 1:32–34.  In solving these problems, the '400 Patent describes embodiments in which a trusted content server can authenticate devices "to ensure that entities in the system are trusted" and "ensure[] that the storage device confirms a trust relationship with the player and vice versa."  *Id.* at 3:23–37.  When the specification uses the word "authenticate," it is *always* for the purpose of

United States District Court
Northern District of California

13

confirming the trust level of the devices in question, and no embodiment in the specification describes "authenticating" as a mere identification of the devices. Western Digital essentially conceded as much at the hearing. *See* Hearing Tr. at 49:10–50:10. If anything, the specification teaches away from mere identification. The Federal Circuit has affirmed narrower constructions based on similar disparaging remarks, combined with "repeated[], consistent[], and exclusive[]" depictions consistent with a narrower construction, and especially when the broader construction runs contrary to the primary purpose of the invention. *In re Abbott Diabetes Care Inc. ("Abbott")*, 696 F.3d 1142, 1149 (Fed. Cir. 2012); *see also Groove Digital v. United Bank*, 825 Fed. App'x 852, 857 (Fed. Cir. 2020) (construing the term "applet" to require geotargeting based on statements in specification that primary object of the claimed invention was geotargeting, and every embodiment disclosed required geotargeting); *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) ("We have explained that a patent's express purpose of the invention 'informs the proper construction of claim terms.' "). Like in *Abbott* and *Groove Digital*, the '400 patent's exclusive use of "authenticat[ion]" to "prevent unauthorized copying of digital content," '400 Patent at 1:25–27, confirms that the patentee intended for the term "authenticate" to include confirmation that the portable data storage device is trusted or authorized.

Accordingly, the Court adopts the construction: "confirming that the portable data storage device is trusted using at least the unique identifier."

**D.** **"provide to the portable data storage device . . . a corresponding access key" ('400 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "provide to the portable data storage device . . . a key for the portable data storage device to decrypt the first media content" |

The parties' dispute as to this claim term relates to what the "corresponding access key" is. Viasat takes the position that the "corresponding access key" must be an access key specific to the portable data storage device, and be used to decrypt the first media content. Viasat Br. at 13–15. Western Digital argues that the access key merely has to "correspond" with the first media content, and does not need to be specific to the portable data storage device. WD Br. at 11–12.

United States District Court
Northern District of California

1    Viasat first argues that the "corresponding access key" must be a key to "decrypt the first

2 media content. The Court agrees. The '400 Patent's specification makes it clear that the access

3 key is used for the encryption and decryption of content. For example, the specification plainly

4 states that the "[t]he access key is used to decrypt and render the [media] content." '400 Patent at

5 9:30; *see also* 18:6–7 ("Sixth, the host system 400 generates the access key 706 in order to decrypt

6 the content."); 21:38–39 (same). It further states that the access key may be used to encrypt the

7 content. *See id.* at 12:20–22 ("The download server 300 may then use the binding key as one

8 component of an access key used to encrypt the content."); 15:7–9 ("For example, the download

9 server 300 may employ AES encryption to encrypt the content 702 based on the access key 706.").

10 Where, as here, "a patentee uses a claim term throughout the entire patent specification, in a

11 manner consistent with only a single meaning, he has defined that term 'by implication.' " *Bell*

12 *Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001); *see*

13 *also Abbott,* 696 F.3d at 1150 (claim term may be defined by implication where patents

14 "repeatedly, consistently, and exclusively" depict embodiments using that definition).

15    Viasat also argues that the "corresponding access key" must be specific to the portable data

16 storage device. Viasat argues that the specification describes the "access key" as being derived

17 from a "content key"—which is specific to the encrypted media content—and a "binding key"—

18 which is "used to bind content to the storage device . . . ." '400 Patent at 9:5–6. According to

19 Viasat, one of the key improvements claimed by the '400 Patent is this two-part "access key,"

20 which prevents *any* portable data storage device from accessing the content. This improved upon

21 prior art that only utilized a content-specific "content key," which enabled bad actors with access

22 to the key to distribute and access the content with other data storage devices. *See* Viasat Br. at

23 13–14; *see also* Dkt. No. 103-4 ("Almeroth Decl.") ¶¶ 68–71; Hearing Tr. at 59:17–60:2. Finally,

24 Viasat again cites to the prosecution history of the '634 Patent, wherein the patentee distinguished

25 the patent from prior art by arguing that "Bauchot relies on storing content and keys separately . . .

26 rather than on binding content to a portable storage device . . . and teaches away from binding

27 content specifically to a portable storage device . . . ." Dkt. No. 103-5 at 7–8.

28    Western Digital counters that Viasat's argument relies upon permissive descriptions of

United States District Court
Northern District of California

certain exemplary embodiments in the specification, which the claim language does not require. *See* '400 Patent at 7:63–8:3 ("FIG. 3 shows an *exemplary download system* of the embodiments. . . . In *one embodiment*, download server 30 encrypts the content with an access key that *may be* derived from a binding key and a content key." (emphasis added)); 9:3–10 ("In *one embodiment*, . . . the cryptographic module 409 may be configured to generate a binding key that is used to bind content to the storage device 110." (emphasis added)). Western Digital further argues that the statements made during prosecution history of the '634 Patent cannot support disclaimer in the '400 Patent, because the '634 Patent expressly claimed a "binding key unique to the portable data storage device . . . ," a limitation notably missing from the '400 Patent. *See* WD Br. at 13. Finally, Western Digital argues that Viasat's construction would exclude disclosed embodiments in which the "corresponding access key" is used by devices other than the portable data storage device to decrypt content, such as the playback device. *See* '400 Patent at 9:27–30 ("Responsive to this request, the storage device may then send the binding and content keys to the player so that it can generate the access key. The access key is used to decrypt and render the content.").

On this issue, the Court agrees with Western Digital. As it argues, the specification's language describing the "access key" being derived from a "content key" and a "binding key" is permissive and only describes exemplary embodiments. Such language would indicate to a POSITA that the "corresponding access key" claimed in the '400 Patent may be so derived, but need not be. *See Game & Tech.*, 942 F.3d at 1351. To adopt Viasat's proposed construction would improperly import limitations from those embodiments into the claim language. Moreover, such a construction would also improperly exclude embodiments in which the "corresponding access key" is generated and used by the playback device, *not* the portable data storage device, to decrypt and render the content. *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) ("A claim construction that excludes a preferred embodiment is rarely, if ever correct[.]"). The intrinsic evidence does not support such a construction. As for Viasat's arguments from the '634 Patent prosecution history, the Court does not find the statements made regarding Bauchot's lack of a binding key disclosure relevant to the '400 Patent, which, unlike the '634 Patent, does not expressly recite or claim such a binding key.

Viasat argued at the hearing that unless the "corresponding access key" was specific to the portable data storage device, the construction would "collapse the distinction between an access key and the content key." Hearing Tr. at 61:8–62:6. However, the claim language does not claim that the access key must be distinct from a "content key"—unlike the '634 Patent, the '400 Patent's claims do not recite a "content key" or "binding key" anywhere. This argument, like Viasat's arguments from the '634 Patent's prosecution history, presumes that the '400 Patent recites the same claim language as the '634 Patent. But the '400 Patent was drafted using broader language in this regard. A POSITA, having read the intrinsic record of both patents, would not understand that, in the context of the '400 patent, the "corresponding access key" must necessarily be distinct from a "content key."

Accordingly, the Court adopts the construction: "provide to the portable data storage device . . . a key to decrypt the first media content."

### E.   "public environment" ('400 Patent)

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a location accessible by the general public" |

It is unclear to the Court that there is a genuine fundamental dispute as to the scope of this term. Both parties seem to agree that the term "public environment" should be accorded its plain and ordinary meaning, with the only difference between the parties' respective proposed constructions being the inclusion of the word "general" in Viasat's construction. *See* Hearing Tr. at 76:4–11 (Western Digital proposing construction of "environment accessible to the public.").

As with many of Viasat's proposals, the inclusion of the word "general" here appears to be a litigation-driven decision to preclude an as-yet hypothetical position that Western Digital might take. Here, Viasat argues that, without the inclusion of the word "general," Western Digital might try to argue that any location accessible to any singular member (or subset of) the public is a "public environment," such as a person's house. *See* Hearing Tr. 73:6–14. Again, there is no evidence that Western Digital intends to take such a position, and as such, the Court sees no real dispute between the parties as to the scope of the claim. Absent such a dispute, the Court sees no

United States District Court
Northern District of California

17

1    reason to add a term to the construction that may inject confusion for the jury.

2         Viasat argues in its briefing that "there is a clear dispute over this term as evidenced by

3    Plaintiffs' infringement contentions where they contend that a server located above the ceiling or

4    under the floor of a plane, and thus completely inaccessible to airline customers, is still somehow

5    in a 'public environment.' " Viasat Br. at 16. But that dispute concerns infringement, not claim

6    scope. Unlike in *Eon*, where the Court's failure to construe the terms "portable" and "mobile" left

7    open infringement positions that would otherwise have been foreclosed, the parties' respective

8    constructions are not so different here as to leave open a dispute of infringement. A location

9    "accessible by the general public" and a location "accessible by the public" are substantially the

10   same, and whether a server on a plane satisfies this accessibility requirement is a fact question for

11   the jury to resolve. Because the parties' dispute has no bearing on their respective proposed

12   constructions, the Court declines to consider it. *See Scripps Clinic & Res. Found. v. Genentech,*

13   *Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("the words of the claims are construed independent of

14   the accused product.").

15        Accordingly, the Court adopts the construction: "location accessible by the public."

16        **F.    "secure region" ('667 Patent)**

17        The parties resolved their dispute as to the scope of this claim term at the hearing, and per

18   the Court's instructions, submitted a stipulated construction of "secure region"   as "a region of the

19   NAS device to which access is controlled." *See* Dkt. No. 119.

20        Accordingly, the Court adopts the construction: "a region of the NAS device to which

21   access is controlled."

22        **G.    "receive an indication of the NAS device having a secure region" ('667 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "receive an indication of the presence of a secure region within the NAS device" |

26        The parties dispute whether the claim term "receive an indication of the NAS device

27   having a secure region" requires that the processor merely receive an indication of the NAS device

28   (which happens to have a secure region), or whether the processor must also receive an indication

of the presence of the secure region itself. *See* WD Br. at 17–18; Viasat Br. at 21–23. Western Digital argues that the plain language of the claim term does not require the processor to receive an indication of the presence of the secure region, and that the claim should not be construed as requiring such an indication every time media is transmitted through the claimed system. Viasat counters that the novel aspect of the claimed invention is the use of this secure region to buffer content for streaming providers, and that the system would not be able to operate without the processor being aware of the presence of the secure region to stream content to.

The Court is persuaded by Viasat's argument. The focus of the '667 Patent, as described by the specification, is a novel NAS device having a secure region to buffer content from streaming services; as such, the claims logically require an indication that the NAS device has such a secure region for this buffer. Simply put, the claimed processor must have some indication of the presence of the secure region to use that secure region as a buffer. Otherwise, the claimed invention would not make sense, because if the system did not have an indication of the presence of the secure region, it would not be able to use that secure region to buffer content. Because "claims are directed to the invention that is described in the specification[,] they do not have meaning removed from the context in which they arose." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001); *see also Sequoia*, 66 F.4th 1326. Viasat's construction most clearly describes what a POSITA would understand the claim language to mean, when viewed "with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Accordingly, the Court adopts the construction: "receive an indication of the presence of a secure region within the NAS device."

\\

\\

\\

\\

\\

**H.    "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "access to the secure region is managed by the media streaming system"… "manage streaming access to the digital content stored on the buffer" |

Viasat argues this claim term should be construed because the specification describes the secure region as being controlled in a "continuous manner" (i.e., control is maintained) by the media streaming system.  Viasat Br. at 24–25.  Viasat argues that the word "manage" better captures the continuous nature of this control than simply the word "control."  *Id.*  Western Digital argues that no construction is necessary here.  WD Br. at 19–20.

The Court agrees that there is no reason to construe this term.  Western Digital does not dispute that the specification describes the secure region as being continuously controlled by the media streaming system, and Viasat has provided no basis for its assertion that the word "manage" better captures the continuous nature of this control than the plain language of the claim.  Viasat appears to simply request that the Court replace the plain language of the claim with a word that it prefers, but has provided no reason to do so.  *See Solutran, Inc. v. U.S. Bancorp & Elavon, Inc.,* No. 13-CV-2637 (SRN/BRT), 2017 WL 2274959, at *4 (D. Minn. May 24, 2017) (rejecting construction replacing "point of sale" with "point of purchase" as "it does not in any way clarify the original term[.]"); *Tech. Innovations, LLC v. Nstein Techs., Inc.*, No. 2:10-CV-341-FTM, 2015 WL 1910434, at *10 (M.D. Fla. Apr. 27, 2015) ("[S]imply replacing one word of the term at issue with a synonym does not provide any type of a construction.").  Accordingly, because there is no fundamental dispute as to the scope of this claim term, and the plain language of the claim term adequately describes the agreed scope of the term, the Court declines to construe this term.

\\

\\

\\

20

## IV.  CONCLUSION

The Court construes the claim terms as follows:

| Claim Term | Adopted Construction |
|---|---|
| "kiosk" ('400 Patent) | "any device used to access and distribute content provided by the system" |
| "portable data storage device" ('400 Patent) | "a storage device that can be easily carried or moved about" |
| "authenticate the portable data storage device, using at least the unique identifier" ('400 Patent) | "confirming that the portable data storage device is trusted using at least the unique identifier" |
| "provide to the portable data storage device . . . a corresponding access key" ('400 Patent) | "provide to the portable data storage device . . . a key to decrypt the first media content" |
| "public environment" ('400 Patent) | "location accessible by the public" |
| "secure region" ('667 Patent) | "a region of the NAS device to which access is controlled" |
| "receive an indication of the NAS device having a secure region" ('667 Patent) | "receive an indication of the presence of a secure region within the NAS device" |
| "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent) | No construction necessary |

The Court further **SETS** a telephonic case management conference on October 15, 2024, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The Court further **DIRECTS** the parties to meet and confer and submit a joint case management statement by October 8, 2024.

**IT IS SO ORDERED.**

Dated:   9/20/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge