# Exhibit B

# (Public Redacted Version)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Steven Cherny (*pro hac vice*)
  stevencherny@quinnemanuel.com
  Patrick D. Curran (Bar No. 241630)
  patrickcurran@quinnemanuel.com
  Tzivya H. Beck (*pro hac vice*)
  tzivyabeck@quinnemanuel.com
  Hannah Dawson (*pro hac vice*)
  hannahdawson@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:    (617) 712-7100
Facsimile:    (617) 712-7200

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jodie Cheng (Bar No. 292330)
  jodiecheng@quinnemanuel.com
  Gyu Shik Jang (Bar No. 337747)
  kevinjang@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Nicola R. Felice (*proc hac vice*)
  nicolafelice@quinnemanuel.com
  Vanessa Blecher (*pro hac vice*)
  vanessablecher@quinnemanuel.com
  Alicia Lai (*pro hac vice*)
  alicialai@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

*Attorneys for Defendant Viasat, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA,
## OAKLAND DIVISION

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et al., | Case No. 4:22-cv-4376-HSG |
| Plaintiff, | |
| vs. | **VIASAT, INC.'S THIRD SUPPLEMENTAL OBJECTIONS & RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (NOS. 1-8)** |
| VIASAT, INC., | |
| Defendant. | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Viasat, Inc. ("Viasat") hereby supplements its responses to Plaintiffs' First Set of Interrogatories (Nos. 1-8) as follows.  Pursuant to Federal Rule of Civil Procedure 26(e), Plaintiff reserves the right to further supplement its responses to these Interrogatories if it learns of additional responsive information.

calculation (e.g., the royalty rate on net sales); (iii) the date(s) on which you contend damages should begin (and the bases supporting such dates); (iv) the amount of damages attributable to any portion of the Accused Products; and (v) an identification of all documents and things on which such calculation is based. Your answer should also include all factual bases for any contentions concerning the Georgia Pacific factors or other factors relevant to the determination of damages. If you contend that the entire market value of the Accused Products is not the proper damages base, your answer should identify what You contends the proper damages base should be and identify all support for any contention that the basis of consumer demand for the Accused Products does not correspond to one or more elements of the asserted claims of the Asserted Patents.

**RESPONSE TO INTERROGATORY NO. 7:**

Viasat incorporates by reference all of its General Objections as if fully set forth herein. Viasat objects to this Interrogatory as compound and containing multiple subparts asserted in a single Interrogatory. Viasat further objects to this Interrogatory on the grounds it is overbroad, unduly burdensome, vague, and ambiguous, including without limitation through its use of the term "Accused Products," which as noted above, is not clearly defined. Viasat objects to this Interrogatory to the extent it seeks information related to expert disclosure. Viasat further objects to this Interrogatory as premature, including because the Court has not yet set a schedule in this case and Plaintiffs' Patent L.R. 3-1 infringement contentions served on February 23, 2023 are deficient.

Discovery is at an early stage, and Viasat's investigation is ongoing. Plaintiffs' contention interrogatory is premature to the extent that it fails to comply with applicable rules and procedures of the Court, requires Viasat to set forth the theories of its case before Plaintiffs have served sufficient infringement contentions that comply with the local rules of this Court, and without the benefit of documentary and testimonial discovery.

Viasat's investigation and discovery are ongoing. Viasat reserves all rights to amend or supplement its objections and/or responses as its investigation continues.

**INTERROGATORY NO. 8:**

Separately for each Accused Product, for each asserted claim of an Asserted Patent that You contend is not infringed, state in full the basis for Your contention, including the element(s) that are

not met, the factual support for contending that an element is not met, and all Documents supporting Your contention.

**RESPONSE TO INTERROGATORY NO. 8:**

Viasat incorporates by reference all of its General Objections as if fully set forth herein. Viasat further objects to this Interrogatory on the grounds it is overbroad, unduly burdensome, vague, and ambiguous, including without limitation through its use of the term "Accused Product," which as noted above, is not clearly defined. Viasat objects to this Interrogatory to the extent it seeks information related to expert disclosure. Viasat further objects to this Interrogatory as premature, including because the Court has not yet set a schedule in this case and Plaintiffs' Patent L.R. 3-1 infringement contentions served on February 23, 2023 are deficient.

Discovery is at an early stage, and Viasat's investigation is ongoing. Plaintiffs' contention interrogatory is premature to the extent that it fails to comply with applicable rules and procedures of the Court, requires Viasat to set forth the theories of its case before Plaintiffs have served sufficient infringement contentions that comply with the local rules of this Court, and without the benefit of documentary and testimonial discovery.

Viasat's investigation and discovery are ongoing. Viasat reserves all rights to amend or supplement its objections and/or responses as its investigation continues.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8 (12/30/2024):**

Viasat incorporates by reference its prior objections and response to this Interrogatory. Viasat further objects to this Interrogatory to the extent that Plaintiffs' request for Viasat's basis for non-infringement improperly seeks to shift the burden to Viasat on an issue on which Plaintiffs have the burden of proof. Subject to and without waiving the foregoing response and objections, Viasat hereby supplements its objections and response as follows:

As Viasat has explained repeatedly, including in correspondence (such as those from Patrick Curran to Kieran Kieckhefer, dated May 19, August 4, and September 8, 2023), in emails (such as those sent by Nicola Felice to Ahmed ElDessouki and Ryan Jin, dated April 2 and October 8, 2024, respectively), during various meet and confers throughout the lifespan of this case, and to the Court in the recently submitted Case Management Statement as well as during the October 15, 2024 status

conference, Plaintiffs have failed to set forth any infringement theory for either of the Asserted Patents and have failed to meet the requirements of Patent Local Rule 3-1(c), as they have yet to provide "[a] chart identifying specifically *where and how each element* of each asserted claim is found within each Accused Instrumentality." This is especially true in light of the Court's September 20, 2024 claim construction order, which rejected Plaintiffs' improper reading of several claim elements, leaving Plaintiffs with no plausible theory of infringement as to those elements.

Despite Viasat's repeated efforts and the Court's more recent warnings that proceeding under its current theories would be a clear violation of § 285 and cause for awarding fees to Viasat, Plaintiffs have not even attempted to remedy these deficiencies. Plaintiffs' repeated and longstanding failure to provide a coherent claim of infringement has prejudiced Viasat's ability to fully articulate the reasons why Plaintiffs' theory of infringement is incorrect and why Viasat does not infringe. Notwithstanding Plaintiffs' failure to meet its obligations to set forth its purported basis for asserting infringement, based on Viasat's best understanding of Plaintiffs' theories and its investigation to date, at least the claim limitations identified below are not present in the Accused Products. Viasat's investigation of these issues is ongoing and Viasat reserves its rights to further supplement this response.

### Non-Infringement of the '400 Patent

The Accused Products do not meet at least the following limitations of the asserted claims of the '400 patent:

- "A kiosk for provisioning secure media content to a plurality of portable data storage devices"/"A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk" (claims 1, 9)

- "a first data interface configured to communicate with a portable data storage device"/"establishing communications with a portable data storage device over a first data interface" (claims 1, 9)

- "a second data interface configured to communicate, over a network, with a remote trusted server"/"establishing communications with a remote trusted server via a second data interface over a network" (claims 1, 9)

- "obtain[ing] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device" (claims 1, 9)

- "authenticat[e/ing] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" (claims 1, 9)

- "in response to the authentication, provid[e/ing] to the portable data storage device an encrypted first media content and a corresponding access key" (claims 1, 9)

- "The [kiosk of claim 1/method of claim 9], [further comprising/wherein the kiosk comprises] a local data storage storing a plurality of encrypted media content" (claims 2, 10)

- "The [kiosk of claim 1/method of claim 9], wherein the second data interface is a network interface" (claims 6, 13)

- "The [kiosk of claim 1/method of claim 9], wherein the kiosk is located in a public environment" (claims 8, 17)

### Non-Infringement of the '667 Patent

The Accused Products do not meet at least the following limitations of the asserted claims of the '667 patent:

- "receiv[e/ing] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system" (claims 1, 11)

- "transmit[ting] [the digital/media] content to the secure region within the NAS device for playback by the separate display device from the buffer" (claims 1, 11)

- "transmit[ting] instructions to the NAS device to control streaming access to the [digital/media] content stored on the buffer" (claims 1, 11)

- "The media streaming system of claim 1, wherein the separate display device comprises a smart television" (claim 2)

- "The [media streaming system of claim 1/method of claim 11], wherein transmitting the [digital content/media content to the secure region] comprises time-shifting [the transmitting of the media content] to a time with more available bandwidth on a connection to the NAS device" (claims 3, 12)

- "The [media streaming system of claim 1/method of claim 11], wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system" (claims 4, 13)

- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] caus[e/ing] the NAS device to use encryption that secures the digital content to the secure region" (claims 5, 14)

- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] provid[e/ing] instructions to the NAS device for controlling an amount of data stored in the secure region" (claims 6, 15)

- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] provid[e/ing] instructions to the NAS device for controlling an encryption type used in the secure region" (claims 7, 16)

Additionally, pursuant to Federal Rule of Civil Procedure 33(d), Viasat identifies the following materials from which the answer to this interrogatory may be derived or ascertained: May 19, 2024 letter from Patrick Curran to Kieran Kieckhefer; August 4, 2024 letter from Patrick Curran to Kieran Kieckhefer; September 8, 2023 letter from Patrick Curran to Kieran Kieckhefer; April 2, 2024 email from Nicola Felice to Ahmed ElDessouki; October 8, 2024 email from Nicola Felice to Ryan Jin; Dkt. 126 (Joint Case Management Statement); VIASAT_00000618; VIASAT_00003234; VIASAT_00003288;     VIASAT_00005782;     VIASAT_00006153;     VIASAT_00006166; VIASAT_00006354;     VIASAT_00006471;     VIASAT_00006779;     VIASAT_00007270; VIASAT_00007343;     VIASAT_00007559;     VIASAT_00007581;     VIASAT_00007973;

VIASAT_00008075;      VIASAT_00008188;      VIASAT_00008420;      VIASAT_00008428;

VIASAT_00008738; the source code produced by Viasat at *2023-04-18 Viasat code*; and the source

code produced by Viasat at *2024-03-08 Viasat VCDS code*.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8 (1/25/2025):**

Viasat incorporates by reference its prior objections and response to this Interrogatory.

Viasat further objects to this Interrogatory to the extent that Plaintiffs' request for Viasat's basis for

non-infringement improperly seeks to shift the burden to Viasat on an issue on which Plaintiffs have

the burden of proof. Subject to and without waiving the foregoing response and objections, Viasat

hereby supplements its objections and response as follows:

As Viasat has explained repeatedly, including in correspondence (such as those from Patrick

Curran to Kieran Kieckhefer, dated May 19, August 4, and September 8, 2023), in emails (such as

those sent by Nicola Felice to Ahmed ElDessouki and Ryan Jin, dated April 2 and October 8, 2024,

respectively), during various meet and confers throughout the lifespan of this case, and to the Court

in the recently submitted Case Management Statement as well as during the October 15, 2024 status

conference, Plaintiffs have failed to set forth any infringement theory for either of the Asserted

Patents and have failed to meet the requirements of Patent Local Rule 3-1(c), as they have yet to

provide "[a] chart identifying specifically ***where and how each element*** of each asserted claim is

found within each Accused Instrumentality." This is especially true in light of the Court's September

20, 2024 claim construction order, which rejected Plaintiffs' improper reading of several claim

elements, leaving Plaintiffs with no plausible theory of infringement as to those elements.

On January 3, 2025, four weeks before the close of fact discovery, Plaintiffs' served a set of

amended contentions. As Viasat has explained to Plaintiffs, there is no basis for Plaintiffs' amended

contentions at this stage in the case. However, even if Plaintiffs' amended contentions were proper,

they fail to remedy any of previously identified deficiencies in Plaintiffs' alleged infringement

theories and further, reveal additional deficiencies. Plaintiffs' repeated and longstanding failure to

provide a coherent claim of infringement has prejudiced Viasat's ability to fully articulate the

reasons why Plaintiffs' theory of infringement is incorrect and why Viasat does not infringe.

Notwithstanding Plaintiffs' failure to meet its obligations to set forth its purported basis for asserting

infringement, based on Viasat's best understanding of Plaintiffs' theories and its investigation to date, at least the claim limitations identified below are not present in the Accused Products. Viasat's investigation of these issues is ongoing and Viasat reserves its rights to further supplement this response.

### Non-Infringement of the '400 Patent

The Accused Products do not meet at least the following limitations of the asserted claims of the '400 patent:

- "A kiosk for provisioning secure media content to a plurality of portable data storage devices"/"A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk" (claims 1, 9)
  - *See, e.g.*, VIASAT_00006166; VIASAT_00006471; VIASAT_00007973; VIASAT_00005782
- "a first data interface configured to communicate with a portable data storage device"/"establishing communications with a portable data storage device over a first data interface" (claims 1, 9)
  - *See, e.g.*, VIASAT_00006471; VIASAT_00007973
- "a second data interface configured to communicate, over a network, with a remote trusted server"/"establishing communications with a remote trusted server via a second data interface over a network" (claims 1, 9)
  - *See, e.g.*, VIASAT_00006471; VIASAT_00007973; VIASAT_00000618; VIASAT_00008420
- "a processor configured to (claims 1, 9)
  - *See, e.g.*, VIASAT_00006471
- "obtain[ing] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device" (claims 1, 9)
  - *See, e.g.*, VIASAT_00006354; VIASAT_00006153; VIASAT_00008738; VIASAT_00008188

- "authenticat[e/ing] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" (claims 1, 9)
  - *See, e.g.*, VIASAT_00006471; VIASAT_00000618; VIASAT_00006354; VIASAT_00006153; VIASAT_00006779; VIASAT_00008188; VIASAT_00008738; VIASAT_00008420
- "in response to the authentication, provid[e/ing] to the portable data storage device an encrypted first media content and a corresponding access key" (claims 1, 9)
  - *See, e.g.*, VIASAT_00005782; VIASAT_00003288; VIASAT_00008738; VIASAT_00006471
- "The [kiosk of claim 1/method of claim 9], [further comprising/wherein the kiosk comprises] a local data storage storing a plurality of encrypted media content" (claims 2, 10)
  - *See, e.g.*, VIASAT_00006471; VIASAT_00005782; VIASAT_00008738; VIASAT_00007395
- "The [kiosk of claim 1/method of claim 9], wherein the second data interface is a network interface" (claims 6, 13)
  - *See, e.g.*, VIASAT_00006471; VIASAT_00007973; VIASAT_00000618; VIASAT_00008420
- "The [kiosk of claim 1/method of claim 9], wherein the kiosk is located in a public environment" (claims 8, 17)

### Non-Infringement of the '667 Patent

The Accused Products do not meet at least the following limitations of the asserted claims of the '667 patent:

- "A media streaming system comprising:"/"A method of transmitting media content from a media streaming system, the method comprising"  (claims 1, 11)

- o  *See, e.g.*, VIASAT_00003234; VIASAT_00008738; VIASAT_00007343; VIASAT_00008420; the source code produced by Viasat at *2023-04-18 Viasat code*

- "[a network interface adapter configured to transmit digital content/establishing a connection], via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)" (claims 1, 11)

  - o  *See, e.g.*, VIASAT_00008420; VIASAT_00008075; VIASAT_00007973; VIASAT_00007559;        VIASAT_00008420;        VIASAT_00008075; VIASAT_00007973;        VIASAT_00006471;        VIASAT_00007581; VIASAT_00008428; VIASAT_00007343

- "one or more hardware processors configured to:" (claim 1)

  - o  *See, e.g.*, VIASAT_00003234; VIASAT_00008420;

- "receiv[e/ing] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system" (claims 1, 11)

  - o  *See, e.g.*, VIASAT_00007559; VIASAT_00008738; VIASAT_00007395; VIASAT_00007270; VIASAT_00007343

- "transmit[ting] [the digital/media] content to the secure region within the NAS device for playback by the separate display device from the buffer" (claims 1, 11)

  - o  *See, e.g.*, VIASAT_00008738; VIASAT_00007559

- "transmit[ting] instructions to the NAS device to control streaming access to the [digital/media] content stored on the buffer" (claims 1, 11)

  - o  *See, e.g.*, VIASAT_00008738; VIASAT_00003234; VIASAT_00013053

- "The media streaming system of claim 1, wherein the separate display device comprises a smart television" (claim 2)

  - o  *See, e.g.*, VIASAT_00006471; VIASAT_00007973;

- "The [media streaming system of claim 1/method of claim 11], wherein transmitting the [digital content/media content to the secure region] comprises time-shifting [the transmitting of the media content] to a time with more available bandwidth on a connection to the NAS device" (claims 3, 12)
  - *See, e.g.*, VIASAT_00008738; VIASAT_00007270; VIASAT_00003234; VIASAT_00008639
- "The [media streaming system of claim 1/method of claim 11], wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system" (claims 4, 13)
  - *See, e.g.*, VIASAT_00008738; VIASAT_00007559; VIASAT_00007395
- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] caus[e/ing] the NAS device to use encryption that secures the digital content to the secure region" (claims 5, 14)
  - *See, e.g.*, VIASAT_00008738; VIASAT_00007559; VIASAT_00007395
- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] provid[e/ing] instructions to the NAS device for controlling an amount of data stored in the secure region" (claims 6, 15)
  - *See, e.g.*, VIASAT_00008738
- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] provid[e/ing] instructions to the NAS device for controlling an encryption type used in the secure region" (claims 7, 16)

Plaintiffs additionally cite to certain public materials in their infringement contentions, but these public materials do not support Plaintiffs' allegations; to the extent such public materials are at all relevant, they demonstrate that the Accused Products do ***not*** infringe the Asserted Patents. Similarly, Plaintiffs cite to various source code files and folders without any meaningful explanation

as to how such source code is relevant to their allegations. The cited source code does not support Plaintiffs allegations of infringement, and to the extent it is at all relevant to the functionality discussed within Plaintiffs' contentions, it demonstrates instead that that the Accused Products do *not* infringe the Asserted Patents.

Additionally, pursuant to Federal Rule of Civil Procedure 33(d), Viasat identifies the following materials from which the answer to this interrogatory may be derived or ascertained: May 19, 2024 letter from Patrick Curran to Kieran Kieckhefer; August 4, 2024 letter from Patrick Curran to Kieran Kieckhefer; September 8, 2023 letter from Patrick Curran to Kieran Kieckhefer; April 2, 2024 email from Nicola Felice to Ahmed ElDessouki; October 8, 2024 email from Nicola Felice to Ryan Jin; Dkt. 126 (Joint Case Management Statement); VIASAT_00000618; VIASAT_00003234; VIASAT_00003288;     VIASAT_00005782;     VIASAT_00006153;     VIASAT_00006166; VIASAT_00006354;     VIASAT_00006471;     VIASAT_00006779;     VIASAT_00007270; VIASAT_00007343;     VIASAT_00007559;     VIASAT_00007581;     VIASAT_00007973; VIASAT_00008075;     VIASAT_00008188;     VIASAT_00008420;     VIASAT_00008428; VIASAT_00008738; the source code produced by Viasat at *2023-04-18 Viasat code*; and the source code produced by Viasat at *2024-03-08 Viasat VCDS code*.

On January 3, 2025, Plaintiffs served proposed amended infringement contentions citing to additional documentation and source code. Due to the late nature of Plaintiffs' proposed amendment, Viasat's ability to investigate these new contentions has been significantly impaired. Viasat has not yet had a fair opportunity to analyze Plaintiffs' proposed new contentions. But Plaintiffs' effort to pivot to new and different infringement theories at the last minute confirms that Plaintiffs do not have, and have not had, any coherent theory of infringement for the duration of this litigation. Viasat reserves all rights, including the right to seek fees and costs under Section 285, as well as the right to amend these contentions after Viasat has had a fair opportunity to analyze Plaintiffs' proposed amended contentions.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8 (2/5/2025):

Viasat incorporates by reference its prior objections and response to this Interrogatory. Viasat further objects to this Interrogatory to the extent that Plaintiffs' request for Viasat's basis for

1   non-infringement improperly seeks to shift the burden to Viasat on an issue on which Plaintiffs have

2   the burden of proof. Subject to and without waiving the foregoing response and objections, Viasat

3   hereby supplements its objections and response as follows:

4       As Viasat has explained repeatedly, including in correspondence (such as those from Patrick

5   Curran to Kieran Kieckhefer, dated May 19, August 4, and September 8, 2023), in emails (such as

6   those sent by Nicola Felice to Ahmed ElDessouki and Ryan Jin, dated April 2 and October 8, 2024,

7   respectively), during various meet and confers throughout the lifespan of this case, and to the Court

8   in the recently submitted Case Management Statement as well as during the October 15, 2024 status

9   conference, Plaintiffs have failed to set forth any infringement theory for either of the Asserted

10  Patents and have failed to meet the requirements of Patent Local Rule 3-1(c), as they have yet to

11  provide "[a] chart identifying specifically *where and how each element* of each asserted claim is

12  found within each Accused Instrumentality." This is especially true in light of the Court's September

13  20, 2024 claim construction order, which rejected Plaintiffs' improper reading of several claim

14  elements, leaving Plaintiffs with no plausible theory of infringement as to those elements.

15      Plaintiffs' repeated and longstanding failure to provide a coherent claim of infringement has

16  prejudiced Viasat's ability to fully articulate the reasons why Plaintiffs' theory of infringement is

17  incorrect and why Viasat does not infringe. Notwithstanding Plaintiffs' failure to meet its

18  obligations to set forth its purported basis for asserting infringement, based on Viasat's best

19  understanding of Plaintiffs' theories and its investigation to date, at least the claim limitations

20  identified below are not present in the Accused Products.

21      On January 3, 2025, Plaintiffs served proposed amended infringement contentions citing to

22  additional documentation and source code. Due to the late nature of Plaintiffs' proposed amendment,

23  Viasat's ability to investigate these new contentions has been significantly impaired. Viasat has not

24  yet had a fair opportunity to analyze Plaintiffs' proposed new contentions. But Plaintiffs' effort to

25  pivot to new and different infringement theories at the last minute confirms that Plaintiffs do not

26  have, and have not had, any coherent theory of infringement for the duration of this litigation. Viasat

27  reserves all rights, including the right to seek fees and costs under Section 285, as well as the right

28

to amend these contentions after Viasat has had a fair opportunity to analyze Plaintiffs' proposed amended contentions.

As an initial matter, Plaintiffs appear to allege infringement of the asserted claims of the '400 patent and the '667 patent based on acts that occur outside the United States, including alleged acts by Viasat's airline customers that take place outside the United States (e.g., foreign flights) or alleged acts by passengers on commercial aircraft operated outside the United States by Viasat's customers (e.g., passengers on foreign flights). Plaintiffs fail to demonstrate any act that could constitute either direct or indirect infringement to the extent they rely on alleged acts outside the United States that do not constitute acts of infringement under the Patent Act.

Additionally, Plaintiffs appear to be trying to allege divided infringement, combining a series of alleged acts by Viasat with alleged acts by third parties—such as alleged acts by Viasat's airline customers, or alleged acts by passengers on commercial aircraft operated by Viasat's customers, or alleged acts by users of Viasat's residential in-home Internet service. Plaintiffs have not shown that the requirements for divided infringement are met. For example, Plaintiffs have not shown that Viasat directs or controls the alleged acts by Viasat's airline customers, or the alleged acts by passengers on commercial aircraft operated by Viasat's customers, or the alleged acts by users of Viasat's residential in-home Internet service, that Plaintiffs rely on for their apparent theory of divided infringement. For that reason, Plaintiffs have not shown Viasat is liable for any alleged act of divided infringement.

## **Non-Infringement of the '400 Patent**

The Accused Products[1] do not meet at least the following limitations of the asserted claims of the '400 patent:

---

[1]  Plaintiffs' eleventh-hour accusations of Viasat's residential products are untimely and prejudicial. To the extent that Plaintiffs are permitted to add Viasat's residential products as an Accused Product, all the same non-infringement arguments—on all limitations—regarding the Accused Products would apply to the residential products.  Given the late timing of the proposed amended contentions, Viasat notes that it is still analyzing the amended contentions and reserve all rights to respond if the residential products are permitted to be added to this litigation.

- "A kiosk for provisioning secure media content to a plurality of portable data storage devices"/"A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk" (claims 1, 9)

Plaintiffs claim the Accused Products are a "kiosk" and practice "a method for provisioning secure media content to a plurality of portable data storage devices from a kiosk." Plaintiffs fail to substantiate this allegation or even pinpoint which specific component of the Accused Products constitutes the "kiosk." For instance, at times, Plaintiffs point to "e.g., one or more modules of the IFE system; e.g., one or more modules of Viasat's Network Access Unit ("NAU"), the Viasat's Mobile Application Server, or the Viasat S4 Server; e.g., one or more modules of the Gateway system," while also citing to documents showing the Viasat Passenger Portal and the Apple Music app. However, with respect to all Accused Products, Plaintiffs fail to show a "kiosk" as required by all asserted claims. As the Court's claim construction order explained, "kiosk" is limiting in all asserted claims, and is a "device used to access and distribute content provided by the system." Plaintiffs have not identified a device that constitutes the claimed "kiosk" as construed by the Court and practices all the limitations of the claim—including having a "first data interface," a "second data interface," and a processor that performs all the remaining limitations of claim 1. Plaintiffs have failed to pinpoint any single component of the Accused Products as the "kiosk." Plaintiffs cannot accuse multiple different Viasat devices of constituting the "kiosk" in order to mix-and-match devices as if multiple devices were one device. As explained below, Plaintiffs oscillate between multiple components of the Accused Products and have identified no single device to be a "kiosk" that performs all the limitations of claim 1. That includes Plaintiffs' effort to treat the M3 modem running the VCDS Client application and the S4 server as if they were a single device. They are not. As Plaintiff's own cited documents show, these components are separate and distinct devices. *See, e.g.*, VIASAT_00005782 at -798 (showing the S4 server and the M3 modem to be separate and distinct devices). For this reason alone, Plaintiffs have not shown the Accused Products comprise a "kiosk" or practice "a method for provisioning secure media content to a plurality of portable data storage devices from a kiosk."

Plaintiffs fail to identify a single component of the Accused Products that is a "kiosk for provisioning secure media content to a plurality of portable data storage devices." To the extent that Plaintiffs accuse the Gateway modem, Plaintiffs' own cited documents show that the Gateway modem is not a "kiosk" according to the Court's construction. *See, e.g.*, Viasat, *Gateway FAQs*, at https://help.viasat.com/s/article/Viasat-WiFi-Gateway-FAQ-s. Plaintiffs also fail to identify a single component of the Accused Products that is allegedly a "kiosk for provisioning secure media content to a plurality of portable data storage devices." The claims require that the "kiosk" be a single device. No single device satisfies all limitations of the claim. *See, e.g.*, VIASAT_00006166; VIASAT_00006471; VIASAT_00007973; VIASAT_00005782.

Additionally, none of the Accused Products constitute a "kiosk" device used to access and distribute media content in the manner recited in the claims. That includes provisioning secure media content to "a plurality of portable data storage devices." Plaintiffs accuse "end-user devices (e.g., 'PED' devices, laptops, tablets, smartphones, etc.), "semi embedded" devices, and "seatback" devices" as being "portable data storage devices." The Court has construed "portable data storage device" as a data storage device that is "easily carried or moved about." Seatback devices and semi-embedded devices are securely fixed to the seat backs in airlines and not easily carried or moved about, as confirmed by the diagrams in Plaintiffs' own cited documents. *See, e.g.*, VIASAT_00006471 at -490 (showing seatback devices and semi-embedded devices securely fixed to the seat). As Danny Ybarra, co-inventor of the '400 patent, testified, portable storage devices "allow the user to roam" and "move around." Ybarra Rough Tr. at 86. Devices that do not permit the user to roam or move around, including seatback devices nor semi-embedded devices, are not portable data storage devices and are not "easily carried or moved about" as required by the claims. The accused end-user devices are also not "data storage devices" but rather playback devices that do not "stor[e]" any media content that an airline passenger requests. Rather, end-user devices dynamically play back the media content as it is downloaded without storing the media content in the manner described by the claims, which require a "storage device" for content—not a playback device for content that is *streamed*, as opposed to *stored*.

For these reasons alone, Plaintiffs have not shown the Accused Products are a "kiosk for provisioning secure media content to a plurality of portable data storage devices" or practice "a method for provisioning secure media content to a plurality of portable data storage devices from a kiosk." Further, as explained below, the Accused Products do not practice the remaining limitations of claims 1 or 9. Therefore, even if the Accused Products were a "kiosk for provisioning secure media content to a plurality of portable data storage devices," they would not be a "kiosk . . . comprising" the limitations of claim 1. Similarly, even if the Accused Products practiced a "method for provisioning secure media content to a plurality of portable data storage devices from a kiosk," they would not practice a "method for provisioning secure media content to a plurality of portable data storage devices from a kiosk . . . comprising" the limitations of claim 9.

- "a first data interface configured to communicate with a portable data storage device"/"establishing communications with a portable data storage device over a first data interface" (claims 1, 9)

Plaintiffs claim the Accused Products comprise "a first data interface configured to communicate with a portable data storage device" and practice "establishing communications with a portable data storage device over a first data interface." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions point to the "WiFi connection" and "Wired Connection" but do not identify how, specifically, the Accused Products allegedly satisfies these claim limitations.

First, Plaintiffs have failed to identify a "portable data storage device" with which the first data interface is configured to communicate. For the reasons described above, end-user devices, semi-embedded devices, and seatback devices do not constitute "portable data storage devices."

Second, Plaintiffs have failed to show that the "first data interface" is located on any device that Plaintiffs have identified as a "kiosk." The claim limitations clearly require that the "kiosk . . . comprise . . . the first data interface." Plaintiffs have identified no device to be a "kiosk" that has both a "first data interface" and a "second data interface," as well as performs all the remaining limitations of claim 1. As Plaintiffs' own cited documents show, the WiFi connection and Wired Connection are configured by the airlines (for seatback devices and semi-embedded devices) or by

the user device manufacturers (for personal end-user devices), not by Viasat. *See, e.g.,* VIASAT_00006471 at -477 (showing the WiFi connection and Wired Connection labeled together with end-user devices). Similarly, Viasat does not "establish[] communications with a portable data storage device over a first data interface" nor does Viasat exercise any control over the establishing of communications. For these reasons alone, Plaintiffs have not shown the Accused Products comprise "a first data interface configured to communicate with a portable data storage device" or practice "establishing communications with a portable data storage device over a first data interface."

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "kiosk," including by identifying one device that purportedly includes both the claimed "first data interface" and "second data interface." Therefore, it is unclear what components Plaintiffs contend comprise the claimed "first data interface," and Plaintiffs have failed to meet their burden of showing this limitation is met.

Further, as explained below, the Accused Products do not practice the remaining limitations of claim 1. Therefore, even if the Accused Products comprised a "first data interface," they would not comprise "kiosk" configured to perform the remaining limitations of claim 1.

- "a second data interface configured to communicate, over a network, with a remote trusted server"/"establishing communications with a remote trusted server via a second data interface over a network" (claims 1, 9)

Plaintiffs claim the Accused Products comprise "a second data interface configured to communicate, over a network, with a remote trusted server" and practice "establishing communications with a remote trusted server via a second data interface over a network." Plaintiffs' infringement contentions do not explain the basis for this position. In the mobility context, Plaintiffs point to "an IFC on board the aircraft, or a gateway modem, that communicates via a network interface with trusted 'partner data centers.'" In the residential context, to the extent residential products are allowed to be accused, Plaintiffs appear to point vaguely to the same components of the aircraft (which are not present in the residential context), and alternatively to a "sat-com data interface configured to communicate with the VCDS servers (e.g., Core Node, Smarts, Web Proxy,

1  VCDS AWS Account) and content provider servers." Plaintiffs do not identify how, specifically,

2  the Accused Products allegedly satisfies these claim limitations.

3      First, Plaintiffs have failed to identify a "remote trusted server" with which the alleged

4  second data interface is configured to communicate. Plaintiffs vaguely gesture to "trusted 'partner

5  data centers' and other such systems on the ground" but do not identify which specific partner data

6  centers they accuse, nor why these partner data centers are "remote" or "trusted." Further, for the

7  reasons described below, none of the components of the Accused Products that Plaintiffs allege to

8  be a "remote trusted server" are used to "authenticate the portable data storage device," and thus do

9  not practice the remaining limitations of claim 1. Therefore, even if the Accused Products

10 comprised a "a second data interface configured to communicate, over a network, with a remote

11 trusted server" (they do not), they do not communicate with a "remote trusted server" that performs

12 the remaining limitations of claim 1.

13     Second, Plaintiffs have failed to show that the "second data interface" is located on any

14 device that Plaintiffs have identified as a "kiosk." The claim limitations clearly require that the

15 "kiosk . . . comprise . . . the second data interface . . ." Plaintiffs have identified no single device to

16 be a "kiosk" that has both a "first data interface" and a "second data interface," as well as performs

17 all the remaining limitations of claim 1. Moreover, even if an IFC system or gateway modem or

18 sat-com data interface constitute "a second data interface configured to communicate, over a

19 network, with a remote trusted server," Viasat does not "configure" the data interface nor does

20 Viasat exercise any control over the configuration of the second data interface. *See, e.g.*,

21 VIASAT_00006471; VIASAT_00007973; VIASAT_00000618; VIASAT_00008420. Similarly,

22 Viasat does not "establish[] communications with a remote trusted server via a second data interface

23 over a network" nor does Viasat exercise any control over the establishing of communications. For

24 these reasons alone, Plaintiffs have not shown the Accused Products comprise "a second data

25 interface configured to communicate, over a network, with a remote trusted server" or practice

26 "establishing communications with a remote trusted server via a second data interface over a

27 network."

28

THIRD SUPPLEMENTAL OBJECTIONS & RESPONSES TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed "second data interface," and Plaintiffs have failed to meet their burden of showing this limitation is met.

Further, as explained below, the Accused Products do not practice the remaining limitations of claim 1. Therefore, even if the Accused Products comprised a "second data interface," they would not comprise a "kiosk" with the claimed "second data interface" and "first data interface" configured to perform the remaining limitations of claim 1.

- "a processor configured to (claims 1, 9)

Plaintiffs claim the Accused Products comprise a "processor." Plaintiffs' infringement contentions do not explain the basis for this position. For the in-flight context, Plaintiffs accuse the "Quad-core Intel Core-i7 CPU;" for the residential context, Plaintiffs now appear to be adding accusations that the "Viasat WiFi Gateway" modem is a residential device, though Plaintiffs appear to also describe this component as a component of the aircraft in Plaintiffs' infringement contentions. In either scenario, Plaintiffs do not explain how, specifically, the Accused Products allegedly satisfy these claim limitations. Crucially, Plaintiffs have identified no single "processor" on a single device that performs all the limitations of claim 1.

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed "processor," and Plaintiffs have failed to meet their burden of showing this limitation is met.

Further, as explained below, the Accused Products do not practice the remaining limitations of claim 1. Therefore, even if the Accused Products comprised a "processor," they would not comprise "kiosk" configured to perform the remaining limitations of claim 1.

- "obtain[ing] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device" (claims 1, 9)

Plaintiffs claim the Accused Products comprise of a processor that "obtains a unique identifier from the portable data storage device, wherein the unique identifier is specific to the

portable data storage device and is concealed by the portable data storage device." Plaintiffs'
allegations fail for numerous reasons. The Accused Products do not "obtain a unique identifier"
that is "obtain[ed] . . . from the portable data storage device," "specific to the data storage device,"
and "concealed by the portable data storage device." Plaintiffs accuse a litany of source code
variables; none of these variables represent unique identifiers that are "obtain[ed] . . . from the
portable data storage device," "specific to the portable data storage device," and "concealed by the
portable data storage device." For instance, Plaintiffs accuse the device "MAC address," but
Plaintiffs' own cited documents acknowledge that these MAC addresses are visible to any network
that an end-user device connects to and not "concealed" by an end-user device. *See, e.g.*, Apple,
*Use private Wi-Fi addresses on Apple devices*, https://support.apple.com/en-us/102509
(acknowledging that "network operators and other network observers" use the device MAC address
to track a "device's network activity and location over time"). Plaintiffs also accuse the "Modem
MAC address," but the *modem* MAC address does not identify an end-user device but rather the
modem, and thus cannot be "specific to" a "portable data storage device." *See, e.g.*,
VIASAT_00008738. Plaintiffs suggest that MAC addresses can be randomized, but provide no
explanation for how a randomized MAC address constitutes a "unique identifier" that is both
"specific to" and "concealed by" a portable data storage device. Although MAC addresses can be
randomized, the randomized MAC address is not hidden from Viasat, and is not concealed by the
device—it is instead broadcast by the device. As another example, Plaintiffs accuse IP addresses;
however, IP addresses are public and not "concealed" by an end-user device. Plaintiffs accuse the
"███████████"; however, Plaintiffs fail to allege, much less show, that ████ are "concealed by"
the end-user device. Plaintiffs accuse the "██████████████████"; however, ██████████
████████████ and are not "specific to" a single device. Plaintiffs accuse ████████████; however,
████████████ are neither obtained from an end-user device nor specific to an end-user device, but
rather generated by the S4 server to verify the identity of Viasat. *See, e.g.*, VIASAT_00006147;
VIASAT_00000618. Plaintiffs accuse ████████ however, ████████ are generated by Vualto
(not obtained from the end-user device) and ████████████████████████████
████████ These are different concepts, as the '400 patent inventors agree. *See, e.g.*, Hesselink Rough

1  Tr. at 136 (agreeing that "even if a ███████████, that's still different from a storage device

2  identifier that's unique").  The identifiers that Plaintiffs accuse do not perform all three claim

3  limitations: they are not "obtained from," "specific to," and "concealed by" the end-user device.

4  *See also* VIASAT_00006354; VIASAT_00006153; VIASAT_00008738; VIASAT_00008188.

5  Plaintiffs' scattershot accusations ignore the claim requirements.

6       Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products

7  are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed

8  "kiosk" device or explain how that device's processor is configured to itself "obtain a unique

9  identifier from the portable data storage device, wherein the unique identifier is specific to the

10 portable data storage device and is concealed by the portable data storage device," and Plaintiffs

11 have failed to meet their burden of showing this limitation is met.

12       Further, as explained below, the Accused Products do not practice the remaining limitations

13 of claim 1. Therefore, even if the Accused Products comprised a processor configured to "obtain a

14 unique identifier from the portable data storage device, wherein the unique identifier is specific to

15 the portable data storage device and is concealed by the portable data storage device," they would

16 not comprise a "kiosk" configured to perform the remaining limitations of claim 1.

17       • "authenticat[e/ing] the portable data storage device, using at least the unique

18          identifier, by communicating with the remote trusted server over the second data

19          interface" (claims 1, 9)

20       Plaintiffs claim the Accused Products comprise of a processor that "authenticates the

21 portable data storage device, using at least the unique identifier, by communicating with the remote

22 trusted server over the second data interface."  Plaintiffs cite to documents that merely mention the

23 term "authorization" but fails to explain what device is performing the alleged authorization, what

24 is being authorized, or how the Accused Products conduct the authorization process taught by the

25 claims.  For this reason alone, Plaintiffs have not shown the Accused Products "authenticate the

26 portable data storage device, using at least the unique identifier, by communicating with the remote

27 trusted server over the second data interface."

28

First, the Accused Products do not utilize any "unique identifiers" to "authenticate" end-user devices in the manner recited by the asserted claims. Once the W-IFE modem receives a request for media content, it will transmit the media content without performing any authentication process of the end-user device at all. To the extent that Plaintiffs identify any type of authentication or authorization conducted following a user's request for content, Plaintiffs have not shown that it is Viasat's "kiosk" that performs the authentication rather than other third-party devices, such as content provider servers, nor that it is the "portable data storage device" that is being authenticated by the "kiosk" on a device-by-device basis. The claim clearly requires that it is the "kiosk"—a single device—that is configured to "authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface," as well as perform the remaining limitations of claim 1. None of the various devices that Plaintiffs accuse of being a "kiosk" perform this authentication process and the remaining limitations of claim 1. To the extent that the Accused Products obtain any "unique identifiers" that are "obtain[ed] from," "specific to," *and* "concealed by" a "portable data storage device" (they do not, as explained above), the Accused Products do not use these identifiers to "authenticate" the end-user device at all, much less by communicating that unique identifier to a "remote trusted server" over a "second data interface" of the "kiosk" device. Simply using a unique identifier is not enough to satisfy the claim language. Indeed, the '400 patent inventors admit that unique identifiers can be used for many purposes. *See, e.g.*, Hesselink Rough Tr. at 147-48 (stating that there are "all kinds of things you can do" with unique identifiers that are "non-cryptographic uses"). For instance, some identifiers— such as ████████████████████████—track analytics of passenger viewership and are not used for authentication. Other identifiers—such as ████████████—verify the identity of Viasat, not the identity of the end-user device.

Second, **with respect to Viasat's mobility IFE offering**, the Accused Products do not communicate with a "remote trusted server" to authenticate the end-user device. Plaintiffs accuse "Viasat AWS servers, content provider servers, Viasat data center, content management server" and "VCDS servers (e.g., Core Node, Smarts, Web Proxy, VCDS AWS Account)" and "content provider servers" (unnamed) as being the "remote trusted server;" however, this position fundamentally

misconstrues both the claim requirements and Viasat's system architecture. As a factual matter, Plaintiffs cannot call the onboard server a "remote" server for the accused airline systems. Plaintiffs' own citations acknowledge that the media content is transmitted by a local "onboard" server.  *See, e.g.*, VIASAT_00006471 at -491-492 ("Stream media from ViaSat's onboard server . . ."); VIASAT_00000618 at -623 (showing "Application Server" that delivers content to the user device as onboard the aircraft).  Moreover, the claim limitation requires that the "remote trusted server" be used to "*authenticate* the portable data storage device."  By citing to AWS servers and content provider servers, Plaintiffs accuses servers used for content delivery, *not for device authentication*. And even if Plaintiffs had accused Viasat's third-party DRM license components as being the "remote trusted server" used for device authentication (they did not), the third-party DRM license servers on the S4 are local, *not "remote" servers. See, e.g.*, VIASAT_00006471 at -499 (showing "DRM License Server" as part of the local "onboard server"); VIASAT_00000618 at -623 (showing "DRM System" as onboard the aircraft, not remote).  The Accused Products are designed to avoid, not use, communication with a *remote* server to obtain a DRM license: both the ███████ DRM server (███ and ████████ DRM server (█████ run locally on the plane, as a different design choice than the use of a remote DRM server. While ████████ DRM (███████ license requests are cloud-based, Viasat only supported ████████ DRM for a small set of devices (Windows machines running the Edge browser), and, on December 17, 2024, Viasat deprecated its ███████ DRM entirely and switched to ████████ DRM, causing the ████████ DRM server to drop to nearly zero hits per day.  As Plaintiffs' own cited documents show, the DRM license servers that Viasat utilizes are locally onboard the aircraft.  *See, e.g.*, VIASAT_00006471 at -499 (showing the "DRM License Server" and "████████ located within the "Onboard Server").  Lastly, the claim requires an authentication process between the "kiosk" and the single claimed "*processor*" and the "remote trusted server" directly for authentication; communications between the *end-user device* and the DRM server, as opposed to the claimed "kiosk" and a remote server, do not satisfy this limitation.

Third, the Accused Products have no "kiosk" that conducts any "authentication" process at all.  As explained above, and as Plaintiff's own cited documents show, Viasat's M3 modem and S4

server are separate and distinct devices that cannot both constitute the "kiosk." *See, e.g.,* VIASAT_00005782 at -798 (showing the S4 server and the M3 modem to be separate and distinct devices). To the extent that Plaintiffs allege that the M3 modem constitutes the "kiosk," the M3 modem does not perform any verification or authorization check of the end-user device before serving the media content. To the extent that Plaintiffs allege that the S4 server constitutes the "kiosk," the S4 server does not perform any access control before delivering the requested media content to the end-user device if the requested media content is already located on the S4 server. Even if the requested media content is not located on the S4 server and must be retrieved, the Accused Products do not use a "unique identifier" to conduct "authentication" of each end-user device. To retrieve content, Viasat utilizes a ███████ which—as explained above—is used to verify the identity of Viasat not the end-user device; the Accused Products do not obtain a "unique identifier" that is "specific to" an end-user device, much less use any alleged identifier to authenticate the end-user device. Moreover, Plaintiffs have not shown that it is *Viasat's* "kiosk" that performs any alleged device authentication rather than other *third-party* devices communicating directly with end-user devices over the Internet, such as content provider servers. For instance, even if a third-party content provider such as Disney conducted some form of playback device "authentication" over the Internet prior to transmitting Disney+ content, any authentication conducted by Disney through communication between Disney and the user's playback device would not constitute "authentication" of the device *by Viasat's "kiosk"* as required by the claim. In such cases, the Accused Products do not conduct the third-party authentication nor does Viasat exercise any control over any third-party authentication.

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed processor configured to "authenticate[] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface," and Plaintiffs have failed to meet their burden of showing this limitation is met.

Further, as explained below, the Accused Products do not practice the remaining limitations of claim 1. Therefore, even if the Accused Products comprised a processor configured to

1    "authenticate[] the portable data storage device, using at least the unique identifier, by

2    communicating with the remote trusted server over the second data interface," they would not

3    comprise "kiosk" configured to perform the remaining limitations of claim 1.

4        • "in response to the authentication, provid[e/ing] to the portable data storage device

5            an encrypted first media content and a corresponding access key" (claims 1, 9)

6        Plaintiffs claim the Accused Products comprise of a processor that, "in response to the

7    authentication, provide[s] to the portable data storage device an encrypted first media content and a

8    corresponding access key."  Plaintiffs appear to argue that Viasat's third-party DRM license servers,

9    such as ██████████████████████████████████ provide a "corresponding access key"

10   because they "provide a license to authenticated requests (i.e. with a valid token)." Plaintiffs have

11   failed to explain how the Accused Products satisfy this limitation.  The Court has construed

12   "corresponding access key" as "a key to decrypt the first media content."  But Plaintiffs have

13   presented no evidence that the DRM license is a "corresponding access key" used to decrypt

14   encrypted media content.  *See, e.g.*, VIASAT_00005782; VIASAT_00003288;

15   VIASAT_00008738; VIASAT_00006471.  Crucially, the claim also requires that it is Viasat's

16   "kiosk" that "provides . . . an encrypted first media content and corresponding access key."

17   Plaintiffs do not identify any act of device "authentication" that results in providing (1) specific

18   media content, (2) an access key corresponding to that specific media content, (3) from the claimed

19   "kiosk," (4) as the "response" to the kiosk authenticating a device based on the kiosk's

20   communication of a unique device identifier to a remote trusted server. *None* of this has been shown

21   by Plaintiffs, much less *every* step in this required causal chain. Moreover, to the extent Plaintiffs

22   claim that DRM servers are "remote" from the "kiosk" for their allegations on earlier claim

23   limitations, they cannot also claim for this limitation that those allegedly "remote" services are not

24   "remote" but are instead the claimed "kiosk" itself for purposes of this limitation.  In any event,

25   Plaintiffs have not accused any third-party DRM license server as being the "kiosk" that meets this

26   limitation and all remaining limitations of claim 1.

27       Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products

28   are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed

processor configured to "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key," and Plaintiffs have failed to meet their burden of showing this limitation is met.

Further, as explained below, the Accused Products do not practice the remaining limitations of claim 1. Therefore, even if the Accused Products comprised a processor configured to "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key," they would not comprise "kiosk" configured to perform the remaining limitations of claim 1.

- "The [kiosk of claim 1/method of claim 9], wherein the kiosk is located in a public environment" (claims 8, 17)

Plaintiffs allege that the Accused Products as a "kiosk" that is "located in a public environment." Plaintiffs argue that "modules of the Gateway system" are located in public environments "such as on commercial airplanes." Plaintiffs do not identify how, specifically, the Accused Products allegedly satisfies this claim limitation. ***With respect to Viasat's residential Stream offering***, to the extent that Plaintiffs are permitted to add accusations that accuse unspecified components of the residential internet service system, the Viasat modem would be located in individuals' private homes, which are not public. To the extent Plaintiffs are permitted to add a new doctrine of equivalents theory, that theory would fail as a matter of law, as it would vitiate the term "public" from the claim. ***With respect to Viasat's mobility IFE offering***, to the extent that Plaintiffs accuse the S4 server of constituting the "kiosk," the S4 server is located in the electronics bay in the belly of the aircraft, which is entirely inaccessible to passengers or the general public. Indeed, none of the modules on the commercial aircraft are accessible to the general public. The M3 modem is also located in the electronics bay in the belly of the aircraft, which is inaccessible to passengers or the general public. The antennae, amplifier, and receiver are located in the ceiling of the aircraft, which is inaccessible to passengers or the general public; as Plaintiffs' own cited documents show, these components are covered by a "radome" "structure overtop" that requires "drilling holes in the fuselage." *See* Viasat, *100 planes and counting: Behind the scenes installing the best Wi-Fi in the*

*sky*, at https://www.Viasat.com/about/newsroom/blog/100-planes-and-counting-behind-the-scenes-installing-the-best-wi-fi-in-the-sky/.

Plaintiffs next argue that unspecified components of the Accused Products are located in a public environment because, regardless of their location, they can be communicated with "over a wired or wireless network." This ignores the claims and the Court's claim construction, which noted that this claim is about *location*—not network availability. Plaintiffs do not identify how, specifically, the Accused Products allegedly satisfies these claim limitations. The Court construed "public environment" to mean "*location* accessible by the public;" a device that is not in a public location, but that is nonetheless available for communication over a network, does not meet this limitation. Plaintiffs' effort to read "location" as "networked device" is not consistent with the Court's claim construction or with the patent.

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "kiosk." Therefore, it is unclear what components Plaintiffs contend comprise the claimed kiosk "wherein the kiosk is located in a public environment," and Plaintiffs have failed to meet their burden of showing this limitation is met.

### Non-Infringement of the '667 Patent

The Accused Products do not meet at least the following limitations of the asserted claims of the '667 patent:

- "A media streaming system comprising:"/"A method of transmitting media content from a media streaming system, the method comprising" (claims 1, 11)

Plaintiffs claim the Accused Products are a "media streaming system" and practice a "method of transmitting media content from a media streaming system." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products are a "media streaming system" or practice a "method of transmitting media content from a media streaming system."

Further, as explained below, the Accused Products do not practice the remaining limitations of claims 1 or 11. Therefore, even if the Accused Products were a "media streaming system," they would not be a "media streaming system comprising" the limitations of claim 1. Similarly, even if the Accused Products practiced a "method of transmitting media content from a media streaming system," they would not practice a "method of transmitting media content from a media streaming system … comprising" the limitations of claim 11.

- "[a network interface adapter configured to transmit digital content/establishing a connection], via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)" (claims 1, 11)

Plaintiffs claim the Accused Products comprise "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products comprise "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)."

**"a network interface adapter"**

***With respect to Viasat's residential Stream offering,*** Plaintiffs have failed to even explain what a "network interface adapter" is, let alone identify any component as a "network interface adapter." To the extent Plaintiffs allege that a component is a "network interface," they've failed to explain or show how that component is also an "adapter."

***With respect to Viasat's mobility IFE offering,*** similarly, Plaintiffs have failed to identify any component as a "network interface adapter." To the extent Plaintiffs allege that a component is a "network interface," they've failed to explain or show how that component is also an "adapter."

**"a network attached storage (NAS) device operating on a local area network (LAN)"**

***With respect to Viasat's residential Stream offering,*** Stream does not utilize any sort of "network attached storage (NAS) device operating on a local area network (LAN)." The Viasat

"Hub," which Plaintiffs seemingly identify as the claimed NAS device, connects via USB and has no network interface or other network connectivity capabilities. The Hub is therefore a ***direct*** attached storage, or DAS, device. *See* Ryan Depo Tr. 102:8-103:5 (explaining the difference between network attached storage and direct attached storage); Jenkins Depo Tr. 42:16-43:12 (explaining that a device that only has a USB connection is not a NAS device). The documents and source code Plaintiffs cite expressly show that this limitation is not satisfied. For example, Plaintiffs cite Viasat's publicly available Viasat Stream webpages and VIASAT_00008428, both of which show images of a Viasat Hub connecting via USB. https://www.viasat.com/satellite-internet/add-ons/viasat-stream/; VIASAT_00008428 at 444. Plaintiffs also cite VIASAT_00008420 and VIASAT_00007343, both of which state that the external storage used for Stream are "USB" storage drives. VIASAT_00008420 at 423; VIASAT_00007343 at 384. Indeed, that distinction between the '667 patent and Viasat's residential Stream offering is well documented. *See, e.g.*, VIASAT_00132727-VIASAT_00132817.

**<u>"transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device"</u>**

***With respect to Viasat's mobility IFE offering,*** the in-plane S4 server is not connected to any wide area network; it is connected to the M3 modem via a local area network connection. Any data transmitted to the S4 server is transmitted from the M3 modem, and therefore, any data transmitted to the S4 server is not transmitted "via a wide area network."

- "one or more hardware processors configured to:" (claim 1)

Plaintiffs claim the Accused Products comprise "one or more hardware processors." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products comprise "one or more hardware processors."

Additionally, as explained above, Plaintiffs have failed to explain how the Accused Products are a "media streaming system." Therefore, it is unclear what hardware device or devices Plaintiffs

1  contend comprise the claimed "one or more hardware processors," and Plaintiffs have failed to meet

2  their burden of showing this limitation is met.

3      Further, as explained below, the Accused Products do not practice the remaining limitations

4  of claim 1. Therefore, even if the Accused Products comprised "one or more hardware processors,"

5  they would not comprise "one or more hardware processors configured to" perform the remaining

6  limitations of claim 1.

7      • "receiv[e/ing] an indication of the NAS device having a secure region comprising a

8          buffer for streaming media on a separate display device on the local area network,

9          wherein access to the secure region is controlled by the media streaming system"

10         (claims 1, 11)

11     Plaintiffs claim the Accused Products "receive an indication of the NAS device having a

12 secure region comprising a buffer for streaming media on a separate display device on the local area

13 network, wherein access to the secure region is controlled by the media streaming system."

14 Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs'

15 contentions vaguely cite multiple documents and source code files but do not identify what,

16 specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone,

17 Plaintiffs have not shown the Accused Products "receive an indication of the NAS device having a

18 secure region comprising a buffer for streaming media on a separate display device on the local area

19 network, wherein access to the secure region is controlled by the media streaming system."

20     **"the NAS device having a secure region comprising a buffer for streaming media"**

21     ***With respect to Viasat's residential Stream offering,*** Viasat's Stream Hubs do not have a

22 "secure region." The '667 patent clearly describes a "secure region" as a **non-whole** portion of the

23 device; for example, the '667 patent discusses the device "having a user accessible region and a

24 secure region." *See, e.g.*, '667 patent at 7:24-26, Fig. 1, 3, 4A, 4B. However, each Stream Hub is

25 encrypted in its entirety, and the entire device can be used to store cached media content. The Hub

26 therefore has no secure ***region***. The documents and source code Plaintiffs cite expressly show that

27 this limitation is not satisfied. For example, Plaintiffs cite ███████████████████████

28 ███████████████, which is described as containing "information about ***the Media storage device.***"

1    ██████████████████████. The ██████████ struct contains the variable "████████

2    which is described as "█████████████████████████," and the boolean value

3    "████████," which is described as "█████████████████████████████." *Id.* This

4    indicates that the Stream Hub stores information about the entire device, rather than any particular

5    "region."

6          Additionally, the NAS device does not serve as a "buffer," but as a cache. A buffer is a

7    region of a device that stores content temporarily as it is rendered for playback on a user device,

8    whereas the Hub is a cache that stores data for long-term use.

9          **With respect to Viasat's mobility IFE offering,** Viasat has no ability to control or even

10   detect whether a particular airplane's S4 server is encrypted. As such, Viasat assumes that all S4

11   servers are **not** encrypted, and therefore, **not** secure. As the entirety of the S4 servers are assumed

12   to be non-secure, there are therefore no "**secure** regions" on any such devices that Viasat is aware

13   of. Plaintiffs have failed to provide any evidence demonstrating whether any such secure regions

14   exist. To the extent such devices do have secure regions, Viasat has no involvement in including

15   such regions.

16   **"receive an indication of the NAS device having a secure region"**

17         **With respect to Viasat's residential Stream offering,** as explained above, Viasat's Stream

18   Hubs do not have a "secure region." Therefore, any "indication" corresponding to that device does

19   not indicate "the presence of a secure region within" the Hub. Plaintiffs allege that the "████████

20   boolean in the ██████████ struct is the claimed indication, but that variable describes **at most** that

21   the entire Hub device is encrypted, not that there is any "secure region within" the Hub.

22   Additionally, the Hub is not a NAS device for the reasons explained above. Therefore, even if the

23   "████████" boolean were an indication of a secure region, it would not be an indication of a **NAS**

24   **device** having a secure region.

25         Moreover, the "████████" boolean doesn't actually even indicate that the Hub is encrypted;

26   all it indicates is whether the drive's mount entry starts with a particular directory path.

27   ██████████████████████ An encrypted drive might not have the correct path, which would

28   result in a **false** "████████" value, and an unencrypted drive may contain the path, which would

result in a **true** "████████" value. Neri Rough Tr. at 183:21-185:13. Therefore, even if the Hub were a NAS device, and even if it did have a secure region, the "████████" boolean would not be an indication of the presence of that region.

   **With respect to Viasat's mobility IFE offering,** as explained above, Viasat has no ability to control or even detect whether a particular airplane's S4 server is encrypted, and as such, Viasat assumes that all S4 servers are **not** encrypted. Because of this, whenever an S4 server is being accessed, Viasat automatically sets the "████████" boolean to false. The documents and source code Plaintiffs cite expressly show that this limitation is not satisfied. For example, Plaintiffs cite ███████████████, which shows the "████████" boolean being set based on whether the drive starts with a particular directory path. ███████████████ at 408-65. This file separately shows that NFS devices, such as an S4 server, have a different path prefix. *See, e.g.*, *id.* at 75-79, 437-39. Accordingly, when an S4 server is being accessed, the "████████" boolean will always be set to false. Therefore, if the "████████" boolean indicates **anything** in such cases (it does not, as a variable that is always automatically set to the same value cannot indicate anything), it indicates that the device is **not** secure and that there is **no** "secure region within" the device.

   **"access to the secure region is controlled by the media streaming system"**

   **With respect to Viasat's residential Stream offering,** Viasat does not "control" access to the media content stored on the alleged NAS devices. Currently, and since its release, Stream has only handled content accessed through Disney+. In order to access such content, residential users must first log onto their Disney+ application using Disney's authentication process; Viasat has no involvement in or control over this process. Once a user has successfully logged into the Disney+ application, they can select a show or movie to play, which sends a request for the selected content from the user's device to their modem. This request is ultimately received by the vcds-client application; prior to receiving this request Viasat has no involvement in or control over this process. When the vcds-client application receives such a request for media content, it simply serves the content. The vcds-client application does not perform any further authentication of the user; it assumes that the user must have already been successfully authenticated by Disney to have reached

such a point. Therefore, the vcds-client application does not "control" access to the alleged NAS device, as it will never deny a user access to the content on that device.

**With respect to Viasat's mobility IFE offering,** a similar process takes place. Critically, as with Stream, once the vcds-client application on the IFE modem receives a request for media content, it simply serves the content. It performs no authentication of the user, nor will it deny a user access to the content on the alleged NAS device. Therefore, the vcds-client application does not "control" access to the alleged NAS device.

- "transmit[ting] [the digital/media] content to the secure region within the NAS device for playback by the separate display device from the buffer" (claims 1, 11)

Plaintiffs claim the Accused Products "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer."

**With respect to Viasat's residential Stream offering,** as explained above, the Viasat Hub is not a NAS device and does not have a secure region. Therefore, any media content transmitted by Viasat's systems is not transmitted to any "secure region with the NAS device."

**With respect to Viasat's mobility IFE offering,** as explained above, Viasat's S4 servers do not have a secure region. Therefore, any media content transmitted by Viasat's systems is not transmitted to any "secure region with the NAS device."

- "transmit[ting] instructions to the NAS device to control streaming access to the [digital/media] content stored on the buffer" (claims 1, 11)

Plaintiffs claim the Accused Products "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products

allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer."

**With respect to Viasat's residential Stream offering,** as explained above, once the vcds-client application on the Stream modem receives a request for media content, it simply serves the content. It performs no authentication of the user, nor will it deny a user access to the content on the alleged NAS device. Even more critically, the Viasat Hub, which Plaintiffs contend is the claimed "NAS device," has no means of controlling streaming access to the content it stores. The Hub is a simple hard drive; it does not even contain a processor, and as such, it is incapable of "making decisions" such as whether to serve content or not. It is not clear from Plaintiffs' contentions what they allege the claimed "instructions" are or how the Hub "control[s] streaming access" to the stored content, but to the extent Plaintiffs allege that Viasat's tokenization features somehow satisfy this limitation, they are incorrect. The only point during the VCDS process at which Viasat uses tokens is shortly after a user first requests certain content; when a user requests content, ███████████ ████████████████████████████████████████████████████████████████████. The ██████████ ██████████████████████████████████████████████████████████████████████████████████ ████████████████████. ███████████████████████████████████████████████████████████. No token or token information are ever used by the vcds-client or the Hub, and therefore, tokens are not "instructions" sent to the Hub to "control streaming access" to the stored content. The documents and source code Plaintiffs cite expressly show that this limitation is not satisfied. For example, in their infringement contentions for the '400 patent, Plaintiffs cite VIASAT_00016425, which shows that the VCDS Client is configured to **ignore** any "token path element[s]" included in a content request. VIASAT_00016425 at 425-26. Therefore, neither VCDS Client nor the Hub "control streaming access" to the stored content. Indeed, that distinction between the asserted patent claim and the accused product is well documented. *See, e.g.*, VIASAT_00016425; VIASAT_00016428; VIASAT_00016430;        VIASAT_00016439;        VIASAT_00017759;        VIASAT_00017768;

1  VIASAT_00017807;    VIASAT_00017812;    VIASAT_00017815;    VIASAT_00017820;

2  VIASAT_00017822; VIASAT_00017825.

3      Additionally, the tokens do not "control **streaming access**" to requested content. Requested

4  content has been served by the Hub and vcds-client is not in a user-watchable state, as it is still

5  protected by Disney's DRM processes. Therefore, if anyone "controls streaming access" to content

6  stored on the Hub, it is Disney, not Viasat.

7      **With respect to Viasat's mobility IFE offering,** as explained above, once the vcds-client

8  application on the in-flight modem receives a request for media content, it simply serves the content.

9  It performs no authentication of the user, nor will it deny a user access to the content on the alleged

10  NAS device. Once again, it is not clear from Plaintiffs' contentions what they allege the claimed

11  "instructions" are or how the S4 server, the alleged NAS device, "control[s] streaming access" to

12  the stored content, but to the extent Plaintiffs allege that Viasat's tokenization features somehow

13  satisfy this limitation, they are incorrect for the same reasons as discussed above with respect to

14  Stream.

15      • "The media streaming system of claim 1, wherein the separate display device

16          comprises a smart television" (claim 2)

17      As an initial matter, as explained above, the Accused Products do not satisfy the limitations

18  of claim 1. Therefore, the Accused Products cannot satisfy claim 2, which depends on the limitations

19  of claim 1.

20      Plaintiffs claim the Accused Products comprise a "separate display device [that] comprises

21  a smart television." Plaintiffs' infringement contentions do not explain the basis for this position.

22  Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not

23  identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this

24  reason alone, Plaintiffs have not shown the Accused Products comprise a "separate display device

25  [that] comprises a smart television."

26      Moreover, Viasat has no control over what type of device an end user of Viasat's residential

27  Stream or mobility IFE offerings chooses to watch content retrieved via those services on, nor does

28  Viasat instruct its customers to use any particular kind of device. Viasat's services function

identically whether the end user chooses to watch their content on a television, a computer, a tablet, or a phone. To the extent an end user chooses to access Viasat-provided content via a smart television, Viasat has no involvement in that decision.

- "The [media streaming system of claim 1/method of claim 11], wherein transmitting the [digital content/media content to the secure region] comprises time-shifting [the transmitting of the media content] to a time with more available bandwidth on a connection to the NAS device" (claims 3, 12)

As an initial matter, as explained above, the Accused Products do not satisfy the limitations of claims 1 or 11. Therefore, the Accused Products cannot satisfy claims 3 or 12, which depend on the limitations of claims 1 and 11, respectively.

Plaintiffs claim the Accused Products "time-shift[] the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products "time-shift[] the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device."

**With respect to Viasat's residential Stream offering,** as explained above, the Stream Hub is not a "NAS device," nor does it contain any "secure region." Therefore, any transmitting of content to the Hub does not transmit content to a secure region or comprise time-shifting based on a connection to any NAS device.

**With respect to Viasat's mobility IFE offering,** as explained above, Viasat's S4 servers do not have a secure region. Therefore, any transmitting of content to the S4 server does not transmit content to a secure region.

- "The [media streaming system of claim 1/method of claim 11], wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system" (claims 4, 13)

As an initial matter, as explained above, the Accused Products do not satisfy the limitations of claims 1 or 11. Therefore, the Accused Products cannot satisfy claims 4 or 13, which depend on the limitations of claims 1 and 11, respectively.

Plaintiffs claim the Accused Products comprise a "secure region [that] is inaccessible by a user of the NAS device without permission from the media streaming system." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products comprise a "secure region [that] is inaccessible by a user of the NAS device without permission from the media streaming system."

**With respect to Viasat's residential Stream offering,** as explained above, once the vcds-client application on the Stream modem receives a request for media content, it simply serves the content. It performs no authentication of the user, nor will it deny a user access to the content on the Hub. Therefore, a user does not need any type of "permission" from Viasat to access media content stored on the Hub.

**With respect to Viasat's mobility IFE offering,** as explained above, once the vcds-client application on the in-flight modem receives a request for media content, it simply serves the content. It performs no authentication of the user, nor will it deny a user access to the content on the S4 server. Therefore, a user does not need any type of "permission" from Viasat to access media content stored on the S4 server.

- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] caus[e/ing] the NAS device to use encryption that secures the digital content to the secure region" (claims 5, 14)

As an initial matter, as explained above, the Accused Products do not satisfy the limitations of claims 1 or 11. Therefore, the Accused Products cannot satisfy claims 5 or 14, which depend on the limitations of claims 1 and 11, respectively.

1    Plaintiffs claim the Accused Products "cause the NAS device to use encryption that secures

2    the digital content to the secure region." Plaintiffs' infringement contentions do not explain the basis

3    for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code

4    files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim

5    limitation. For this reason alone, Plaintiffs have not shown the Accused Products "cause the NAS

6    device to use encryption that secures the digital content to the secure region."

7    **With respect to Viasat's residential Stream offering,** as explained above, the Stream Hub is

8    not a "NAS device," nor does it contain any "secure region." Therefore, any encryption performed

9    by the Hub is not a "NAS device [] us[ing] encryption [to] secure[] the digital content to the secure

10   region."

11   **With respect to Viasat's mobility IFE offering,** as explained above, Viasat has no control

12   over nor awareness of whether a given S4 server utilizes encryption. Plaintffs have not provided any

13   evidence demonstrating that any S4 servers do so. Therefore, the S4 servers do not "use encryption

14   [to] secure[] the digital content to the secure region."

15   - "The [media streaming system of claim 1, wherein the one or more processors are

16   further configured to:/method of claim 11, further comprising:] provid[e/ing]

17   instructions to the NAS device for controlling an amount of data stored in the secure

18   region" (claims 6, 15)

19   As an initial matter, as explained above, the Accused Products do not satisfy the limitations

20   of claims 1 or 11. Therefore, the Accused Products cannot satisfy claims 6 or 15, which depend on

21   the limitations of claims 1 and 11, respectively.

22   Plaintiffs claim the Accused Products "provide instructions to the NAS device for

23   controlling an amount of data stored in the secure region." Plaintiffs' infringement contentions do

24   not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple

25   documents and source code files but do not identify what, specifically, in the Accused Products

26   allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused

27   Products "provide instructions to the NAS device for controlling an amount of data stored in the

28   secure region."

**With respect to Viasat's residential Stream offering,** the Hub simply stores whatever data it is given to store; it does not, nor does it have any ability to, "control[] an amount of data" it stores. None of the documents and source code Plaintiffs cite to even mention **anything** about the amount of data on a Hub.

**With respect to Viasat's mobility IFE offering,** the S4 server simply stores whatever data it is given to store; it does not, nor does it have any ability to, "control[] an amount of data" it stores. None of the documents and source code Plaintiffs cite to even mention **anything** about the amount of data on an S4 server.

- "The [media streaming system of claim 1, wherein the one or more processors are further configured to:/method of claim 11, further comprising:] provid[e/ing] instructions to the NAS device for controlling an encryption type used in the secure region" (claims 7, 16)

As an initial matter, as explained above, the Accused Products do not satisfy the limitations of claims 1 or 11. Therefore, the Accused Products cannot satisfy claims 7 or 16, which depend on the limitations of claims 1 and 11, respectively.

Plaintiffs claim the Accused Products "provide instructions to the NAS device for controlling an encryption type used in the secure region." Plaintiffs' infringement contentions do not explain the basis for this position. Instead, Plaintiffs' contentions vaguely cite multiple documents and source code files but do not identify what, specifically, in the Accused Products allegedly satisfies this claim limitation. For this reason alone, Plaintiffs have not shown the Accused Products "provide instructions to the NAS device for controlling an encryption type used in the secure region."

**With respect to Viasat's residential Stream offering,** as explained above, the Stream Hub is not a "NAS device," nor does it contain any "secure region." Additionally, the Hubs are pre-configured during development to be encrypted; at no point do the Hubs receive "instructions … for controlling an encryption type used in the secure region."

**With respect to Viasat's mobility IFE offering,** as explained above, Viasat has no control over nor awareness of whether a given S4 server utilizes encryption. Plaintffs have not provided any

evidence demonstrating that any S4 servers do so. Therefore, the S4 servers do not receive "instructions to … control[] an encryption type used in the secure region."

### **Indirect Infringement**

Plaintiffs' Patent L.R. 3-1(d) contentions, last updated March 22, 2024, allege that certain claims have been indirectly infringed through inducement.[2] Specifically, Plaintiffs assert that Viasat has induced, and continues to induce, infringement of the '400 patent and the '667 patent under 35 U.S.C. § 271(b). Plaintiffs are wrong for multiple reasons.

First, indirect infringement requires an act of direct infringement. Plaintiffs do not identify any act of direct infringement for any asserted claim of the '400 patent or the '667 patent. Viasat does not infringe any asserted claim of the '400 patent or the '667 patent. Viasat's airline customers do not infringe any asserted claim of the '400 patent or the '667 patent by using products and services Viasat provides for those customers' commercial aircraft. Passengers on commercial aircraft operated by Viasat's airline customers do not infringe any asserted claim of the '400 patent or the '667 patent by using products and services provided by Viasat for those commercial aircraft. To the extent residential home satellite internet service is accused, Viasat's residential home satellite internet service does not infringe any asserted claim of the '400 patent or the '667 patent, and users of residential home satellite internet service do not infringe any asserted claim of the '400 patent or the '667 patent by using Viasat's residential home satellite internet service, including but not limited to by using the "Stream" beta.

Second, to the extent Plaintiffs' allegations of induced infringement rely on alleged acts of direct infringement by (1) Viasat's airline customers, (2) passengers on aircraft operated by Viasat's airline customers, or (3) users of Viasat's residential home satellite internet service, Plaintiffs have failed to establish any such act of direct infringement. As noted above, no such infringement exists. Moreover, Plaintiffs have not identified as required by Patent L.R. 3-1(d) any specific act of direct infringement by any specific alleged direct infringer. Plaintiffs have not identified any specific

---

[2] Plaintiffs do not assert contributory infringement in their Patent L.R. 3-1(d) contentions. The only theory of indirect infringement Plaintiffs disclosed was an inducement theory.

airline customer, any specific passenger on an aircraft operated by a Viasat airline customer, or any specific Viasat residential home satellite internet service customer as an alleged direct infringer, or any specific acts by any such third party that supposedly constitute direct infringement. Plaintiffs instead generically allege that direct infringement exists, without specifying who the direct infringer supposedly is, or how the direct infringement supposedly occurs. These vague allegations are not sufficient to assert induced infringement, and Plaintiffs' Patent L.R. 3-1(d) contentions show that Plaintiffs cannot meet their burden on indirect infringement.

Third, indirect infringement requires both (1) knowledge of the patent and (2) knowledge of infringement. *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 647 (N.D. Cal. 2022). A party cannot indirectly infringe a patent without knowledge of it. Moreover, a claim for induced infringement under Section 271(b) also requires specific intent to encourage another's infringement of the patent. *Id*. The filing of a complaint is not sufficient to show knowledge of the patent for purposes of inducement allegations. *Id*. at 648 (dismissing indirect infringement allegations; "the complaint will generally not be adequate to serve as notice for either willful or indirect infringement"). Plaintiffs cannot meet their burden on any of these points. Plaintiffs have not shown, and cannot show, that Viasat had pre-suit knowledge of the '400 patent or the '667 patent. Viasat did not, and Plaintiffs do not contend otherwise. For that reason alone Plaintiffs cannot prove indirect infringement. Moreover, Plaintiffs have not shown and cannot show that Viasat specifically intended to induce an act of infringement by others. Viasat did not believe, and does not believe, that there is any infringement of the '400 patent or '667 patent, and at no point had a specific intent to encourage any act of infringement of either patent.

Fourth, Plaintiffs have not shown that Viasat instructs any specific third party to perform all of the acts that allegedly constitute direct infringement. Indeed, Plaintiffs' Patent L.R. 3-1(d) contentions cite no evidence that Viasat directs any specific third party to perform all steps of any asserted claim. For example:

- On the '400 patent, Plaintiffs allege that Viasat "advertises that vertically integrated technology allows Viasat to optimize the connectivity pipeline from end-to-end, delivering a game-changing in-flight connectivity service that mirrors the experience

consumers have on the ground." But using the Internet is not alleged to infringe the '400 patent. Optimized Internet connectivity is not alleged to infringe the '400 patent. Providing Internet connectivity on an airplane is not alleged to infringe the '400 patent. Providing in-flight Internet connectivity that mirrors the quality of service available to Internet users on the ground is not alleged to infringe the '400 patent. These statements cited by Plaintiffs do not mention, much less specifically encourage, any third party to perform all of the steps alleged to constitute infringement of the '400 patent.

- On the '400 patent, Plaintiffs also offer the conclusory allegation that Viasat "intends and induces airlines to encourage passengers to use the systems for entertainment and engagement during flights, including, specifically, the functionality covered by the Asserted Claims." But Plaintiffs do not cite any specific instruction to a specific third party directing that party to perform all of the steps alleged to constitute infringement of the '400 patent. Indeed, the documents cited by Plaintiff have only generic statements quoted, such as "Keep Passengers Entertained." (Patent L.R. 3-1(d) contentions at 3 n.9.)  The Viasat statements cited by Plaintiffs say nothing about use of the specific functionality that Plaintiffs contend is covered by the Asserted Claims and thus do not encourage any third party to perform all of the steps alleged to constitute infringement of the '400 patent.

- On the '400 patent, Plaintiffs further allege that Viasat "controls the content catalog for its airline customers" but does not explain what this means, or how it occurs, or how it would involve an act of direct infringement, or how "control[ling] the content catalog" would constitute encouragement to commit direct infringement. It does not. Plaintiffs likewise state that Viasat "offers 'Ad Supported Channels' 'where content costs are offset by advertisers,'" but again do not explain what this means, or how it occurs, or how it would involve an act of direct infringement, or how "Ad Supported Channels" would constitute encouragement to commit direct infringement. The same is true for Plaintiffs' allegations regarding "the ability for American Airlines

passengers to stream Apple Music for free using Viasat satellite Wi-Fi," or for Plaintiffs' allegations regarding "free Wi-Fi," "including free Wi-Fi through Viasat's 'Sponsored Access' model," or for Plaintiffs' allegations regarding Viasat's provision of "customer support" for "in-flight connectivity and entertainment," or for Plaintiffs' allegations regarding "installation services, content loading and streaming services," and generic claims of providing "information and instructions." None of these are alleged acts of direct infringement. Offering wireless Internet access, or allowing users "to stream Apple music for free using Viasat satellite Wi-Fi," or the provision of free Wi-Fi service through "Sponsored Access," or the other grab-bag of allegations Plaintiffs offer are not allegations of direct infringement. They are also not allegations of instructions to a third party by Viasat, directing the third party to perform all elements of any asserted '400 patent claim.

- On the '667 patent, Plaintiffs allege that "Viasat has promoted use of Viasat's IFEC systems and participated in encouraging airline customers to use functionality of Viasat's IFEC systems that connect to the '667 Accused Products." But using in-flight Internet service is not alleged to infringe the '667 patent. Accordingly, encouraging the use of in-flight Internet service is not encouraging infringement of the '667 patent. Plaintiffs do not explain what they mean by "use functionality of Viasat's IFEC systems that *connect to* the '667 Accused Products," but using something that "connects to" an accused product is not itself an act of infringement. Plaintiffs' Patent L.R. 3-1(d) allegations for the '667 simply do not state any act of "promot[ion] or of "participat[ing] in encouraging" an act of direct infringement for the '667 patent.

- On the '667 patent, Plaintiffs further allege that Viasat "advertises that vertically integrated technology allows Viasat to optimize the connectivity pipeline from end-to-end, delivering a game-changing in-flight connectivity service that mirrors the experience consumers have on the ground." But using the Internet is not alleged to infringe the '667 patent. Optimized Internet connectivity is not alleged to infringe

the '667 patent. Providing Internet connectivity on an airplane is not alleged to infringe the '667 patent. Providing in-flight Internet connectivity that mirrors the quality of service available to Internet users on the ground is not alleged to infringe the '667 patent. These statements cited by Plaintiffs do not mention, much less specifically encourage, any third party to perform all of the steps alleged to constitute infringement of the '667 patent.

- On the '667 patent, Plaintiffs further allege that Viasat "has monitored end users' media consumption and tried to differentiate its entertainment offerings to be more attractive so as to induce airlines and customers to adopt them." This is not an alleged act of direct infringement or an instruction to perform an alleged act of direct infringement. Plaintiffs likewise state that Viasat has "partner[ed] with DIRECTV to make it 'less cumbersome' for airlines to make in-flight entertainment available to passengers." This is also not an alleged act of direct infringement or an instruction to perform an alleged act of direct infringement. The same is true for Plaintiffs' allegations that Viasat "offer[s] live programming in flights, in homes, and other locations," or its allegation that "the live services provided through our offering is valued by the customers," or its allegation that Viasat participated in sponsored access "giving passengers the NBA League Pass in-flight, providing access to live basketball games, at no additional cost on Jetblue and American Airlines," or its allegations that "end-users, airlines and content providers" all "stream[] live TV in planes, homes, and other locations." None of this is an alleged act of direct infringement or an instruction to perform an act of direct infringement. Nor are vague references to providing live TV "using the VCDS" sufficient to allege direct infringement or to show specific instructions to perform an act of direct infringement. Plaintiffs' allegations regarding "installation services, content streaming services," and generic claims of providing "information and instructions" are likewise insufficient to show induced infringement. None of these are alleged acts of direct

infringement or instructions to a third party by Viasat, directing the third party to perform all elements of any asserted '667 patent claim.

DATED: February 6, 2025                    QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP


                                           By_____/s/ Patrick Curran_____
                                              Patrick Curran
                                              Attorneys for *Defendant Viasat Inc.*

THIRD SUPPLEMENTAL OBJECTIONS & RESPONSES TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2025, I caused a copy of the foregoing document to be served on the following counsel for Plaintiffs via email:

GDCWesternDigitalNDCA@gibsondunn.com

*/s/ Alicia Lai*
Alicia Lai
Counsel for Defendant

THIRD SUPPLEMENTAL OBJECTIONS & RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES