1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN FRANCISCO DIVISION

7

8    SANDISK3D IP HOLDINGS LTD., et al.,
                                                    Case No. 22-cv-04376-HSG   (PHK)
9                      Plaintiffs,

10              v.                                   **ORDER RESOLVING DISCOVERY
                                                    LETTER BRIEFS RE DISPUTES RE
11   VIASAT, INC.,                                   SOURCE CODE, FINANCIAL
                                                    DOCUMENTS, AND DEPOSITIONS**
12                     Defendant.
                                                    Re: Dkt. 159, 162, 170, and 179
13

14          This case has been referred to the undersigned for purposes of all discovery disputes and

15   issues.  *See* Dkt. 173.  Now pending before the Court is a series of letter briefs regarding disputes

16   between the Parties concerning certain source code and technical documents, certain financial

17   documents, and 30(b)(6) depositions.  [Dkts. 159, 170, and 179].  The Court finds these disputes

18   suitable for resolution without oral argument.  *See* Civil L.R. 7-1(b).

19                                    **LEGAL STANDARD**

20          With regard to the scope of discovery in federal civil actions, Federal Rule of Civil Procedure

21   26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is

22   relevant to any party's claim or defense and proportional to the needs of the case."  Information need

23   not be admissible to be discoverable.  *Id.*  Relevancy for purposes of discovery is broadly defined

24   to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear

25   on, any issue that is or may be in the case."  *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th

26   Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In*

27   *re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL

28   10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes

United States District Court
Northern District of California

of discovery is broader than relevancy for purposes of trial.") (alteration omitted).

While the scope of relevance is broad, discovery is not unlimited. *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries."). Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1). The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. In evaluating the proportionality of a discovery request, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the burden of establishing that its request satisfies the relevancy requirements under Rule 26(b)(1). *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012). The resisting party, in turn, has the burden to show that the discovery should not be allowed. *Id.* The resisting party must specifically explain the reasons why the request at issue is objectionable and may not rely on boilerplate, conclusory, or speculative arguments. *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied.").

The Court has broad discretion and authority to manage discovery. *U.S. Fidelity & Guar. Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). As part of its inherent

United States District Court
Northern District of California

2

discretion and authority, the Court has broad discretion in determining relevancy for discovery purposes. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)). The Court's discretion extends to crafting discovery orders that may expand, limit, or differ from the relief requested. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery"). For example, the Court may limit the scope of any discovery method if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

The Court notes that these discovery disputes were first presented to the District Judge in a letter filed by Plaintiff SanDisk Technologies LLC ("Sandisk"), dkt. 159, and not by a Joint Discovery Letter as required by Judge Gilliam's standing order as pointed out by Defendant Viasat, Inc. ("Viasat"), dkt. 162. Sandisk's discovery letter was filed on the same day Sandisk filed a Motion to Extend the Deadline for the Close of Fact Discovery and Extend the Case Schedule. [Dkt. 158–159]. The Motion to Extend the deadlines relied in part on the pendency of these discovery disputes. [Dkt. 158]. Sandisk's Motion to Extend the Deadline for the close of Fact Discovery and Extend the Case Schedule has been denied. [Dkt. 181].

Viasat's opposition discovery letter brief was filed on February 12, 2025. [Dkt. 170]. After this case was referred to the undersigned for discovery, dkt. 173, this Court ordered the Parties to meet and confer as required by this Court's Standing Discovery Order, dkt. 175. Per the Parties' status report after that meet and confer, these disputes were neither resolved nor narrowed in any way. [Dkt. 179].

## DISCUSSION

### A.    DISPUTES REGARDING SOURCE CODE

The Parties' first dispute concerns whether Viasat should be required to produce its source code for its servers referred to as VCDS (Viasat Content Delivery Service) servers. Sandisk argues that Viasat has failed to produce "the source code the VCDS server-side components." [Dkt. 159 at 1]. Sandisk argues that this source code "is directed to relevant components of the accused system,

1    including how and what type of information is exchanged between Viasat and third-party content

2    providers, as well as configuration files for IPTV, another explicitly accused product." *Id.*

3         Viasat argues that Sandisk's infringement contentions do not accused the VCDS server.

4    [Dkt. 170 at 2]. Viasat points at that "[t]he first time Plaintiffs said VCDS *ground server* code

5    should be produced was the evening of Feb. 3, 2025 – four days before discovery closed." *Id.*

6         To understand this dispute (and the reference to a VCDS "ground server") some background

7    context is necessary. The asserted claims of U.S. Patent No. 9,424,400 ("the '400 patent") such as

8    independent claim 1 claim a "kiosk comprising" various elements. The claimed "kiosk" comprises

9    "a first data interface configured to communicate with a portable data storage device." '400 patent,

10   col. 22:45-46. The claimed kiosk further comprises "a second data interface configured to

11   communicate, over a network, with a remote trusted server." *Id.* at col. 22:47-48.

12        Sandisk's accused products for the '400 patent include Viasat systems which provide

13   streaming content to devices. One of the accused Viasat systems is the Viasat in-flight entertainment

14   system, which is installed on airplanes to provide streaming content to passengers watching screens

15   embedded on the seat back, for example. *See* Dkt. 145-2 at 2 (Sandisk Infringement Contentions

16   for '400 patent). The Viasat system includes a server on the airplane (which Viasat has referred to

17   as a "client-side server") and a server on the ground (the so-called "ground server").

18        The Parties do not dispute that Viasat has produced source code the VCDS client-side server.

19   The issue is whether, as Sandisk now argues, source code running on the VCDS ground server is

20   properly the subject of discovery. After review of the '400 patent, Sandisk's infringement

21   contentions, and the Parties' arguments on this motion, the Court **FINDS** that Sandisk has not met

22   its burden to demonstrate that the VCDS server-side source code is within the relevant scope of

23   discovery or proportional for purposes of discovery.

24        First, the Court notes that, after review of Sandisk's infringement contentions, nowhere does

25   Sandisk contend that *operation* or functioning of the VCDS ground server results in satisfying any

26   limitations of any asserted claims of any of the patents in suit. As explained above, the closest the

27   '400 claims come to this issue is the limitation of the "second data interface configured to

28   communicate . . . with a remote trusted server." '400 patent col. 22:47. However, the text of the

United States District Court
Northern District of California

1    '400 claims contain no express limitations directed to software operating on the "remote trusted

2    server" – there are no functional, operational, or method step limitations in the facial text of the

3    claims directed to that "remote trusted server."  The fact that Sandisk accuses the mere existence of

4    a ground server as sufficient for infringement purposes does not make discovery of the *operational*

5    *details* of that server relevant or proportional for discovery purposes.

6    　　　The corollary problem for Sandisk is that Sandisk's infringement contentions nowhere

7    accuse the functionality, operation, or method steps performed by the VCDS ground server itself.

8    *See* Dkt. 145-2 at 27.  As noted, because the claim itself only requires a "second data interface"

9    which is "configured to communicate . . . with a remote trusted server," it is no surprise that

10   Sandisk's infringement contentions merely accuse generic categories of systems on the ground with

11   which the claimed "second data interface" can communicate.  Indeed, Sandisk's infringement

12   contentions refer to a data interface configured to communicate from the airplane with "trusted

13   partner data centers and other such systems on the ground," dkt. 145-2 at 27, or "a remote trusted

14   server (*e.g.*, Viasat AWS servers, content provider servers, Viasat data center, content management

15   server)," *id.* at 32, but accuse no actual functionality of any of these "systems on the ground."  That

16   is, discovery of the ground server source code is not shown to be necessary, relevant, or proportional

17   to proving Sandisk's contention that a ground server exists.

18   　　　Similarly, the claim language does not contain an express limitation of actual

19   communication between the "second data interface" and the "remote trusted server" – merely that

20   the data interface be "configured" to be capable of such communication.  It is no surprise therefore

21   that, for infringement purposes, Sandisk has taken the position that the mere existence of some kind

22   of remote server (*i.e.*, what Sandisk accuses as any "other such systems on the ground") suffices to

23   demonstrate infringement, without regard to actual software running on that remote server.

24   Accordingly, it would be inconsistent for Sandisk to now argue that the claims should be limited in

25   some way to specific functional limitations for the claimed "remote trusted server" in order to justify

26   discovery of the source code the VCDS ground server.  Indeed, if Sandisk were serious about

27   needing this discovery for infringement purposes, then that could potentially raise non-trivial

28   divided infringement barriers to liability or at least indirect infringement issues here (to the extent

United States District Court
Northern District of California

5

1  Sandisk's infringement contentions refer to third-party ground servers) – which further underscores

2  why Sandisk has not shown the relevance of this discovery.

3        Sandisk's one-sentence argument as to relevance does not satisfy its burden.  First, Sandisk's

4  statement that the VCDS ground server source code would show "how and what type of information

5  is exchanged between Viasat and third-party content providers" is vague and unconnected to the

6  claim language.  [Dkt. 159 at 1].  What does "Viasat" in the quoted language refer to?  If it refers to

7  the Viasat "client-side" components on the airplane, then, as noted, Viasat has already produced that

8  source code for inspection.  Thus, Sandisk already knows "what information" the Viasat client-side

9  server communicates.  If by the word "Viasat," Sandisk intends to refer to a Viasat ground server,

10 as discussed in detail above, there are no infringement contentions (and Sandisk points to no express

11 claim language) directed to the software processes for exchanging information exchanged on the

12 ground between any Viasat ground server and any third-party content providers.  It would be

13 inconsistent for Sandisk to now argue that the claims should be construed to require specific

14 functional limitations of the claimed "remote trusted server" as it communicates to third party

15 servers, so as to make discovery of such communications and related source code relevant for

16 purposes of discovery.

17       Sandisk's unexplained argument that the VCDS ground server source code is required for

18 discovery because it would show "configuration files for IPTV" is equally unavailing.  *Id.*  First,

19 IPTV (Internet Protocol Television) is a service for delivering content over the Internet, and the

20 configuration files for encoding that content for distribution is accomplished by the content provider.

21 That is, configuration files for IPTV are directed to the specifics of how the content is packetized,

22 multiplexed, and/or transported according to industry-standard or other well-known protocols.

23 Sandisk simply identifies no limitations in the '400 patent claims directed to *how* the IPTV content

24 is configured.  Again, it is no surprise therefore that Sandisk's infringement contentions make only

25 passing reference to the mere existence of IPTV as an example (among other listed streaming

26 services) of a media streaming service for purposes of "provisioning secure media content" as

27 required by the preamble of '400 claim 1.  [Dkt. 145-2 at 4].  Notably, as with the "remote trusted

28 server" limitation discussed above, Sandisk's infringement contentions contain no accusations as to

United States District Court
Northern District of California

6

how any IPTV service is configured because the '400 claims contain no such express limitation. And again, it is inconsistent for Sandisk to argue that the '400 claims should be construed to now require specific functional limitations as to the configuration of the claimed "secure media content" (when Sandisk points to no such express claim limitations) so as to argue that IPTV configuration files are now somehow within the scope of relevant discovery. Additionally, this conclusion aligns with Judge Gilliam's Order denying Sandisk's motion for leave to amend its infringement contentions. [Dkt. 182]. For purposes of discovery, Sandisk has not met its burden to show how or why the IPTV configuration files are within the scope of relevance or proportional in order to prove Sandisk's contention that the mere existence of IPTV content would be sufficient for infringement purposes. For the purposes of these particular discovery disputes, the undersigned makes no findings regarding which products are or were adequately accused of infringement, as that issue is not necessary to resolve in deciding the discovery dispute.

The Court notes that the remaining limitations of '400 independent claim 1 are similarly directed to "a processor [within the claimed kiosk] configured to" carry out certain functions, and for the same reasoning, Sandisk's infringement contentions make no arguments that the functions, operations, or methods carried out by the VCDS ground server are at all involved in infringement of these remaining limitations.

As discussed above, even if the VCDS ground server source code were relevant, that would not end the inquiry. Such discovery would still need to be proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Sandisk never took the position earlier in the discovery period that its infringement contentions were deficient without the VCDS ground server source code, and even now, Sandisk's briefing is careful not to undermine its existing infringement contentions (which for the '400 patent span over seventy-five pages of claims charts). The record shows that Sandisk has not been impeded in propounding infringement contentions even without the VCDS ground server source code. Thus, Sandisk has not met its burden to show that such discovery of this source code is important in resolving the issues in this case, nor that the discovery is sufficiently important to the issues at stake in this action. *Id.* Nor has Sandisk demonstrated diligence in seeking this discovery, where Sandisk has known about the VCDS ground server for most if not all of the fact

discovery period.

The Court further notes that Sandisk filed a motion to amend its infringement contentions on January 16, 2025, and in that motion Sandisk made no argument or even mention of the VCDS ground server source code as a reason why Sandisk sought leave to amend.  [Dkt. 146].  Indeed, Sandisk argued that leave to amend its infringement contentions was warranted because Sandisk sought to update its contentions as to only certain claim limitations, not including the "remote trusted server" and "provisioning secure media content."  *Id.* at 7.  Sandisk also sought to incorporate additional discovery Viasat had ***already*** provided regarding Viasat's source code, *i.e.*, the client-side source code referenced above.  *Id.*  Sandisk's failure to raise the VCDS ground server source code in the context of the motion for leave to amend infringement contentions (since denied) further demonstrates why discovery as to that source code is not proportional to the needs of the case.

Finally, as noted, the timing of Sandisk's motion to compel undercuts the strength of its arguments.  Sandisk raised its demand for the VCDS ground server source code only days before the end of fact discovery and in an evident attempt to create discovery issues to support its motion to extend the fact discovery deadline.  The Court is not blind to the tactical timing and sequence of Sandisk's motion here (and the linkage to the motion to extend the case deadlines).  This further supports the Court's conclusion that discovery of the VCDS ground server source code is not proportional to the needs of the case because it is not shown to be sufficiently important to resolve the merits of the substantive patent infringement issues in the case and is not sufficiently important to the issues at stake in this lawsuit.  Fed. R. Civ. P. 26(b)(1).

Sandisk's motion briefly raises three other source-code related disputes:  first, that Viasat has failed to produce source code files which provide definitions for functions in the source code; second, that Viasat has failed to produce prior versions of the source code already produced; and third that, in response to Document Request No. 87, Viasat has not produced documents and source code showing the details of the Digital Rights Management system used by the accused products.  [Dkt. 159 at 1–2].

Viasat responds that Sandisk does not explain why the code files with definitions of any functions are relevant or proportional; that Sandisk never previously sought prior versions of Viasat

source code until this late date; that Document Request No. 87 expressly requests "[d]ocuments sufficient to show the functionality of [third-party vendor] JWP's digital rights management (DRM) system in the Accused Products;" and that Viasat already produced the source code for all the accused products using the vendor JWP's DRM library, as well as documents showing the relevant functionality of the JWP DRM library.  [Dkt. 170 at 3].

First, Sandisk has failed to demonstrate how or why definition files for unspecified functions in the produced Viasat source code are relevant.  Sandisk does not identify what issues discovery of these function definition files would help resolve.  Indeed, Sandisk does not even identify which functions lack definition files, much less explain why the definition files are relevant.  Sandisk's infringement contentions for all the asserted claims in both patents in suit do not rely on specifying the definitions of any functions in the Viasat source code. [Dkts. 145-2 and 145-4].  Nor does Sandisk meet its burden to show why discovery of such definition files for unidentified functions is proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  As discussed above, Sandisk has not been impeded in propounding infringement contentions without such discovery, has reviewed Viasat source code for months without such discovery, and does not take the position that is current infringement contentions are deficient without this discovery.

Second, Sandisk has failed to meet its burden to show why prior versions of the Viasat source code would be relevant, nor has Sandisk even attempted to show why such production would be proportional to the needs of the case.  This Court is well aware of the time and burden required to make proprietary source code available for inspection in discovery in patent litigation such as this, and is further aware of the time and effort required to review and analyze that source code (which, as here, typically requires the assistance of technical expert witnesses).  If Sandisk were truly concerned about obtaining prior versions of the Viasat source code, Sandisk's counsel would surely have raised the issue months ago.  The delay alone in raising this issue substantively undercuts any claim that such discovery would be proportional to the needs of the case.

Finally, Sandisk's request for documents and source code to show the "details" of the DRM used in the accused products is facially defective.  As noted, Sandisk's Request for Production No. 87 only sought documents sufficient to show the operation of the DRM system in the accused

1  products, not the "details" of that DRM.  Viasat's production of the DRM libraries and the Viasat

2  source code which access those libraries is alone more than sufficient to show the details of how the

3  DRM works.  The fact that Viasat also produced documents describing the DRM system further

4  undermines Sandisk's request here.  Because the document request at issue does not seek documents

5  on all the details of the Viasat DRM system, Sandisk's motion here seeks documents and material

6  which, by definition, outside the literal scope of Document Request No. 87 and is thus not within

7  the scope of relevant discovery.  Further, as with the other last-minute requests Sandisk made above,

8  Sandisk has not met its burden to show how additional discovery on the unspecified "details" of the

9  DRM system is proportional to the needs of the case.  Again, Sandisk does not link this request to

10  any claim limitations for the patents-in-suit, does not identify how or why Sandisk's current

11  infringement contentions are deficient or defective absent this discovery, and does not explain why

12  Sandisk waited until the last minute to raise this dispute.

**B.**    <u>**DISPUTES REGARDING FINANCIAL DOCUMENTS AND DATA**</u>

14          The second dispute presented here concerns Sandisk's request for Viasat to produce certain

15  financial data which allegedly relates to damages.  Specifically, Sandisk complains that Viasat has

16  "not provided full financial information related to its IFC [In Flight Connectivity] services and has

17  improperly limited its production to financials that are purely related to in-flight entertainment

18  ("IFE") and live in-flight TV ("IPTV")."  [Dkt. 159 at 2].  Sandisk further complains that Viasat's

19  document production with regard to IFE and IPTV are deficient, because Viasat failed to produce

20  certain monthly and quarterly reports.  Sandisk next argues that Viasat failed to produce certain

21  metrics, such as usage data, and finally argues that Viasat has failed to produce a "standard" slide

22  deck allegedly used by Viasat for marketing purposes.

23          With regard to financial data relating to IFC, Viasat argues that merely using the Internet

24  while in-flight is not an accused functionality, and that Viasat has produced usage data on the

25  accused functionality, namely IFE and residential streaming.  [Dkt. 170 at 3].  The Court's review

26  of Sandisk's infringement contentions confirms that mere Internet access (in the absence of

27  streaming content) is not part of an infringement theory in this case.  [Dkts. 154-2 and 154-4].

28  Accordingly, Sandisk has not met its burden to show how or why IFC financial data is within the

United States District Court
Northern District of California

1    scope of relevance (or proportional) for discovery.  The Court **DENIES** Sandisk's motion to compel

2    further IFC financial data.

3         With regard to Sandisk's request that Viasat produce usage metrics, Sandisk has not met its

4    burden to show that such discovery is proportional to the needs of the case (or even that it was not

5    produced in the first instance).  For example, Sandisk argues that Viasat has not produced data on

6    the number of aircraft equipped with the accused products, but Viasat cites by Bates number the

7    documents it produced which do provide that data.  [Dkt. 170 at 3].  Sandisk's request for data on

8    "take rates, quality of the connection, passenger usage, [and] seatback device customers" is not

9    supported with a sufficient showing that such data is important to resolve the damages issues in this

10   case, since Viasat has produced financial data and Sandisk has not explained why this additional

11   data is proportional to the needs of the case.  The Court **DENIES** Sandisk's motion to compel further

12   data on usage metrics.

13        With regard to the specific monthly and quarterly reports sought by Sandisk, Viasat broadly

14   argues that it has already produced IFE data and financial reports, and thus these reports are not

15   shown to be relevant or proportional.  [Dkt. 170 at 3].  Sandisk argues that these reports contain

16   details which are not available in the documents and data already produced.  [Dkt. 159 at 2].

17   According to Sandisk, the monthly reports (which were identified by Viasat witnesses) detail how

18   the fees charged to each airline customer are calculated.  *Id.*  Additionally, the quarterly reports (also

19   identified by Viasat witnesses) discuss the profitability of IFE and IPTV, and other unidentified

20   quarterly financial reports track revenue associated with "key functionalities including hardware

21   sales, IFE, IPTV, and VCDS content delivery for residential and mobility users."  *Id.*

22        The Court finds that Sandisk has demonstrated why these specific monthly and quarterly

23   reports are within the scope of relevant discovery, but as noted, relevance alone does not end the

24   inquiry.  Viasat's primary argument that these reports are not needed because Viasat has produced

25   other data is not specific enough to overcome a showing that some amount of this discovery would

26   be proportional to the needs of the case.  [Dkt. 170 at 3].  Viasat has cited documents by Bates

27   number but not explained how the documents produced show the details identified by Sandisk (such

28   as how fees are charged, for example).  *Id.*  Further, the Court notes that since Viasat witnesses have

United States District Court
Northern District of California

1    apparently testified as to the existence of these monthly and the quarterly reports on profitably, there

2    should be relatively low levels of burden to find these reports. Sandisk's brief does not allege that

3    Viasat witnesses testified about the "other quarterly financial reports" sought, however, and thus the

4    burden to find and produce these reports is not diminished. Further, while some amount of discovery

5    would be proportional, the Court is mindful of the fact discovery cutoff deadline and the fact that

6    again Sandisk raised these issues at the last minute.

7        Accordingly, and balancing the issues of both relevance and proportionality here, the Court

8    **FINDS** that a limited amount of targeted discovery would be both relevant and proportional with

9    regard to these monthly and quarterly reports. Sandisk argues that these documents relate to

10   damages. The Complaint (filed July 28, 2022) avers that Viasat first had notice of the patents-in-

11   suit no later than the date of the Complaint and does not allege specific actual notice prior to the

12   filing of this lawsuit. [Dkt. 1]. The Complaint does not appear to aver a theory of constructive

13   notice and has no averments as to marking. *Id.* Patent damages are recoverable for the period of

14   actual notice, if the patentee is not relying on patent marking and constructive notice. 35 U.S.C.

15   § 287(a). Accordingly, the Court finds that the temporal scope of discovery regarding these

16   financial documents is from July 28, 2022 (the date of the Complaint) until February 7, 2025 (the

17   date of this motion).

18        The Court **ORDERS** Viasat to produce promptly the following:

19        One copy of each of the Viasat's monthly reports (which Viasat witnesses testified about)

20   which detail how the fees charged to each airline customers are calculated, from July 2022 to

21   February 2025 (to the extent monthly reports exist for each such month during this period); and

22        One copy of the Viasat's quarterly reports on the profitability of IFE and IPTV (again which

23   Viasat witnesses testified about), from the third quarter of 2022 until the first quarter of 2025 (to the

24   extent such quarterly reports exist for each such quarter).

25        The Court **DENIES** Sandisk's request for production of the "other quarterly financial

26   reports" as not proportional to the needs of the case because they are insufficiently identified, no

27   Viasat witness is identified as having testified about them, and they were apparently requested at

28   the last minute.

United States District Court
Northern District of California

1    With regard to Sandisk's motion requesting production of the so-called "template" or

2    "standard" slide deck, Viasat has represented that it already produced that slide deck.  [Dkt. 170 at

3    3].  Accordingly, the Court **DENIES** Sandisk's motion for production of this slide deck as moot.

4    Sandisk finally seeks production of unspecified data on "advertising revenue attributable to

5    the Accused Products."  [Dkt. 159 at 2–3].  Viasat responds that it has produced financial

6    information for ad revenues.  [Dkt. 170 at 3].  Because Sandisk's one-sentence request for this

7    information is not tied to any specific document request, the potential breadth of what Sandisk seeks

8    renders the request non-proportional to the needs of the case.  The fact that one Viasat fact witness

9    may have testified that some undefined data "provided to date" is insufficient to identify advertising

10   revenue attributable to the Accused Products is unavailing.  [Dkt. 159 at 3].  Sandisk has not

11   identified who this witness is, why their opinion on this matter is determinative, what data was

12   shown to the witness at deposition, and how or why Sandisk's damages contentions are so impeded

13   that Sandisk should be entitled to an unbounded amount of additional "information" on advertising

14   revenue.  *Id.* at 2–3.  Accordingly, the Court **DENIES** Sandisk's request to compel the production

15   of further data on advertising revenue attributable to the Accused Products.

16   **C.    DISPUTE REGARDING 30(b)(6) DEPOSITIONS**

17   The final dispute concerns Sandisk's request to compel Viasat to make available another

18   witness under Rule 30(b)(6) to testify at deposition concerning approximately 18 topics for which

19   Sandisk alleges the previous 30(b)(6) designees were inadequately prepared to testify.  [Dkt. 159 at

20   3 (listing topics 58–60, 64, 75, 55, 57, 64, 70–72, 74–75, 86, and 91–94 as those for which Viasat

21   witnesses were inadequately prepared)].  Sandisk also complains that Viasat has refused to produce

22   witnesses in response to 27 other unidentified 30(b)(6) topics.  *Id.*

23   Viasat responds that it did provide witnesses to testify at length on seventy seven corporate

24   topics.  [Dkt. 170 at 4].  Viasat argues that Sandisk has failed to show what the other 27 topics are,

25   much less why they are relevant or proportional.  *Id.*

26   In the Status Report after the Parties' last, failed meet and confer, Sandisk reports that Viasat

27   proposed a compromise under which each side would provide a 30(b)(6) witness on two topics for

28   which that side had not previously designated a witness.  [Dkt. 179 at 2].  Sandisk reports that

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Sandisk's counter offer was that Viasat alone produce a 30(b)(6) witness on four such topics.  *Id.*

2         The Court is disappointed that the Parties here were incapable of resolving this dispute, in

3    particular out of all the disputes discussed in this Order, through the meet and confer process.  Here,

4    one side proposed a compromise under which each side would provide a witness on two 30(b)(6)

5    topics which were previously undesignated; the other side counter-proposed that the opposing side

6    only provide a witness for four 30(b)(6) topics.  *Id.*  One of the reasons the Court's Order directing

7    that lead trial counsel conduct the meet and confer (and as required by this Court's Standing

8    Discovery Order), dkt. 175, is because this Court is well aware that experienced trial lawyers know

9    that they are expected to (and know how to) compromise on disputes over picking numbers (like

10   picking numbers of 30(b)(6) topics).  Here, one side offered two 30(b)(6) topics, the other side

11   countered with four topics.  The obvious compromise here is apparent.  The fact that the attorneys

12   from the law firms involved in this case were ineffectual in reaching such an obvious deal does not

13   put any of them in a good light.  The fact that the senior lead trial attorneys from each side were

14   incapable of reaching negotiated resolution of such a straightforward issue is even further

15   disappointing and calls into question how involved they actually were in the ordered meet and

16   confer, how much effort both sides put in, how long the meet and confer lasted, and how much time

17   was spent by the lead trial counsel speaking directly with each other.  Smart lawyers should know

18   better than to spend Party resources, the Court's resources, and the time required for the instant

19   discovery letter briefs on this 30(b)(6) issue, rather than work out a compromise.

20        Since counsel for the Parties were not able to work out a compromise, the Court resolves

21   this dispute as follows.  First, Sandisk has not met its burden to demonstrate how and in response to

22   what questions the Viasat 30(b)(6) witnesses were allegedly "inadequately prepared" to testify.  Nor

23   has Sandisk provided enough information for the Court to determine whether Viasat's refusal to

24   designate 30(b)(6) witnesses on the other 27 topics is justified or not.  For example, if the objected-

25   to 30(b)(6) topics are so-called contention depositions, then perhaps Viasat's objections may have

26   some basis depending on the specific details.  *See, e.g.*, *In re Social Media Adolescent*

27   *Addition/Personal Injury Prods. Liab. Litig.*, 2025 WL 470482 at *2 (N.D. Cal. Feb. 12, 2025).

28   However, Viasat has not justified its refusal to designate witnesses on these 27 topics, and simply

United States District Court
Northern District of California

argues that it has already provided witnesses on 77 other topics without explaining whether, how, or why the 27 disputed topics would be outside the scope of relevant discovery or in any specific way duplicative. Indeed, the Court infers that the 27 disputed topics are not cumulative or duplicative, because otherwise the previously designated 30(b)(6) witnesses would likely have been designated on overlapping topics, if any existed. Nor has Viasat contended that any of Sandisk's 30(b)(6) witnesses were inadequately prepared, although there appears to have been topics for which Sandisk also refused to produce a 30(b)(6) witness (because Viasat references topics both sides did not designate witnesses for, and Sandisk only refers to producing witnesses for "agreed upon" 30(b)(6) topics which implies there were disagreed topics as well for Sandisk's designations).

Based on the submissions of the Parties, it appears that some amount of additional 30(b)(6) deposition testimony is not entirely objectionable here. Because it appears that each side refused to produce 30(b)(6) witnesses in response to certain topics, the Court **ORDERS** each side to prepare, designate, and produce a 30(b)(6) witness to testify on **THREE** topics (of that party's choice) in the other side's 30(b)(6) deposition notice for which the producing party previously refused to produce a 30(b)(6) witness previously during discovery. A producing party may designate more than one person if needed to have a 30(b)(6) witness cover different topics.

The Court **ORDERS** the Parties to promptly meet and confer to schedule these depositions, to be completed by March 31, 2025, unless agreed upon or ordered otherwise.

The Court notes that the fact discovery cutoff has passed, and the District Judge has denied Sandisk's request to extend the case deadlines including the fact discovery deadline. Because the Parties were apparently in agreement with the concept of taking some amount of cleanup discovery here despite the cutoff, the Court **ORDERS** that the total time spent on the record during the period of examination by the Party noticing the deposition **SHALL** be no longer than three hours total, divided however that examining Party chooses among the three 30(b)(6) topics. If the defending attorney conducts any redirect examination of their own 30(b)(6) witness, the examining attorney **SHALL** be entitled to additional re-cross examination to last no longer than half the amount of time spent during the redirect examination by the defending attorney.

The Parties are free to reach agreement to forego these depositions, alter the number of

deposition topics, and alter the time limits for these depositions, by Stipulation and [Proposed] Order submitted to the Court, but **SHALL NOT** extend the March 31 deadline to complete the depositions. No extensions of that deadline will be granted.

## CONCLUSION

As discussed above, under applicable legal standards, the Court has broad discretion to manage discovery, including scheduling and timing issues.  In the full exercise of the Court's discretion, the Court accordingly **ORDERS** as follows:

1) The motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

2) With regard to the disputes on source code issues, consistent with the discussion herein, the Court **DENIES** Sandisk's motion to compel the production of VCDS ground server source code; source code files which provide definitions for functions in the produced Viasat source code; prior versions of the Viasat source code already produced; and, with regard to Document Request No. 87, further documents and source code showing the details of the Digital Rights Management system used by the Accused Products.

3) With regard to the disputes on financial documents, consistent with the discussion herein, the Court **DENIES** Sandisk's motion to compel the production of further IFC financial data; **DENIES** Sandisk's motion to compel the production of further data on usage metrics; **ORDERS** Viasat to produce promptly (and by no later than March 28, 2025) the monthly reports and the specified quarterly reports as discussed herein; **DENIES** Sandisk's motion to compel the production of the "other quarterly financial reports" as discussed herein; **DENIES** Sandisk's motion for production of the "standard" template slide deck (discussed herein) as moot; and **DENIES** Sandisk's motion to compel the production of further data on advertising revenue attributable to the Accused Products

4) The Court **GRANTS-IN-PART** and **DENIES-IN-PART** Sandisk's motion to compel a further 30(b)(6) deposition on multiple topics.  The Court **ORDERS** the Parties to meet and confer without delay to schedule and then take the limited, additional 30(b)(6) depositions of each side as ordered herein by March 31, 2025 (or submit a Stipulation indicating that the Parties have agreed to forego these depositions).

United States District Court
Northern District of California

5)  Because of the Court's questions regarding the failure of the meet and confer process here with regard to the 30(b)(6) deposition dispute, the Court further **ORDERS** each of the lead trial counsel for the Parties who were involved in the meet and confer held in response to the Court's Order of February 19, 2025, dkt. 175, as follows:  (a) each such lead trial counsel who participated in the meet and confers here **SHALL** personally deliver a copy of this Order to the General Counsel and the in-house litigation attorney(s) supervising this litigation for their respective clients by email by March 21, 2025, and (b) by March 24, 2025, each such lead trial counsel **SHALL** file a declaration under oath explaining how long the meet and confer lasted; what percentage of time during the meet and confer they spoke for their side (as compared to the percentage of time spent by other attorneys on their side); whether they spoke directly to opposing lead counsel during the meet and confer and, if so, for what length of time; whether, at the time this Court's Standing Discovery Order became applicable to this case, they read this Court's Standing Discovery Order (and in particular Section H); and confirming whether they have delivered a copy of this Order to their respective clients per (a) above.

6)  While the fact discovery period has now passed, the Court hereby provides **NOTICE** to counsel and the Parties regarding consequences for demonstrated failures to reasonably and professionally negotiate disputes regarding any further expert discovery that experienced counsel are normally expected to resolve without the need for Court intervention.  For example, the Court will consider imposing additional meet and confer procedures for future discovery disputes, including but not limited to requiring any counsel directly involved in any of the meet and confers to meet and confer in person; requiring in-person meet and confers by lead trial counsel with no other attorneys present regardless of lead counsels' geographic proximity; requiring meet and confers to take place in-person at the San Francisco courthouse or other location; requiring in-house counsel, a Party, or Party representatives (including officers and/or directors) to attend all meet and confers; and/or any other procedures the Court deems appropriate in the circumstances.

7)  While the Court references Sandisk's infringement contentions herein, the Court recognizes that those contentions were filed under seal and are designated under the Protective Order.  The Court drafted this Order in a way intended deliberately to avoid discussing or quoting the details of those contentions and thus any confidential information.  For that reason, this Order is not filed under seal.  To the extent the Parties agree that any portions of this Order are confidential under the Protective Order, the Parties are **DIRECTED** to meet and confer and submit stipulation or joint motion with a proposed redacted version of this Order promptly.

This **RESOLVES** Dkts. 159, 162, 170, and 179.

**IT IS SO ORDERED.**

Dated:  March 14, 2025

_____

PETER H. KANG
United States Magistrate Judge