# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VIASAT, INC.,<br><br>Defendant. | Case No. 4:22-cv-04376-HSG |

# EXPERT REPORT OF LAUREN R. KINDLER

**MARCH 24, 2025**

**TABLE OF CONTENTS**

I. INTRODUCTION AND ASSIGNMENT ....... 1

II. QUALIFICATIONS AND EXPERIENCE ....... 2

III. INFORMATION REVIEWED AND CONSIDERED ....... 3

IV. SUMMARY OF OPINIONS ....... 3

V. OVERVIEW OF PARTIES ....... 7

A. Sandisk ....... 7

B. Viasat ....... 10

VI. OVERVIEW OF SATELLITE SERVICES ....... 16

A. Residential Satellite Services ....... 17

B. In-Flight Satellite Services: IFC and IFE ....... 19

1. IFC ....... 20
2. IFE ....... 25

C. Satellite Capacity ....... 32

VII. THE PATENTS-IN-SUIT, ACCUSED SYSTEMS, AND INFRINGING USE CASES ....... 37

A. Patents-in-Suit ....... 37

1. '667 Patent ....... 38
2. '400 Patent ....... 41

B. Overview of Accused Systems ....... 42

C. Overview of Infringing Use Cases ....... 54

VIII. Viasat's Revenues and Costs Associated with Satellite Services ....... 59

A. Residential Services Revenues ....... 59

B. In-Flight Services Revenues ....... 62

C. Costs to Provide Satellite Services ....... 74

IX. PATENT INFRINGEMENT ROYALTY DAMAGES ....... 81

A. No Less Than a Reasonable Royalty ....... 81

B. Hypothetical Negotiation Framework and the *Georgia-Pacific* Factors ....... 81

C. Royalty Payment Structure ....... 83

D. Hypothetical Negotiation Dates and Parties ....... 83

E. Royalty Rate: The *Georgia-Pacific* Analysis ....... 84

Factor 1: The royalties received by the patentee for the licensing of the patents in suit ....... 85

Factor 2: The royalty rates paid by the licensee for the use of other patents comparable to the patents in suit. .......... 86
Factor 3: The nature and scope of the licenses (e.g., exclusive vs. non-exclusive or restricted vs. non-restricted). .......... 86
Factor 4: The licensor's established policy regarding the licensing (or non-licensing) of its patents. .......... 87
Factor 5: The commercial relationship between the licensor and licensee. .......... 87
Factor 6: The extent of derivative or convoyed (i.e., ancillary) sales. .......... 88
Factor 7: The duration of the patent and the term of the license. .......... 94
Factor 8: The established profitability of the patented product and its commercial success. .......... 94
Factor 9: The utility and advantages of the patented product over other modes or devices. .......... 100
Factor 10: The nature of the patented invention and the benefits to those who have used the invention. .......... 100
Factor 11: The extent to which the infringer has made use of the invention and evidence of the value of that use. .......... 116
Factor 12: The portion of the profit or selling price of the invention that may be customary to allow for the use of the invention or analogous inventions. .......... 127
Factor 13: The portion of the realizable profit credited to the invention as distinguished from non-patented elements. .......... 147
Factor 14: The opinion of qualified experts. .......... 169
Factor 15: The amount a willing licensor (such as the patentee) and a willing licensee (such as the alleged infringer) would have agreed upon at the time of the infringement if both had reasonably and voluntarily attempted to reach an agreement. .......... 170

F. Outcome of the Hypothetical Negotiations .......... 170
1. '667 Patent Value Indicators .......... 173
2. '400 Patent Value Indicator .......... 175
3. Outcome of the Hypothetical Negotiations .......... 176

W-IFE and broader in-flight services (i.e., a total margin across IFC, IFE, and associated support, combined), respectively.

e. At the hypothetical negotiations, Western Digital and Viasat would have recognized that, in addition to the revenues and profits that Viasat would have made through its use of the Patents-in-Suit, Viasat would generate additional revenues and profits through at least the placement of advertisements, sales of Viasat's Media Hub product, and additional sales from expanding its customer base (e.g., disconnected airlines).

f. At the hypothetical negotiations, the parties would recognize the demand for and the importance of the Infringing Use Cases to Viasat's customers and its business and that the accused W-IFE and IPTV services would serve as an entry point into airlines for Viasat's broader product offerings.

g. I understand from Dr. Easttom that there are no commercially available alternatives to the inventions of the Patents-in-Suit that would be non-infringing, acceptable, and cost-effective to implement. On the contrary, I understand that it is Viasat's position that it could modify its systems and software to remove the infringing functionalities in a manner that is "commercially acceptable" to customers.[7] However, based on a discussion with Dr. Easttom, I understand that none of the alternatives proposed by Viasat would be considered commercially acceptable alternatives to the use of the Patents-in-Suit.

12. Based on my assessment of the evidence available in this matter and input from Sandisk's technical expert (Dr. Easttom), I have determined that Western Digital and Viasat would have agreed to the following royalty rates at the respective hypothetical negotiations.

a. '667 Patent – IPTV. The parties would agree to a royalty rate no less than [REDACTED]. In the alternative, based on Viasat's cost savings from using the '667 Patent, the parties would agree to royalty rates in the range of [REDACTED]

b. '667 Patent – W-IFE. The parties would agree to a royalty rate of [REDACTED]

c. '400 Patent – IPTV and W-IFE. The parties would agree to a royalty rate of [REDACTED].

[7] Viasat, Inc.'s Fourth Supplemental Objections & Responses to Plaintiffs' Second Set of Interrogatories (Nos. 9-15), February 7, 2025, pp. 14 – 20.

13. Applying the aforementioned reasonable royalty rates to the relevant royalty bases yields reasonable royalty damages as follows and summarized in **Table 2** below.[8]

a. <u>’667 Patent – IPTV</u>. Based on apportioned revenue, royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of IPTV total approximately [redacted]. Alternatively, based on cost savings, royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of IPTV [redacted].[9]

b. <u>’667 Patent – W-IFE</u>. Royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of W-IFE total approximately [redacted].[10]

c. <u>’400 Patent – IPTV</u>. Royalty damages associated with Viasat’s use of the ’400 Patent in the provisioning of IPTV total approximately [redacted].[11]

d. <u>’400 Patent – W-IFE</u>. Royalty damages associated with Viasat’s use of the ’400 Patent in the provisioning of W-IFE total approximately [redacted].[12]

---

[8] These reasonable royalty damages (based on a running royalty) would compensate Plaintiffs for Viasat’s infringement through the start of trial and do not include any future damages beyond November 2025.

[9] In the event the damages are limited to begin only after the complaint filing, [redacted] (**Exhibit 10.3** and **Exhibit 11.1**.) The royalty rate calculation is described above beneath **Table** 20. (**Exhibit 11.1**.)

[10] **Exhibit 10.8**.

[11] In the event damages are limited to begin only after the complaint filing, there would be 141,841,193 IPTV sessions. Applying [redacted] to these sessions result in damages of approximately [redacted]. (*See* **Exhibit 11.1**.) In the event damages are limited to W-IFE and IPTV sessions via PEDs, [redacted] In the event damages are limited IPTV sessions via PEDs *and* begin only after the complaint filing, damages would be approximately [redacted] (*See* **Exhibit 11.2**.)

[12] In the event damages are limited to begin only after the complaint filing, there would be [redacted] (*See* **Exhibit 11.1**.) In the event damages are limited to W-IFE sessions via PEDs, [redacted] In the event damages are limited to W-IFE sessions via PEDs *and* begin only after the complaint filing, damages would be approximately [redacted] (*See* **Exhibit 11.2**.)

**Table 2**



14. The details of my opinions are contained in the remainder of this narrative to my report and the associated exhibits.

## V. OVERVIEW OF PARTIES

### A. Sandisk

15. The Plaintiffs in this matter – Sandisk Technologies, Inc., SanDisk Technologies LLC, SanDisk 3D IP Holdings Ltd., and SanDisk Storage Malaysia Sdn. Bhd. – are subsidiaries of Sandisk Corporation (previously "SanDisk Corporation" as discussed below).[16]

16. SanDisk Corporation was founded in June 1988 as a global leader in flash storage solutions with products covering "a broad range of solid state drives, or SSDs, embedded products, removable cards, universal serial bus, or USB, drives, wireless media drives, digital media players,

[13] **Exhibits 10.2, 10.3, 10.8,** and **11.1**.

[14] As discussed in *Georgia-Pacific* Factor 12,

[15] Damages for the '667 Patent and '400 Patent are not duplicative in whole or in part. Therefore, the total damages owed to Sandisk would be the sum of the damages associated with Viasat's infringement of the '667 Patent and the damages associated with Viasat's infringement of the '400 Patent.

[16] Sandisk Corporation SEC Form 10, November 25, 2024, Exhibit 21.1. *See also,* Western Digital Corporation Legal Entity Structure, September 4, 2024. (WD-Viasat-NCDA00011497 – 498, at 497 – 498.)

IPTV User Interface ("UI").[307] As shown in **Figure 20** below,



**Figure 20**



78.

[311] For example,

[307] (VIASAT_00014633 – 831, at 794.))

[308] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 689.)

[309] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 689.)

[310] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 697.)

[311] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 719 – 724.)



[312] (*See* **Figure 21**.) In addition, [313] (*See* **Figure 22**.)

**Figure 21**



[312] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 725.)

[313] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 720 – 722.)

[314] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 725.)





**Figure 22**

[redacted]

79. In addition, I understand that Viasat sells aircraft equipment, including “[redacted]”[317] Viasat has not produced this agreement regarding American Airlines’ hardware purchases. However, other airline agreements include Viasat’s pricing for aircraft equipment. For example, under Southwest’s agreement, Viasat agreed

---

[315] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 722.)

[316] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 676.) (Bracketed text added for clarification.)

[317] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 637 and 676.)

176. With this information, Viasat's bandwidth savings from use of the '667 Patent can be estimated as shown in **Table 14**.[712] As shown below, of the total bytes distributed to passengers, more than 95% represent bandwidth savings due to Viasat's use of the '667 Patent (i.e., the caching functionality).

**Table 14**

[redacted]

*(i) Revenue Apportionment*

177. The portion of Viasat's IPTV revenue that can reasonably be attributed to the '667 Patent can be determined using the results of the analysis above and other economic inputs detailed below.

[712] These bandwidth savings reflect the savings for only domestic IPTV services, as these savings are calculated using the bytes sent OTA and served for Viasat's domestic IPTV product (per the weekly status updates). Viasat's weekly status updates provide data on bytes transmitted for a "domestic" IPTV product and "international" IPTV product. However, I only include the "domestic" bytes transmitted in my analysis. (*See*, *e.g.*, VCDS Home. (VIASAT_00008738 – 9831, at 9693 – 9694.) *See also*, **Exhibit 10.5**.) Furthermore, I observe in Viasat's internal documents and airline agreements that [redacted] (*See*, *e.g.*, Entertainment Product Management, Commercial Aviation, Exported, January 17, 2023. (VIASAT_00015430 – 676, at 479 – 481.) *See also*, American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 799.))

[713] **Exhibit 10.1**. Figures may not tie due to rounding.

178. First, as outlined in **Section VIII.B**, [redacted]"[715]

179. Under the American Airlines service agreement, [redacted][716] (*See* **Figure 39**.)

---

[714] Viasat / Condor Discussion, July 6, 2022. (VIASAT_00073879 – 939, at 927.) (Bracketed text added for clarification.)

[715] Viasat / Condor Discussion, July 6, 2022. (VIASAT_00073879 – 939, at 927.)

[716] [redacted] *See* American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 697 – 698 and 720 – 722.) I observe similar SLC arrangements in the service agreements between Viasat and other airlines. For example, [redacted] (VIASAT_00015862 – 6050, at 5983.))

**Figure 39**



180. This [redacted] provides a relevant proxy for the value assigned to ensuring reliable content delivery for American Airlines passengers. Whereas the total IPTV Fee may reflect the value of various components required for providing the service, such as Viasat's satellite and ground station infrastructure, content access, and efficient stream delivery, the fact that [redacted] provides an indication of the relative contribution of efficient delivery to Viasat's total IPTV revenue. This figure represents a lower bound for the value attributable to efficient content delivery, at least because (a) it is unlikely that customers would contract with Viasat for IPTV services if the service was unreliable and (b) [redacted]

[717] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 722.)

[redacted].[718]

181. Based on a discussion with Dr. Easttom, I understand that Viasat could not have delivered the same availability and quality of IPTV service to its customer base (e.g., airlines) had it not used the '667 Patent and instead was required to serve a separate stream to each requesting passenger.[719] Specifically, I understand that without its alleged use of the '667 Patent, [redacted][720] However, I also understand that multi-casting, which is not an Accused Functionality, contributes to efficient content delivery. Thus, as a next step, the contributions of the '667 Patent to IPTV delivery must be isolated. As described above, 95.7% to 97.3% (based on IPTV take rates of 25% and 40%, respectively) of the total data distributed to passengers can be attributed to the benefits enabled by the '667 Patent. That is, 95.7% to 97.3% of the satellite bandwidth savings (i.e., data that Viasat is able to distribute to passengers without additional data transmission over satellite) is attributable to the '667 Patent as opposed to multicasting. Thus, a conservatively low estimate of the percentage of IPTV revenue attributable to the '667 Patent can be obtained by multiplying [redacted] (reflecting an apportionment to efficient content delivery) by a further apportionment (to take into account Viasat's contributions, including the benefits attributable to multicasting) of 95% yielding a fully apportioned value of [redacted]. (*See* **Exhibit 10.2**.)

---

[718] Specifically, [redacted] (*See* American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 723.))

[719] Easttom Report, § V.C. Based on discussion with Dr. Easttom (Sandisk's technical expert).

[720] Easttom Report, § V.C. Based on discussion with Dr. Easttom (Sandisk's technical expert).

182. Because this revenue apportionment uses as a starting point [redacted] that Viasat would have otherwise been required to pay in the absence of its use of the '667 Patent, this portion of revenues directly translates to profits for Viasat. In other words, without the use of the '667 Patent, Viasat still would have needed to incur all of the same operational costs even to earn the [redacted] of IPTV revenues excluded from my calculation (i.e., even to serve the small amount of IPTV data it could provide without the use of the '667 Patent).

*(ii) Bandwidth Cost Savings*

183. I understand the Viasat incurs a cost associated with each byte of data it sends OTA.[721] Thus, as an alternative to apportioning the revenue Viasat receives that is attributable the '667 Patent, the value of the benefits of the '667 Patent can also be analyzed by evaluating the cost savings associated with allowing for smaller amounts of data to be sent OTA. Under this approach, the parties at the hypothetical negotiation would look to quantify the costs that Viasat avoided incurring associated with sending the additional data that it would have otherwise had to send OTA but for its infringement of the '667 Patent.

184. As shown above in **Table 14**, I have estimated that Viasat sent [redacted] TBs of data OTA for IPTV.[722] However, without the benefits of the '667 Patent, as shown in **Exhibit 10.1**, assuming a 25% IPTV take rate, I estimated that Viasat would have been required to send [redacted] TBs (or [redacted] TBs using a 40% take rate). The parties to the hypothetical negotiation for the '667 Patent would recognize that Viasat would experience significant bandwidth savings from its use of the '667 Patent. As described above (and summarized in **Exhibit 10.1**), assuming a 25%

[721] Based on discussion with Dr. Easttom (Sandisk's technical expert).

[722] **Exhibit 10.5**.

*1. ’667 Patent Value Indicators*

213. At the October 2019 hypothetical negotiation for the ’667 Patent, the parties would recognize that Viasat’s use of the ’667 Patent provided significant benefits, as quantified below for the different Infringing Use Cases.

a. IPTV. As discussed above in *Georgia-Pacific* Factors 9 and 10, one benefit from Viasat’s use of the ’667 Patent is significant satellite bandwidth savings related to customer use of the accused IPTV use case. As discussed in *Georgia-Pacific* Factor 13, over the October 2019 through November 2025 time period, of the total bytes distributed to passengers, more than 95% represent bandwidth savings due to Viasat’s use of the ’667 Patent.

i. Revenue Apportionment. The parties at the hypothetical negotiation would consider estimates of the portion of Viasat’s IPTV revenue attributable to the use of the ’667 Patent, based on its role in ensuring reliable and efficient content delivery. Specifically, the parties would consider that under Viasat’s agreement with American Airlines, [REDACTED], highlighting the value of the delivery of the content. The parties would recognize that absent the ’667 Patent, [REDACTED] As described above, over 95% of the total data shared with passengers can be attributed to the benefits enabled by the ’667 Patent. Thus, a conservatively low estimate of the percentage of IPTV revenue attributable to the ’667 Patent can be obtained by multiplying [REDACTED] by a further apportionment (to take into account Viasat’s contributions, including the benefits attributable to multicasting) of 95% yielding a fully apportioned value of [REDACTED] in revenue attributable to the ’667 Patent.[763]

ii. Bandwidth Cost Savings. I understand that Viasat incurs a cost associated with each byte of data it sends over a satellite network. Thus, as an alternative to apportioning the revenue Viasat receives that is attributable the ’667 Patent, the value of the benefits of the ’667 Patent can also be analyzed by evaluating the cost savings associated with allowing for smaller amounts of data to be sent over a satellite network. Based on the documentary evidence available, I have estimated the bandwidth costs to Viasat associated with sending an additional gigabyte over a satellite

---

[763] As discussed earlier in my report, because this revenue apportionment uses as a starting point [REDACTED] this portion of revenues directly translates to profits for Viasat.

IPTV. In the absence of a license to the ’667 Patent, Viasat’s IPTV offering (which was and is demanded by airlines and passengers) may not have been viable.

e. The absence of acceptable, non-infringing alternatives to the Patents-in-Suit.

217. In light of the above and considerations discussed throughout my report, at the time of the hypothetical negotiations, Western Digital held a relatively stronger bargaining position compared to Viasat and reasonably would have been able to negotiate a profit-sharing arrangement of at least 50% of the incremental gains to be obtained by granting Viasat licenses to the Patents-in-Suit. I conservatively conclude the parties would agree to a 50-50 sharing of the benefits for both the ’667 Patent and ’400 Patent.

218. Applying a 50-50 sharing of the benefits results in the following indicators of value for the ’667 Patent presented in **Table 20**.



**Table 20**

[redacted]

219. Under the cost savings approach, it would be reasonable for the parties to agree to a royalty based on the number of IPTV sessions, which is a metric I understand Viasat tracks in the normal course of business. Based on the estimated number of IPTV sessions during the October 15, 2019 – November 30, 2025 period of [redacted],[768] the implied per session royalty ranges from [redacted][769]

[767] **Exhibit 10**. Throughout **Exhibit 10**, at the request of counsel, I consider various combination of scenarios in which I (a) limit the damages recovery period to begin in August 2022 (i.e., following the date the initial complaint was filed) and (b) limit the damages to only U.S. customers.

[768] Calculation: [redacted]

[769] Calculations: [redacted]

220. Given the previously discussed qualitative and quantitative considerations, my assessment of the *Georgia-Pacific* factors, and business and economic considerations discussed throughout my report, Western Digital and Viasat would have agreed to a running royalty with reasonable royalty rates, as follows.

a. ’667 Patent – IPTV. The parties would agree to a royalty rate no less than [REDACTED] of total IPTV revenue. In the alternative, based on Viasat’s cost savings from using the ’667 Patent, the parties would agree to royalty rates in the range of [REDACTED] per IPTV session.

b. ’667 Patent – W-IFE. The parties would agree to a royalty rate of [REDACTED] of total W-IFE revenues.

c. ’400 Patent – IPTV. The parties would agree to a royalty rate of [REDACTED] per session.

221. Applying the aforementioned reasonable royalty rates to the relevant royalty bases yields reasonable royalty damages as follows.[770] (*See* **Table 21**.)

a. ’667 Patent – IPTV. Based on apportioned revenue, royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of IPTV total [REDACTED]. Alternatively, based on cost savings, royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of IPTV range from [REDACTED][771]

b. ’667 Patent – W-IFE. Royalty damages associated with Viasat’s use of the ’667 Patent in the provisioning of W-IFE total [REDACTED][772]

[770] These reasonable royalty damages (based on a running royalty) would compensate Plaintiffs for Viasat’s infringement through the start of trial and do not include any future damages beyond November 2025.

[771] In the event the damages are limited to begin only after the complaint filing, there would be 141,841,193 IPTV sessions. Applying a royalty rate of [REDACTED] results in damages [REDACTED] (**Exhibit 10.3** and **Exhibit 11.1**.) The royalty rate calculation is described above beneath **Table 20**. (**Exhibit 11.1**.)

[772] **Exhibit 10.8**.

c. ’400 Patent – IPTV. Royalty damages associated with Viasat’s use of the ’400 Patent in the provisioning of IPTV total approximately [redacted][773]

d. ’400 Patent – W-IFE. Royalty damages associated with Viasat’s use of the ’400 Patent in the provisioning of W-IFE total approximately [redacted][774]

**Table 21**

[redacted]

---

[773] In the event damages are limited to begin only after the complaint filing, there would be [redacted] Applying a royalty rate of [redacted] (*See* **Exhibit 11.1**.) In the event damages are limited to W-IFE and IPTV sessions via PEDs, the total IPTV sessions excluding seatback display sessions are estimated to be [redacted] Applying a royalty rate of [redacted] In the event damages are limited IPTV sessions via PEDs *and* begin only after the complaint filing, damages would be approximately [redacted] (*See* **Exhibit 11.2**.)

[774] In the event damages are limited to begin only after the complaint filing, there would be [redacted] (*See* **Exhibit 11.1**.) In the event damages are limited to W-IFE sessions via PEDs, the total W-IFE sessions excluding seatback display sessions are estimated to be [redacted] Applying a royalty rate of [redacted] In the event damages are limited to W-IFE sessions via PEDs *and* begin only after the complaint filing, damages would be approximately [redacted] (*See* **Exhibit 11.2**.)

[775] **Exhibits 10.2, 10.3, 10.8,** and **11.1**.

[776] As discussed in *Georgia-Pacific* Factor 12, it is reasonable to conclude that Sandisk and Viasat would have considered the [redacted]

[777] Damages for the ’667 Patent and ’400 Patent are not duplicative in whole or in part. Therefore, the total damages owed to Sandisk would be the sum of the damages associated with Viasat’s infringement of the ’667 Patent and the damages associated with Viasat’s infringement of the ’400 Patent.

**Exhibit 10.2**
**Summary of IPTV Reasonable Royalty Damages Attributable to the '667 Patent**
**October 15, 2019 – November 30, 2025**

| | | |
|---|---|---|
| Bandwidth Savings Attributable to '667 Patent (as percentage) | [A] | 95.0% |
| Portion of Revenue Attributable to Content Delivery[(a)] | [B] | [redacted] |
| Percentage of Revenue Attributable to '667 Patent | [C] = [A] x [B] | 28.5% |
| *Sharing with Sandisk* [(b)] | *[D]* | *50%* |
| **Implied Royalty Rate** | **[E] = [C] x [D]** | [redacted] |
| IPTV Revenue for All Customers (Oct. 15, 2019 through Nov. 30, 2025) | [F] | [redacted] |
| **Reasonable Royalty Damages** | **[G] = [E] x [F]** | [redacted] |
| IPTV Revenue for All Customers (August 2022 through November 2025) | [H] | [redacted] |
| **Reasonable Royalty Damages** | **[I] = [E] x [H]** | [redacted] |
| IPTV Revenue for U.S.-based Customers (Oct. 15, 2019 through Nov. 30, 2025) | [J] | [redacted] |
| **Reasonable Royalty Damages** | **[K] = [E] x [J]** | [redacted] |
| IPTV Revenue for U.S.-based Customers (August 2022 through November 2025) | [L] | [redacted] |
| **Reasonable Royalty Damages** | **[M] = [E] x [L]** | [redacted] |

Notes:
(a) I understand that [redacted]

(b) As discussed in **Section IX.F** of my report, I conservatively assume the parties would agree to a 50-50 sharing of the benefits at the time of the hypothetical negotiations.

Sources:
[1] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 722.)
[2] ***Georgia-Pacific*** **Factor 13**.
[3] **Section IX.F**.
[4] **Exhibit 10.1**.
[5] **Exhibit 10.6**.