# EXHIBIT 1

# EXPERT REBUTTAL REPORT
## OF
## GARETH MACARTNEY, PH.D.

**In the matter of**

*Sandisk Technologies, Inc. et al. v.*
*Viasat, Inc.,*
**USDC, Northern District of California, Case No. 4:22-cv-4376**



**April 14, 2025**

royalty rate of ▇▇▇▇ for the alleged use of the '667 patent in connection with IPTV, a royalty rate of ▇▇▇ for the alleged use of the '667 patent in connection with W-IFE, and a royalty rate of $0.03 per session for the '400 patent.[4] For the Patents-in-Suit based on these royalties Ms. Kindler claims a total of $20.56 million of damages for alleged infringement of the '667 patent and $10.4 million for alleged infringement of the '400 patent.[5] As an alternative, Ms. Kindler also calculates a royalty based on alleged cost savings for IPTV from the '667 patent of $0.15-$0.48 per session, depending on the take rate she applies and the assumption she makes on the cost per gigabyte of bandwidth that she contends Viasat would have to pay to third parties absent those supposed savings.[6] This results in a range of $55.1 and $89.7 million in alleged royalty damages from alleged cost savings from the '667 patent.[7]

6.  I have been asked by Viasat's counsel to assess Ms. Kindler's damages analysis. I do so in this Rebuttal Report. For the purposes of my analysis, I have been asked to assume that the Patents-in-Suit are valid and that they were infringed by Viasat. A list of the materials that I considered in the course of my work is attached hereto as Exhibit B. I also conducted interviews with Dr. Kevin Almeroth, Viasat's technical expert; Finn Hughes, a Senior Software Engineer working on W-IFE for Viasat; Ajai Tuli, Vice President of Commercial Strategy for Aviation at Viasat; and Daniel Newman, Chief Technology Officer of Content Delivery at Viasat. The rate charged for my time spent on this matter is $700 per hour. I was supported in my work by the staff of OnPoint Analytics, Inc. Time spent by the staff of OnPoint was billed at their standard hourly rates which vary from $60 to $475 per hour depending upon the experience and credentials of the individuals performing the services.

---

[4] Expert Report of Lauren R. Kindler, filed March 24, 2025 (hereafter, Kindler Report), at ¶ 220 and Table 20.
[5] Kindler Report, at Table 2.
[6] Kindler Report, at ¶¶ 218-220.
[7] Kindler Report, at Exhibit 10.2, 10.3, 10.8, 11.1, Table 2.

infrastructure, and user terminals enables them to offer a wide range of cost-effective, high-quality broadband, narrowband, and other connectivity solutions to users around the globe.[31] By May 2024, Viasat had 20 space satellites and 10 additional ones in construction.[32] Viasat serves several industries namely Aviation, Government, Enterprise, Maritime, Energy, and Satellite Internet.[33]

      12. Before 2016, Viasat did not have its own IFE offerings[34] and instead used its partnership with a third-party company, Arconics, to "integrate wireless IFE as a product into [its] broader solution set"[35] to serve "the wireless IFE needs of multiple airline customers."[36] Arconics offered airlines "the Arconics App Suite, which [spanned] wireless In-flight Entertainment (IFE), Electronic Flight Bag (EFB), Airline Document Management and Cabin Management solutions, to communicate and share data with the aircraft and, using available connectivity, to connect with ground systems across mobile or avionics platforms" and served "Qatar Airways, Cathay Pacific, Ryanair, Aer Lingus, Philippine Airlines, Tigerair Australia, SpiceJet and others."[37] Arconics offerings were then "integrated with [Viasat's] in-flight connectivity and other applications, servers, and software" as a part of this partnership.[38]

      13. On November 14, 2016, Viasat acquired Arconics for $21.6 million.[39] At the time, Vice President and General Manager of Commercial Mobility business at Viasat, Don Buchman,

---

[31] Viasat, Inc., Form 10-K for fiscal year ending March 31, 2024, at p. 3.

[32] VIASAT_00123343-3424, at -3344.

[33] VIASAT_00078634-8692, at -8639; Viasat, "What We Do," accessed April 14, 2025, at https://www.viasat.com/about/what-we-do/.

[34] Deposition of Josh Slater, February 6, 2025, at 36:9-25.

[35] Deposition of Josh Slater, February 6, 2025, at 39:8-20.

[36] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.

[37] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.

[38] Deposition of Josh Slater, February 6, 2025, at 36:9-37:19.

[39] VIASAT_00016483-7758, at -6492; Deposition of Des O'Sullivan (rough), February 26, 2025, at 68:2-5.

noted, "We believe combining our strengths with Arconics will position Viasat to be the market leader for connectivity, passenger services and flight deck applications and operations."[40]

### b. Overview of satellites

14. Satellite internet is a type of internet access that is "delivered through a wireless connection created by signals transmitted between a satellite and an antenna (or dish) on a home or business."[41] Satellite internet, unlike land-based internet, does not depend on wires in order to transmit the data, but rather relies on "wireless internet beamed down from satellites orbiting the Earth."[42] Satellite internet can be used anywhere, including temporary locations such as construction sites, emergency shelters, or transportation modes such as aircrafts, ships, and trains.[43]

15. The evolution of satellite communication has been a key driver in the development of satellite internet, which has facilitated high-speed internet and global connectivity.[44] Advancements in satellite technology, driven by developments in space exploration, have enhanced the capability of satellite internet and satellite internet has now become a crucial aspect of digital success.[45] In 1996, the world's first satellite internet service for consumers and small

---

[40] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.

[41] Viasat, "Everything You Need To Know About Satellite Internet in 2023 and Beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[42] Viasat, "Everything You Need to Know About Satellite Internet in 2023 and Beyond," accessed April 9, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/; Satellite Internet.com, "What is Satellite Internet?," accessed April 8, 2025, at https://www.satelliteinternet.com/resources/what-is-satellite-internet/.

[43] Viasat, "Everything you need to know about Satellite Internet in 2023 and beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[44] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[45] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

## C. Patented Features and Accused Products

32. Viasat's Video Content Delivery System ("VCDS") is part of the service delivery platform ("SDP") designed to efficiently transport and cache bandwidth-intensive files close to the consumer.[123] Since 2017, VCDS has delivered "better video using less bandwidth" and supports Video-on-Demand ("VOD") through multicasting and caching.[124] Multicasting sends one copy of content per satellite beam, while caching stores content on the plane's server for all passengers.[125] Plaintiffs claim that the patented features relate to "media streaming software, systems, and services" used in in-flight entertainment and communication systems for commercial and private aviation.[126]

33. The '400 patent entitled "Digital Rights Management System Transfer of Content and Distribution," was filed on December 15, 2014, and issued on August 23, 2016.[127] Plaintiffs allege that it "include[s] a kiosk for provisioning secure media content to a plurality of portable data storage devices."[128] Plaintiffs accuse the Viasat in-flight entertainment ("IFE"), wireless system ("W-IFE"), Wi-Fi Gateway Modem ("Gateway") and all products which incorporate the functionality of the aforementioned systems.[129]

34. The '667 patent entitled "Secure Stream Buffer on Network attached Storage," was filed on April 16, 2018, and issued on October 15, 2019.[130] The '667 patent allegedly is responsible for "implement[ing] a method of transmitting media content from a media streaming

---

[123] VIASAT_00008738-9831, at -8743, 8745-8746.
[124] VIASAT_00007343-394, at -345; VIASAT_00008738-9831, at -8761.
[125] VIASAT_00007343-394, at -346, -361, -364.
[126] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 2.
[127] U.S. Patent No. U.S. Patent No. 9,424,400, filed December 15, 2014, issued August 23, 2016; Complaint for Patent Infringement, filed July 28, 2022, at ¶ 19.
[128] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 23.
[129] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at p. 2.
[130] U.S. Patent No. U.S. Patent No. 10,447,667, filed April 16, 2018, issued October 15, 2019; Complaint for Patent Infringement, filed July 28, 2022, at ¶ 35.

system." [131] Plaintiffs allege the '667 patent "establish[es] a connection, via a wide area network ("WAN"), to a network attached storage ("NAS") device operating on a local area network ("LAN")" in tandem with the satellite internet system connected to the server within an aircraft. [132] Similar to the '400 patent, the accused instrumentalities are "Viasat's media streaming software, systems, and services, including systems that implement edge storage, such as and including the Opening Caching standards." [133]

35. Based on my conversation with Dr. Kevin Almeroth, Viasat's technical expert, the '400 patent relates to a kiosk for authenticating end-user devices via a remote trusted server and delivering encrypted content and access key to the end-user devices. [134] Whereas the '667 patent relates to a network-attached storage device that ensures protection of the content being streamed on devices. [135] The concept behind the '667 patent comes from the early days when content providers were wary about the protection of their content being streamed. [136]

36. Plaintiffs accuse Viasat's IFE system in commercial and private aviation of infringing both the '400 and '667 patents. [137] In addition to the IFE system, the '667 patent allegedly is also infringed by the systems Viasat uses to implement "edge storage solutions."[138] Specifically, Viasat is accused of allegedly practicing the patents in their antennas, wireless access points ("WAPs"), modems, servers, gateways, core nodes, data centers, and satellites which allow the

---

[131] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 39.
[132] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 40.
[133] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at pp. 2-3.
[134] Interview with Dr. Kevin Almeroth, April 8, 2025.
[135] Interview with Dr. Kevin Almeroth, April 8, 2025.
[136] Interview with Dr. Kevin Almeroth, April 8, 2025.
[137] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed February 23, 2023, at p. 1; Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at pp. 1-2.
[138] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed February 23, 2023, at p. 2.

74. Under her alternative cost-saving approach for the '667 patent applied to IPTV, she calculates the low- and high-end royalties by dividing her claimed cost savings by the total estimated number of IPTV sessions, yielding rates of $0.15 to $0.30 per session (depending on her assumed cost per GB) at a 25% take rate, and $0.24 to $0.48 per session (depending on her assumed cost per GB) at a 40% take rate.[264]

## IV. FUNDAMENTAL ERRORS IN MS. KINDLER'S ANALYSIS

75. In this section I describe the fundamental errors in Ms. Kindler's analysis, which I find to be both arbitrary and unreliable.

### A. Ms. Kindler's Damage Estimate is Implausible on its Face

76. Any sound economic analysis, including damage estimates, must pass a "reality check." Ms. Kindler's conclusions fail this test as her proposed damages far exceed the $21.6 million Viasat paid to acquire Arconics, which integrated wireless IFE into its broader offerings.[265] It is unrealistic to suggest Viasat would license a patent for $10.4 million ('400 patent) or nearly $20.6 million ('667 patent) for technologies that, at best, offer only a small fraction of Arconics' value.[266] From both an economic and business standpoint, this is implausible, also especially given the many available non-infringing alternatives, as discussed in Section IV.B.

77. In addition, her analysis fails a reality check related to passenger viewing hours, because she exaggerates the amount of data delivered to passengers. To test this, I estimate total possible passenger viewing hours based on a count of IPTV-equipped aircraft, the average

---

[264] Kindler Report, at ¶¶ 218-220.
[265] Deposition of Josh Slater, February 6, 2025, at 39:8-20; Share Purchase Agreement between Viasat, INC. and Principal Sellers, dated November 14, 2016, VIASAT_00016488-7758, at -6492; Deposition of Des O'Sullivan, February 26, 2025, at 68:2-5.
[266] Interview with Dr. Kevin Almeroth, April 8, 2025; Interview with Daniel Newman, April 7, 2025.

number of passengers per plane, the average hours planes fly each year, and Ms. Kindler's 25%

take rate. I convert Ms. Kindler's assumed data delivered to passengers into viewing hours using

a 0.7 GB/hour data rate. From 2022 to 2023, Ms. Kindler's estimated IPTV viewing time

exceeded total possible passenger viewing hours by between 49% to 66%, demonstrating that her

analysis is implausible and significantly flawed.[267] I then repeat the analysis to show that if one

considers a more realistic and supported take rate, Ms. Kindler's results are even more

implausible. Again, I estimate total possible passenger viewing hours based on a count of IPTV-

equipped aircraft, the average number of passengers per plane, the average hours planes fly each

year, but I now use a more realistic and supported 8.4% take rate (rather than the 25% that Ms.

Kindler uses). I convert Ms. Kindler's assumed data delivered to passengers into viewing hours

using a 0.7 GB/hour data rate. From 2021 to 2023, Ms. Kindler's estimated IPTV viewing time

exceeded total possible passenger viewing hours by between 46% to 394%, demonstrating

further that her analysis is implausible and significantly flawed.[268]

## B. Plaintiffs' Experts Ignore Non-Infringing Alternatives
### 1. The '667 Patent

78. The '667 patent involves a network-attached storage device that transmits an

indication of a secure region for storing media content within the device. Based on his Opening

Report and my interviews with Viasat's technical expert, Dr. Kevin Almeroth, there are multiple,

easily-implemented viable non-infringing alternatives to the asserted claims of the '667 patent.[269]

79. In Viasat's products, Plaintiffs identify a Boolean variable called "encrypted" as the

aforementioned indication.[270] In aviation, this variable is redundant, as it defaults to "false," and

---

[267] *See,* my workpapers.
[268] *See,* my workpapers.
[269] Interview with Dr. Kevin Almeroth, April 8, 2025; Opening Report of Kevin C. Almeroth, filed March 24, 2025 (hereafter, "Almeroth Report"), at ¶¶ 504-505.
[270] Almeroth Report, at ¶¶ 504-505.

is not used for device security, and in residential, this variable is an unnecessary failsafe.[271] A non-infringing alternative would be to remove it entirely, with no performance impact.[272] This change could be made in four weeks at a cost of about $100,000.[273] Another non-infringing alternative would be to remove any encryption that is present on the storage devices, with minimal performance impact.[274] This change could be made in three months at a cost of about $500,000.[275]

## 2. *The '400 Patent*

80. The '400 patent covers a kiosk for authenticating end-user devices and delivering encrypted content and an access key to end-user devices. Based on his Opening Report and my interviews with Viasat's technical expert, Dr. Kevin Almeroth, there are multiple, easily-implemented viable non-infringing alternatives to the asserted claims of the '400 patent.[276]

81. *First,* instead of using a "unique identifier" that is specific to and concealed by the device, Viasat could edit the source code to publicize any unique identifier that is "concealed," thereby making the unique identifier not one that is "concealed by" any portable data storage device.[277] This non-infringing alternative could be implemented, fully tested, and deployed in approximately two days for $1,600.[278] This development time is confirmed by Dr. Almeroth. This cost I find is consistent with public information on wage rates for embedded software engineers which suggest a development cost for two days work of $1,358.[279]

---

[271] Interview with Dr. Kevin Almeroth, April 8, 2025.
[272] Almeroth Report, at ¶ 507.
[273] Almeroth Report, at ¶ 509.
[274] Almeroth Report, at ¶¶ 510-516.
[275] Almeroth Report, at ¶ 516.
[276] Interview with Dr. Kevin Almeroth, April 8, 2025; Almeroth Report, at ¶ 113.
[277] Almeroth Report, at ¶ 485.
[278] Dr. Almeroth told me that software development costs were approximately $800 per day. Interview with Dr. Kevin Almeroth, April 8, 2025; Almeroth Report, at ¶ 486.
[279] Viasat, "Embedded Software Engineer," accessed April 8, 2025, at https://careers.viasat.com/jobs/4209?lang=en-us.; *see,* my workpapers.

### F. *Ms. Kindler Exaggerates Alleged Concurrent Streams and Bytes*

87. Ms. Kindler claims, "the data required to stream a video can depend on the quality of the video being streamed," specifically the resolution.[296] She estimates, "[a]ssuming all IPTV is streamed at the minimum 480p, the minimum bit rate required. is 1.55 Mbps."[297] However, this estimate overstates data usage by disregarding standard video compression, inconsistent with service agreements. Ms. Kindler ignores that videos are compressed, with only the first frame stored fully and subsequent frames showing only changes.[298] Therefore, the data needed for streaming depends on content nature, with videos having less change between frames requiring less data.

88. The key metric for estimating data use is the bitrate.[299] Viasat's service contracts with airlines highlight bitrate as the key metric. In their agreement with American Airlines, IPTV channels have target bitrates, ranging from 350 kbps for news to 750 kbps for high-action content like ESPN as shown in Figure 9.[300] The American Airlines agreement also states that "American may, in its discretion, adjust the target Average Video Bitrates for each channel once per calendar quarter; provided that the average of the target Average Video Bitrates of all channels is no greater than 450 kbps and no channel is adjusted to a target Average Video Bitrate

---

[296] Kindler Report, at ¶ 175.b.ii.
[297] Kindler Report, at ¶ 175.b.ii.
[298] Al-Mualla, Mohammed E., C. Nishan Canagarajah, and David R. Bull, "Video Coding: Fundamentals," Chapter 2 in *Video Coding for Mobile Communications*, Academic Press, 2002, at pp. 17-18, 39.
[299] WSN Live, "What Is a Good Bitrate for Streaming Live Sports," accessed April 11, 2025, at https://www.wsn.live/blog/what-is-a-good-bitrate-for-streaming-live-sports ("Live sports broadcasts are dynamic and often include fast-paced action, detailed scenes, and rapid camera movements. The complexity of the content influences the required bitrate. This is because intricate scenes demand more data to preserve detail and avoid compression artifacts."). University of Kentucky, College of Communication and Information, "Video Bitrate & Resolution: An Easy Overview," accessed April 9, 2025, at https://ci.uky.edu/about/faculty-and-staff-resources/ci-technology-services/tutorials/video-bitrate-resolution-easy.
[300] VIASAT_00014633-4813, at -4795.

of less than 350 kbps."[301] Ms. Kindler's 1.55 Mbps bitrate estimate overstates data usage, being more than twice the highest bitrate offered (750kbps) and more than three times the average.

*Figure 9. IPTV Service Channels and Target Bitrate in American Airlines Service Agreement[302]*

| Channel | Target Bitrate (kbps) |
|---|---|
| CBS | 450 |
| NBC | 450 |
| FOX (WNYW) | 450 |
| NFL Network | 650 |
| Disney | 350 |
| Telemundo | 350 |
| ESPN | 750 |
| USA | 400 |
| TNT | 500 |
| Bravo | 350 |
| CNN | 350 |
| CNBC | 350 |

89. Ms. Kindler uses her incorrect bitrate to calculate the number of different IPTV channels being streamed on average to airplanes at any point in time. She accepts that her damage estimate is highly sensitive to the number of channels streamed, writing that "a higher number of different channels being viewed concurrently results in lower estimated bandwidth savings in the framework outlined here."[303] I will show below that once her bitrate is corrected from 1.55 Mbps to 750kbps, this reduces her damage estimate.

### G. Ms. Kindler Overstates the Alleged Take Rate for IPTV and W-IFE Services

90. Ms. Kindler's analysis is based on her assumption of a 25% take rate or, in the alternative, a 40% take rate for the IPTV and W-IFE services provided by Viasat.[304] Both are too high and are driven by Ms. Kindler's unreliable data analysis. She relies on nine months of data

---

[301] Third Amended and Restated Connectivity Services Agreement Between American Airlines, Inc. and Viasat, Inc., October 1, 2020, VIASAT_00014633-813, at -795.
[302] VIASAT_00014633-4813, at -4795.
[303] Kindler Report, at ¶ 175.b, n. 706.
[304] Kindler Report, at ¶¶ 148-151, 176, 181, 184, 198, Tables 17 and 19.

### 2. '400 Patent

120.    For the '400 patent, Ms. Kindler has grossly overestimated the number of IPTV and W-IFE sessions viewed by passengers, by assuming an unrealistically high take rate of 25%. I correct this to a take rate of 8.4%.[363] So, based on 66,724,654 IPTV sessions and 47,890,078 W-IFE sessions, and retaining for now Ms. Kindler's royalty rate of $0.03 per session, I calculate royalty damages of $2,001,740 attributable to IPTV and $1,436,702 attributable to W-IFE. This results in total lump sum royalty damages of $3,438,442 for the '400 patent, reduced from the $10.4 million that Ms. Kindler finds.[364]

121.    This is still an overstatement of any royalty that Viasat would pay for the '400 patent. A more reliable approach is to consider what Viasat actually does pay for digital rights management ("DRM"). Viasat pays a company called Vualto for DRM hardware and software, as well as licensing. Under Viasat's agreement with Vualto, it pays discounted annual costs of $667 per airplane up to 450 airplanes or annual costs of $556 per airplane up to 2,000 airplanes, such that its costs depend on the size of Viasat's fleet.[365] However, based on my analysis of that agreement, I find that 50% of those prices are related to hardware (unified streaming servers), 30% to video play and on-demand licensing, and only 20% to DRM licensing.[366] I calculate the Viasat fleet size for each year between 2018 and 2025, applying the tiered per airplane pricing (which, given its fleet size, was $667 in 2018 and $556 thereafter), and multiply that by 20% to isolate DRM licensing. This results in $752,938, which is a much more realistic estimate of royalty damages for the '400 patent than Ms. Kindler's $10.4 million.[367]

---

[363] *See,* my workpapers.
[364] *See,* my workpapers.
[365] Viasat_00014400_415, at -412.
[366] Viasat_00014400_415, at -412.
[367] *See,* my workpapers.

## VI.  CONCLUSION

122.    To the extent that discovery in this case is not yet complete, I reserve the right to revise or supplement my opinions as additional information becomes available. Exhibits to be used in support of the opinions stated in this Rebuttal Report include all of the tables, graphics and information contained herein as well as the Exhibits cited in or accompanying this Rebuttal Report. Additional demonstrative exhibits based upon this same information may be prepared for trial and used to support my opinions.


April 14, 2025                                        Respectfully submitted,


_____

Gareth Macartney, Ph.D

# EXPERT REBUTTAL REPORT
## OF
## GARETH MACARTNEY, PH.D.

**In the matter of**

***Sandisk Technologies, Inc. et al. v.***
***Viasat, Inc.,***
**USDC, Northern District of California, Case No. 4:22-cv-4376**



**Highly Confidential**
**Pursuant to Protective Order – Attorneys' Eyes Only**

**April 14, 2025**

████████████████████

# Table of Contents

I.    Introduction ................................................................................................. 1

II.   Background ................................................................................................... 5

   A.  Parties ...................................................................................................... 5

     1.  Western Digital Technologies ................................................................ 5

     2.  Sandisk ................................................................................................ 6

     3.  Viasat .................................................................................................. 7

   B.  Wireless In-Flight Connectivity & Entertainment Service ............................. 16

   C.  Patented Features and Accused Products ..................................................... 21

   D.  Secure Content Storage Association ............................................................ 23

   E.  The Value Drivers of Viasat ...................................................................... 24

     1.  Satellites ............................................................................................ 25

     2.  Internet connectivity .......................................................................... 27

     3.  Hardware, software, and technical support ........................................... 28

     4.  Flexibility and variety of offerings ...................................................... 29

     5.  Entertainment content ........................................................................ 30

     6.  Passenger experience .......................................................................... 32

     7.  Advertising ........................................................................................ 32

III.  Summary of Ms. Kindler's Analysis ............................................................ 35

   A.  Hypothetical Negotiation & Damage Period ................................................ 36

   B.  Ms. Kindler Estimates IPTV & W- IFE Take Rates ..................................... 37

   C.  Ms. Kindler Calculates the Alleged "Bandwidth Savings" From the '667 Patent ........... 37

   D.  '667 Patent Incremental Value Under Ms. Kindler's Revenue Apportionment Approach .. 38

   E.  Ms. Kindler Does Not Apply a Profit Margin ............................................... 39

   F.  Ms. Kindler Assumes '400 Patent Royalty Based on SCSA Agreements ........................ 39

   G.  '667 Patent Incremental Value Under Ms. Kindler's Cost-Savings Approach ............... 40

   H.  Ms. Kindler Assumes an Unsupported 50:50 Georgia-Pacific Split and Calculates Damages ........... 40

   I.  Ms. Kindler Calculates a Royalty Rate ...................................................... 41

IV.  Fundamental Errors in Ms. Kindler's Analysis ........................................... 42

   A.  Ms. Kindler's Damage Estimate is Implausible on its Face ........................... 42

   B.  Plaintiffs' Experts Ignore Non-Infringing Alternatives ................................. 43

     1.  The '667 Patent .................................................................................. 43

2.   The '400 Patent ......................................................................... 44

C.   Ms. Kindler Fails to Accurately Apply the Georgia-Pacific Factors ................................ 45

D.   Ms. Kindler Fails to Apply Margin and Calculates Damages on Revenue, Not Profit .... 46

E.   Ms. Kindler's Reliance on Dr. Easttom's Unsupported, Qualitative Opinion.................. 47

F.   Ms. Kindler Exaggerates Alleged Concurrent Streams and Bytes .................................. 48

G.   Ms. Kindler Overstates the Alleged Take Rate for IPTV and W-IFE Services .............. 49

H.   Ms. Kindler's Cost Saving Analysis is Based on Pure Assumptions ............................... 51

**V.   Correcting Ms. Kindler's Analysis ............................................................................ 52**

A.   Overview of the Georgia-Pacific Factors ............................................................ 52

B.   Analyzing the Incremental Value of the Patents-in-Suit .................................... 53

1.   Correcting Ms. Kindler's take rate ............................................................... 54

2.   Method 1 for correcting Ms. Kindler's estimate of the data delivered to passengers .. 55

3.   Method 2 for correcting Ms. Kindler's estimate of the data delivered to passengers .. 56

4.   Correcting Ms. Kindler's use of revenues instead of profits ....................... 57

C.   Application of the Remaining Georgia-Pacific Factors........................................ 57

1.   How will Western Digitals' business be affected by the license? [Factors 5 & 6]....... 58

2.   How will Viasat's business be affected by the license? [Factor 6]............................... 59

3.   Historical licensing practices [Factors 1, 2, 4, & 12].................................... 59

4.   Scope, exclusivity, and term [Factors 3 & 7]................................................ 60

5.   Are there non-infringing alternatives? [Factor 9] ........................................ 61

6.   The opinion testimony of qualified experts [Factor 14] .............................. 61

7.   Resulting Georgia-Pacific split .................................................................... 61

D.   Corrected Damages .............................................................................................. 63

1.   '667 Patent ................................................................................................... 64

2.   '400 Patent ................................................................................................... 66

**VI.  Conclusion....................................................................................................... 67**

UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| SANDISK TECHNOLOGIES, INC., et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 4:22-cv-4376 |
| | ) | |
| VIASAT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REBUTTAL REPORT OF GARETH MACARTNEY, PH.D.**

**I.  INTRODUCTION**

1.   I am a Senior Economist, President, and Chief Executive Officer at OnPoint Analytics, Inc., an economic and statistical consulting firm. I hold a Ph.D. in economics from University College London. In the course of my studies, I was awarded the W. M. Gorman scholarship and the Advanced Institute of Management scholarship. During my Ph.D. program, I worked at the Institute for Fiscal Studies, London's leading economic research institute. During that time, I also taught economics at University College London and lectured on competition and innovation at the University of Cambridge and Oxford University. I have presented my research at the Bar Association of San Francisco (where I made a CLE-accredited presentation on patent damages), the European Policy on Intellectual Property Conference, the European Economics Association Congress, the Royal Economic Society Conference, the London School of Economics, the Research in Law and Economics Conference on Antitrust Class Actions, and the Golden State Antitrust Conference. For the analysis in my Ph.D. dissertation, I constructed a large database of patent filings at the USPTO, European Patent Office, and Japanese Patent

Office matched to company account information for every registered company in Europe. It is my understanding that this database is still being used by researchers to this day.

2.   My research has been published in the *Review of Economics and Statistics*, the *Economic Journal*, *Research in Law and Economics*, *Antitrust Magazine*, and the *Journal of Business and Economics*. Much of that research relates to innovation and the analysis of patent data. For instance, my article "Employment Protection Legislation, Multinational Enterprises and Innovation" was published in the *Review of Economics and Statistics* and my article "The Location of Innovative Activity in Europe" was published in the *Institute for Fiscal Studies* working paper series. I have also published articles on aspects of competition. My article "Product Market Reforms, Labour Market Institutions and Unemployment" was published in *The Economic Journal*. My article "Antitrust Class Proceedings – Then and Now," published in *Research in Law and Economics*, won the Best Antitrust Academic Article Award in the Private Enforcement Category of the Antitrust Writing Awards in 2015. My article "Economic Principles for Class Certification Analysis in Antitrust Cases" was published in the Spring 2016 issue of *Antitrust Magazine*. I have also conducted peer reviews of academic articles for the *European Economic Review*, the *Journal of Competition Law and Economics*, the *Economics of Transition*, *Oxford Economic Papers*, and *Fiscal Studies*.

3.   I have experience analyzing market conduct, including patent infringement; the estimation of reasonable royalties; price-fixing; monopolization; market foreclosure and market allocation; breach of contract; environmental damages; class certification; illegal taxation; and wage and hour matters. I have analyzed a wide variety of industries, including insurance (property & casualty, long-term care, healthcare, title); education; pharmaceuticals; heavy industry (auto parts, steel, ready-mixed concrete, hard rock mining, caustic soda); electronic manufacturing (liquid crystal displays, optical disk drives, lithium ion batteries, DRAM);

transport (rail freight, air cargo, trucks); energy (oil, natural gas, gasoline); food and agriculture (packaged seafood, eggs, milk, poultry, cattle, fertilizers, fruits); consumer electronics (digital cameras, smartphones, personal computers, network switches, music streaming, e-books, car navigation, mesh Wi-Fi, e-cigarettes); retail (apparel, yoghurt, single-serve coffee, protein bars); cosmetics and personal care; online advertising; cryptocurrencies; water; real estate; and, travel. I have testified as an expert witness in deposition and in arbitration, and I have testified at trial on the topic of patent damages. A true and correct copy of my *curriculum vitae* is attached as Exhibit A, including a list of my expert testimony cases.

4.   In this case, Plaintiffs SanDisk Technologies, Inc., Sandisk 3D IP Holdings LTD., Sandisk Technologies LLC, and Sandisk Storage Malaysia Sdn. Bhd.,[1] are suing Defendant Viasat, Inc., ("Viasat") for infringement of U.S. Patent Nos. 9,424,400 ("the '400 Patent") and 10,447,667 ("the '667 Patent") (collectively, "the Patents-in-Suit").[2] I understand that Plaintiffs initially asserted that Viasat also allegedly infringed U.S. Patent No. 8,503,834 ("the '834 Patent") but did not assert claims after dismissal by the Court under 35 U.S.C. § 101.[3]

5.   On March 24, 2025, Plaintiffs submitted an expert report by Ms. Lauren Kindler, in which Ms. Kindler estimates damages for Viasat's alleged infringement of the Patents-in-Suit under a reasonable royalty framework. In her report, Ms. Kindler concludes that as the result of a hypothetical negotiation between Western Digital and Viasat, Plaintiffs would have received a

---

[1] This case was initially filed as *Western Digital Technologies, Inc., et al. v. Viasat, Inc.* Since then, Western Digital Ireland Ltd. merged into SanDisk Technologies LLC, and Western Digital Technologies, Inc. assigned the asserted U.S. Patent Nos. 9,424,400 and 10,447,667 to SanDisk Technologies, Inc., which later changed its name to Sandisk Technologies, Inc. On November 27, 2024, the court granted a motion to amend the caption, removing Western Digital Technologies, Inc. and Western Digital Ireland Ltd., and adding Sandisk Technologies, Inc. Complaint for Patent Infringement filed, July 28, 2022, at p. 1; Plaintiffs' Notice of Motion and Motion to Substitute Parties and Amend Case Caption, filed September 20, 2024, at p. 2. "Plaintiffs" as used in this report refers to Western Digital Technologies, Inc., Western Digital Ireland Ltd., SanDisk Technologies, Inc., Sandisk 3D IP Holdings LTD., Sandisk Technologies LLC, and Sandisk Storage Malaysia Sdn. Bhd, as appropriate in light of the timeframe.
[2] Complaint for Patent Infringement, filed July 28, 2022.
[3] Viasat, Inc.'s Supplemental Invalidity Contentions, filed April 19, 2024, at ¶ 1. *See,* Plaintiffs' Amended Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024.

royalty rate of ▮▮▮ for the alleged use of the '667 patent in connection with IPTV, a royalty rate of ▮▮ for the alleged use of the '667 patent in connection with W-IFE, and a royalty rate of $0.03 per session for the '400 patent.[4] For the Patents-in-Suit based on these royalties Ms. Kindler claims a total of $20.56 million of damages for alleged infringement of the '667 patent and $10.4 million for alleged infringement of the '400 patent.[5] As an alternative, Ms. Kindler also calculates a royalty based on alleged cost savings for IPTV from the '667 patent of $0.15-$0.48 per session, depending on the take rate she applies and the assumption she makes on the cost per gigabyte of bandwidth that she contends Viasat would have to pay to third parties absent those supposed savings.[6] This results in a range of $55.1 and $89.7 million in alleged royalty damages from alleged cost savings from the '667 patent.[7]

6.   I have been asked by Viasat's counsel to assess Ms. Kindler's damages analysis. I do so in this Rebuttal Report. For the purposes of my analysis, I have been asked to assume that the Patents-in-Suit are valid and that they were infringed by Viasat. A list of the materials that I considered in the course of my work is attached hereto as Exhibit B. I also conducted interviews with Dr. Kevin Almeroth, Viasat's technical expert; Finn Hughes, a Senior Software Engineer working on W-IFE for Viasat; Ajai Tuli, Vice President of Commercial Strategy for Aviation at Viasat; and Daniel Newman, Chief Technology Officer of Content Delivery at Viasat. The rate charged for my time spent on this matter is $700 per hour. I was supported in my work by the staff of OnPoint Analytics, Inc. Time spent by the staff of OnPoint was billed at their standard hourly rates which vary from $60 to $475 per hour depending upon the experience and credentials of the individuals performing the services.

---

[4] Expert Report of Lauren R. Kindler, filed March 24, 2025 (hereafter, Kindler Report), at ¶ 220 and Table 20.
[5] Kindler Report, at Table 2.
[6] Kindler Report, at ¶¶ 218-220.
[7] Kindler Report, at Exhibit 10.2, 10.3, 10.8, 11.1, Table 2.

## II.  BACKGROUND

### A.  Parties

#### 1.  Western Digital Technologies

7.   Western Digital was founded in 1970, headquartered in San Jose, California as a subsidiary of Western Digital Corporation incorporated in Delaware.[8] Western Digital operates in the data storage industry and "is a leading developer, manufacturer and provider of data storage devices and solutions based on both hard disk drive and NAND[9] flash technologies."[10] Western Digital has a broad portfolio of Hard Disk Drives ("HDD") and Flash-based ("Flash") storage solutions that allows customers to "capture, preserve, access, and transform" complex data.[11] This broad portfolio of products is offered to multiple end markets, including "Cloud," "Client," and "Consumer."[12] Western Digital does not provide any in-flight entertainment or connection services.[13]

8.   Western Digital has approximately 13,000 active patents worldwide and there are many patent applications still in process.[14] Western Digital also relies on licenses for certain technologies from other parties to manufacture and sell their products.[15] Western Digital reported total revenues of $18.793 billion in Fiscal Year 2022, in which Flash business reported

[8] Western Digital, "Western Digital Corporation Subsidiaries of the Company," accessed March 14, 2025, at https://www.sec.gov/Archives/edgar/data/106040/000119312512361018/d356205dex21.htm; Western Digital, Form 10-K for fiscal year ending June 28, 2024, filed August 19, 2024, at p. 4.
[9] NAND flash technology is "a type of non-volatile solid-state storage that persistently stores and retrieves data. It is non-volatile memory since it retains data when power is not applied." ATP, *NAND Flash 101*, 2020, accessed March 21, 2025, at https://www.simms.co.uk/Uploads/Resources/50/f4366381-b992-425a-bec4-cca409b51a6c.pdf, at slide 3.
[10] Western Digital, Form 10-K for fiscal year ending June 28, 2024, filed August 19, 2024, at p. 4.
[11] Western Digital, Form 10-K for fiscal year ending June 28, 2024, filed August 19, 2024, at p. 4.
[12] Western Digital, Form 10-K for fiscal year ending June 28, 2024, filed August 19, 2024, at p. 4.
[13] Western Digital, "Product Portfolio," accessed March 21, 2025, at https://www.westerndigital.com/products/product-portfolio.
[14] Western Digital, Form 10-K for fiscal year ending June 28, 2024, August 19, 2024, at p. 7.
[15] Western Digital, Form 10-K for fiscal year ending June 28, 2024, August 19, 2024, at p. 7.

total revenues of $9.753 billion, and its HDD business reported total revenues of $9.040 billion.[16]

### 2. Sandisk

9.  Based in Milpitas, California, Sandisk Corporation "designs, develops and manufactures data storage solutions in a range of form factors using its flash memory, controller and firmware technologies."[17] Western Digital has described Sandisk Corporation as a provider of flash storage solutions.[18] Flash storage products offered by Sandisk are used in data centers, smartphones, tablets, and PC's, and are available in retail stores.[19] Sandisk sells several kinds of Solid-State Drives ("SSDs"), including internal, external, portable, and enterprise SSDs that can be used for gaming, digital photography, phones, and data centers.[20] Sandisk also offers memory cards, USB flash drives, embedded flash solutions, and several other accessories to customers.[21]

10. In 2015, Western Digital announced the acquisition of Sandisk Corporation, under which Western Digital decided to acquire all of the outstanding shares of Sandisk for a combination of cash and stock.[22] The deal was approved in 2016, when Western Digital received regulatory approval.[23] Through Sandisk's non-volatile memory ("NVM") offerings, Western

---

[16] Western Digital, Form 10-K for fiscal year ending July 1, 2022, filed August 21, 2023, at pp. 36-37.
[17] Forbes, "SanDisk," accessed March 17, 2025, at https://www.forbes.com/companies/sandisk/.
[18] Western Digital, "Sandisk Professional," accessed April 13, 2025, at https://www.westerndigital.com/brand/sandisk-professional.
[19] Western Digital, "Western Digital Announces Acquisition of SanDisk," press release, October 21, 2015, accessed March 17, 2025, at https://www.sec.gov/Archives/edgar/data/1000180/000110465915071775/a15-21372_3ex99d1.htm.
[20] SanDisk, "SSDs," accessed April 11, 2025, at https://shop.sandisk.com/product-portfolio/ssd.
[21] SanDisk, "Memory Cards," accessed March 21, 2025, at https://shop.sandisk.com/product-portfolio/memory-cards; SanDisk, "USB Flash Drives," accessed March 21, 2025, at https://shop.sandisk.com/product-portfolio/usb-flash-drives; SanDisk, "Embedded Flash," accessed March 21, 2025, at https://shop.sandisk.com/product-portfolio/embedded-flash; SanDisk, "Accessories," accessed March 21, 2025, at https://shop.sandisk.com/product-portfolio/accessories.
[22] Western Digital, "Western Digital Announces Acquisition of SanDisk," press release, October 21, 2015, accessed March 17, 2025, at https://www.sec.gov/Archives/edgar/data/1000180/000110465915071775/a15-21372_3ex99d1.htm.
[23] Western Digital, "Western Digital Acquisition of SanDisk Receives Approval from China's Ministry of Commerce," press release, May 10, 2016, accessed March 17, 2025, at https://investor.wdc.com/static-files/4edb9fa0-6dd8-4212-8d28-3011091435ee; Deposition of John Soji, February 14, 2025, at 11:25-12:9.

Digital was able to expand its expertise in NVM and thereby "secure[s] long-term access to solid state technology at lower cost."[24] However, in 2023, the board of directors at Western Digital unanimously voted to separate its Hard Disk Drive ("HDD") and Flash business.[25] This separation occurred in February 2025 when Sandisk became an independent publicly traded organization.[26] Western Digital and Sandisk, through separation, claimed that they will be in a better position to "execute innovative technology and product development, capitalize on unique growth opportunities, extend respective market leadership positions, and operate more efficiently with distinct capital structures."[27] Even through the merger, separation and thereafter, neither Western Digital nor Sandisk ever provided any in-flight entertainment or connection services.[28]

### 3.  Viasat

#### a.  Company overview

11. Viasat was founded in Carlsbad, California in 1986 by Mark Dankberg, Steve Hart, and Mark Miller.[29] Viasat is a "satellite internet company that brings fast speeds and unlimited data options to customers," including homes, airplanes, and vessels across the continental United States and globally.[30] Viasat's end-to-end multi-band platform of satellites, ground

---

[24] Western Digital, "Western Digital Announces Acquisition of SanDisk," press release, October 21, 2015, accessed March 17, 2025, at https://www.sec.gov/Archives/edgar/data/1000180/000110465915071775/a15-21372_3ex99d1.htm.

[25] Western Digital, "Western Digital to Form Two Independent Public Companies Focused on Data Storage Growth in HDD and Flash Markets," press release, October 30, 2023, accessed April 11, 2025, at https://www.westerndigital.com/company/newsroom/press-releases/2023/2023-10-30-western-digital-to-form-two-independent-public-companies; Deposition of Soji John, February 14, 2025, at 10:13-18.

[26] SanDisk, "SanDisk Celebrates Nasdaq Listing After Completing Separation from Western Digital," press release, February 24, 2025, accessed April 11, 2025, at https://shop.sandisk.com/company/newsroom/press-releases/2025/sandisk-celebrates-nasdaq-listing-after-completing-separation.

[27] Western Digital, "Western Digital Announces Update on Company Separation," press release, March 5, 2024, accessed March 20, 2025, at https://www.westerndigital.com/company/newsroom/press-releases/2024/2024-03-05-western-digital-announces-update-on-company-separation.

[28] Western Digital, "Product Portfolio," accessed March 21, 2025, at https://www.westerndigital.com/products/product-portfolio.

[29] VIASAT_00078634-8692, at -8637; VIASAT_00132818-2947, at -2828 and -2842; Viasat, "Steven R. Hart," accessed April 11, 2025, at https://investors.viasat.com/management/steven-hart.

[30] Viasat, "Unleash the Possibilities with Viasat Internet," accessed March 17, 2025, at https://www.viasatsavings.com/; Viasat, "About Us," accessed March 17, 2025, at https://www.viasat.com/about/; Deposition of Edwin Edillon, February 7, 2025, at 19:8-11.

infrastructure, and user terminals enables them to offer a wide range of cost-effective, high-quality broadband, narrowband, and other connectivity solutions to users around the globe.[31] By May 2024, Viasat had 20 space satellites and 10 additional ones in construction.[32] Viasat serves several industries namely Aviation, Government, Enterprise, Maritime, Energy, and Satellite Internet.[33]

    12. Before 2016, Viasat did not have its own IFE offerings[34] and instead used its partnership with a third-party company, Arconics, to "integrate wireless IFE as a product into [its] broader solution set"[35] to serve "the wireless IFE needs of multiple airline customers."[36] Arconics offered airlines "the Arconics App Suite, which [spanned] wireless In-flight Entertainment (IFE), Electronic Flight Bag (EFB), Airline Document Management and Cabin Management solutions, to communicate and share data with the aircraft and, using available connectivity, to connect with ground systems across mobile or avionics platforms" and served "Qatar Airways, Cathay Pacific, Ryanair, Aer Lingus, Philippine Airlines, Tigerair Australia, SpiceJet and others."[37] Arconics offerings were then "integrated with [Viasat's] in-flight connectivity and other applications, servers, and software" as a part of this partnership.[38]

    13. On November 14, 2016, Viasat acquired Arconics for $21.6 million.[39] At the time, Vice President and General Manager of Commercial Mobility business at Viasat, Don Buchman,

---

[31] Viasat, Inc., Form 10-K for fiscal year ending March 31, 2024, at p. 3.
[32] VIASAT_00123343-3424, at -3344.
[33] VIASAT_00078634-8692, at -8639; Viasat, "What We Do," accessed April 14, 2025, at https://www.viasat.com/about/what-we-do/.
[34] Deposition of Josh Slater, February 6, 2025, at 36:9-25.
[35] Deposition of Josh Slater, February 6, 2025, at 39:8-20.
[36] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.
[37] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.
[38] Deposition of Josh Slater, February 6, 2025, at 36:9-37:19.
[39] VIASAT_00016483-7758, at -6492; Deposition of Des O'Sullivan (rough), February 26, 2025, at 68:2-5.

noted, "We believe combining our strengths with Arconics will position Viasat to be the market leader for connectivity, passenger services and flight deck applications and operations."[40]

### b.  Overview of satellites

14. Satellite internet is a type of internet access that is "delivered through a wireless connection created by signals transmitted between a satellite and an antenna (or dish) on a home or business."[41] Satellite internet, unlike land-based internet, does not depend on wires in order to transmit the data, but rather relies on "wireless internet beamed down from satellites orbiting the Earth."[42] Satellite internet can be used anywhere, including temporary locations such as construction sites, emergency shelters, or transportation modes such as aircrafts, ships, and trains.[43]

15. The evolution of satellite communication has been a key driver in the development of satellite internet, which has facilitated high-speed internet and global connectivity.[44] Advancements in satellite technology, driven by developments in space exploration, have enhanced the capability of satellite internet and satellite internet has now become a crucial aspect of digital success.[45] In 1996, the world's first satellite internet service for consumers and small

---

[40] Viasat, "ViaSat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.

[41] Viasat, "Everything You Need To Know About Satellite Internet in 2023 and Beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[42] Viasat, "Everything You Need to Know About Satellite Internet in 2023 and Beyond," accessed April 9, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/; Satellite Internet.com, "What is Satellite Internet?," accessed April 8, 2025, at https://www.satelliteinternet.com/resources/what-is-satellite-internet/.

[43] Viasat, "Everything you need to know about Satellite Internet in 2023 and beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[44] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[45] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

businesses was launched by Hughes Network System, called DirecPC.[46] Prior to satellite internet, terrestrial cables and infrastructure drove the access to traditional internet; however, its challenges posed significant hurdles in remote and rural areas. This digital divide led to the emergence of satellite internet.[47]

16. Today, the advent of technology has revolutionized the landscape of satellite internet, especially the introduction of high-throughput technology.[48] High-throughput technology is the "ability to transmit large amounts of data at extremely high-speeds."[49] Through the introduction of high-throughput technology, satellite internet has grown and surpassed its limitations of high latency, low speed, high costs, and limited bandwidth.[50] Satellite internet relies primarily on connection from space, it has the capability to provide internet access in rural or remote areas where the access to internet through cable or fiber could be onerous.[51] Moreover, satellite internet is also resilient in hazardous weather conditions and emergencies.[52] Given its superior capabilities, satellite internet has enabled people and businesses to work and shop from anywhere in the world, stay in touch with loved ones, and leverage the advent of smart home technology.[53]

---

[46] Hughes Network System, "The Evolution of High-Speed Satellite Internet," accessed April 7, 2025, at https://www.hughesnet.com/blog/evolution-high-speed-satellite-internet.

[47] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[48] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[49] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[50] RSINC, "The History of High Speed Satellite Internet. A Brief Overview," accessed April 7, 2025, at https://www.rsinc.com/history-of-satellite-internet-a-brief-overview.php.

[51] Viasat, "Everything You Need To Know About Satellite Internet in 2023 and Beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[52] Viasat, "Everything You Need To Know About Satellite Internet in 2023 and Beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[53] Viasat, "Everything you need to know about Satellite Internet in 2023 and beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

### c. *Business segments*

17. Viasat's services are broadly categorized into three segments: *Satellite Services*, *Commercial Networks*, and *Government Systems*.[54] Figure 1 represents the various industries and markets in which Viasat is involved. In Figure 1 the orange color represents Viasat's "Mobility Services," green represents "Government Services," light blue represents "Global Fixed Satellite Services," and dark blue represents the category "Other."[55]

*Figure 1. Viasat Industries & Key Markets[56]*



18. In Fiscal Year 2022, Viasat reported total revenues of $1,189 million in the *Satellite Services* segment, approximately $319.9 million more than their total revenue in fiscal year 2021.[57] For its *Commercial Services* segment, Viasat reported total revenues of $512.1 million

---

[54] VIASAT_00132818-2947, at -2821; Viasat, Inc., Form 10-K for fiscal year ending March 31, 2024, at pp. 4-7.
[55] VIASAT_00099534-9549, at -9538.
[56] VIASAT_00099534-9549, at -9538.
[57] VIASAT_00132818-2947, at -2873.

for fiscal year 2022, which is $191.2 million higher than its total revenues in Fiscal Year 2021.[58] For its *Government Systems segment*, Viasat reported total revenues of $1,087 million for fiscal year 2022, which was approximately 25% of revenue generated in the year.[59] In 2024, Viasat reported a gross margin of 26.95% and a net margin of -24.71%.[60]

### i. *Satellite Services*

19. The Satellite Services segment of Viasat utilizes its proprietary technology platform to "provide satellite-based high-speed broadband services around the globe for use in commercial applications."[61] Viasat's proprietary Ka-band[62] satellites are at the forefront of their technology platform and it has access to several Ka-band and Ku-band[63] satellites in service around the globe.[64] The Satellite Services segment includes Viasat's services related to Fixed Broadband Services, In-Flight Services, Prepaid Internet Services, Other Mobile Broadband Services, and Energy Services.[65] In the commercial airline space, Viasat works with over 60 airlines, such as American Airlines, Emirates, Air Asia, Air France, Delta, United and Jet Blue, across a fleet of more than 3,300 planes.[66] Viasat also serves satellite internet in remote and rural

---

[58] VIASAT_00132818-2947, at -2873.
[59] VIASAT_00132818-2947, at -2830 and -2874.
[60] Wall Street Journal Markets, "ViaSat Inc.," accessed April 10, 2025, at https://www.wsj.com/market-data/quotes/VSAT/financials/annual/income-statement.
[61] VIASAT_00132818-2947, at -2822.
[62] Ka-Band is a communication satellite, "uplink in either the 27.5 GHz and 31 GHz, and high-resolution, close-range targeting radars on military aircraft." *See* The European Space Agency, "Satellite Frequency Bands," accessed March 21, 2025, at
https://www.esa.int/Applications/Connectivity_and_Secure_Communications/Satellite_frequency_bands.
[63] Ku-Band Satellites are used for satellite communications. *See* The European Space Agency, "Satellite Frequency Bands," accessed March 21, 2025, at
https://www.esa.int/Applications/Connectivity_and_Secure_Communications/Satellite_frequency_bands.
[64] VIASAT_00132818-2947, at -2822.
[65] VIASAT_00132818-2947, at -2822 and -2823.
[66] VIASAT_00114142-4150, at -4143; VIASAT_00114662-4752, at -4669.

parts of the United States, where other internet companies either cannot offer any service or only limited service.[67]

20. Figure 2 below illustrates the three generations of Viasat satellites over time, which deliver the services outlined in this section.

*Figure 2. ViaSat Satellites (ViaSat-1, ViaSat-2, & ViaSat-3)[68]*



21. In November 2021, Viasat entered into a Share Purchase Agreement to acquire satellite service provider Inmarsat[69] for a sum of $7.3 billion.[70] Inmarsat held a diverse portfolio of mobile telecommunications satellite networks, encompassing L-band, Ka-band, and S-band satellites, and was primarily based on providing maritime industry solutions.[71] Inmarsat also

---

[67] Viasat, "Viasat is the Best Option for Rural Internet," accessed March 20, 2025, at https://www.viasat.com/satellite-internet/rural-internet/; Viasat, "Everything You Need To Know About Satellite Internet in 2023 and Beyond," accessed April 8, 2025, at https://www.viasat.com/perspectives/satellite-internet/2023/everything-you-need-to-know-about-satellite-internet-in-2023-and-beyond/.

[68] Viasat, "More Bandwidth and Throughput to Satisfy Every Customer," accessed March 21, 2025, at https://www.viasat.com/about/what-we-do/satellite-fleet/.

[69] Inmarsat, "Inmarsat Named World's Leading Inflight Internet Service Provider For Fourth Consecutive Year," press release, January 21, 2021, accessed April 10, 2025, at https://www.inmarsat.com/en/news/latest-news/aviation/2021/inmarsat-named-world-s-leading-inflight-internet-service-provide.html.

[70] Inmarsat, "Viasat and Inmarsat to Combine, Creating a New Leading Global Communications Innovator," press release, November 8, 2021, accessed April 10, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-and-inmarsat-combine-creating-new-leading-global; VIASAT_00132818-2947, at -2821.

[71] Deposition of Michelle Talcott, January 24, 2025, at 42:12-16.

provided inflight broadband solutions to aircrafts,[72] and before its acquisition, had won several accolades for its aviation services for multiple consecutive years.[73] Viasat Chairman and CEO Mark Dankberg justified the deal in a 2022 interview, citing its strong cash flow generation potential and business expansion opportunities in Inmarsat's L-band narrowband segment.[74]

22. Viasat provides satellite internet to rural U.S. areas where competitors offer limited or no service.[75] Residential internet accounts for 10% of Viasat's revenue,[76] but subscriptions have declined, dropping from 603,000 in September 2020 to 257,000 in Q1 2025, especially after Starlink's 2020 launch.[77] In August 2023, Viasat announced plans to exit the U.S. fixed residential market and focus on satellite mobile services for commercial and business aviation.[78]

### ii. Government Systems

23. The Government Systems segment provides an array of products and services designed "to enable the collection and transmission of secure real-time digital transformation and communications between fixed and mobile command centers, intelligence and defense platforms and individuals in the field."[79] Viasat serves the United States Department of Defense, intelligence alliances, allied foreign governments, armed forces, public-safety first-responders

---

[72] Inmarsat, "Maritime Connectivity," accessed April 10, 2025, at https://www.inmarsat.com/en/solutions-services/maritime.html.
[73] Inmarsat, "Inmarsat Named World's Leading Inflight Internet Service Provider For Fourth Consecutive Year," press release, January 21, 2021, accessed April 10, 2025, at https://www.inmarsat.com/en/news/latest-news/aviation/2021/inmarsat-named-world-s-leading-inflight-internet-service-provide.html
[74] Via Satellite, "Dankberg and Suri Explain Strategy Behind Viasat/Inmarsat Acquisition," accessed April 10, 2025, at https://interactive.satellitetoday.com/via/january-february-2022/dankberg-and-suri-explain-strategy-behind-viasat-inmarsat-acquisition.
[75] Viasat, "Viasat is the Best Option for Rural Internet," accessed March 20, 2025, at https://www.viasat.com/satellite-internet/rural-internet/.
[76] S&P Global, "Satellite Providers Pulled Into Starlink's Orbit," accessed April 10, 2025, at https://www.spglobal.com/ratings/en/research/articles/241107-satellite-providers-pulled-into-starlink-s-orbit-13315383.
[77] Viasat, *Q1 FY25 Shareholder Letter*, accessed April 10, 2025, at https://investors.viasat.com/static-files/67b745fb-9e36-44f0-8914-2a44a405a50c, at p. 3; Starlink, "Starlink Beta Services Terms," accessed April 10, 2025, at https://web.archive.org/web/20200715141229/https://www.starlink.com/terms-of-service.
[78] Viasat, Inc. 2022 *Annual Report*, at pp. 3-4.
[79] VIASAT_00132818-2947, at -2825.

and remote government employees.[80] The Government Systems segment includes services related to government mobile broadband products and services, government satellite communication systems, secure networking, cybersecurity, information assurance products and services, and tactical data links.[81] The products and services under Viasat's Government Satellite Communication Systems ("SATCOM") supports "high-throughput broadband data links," to increase available bandwidth using existing satellite capacity and to be resilient to catastrophic events.[82]

24. The Government Systems segment comprised 39% of total product and services revenues in 2022.[83] Several large contracts from government agencies contribute to this significant share. For example, in December 2024, Viasat announced it had been awarded a contract for up to $568 million from General Services Administration to "support U.S. Department of Defense (DoD) technology modernization with tactical networking, ground system, satellite communication and cybersecurity solutions."[84] In January 2025, Viasat was awarded a $4.8 billion NASA contract to support NASA "with connectivity for future missions under the five-year indefinite delivery, indefinite quantity award."[85] In February 2025, Viasat

---

[80] VIASAT_00132818-2947, at -2825.
[81] VIASAT_00132818-2947, at -2825.
[82] VIASAT_00132818-2947, at -2825.
[83] Dividing government systems revenue by total revenue: ($1,086,720)/($2,787,635) ~ 38.9%. *See* VIASAT_00132818-2947, at -2905.
[84] Viasat, "Viasat Awarded up to $568 Million IDIQ Contract from General Services Administration to Support C5ISR Capabilities for U.S. Defense Forces," press release, December 10, 2024, accessed April 10, 2025, at https://www.viasat.com/news/latest-news/government/2024/viasat-awarded-up-to-568-million-idiq-contract-from-general-services-administration-to-support-c5isr-capabilities-for-u-s-defense-forces/.
[85] Viasat, "Viasat Selected for $4.8B Ceiling NASA Near Space Network Services Contract," press release, January 21, 2025, accessed April 10, 2025, at https://www.viasat.com/news/latest-news/government/2025/viasat-selected-for-4-8b-ceiling-nasa-near-space-network-services-contract/.

announced it had been awarded a $3.5 million contract to "provide a low Earth orbit satellite communications capability to support Department of Defense missions."[86]

### iii. Commercial Services

25. The Commercial Services segment of Viasat "develops and sells a wide array of advanced satellite and wireless products, antenna systems and terminal solutions" that enable "the provision of high-speed fixed and mobile broadband services."[87] This segment also involves designing, developing, and producing space system solutions for multiple orbital regimes, which include geostationary earth orbit ("GEO"), medium earth orbit ("MEO"), and low earth orbit ("LEO").[88] The Commercial Services segment includes services related to mobile broadband satellite communication systems, fixed broadband satellite communication systems, antenna systems, satellite networking development, and space system design and development.[89]

### B. Wireless In-Flight Connectivity & Entertainment Service

26. In-Flight Connectivity ("IFC") provides internet connectivity to airline passengers and crew.[90] IFC is not accused of infringing the Patents-in-Suit, as Ms. Kindler acknowledges.[91] Lufthansa Airlines was the first airline to offer IFC to its passengers in 2004, with Boeing's newly pioneered high-speed in-flight connectivity service Connexion.[92] Boeing signed contracts with other airlines such as China Airlines, Japan Airlines, Scandinavian Airlines and El-Al,

---

[86] Viasat, "Viasat Wins Task Order Award to Provide U.S. Space Force with Low Earth Orbit Services," press release, February 3, 2025, accessed April 10, 2025, at https://www.viasat.com/news/latest-news/government/2025/viasat-wins-task-order-award-to-provide-u-s-space-force-with-low-earth-orbit-services/.
[87] VIASAT_00132818-2947, at -2861.
[88] VIASAT_00132818-2947, at -2861.
[89] VIASAT_00132818-2947, at -2861 and -2862.
[90] Viasat, *Viasat In-Flight Connectivity Solutions,* May 1, 2018, accessed April 13, 2025 at https://www.viasat.com/content/dam/us-site/aviation/documents/565522_In-flight_Connectivity_011_aag.pdf.
[91] Kindler Report, at ¶¶ 25, 29.
[92] Talcott, Michelle, "From Take-Off to Future Flightpath: A Look at the Origins and Enormous Potential of In-Flight Wi-Fi," *Viasat*, January 5, 2021, accessed April 11, 2025, at https://www.viasat.com/perspectives/aviation/2021/from-take-off-to-future-flightpath-a-look-at-the-origins-and-enormous-potential-of-in-flight-wi-fi/; Sakhaee, Ehssan, Abbas Jamalipour, "The Global In-Flight Internet," *IEEE Journal on Selected Areas in Communications* 24, no. 9 (September 2006): 1748-1757, at p. 1748.

within months of Lufthansa's offering.[93] Paul Metsellar, the CEO of Ovation Travel Group wrote in an article that, while the connections were "slow and spotty and initial use of the service required big, clunky cords … there was an undeniable excitement to browsing the internet and sending emails at 30,000 feet."[94] However, Connexion was not long-lived, and Boeing discontinued the service in 2006 because the company believed that the market for in-flight Wi-Fi services had not "materialized," and the company failed to overcome its cost structure.[95] Within years of Boeing's exit from in-flight Wi-Fi services, an influx of in-flight connectivity providers entered the market, one of which was Viasat.[96] Viasat entered the IFC market in collaboration with JetBlue Airways in December 2013.[97] JetBlue branded its Wi-Fi as "Fly-Fi." Powered by Viasat's service, "Fly-Fi" allowed passengers to access uninterrupted and stable in-flight Wi-Fi for the very first time.[98] Over time Viasat has invested over $2 billion in broadband investment and has served over 70 million passenger devices.[99] Viasat works with airlines to offer advertising related to IFC, increasing revenue for the airline and value to advertisers, thus

---

[93] Surette, Justin, "The Story of Connexion by Boeing: An Early Onboard Internet Service," *Simple Flying,* February 16, 2023, accessed April 11, 2025, at https://simpleflying.com/connexion-boeing-internet-story/.

[94] Metselaar, Paul, "Why In-Flight Wi-Fi May Finally Be Taking Off," *Inc.,* September 4, 2019, accessed April 11, 2025, at https://www.inc.com/paul-metselaar/why-in-flight-wi-fi-finally-be-taking-off.html.

[95] Boeing, "Boeing to Discontinue Connexion by Boeing Service," press release, accessed April 11, 2025, at https://boeing.mediaroom.com/2006-08-17-Boeing-to-Discontinue-Connexion-by-Boeing-Service; Jin, Min-Jung, and Jin Ki Kim, "Customer Adoption Factors for In-Flight Entertainment and Connectivity," *Research in Transportation Business & Management* 43, (2022), at p. 2.

[96] Talcott, Michelle, "From Take-Off to Future Flightpath: A Look at the Origins and Enormous Potential of In-Flight Wi-Fi," *Viasat*, January 5, 2021, accessed April 11, 2025, at https://www.viasat.com/perspectives/aviation/2021/from-take-off-to-future-flightpath-a-look-at-the-origins-and-enormous-potential-of-in-flight-wi-fi/.

[97] Deposition of Michelle Munoz-Talcott, January 24, 2025, at 44:3-6; Talcott, Michelle, "From Take-Off to Future Flightpath: A Look at the Origins and Enormous Potential of In-Flight Wi-Fi," *Viasat*, January 5, 2021, accessed April 11, 2025, at https://www.viasat.com/perspectives/aviation/2021/from-take-off-to-future-flightpath-a-look-at-the-origins-and-enormous-potential-of-in-flight-wi-fi/.

[98] Talcott, Michelle, "From Take-Off to Future Flightpath: A Look at the Origins and Enormous Potential of In-Flight Wi-Fi," *Viasat*, January 5, 2021, accessed April 11, 2025, at https://www.viasat.com/perspectives/aviation/2021/from-take-off-to-future-flightpath-a-look-at-the-origins-and-enormous-potential-of-in-flight-wi-fi/.

[99] VIASAT_00006655-705, at -657; Deposition of Michelle Munoz-Talcott, January 24, 2025, at 45:18-47:13.

creating a mutually beneficial relationship between Viasat, airlines and advertisers, as seen in Figure 3.[100]



*Figure 3. Viasat Advertisement, Airlines and Revenues[101]*

27. In-Flight Entertainment ("IFE") offerings give users the ability to engage with movies, TV, and music; digital newspapers and magazines; moving maps; and other offerings.[102] Users can engage with IFE using a personal electronic device ("PED") or seatback console.[103] Viasat's IFE offerings use the same architecture—meaning the same antenna, radome, modem, wireless access points, *etc.*—as its IFC offerings which are not accused of infringing the Patents-in-Suit.[104]

---

[100] VIASAT_00114662-4752, at -4699.
[101] VIASAT_00114662-4752, at -4699.
[102] VIASAT_00006471-537, at -500.
[103] VIASAT_00006471-537, at -477.
[104] VIASAT_00105740-838, at -793; Deposition of Ajai Tuli, February 4, 2025, at 56:9-16 ("[W]ireless IFE and live TV, it's an extension of the IFC investment. So the hardware and the system there's no additional kind of equipment needed to enable the wireless IFE or IPTV services.").

28. I understand that Plaintiffs in this case are accusing Viasat's in-flight entertainment and communications[105] services of infringing the Patents-in-Suit. This service comes under the satellite services arm of Viasat. [106] W-IFE is a cloud-based content management system that "delivers a curated selection of on-demand content to passenger devices in a contemporary, streaming style interface."[107]

29. Viasat offers wireless in-flight entertainment services to commercial aircraft and private jets as well as narrowband safety services, and complementary aviation software services.[108] Viasat's W-IFE service provides passengers with access to a range of premium entertainment, video and information services maintained on an onboard server. Viasat partners with major Hollywood studios that include Warner Bros., Walt Disney Pictures, Universal, Paramount, 20th Century Fox, and Sony Pictures to provide licensed digital rights management content to W-IFE users.[109] Viasat's W-IFE can also integrate with other systems that include ePOS solutions, booking, payment, loyalty systems, customer relationship and intelligence, catering, and access to third-party developers' portals.[110]

30. Mr. Ajai Tuli, Vice President of Commercial Strategy for Aviation, testified that airlines with IFE also have IFC.[111] Viasat provides IFC to over 20 airlines, some of which also receive IFE, which is considered an add-on feature.[112] Conversely, Viasat does not provide IFE to any airlines that do not have IFC.[113] W-IFE enhances the passenger experience,[114] but IFC is

---

[105] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 2.
[106] VIASAT_00132818-2947, at -822.
[107] VIASAT_00132818-2947, at -822; Viasat, Inc., Form 10-K for fiscal year ending March 31, 2024, filed May 29, 2024, at p. 4.
[108] VIASAT_00132818-2947, at -822.
[109] VIASAT_00006655-705, at -667.
[110] VIASAT_00006655-705, at -669.
[111] Deposition of Ajai Tuli, February 5, 2025, at 22:5-7 and 59:19-22.
[112] Deposition of Gregory Houda, February 4, 2025, at 28:10-21; Interview with Daniel Newman, April 7, 2025.
[113] Deposition of Ajai Tuli, February 5, 2025, at 59:7-14; 32:13-23.
[114] VIASAT_00003288-349, at -324; VIASAT_00114662-4752, at -4686 and -4703.

significantly more important and airlines come to Viasat for its IFC offerings; it is IFC (not accused of infringing the Patents-in-Suit) that is the impetus for doing business with Viasat from the airlines' perspective.[115] Simultaneously, airlines enjoy the benefit of access to Viasat's content, analytics and ecosystem which supports advertising.[116] Moreover, passengers also enjoy high-quality content.[117] As seen in Figure 4, W-IFE allows users to access media content within an airline branded user interface that does not require a third-party configuration.[118]

*Figure 4. W-IFE Passenger Experience and System Capabilities[119]*



31. In his deposition, Mr. Ajai Tuli of Viasat highlighted the strengths of Viasat's IFC, noting its proven scalability and flexible model across major airframes like Boeing, Airbus, and Embraer.[120] He also cited strong bandwidth offerings.[121] He also testified that W-IFE and live TV can be seamlessly added to existing IFC systems without extra hardware.[122]

---

[115] Interview with Daniel Newman, April 7, 2025.
[116] VIASAT_00003288-349, at -324.
[117] Deposition of Ajai Tuli, February 5, 2025, at 63:8-21.
[118] VIASAT_00003288-349, at -324; Viasat, "Passenger Portals," accessed March 21, 2025, at https://www.viasat.com/aviation/commercial-aviation/passenger-portals/.
[119] VIASAT_00003288-349, at -324.
[120] Deposition of Ajai Tuli, February 5, 2025, at 53:17-25.
[121] Deposition of Ajai Tuli, February 5, 2025, at 54:15-25.
[122] Mr. Ajai Tuli includes Wireless IFE and live TV as part of the IFE offering. *See*, Deposition of Ajai Tuli, February 5, 2025, at 56:9-24 and 57:16-25.

## C. Patented Features and Accused Products

32. Viasat's Video Content Delivery System ("VCDS") is part of the service delivery platform ("SDP") designed to efficiently transport and cache bandwidth-intensive files close to the consumer.[123] Since 2017, VCDS has delivered "better video using less bandwidth" and supports Video-on-Demand ("VOD") through multicasting and caching. [124] Multicasting sends one copy of content per satellite beam, while caching stores content on the plane's server for all passengers.[125] Plaintiffs claim that the patented features relate to "media streaming software, systems, and services" used in in-flight entertainment and communication systems for commercial and private aviation.[126]

33. The '400 patent entitled "Digital Rights Management System Transfer of Content and Distribution," was filed on December 15, 2014, and issued on August 23, 2016.[127] Plaintiffs allege that it "include[s] a kiosk for provisioning secure media content to a plurality of portable data storage devices."[128] Plaintiffs accuse the Viasat in-flight entertainment ("IFE"), wireless system ("W-IFE"), Wi-Fi Gateway Modem ("Gateway") and all products which incorporate the functionality of the aforementioned systems.[129]

34. The '667 patent entitled "Secure Stream Buffer on Network attached Storage," was filed on April 16, 2018, and issued on October 15, 2019.[130] The '667 patent allegedly is responsible for "implement[ing] a method of transmitting media content from a media streaming

---

[123] VIASAT_00008738-9831, at -8743, 8745-8746.
[124] VIASAT_00007343-394, at -345; VIASAT_00008738-9831, at -8761.
[125] VIASAT_00007343-394, at -346, -361, -364.
[126] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 2.
[127] U.S. Patent No. U.S. Patent No. 9,424,400, filed December 15, 2014, issued August 23, 2016; Complaint for Patent Infringement, filed July 28, 2022, at ¶ 19.
[128] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 23.
[129] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at p. 2.
[130] U.S. Patent No. U.S. Patent No. 10,447,667, filed April 16, 2018, issued October 15, 2019; Complaint for Patent Infringement, filed July 28, 2022, at ¶ 35.

system." [131] Plaintiffs allege the '667 patent "establish[es] a connection, via a wide area network ("WAN"), to a network attached storage ("NAS") device operating on a local area network ("LAN")" in tandem with the satellite internet system connected to the server within an aircraft. [132] Similar to the '400 patent, the accused instrumentalities are "Viasat's media streaming software, systems, and services, including systems that implement edge storage, such as and including the Opening Caching standards." [133]

35. Based on my conversation with Dr. Kevin Almeroth, Viasat's technical expert, the '400 patent relates to a kiosk for authenticating end-user devices via a remote trusted server and delivering encrypted content and access key to the end-user devices. [134] Whereas the '667 patent relates to a network-attached storage device that ensures protection of the content being streamed on devices. [135] The concept behind the '667 patent comes from the early days when content providers were wary about the protection of their content being streamed. [136]

36. Plaintiffs accuse Viasat's IFE system in commercial and private aviation of infringing both the '400 and '667 patents. [137] In addition to the IFE system, the '667 patent allegedly is also infringed by the systems Viasat uses to implement "edge storage solutions." [138] Specifically, Viasat is accused of allegedly practicing the patents in their antennas, wireless access points ("WAPs"), modems, servers, gateways, core nodes, data centers, and satellites which allow the

---

[131] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 39.
[132] Complaint for Patent Infringement, filed July 28, 2022, at ¶ 40.
[133] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at pp. 2-3.
[134] Interview with Dr. Kevin Almeroth, April 8, 2025.
[135] Interview with Dr. Kevin Almeroth, April 8, 2025.
[136] Interview with Dr. Kevin Almeroth, April 8, 2025.
[137] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed February 23, 2023, at p. 1; Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at pp. 1-2.
[138] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed February 23, 2023, at p. 2.

application of "media streaming software, systems, and services."[139] Figure 5 below summarizes

Viasat's content delivery service which shows how cloud content is cast to satellites and then to

the receiving edge cache (*i.e.* airplanes).

*Figure 5. Viasat Content Delivery Service Summary[140]*



37. It is my understanding that Plaintiffs do not contend that any Sandisk product or any

third-party product practices or ever has practiced any claims of the '400 or the '667 patents.[141]

Moreover, Plaintiffs also acknowledged in their interrogatory response that they were "not

presently aware of any other products that practice or practiced any asserted claim of the '400 or

'667 patents."[142]

### D.  Secure Content Storage Association

38. Secure Content Storage Association ("SCSA") was founded in 2012 by Western

Digital, Sandisk, Twentieth Century Fox, and Warner Bros., as a consortium of companies

---

[139] Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed February 23, 2023, at p. 1; Plaintiff's Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions, filed March 22, 2024, at pp. 1-2.
[140] VIASAT_00003234-287, at -238.
[141] Deposition of Soji John, March 28, 2025, at 29:18-20.
[142] Plaintiffs' Responses and Objections to Viasat's First Set of Interrogatories, at p. 9.

within the entertainment and storage industry.[143] SCSA focused on "developing solutions to make it easy and secure for consumers to purchase, transfer, and view the highest value digital content across multiple electronic devices while seamlessly complementing and integrating with online content locker services."[144] SCSA did not create the concept of Digital Rights Management ("DRM"), but rather was formed to create a new DRM system that controls the secure transfer of media content to a SCSA storage device.[145] David Blankenbeckler, a former Program Manager at Western Digital who served as Western Digital's technical representative on SCSA, testified that the SCSA approved process was secure enough for the various studios to give them access to the premium content on Western Digital's devices.[146]

### E. The Value Drivers of Viasat

39. Viasat has developed a system designed to "provide high-speed, cost-efficient broadband access to customers" and "utilize fixed broadband satellite infrastructure."[147] Viasat's system seamlessly integrates high-capacity Ka-band satellites, ground infrastructure, and user terminals into a vertically integrated, end-to-end platform.[148] This system creates significant synergies across the business, enabling Viasat to offer a diverse range of high-speed, high-quality broadband solutions to enterprises, consumers, and military and government clients.[149] By driving operational efficiencies, Viasat is able to deliver cost-effective services that meet a

---

[143] Deposition of Soji John, February 14, 2025, at 74:19-21; Deposition of Danny Ybarra, January 30, 2025, at 17:15-18:5; Rambus, "Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise," press release, September 6, 2012, accessed April 9, 2025, at https://www.rambus.com/secure-content-storage-association-scsa-selects-cryptography-research-to-provide-security-expertise/.
[144] Rambus, "Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise," press release, September 6, 2012, accessed April 9, 2025, at https://www.rambus.com/secure-content-storage-association-scsa-selects-cryptography-research-to-provide-security-expertise/.
[145] Deposition of Danny Ybarra, January 30, 2025, at 17:17-18:5.
[146] Deposition of David Blankenbeckler, January 22, 2025, at 22:19-23:17, 47:9-48:7.
[147] VIASAT_00132818-2947, at -2824.
[148] VIASAT_00132818-2947, at -2826.
[149] VIASAT_00132818-2947, at -2826.

broad spectrum of client needs while maintaining exceptional service standards.[150] This value in Viasat comes from a number of factors, none of which are specifically related to the Patents-in-Suit, and which are instead driven by the efforts and investments made by Viasat.

### 1. Satellites

40. *First and foremost,* Viasat has over 20 space satellites and an additional 10 in construction, which are the product of over $2 billion in satellite broadband investments and which enhance Viasat's ability to deliver high quality services to all clients, not only commercial airlines.[151] Four satellites in Viasat's fleet are equipped with "Ka-Band" capabilities, which offer faster speeds, forward compatibility, "unrivaled" capacity and unlimited streaming.[152] Viasat is "hyper-focused on maximizing the useful bandwidth per total lifetime capital cost of each satellite" also referred to as bandwidth productivity, a crucial metric in determining the return on investment for each satellite.[153] The greater the capacity offered in Viasat's satellites means that end-users experience faster, higher quality and more reliable internet with each Viasat innovation.[154]

41. Viasat invests heavily in not only developing satellites but also in technologies for spacecraft, ground infrastructures, terminals and network design to "serve the evolving technology needs of [its] customers whether on the ground, in the air or at sea."[155] Viasat constantly innovates its satellite fleet, equipping each with the most advanced technology to

---

[150] VIASAT_00132818-2947, at -2826.
[151] VIASAT_00006655-6705, at -6657; VIASAT_00006471-6537, at -6480; Viasat_00123343-3424, at -3344; Deposition of Michelle Munoz-Talcott, January 24, 2025, at 45:18-47:13.
[152] VIASAT_00132818-2947, at -3822; Viasat, *In-Flight Connectivity for Business Aviation,* July 7, 2020, accessed March 20, 2025, at https://www.viasat.com/content/dam/us-site/aviation/documents/971881_Business_Aviation_Ka-band_Brochure_009_Web.pdf, at p. 3.
[153] VIASAT_00132818-2947, at -2828.
[154] VIASAT_00078755-8812, at -8757.
[155] VIASAT_00132818-2947, at -2826.

improve coverage, capacity and speed to meet growing customer demand.[156] For example, in 2011, Viasat launched ViaSat-1 which had 140 gigabytes per second (Gbps) of capacity.[157] ViaSat-2 was launched in 2017 with 260 gbps and seven times the coverage.[158] In 2023, Viasat launched ViaSat-3 which improved capacity to one terabyte, which brought affordable high-quality internet to individuals who were once "off the grid."[159] This drive for innovation, new technologies and techniques won ViaSat-1 a Guinness World Record title of "highest-capacity communications satellite" in 2013.[160] Five years later, ViaSat-2 would win the "Space, Platforms" category of the 61st Annual Awards for Aviation Week, which honor achievements in the global aerospace industry.[161]

42. Viasat also specializes in satellite networking and space system design, providing services in satellite communication system architecture, ground systems, and advanced semiconductor design for Application-Specific Integrated Circuits ("ASIC") and Monolithic Microwave Integrated Circuit ("MMIC") chips.[162] It develops high-capacity Ka-band satellites, satellite payloads, and antenna technologies for both commercial and military applications.[163] In addition to supporting its own satellite fleet, Viasat also offers these services to third-party clients, showcasing their expertise in satellite technology and development.[164]

---

[156] Viasat, "More Bandwidth and Throughput to Satisfy Every Customer," accessed March 19, 2025, at https://www.viasat.com/about/what-we-do/satellite-fleet/.
[157] National Aeronautics and Space Administration, "ViaSat 1," accessed March 19, 2025, at https://nssdc.gsfc.nasa.gov/nmc/spacecraft/display.action?id=2011-059A; VIASAT_00078755-8812, at -8761; VIASAT_00132818-2947, at -2822, -2828.
[158] Viasat, "ViaSat-2 Launched With Nearly Double the Capacity of ViaSat-1," accessed March 19, 2025, at https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-2/; VIASAT_00078755-8812, at -8761; VIASAT_00132818-2947, at -2822, -2828.
[159] Viasat, "ViaSat-3 is Satellite Reimagined," accessed March 19, 2025, at https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-3/; VIASAT_00078755-8812, at -8761.
[160] VIASAT_00132818-2947, at -2826.
[161] VIASAT_00132818-2947, at -2826.
[162] VIASAT_00132818-2947, at -2824.
[163] VIASAT_00132818-2947, at -2824.
[164] VIASAT_00132818-2947, at -2824.

43. Viasat's investments, constant development and innovation in its satellite segment result in a clear, easy to use, efficient, high quality and high-capacity internet experience for its users; all features which are unrelated to the Patents-in-Suit.[165]

### 2. *Internet connectivity*

44. As mentioned above, In-Flight Connectivity ("IFC") is the impetus for doing business with Viasat from the airlines' perspective, because it is connectivity that passengers value the most.[166] Viasat considers itself the global leader in in-flight Wi-Fi.[167] Viasat's approximately 20 satellites translate to more bandwidth per passenger, equivalent to a "home quality broadband connection" in each aircraft.[168] Customers see Wi-Fi as a crucial aspect of flying. A Viasat "Passenger Experience Survey" of over 11,000 passengers conducted in 2023 reported that other than ticket price, free in-flight Wi-Fi has become the most influential factor in choosing an airline over food & drink, leg room, and entertainment.[169] Viasat's Ajai Tuli confirmed that the key value driver for customers is high-quality Wi-Fi, meaning IFC, at scale.[170] Indeed, in presentations that Viasat makes to airlines it emphasizes IFC, rather than IPTV or W-IFE, presenting IFC in its main title, describing it first, and allocating more slides to IFC.[171]

45. Airlines also highly value good internet connectivity because it promotes passengers' sense of brand loyalty towards them.[172] In the survey just mentioned, 83% of passengers stated

---

[165] VIASAT_00074929-4999, at -4936.
[166] Interview with Daniel Newman, April 7, 2025.
[167] Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.
[168] VIASAT_00078755-8812, at -8757, -8776.
[169] Viasat, "Free In-flight Wi-Fi Now Most Influential Factor, Other Than Ticket Price, for Airline Passengers, Reveals New Viasat Survey," press release, September 19, 2023, accessed March 19, 2025, at https://www.viasat.com/news/latest-news/aviation/2023/free-in-flight-wi-fi-now-most-influential-factor-other-than-ticket-price-for-airline-passengers-reveals-new-viasat-survey/.
[170] Interview with Ajai Tuli, April 7, 2025.
[171] VIASAT_00132453-2578, at -2454, -2457.
[172] Inmarsat, "Demand for Inflight Wi-Fi is Driving Airline Loyalty Amongst Passengers," press release, August 7, 2018, accessed April 12, 2025, at https://www.inmarsat.com/en/news/latest-news/aviation/2018/demand-for-inflight-wi-fi-is-driving-airline-loyalty-amongst-passengers.html

they would be more likely to rebook with an airline that provided quality Wi-Fi and 81% of passengers stated that "Wi-Fi was important to their onboard experience."[173] In the survey, customers also stated that they would be willing to participate in sponsored access for free online activity such as watching an advertisement.[174]

46. Viasat's IFC has won numerous awards such as the 2015 Crytal Cabin Award (for best "passenger comfort system"), the 2015 Excellence in Avionics Award for In-Flight Connectivity Innovation, the 2015 Via Satellite Excellence Award for Vertical Impact, the 2018 APEX Regional Passenger Choice Award Winner for Best Wi-Fi (for JetBlue), the 2019 APEX Global Passenger Choice Award Winner and the 2022 APEX Passenger Choice Award Winner for Best Wi-Fi (for Delta Air Lines).[175]

### 3. Hardware, software, and technical support

47. Viasat provides both hardware and software, including power supply, antenna, modem, server, wireless access points, and satellite access.[176] Its portal features allow list controls, language options, end-user care, flight info, and entertainment.[177] Under its wireless entertainment contract with airlines, Viasat partners with third-party Vualto, which provides DRM services to encrypt, decrypt, and securely transfer licensed content.[178] Viasat also offers

---

[173] Viasat, "Free In-flight Wi-Fi Now Most Influential Factor, Other Than Ticket Price, for Airline Passengers, Reveals New Viasat Survey," press release, September 19, 2023, accessed March 19, 2025, at https://www.viasat.com/news/latest-news/aviation/2023/free-in-flight-wi-fi-now-most-influential-factor-other-than-ticket-price-for-airline-passengers-reveals-new-viasat-survey/. *See,* VIASAT_00114662-4752, at -4672; Viasat_00123343-3424, at -3352.

[174] Viasat, "Free In-flight Wi-Fi Now Most Influential Factor, Other Than Ticket Price, for Airline Passengers, Reveals New Viasat Survey," press release, September 19, 2023, accessed March 19, 2025, at https://www.viasat.com/news/latest-news/aviation/2023/free-in-flight-wi-fi-now-most-influential-factor-other-than-ticket-price-for-airline-passengers-reveals-new-viasat-survey/; VIASAT_00074929-999, at -963.

[175] VIASAT_00132818-2947, at -2827.

[176] VIASAT_00105740-5838, at -5793, -5800; Deposition of Ajai Tuli, February 4, 2025, at 56:9-16 ("[W]ireless IFE and live TV, it's an extension of the IFC investment. So the hardware and the system there's no additional kind of equipment needed to enable the wireless IFE or IPTV services.").

[177] VIASAT_00079827-9879, at -9860.

[178] VIASAT_00014633-4813, at -4738.

software that incorporates artificial intelligence and machine learning to help clients transform data into actionable insights.[179] Additionally, Viasat provides complex satellite communication systems and products to service providers, enterprises, and government organizations, along with military-focused solutions that include tactical data links, cybersecurity, and information assurance services.[180]

48. Airlines who partner with Viasat receive VCARE, a comprehensive maintenance support service, which provides service launch support like program support and training as well as operational support once the service is implemented.[181] Viasat offers a 24/7 customer service center that assists with IFC maintenance, technical support and monitoring reports.[182] Viasat couples service support with hardware support that guarantees spare parts, repairs, logistics, and Line Replaceable Units ("LRUs") covered for the duration of the airline contract.[183] Mr. Tuli also pointed out that Viasat offers maintenance and support services globally in a timely manner, which is also valued by customers.[184] This significantly reduces the airline's responsibility for maintaining and managing its in-flight internet connectivity.

### 4. Flexibility and variety of offerings

49. Viasat works with airlines to develop product offerings that fit each airline's needs, ranging from different connectivity plans, the content they want to provide, user management, advertising with third parties, and branding.[185] The flexibility in service architecture allows

---

[179] VIASAT_00132818-3947, at -3826.
[180] VIASAT_00132818-3947, at -3826.
[181] VIASAT_00123343-3424, at -3416-3418, -3423; VIASAT_00074929-999, at -977, 982, -985; VIASAT_00114662-4752, at -4741, -4743, -4746; VIASAT_00097221-295, at -287.
[182] VIASAT_00123343-3424, at -3419; VIASAT_00074929-999, at -985-986, -989; VIASAT_00114662-4752, at -4744.
[183] VIASAT_00078755-8812, at -8806, -8808. *See also,* VIASAT_00114662-4752, at -4742.
[184] Interview with Ajai Tuli, April 7, 2025.
[185] VIASAT_00079725-773, at -755; VIASAT_00078755-8812, at -8776.

Viasat's clients to control the products offered to passengers to fit the airline's experience strategy.[186]

50. Viasat's pricing is also flexible. For example, in its contract with American Airlines, Viasat uses a "Wholesale Service Pricing" model, where American Airlines pays for passenger IFC, IPTV, and IFE services.[187] Pricing depends on aircraft size, flight duration, and services provided. For instance, Viasat's IFE to passengers' devices follows a per-aircraft pricing model, as shown in Figure 6 below.[188]

*Figure 6. Viasat's Wireless Entertainment Pricing[189]*

| Wireless Entertainment Elements | Fees |
| --- | --- |
| Wireless Entertainment Software License | One-time fee of $15,000 per Aircraft |
| Wireless Entertainment Management Services | $450 per Active Aircraft per month |
| Wireless Entertainment Content Ingestion and DRM Services | $100 per title ingested into the Wireless Entertainment content server; this fee is applied once per title regardless of the number of Aircraft to which the content will be distributed. |

### 5. *Entertainment content*

51. Another major value driver for airlines is the relationships Viasat has built with content providers. Viasat reduces the administrative burden of airlines by supplying a broad library of content with major Content Service Providers ("CSPs") and studios such as Disney and Paramount.[190] Airlines can then provide a portfolio set of licensed movies, TV series, live events and other products offered to passengers under a unified interface to fit the airline's experience strategy.[191] Additionally, many passengers download content to local storage to watch on their

---

[186] VIASAT_00078755-8812, at -8776.
[187] VIASAT_00014922-5031, at -4995-4997.
[188] VIASAT_00014633-4813, at -4685, -4691-4692.
[189] VIASAT_00014633-4813, at -4691.
[190] VIASAT_00003288-3349, at -3327. *See,* VIASAT_00003288-3349, at -3296-3302.
[191] Viasat, "Passenger Portals," accessed March 21, 2025, at https://www.viasat.com/aviation/commercial-aviation/passenger-portals/; VIASAT_00078755-8812, at -8776; VIASAT_00003288-3349, at -3310.

personal devices during the flight. Streaming services including Hulu, Netflix, Apple TV, Paramount+, Disney+, and Amazon Prime all permit passengers to download and store content locally before their flight for in-flight viewing.[192]

52. Viasat has invested in relationships with leading edge content providers like Apple, fuboTV, the NBA and others, which "enhance end-users' experiences with their online and streaming media services over [Viasat's] network."[193] This enriches the passengers' experience by providing a broad portfolio of content while leveraging affordable broadband services to make the flying experience the best available.[194] Viasat offers TV shows and movies in various categories (*e.g.,* comedy, family, kids) to users which are refreshed quarterly or semi-annually to reflect the recent "blockbusters" and releases.[195] Users have access to films and media from all six major Hollywood Studios (WB, Disney, Paramount, Universal, Sony and 20th Century Fox) and other major independent studios, such as Terry Steiner which is a testament to Viasat's relationship with major Content Service Providers ("CSPs") like SpaFax and Anuvu.[196] Viasat also provides a large portfolio of TV shows, movies and live television which users can enjoy from household channels such as ABC, FOX, ESPN, and HGTV.[197] Domestically, airlines who offer IPTV through Viasat typically offer between 12 to 20 channels.[198] For example, as of August 2024, American Airlines offered 12 channels, Southwest offered 13 channels, Delta offered 18 channels, and JetBlue offered 20 channels.[199]

---

[192] *See, e.g.*, Apple, "Watch Shows and Movies Offline," accessed April 13, 2025, at https://apps.apple.com/us/story/id1434355437.
[193] VIASAT_00132818-2947, at -2830; Deposition of Michelle Munoz-Talcott, January 24, 2025, at 72:5-73:5.
[194] VIASAT_00132818-3947, at -3830.
[195] VIASAT_00003288-3349, at -2393, -3295, -3296-3303.
[196] VIASAT_00003288-3349, at -3327, -3332-3333; VIASAT_00003350-355, at -352; VIASAT_00006655-6705, at -667.
[197] Viasat, "In-Flight Entertainment," accessed March 19, 2025, at https://www.viasat.com/aviation/commercial-aviation/in-flight-entertainment/; VIASAT_00003288-3349, at -3315.
[198] VIASAT_00136959, at p. 56.
[199] VIASAT_00136959, at p. 56.

### 6. *Passenger experience*

53. Viasat offers an enhanced user experience and interface that users can access from an in-flight or personal device.[200] In the user interface, passengers are accompanied by a two or three-dimensional Moving Map which follows the flight path, in addition to media access.[201] Viasat reduces airline administrative burdens by also processing payments on flights and supporting major credit card payments, as well as digital wallets such as Apple pay.[202]

### 7. *Advertising*

54. Another major value driver for airlines is the advertising that Viasat can facilitate, which generates revenue for them. Viasat has invested significantly in enhancing the value of such advertising, again unrelated to the Patents-in-Suit. For a start, due to its investment in satellite technology, Viasat is a vast enterprise which spans over 60 global airlines, 400 destinations, and hundreds of millions of annual passengers.[203] Each flight provides a high passenger "dwell time," meaning extended exposure, which correlates with greater consumer brand recall.[204] Also, passengers are not resistant to advertising. A majority of passengers have stated that they are willing to view sponsored content, such as advertisements, to get more consistent Wi-Fi access.[205]

55. Indeed, in presentations to airlines, Viasat highlights the value of its advertising services.[206] Michelle Munoz-Talcott, Vice President of Marketing at Viasat, testified that

---

[200] Viasat, "Passenger Portals," accessed March 21, 2025, at https://www.viasat.com/aviation/commercial-aviation/passenger-portals/; VIASAT_00000618-629, at -621; VIASAT_00114662-4752, at -4684-4685.
[201] VIASAT_00114662-4752, at -4696.
[202] VIASAT_00123343-3424, at -3401; VIASAT_00097221-295, at -272.
[203] Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.
[204] Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.
[205] Viasat, "Free In-flight Wi-Fi Now Most Influential Factor, Other Than Ticket Price, for Airline Passengers, Reveals New Viasat Survey," press release, September 19, 2023, accessed March 19, 2025, at https://www.viasat.com/news/latest-news/aviation/2023/free-in-flight-wi-fi-now-most-influential-factor-other-than-ticket-price-for-airline-passengers-reveals-new-viasat-survey/; VIASAT 00008364-386, at -371.
[206] VIASAT_00087127-141, at-140; VIASAT_00105966-06066, at -06028.

Viasat's "advertising solution is important to Viasat, and it is a differentiator against [its] competitors."[207] This is because traditional in-flight advertising is "static," meaning that all users see the same advertising making it a challenge to get many advertisers.[208] Viasat ensures that advertisers capture the attention of audiences by deploying a targeted advertising system and offering advertisers unique and valuable opportunities to capture the attention of their target audience.[209] To reduce "passenger fatigue," Viasat targets specific conditions when deploying an advertisement.[210] For example, Viasat offers targeted advertising based on destinations; advertisers can monopolize ad space for a flight destination such as New York City, which ensures that advertisements reach the most relevant audience.[211] Also, Viasat offers advertising for brands and companies on the same unified interface tailored to the airline brand.[212] In Figure 7 below, Viasat summarizes the capabilities of its advertising platform including that it offers higher engagement, minimized passenger fatigue, budget control, and support for campaign goals, all through an optimized data-driven approach.[213]

---

[207] Deposition of Michelle Munoz-Talcott, January 24, 2025, at 37:8-22 and 163:11-19.
[208] VIASAT_00114662-4752, at -4703.
[209] Viasat, "Right Place, Right Time," accessed March 20, 2025, at https://www.viasatads.com/resources/right-place-right-time/; Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.
[210] VIASAT_00114662-4752, at -4703; Viasat, "Right Place, Right Time," accessed March 20, 2025, at https://www.viasatads.com/resources/right-place-right-time/; Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.
[211] Viasat, "Right Place, Right Time," accessed March 20, 2025, at https://www.viasatads.com/resources/right-place-right-time/; VIASAT_00114662-4752, at -4703.
[212] Viasat, "Passenger Portals," accessed March 21, 2025, at https://www.viasat.com/aviation/commercial-aviation/passenger-portals/; VIASAT_00079725-773, at -754; VIASAT_00078755-8812, at -8784.
[213] VIASAT_00123343-3424, at -3383.

*Figure 7. Viasat Advertising Platform Capabilities[214]*



56. Moreover, Viasat reduces the administrative burden by managing targeted advertising with airlines needing only to choose from existing brands and partners to receive quarterly advertising revenue, as seen in Figure 8. For both advertisers and airlines, Viasat reduces the administrative burden by providing insights on ad performance and managing billing for programming.[215] Advertisers provide Viasat with turnkey advertisements, meaning the advertisements are prepared for immediate deployment to in-flight audiences.[216] Airline partners ultimately select brands and products that most align with their goals and directives and can deploy the advertisements instantly and receive quarterly advertising revenue.[217] Viasat also "provides self-service results through a single, unified dashboard," allowing advertisers to monitor the effectiveness of their ad campaigns using data analytics.[218] This increases the value

---

[214] VIASAT_00123343-3424, at -3383.

[215] Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/; VIASAT_00078755-8812, at -8786.

[216] VIASAT_00078755-8812, at -8786; Viasat, "Let Ads Pay for Wi-Fi," accessed March 20, 2025, at https://www.viasat.com/aviation/advertising/let-ads-pay/.

[217] VIASAT_00078755-8812, at -8786-8787; Viasat, "Let Ads Pay for Wi-Fi," accessed March 20, 2025, at https://www.viasat.com/aviation/advertising/let-ads-pay/.

[218] Viasat, "Join Their Journey," accessed March 20, 2025, at https://www.viasatads.com/.

of Viasat-based in-flight advertising to the advertisers and, therefore, their willingness to pay airlines (through Viasat) for that advertising.

*Figure 8. Viasat and Airline Responsibilities in Advertising[219]*



57. In sum, the value drivers of Viasat are based on its significant investment in a global satellite system, its award winning in-flight internet connectivity ("IFC"); the hardware, software and technical support it provides to airlines, the flexibility and variety of its product offerings; its relationships with entertainment content providers, the passenger experience it offers with its platform, and its targeted advertising and related analytics. These drivers are not related to the Patents-in-Suit.

## III.   SUMMARY OF MS. KINDLER'S ANALYSIS

58. In this section, I summarize Ms. Kindler's analysis. Ms. Kindler calculates damages for two products: the IPTV and W-IFE services offered by Viasat.[220] Ms. Kindler assesses damages for each patent independently using "revenue apportionment" or "cost-saving" approaches for the '667 patent and an assumed royalty rate for the '400 patent.[221] The cost-

---

[219] VIASAT_00078755-8812, at -8787.
[220] Kindler Report, at ¶¶ 220-221, Tables 20-21.
[221] Kindler Report, at § IX. E-F.

saving approach is offered by her as an alternative to her revenue approach exclusively for the

'667 patent applied to IPTV.[222] As I discuss below, Ms. Kindler's analysis is deeply flawed,

unreliable and is not the product of sound economic analysis or methodologies. I also find that

her analysis uses erroneous information regarding the application of the Patents-in-Suit in the

allegedly infringing features, ignores costs by looking at revenues instead of profits, and

misapplies Georgia-Pacific exaggerating the share of value that would go to the Plaintiffs, among

other serious errors. Once these errors are corrected, Ms. Kindler's damages are reduced

substantially.

### A.  *Hypothetical Negotiation & Damage Period*

59. Ms. Kindler describes her understanding of two hypothetical negotiations—one for

each Patent-in-Suit. [223] For the '400 patent, issued in August 2016, she assumes a negotiation in

early 2017, based on the premise that "Infringing Use Cases were developed after Viasat's

acquisition of Arconics," a "provider of software solutions to the aviation industry," in

November 2016.[224] Nevertheless, she calculates damages for the '400 patent from January 2018

through November 30, 2025.[225] For the '667 patent, issued in October 2019, Ms. Kindler sets the

hypothetical negotiation and damages period to begin at issuance in October 2019.[226] She states

that, per Plaintiffs' counsel's direction, she also calculates damages from August 2022—the

complaint filing date—through November 30, 2025.[227]

---

[222] Kindler Report, at § IX. E-F.
[223] Kindler Report, at ¶ 98.
[224] Kindler Report, at ¶ 98.a; Viasat, "Viasat Acquires Arconics for Added Aircraft Operations Capabilities," press release, November 14, 2016, accessed April 1, 2025, at https://investors.viasat.com/news-releases/news-release-details/viasat-acquires-arconics-added-aircraft-operations-capabilities.
[225] Kindler Report, at ¶ 221, Table 20, n. 767.
[226] Kindler Report, at ¶ 98.b, Table 20, n. 767.
[227] Kindler Report, at Table 20, n. 767.

**B.  Ms. Kindler Estimates IPTV & W- IFE Take Rates**

60. Ms. Kindler begins her damages analysis by estimating a "take rate," or the percentage of passengers using the allegedly infringing functionality on IPTV and W-IFE – equipped aircraft.[228] She relies on two figures: a 40% baseline for free W-IFE services, based on a Viasat IFC projection,[229] and a 25% rate derived from limited 2018 data for American Airlines.[230] Despite its narrow basis, the 25% rate is used throughout her report and does not reflect actual take rates for IPTV or W-IFE. Notably, the same source projecting the 40% IFC take rate also projects only a 2%–10% range for paid services.[231]

**C.  Ms. Kindler Calculates the Alleged "Bandwidth Savings" From the '667 Patent**

61. For the '667 patent, Ms. Kindler applies two damage methods: revenue apportionment and cost-saving, both of which rely on how much bandwidth she claims is saved because of the patent.[232] To estimate these supposed bandwidth savings, she calculates total data transmitted over-the-air to satellites (10,853 TB) and then by satellites to aircraft (19,052 TB).[233] She argues Viasat's 480p IPTV service consumes 700 MB/hour, which she converts to a 1.55 Mbps stream rate.[234] Based on 100 concurrent flights and 250 Mbps bandwidth at peak,[235] she estimates unique IPTV channels per flight by dividing total bandwidth by flights and stream rate resulting in concurrent channels of 1.613.[236] Because any individual passenger can only watch one channel at a time, she adjusts the data delivered to airplanes by dividing the 19,052 TB delivered to airplanes by 1.613, resulting in an adjusted total bytes served to airlines of 11,812

---

[228] Kindler Report, at ¶¶ 77.a., 148, n. 289.
[229] VIASAT_00104683, at tab "Assumptions."
[230] Kindler Report, at ¶ 148.c., citing VIASAT_00104683, at tab "Assumptions"; VIASAT_00015430 – 676, at 635. See, Kindler Report, at Exhibit 7.3.
[231] Kindler Report, at ¶ 148.c., citing VIASAT_00104683, at tab "Assumptions."
[232] Kindler Report, at § IX. E-F.
[233] Kindler Report, at ¶ 175 and Exhibit 8.6.
[234] Kindler Report, at ¶ 175.ii, n. 700.
[235] Kindler Report, at ¶ 175.iii.
[236] 1.613= 250 Mbps/100 flights /1.55 Mbps.

TB.[237] Using a 150–passenger per plane average and a 25% take rate (she also uses her alternative of 40%), she estimates the total data delivered to passengers by multiplying the take rate by number of passengers and adjusted bytes served to the airplanes, resulting in 442,965 TB of data delivered to passengers (or 708,744 TB, when using her 40% take rate).[238]

62. She then assumes that the difference between bytes served to the passengers and those served to the airplanes can be attributed to bandwidth savings from caching that she attributes to the '667 patent as opposed to any other Viasat feature or functionality including multicasting, which is not alleged to infringe. Based on these assumptions, Ms. Kindler offers an opinion asserting 95.7% of bandwidth savings from the '667 patent at her 25% take rate and 97.3% at her 40% take rate.[239]

### D.  '667 Patent Incremental Value Under Ms. Kindler's Revenue Apportionment Approach

63. According to Ms. Kindler, Viasat's Service Level Credit agreement for IPTV requires it to forfeit 30% of the revenue it receives from airlines if it fails to ensure "reliable content delivery."[240] Ms. Kindler applies her estimated 95% IPTV bandwidth savings she claims are attributed to the '667 patent to this 30%, allocating a full 28.5% of Viasat's IPTV revenue to the '667 patent.[241]

64. For W-IFE, under Viasat's wireless entertainment agreements, Ms. Kindler estimates 85.7% of revenue stems from content delivery.[242] If content updates fall below 85%, Viasat must return 20% of revenue to airlines.[243] Multiplying these figures, she calculates 17.13% of W-IFE

---

[237] Kindler Report, at ¶ 175.v.
[238] Kindler Report, at ¶ 175.vi-vii, Exhibit 10.1.
[239] Kindler Report, at Exhibit 10.1.
[240] Kindler Report, at ¶ 180.
[241] Kindler Report, at ¶ 181.
[242] Kindler Report, at ¶ 204.
[243] Kindler Report, at ¶ 203.

revenues, concluding that all of this revenue is attributable to the '667 patent because its supposed bandwidth savings enable Viasat to maintain reliable W-IFE service.[244]

### E. Ms. Kindler Does Not Apply a Profit Margin

65. Ms. Kindler employs a pure *revenue* (rather than *profit*) apportionment model, basing her damages solely on revenue from IPTV and W-IFE, without accounting for any associated costs. She estimates profit margins but she does not apply them in her analysis.[245] Thus, her model excludes all operating expenses, as well as those related to service development such as R&D.[246] In fact, she herself cites to a 2024 gross margin for Visat of 26.95%, but she never applies it in her analysis.[247]

### F. Ms. Kindler Assumes '400 Patent Royalty Based on SCSA Agreements

66. Ms. Kindler reviewed several SCSA agreements, including Early Developer, Early Adopter Pre-Launch, Project Phenix Pre-Launch, and Contributor Agreements—which feature varied payment structures such as transaction, provider, and storage fees.[248] After consulting Dr. Easttom, she concluded that SCSA technology is comparable to the Patents-in-Suit.[249] Based on input from David Blankenbeckler, a former Program Manager at Western Digital who served as Western Digital's technical representative on SCSA, she identified a $0.03 Content Publisher Fee per transfer as most relevant for the '400 patent, citing purported technical similarity, licensing scope, Western Digital's familiarity with SCSA fees, and patent pool considerations.[250] She uses this $0.03 as her royalty rate per IPTV and W-IFE viewing session to calculate damages for the '400 patent.

---

[244] Kindler Report, at ¶¶ 204-205, Table 18, citing, VIASAT_00014633-4831, at -4726.
[245] Kindler Report, at ¶¶ 86, 88, Exhibit 6.
[246] *See,* Kindler Report, at ¶ 88, Exhibit 6.
[247] Kindler Report, at ¶ 24.
[248] Kindler Report, at ¶¶ 159-164.
[249] Kindler Report, at ¶ 168.
[250] Kindler Report, at ¶¶ 167-168.

### G. '667 Patent Incremental Value Under Ms. Kindler's Cost-Savings Approach

67. As an alternative to her revenue apportionment approach for the '667 patent (based on supposed revenue savings from Service Level Credits, as described above in Section III.D), she performs an alternative cost-savings approach for the '667 patent, but only applied to IPTV (not W-IFE). Her premise is that Viasat would either have to use more of its additional over-the-air bandwidth or purchase bandwidth from third parties, if it did not have the '667 patent which, as discussed above, she contends allows it to save bandwidth through caching data on airplanes. Citing airline presentations to Turkish Airlines and International Airlines Group (IAG), Ms. Kindler claims third-party data costs range from $1.00 to $2.00 per GB.[251] Based on the same presentations, she estimates Viasat's cost per GB as $0.13 to $0.26.[252] She uses these rates in conjunction with her estimate of supposed bandwidth savings for IPTV from the '667 patent to calculate damages under her cost-savings approach.

### H. Ms. Kindler Assumes an Unsupported 50:50 Georgia-Pacific Split and Calculates Damages

68. Ms. Kindler assumes a 50-50 Georgia-Pacific split between Viasat and Western Digital, which is unrealistically favorable to Western Digital, as I will describe below.[253]

69. For the '667 patent, she attributes 28.5% of IPTV revenue ($123,858,149) to the patent, resulting in $35,299,572 of revenue, and 17% of W-IFE revenue ($34,200,021) to the patent, resulting in $5,814,004.[254] Applying her 50-50 split, she calculates $17,649,786 for IPTV and $2,907,002 for W-IFE as royalty damages.[255]

---

[251] Kindler Report, at ¶ 185
[252] Kindler Report, at Table 15-16.
[253] Kindler Report, at ¶¶ 216-217.
[254] Kindler Report, at ¶¶ 213.a.i, 213.b, Exhibit 10.8.
[255] Kindler Report, at Table 20, Exhibit 10.2, Exhibit 10.8.

70. For the '400 patent, Ms. Kindler multiplies her estimated W-IFE and IPTV sessions (using an assumed take rate of 25%) from January 2018 to November 2025 by a royalty rate of $0.03 (which she attains from the SCSA agreements), resulting in $10,395,364 of royalty damages.[256]

71. In total, she concludes $20,556,788 in damages for the '667 patent and $10,395,364 in damages for the '400 patent, yielding combined damages of $30,952,152.[257]

72. Under her alternative cost-saving approach for the '667 patent applied to IPTV, she calculates purported bandwidth cost savings by multiplying the $0.13 and $0.26 per-gigabyte costs by the bandwidth she claims is saved by the '667 patent at 25% and 40% take rates, resulting in calculated, alleged total savings between $55.1 million and $179.3 million.[258] Limiting the analysis to the $0.13, per-gigabyte scenario the range for alleged cost savings is $55.1 million to $89.7 million (depending on the take rate she assumes), which are the figures she reports in her summary table of royalty damages.[259]

### I.  Ms. Kindler Calculates a Royalty Rate

73. Under her revenue apportionment approach, Ms. Kindler determines a 14.25%[260] royalty rate for the '667 patent on IPTV revenues and an 8.5%[261] royalty rate on W-IFE revenues, by dividing her royalty damages by the respective revenues.[262] For the '400 patent, she concludes that a $0.03 fee would serve as a reasonable royalty per viewing session.[263]

---

[256] Kindler Report, at ¶¶ 169, 214, 220 and Exhibit 11.1.
[257] Adding IPTV and W-IFE revenue: ($17,649,786) with ($2,907,002) respectively ~ $20,556,788. *See* Kindler Report, at ¶¶ 13.a-b, 221.a-b, Table 20, Exhibits 10.2., 10.6, 10.8 and 11.1.
[258] Kindler Report, at ¶ 213.a.ii, Table 19 and Exhibit 10.3.
[259] Kindler Report, at ¶¶ 13.a, 213. a. ii, Tables 2, 19-21, Exhibit 10.3.
[260] 28.5% * 50%. *See,* Kindler Report, at Table 20.
[261] 17% * 50%. *See,* Kindler Report, at Table 20.
[262] Kindler Report, at ¶ 220 and Table 20.
[263] Kindler Report, at ¶ 220.c.

74. Under her alternative cost-saving approach for the '667 patent applied to IPTV, she calculates the low- and high-end royalties by dividing her claimed cost savings by the total estimated number of IPTV sessions, yielding rates of $0.15 to $0.30 per session (depending on her assumed cost per GB) at a 25% take rate, and $0.24 to $0.48 per session (depending on her assumed cost per GB) at a 40% take rate.[264]

## IV. FUNDAMENTAL ERRORS IN MS. KINDLER'S ANALYSIS

75. In this section I describe the fundamental errors in Ms. Kindler's analysis, which I find to be both arbitrary and unreliable.

### A. *Ms. Kindler's Damage Estimate is Implausible on its Face*

76. Any sound economic analysis, including damage estimates, must pass a "reality check." Ms. Kindler's conclusions fail this test as her proposed damages far exceed the $21.6 million Viasat paid to acquire Arconics, which integrated wireless IFE into its broader offerings.[265] It is unrealistic to suggest Viasat would license a patent for $10.4 million ('400 patent) or nearly $20.6 million ('667 patent) for technologies that, at best, offer only a small fraction of Arconics' value.[266] From both an economic and business standpoint, this is implausible, also especially given the many available non-infringing alternatives, as discussed in Section IV.B.

77. In addition, her analysis fails a reality check related to passenger viewing hours, because she exaggerates the amount of data delivered to passengers. To test this, I estimate total possible passenger viewing hours based on a count of IPTV-equipped aircraft, the average

---

[264] Kindler Report, at ¶¶ 218-220.
[265] Deposition of Josh Slater, February 6, 2025, at 39:8-20; Share Purchase Agreement between Viasat, INC. and Principal Sellers, dated November 14, 2016, VIASAT_00016488-7758, at -6492; Deposition of Des O'Sullivan, February 26, 2025, at 68:2-5.
[266] Interview with Dr. Kevin Almeroth, April 8, 2025; Interview with Daniel Newman, April 7, 2025.

number of passengers per plane, the average hours planes fly each year, and Ms. Kindler's 25% take rate. I convert Ms. Kindler's assumed data delivered to passengers into viewing hours using a 0.7 GB/hour data rate. From 2022 to 2023, Ms. Kindler's estimated IPTV viewing time exceeded total possible passenger viewing hours by between 49% to 66%, demonstrating that her analysis is implausible and significantly flawed.[267] I then repeat the analysis to show that if one considers a more realistic and supported take rate, Ms. Kindler's results are even more implausible. Again, I estimate total possible passenger viewing hours based on a count of IPTV-equipped aircraft, the average number of passengers per plane, the average hours planes fly each year, but I now use a more realistic and supported 8.4% take rate (rather than the 25% that Ms. Kindler uses). I convert Ms. Kindler's assumed data delivered to passengers into viewing hours using a 0.7 GB/hour data rate. From 2021 to 2023, Ms. Kindler's estimated IPTV viewing time exceeded total possible passenger viewing hours by between 46% to 394%, demonstrating further that her analysis is implausible and significantly flawed.[268]

### B. Plaintiffs' Experts Ignore Non-Infringing Alternatives

#### 1. The '667 Patent

78. The '667 patent involves a network-attached storage device that transmits an indication of a secure region for storing media content within the device. Based on his Opening Report and my interviews with Viasat's technical expert, Dr. Kevin Almeroth, there are multiple, easily-implemented viable non-infringing alternatives to the asserted claims of the '667 patent.[269]

79. In Viasat's products, Plaintiffs identify a Boolean variable called "encrypted" as the aforementioned indication.[270] In aviation, this variable is redundant, as it defaults to "false," and

---

[267] *See,* my workpapers.
[268] *See,* my workpapers.
[269] Interview with Dr. Kevin Almeroth, April 8, 2025; Opening Report of Kevin C. Almeroth, filed March 24, 2025 (hereafter, "Almeroth Report"), at ¶¶ 504-505.
[270] Almeroth Report, at ¶¶ 504-505.

is not used for device security, and in residential, this variable is an unnecessary failsafe.[271] A non-infringing alternative would be to remove it entirely, with no performance impact.[272] This change could be made in four weeks at a cost of about $100,000.[273] Another non-infringing alternative would be to remove any encryption that is present on the storage devices, with minimal performance impact.[274] This change could be made in three months at a cost of about $500,000.[275]

### 2. The '400 Patent

80. The '400 patent covers a kiosk for authenticating end-user devices and delivering encrypted content and an access key to end-user devices. Based on his Opening Report and my interviews with Viasat's technical expert, Dr. Kevin Almeroth, there are multiple, easily-implemented viable non-infringing alternatives to the asserted claims of the '400 patent.[276]

81. *First,* instead of using a "unique identifier" that is specific to and concealed by the device, Viasat could edit the source code to publicize any unique identifier that is "concealed," thereby making the unique identifier not one that is "concealed by" any portable data storage device.[277] This non-infringing alternative could be implemented, fully tested, and deployed in approximately two days for $1,600.[278] This development time is confirmed by Dr. Almeroth. This cost I find is consistent with public information on wage rates for embedded software engineers which suggest a development cost for two days work of $1,358.[279]

---

[271] Interview with Dr. Kevin Almeroth, April 8, 2025.
[272] Almeroth Report, at ¶ 507.
[273] Almeroth Report, at ¶ 509.
[274] Almeroth Report, at ¶¶ 510-516.
[275] Almeroth Report, at ¶ 516.
[276] Interview with Dr. Kevin Almeroth, April 8, 2025; Almeroth Report, at ¶ 113.
[277] Almeroth Report, at ¶ 485.
[278] Dr. Almeroth told me that software development costs were approximately $800 per day. Interview with Dr. Kevin Almeroth, April 8, 2025; Almeroth Report, at ¶ 486.
[279] Viasat, "Embedded Software Engineer," accessed April 8, 2025, at https://careers.viasat.com/jobs/4209?lang=en-us.; *see,* my workpapers.

82. *Second,* Viasat could replace cloud-based PlayReady DRM servers with local WideVine DRM servers, a change already underway, such that no communication with any "remote trusted server" occurs.[280] I understand that this non-infringing alternative is already in the process of being implemented, and thus would require no additional cost to roll out with the planned updates to all airlines. This non-infringing alternative was implemented in two days for $1,600. This development time is confirmed by Dr. Almeroth. This cost I find is consistent with public information on wage rates for embedded software engineers which suggest a development cost for two days work of $1,358.[281]

83. *Third,* Viasat could redesign its W-IFE system to separately deliver encrypted media content and the corresponding access key through multiple components, such that no single "kiosk" delivers both the "'encrypted first media content' and the 'corresponding access key.'"[282] This non-infringing alternative could be implemented by two engineers in up to three months for $96,000. This development time is confirmed by Dr. Almeroth. This cost I find is consistent with public information on wage rates for embedded software engineers which suggest a development cost for three months of work of $88,250.[283],[284]

### C.  Ms. Kindler Fails to Accurately Apply the Georgia-Pacific Factors

84. Although Ms. Kindler describes the elements of a Georgia-Pacific analysis, the purpose of which should be to determine the bargaining split between the parties, she inappropriately allocates a 50-50 sharing of what she contends are the benefits from the '667

---

[280] Almeroth Report, at ¶¶ 491-494.
[281] Almeroth Report, at ¶ 495; Viasat, "Embedded Software Engineer," accessed April 8, 2025, at https://careers.viasat.com/jobs/4209?lang=en-us.; *see,* my workpapers.
[282] Almeroth Report, at ¶ 501.
[283] Interview with Dr. Kevin Almeroth, April 8, 2025.
[284] Almeroth Report, at ¶ 503; Viasat, "Embedded Software Engineer," accessed April 8, 2025, at https://careers.viasat.com/jobs/4209?lang=en-us.; *see,* my workpapers.

patent and the '400 patent.[285] Ms. Kindlers' analysis is flawed in several respects. For instance, she misapplies pressure to factors where economic guidance is clear. For example, Factor 5 considers the parties' relationship; since Plaintiffs and Viasat are not competitors, this factor applies downward pressure, and her neutral pressure is inappropriate.[286] Likewise, Factor 3 concerns the license's nature. Despite assuming a non-exclusive, U.S.-based license, Ms. Kindler still applies neutral pressure contrary to literature showing licensors have more bargaining power in exclusive deals.[287]

### D. Ms. Kindler Fails to Apply Margin and Calculates Damages on Revenue, Not Profit

85. Ms. Kindler's damages analysis under her revenue apportionment approach for the '667 patent is based on revenues, rather than profits, meaning that she ignores costs altogether. Thus, her analysis does not represent the incremental value of the '667 patent, because value to a company like Viasat comes from profits and not revenues. Although she does not apply it in her analysis, Ms. Kindler reports a 26.95% gross margin for Viasat in 2024.[288] So, despite having the data to calculate profits, she fails to do so.[289] By way of illustration, if I were to apply Viasat's gross margin of 26.95% to Ms. Kindler's damages shown in her Table 21, it results in total damages (IPTV & W-IFE) of $5,540,920[290] for the '667 patent rather than Ms. Kindlers damages of $20.56 million.

---

[285] Kindler Report, at ¶¶ 217-218.
[286] Sidak, J. Gregory, "Bargaining Power and Patent Damages," *Stanford Technology Law Review* 19, no.1, (Fall 2015):1-31, at p. 18; *supra,* Section II.A.1, II.A.2.
[287] Kindler Report, at ¶ 104; Sidak, J. Gregory, "Bargaining Power and Patent Damages," *Stanford Technology Law Review* 19, no.1, (Fall 2015):1-31, at p. 18
[288] Kindler Report, at ¶ 24, Exhibit 2.1, 2.2.
[289] Kindler Report, at ¶ 24.
[290] 26.95%*20,560,000 = $5,540,920. Kindler Report, at ¶ 24, Table 21.

### E. Ms. Kindler's Reliance on Dr. Easttom's Unsupported, Qualitative Opinion

86. Ms. Kindler relies on Dr. Easttom. Dr. Easttom emphasizes caching's importance for Viasat, claiming the company could not meet bandwidth needs without it, but he provides no numerical data and no quantitative conclusions.[291] He also asserts that caching transmitted data is necessary for W-IFE updates because sneakernet is "slow," again citing only qualitative statements with no data support.[292] Dr. Easttom also references an American Airlines SLA requiring timely "Wireless Entertainment Content Uploads" and penalties for non-compliance.[293] Without citing data, he concludes that, due to the purported lack of viable alternatives, Viasat would likely miss the 84.99% content update threshold without the '667 patent.[294] Ms. Kindler, citing a different "IPTV SLA" from the same agreement, opines that Viasat couldn't meet IPTV service thresholds without the '667 patent.[295] Although Ms. Kindler cites to Dr. Easttom's opinion, the cited portion of Dr. Easttom's report contains no analysis, either quantitative or qualitative, of whether and if so how, not using the '667 patent would allegedly affect the "IPTV Availability Range" and therefore whether it would trigger any IPTV SLC. Ms. Kindler does not identify, and I have not been able to locate, any technical opinion from Dr. Easttom to support Ms. Kindler's opinion that, without the technology of the '667 patent, Viasat would be faced with the highest SLC percentage related to reduced "IPTV Availability" set forth in the American Airlines agreement.

---

[291] Expert Report of Dr. William C. Easttom, filed March 24, 2025 (hereafter, Easttom Report), at ¶ 95, Section IV.E.
[292] Easttom Report, at ¶ 97.
[293] VIASAT_00014633-813, at -726.
[294] Easttom Report, at ¶ 97.
[295] Kindler Report, at ¶¶ 179, 181, citing Easttom Report § V.C.

### F. Ms. Kindler Exaggerates Alleged Concurrent Streams and Bytes

87. Ms. Kindler claims, "the data required to stream a video can depend on the quality of the video being streamed," specifically the resolution.[296] She estimates, "[a]ssuming all IPTV is streamed at the minimum 480p, the minimum bit rate required. is 1.55 Mbps."[297] However, this estimate overstates data usage by disregarding standard video compression, inconsistent with service agreements. Ms. Kindler ignores that videos are compressed, with only the first frame stored fully and subsequent frames showing only changes.[298] Therefore, the data needed for streaming depends on content nature, with videos having less change between frames requiring less data.

88. The key metric for estimating data use is the bitrate.[299] Viasat's service contracts with airlines highlight bitrate as the key metric. In their agreement with American Airlines, IPTV channels have target bitrates, ranging from 350 kbps for news to 750 kbps for high-action content like ESPN as shown in Figure 9.[300] The American Airlines agreement also states that "American may, in its discretion, adjust the target Average Video Bitrates for each channel once per calendar quarter; provided that the average of the target Average Video Bitrates of all channels is no greater than 450 kbps and no channel is adjusted to a target Average Video Bitrate

---

[296] Kindler Report, at ¶ 175.b.ii.
[297] Kindler Report, at ¶ 175.b.ii.
[298] Al-Mualla, Mohammed E., C. Nishan Canagarajah, and David R. Bull, "Video Coding: Fundamentals," Chapter 2 in *Video Coding for Mobile Communications*, Academic Press, 2002, at pp. 17-18, 39.
[299] WSN Live, "What Is a Good Bitrate for Streaming Live Sports," accessed April 11, 2025, at https://www.wsn.live/blog/what-is-a-good-bitrate-for-streaming-live-sports ("Live sports broadcasts are dynamic and often include fast-paced action, detailed scenes, and rapid camera movements. The complexity of the content influences the required bitrate. This is because intricate scenes demand more data to preserve detail and avoid compression artifacts."). University of Kentucky, College of Communication and Information, "Video Bitrate & Resolution: An Easy Overview," accessed April 9, 2025, at https://ci.uky.edu/about/faculty-and-staff-resources/ci-technology-services/tutorials/video-bitrate-resolution-easy.
[300] VIASAT_00014633-4813, at -4795.

of less than 350 kbps."[301] Ms. Kindler's 1.55 Mbps bitrate estimate overstates data usage, being more than twice the highest bitrate offered (750kbps) and more than three times the average.

*Figure 9. IPTV Service Channels and Target Bitrate in American Airlines Service Agreement[302]*

| Channel | Target Bitrate (kbps) |
|---|---|
| CBS | 450 |
| NBC | 450 |
| FOX (WNYW) | 450 |
| NFL Network | 650 |
| Disney | 350 |
| Telemundo | 350 |
| ESPN | 750 |
| USA | 400 |
| TNT | 500 |
| Bravo | 350 |
| CNN | 350 |
| CNBC | 350 |

89. Ms. Kindler uses her incorrect bitrate to calculate the number of different IPTV channels being streamed on average to airplanes at any point in time. She accepts that her damage estimate is highly sensitive to the number of channels streamed, writing that "a higher number of different channels being viewed concurrently results in lower estimated bandwidth savings in the framework outlined here."[303] I will show below that once her bitrate is corrected from 1.55 Mbps to 750kbps, this reduces her damage estimate.

### G. Ms. Kindler Overstates the Alleged Take Rate for IPTV and W-IFE Services

90. Ms. Kindler's analysis is based on her assumption of a 25% take rate or, in the alternative, a 40% take rate for the IPTV and W-IFE services provided by Viasat.[304] Both are too high and are driven by Ms. Kindler's unreliable data analysis. She relies on nine months of data

---

[301] Third Amended and Restated Connectivity Services Agreement Between American Airlines, Inc. and Viasat, Inc., October 1, 2020, VIASAT_00014633-813, at -795.
[302] VIASAT_00014633-4813, at -4795.
[303] Kindler Report, at ¶ 175.b, n. 706.
[304] Kindler Report, at ¶¶ 148-151, 176, 181, 184, 198, Tables 17 and 19.

from American Airlines, which is too limited to infer general consumer behavior.[305] She further

bases her 24% take rate on just the last month of the data, ignoring factors like airline, passenger

demographics, flight duration, and session pricing, and the previous monthly rates which are

much lower.[306] Additionally, Ms. Kindler uses testimony from Ajai Tuli,[307] which mentions take

rates between 5-10% for paid offerings and 40% for free offerings, but Ms. Kindler has not

analyzed the breakdown of free versus paid sessions, and Mr. Tuli was talking about IFC, not

IPTV or W-IFE, in any event.[308] Ms. Kindler also tries to justify her 40% take rate by citing to a

Viasat projection of IFC take rates that is explicitly labelled under the "Assumptions" tab of the

workbook and only pertains to "FREE SERVICES,"[309] which is inappropriate since it does not

account for the actual distribution of free versus paid services on aircraft. Further, as I will

discuss further, data on the *actual* take rate of IFC (rather than projected or assumed) for a

comprehensive period of time, confirms that it is much lower at 8.4% (for American Airlines).[310]

Given that IFC is the main and most valuable of Viasat's product offerings[311] rather than IPTV

and W-IFE, the actual data showing an 8.4% take rate for IFC represents a more reasonable

assumption for the take rate that Ms. Kindler should have used for each of IPTV and W-IFE.

91. Ms. Kindler wrongly assumes W-IFE and IPTV take rates are the same.[312] This is

implausible for several reasons. For a start, by assuming 40% take rates for both services on the

same passenger base used in her sessions calculate. ions, she effectively assumes 80% of

---

[305] Kindler Report, at ¶ 147.
[306] Kindler Report, at Exhibit 7.3.
[307] "[W]hen it's a paid offering, the number of passengers connected is on average, I don't know, somewhere between like 5 to 10 percent versus – I'm not speaking of simply American, just on average -- versus if it's a free-to-all passengers offering, typically the take rates could be at least 40 plus percent." Deposition of Ajai Tuli, at 136:8-14.
[308] Kindler Report, at ¶ 148.c.
[309] Kindler Report, at ¶ 148; VIASAT_00104683.
[310] VIASAT_00124996.
[311] *See,* Section II.E.2
[312] Kindler Report, at ¶ 150.

passengers are using one or the other of these two services or both, which inflates her damage claims and is implausible.[313] But on an economic basis this is also an invalid assumption because IPTV demand will fluctuate based on the schedules of popular live events like sports and news. This is supported by testimony from Edwin Edillon, Director of Partnerships and Strategic Entertainment Initiatives at Viasat, that IPTV services see "higher engagement" for "sporting events" and "news during an election cycle."[314] Naturally then, the take rate of IPTV services will be seasonal (or indeed more periodic in the case of election cycles) based on the prevalence of these events. Ms. Kindler has performed no analysis to correct for this.

92. Based on these flawed assumptions, Ms. Kindler overestimates the take rate and therefore bandwidth savings she claims are from the '667 patent thus inflating damages, as well as overestimating the number of sessions viewed which inflates her damages for the '400 patent.

### H.  Ms. Kindler's Cost Saving Analysis is Based on Pure Assumptions

93. Ms. Kindler's alternative cost-saving approach for the '667 patent (for IPTV only) assumes that Viasat would have to pay for extra bandwidth without her claimed bandwidth savings from the '667 patent. Her analysis is flawed for several reasons. *First*, as described previously she greatly exaggerates the supposed bandwidth savings and therefore her damages under this approach are grossly inflated. *Second*, the requirement for Viasat to contract with third parties for extra bandwidth is derived from "coverage gaps," as in physical gaps in the coverage areas from Viasat's satellites, rather than excessive bandwidth usage and Viasat often has available extra bandwidth anyway.[315] Also, such coverage gaps will be significantly reduced with future launches of ViaSat-3.[316] *Third*, Ms. Kindler relies on draft documents from Viasat to

---

[313] *See,* Kindler Report, at Exhibits 7.1 and 8.1
[314] Deposition of Edwin Edillon, February 7, 2025, at 66:22-67:2.
[315] Interview with Ajai Tuli, April 7, 2025.
[316] Interview with Ajai Tuli, April 7, 2025.

estimate her assumed cost per gigabyte of extra bandwidth, which documents state that they are "subject to change" and which were not officially published.[317]

## V.  CORRECTING MS. KINDLER'S ANALYSIS

94. In this section I conduct a detailed analysis of the various errors in Ms. Kindler analysis of royalty damages related to the Patents-in-Suit. I do so through a correct application of the Georgia-Pacific framework. Once Ms. Kindler's analysis is corrected, the royalty damages reduce substantially.

### A.  *Overview of the Georgia-Pacific Factors*

95. The Georgia-Pacific case established the broadly-accepted framework for determining a reasonable royalty as a patent infringement remedy.[318] Under the guidance of that case, I understand that the trier of fact must seek to assess the outcome of a hypothetical licensing negotiation between the parties that would have obviated the need for any infringement. It is assumed that both the patent holder and the alleged infringer are willing parties to the hypothetical negotiation, operating in good faith and at arm's length. Georgia-Pacific enumerates fifteen factors that might influence the outcome of such a negotiation and requires consideration of each.[319] Certain of these factors are *quantitative* in nature, such as those relating to the incremental profits and benefits attributable to the allegedly infringing product features. Others are *qualitative* and when applied to the circumstances of any individual case, may result in what is referred to as "upward pressure" (producing a higher royalty rate) or "downward pressure" (lowering the royalty rate), while still others may be neutral given the facts of the case. The fifteen Georgia-Pacific factors are presented in Table 10.

---

[317] Kindler Report, at ¶ 185.
[318] *Georgia-Pacific*, 318 F. Supp. At 1116.
[319] *Georgia-Pacific*, 318 F. Supp. At 1120.

**Table 10. The Georgia-Pacific Factors**

| # | Description from Georgia-Pacific Decision |
|---|---|
| 1 | "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." |
| 2 | "The rates paid by the licensee for the use of other patents comparable to the patent in suit." |
| 3 | "The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold." |
| 4 | "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." |
| 5 | "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter." |
| 6 | "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." |
| 7 | "The duration of the patent and the term of the license." |
| 8 | "The established profitability of the product made under the patent; it's commercial success; and its current popularity." |
| 9 | "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." |
| 10 | "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." |
| 11 | "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." |
| 12 | "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." |
| 13 | "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." |
| 14 | "The opinion testimony of qualified experts." |
| 15 | "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." |

## B. *Analyzing the Incremental Value of the Patents-in-Suit*

96. In this section, I correct fundamental errors in Ms. Kindler's method under the *quantitative* Georgia-Pacific factors that go to the incremental value and benefit of the patented invention and the allegedly infringing products, in the form of extra profits. This analysis fits under Georgia-Pacific factors 8, 10, 11, and 13, as described in Table 10.

97. The central premise of Ms. Kindler's analysis of the supposed value of the '667 patent is based on her claim that it enables Viasat to deliver more terrabytes of data to passengers because of data caching on the airplanes. She claims that this saves Viasat from using excessive

over-the-air bandwidth. She then values those bandwidth savings by claiming they enable Viasat to meet its service obligations and not have to pay service credits to airlines. Thus, central to Ms. Kindler's analysis is her estimate of how much data is delivered to passengers. She also uses these supposed bandwidth savings and her estimate of how much data is delivered to passengers for her alternative analysis of cost savings related to Viasat avoiding the cost of paying for extra bandwidth (which analysis she does just for IPTV). Similarly, her estimate of the value of the '400 patent hinges on her estimate of the number of sessions that passengers watch.

98. But Ms. Kindler has greatly exaggerated the amount of data delivered to passengers and the number of sessions they watch. In this section, I will first correct her unrealistically high take rate (meaning the percentage of passengers that watch IPTV and W-IFE). Using a more realistic and supported take rate, I will then perform two alternative methods to correct her estimate of the amount of data delivered to passengers. These two methods produce highly consistent results. Finally, I will take into account costs, which Ms. Kindler completely ignores, and correct her incremental revenue into incremental profit, which is the appropriate measure when looking at the incremental value of a patent.

### 1. Correcting Ms. Kindler's take rate

99. As I described in Section IV.G, Ms. Kindler assumes an unrealistically high 25% take rate for IPTV and W-IFE services provided by Viasat and even proposes an even higher alternative of 40%.[320] As I described in the same section, her numbers are based on projections and unreliable, limited data analysis over just a few months, and a much more realistic number is a take rate of 8.4%. This number is derived from actual invoice data from American Airlines, covering 71 months from April 2018 to March 2024.[321] This data, which is more comprehensive

---

[320] Kindler Report, at ¶¶ 148-151, 176, 181, 184, 198, Tables 17 and 19.
[321] VIASAT_00124996, at tab "Billing Data."

than Ms. Kindler's, also accounts for seasonality in take rates.[322] Based on this data, I calculate an average take rate of 8.4% for Viasat's IFC services during this period.[323] Relying on Viasat's IFC data to estimate take rates for IPTV and W-IFE services is conservative, as IFC services are Viasat's main offering and are valued most by passengers, rather than either IPTV or W-IFE services, as described in Section II.E.2 above. Using a take rate of 8.4% greatly reduces her damages for the '667 patent.

 100. When applying the 8.4% take rate to Ms. Kindler's IPTV and W-IFE sessions estimate that she uses in her estimate of damages for the '400 patent, the resulting sessions decrease substantially. I also find that Ms. Kindler uses the maximum number of aircraft equipped with IPTV, which overstates her damage estimate. To provide a more conservative and accurate reflection, I adjust this figure to represent the average number of aircraft with IPTV during the relevant month.[324] These changes greatly reduce her damages for the '400 patent.

### 2. Method 1 for correcting Ms. Kindler's estimate of the data delivered to passengers

 101. I described in Section IV.A how Ms. Kindler has greatly exaggerated the amount of IPTV data delivered to passengers claiming that it is 442,965 TB during her damages period.[325] This is largely due to her exaggerated take rate, but also due to her misestimate of concurrent IPTV streams served to airplanes (as discussed below in the next section). To show that her data delivered number is exaggerated, I estimate total possible passenger viewing hours based on a count of IPTV-equipped aircraft, the average number of passengers per plane, the average hours planes fly each year, and a more realistic and supported 8.4% take rate (rather than the 25% that Ms. Kindler uses). I convert Ms. Kindler's assumed data delivered to passengers

---

[322] VIASAT_00124996, at tab "Billing Data."
[323] *See,* my workpapers.
[324] *See,* my workpapers.
[325] Dan Newman confirmed to me that her number is greatly exaggerated.  Interview with Daniel Newman, April 7, 2025.

into viewing hours using a 0.7 GB/hour data rate. From 2021 to 2023, Ms. Kindler's estimated IPTV viewing time exceeded total possible passenger viewing hours by between 81% to 394%, demonstrating that her analysis is implausible and significantly flawed.[326] This analysis also allows me to correct Ms. Kindler's number. I do so by multiplying the total possible passenger viewing hours I calculated by the 0.7 GB/hour data rate and then (using the figure for 2023, the last year of actual data, rather than Ms. Kindler's projected data) I find that the IPTV data delivered to passengers is only 23% of Ms. Kindler's number. I then multiply her 442,965 TB by 23% to get a much more realistic 101,882 TB.[327]

### 3. *Method 2 for correcting Ms. Kindler's estimate of the data delivered to passengers*

102.    In calculating how much data is delivered to passengers, Ms. Kindler notes that "the total bytes served to an aircraft may include multiple concurrent IPTV streams of different channels," and that "the same passenger does not watch multiple IPTV streams simultaneously."[328] So, she estimates that on average across flights 1.613 IPTV channels are streamed per flight at any point in time.[329] She downwardly adjusts the data delivered to passengers by dividing by this number. She accepts that "a higher number of different channels being viewed concurrently results in lower estimated bandwidth savings in the framework outlined here."[330] But the evidence shows that the number of concurrently streamed channels is indeed higher than 1.613. Ms. Kindler calculates this number of concurrent channels using an estimated bitrate of 1.55 Mbps.[331] As I demonstrated in Section IV.F this bitrate is unrealistically high and evidence from Viasat's agreement with American Airlines shows a maximum bitrate of

---

[326] *See,* my workpapers.
[327] *See,* my workpapers.
[328] Kindler Report, at ¶ 175.b.
[329] Kindler Report, at Exhibit 10.1.
[330] Kindler Report, at ¶ 175.b, n. 706.
[331] Specifically, her formula is (250/100)/1.55.

0.75 Mbps. Using this maximum bitrate from the American Airlines agreement, I find that a more reliable estimate of the number of concurrent IPTV channels is 3.33.[332] Using this corrected number, and again using a more realistic take rate of 8.4%, reduces Ms. Kindler's data delivered to passengers from 442,965 TB to 71,892 TB.

### 4. Correcting Ms. Kindler's use of revenues instead of profits

103.    As noted in Section IV.D, Ms. Kindler calculates damages using revenue apportionment, disregarding Viasat's costs in development of the systems necessary to deliver the accused products, as well as its many other costs in delivering its services. For example, Viasat's 10-K reports capitalized interest expenses for satellites and related equipment totaling $102.1 million, $81 million, and $54.1 million for fiscal years 2022, 2021, and 2020, respectively.[333] Moreover, the Georgia-Pacific factors refer to profits, not revenues, in determining the incremental value of patented inventions, and ignoring Viasat's associated costs significantly inflates the damages for the '667 patent.[334] Despite Ms. Kindler referencing Viasat's FY 2024 gross margin of 26.95%, she does not apply it in her model.[335] To correct this, I apply the 26.95% gross margin to her '667 patent damages.[336]

### C. Application of the Remaining Georgia-Pacific Factors

104.    Georgia-Pacific Factor 15 (*see* Table 10) establishes the nature of the hypothetical negotiation in that the parties would have entered into a negotiation at the time the infringement began and would have been "reasonably and voluntarily trying to reach an agreement."[337]

---

[332] Specifically, using Ms. Kindler's formula (250/100)/0.75.
[333] VIASAT_00132818-947, at -897.
[334] Kindler Report, at ¶ 221.
[335] Kindler Report, at ¶ 24.
[336] Kindler Report, at ¶ 24.
[337] *See,* Table 10, #15.

105.    The rest of this section applies the remaining Georgia-Pacific factors, other than factor 15 and the factors 8, 10, 11, and 13, considered in Section V.B, to determine the share of the incremental profit attributable to the Patents-in-Suit that would have been given to Western Digital by Viasat under the hypothetical license. It should be noted that, although factors 8, 10, 11, and 13, all of which go to the incremental value of the patented technology, have been considered in Section V.B, they also have a bearing on Viasat's negotiating posture in the hypothetical negotiation. That is, as well as their *quantitative* aspect estimated in Section V.B, they also have a *qualitative* aspect. Simply, I have found that the incremental value to Viasat of the patented technology is low, and this would put downward pressure on the royalty amount that Viasat would be willing to pay for that technology. It should also be noted that the analysis presented in this section is founded on the analysis I have presented in this report thus far. For the sake of brevity, I do not repeat that foundational analysis here. Instead, it is incorporated by reference. Finally, it should be noted that I have put certain factors into economically logical groups in what follows.

### 1. How will Western Digitals' business be affected by the license? [Factors 5 & 6]

106.    Factor 5 recommends looking at the commercial relationship of Western Digital and Viasat. Clearly, they are not competitors. Plaintiffs will not lose any sales to Viasat by licensing the Patents-in-Suit. Factor 6 recommends looking at "the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." But again, Plaintiffs have not commercialized the Patents-in-Suit and will not lose any convoyed sales to Viasat if it licenses the technology. Because of these considerations, I ascribe downward pressure to factor 5 and the aspect of factor 6 relevant for Western Digital.

### 2. *How will Viasat's business be affected by the license? [Factor 6]*

107.    Factor 6 also recommends looking at "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee… the extent of such derivative or convoyed sales." As I described in Section II.E.2, Viasat's main value driving product offering is IFC, which is not alleged to infringe the Patents-in-Suit. Moreover, IPTV and W-IFE are considered as addons to IFC by airlines, thus it is IFC that drives IPTV and W-IFE sales, not the other way around. Viasat does sell other services, such as advertising, but again, the ability to do so is driven by Viasat's main product offering of IFC, which drives IPTV and W-IFE sales, even if advertising is linked to all of these offerings. Finally, airlines' decision to choose the addon IPTV and W-IFE features is driven by factors other than the Patents-in-Suit, such as content. In sum, there is no reliable evidence of convoyed sales linked to the Patents-in-Suit and I ascribe downward pressure to the aspect of factor 6 relevant for Viasat.

### 3. *Historical licensing practices [Factors 1, 2, 4, & 12]*

108.    Factor 1 recommends looking at royalties previously paid for the Patents-in-Suit. I understand that the Patents-in-Suit have not been licensed and I therefore consider this factor to be neutral. Factors 2 and 12 recommend looking at royalties paid for similar patents. I understand that there are no economically comparable licensing agreements for the '667 patent. Ms. Kindler, based on her conversation with Dr. Easttom, states that the technology developed for the SCSA is *technically comparable* to the technology taught by the '400 patent.[338] However, based on my conversation with Dr. Almeroth, I understand that the SCSA product is *technically identical* to the technology taught by the '667 patent.[339] I understand that the SCSA product has been cited as invalidating prior art with respect to the '667 patent.[340] Plaintiffs have never

---

[338] Kindler Report, at ¶ 157.
[339] Interview with Kevin Almeroth, April 8, 2025; Almeroth Report at ¶ 338.
[340] Interview with Kevin Almeroth, April 8, 2025; Almeroth Report at ¶ 134.

accused any other entity of infringing either of the Patents-in-Suit.[341] I assign neutral pressure to these factors.

109.    Factor 4 recommends looking at "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." I find no evidence that Plaintiffs attempted to maintain a patent monopoly.[342] As a result, I assign downward pressure to this factor.

### 4.  Scope, exclusivity, and term [Factors 3 & 7]

110.    Factor 3 recommends looking at the scope and exclusivity of the hypothetical license and factor 7 recommends looking at duration. I agree with Ms. Kindler that Viasat and Western Digital would likely agree to a non-exclusive, U.S. license for both Patents-in-Suit,[343] and that the hypothetical license terms would be 15.3 years for the '667 patent and 15.2 years for the '400 patent.[344] However, I disagree with her assessment that both factors would be neutral in their impact. Longer license terms, such as those identified here, are typically associated with higher royalty rates, as they allow the licensee extended use of the patented technology to build goodwill and brand value that may persist beyond the patent's expiration.[345] I consider these to be long-term licenses. Conversely, non-exclusive licenses generally command lower royalty rates compared to exclusive licenses, as the benefits of the patent are not limited to a single

---

[341] Plaintiffs' Responses and Objections to Viasat's First Set of Interrogatories, at p. 9; Deposition of Soji John, February 14, 2025, at 123:11-14.

[342] Deposition of Soji John, February 14, 2025, at 74:19-21; Deposition of Danny Ybarra, January 30, 2025, at 17:15-18:5; Rambus, "Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise," press release, September 6, 2012, accessed April 9, 2025, at https://www.rambus.com/secure-content-storage-association-scsa-selects-cryptography-research-to-provide-security-expertise/.

[343] Kindler Report, at ¶ 104.

[344] Kindler Report, at ¶ 119.

[345] Sidak, J. Gregory, "Bargaining Power and Patent Damages," *Stanford Technology Law Review* 19, no.1 (Fall 2015): 1-31, at pp. 18-19.

party. [346] Licenses with limited geographic scope also command lower royalty rates. Thus, I ascribe downward pressure to factor 3 and upward pressure to factor 7.

### 5. *Are there non-infringing alternatives? [Factor 9]*

111.    Factor 9 recommends looking at "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." Dr. Almeroth has offered extensive and cost-effective options for Viasat to implement non-infringing alternatives as I described in Section IV.B. Ms. Kindler opines that "there are no commercially available alternatives to the inventions of the Patents-in-Suit that would be non-infringing, and cost-effective to implement"[347] while also stating "Viasat asserts that it could modify the systems and software to remove the infringing functionalities…"[348] Clearly, if a product can be modified to remove infringing functionality, then that also constitutes a commercially viable non-infringing alternative. Because of this, I ascribe downward pressure to this factor.

### 6. *The opinion testimony of qualified experts [Factor 14]*

112.    Finally, I have considered the opinion of Viasat's technical expert Dr. Kevin Almeroth as described throughout this report. Other than where it features in the preceding discussion, I do not ascribe any further pressure from Dr. Easttom's opinion.

### 7. *Resulting Georgia-Pacific split*

113.    I summarize my findings under Georgia-Pacific in Table 11, where an up arrow means upward pressure, a down arrow means downward pressure, and a horizontal double-headed arrow means neutral.

---

[346] Sidak, J. Gregory, "Bargaining Power and Patent Damages," *Stanford Technology Law Review* 19, no.1 (Fall 2015): 1-31, at p. 18.
[347] Kindler Report, at ¶ 139.
[348] Kindler Report, at ¶ 139.

*Table 11. The Georgia Pacific Factors – Analysis Results*

| # | Description from Georgia-Pacific Decision | Pressure |
|---|---|---|
| 1 | "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." | ↔ |
| 2 | "The rates paid by the licensee for the use of other patents comparable to the patent in suit." | ↔ |
| 3 | "The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold." | ↓ |
| 4 | "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." | ↓ |
| 5 | "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter." | ↓ |
| 6 | "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." | ↓ |
| 7 | "The duration of the patent and the term of the license." | ↑ |
| 8 | "The established profitability of the product made under the patent; it's commercial success; and its current popularity." | ↓ |
| 9 | "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." | ↓ |
| 10 | "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." | ↓ |
| 11 | "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." | ↓ |
| 12 | "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." | ↔ |
| 13 | "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." | ↓ |
| 14 | "The opinion testimony of qualified experts." | ↔ |
| 15 | "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." | ↔ |

114.    Based on my analysis of the Georgia-Pacific factors described above, I conclude that in the hypothetical negotiation, Western Digital would receive no more than 20% of the incremental value of the patented technology in the form of royalties. This is substantially lower

than the unsupported allocation of 50% of the incremental value that Ms. Kindler makes to Western Digital. I find that a 20% allocation is a much more accurate reflection of the bargaining power between Western Digital and Viasat at the negotiating table. Western Digital had low bargaining power, because it has no patent practicing commercial products, and, no effective way to monetize the Patents-in-Suit in the way that Viasat could. In contrast, Viasat has a successful platform in the satellite internet industry and inflight entertain with value driven by the reduced administrative burden for airlines and advertisers, a fleet of satellites, appealing user interface, and additional values drivers all of which are unrelated to the Patents-in-Suit. [349]

### D. Corrected Damages

115.    In this section, I calculate corrected damages, where I multiply the 20% share of incremental profits that Viasat would have negotiated with Western Digital at the hypothetical negotiation with the corrected incremental profits attributable to the '667 and I correct Ms. Kindler's calculation of royalty damages for the '400 patent. Damages would be payable as a lump sum, thereby affording the parties a clear and definitive measure of cost certainty, rather than as a running royalty. This would also be consistent with the payment schedules airlines pay to Viasat when enlisting a new aircraft into their fleet or as a part of their "one installment" for "purchase orders."[350] Additionally, lump sum payments deliver immediate compensation without the uncertainty of future sales or market fluctuations such as the COVID-19 pandemic which had large negative impacts on air travel.[351]

---

[349] *Supra*, II.D.
[350] VIASAT_00015060-155, at -095; VIASAT_00014814-921, at -846.
[351] Centers for Disease Control and Prevention, "Air Travel," accessed April 13, 2025, at https://wwwnc.cdc.gov/travel/yellowbook/2024/air-land-sea/air-travel.

### 1.  '667 Patent

116.    As I described, Ms. Kindler vastly overstates the amount of data delivered to passengers. Under my Method 1 described above (Section V.B.2), I recalculate the amount of data delivered to passengers by multiplying the number of Viasat-equipped aircraft by average annual flight hours (sourced from the Department of Transport), an assumed 150 passengers per flight, an 8.4% take rate, and Kindler's own figure of 0.7GB per hour of viewing (this is conservative as the true number is likely closer to 0.4GB per hour).[352] This analysis indicates her estimate should be reduced by multiplying it by 23%.[353] As Ms. Kindler has completely ignored costs, I apply a 26.95% gross profit margin to the IPTV revenue she uses to calculate damages.[354] Ms. Kindler allocates 50% of value to Western Digital, which I find unreasonable given its limited contribution. I apply a more appropriate 20% share, as described above. After making these adjustments, I calculate IPTV damages under the '667 patent of $1,628,259, down from Ms. Kindler's $17.65 million, reflecting a 1.31% implied royalty rate.[355] As an alternative but similar approach under my Method 2 described above (Section V.B.3), using 3.33 concurrent streams (instead of Ms. Kindler's 1.613) and an 8.4% take rate, damages are $1,472,024, reflecting a 1.19% implied royalty rate.[356]

117.    As I have described, Ms. Kindler's damages estimate for W-IFE is overly simplistic. She assumes that the '667 patent allows Viasat to avoid paying 20% of relevant W-IFE revenue back to customers as Service Level Credits ("SLCs"). However, based on input from Viasat employees and Dr. Almeroth, the '667 patent is even less applicable in the W-IFE context, since W-IFE operates through scheduled monthly content downloads to aircraft, not

---

[352] *See,* my workpapers.
[353] *See,* my workpapers.
[354] *See,* my workpapers.
[355] *See,* my workpapers.
[356] *See,* my workpapers.

real-time delivery.[357] So, as a conservative upper bound, I apply the 1.31% implied royalty rate I previously calculated for IPTV (after correcting Ms. Kindler's analysis) to Viasat's W-IFE revenue. This reduces Ms. Kindler's W-IFE damages from $2.9 million to $449,599.[358] Using my alternative implied royalty of 1.19%, I calculate further reduced damages of $406,459.[359]

118.    Considering Ms. Kindler's alternative cost-saving approach for the '667 patent applied to IPTV, I recalculate her damages by using the reduced bandwidth savings I find when I correct her calculation of the amount of data delivered to passengers. I also apply a Georgia-Pacific split of 20% of the benefit going to Western Digital.[360] Under an assumed price for bandwidth of $0.13 per GB, I find damages of $2,153,571 under my first method for calculating the data delivered to passengers, and $1,373,834 under my second method.[361] These numbers are significantly lower than the $55.1 to $89.7 million that Ms. Kindler finds.

119.    I understand that the SCSA agreement is considered to describe prior art for the '667 patent. As such, if one was to consider the $0.03 per content transfer as a royalty for the '667 patent, this would result in royalty damages of $3,438,442, after I correct Ms. Kindler's estimate of IPTV and W-IFE sessions to use a more realistic and supported take rate of 8.4%.[362] This, again, is considerably lower than Ms. Kindler's damages for the '667 patent of $17.65 million.

---

[357] Interview with Daniel Newman, April 7, 2025; Interview with Finn Hughes, April 7, 2025; Interview with Dr. Almeroth, April 9, 2025.

[358] *See,* my workpapers.

[359] *See,* my workpapers.

[360] It is unclear if Ms. Kindler applied her own 50:50 split in calculating the cost savings damages she presents in her main summary table (Kindler Report, Table 2) because she does not specify if she is using her assumed cost of $0.13 per GB or her alternative assumed cost of $0.26 per GB for that table (noting that $0.13 is 50% of $0.26, so she either assumed $0.13 and did not apply her split or she assumed $0.26 and did apply her split).

[361] *See,* my workpapers.

[362] *See,* my workpapers.

### 2. '400 Patent

120.    For the '400 patent, Ms. Kindler has grossly overestimated the number of IPTV

and W-IFE sessions viewed by passengers, by assuming an unrealistically high take rate of 25%.

I correct this to a take rate of 8.4%.[363] So, based on 66,724,654 IPTV sessions and 47,890,078

W-IFE sessions, and retaining for now Ms. Kindler's royalty rate of $0.03 per session, I calculate

royalty damages of $2,001,740 attributable to IPTV and $1,436,702 attributable to W-IFE. This

results in total lump sum royalty damages of $3,438,442 for the '400 patent, reduced from the

$10.4 million that Ms. Kindler finds.[364]

121.    This is still an overstatement of any royalty that Viasat would pay for the '400

patent. A more reliable approach is to consider what Viasat actually does pay for digital rights

management ("DRM"). Viasat pays a company called Vualto for DRM hardware and software,

as well as licensing. Under Viasat's agreement with Vualto, it pays discounted annual costs of

$667 per airplane up to 450 airplanes or annual costs of $556 per airplane up to 2,000 airplanes,

such that its costs depend on the size of Viasat's fleet.[365] However, based on my analysis of that

agreement, I find that 50% of those prices are related to hardware (unified streaming servers),

30% to video play and on-demand licensing, and only 20% to DRM licensing.[366] I calculate the

Viasat fleet size for each year between 2018 and 2025, applying the tiered per airplane pricing

(which, given its fleet size, was $667 in 2018 and $556 thereafter), and multiply that by 20% to

isolate DRM licensing. This results in $752,938, which is a much more realistic estimate of

royalty damages for the '400 patent than Ms. Kindler's $10.4 million.[367]

---

[363] *See,* my workpapers.
[364] *See,* my workpapers.
[365] Viasat_00014400_415, at -412.
[366] Viasat_00014400_415, at -412.
[367] *See,* my workpapers.

## VI.  CONCLUSION

122.    To the extent that discovery in this case is not yet complete, I reserve the right to revise or supplement my opinions as additional information becomes available. Exhibits to be used in support of the opinions stated in this Rebuttal Report include all of the tables, graphics and information contained herein as well as the Exhibits cited in or accompanying this Rebuttal Report. Additional demonstrative exhibits based upon this same information may be prepared for trial and used to support my opinions.


April 14, 2025                                          Respectfully submitted,


                                          _____
                                          Gareth Macartney, Ph.D

# Exhibit A

## Curriculum Vitae of
## Gareth Macartney, Ph.D.



**Gareth James Macartney, Ph.D.**
President & CEO, Senior Economist

Direct: (510) 463-0168
gmacartney@onpointanalytics.com

# INDUSTRY EXPERIENCE

**_Senior Economist, OnPoint Analytics, Inc., 2008 – Present:_**
Dr. Gareth Macartney is the President & CEO at OnPoint. He is a testifying economist with a particular emphasis on liability, impact, and damages analysis in the context of antitrust, intellectual property, breach of contract, and class action cases, among other types of complex litigation. As the Director of the firm's Competition practice, Dr. Macartney also manages work for affiliate experts, supervising staff and overseeing report and testimony preparation. As testifying expert and as manager, Dr. Macartney has analyzed a wide variety of industries, including insurance (property & casualty, long-term care, healthcare, title); education; pharmaceuticals; heavy industry (auto parts, steel, ready-mixed concrete, hard rock mining, caustic soda); electronic manufacturing (liquid crystal displays, optical disk drives, lithium ion batteries, DRAM); transport (rail freight, air cargo, trucks); energy (oil, natural gas, gasoline); food and agriculture (packaged seafood, eggs, milk, poultry, cattle, fertilizers, fruits); consumer electronics (digital cameras, smartphones, personal computers, network switches, music streaming, e-books, car navigation, mesh Wi-Fi, e-cigarettes); retail (apparel, yoghurt, single-serve coffee, protein bars); cosmetics and personal care; online advertising; cryptocurrencies; water; real estate; and, travel. Dr. Macartney has testified as an expert witness in deposition, in arbitration, and at trial.

# CASES

**_As Expert:_**
_R2 Solutions LLC v. Databricks, Inc._
Fenwick & West LLP (2022–2024)
- Patent Damages, Data Management
- One Expert Report

_In Re: Juul Antitrust (End Purchasers)_
Zwerling, Schachter & Zwerling LLP (2020–)
- Antitrust Class Action, E-Cigarettes
- Two Expert Reports

_Randall Heagney et al. v. John Paul Mitchell Systems_
Hagens Berman Sobol Shapiro LLP (2024–)
- False labelling, Hair-care Products
- One Expert Report, One Deposition

_Justyn Hornor v. Brandon Wey aka Brandon Wade, Reflex Media, Inc., et al._
SF Firm LLP (2023–)
- Unfair dismissal, Media
- Two Expert Reports

*Matthew Havrilla, et al. v. Centene Corporation, et al.*
Wexler Boley & Elgersma LLP (2023–)
- Class Action, Health Insurance
- One Declaration

*In re: Cattle and Beef Antitrust Litigation (Indirect Sellers)*
Paul, LLP (2024–)
- Antitrust Class Action, Cattle
- Two Expert Reports, One Deposition

*Oscar Felix, et al. v. Roosevelt University*
Lynch Carpenter, LLP (2024–)
- Class Action, Tuition Fees
- One Expert Report

*Noah Plank, et al. v. Kansas State University, et al.*
Sharp Law, LLP (2024–)
- Class Action, Tuition Fees
- One Expert Report

*Jeffrey Albert Sjobring, et al. v. First American Title Insurance Company, et al.*
Shernoff Bidart Echeverria, LLP (2023–)
- Class Action, Title Insurance
- Three Expert Reports, One Deposition, Jury Trial Testimony

*Julia Jin-Wolfson, et al. v. Lafayette College*
Leeds Brown Law, P.C. (2024–)
- Class Action, Tuition Fees
- One Expert Report, One Deposition

*Samuel Dean, et al. v. Maryville University of Saint Louis*
Lynch Carpenter LLP (2024–)
- Class Action, Tuition Fees
- Two Expert Reports, One Deposition

*TrackThings, LLC v. Amazon.com, Inc., et al.*
Fenwick & West LLP (2022–2024)
- Patent Damages, Mesh Wi-Fi
- Two Expert Reports, One Deposition, Jury Trial Testimony

*Lashify, Inc. v. Worldbeauty*
Fenwick & West LLP (2022–2024)
- Patent Damages, Cosmetics
- Three Expert Reports, One Deposition, Jury Trial Testimony, Post-Judgment Declarations

*Lashify, Inc. v. Hollyren*
Fenwick & West LLP (2022–2024)
- Patent Damages, Cosmetics
- Three Expert Reports, One Deposition

*Sylvia Jones, John Ellis, et al. v. Tulane University*
Leeds Brown Law, P.C. (2023–)
- Class Action, Tuition Fees
- Two Expert Reports, One Deposition

*Shelby Poston, et al. v. Syracuse University*
Leeds Brown Law, P.C. (2023–)
- Class Action, Tuition Fees
- One Expert Report, One Deposition

*Henry Mooers, et al. v. Middlebury College*
Leeds Brown Law, P.C. (2023–)
- Class Action, Tuition Fees
- One Expert Report

*Michael James Lawson, Jr., Tara Lawson, et al. v. Pennsylvania College of Technology*
Poulin Willey Anastopoulo, LLC (2023–)
- Class Action, Tuition Fees
- One Expert Report, One Deposition

*Beacon Navigation GMBH v. BMW AG, BMW of North America, LLC, and BMW Manufacturing Co., LLC*
TechKnowledge Law Group LLP (2023–2024)
- Patent Damages, Car Navigation
- One Expert Report, One Deposition

*Melissa Douglas, Thomas Aikins, Sara Kahl, et al. v. EF Education First International, Ltd., EF Institute for Cultural Exchange, Inc., and EF Explore America, Inc.*
Bailey Glasser (2023–)
- Class Action, Travel
- Two Expert Reports, One Deposition

*Maaz Qureshi, Matthew Rabinowitz, and Danish Arif, et al. v. American University*
Anastopoulo Law Firm, LLC (2023–)
- Class Action, Tuition Fees
- One Expert Report, One Deposition

*Anilda Rodrigues and Sarah Talbott, et al. v. Boston College*
The Golan Firm (2023–)
- Class Action, Tuition Fees
- Two Expert Reports

*Lozada v. Case Western Reserve University*
The Sultzer Law Group, P.C. (2023–)
- Class Action, Tuition Fees
- One Expert Report, One Deposition

*TrackTime, LLC v. Amazon.com, Inc., et al.*
Fenwick & West LLP (2022–2023)
- Patent Damages, Music and Audiobook Technology
- Two Expert Reports, One Deposition, Jury Trial Testimony

*In re University of San Diego Tuition and Fees COVID-19 Refund Litigation*
The Golan Firm (2023–)
- Class Action, Tuition Fees
- Three Expert Reports, One Deposition

*Scott Schmidhauser, et al. v. Tufts University*
The Golan Firm (2022–)
- Class Action, Tuition Fees
- One Expert Report

*Marc Schultz, et al. v. Emory University*
Francis Mailman Soumilas, P.C. (2022–)
- Class Action, Tuition Fees
- Two Expert Declarations, One Deposition

*Holly Wedding, et al. v. California Public Employees' Retirement System, et al.*
Shernoff Bidart Echeverria LLP (2022)
- Class Action, Long-term Care Insurance
- Two Expert Reports, One Deposition

*In re: Caustic Soda Antitrust Litigation*
Wexler Boley & Elgersma LLP, Grant & Eisenhofer P.A. (2020–)
- Class Action, Caustic Soda
- Two Expert Declarations, Two Depositions

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, et al.*
Robbins Geller Rudman & Dowd LLP (2017–)
- Class Action, Insurance
- Three Expert Declarations, One Expert Report, One Deposition

*Nview Health, Inc. v. David V. Sheehan, M.D.*
Gunster (2022)
- Breach of Contract, Healthcare Technology
- One Expert Report

*Jonathan Michel v. Yale University*
The Golan Firm (2022–)
- Class Action, Tuition Fees
- Two Expert Declarations, One Deposition

*Marantz Brothers, LLC v. Tate & Lyle Ingredients Americas LLC, et al.*
Enenstein, Pham & Glass LLP (2021–2022)
- Antitrust, Bar Fiber
- Two Expert Reports, One Deposition

*Cryptocurrency Patent Valuation*
Haug Partners, LLP (2020)
- Patent Valuation
- One Valuation Report

*Micron Technology, Inc. v. United Microelectronics Corporation, et al.*
Dan Johnson Law Group, LLP (2019–2021)
- Trade Secrets, DRAM
- Two Expert Reports

*In Re: Packaged Seafood Products Antitrust Litigation*
Ahern and Associates, P.C. (2019–2022)
- Antitrust, Packaged Seafood
- Two Expert Reports, Two Depositions

*JBR, Inc. (d/b/a Rogers Family Co.) v. Keurig Green Mountain, Inc.*
Dan Johnson Law Group, LLP (2018–)
- Antitrust, Single-Serve Coffee
- Four Expert Reports, One Deposition

*Ipsilium LLC v. Cisco Systems, Inc.*
Dan Johnson Law Group, LLP (2018–2019)
- Patent Damages, Network Switches
- Analysis for Preliminary Damages Contentions

*Engquist, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz LLP (2018–2020)
- Taxation Class Action, Gas Utility Taxes
- Two Expert Declarations

*Altela, Inc. v. Arizona Science and Technology Enterprises, et al.*
The Miller Law Firm, P.C. (2018)
- Breach of Contract, Water Treatment Technology
- One Expert Report, One Deposition, Arbitration Testimony

*Acer, Inc., et al. v. Lite-On IT Corp., et al.*
TechKnowledge Law Group, LLP (2015–2019)
- Antitrust, Optical Disk Drives
- Two Expert Reports, Two Depositions

*Fujifilm Corporation v. Motorola Mobility, LLC*
Morgan, Lewis & Bockius, LLP (2015–2016)
- Patent Damages, Smartphone Technology
- Two Expert Reports, One Deposition, Jury Trial Testimony

*Eastman Kodak Company v. Epson Imaging Devices Corporation, et al.*
Nixon Peabody, LLP (2011–2013)
- Antitrust, Liquid Crystal Display Panels
- Three Expert Reports, Two Depositions

*Attorney General of Mississippi v. Yazaki North America, Inc., et al.*
Hazzard Law, LLC (2015–2019)
- Antitrust, Automotive Wire Harnesses
- Two Expert Declarations

*Acer Inc., et al. v. Samsung SDI Co., LTD., et al.*
TechKnowledge Law Group, LLP (2015–2018)
- Antitrust, Lithium-Ion Batteries

*Acer America Corp., et al. v. Hitachi, Ltd., et al.*
TechKnowledge Law Group, LLP (2014–2015)
- Antitrust, Liquid Crystal Display Panels

*Home Depot USA, Inc. v. AU Optronics Corp., et al.*
Bryan Cave, LLP (2015)
- Antitrust, Liquid Crystal Display Panels

*Teramura, et al. v. Walgreen Co., d/b/a Walgreens*
Sanford Law Firm, LLP (2014)
- Wage & Hour Class Action, Retail
- Two Expert Reports

*NextBus, Inc. v. NextBus Information Systems*
Wm. Kochenderfer, PC (2012)
- Breach of Contract, Real Time Passenger Information Technology & Advertising
- One Expert Report

### **As Manager:**

Antitrust
*Ryder Limited and Hill Hire Limited v. Man SE et al.*
Ashurst, LLP (2018–2023)

*Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC v. Southeast Milk, Inc., et al.*
Ahern and Associates, P.C. (2016–2019)

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*
Hausfeld, LLP, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP (2010–)

*In Re: Processed Egg Products Antitrust Litigation*
Hausfeld, LLP (2008–2018)

*In Re: Wholesale Grocery Products Antitrust Litigation*
Kotchen & Low, LLP (2016–2017)

*Fond du Lac Bumper Exchange, Inc., et al. v. Jui Li Enterprise Company, Ltd., et al.*
Karon, LLC (2014–2016)

*Reorganized Farmland Industries v. OneOk, Inc., et al.*
Sharp McQueen, P.A. (2015–2021)

*In Re: Pool Products Distribution Market Antitrust Litigation*
Kaplan, Fox & Kilsheimer, LLP (2013–2016)

*In Re: Northeastern Milk Antitrust Litigation*
Howrey, LLP (2011–2016)

*In Re: Air Cargo Shipping Services Antitrust Litigation*
Hausfeld, LLP (2012–2013)

*In Re: Southeastern Milk Antitrust Litigation*
Howrey, LLP (2010–2013)

*Stanislaus Food Products v. USS-POSCO Industries et al.*
Lieff, Cabraser, Haimann & Bernstein, LLP (2012)

*In Re: Potash Antitrust Litigation*
Pearson, Simon & Warshaw, LLP (2010–2011)

*In Re: Ready-Mixed Concrete Antitrust Litigation*
Cohen & Malad, LLP (2008–2010)

Intellectual Property
*Eli Lilly and Company v. Mayne Pharma USA, Inc. et al.* (Gemzar)
Winston & Strawn, LLP (2010)

*Impax Laboratories, Inc., v. Shire, LLC et al.* (Adderall XR)
Frommer, Lawrence & Haug, LLP (2010)

*Aspex Eyewear, Inc. and Contour Optik, Inc. v. Hardy Life, LLC, et al.*
Sheppard, Mullin, Richter & Hampton, LLP, Frommer, Lawrence & Haug, LLP (2010)

*Eli Lilly and Company v. Hospira, Inc., et al.* (Gemcitabine)
Winston & Strawn, LLP (2009)

*Santarus, Inc. and the Curators of the University of Missouri v. Par Pharmaceutical, Inc.* (Zegerid)
Arent Fox, LLP (2009)

*Forest Laboratories, Inc., et al. v. Caraco Pharmaceutical Laboratories, Ltd.* (Lexapro)
Winston & Strawn, LLP (2008–2009)

*Novo Nordisk A/S and Novo Nordisk Inc. v. Caraco Pharmaceutical Laboratories, Ltd. and Sun Pharmaceutical Industries, Ltd.* (Prandin)
Winston & Strawn, LLP (2008)

Breach of Contract
*Fowler Packing Company v. Sun Pacific Shippers, Paramount Citrus Association, et al.*
Gibson, Dunn & Crutcher, LLP (2016)

*Tula Foods, Inc. v. The Kroger Co.*
Vorys, Sater, Seymor, and Pease, LLP (2014)

*AgroSource, Inc. v. Sipcam Agro USA, Inc.*
Wiley Rein, LLP (2012)

*Frank K. Cooper Real Estate #1, Inc., et al. v. Cendant Corporation and Century 21 Real Estate Corporation*
Zwerling, Schachter & Zwerling, LLP (2009–2011)

*Road Ranger v. Citgo*
Stahl Cowen Crowley Addis, LLC (2009)

Environmental
*Freeport-McMoRan Inc., Comment Re: Proposed Rule for Financial Responsibility Requirements under CERCLA § 108(b) for Classes of Facilities in the Hardrock Mining Industry*
Vinson & Elkins, LLP (2010–2017)

*Roosevelt Irrigation District v. Salt River Project Agricultural Improvement and Power District, et al.*
Bonnett, Fairbourn, Friedman and Balint, P.C. (2015–2016)

*Clyde Litchfield, et al. v. Onstott Dusters, Inc. et al.*
McCormick, Barstow, Sheppard, Wayte & Carruth, LLP (2009)

*State of Oklahoma v. Tyson Foods, Inc. et al.*
Ryan, Whaley & Coldiron, LLP (2009)

Product Labelling
*Austin Rugg and Jennifer Fish, et al. v. Johnson & Johnson*
The Golan Firm (2019-2020)

*Siobhan Morrow, et al. v. Carter's, Inc, et al.*
Carlson Lynch Sweet Kilpela Carpenter, LLP (2017–2018)

*Leah Segedie, et al. v. the Hain Celestial Group, Inc.*
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP (2016–2018)

*Rosminah Brown, et al. v. the Hain Celestial Group, Inc.*
Lexington Law Group (2014)

Insurance
*Certain Underwriters at Lloyd's Severally Subscribing Policy Number DP359504 et al. v. Tyson Foods, Inc.*
Dickstein Shapiro, LLP (2009–2010)

Taxation
*Estuardo Ardon, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz, LLP (2013–2014)

*Carla Villa and Vanessa Garza, et al. v. City of Chula Vista*
Capretz & Associates (2012)

# EDUCATION

**University College London,** London, England
*Ph.D. Economics* | 2008 | Title: "Market Institutions and Firm Behavior: Output and Innovation in the Face of Reform"

**Royal Holloway College, University of London,** London, England
*M.Sc. Economics* | 2003 | Distinction

**Exeter College, Oxford University,** Oxford, England
*B.A. Physics* | 1996 | Class 2:1

# PUBLICATIONS

Econometrics in Litigation: Challenges at Class Certification, *Natural Resource Management and Policy, Modern Agricultural and Resource Economics and Policy: Essays in Honor of Gordon Rausser*, Springer, 2022, pp. 311-349

Economic Principles for Class Certification Analysis in Antitrust Cases (joint with Gordon Rausser), *Antitrust Magazine, Section of Antitrust Law, American Bar Association*, Spring 2016, vol. 30, no. 2, pp. 60-67

Rising Standards for Class Certification: Implications for Economic Analysis (joint with Gordon Rausser), *The Journal of Business and Economics,* March 2016, vol. 7, no. 3, pp. 836-870

Employment Protection Legislation, Multinational Enterprises and Innovation (joint with Rachel Griffith), *The Review of Economics and Statistics*, March 2014, vol. 96, no. 1, pp. 135-150

Antitrust Class Proceedings – Then And Now (joint with Michael Hausfeld, Gordon Rausser, Michael Lehmann and Sathya Gosselin), *The Law and Economics of Class Action*s, *Research in Law and Economics*, 2014, vol. 26, pp. 77-133

The Location of Innovative Activity in Europe (joint with Laura Abramovsky, Rachel Griffith and Helen Miller), *The Institute for Fiscal Studies,* July 2008, Working Paper 08/10

Product Market Reforms, Labour Market Institutions and Unemployment (joint with Rachel Griffith and Rupert Harrison), *The Economic Journal,* March 2007, vol. 117, no. 519, pp. C142-C166

## SCHOLARSHIPS AND AWARDS

- Best Academic Private Enforcement Article, 2015 Antitrust Writing Awards, Concurrences Journal and George Washington University's Competition Law Center
- Advanced Institute of Management Scholarship 2004–2007
- University College London, Department of Economics, W. M. Gorman Scholarship
- University College London, Department of Economics, Honorable Mention in Teaching Assistant Awards

## PRIOR EMPLOYMENT

**Ph.D. Scholar**, the Institute for Fiscal Studies, London, UK, 2004–2007
- Academic and industry research with the Productivity and Innovation team of a leading UK research institute
- Funded by the institute through Ph.D. program

**Teaching Assistant**, Department of Economics, University College London, 2003–2007
- Undergraduate courses in Industrial Organization, Macroeconomics, and Econometrics

**Consultant**, Corporate Banking and Financial Markets, Royal Bank of Scotland, PLC, 2002 (May to Oct)
- Managed reconciliation exercise between two departments of the bank, reporting to senior bank personnel

**Analyst**, Group Risk, Royal Bank of Scotland, PLC, 1999–2001
- Designed and managed creation of Group-level credit risk reporting software, using Oracle Relational Database Management System
- Passed financial regulator's exams in securities and derivatives

**IT Consultant**, Logica UK Ltd, 1997–1999
- Consultancy in energy, transportation, and defense sectors
- Database design, Oracle, C, SQL, Pro*C programming

## CONFERENCES AND PRESENTATIONS

Antitrust Economics: Developments in Economic Theory and Analysis, Panel Participant at:
Golden State Antitrust & Unfair Competition Law Institute Conference,
San Francisco, November 2022

From Estimation to Prediction in Economic Analysis at Class Certification, presented at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Law & Economics, Panel Participant at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Damage Analysis in Intellectual Property Litigation, presented at:
    Bar Association of San Francisco, Barristers Club, Continuing Legal Education, November 2016

Antitrust Class Proceedings – Then and Now, presented at:
    Class Action Landscape: Yesterday, Today and Tomorrow – Perspectives in Law and Economics,
    Research in Law and Economics Conference 2013, Boston

Firm Investment in Innovation and Fixed Assets: The Effect of US Tax Reforms that Reduced the Relative
Price of Equity to Debt, presented at:
    Productivity, Innovation & Intellectual Property Series 2007, London School of Economics

Competition and Innovation, presented at:
    Oxford University and Cambridge University, Institute for Fiscal Studies, Public Economics Lecture
    Series, February 2007

Product Market Reforms, Labour Institutions and Unemployment, presented at:
    European Economics Association Congress 2006, Vienna University
    Royal Economic Society Conference 2006, Nottingham University

Matching Firm Accounts to Patents, presented at:
    European Policy on Intellectual Property Conference 2006, Bocconi University, Milan

# REFEREE ACTIVITY

The European Economic Review, the Journal of Competition Law and Economics, the Economics of
Transition, Oxford Economic Papers, and Fiscal Studies