# EXHIBIT 2

## Filed Under Seal

## Highly Confidential - Attorneys' Eyes Only

Page 1

```
 1                   UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                       OAKLAND DIVISION

 4
   SANDISK TECHNOLOGIES, INC., et
 5 al.,

 6                    Plaintiff,
                                 Case No.:  4:22-cv-04376-HSG
 7          vs.

 8 VIASAT, INC.,

 9                    Defendant.
   _____
10

11

12             REMOTE VIDEOTAPED DEPOSITION OF

13                    GARETH MACCARTNEY

14                       MAY 7, 2025

15

16

17

18

19

20

21

22

23 REPORTED BY:

24 A. DESIREE TIPPER, CSR NO. 13806

25 JOB NO: 10632
```

Page 21

1    testified at trial.

2          The other example, again, it was a legal thing,

3    the packaged seafood antitrust case.  The client that I

4    was doing the analysis for -- the Court found that they

5    had not properly obtained assigned claims from an

6    intermediary purchaser, and so the Court asked me to

7    adjust my damage computation to remove that volume of

8    commerce.  So that was a legal reason, but it was in the

9    context of what you asked about.  That's it.

10        Q    Do you recall any of those instances where

11   there -- your opinions were excluded on the basis of

12   being unreliable?

13        A    With regard to the Keurig antitrust case, the

14   Court found -- although, as I said, it's being

15   reconsidered -- that the benchmark analysis I did -- but

16   the benchmark was potentially tainted by the unlawful

17   behavior of the defendant and excluded it on that basis.

18   But like I said, it's being reconsidered.

19        Q    For the cases listed in your CV as -- you know,

20   as the expert section in your CV, in each of those cases,

21   did you provide opinions in your capacity as an expert in

22   economics?

23        A    Yes.

24        Q    Do you consider yourself an expert in any

25   technical fields?

1          MS. FERNANDS:  Objection.  Vague.

2          THE WITNESS:  I'm certainly not offered as a --

3    as a technical expert.  I have some past experience in,

4    for example, software engineering in previous jobs, but

5    I'm not offered as a technical expert in this case or in

6    other cases.

7    BY MR. VINCENT:

8      Q    Do you have any technical expertise in the

9    fields that are -- that are related to the asserted

10   patents in this case?

11         MS. FERNANDS:  Objection.  Vague.

12         THE WITNESS:  I don't have -- I'm not being

13   offered as a technical expert in this case.  I have

14   experience as an economist in very many fields that are

15   related with respect to being technological products,

16   including Wi-Fi.  One of the trials I testified at was

17   about mesh Wi-Fi, for example, for instance.  So I have

18   plenty of economic expertise in related products.

19   BY MR. VINCENT:

20     Q    But no technical expertise in, for example,

21   storage devices?

22     A    Again, I have -- I have -- with respect to

23   storage devices, I've done cases on DRAM, on optical disk

24   drives.  So those are storage devices.  But, again, it

25   was an economic analysis.  So I have knowledge of them

1    from my economic analysis, but I'm not being offered as a

2    technical engineering expert.

3        Q    To the extent you relied on technical

4    information in forming your opinions, is it fair to say

5    you relied on input from other individuals for this case?

6        A    I would say that I certainly relied on input

7    from other individuals and input from discovery documents

8    as well.

9        Q    And the individuals that you interviewed for

10   your -- for your report, those are listed in Exhibit B of

11   your reports on page 2 under the section "Interviews"; is

12   that right?

13       A    Yes.

14       Q    Is there anyone else you talked to for forming

15   your opinions in this case that's not listed in this

16   section?

17       A    No.

18       Q    I've seen throughout your report in footnotes,

19   there are references to a discussion with, for example,

20   Dr. Almeroth, et cetera.  Was at least your intention to

21   identify where you were relying on those conversations to

22   include that in a footnote?

23       A    That was my intention, yes.

24       Q    I see at the top of this page 2 of Exhibit B of

25   your reports, it lists expert reports that you reviewed.

Page 97

1    Viasat website, estimated data consumption per hour of

2    0.7 gigabytes, correct?

3        A    Yes.

4        Q    You don't cite any evidence in your report that

5    this 0.7 gigabyte number disregards standard video

6    compression, do you?

7        A    It -- it follows with respect to how it's

8    presented to residential consumers in terms of data

9    usage.

10        Q    You don't have any expertise in video

11    compression, correct?

12        A    That's correct.  I cite -- I cite to an article.

13    I'm reporting what it says in the article about

14    compression.

15        Q    That article doesn't say anything about whether

16    these numbers on Viasat's website account for compression

17    or not, do they?

18        A    Correct, it doesn't.

19        Q    Okay.  So you don't cite any evidence at all in

20    your -- in paragraph 87 that the numbers on Viasat's

21    website disregard compression?

22        A    That's -- that's correct.  It follows the nature

23    of the website.  But also what I'm getting at is

24    Ms. Kindler doesn't discuss compression.  She doesn't

25    mention anything about.  She's looking at a raw -- how

Page 101

1       A    Yep.

2       Q    Do you see in paragraph -- Section A here,

3    beginning on paragraph 66, you have a section titled

4    "Ms. Kindler's damages estimate is implausible on its

5    face."

6            Do you see that?

7       A    Yes.

8       Q    Give me one second.  In paragraph 76, you talk

9    about the Arconics acquisition; is that right?

10      A    Yes.

11      Q    What do you understand that to be?

12      A    It's when Viasat acquired a company called

13   Arconics.

14      Q    Do you know whether Arconics developed the

15   accused products in this case?

16      A    I know that Arconics provided services that were

17   related to WIFE and, in fact, partnered with Viasat

18   before the acquisition with respect to that.  So they had

19   actual products and services and -- that were related to

20   WIFE.  I don't have an understanding that gets into more

21   maybe technical aspects of the accused products.

22      Q    Regardless of the technical aspects, do you

23   know -- do you know -- the accused products that are

24   accused in this case -- do you know if those were

25   developed before or after the Arconics acquisition by

```
 1   Viasat?

 2       A    I would say that I don't have a particular

 3   understanding about -- about who developed what with

 4   respect to that.  What I do know is that Arconics was a

 5   provider of WIFE services and that they partnered with

 6   Viasat in that regard before the acquisition, and then

 7   Viasat bought them.  I don't know anything beyond that.

 8       Q    Do you know whether -- I guess, do you have any

 9   opinions in your report about whether the technology

10   acquired from Arconics would cover the full scope of the

11   asserted claims?

12       A    Again, it's a technical opinion.  I don't have

13   any technical opinions in my report.

14       Q    Okay.  Is it your opinion that the acquisition

15   price of Arconics is a cap on the value of the asserted

16   patents?

17       A    I wouldn't describe it as a cap.  I would

18   describe it as I have done here as a reality check that,

19   essentially, Ms. Kindler, her damage computation, she

20   finds around $20 million, depending on the math, of

21   course, the revenue-based approach $20 million combined

22   for IPTV and WIFE, more than that.

23           Much more when she does her cost approach, which

24   is another signal of unreliability.  She does a different

25   approach and she's getting like $90 million.  And then
```

Page 103

```
 1   she even has an opportunity cost approach, which is not

 2   really a damage number, but it's a sort of a corollary

 3   analysis, which is like 250 million to $1.6 billion.

 4   It's a signal of unreliability that she has a massive

 5   range of different computations.

 6           But the way the Arconics acquisition features it

 7   is that the $21.6 million Viasat was paying not just for

 8   the right to use a patent, but was paying for an entire

 9   company that was providing services, specifically

10   relevant here because it's WIFE.  And it was providing

11   Viasat with its WIFE services.

12           Arconics has people and customers and software

13   and working products.  And given its close relation to

14   the technologies we're talking about in this case, that

15   provides a reality check that demonstrates that her,

16   along with many other things -- that her damages aren't

17   fit.

18      Q    You mentioned close relation, but you had just

19   admitted, did you not, that you don't have any opinions

20   about whether or not the technology acquired from

21   Arconics would cover the full scope of the asserted

22   claims, correct?

23      A    Well, because that's a technical opinion.  I

24   haven't done a technical analysis of Arconics' products.

25   That's a technical opinion.  But it still stands as a
```

Page 104

1   reliable reality check, particularly given all of the

2   other aspects of this case, which we'll get into later,

3   I'm sure.

4       Q   So if you don't know whether Arconics, their

5   technology covers the scope of the claims, on what basis

6   do you opine that it could be a reality check on the

7   value?

8       A   On the basis that I've just described.  And why

9   I hesitate, of course, about a little bit is that

10  there's -- it's WIFE.  It's not IPTV.  So it's specific

11  to WIFE.  And I know this isn't about claims and scope.

12  It's more about the accused products and -- so it's

13  specific to WIFE.

14          But it provides a reality check because, as I

15  say, Arconics is a company with people and products and

16  potentially the technology specifically that we're

17  talking about, or at least very closely related.  I mean,

18  they provided Viasat with their WIFE service capabilities

19  and before -- even before Viasat acquired Arconics.  So

20  in the context of all of that, it provides a reliable

21  reality check.

22      Q   You say in your report in paragraph 76 that the

23  asserted patents -- for only a small fraction of

24  Arconics' value; is that correct -- strike that.

25          In paragraph 76 you said it would be unrealistic

Page 107

1    satellites.  The satellites aren't their accused

2    products.

3        Q    By question was this, sir:  IFE as delivered by

4    Viasat requires the use of satellites, correct?

5        A    As it -- as it currently delivers it, it

6    delivers it through satellites; that is correct.

7        Q    And Arconics did not have satellites, correct?

8        A    That is also correct.

9        Q    So when you said that Arconics covered the whole

10   shebang for IFE, that's not true, is it?

11           MS. FERNANDS:  Objection.  Mischaracterizes.

12           THE WITNESS:  Not the whole shebang with respect

13   to the satellite aspect of it.  Obviously, that's why it

14   works in partnership with Viasat previously.  But it has

15   actual software and actual products that enable WIFE.

16   BY MR. VINCENT:

17       Q    Do you know whether -- you don't have any

18   opinions about whether the software products, whatever

19   Arconics was providing, would be sufficient to practice

20   the asserted claims, fair?

21       A    That's a technical opinion.  I haven't nor am I

22   qualified to do a technical analysis of Arconics's

23   software.

24       Q    I've dropped into the chat -- or into the folder

25   what will be Exhibit 6, I believe.  And it's Viasat

Page 111

 1          (Speaking simultaneously.)

 2          THE WITNESS:  There's no need to get this

 3  transaction and start working on what value Viasat is

 4  providing to.

 5  BY MR. VINCENT:

 6     Q    Whether you think there's a need or not, you can

 7  agree that you didn't do an analysis to determine for the

 8  WIFE products how much value is derived from the Arconics

 9  technology versus what Viasat provides, correct?

10          MS. FERNANDS:  Objection.  Vague and ambiguous.

11          THE WITNESS:  Yeah, first, it's not clear what

12  that means.  But I did -- I did an analysis of -- with

13  respect to this acquisition of the value of what Arconics

14  is bringing because that's reflected in the acquisition

15  price.  And you can't trust that with what's coming from

16  the patents, particularly given the non-infringing

17  alternatives, as I mentioned in paragraph 76.

18          So that's sufficient to demonstrate the reality

19  check aspect of this analysis.  But I didn't do what

20  you're saying nor is it necessary.

21  BY MR. VINCENT:

22     Q    If you look at the next paragraph in this

23  section paragraph 77, you provide here another reality

24  check; is that right?

25     A    Yes.

1    either way.

2        Q    Okay.  Turn to page -- I'm sorry -- paragraph

3    121 of your report.  It says -- this whole section is --

4    the Subsection 2 on the 400 patent on page 66 of your

5    report.

6            Do you see that?

7        A    Yes.

8        Q    So on paragraph 120, you're addressing the 400

9    patent and Ms. Kindler's opinions regarding the 400

10   patent?

11       A    Yes.  I addressed it elsewhere as well, but yes,

12   it goes to that, yes.

13       Q    And in paragraph 121, you provide opinions

14   regarding an agreement ███████████████████████████

     ███ ████████████████████████, correct?

16       A    Yes.

17       Q    And you criticize Ms. Kindler's approach for the

18   400 patent and say in the second sentence of

19   paragraph 121, "A more reliable approach is to consider

20   what Viasat actually does pay for digital rights

21   management, DRM."

22            Do you see that?

23       A    Yes.

24       Q    And then you -- and then you proceed to ████████

     ███ ████████████████████████████████████

Page 128

1    is that right?

2        A    Yes.

3        Q    You don't cite any evidence in paragraph 121 for

4    your opinion that a more reliable approach if they

5    consider what Viasat actually does pay for digital rights

6    management, DRM, correct?

7            MS. FERNANDS:  Objection.  Mischaracterizes.

8            THE WITNESS:  I wouldn't agree with that.  I

9    certainly looked at Ms. Kindler's estimate, which is

10   based on this SCSA agreement, the ███████████████████

11   and I've analyzed the SCSA agreement, and I find that

12   that's -- that's not reliable.  It overstates what the

13   royalty would be in the 400 patent in the context of our

14   case, because SCSA was an organization that created an

15   actual -- an actual thing in a sense, an actual ecosystem

16   of digital rights management.  It had a -- it had a

17   brand -- Infinity brand.  Ms. Kindler talks about that

18   herself.

19           When you signed up to become a content publisher

20   and the three cents is the content publisher, when you

21   signed up to pay that, the three cents, you were getting

22   a lot for that.  You were getting -- you were part of

23   this ecosystem, this industrywide standard with brand

24   recognized, trusted by studios and, therefore, they would

25   trust you to distribute their digitally rights managed

Page 129

1    content.

2            All of that is why her reliance on the ███████

3    ███████ from the SCSA agreement -- which is not a patent

4    license, it's -- it is as I've described it.  That's why

5    it's unreliable.

6            And, therefore, it makes sense that a more

7    reliable approach is to look at something that's specific

8    to Viasat and what it actually pays for DRM, and that

9    leads them to the ███████████████.

10   BY MR. VINCENT:

11       Q    You're not offering any technical opinions that

12   the Vualto agreement is technically comparable to the

13   technology of the 400 patent, correct?

14       A    I'm not offering any technical opinions with

15   respect to anything.  But it is related to digital rights

16   management, and it has a specific fee that goes to that.

17   And, therefore, that's a more reliable estimate if you

18   want to consider what would be paid for the 400 patent.

19   I don't have a technical opinion on anything.

20       Q    You don't have a technical opinion regarding

21   whether the 400 patent covers technology above and beyond

22   the scope of DRM, correct?

23            MS. FERNANDS:  Vague.

24            THE WITNESS:  Well, I don't have a technical

25   opinion on anything.  So -- so the answer -- your

Page 130

1  question can end after the word -- words "technical

2  opinion."  And -- and -- but certainly, the 400 patent

3  is -- is related, as I understand it, to aspects of DRM,

4  and I've described that in my report, relying on the

5  technical expert, Dr. Almeroth.  But no, I don't have a

6  technical opinion about anything.

7  BY MR. VINCENT:

8      Q    And in paragraph 121 where you discuss the

9  ████████████████, you don't cite any evidence with the

10  proposition that the ██████ technology is technically

11  comparable to the 400 patent, correct?

12      A    I don't -- I don't cite anything or form a

13  technical opinion.  I don't have a technical opinion

14  about whether it's explicitly the same as the 400 patent.

15  It is related to digital rights management.  I mean, it's

16  an economic analysis.  It goes to -- it goes to how

17  much -- how much does Viasat value DRM and its evidence

18  by what does Viasat actually pay for DRM?  And it gets --

19  you know, it gets more than just the right to do

20  something under this.

21         My understanding is it gets product and ability

22  to do things and it uses them.  And that's why it's a

23  good indicator and, if anything, still an upper limit

24  on -- on an estimate of a royalty for the 400 patent.

25      Q    So I want to be clear.  You view the  ██████

Page 131

1       ████████ as an upper limit as a cap on what would be a

2    reasonable royalty for the 400 patent; is that right?

3        A    I would say that it's still generous because

4    Viasat gets things from ████, actual, you know, product

5    and stuff.  But it -- from an economic perspective, it's

6    a very good indicator of how -- how much Viasat values

7    services that are related to DRM, and it's a much better

8    indicator -- it's a much better indicator and estimate of

9    the royalty for the 400 patent rather than the SCSA

10   agreement, which is, like I said, a whole ecosystem and

11   industry standard and brand that gets studios to trust

12   content publisher providers with their content, and so

13   it's better estimate in that sense.

14       Q    You've done an analysis to determine what, if

15   any, value exists for the 400 patent technology apart

16   from DRM technology, fair?

17       A    I struggled to understand what that question is

18   getting into.

19       Q    Well --

20       A    I don't understand what that means, frankly.

21       Q    To the extent the 400 patent covers more than

22   just DRM technology, you've done no analysis to determine

23   what the value of that additional coverage is, correct?

24       A    I just -- I struggle with that question given

25   that it's entitled "Digital rights management system,

Page 132

1    system transfer of content and distribution."  That's the

2    title of the 400 patent, so I struggle with what that

3    question means or what you could be alluding to.  But the

4    simple answer is no, given that I don't understand what

5    the question means or what that analysis would be about

6    or what it would involve.  No.

7         Q    Let me break it down, then.  You're not a

8    technical expert, correct?

9         A    That is correct.

10        Q    So you've done no technical analysis of

11   comparing the scope of the 400 patent to the scope of the

12   technology at issue in the Vualto agreement, correct?

13        A    That's correct.  But you've now changed things a

14   little bit.  Previously, you were talking about what's

15   the 400 patent -- did it have scope beyond DRM?  Now

16   you've just changed it to beyond Vualto.

17             But no, I haven't done a technical analysis of

18   anything.

19        Q    And so because you haven't done a technical

20   analysis, you also haven't done an economic analysis to

21   determine the value to the extent the scope of the 400

22   patent is greater than the technology at issue in the

23   Vualto agreement.  You've done no economic analysis to

24   value that difference, correct?

25             MS. FERNANDS:  Objection.  Assumes facts.