# EXHIBIT A

**Filed Under Seal**

**Highly Confidential - Attorneys' Eyes Only**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et. al., | Case No.: 4:22-cv-4376-HSG |
| Plaintiffs, | |
| v. | |
| VIASAT, INC., | |
| Defendant. | |

**OPENING REPORT OF KEVIN C. ALMEROTH, Ph.D.**
**REGARDING INVALIDITY OF AND NON-INFRINGING ALTERNATIVES TO U.S.**
**PATENT NOS. 9,424,400 & 10,447,667**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     SUMMARY OF OPINIONS ................................................................................2

III.    QUALIFICATIONS ..............................................................................................2

IV.     LEVEL OF ORDINARY SKILL IN THE ART .................................................11

V.      LEGAL STANDARDS .......................................................................................12

        A.      Prior Art ...................................................................................................12

        B.      Anticipation Under 35 U.S.C. § 102 ........................................................13

        C.      Obviousness Under 35 U.S.C. § 103 ........................................................14

VI.     TECHNICAL BACKGROUND...........................................................................17

        A.      The Internet...............................................................................................17

        B.      Network Protocols ....................................................................................19

        C.      Protocol Layering and Network Stacks .....................................................20

        D.      Network Architecture................................................................................27

        E.      A Day in the Life of a Packet....................................................................32

        F.      DRM Solutions .........................................................................................36

VII.    OVERVIEW OF THE ASSERTED PATENTS....................................................38

        A.      The '400 Patent.........................................................................................38

        B.      The '667 Patent .........................................................................................39

VIII.   CLAIM CONSTRUCTION.................................................................................40

IX.     SUMMARY OF THE CITED PRIOR ART REFERENCES ..............................41

        A.      The '400 Patent.........................................................................................41

                1.      U.S. Patent No. 8,600,062 ("Rae") ..............................................41

                2.      U.S. Patent No. 2008/0279533 ("Buttars")...................................42

                3.      U.S. Patent No. 2003/0014630 ("Spencer") ................................42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

B.    The '667 Patent ...................................................................................43

    1.    U.S. Patent Pub. No. 2003/0001978 ("Smith") .........................................43

    2.    U.S. Patent Pub. No. 2010/0325675 ("Smoyer").......................................43

    3.    The SCSA System.......................................................................................44

    4.    The DirecTV DVR Systems ........................................................................49

    5.    The DISH DVR Systems .............................................................................51

    6.    The TiVo DVR System................................................................................55

X.    INVALIDITY ANALYSIS ......................................................................................57

A.    The '400 Patent ....................................................................................................57

    1.    U.S. Patent No. 8,600,062 ("Rae") ...........................................................57

        a)    Claim 1 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................60

        b)    Claim 2 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................75

        c)    Claim 6 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................76

        d)    Claim 8 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................76

        e)    Claim 9 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................77

        f)    Claim 10 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................78

        g)    Claim 13 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................78

        h)    Claim 17 of the '400 Patent is anticipated and rendered obvious by Rae.................................................................................78

    2.    U.S. Patent No. 2008/0279533 ("Buttars").............................................78

        a)    Claim 1 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................................79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

b)      Claim 2 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................95

c)      Claim 6 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................95

d)      Claim 8 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................97

e)      Claim 9 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................98

f)      Claim 10 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................99

g)      Claim 13 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................99

h)      Claim 17 of the '400 Patent is anticipated and rendered obvious by Buttars. ........................................................99

B.      The '667 Patent ...........................................................................100

1.      U.S. Patent Pub. No. 2003/0001978 ("Smith") ........................................100

a)      Claim 1 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................100

b)      Claim 2 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................112

c)      Claim 3 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................113

d)      Claim 4 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................114

e)      Claim 5 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................116

f)      Claim 6 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................116

g)      Claim 7 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................117

h)      Claim 11 of the '667 Patent is anticipated and rendered obvious by Smith. ........................................................118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

i)      Claim 12 of the '667 Patent is anticipated and rendered
        obvious by Smith. ..................................................................119

j)      Claim 13 of the '667 Patent is anticipated and rendered
        obvious by Smith. ..................................................................119

k)      Claim 14 of the '667 Patent is anticipated and rendered
        obvious by Smith. ..................................................................119

l)      Claim 15 of the '667 Patent is anticipated and rendered
        obvious by Smith. ..................................................................119

m)      Claim 16 of the '667 Patent is anticipated and rendered
        obvious by Smith. ..................................................................120

2.      U.S. Patent Pub. No. 2010/0325675 ("Smoyer")....................................120

a)      Claim 1 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................120

b)      Claim 2 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................129

c)      Claim 3 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................130

d)      Claim 4 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................130

e)      Claim 5 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................132

f)      Claim 6 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................133

g)      Claim 7 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................135

h)      Claim 11 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................136

i)      Claim 12 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................137

j)      Claim 13 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................137

k)      Claim 14 of the '667 Patent is anticipated and rendered
        obvious by Smoyer. ................................................................137

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

l)     Claim 15 of the '667 Patent is anticipated and rendered obvious by Smoyer. .................................................. 138

m)    Claim 16 of the '667 Patent is anticipated and rendered obvious by Smoyer. .................................................. 138

3.     The SCSA System ........................................................ 138

a)     Claim 1 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 138

b)     Claim 2 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 146

c)     Claim 3 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 146

d)     Claim 4 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 147

e)     Claim 5 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 147

f)     Claim 6 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 148

g)     Claim 7 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 149

h)     Claim 11 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 149

i)     Claim 12 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 150

j)     Claim 13 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 151

k)     Claim 14 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 151

l)     Claim 15 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 151

m)    Claim 16 of the '667 Patent is anticipated and rendered obvious by the SCSA System ....................................... 151

4.     The DirecTV DVR Systems ........................................ 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

a) Claim 1 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................152

b) Claim 2 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................158

c) Claim 3 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................159

d) Claim 4 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................160

e) Claim 5 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................161

f) Claim 6 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................161

g) Claim 7 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................162

h) Claim 11 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................163

i) Claim 12 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................164

j) Claim 13 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................164

k) Claim 14 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................164

l) Claim 15 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................165

m) Claim 16 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems ...................................165

5. The DISH DVR Systems ........................................................................165

a) Claim 1 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ...................................165

b) Claim 2 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ...................................173

c) Claim 3 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ...................................174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

d)     Claim 4 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 174

e)     Claim 5 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 176

f)     Claim 6 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 177

g)     Claim 7 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 177

h)     Claim 11 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 179

i)     Claim 12 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 180

j)     Claim 13 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 180

k)     Claim 14 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 181

l)     Claim 15 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 181

m)     Claim 16 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems ............................................... 181

XI.     LACK OF SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS .............. 181

XII.     NON-INFRINGING ALTERNATIVES ............................................................ 182

    A.     The '400 Patent ............................................................................. 182

       1.     Substituting or Publicizing Any Concealed Unique Identifiers .............. 182

       2.     Localizing Any Remote Trusted Servers ................................. 184

       3.     Not Providing Any Corresponding Access Key ...................... 186

    B.     The '667 Patent ............................................................................. 188

       1.     Removing The "Encrypted" Boolean ..................................... 188

       2.     Unencrypting Storage Drives ................................................. 191

XIII.     CONCLUSION ............................................................................................ 192

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## I.    INTRODUCTION[1]

1.    I, Kevin Almeroth, Ph.D., have been retained by counsel on behalf of Viasat, Inc. as an expert in this litigation.  I have prepared this Report at the request of Viasat and its counsel. This Report provides my opinions on invalidity of the claims of U.S. Patent Nos. 9,424,400 (the "'400 Patent") and 10,447,667 (the "'667 Patent") (collectively, the "Asserted Patents") asserted by Plaintiffs Sandisk Technologies, Inc., SanDisk 3D IP Holdings Ltd., SanDisk Technologies LLC, and SanDisk Storage Malaysia Sdn. Bhd. (collectively, "SanDisk" or "Plaintiffs").  This Report also provides my opinions on certain non-infringing alternatives to the Asserted Patents.

2.    I am being compensated at my standard billing rate of $800 per hour for time spent on this matter, plus reasonable out-of-pocket expenses.  I have received no additional compensation for my work in this litigation.  My compensation does not depend upon the contents of this Report, any testimony that I may provide, or the ultimate outcome of this litigation.

3.    I expect to be called to provide expert testimony regarding opinions formed based on my analysis of the issues considered in this Report.  I may also discuss my own work and publications in the field and knowledge of the state of the art in the relevant time period.  I may rely on handbooks, textbooks, technical literature, and the like to demonstrate the state of the art in the relevant time period and the evolution of relevant technologies.  I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, based on the nature and content of the documentation, data, proof, and other evidence or testimony that Plaintiffs or their expert(s) may present, or based on any additional discovery or other information provided to me or found by me in this matter.  All of the opinions stated in this Report are based on my current personal

---

[1]    Headings in this document are not intended to limit the scope of my opinions within those sections.  Section headings are inserted for the purpose of convenience only and are not intended to affect the meaning or interpretation my opinions.  For example, the headings are not intended to limit my opinions, evidence, or analysis to a particular legal issue and/or claim term.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

knowledge and professional judgment, and if called as a witness during the hearing in this matter, I am prepared to testify competently about them. I reserve the right to use and rely on certain demonstratives to do so. I also reserve the right to amend and/or supplement this Report should additional information or developments that may affect my opinions become available.

4.      In reaching the conclusions described herein, I have considered the documents and materials identified and/or cited in this Report, as well as the materials listed in Exhibit B. My opinions are also based upon my education, training, research, knowledge, and personal and professional experience.

5.      It is my understanding that Plaintiffs may submit an expert report responding to this Report. I reserve the right to rebut any positions taken in that report.

## II.      SUMMARY OF OPINIONS

6.      It is my opinion that the prior art references and systems discussed in this Report anticipate and/or render obvious the asserted claims of the Asserted Patents.

7.      It is my opinion that there are no secondary considerations of non-obviousness of the Asserted Patents.

8.      It is my opinion that the hypothetical alternative designs discussed herein, which I have considered and evaluated based on Viasat's responses to Plaintiffs' interrogatories in this lawsuit, (1) would present end-users with limited if any differences from the end-user perspective, and (2) would not infringe the Asserted Claims of the Asserted Patents.

## III.      QUALIFICATIONS

9.      I have summarized in this section my educational background, career history, publications, and other relevant qualifications below. My full curriculum vitae is attached as Exhibit A to this declaration.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

10.    I am currently a Professor Emeritus in the Department of Computer Science at the University of California, Santa Barbara (UCSB). While active at UCSB, I held faculty appointments and was a founding member of the Computer Engineering (CE) Program, Media Arts and Technology (MAT) Program, and the Technology Management Program (TMP). I also served as the Associate Director of the Center for Information Technology and Society (CITS) from 1999 to 2012. I have been a faculty member at UCSB since July 1997.

11.    I hold three degrees from the Georgia Institute of Technology: (1) a Bachelor of Science degree in Information and Computer Science (with minors in Economics, Technical Communication, and American Literature) earned in June 1992; (2) a Master of Science degree in Computer Science (with specialization in Networking and Systems) earned in June 1994; and (3) a Doctor of Philosophy (Ph.D.) degree in Computer Science (Dissertation Title: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia System, minor in Telecommunications Public Policy) earned in June 1997. During my education, I have taken a wide variety of courses as demonstrated by my minor. My undergraduate degree also included a number of courses more typical of a degree in electrical engineering including digital logic, signal processing, and telecommunications theory.

12.    One of the major concentrations of my research over the past 30+ years has been the delivery of multimedia content and data between computing devices, including various network architectures. In my research, I have studied large-scale content delivery systems, and the use of servers located in a variety of geographic locations to provide scalable delivery to hundreds or thousands of users simultaneously. I have also studied smaller-scale content delivery systems in which content is exchanged between individual computers and portable devices. My work has emphasized the exchange of content more efficiently across computer networks, including the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

scalable delivery of content to many users, mobile computing, satellite networking, delivering content to mobile devices, and network support for data delivery in wireless networks.

13.    In 1992, the initial focus of my research was on the provision of interactive functions (e.g., VCR-style functions like pause, rewind, and fast-forward) for near video-on-demand systems in cable systems; in particular, how to aggregate requests for movies at a cable head-end and then how to satisfy a multitude of requests using one audio/video stream broadcast to multiple receivers simultaneously. This research has continually evolved and resulted in the development of techniques to scalably deliver on-demand content, including audio, video, web documents, and other types of data, through the Internet and over other types of networks, including over cable systems, broadband telephone lines, and satellite links.

14.    An important component of my research has been investigating the challenges of communicating multimedia content, including video, between computers and across networks including the Internet. Although the early Internet was used mostly for text-based, non-real time applications, the interest in sharing multimedia content, such as video, quickly developed. Multimedia-based applications ranged from downloading content to a device to streaming multimedia content to be instantly used. One of the challenges was that multimedia content is typically larger than text-only content, but there are also opportunities to use different delivery techniques since multimedia content is more resilient to errors. I have worked on a variety of research problems and used a number of systems that were developed to deliver multimedia content to users. One content-delivery method I have researched is the one-to-many communication facility called "multicast," first deployed as the Multicast Backbone, a virtual overlay network supporting one-to-many communication. Multicast is one technique that can be used on the Internet to provide streaming media support for complex applications like video-on-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

demand, distance learning, distributed collaboration, distributed games, and large-scale wireless communication. The delivery of media through multicast often involves using Internet infrastructure, devices and protocols, including protocols for routing and TCP/IP.

15.     Starting in 1997, I worked on a project to integrate the streaming media capabilities of the Internet together with the interactivity of the web. I developed a project called the Interactive Multimedia Jukebox (IMJ). Users would visit a web page and select content to view. The content would then be scheduled on one of a number of channels, including delivery to students in Georgia Tech dorms delivered via the campus cable plant. The content of each channel was delivered using multicast communication.

16.     In the IMJ, the number of channels varied depending on the capabilities of the server including the available bandwidth of its connection to the Internet. If one of the channels was idle, the requesting user would be able to watch their selection immediately. If all channels were streaming previously selected content, the user's selection would be queued on the channel with the shortest wait time. In the meantime, the user would see what content was currently playing on other channels, and because of the use of multicast, would be able to join one of the existing channels and watch the content at the point it was currently being transmitted.

17.     The IMJ service combined the interactivity of the web with the streaming capabilities of the Internet to create a jukebox-like service. It supported true Video-on-Demand when capacity allowed, but scaled to any number of users based on queuing requested programs. As part of the project, we obtained permission from Turner Broadcasting to transmit cartoons and other short-subject content. We also connected the IMJ into the Georgia Tech campus cable television network so that students in their dorms could use the web to request content and then view that content on one of the campus's public access channels.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18.     More recently, I have also studied issues concerning how users choose content, especially when considering the price of that content. My research has examined how dynamic content pricing can be used to control system load. By raising prices when systems start to become overloaded (*i.e.*, when all available resources are fully utilized) and reducing prices when system capacity is readily available, users' capacity to pay as well as their willingness can be used as factors in stabilizing the response time of a system. This capability is particularly useful in systems where content is downloaded or streamed on-demand to users.

19.     As a parallel research theme, starting in 1997, I began researching issues related to wireless devices and sensors. In particular, I was interested in showing how to provide greater communication capability to "lightweight devices," *i.e.*, small form-factor, resource-constrained (*e.g.*, CPU, memory, networking, and power) devices.  Starting in 1998, I published several papers on my work to develop a flexible, lightweight, battery-aware network protocol stack. The lightweight protocols we envisioned were similar in nature to protocols like Bluetooth, Universal Plug and Play (UPnP) and Digital Living Network Alliance (DLNA).

20.     From this initial work, I have made wireless networking—including ad hoc, mesh networks and wireless devices—one of the major themes of my research. My work in wireless network spans the protocol stack from applications through to the encoding and exchange of data at the data link and physical layers.

21.     At the application layer, even before the large-scale "app stores" were available, my research looked at building, installing, and using apps for a variety of purposes, from network monitoring to support for traditional computer-based applications (*e.g.,* content retrieval) to new applications enabled by ubiquitous, mobile devices.  For example, my research has looked at developing applications for virally exchanging and tracking "coupons" through "opportunistic

6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

contact" (*i.e.,* communication with other devices coming into communication range with a user). In many of the courses I have taught there is a project component. Through these projects I have supervised numerous efforts to develop new "apps" for download and use across a variety of mobile platforms.

22.    Toward the middle of the protocol stack, my research also looked to build wireless infrastructure support to enable communication among a set of mobile devices unaided by any other kind of network infrastructure. These kinds of networks are useful either in challenged network environments (e.g., when a natural disaster has destroyed existing infrastructure) or when suitable support for network communication never existed. The deployment of such networks (or even the use of traditional network support) are critical to support services like disaster relief, catastrophic event coordination, and emergency services deployment.

23.    Yet another theme is monitoring wireless networks, in particular different variants of IEEE 802.11 compliant networks, to (1) understand the operation of the various protocols used in real-world deployments, (2) use these measurements to characterize use of the networks and identify protocol limitations and weaknesses, and (3) propose and evaluate solutions to these problems. I have successfully used monitoring techniques to study wireless data link layer protocol operation and to improve performance by enhancing the operation of such protocols. For wireless protocols, this research includes functions like network acquisition and channel bonding.

24.    Protecting networks, including their operation and content, has been an underlying theme of my research almost since the beginning of my research career. Starting in 2000, I have been involved in several projects that specifically address security, network protection, and firewalls. After significant background work, a team on which I was a member successfully submitted a $4.3M grant proposal to the Army Research Office (ARO) at the Department of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Defense to propose and develop a high-speed intrusion detection system. Key aspects of the system included associating streams of packets and analyzing them for viruses and other malware. Once the grant was awarded, we spent several years developing and meeting the milestones of the project. A number of my students worked on related projects and published papers on topics ranging from intrusion detection to developing advanced techniques to be incorporated into firewalls. I have also used firewalls, including their associated malware detection features, in developing techniques for the classroom to ensure that students are not distracted by online content.

25.     Recent work ties some of the various threads of my past research together. I have investigated content delivery in online social networks and proposed reputation management systems in large-scale social networks and marketplaces. On the content delivery side, I have looked at issues of caching and cache placement, especially when content being shared and the cache have geographical relevance. We were able to show that effective caching strategies can greatly improve performance and reduce deployment costs. Our work on reputation systems showed that reputations have economic value, and as such, creates a motivation to manipulate reputations. In response, we developed a variety of solutions to protect the integrity of reputations in online social networks. The techniques we developed for content delivery and reputation management were particularly relevant in peer-to-peer communication and recommendations for downloadable "apps."

26.     As an important component of my research program, I have been involved in the development of academic research into available technology in the marketplace. One aspect of this work is my involvement in the Internet Engineering Task Force (IETF). The IETF is a large and open international community of network designers, operators, vendors, and researchers

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

concerned with the evolution of the Internet architecture and the smooth operation of the Internet. I have been involved in various IETF groups including many content delivery-related working groups like the Audio Video Transport (AVT) group, the MBone Deployment (MBONED) group, Source Specific Multicast (SSM) group, the Inter-Domain Multicast Routing (IDMR) group, the Reliable Multicast Transport (RMT) group, the Protocol Independent Multicast (PIM) group, etc. I have also served as a member of the Multicast Directorate (MADDOGS), which oversaw the standardization of all things related to multicast in the IETF. Finally, I was the Chair of the Internet2 Multicast Working Group for seven years.

27.    My involvement in the research community extends to leadership positions for several academic journals and conferences. I am the co-chair of the Steering Committee for the ACM Network and System Support for Digital Audio and Video (NOSSDAV) workshop and on the Steering Committees for the International Conference on Network Protocols (ICNP), ACM Sigcomm Workshop on Challenged Networks (CHANTS), and IEEE Global Internet (GI) Symposium. I have served or am serving on the Editorial Boards of IEEE/ACM Transactions on Networking, IEEE Transactions on Mobile Computing, IEEE Network, ACM Computers in Entertainment, AACE Journal of Interactive Learning Research (JILR), and ACM Computer Communications Review. I have co-chaired a number of conferences and workshops including the IEEE International Conference on Network Protocols (ICNP), IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), International Conference on Communication Systems and Networks (COMSNETS), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), the International Workshop On Wireless Network Measurement (WiNMee), ACM Sigcomm Workshop on Challenged Networks

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(CHANTS), the Network Group Communication (NGC) workshop, and the Global Internet Symposium, and I have served on the program committees for numerous conferences.

28.     Furthermore, in the courses I taught at UCSB, a significant portion of my curriculum covered aspects of the Internet and network communication including the physical and data link layers of the Open System Interconnect (OSI) protocol stack, and standardized protocols for communicating across a variety of physical media such as cable systems, telephone lines, wireless, and high-speed Local Area Networks (LANs). The courses I have taught also cover most major topics in Internet communication, including data communication, multimedia encoding, and mobile application design. My research and courses have covered a range of physical infrastructures for delivering content over networks, including cable, Integrated Services Digital Network (ISDN), Ethernet, Asynchronous Transfer Mode (ATM), fiber, and Digital Subscriber Line (DSL). For a complete list of courses I have taught, see my curriculum vitae (CV).

29.     In addition, I co-founded a technology company called Santa Barbara Labs that was working under a sub-contract from the U.S. Air Force to develop very accurate emulation systems for the military's next generation internetwork. Santa Barbara Labs' focus was in developing an emulation platform to test the performance characteristics of the network architecture in the variety of environments in which it was expected to operate, and, in particular, for network services including IPv6, multicast, Quality of Service (QoS), satellite-based communication, and security. Applications for this emulation program included communication of a variety of multimedia-based services, including video conferencing and video-on-demand.

30.     In addition to having co-founded a technology company myself, I have worked for, consulted with, and collaborated with companies for nearly 30 years. These companies range from well-established companies to start-ups and include IBM, Hitachi Telecom, Turner Broadcasting

System (TBS), Bell South, Digital Fountain, RealNetworks, Intel Research, Cisco Systems, and Lockheed Martin.

31.    Through my graduate education, leadership with CITS, involvement in TMP, role in the development of the Internet2 infrastructure, and consulting with ISPs, I have gained a strong understanding in the role of the Internet in our society and the challenges of deploying large-scale production networking infrastructure.  CITS, since its inception, has looked at the role of the Internet in society, including how the evolution of technology has created communication opportunities and challenges, including, for example through disruptive technologies like P2P. TMP looks to focus on non-purely technical issues, including, for example, state-of-the-art business methods, strategies for successful technology commercialization, new venture creation, and best practices for fostering innovation.  Through my industry collaborations and Internet2 work, I have developed significant experience in the challenges of deploying, monitoring, managing, and scaling communication infrastructure to support evolving Internet services like streaming media, conferencing, content exchange, social networking, and e-commerce.

32.    I am a Member of the Association of Computing Machinery (ACM) and a Fellow of the Institute of Electrical and Electronics Engineers (IEEE).

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

33.    A person of ordinary skill in the art as of the claimed priority date of each of the asserted patents ("POSITA") would have had education in computer science or electrical engineering and experience in the field of media streaming and transmitting multimedia content between devices, as well as knowledge of the scientific literature concerning the same.  The education and experience levels may vary between persons of ordinary skill, with some persons holding a basic Bachelor's degree with three years of relevant work experience, and others holding a Masters or Ph.D. but having one to two years of experience.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

34.     I meet these criteria and consider myself a person with at least ordinary skill in the art pertaining to the asserted patents.  I also would have been such a person at the time of the alleged invention of each of the asserted patents.  In the general timeframe of the patents in question, I would also have been doing related research, designing software and leading or managing other persons skilled in the arts to achieve similar research and development goals.

## V.    LEGAL STANDARDS

35.     In this section, I describe my understanding of certain legal standards.  I have been informed of these legal standards by Viasat's attorneys.  I am not an attorney, and I am relying only on instructions from the Viasat attorneys for these legal standards.

### A.    Prior Art

36.     I understand that a patent or other publication must first qualify as prior art before it can be found to invalidate a patent claim.

37.     I understand that, for patents and patent applications filed prior to March 16, 2013, whether a publication is "prior art" is evaluated under 35 U.S.C. § 102 (pre-AIA).  I understand that 35 U.S.C. § 102 (pre-AIA) operates under a "first to invent" framework, in which patents or patent application published, and publications published, prior to invention of the claimed subject matter in a patent or patent application are considered prior art under 35 U.S.C. § 102(a).  I also understand that patent applications filed before, but published or issued after, invention of the claimed subject matter are considered prior art under § 102(e).  I also understand that, under 35 U.S.C. 102(b), patents or printed publications published more than one year prior to the date of filing a patent application are considered prior art, regardless of the actual invention date.  I understand this one-year cutoff date is commonly referred to as the "critical date."

38.     I also understand that, for patents and patent applications filed on or after March 16, 2013, prior art status is evaluated under the current (post-AIA) version of 35 U.S.C. § 102, which operates under a "first to file" framework.  I understand that, under 35 U.S.C. § 102(a)(1) a patent or printed publication is prior art under this "first to file" framework if the patent or printed publication published before the effective filing date of the patent in question, barring certain exceptions.  I also have been advised and understand that, under 35 U.S.C. § 102(a)(2), an issued patent or patent application that names another inventor that is filed before, but published after, the effective filing date of the patent or patent application in question is prior art, barring certain exceptions.  I understand that "effective filing date" for a patent generally refers to the filing date of the earliest claimed priority application, unless it is shown the claims of the patent are not supported by that earliest claimed priority application.

39.     I understand that subject matter disclosed in an earlier-filed application in compliance with 35 U.S.C. § 112, ¶ 1 is entitled to the filing date of the earlier application in the chain.

40.     I understand that a system or device qualifies as prior art to the asserted patent if it was in "public use," meaning it was accessible to the public or was commercially exploited, before the alleged invention of the asserted patent.

41.     I understand that documents and materials that qualify as prior art may invalidate a patent claim as anticipated or as obvious.

42.     I understand that invalidity must be shown by clear and convincing evidence.

**B.     Anticipation Under 35 U.S.C. § 102**

43.     I understand that, once the claims of a patent have been properly construed, determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

44.     I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily present or implied).

45.     I understand that anticipation must be shown by clear and convincing evidence.

**C.      Obviousness Under 35 U.S.C. § 103**

46.     I understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person of ordinary skill in the pertinent art.

47.     I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

48.     I understand that a person of ordinary skill in the art provides a reference point from which the prior art and claimed invention should be viewed.  This reference point prevents one from using his or her own insight or hindsight in deciding whether a claim is obvious.

49.     I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the asserted claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations or objective indicia of obviousness or non-obviousness.

50.     I am informed that secondary considerations of non-obviousness may include (1) a long felt but unmet need in the prior art that was satisfied by the alleged invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the alleged invention; (4) praise of the alleged invention by others skilled in the art; (5) taking of licenses under the patent by others; and (6) deliberate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

copying of the alleged invention.  I also understand that there must be a relationship or nexus between any such secondary indicia and the alleged invention.  I further understand that near simultaneous and independent invention by others is a secondary consideration supporting an obviousness determination.

51.    I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference are supplied by the common sense of one of skill in the art.

52.    I understand that a claim can be obvious in light of a combination of multiple prior art references.  I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is standard knowledge and simple common sense.

53.    I understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

54.    I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary purposes.  I understand that obviousness analysis therefore takes into account the inferences and creative steps that a person of ordinary skill in the art would employ under the circumstances.

55.    I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination.  For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

56.    I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, obviousness likely bars its patentability.

57.    It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed.

58.    I understand that in analyzing obviousness, one must consider common sense, common wisdom, and common knowledge.  I understand that in an obviousness analysis, common sense may supply a missing claim limitation that is not expressly disclosed in a prior art reference.  I understand it is appropriate to consider whether a skilled artisan would have used common sense to incorporate a claim limitation into a prior art reference or combination of references.

59.    In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art, having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## VI.    TECHNICAL BACKGROUND

### A.    The Internet

60.    Today, Internet is one of the most widely deployed, if not the most widely deployed, computer networks, i.e., physical connections of computers to exchange data, in the world.  The network architecture of the Internet allows people to collaborate for social, professional, and educational purposes.  Households use the Internet for entertainment, to complete school work, and to perform necessary job responsibilities.[2]  Businesses rely on Internet access to provide goods and services to customers, keep track of their finances and other data, and ensure employees and management are communicating seamlessly.  There are institutions like hospitals that rely on Internet access to convey vital, private patient information and allow medical providers to coordinate on patient care; schools that rely on the Internet to get and convey classwork to afford their students a quality education; and regional ISPs that disseminate Internet services based on the backbone of national ISPs to otherwise under-served communities.  It is clear that the Internet is a network that has become ubiquitous and essential to the operation of our economy and our lives.  As the uses and users of the Internet have expanded over time so too has the size, complexity, and necessary security measures necessary to ensure that people are afforded reliable network access.

61.    The Internet has been around for several decades.  Many trace the origins of the Internet to the ARPAnet (the Advanced Research Projects Agency Network), which dates back to the late 1960s.  Since then, the Internet has grown into a massive, highly sophisticated network for highly complex and highly varied forms of communication.

---

[2]  *See, e.g.*, https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (three quarters of Americans have broadband Internet on their homes); https://www.pewresearch.org/fact-tank/2021/03/26/about-three-in-ten-u-s-adults-say-they-are-almost-constantly-online/ (85% of adult Americans say they use the Internet every single day).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

62.     One of the major leaps in the Internet's evolution occurred in the early 1990s in the form of the sale of the NSFnet Backbone to MCI, spurring commercialization of the Internet and interest in the World Wide Web (WWW).  These changes were significant contributors towards the Internet becoming more widely available and usable.

63.     Originally useful mainly for the exchange of text documents through email (using, for example, the Simple Mail Transfer Protocol, or SMTP) or file exchange (using a protocol like the File Transfer Protocol (FTP), the Internet has evolved to support more complex data transactions including multiple media types (e.g., pictures, audio, video), hence the concept of "multimedia."  Coupled with new and improved delivery capabilities and increased ways of offering information to users, the ways in which the Internet could be used increased dramatically during the 1990s.  These factors led to numerous technical innovations in the way data was made available to users.

64.     Much of the communication in networks takes place using a "client/server" paradigm.  That is, content servers hold information desired by users.  Through their clients, users make requests for this information, and the server responds by providing the requested information.  Such a paradigm is used in, for example, the World Wide Web (WWW).  In other applications, like email, servers are responsible for accepting, storing, and forwarding email.  Another alternative to this paradigm is "peer-to-peer" where content can be retrieved from "peers" (e.g., another user's computer) instead of through a server.  I discuss peer-to-peer communication below in Section 4.5.

65.     Two principles upon which applications and the underlying network infrastructure are based are the use of "layered" communication to break the task of data delivery into more

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

manageable sub-tasks and the use of "protocols" to establish rules for how data is communicated.

### B.    Network Protocols

66.    Generally, a "protocol" is a set of rules that define how a set of functions will be performed.  Protocols are important within networks since the participants in a communication must act in the same, predictable way for data to be successfully delivered.  For example, the HyperText Transfer Protocol (HTTP) defines both how requests/responses for objects are to be made and the syntax of such request/response messages.  The way in which data is exchanged is as important as the format of the data when it is exchanged.  Called "syntax," protocol specifications typically include the way information in a message is formatted.  By clearly describing a protocol's communication rules and syntax, ambiguities and errors can be avoided.

67.    One of the common ways in which protocols are defined is through standards setting organizations.  These organizations create documents that describe the requirements for a protocol, and in some cases, provide support to test the interoperability of different implementations of the protocol.  In other words, and for example, two different companies might implement TCP.  To ensure that they adhere to the standard and that the different implementations work correctly together, the two implementations can be tested together in a network.

68.    There are numerous standards setting organizations, usually with a particular focus.  There are some standards organizations like the Institute for Electrical and Electronics Engineers (IEEE) that define standards for the "lower layers" of the protocol stack like the Data Link and Physical layers.  Examples include 802.3 and 802.11.  There are also industry consortia that define and promote specific protocols.  Also at the Data Link and Physical layers is Cable Labs which is responsible for the Data Over Cable Service Interface Specification (DOCSIS).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Similarly, the Broadband Forum (formerly the Digital Subscriber Loop (DSL) Forum formerly the Asymmetric Digital Subscriber Loop (ADSL) Forum) is responsible for the DSL family of protocols. In the middle of the protocol stack is the Internet Engineering Task Force (IETF).

69.     The IETF publishes documents called Request for Comments (RFC). There are several different types of RFCs, including Informational, Experimental, Best Current Practice, Standards Track, and Historic. While only the Standards Track RFCs are truly standards, other RFCs are considered the accepted wisdom of the networking community. Further, though the name "Request for Comments" may suggest that this is not a standard, still not yet fully specified, or changeable, RFCs are considered standards by people working in the field. For example, the Transmission Control Protocol (TCP) is defined in a number of standards, first with RFC 793. And while it is true that standards evolve and additions made, typically a new RFC is issued and the old one marked as obsolete. In less frequent cases, errata for an RFC can be issued.

70.     A network like the Internet, therefore, relies on a number of different standards from different organizations to perform its function of data delivery. Moreover, networks like the Internet use multiple protocols together. Each protocol performs a distinct task, but together they handle all of the requirements necessary to enable end-to-end communication.

### C.     Protocol Layering and Network Stacks

71.     Multiple protocols work in combination, based on the "layer" at which each operates, to perform the functions necessary to deliver data between sources and destinations across the Internet. In many cases, there is one protocol responsible for the functions of not just one, but sometimes multiple layers. Each layer and its corresponding protocol perform a set of functions based on widely, but not universally, agreed upon guidelines. As data is prepared for transmission by an application, it is sent through a set of layers. Each layer performs specified

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

functions.  For some of the layers, there is a corresponding protocol and a corresponding protocol header that is added to the application's data.

72.    To help understand the process and give direction to the flow of data, the layers are "stacked" one on the other, from the highest layer (the application layer) to the lowest layer (the physical layer).  Data, therefore, flows "down" the stack from the application layer of the transmitting host, across the network, and "up" a corresponding stack at the receiver.

73.    Over the years, there have been several efforts to "standardize" the layers and the functions performed by each.  One example is the International Standards Organization's (ISO) Open System Interconnect (OSI).  The OSI stack has seven layers, and the general functions of each layer are well known.  ISO's OSI stack model is an older example dating back to the early 1980s.[3] A more recent example is the "TCP/IP stack," also called the "Internet stack."  It integrated the functionality of two of the layers from the OSI stack (Presentation and Session Layers) into the Application Layer and better maps to the Internet's currently used protocols, e.g., IP, UDP, and TCP, which are described in more detail below.  These representations are shown in Figure 1.23 from Kurose and Ross, shown below.

---

[3] H. Zimmerman, "OSI Reference Model-The ISO Model of Architecture for Open Systems Interconnection," IEEE Transactions on Communication, vol. COM-28, no. 4, April 1980.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Figure 1.23** ♦ The Internet protocol stack (a) and OSI reference model (b)

74.    Of the layers in the TCP/IP stack, the "highest" layer is the application layer and includes protocols like the HyperText Transfer Protocol (HTTP) and the Simple Mail Transfer Protocol (SMTP).  There are dozens of application layer protocols, each typically corresponding to a specific application.

75.    The next layer is the transport layer.  The two most common protocols are the Transmission Control Protocol (TCP) and the User Datagram Protocol (UDP).  Where the UDP protocol only provides support for multiplexing and demultiplexing application-layer traffic, i.e., "ports," TCP provides better support for reliable data delivery through acknowledgements, in-order packet delivery, connections, as well as congestion control, and similar to UDP, port numbers.  Data sent through the Internet almost always uses one of these two protocols.  (TCP is sometimes referred to as a "streaming protocol" as compared to UDP's "datagrams."  Rather, the terminology of "streams" versus "datagrams" refers to the fact that UDP delivers single, independent segments of data whereas TCP delivers a continuous sequence of data.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

76. The next layer down, and the cornerstone of the Internet, is the Internet layer. The corresponding protocol, the Internet Protocol (IP), provides end-to-end delivery through the Internet. Using IP address and a variety of support protocols (e.g., routing protocols), routers in the Internet are able to choose the next path towards a destination, thereby robustly moving packets closer to their destination. From a lay perspective, the most common transport protocol, i.e., TCP, along with IP, forms the core of Internet communications, and hence, the Internet's protocols are commonly called "TCP/IP." Yet, this reference ignores two other important layers below IP.

77. The Data Link Layer (DLL) and the Physical Layer are often closely coupled. The reason is that the function of the DLL is to move bits across one physical hop of an end-to-end path. A DLL protocol is typically designed for a specific physical medium, though there are often many different protocols that can be used for a given medium. Physical Layer protocols are responsible for converting digital bits into the analog transmission signal specific to the particular medium being used for communication. It is therefore clear why there is a close relationship between a DLL protocol and the Physical Layer: both work for a specific medium and together move data across a single hop along a path from a source to a destination.

78. A typical packet flowing through a network like the Internet might look like the following:

| DL Header | IP Header | TCP Header | Data |
|-----------|-----------|------------|------|

79. The "beginning" of the packet and the first part/bit of the packet to flow through the network is the first bit of the Data Link (DL) layer header. The packet headers contain

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

different information packed into a specific structure.  For example, the IP header looks like the following:



80.    The packet header is 20 bytes total (20 bytes * 8 bits/byte = 160 bits)—not including any optional fields that can be included.  These 20 bytes are included in the "IP header" portion of the previous figure.  The 20 bytes or 160 bits start with the first bit of the version field and continue as a sequence of 1s and 0s until the end of the destination address. The structure of the IP header and the meaning of each field was first defined as an RFC in RFC 791, dated September 1981—though earlier documents also describe the header structure. Noteworthy in this structure are the IP source and destination addresses, the 32 bits used to identify where packets come from and to where they are destined.  While IP addresses are transmitted as 32 bit values, they are written in "dotted quad" notation to make them easier for people to remember and use, for example, 128.111.52.10.

81.    A later version of IP, called IP Version 6 (IPv6), was first defined as an RFC in RFC 1883, dated December 1995.  IPv6 (as compared to the earlier version of IP just discussed,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

referred to as IPv4 when it is distinguished from IPv6) has a standard header that is twice as large as the IPv4 header (i.e., 40 bytes) and includes a simplified set of initial header fields and four times the size for the IP source and destination addresses. Both versions of IP run in the existing Internet, though IPv4 is still more common.

82.     Often overlooked in the transmission of data is that DLL protocols – and their headers – only survive across a single hop. Once data is delivered across the hop, the DLL layer header is removed, leaving the IP header exposed, and then based on the next hop to the destination, a new DLL protocol header is added – this one specific to the new medium the packet is to traverse. This process is repeated for each hop along the path from a source to a destination.

83.     As mentioned above, while the stack concept is a popular metaphor to help understand how network communication occurs, no reference model is perfect, each serves as a guideline. Protocols, for example, may perform functions of other layers in violation of a particular reference model, and still be accepted as valid protocols. Even in these cases, the abstraction provided by the general principle of layering and abstraction are sufficient to enable data transmission to take place successfully.

84.     In client/server-based architectures that use a particular protocol to support a specific application, the protocol is usually implemented in both the client and the server. Thus, for example, there is an HTTP client (i.e., a web browser) and an HTTP server. The client and server communicate over the network using additional protocols focused on the actual delivery of data.

85.     There are a number of support protocols that assist in the communication of data between endpoints. One such protocol is part of the Domain Name System (see, e.g., IETF

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

RFCs 1033 and 1034, both published in November 1987).  In its simplest form, DNS takes a host domain name (e.g., www.cnn.com) and converts it into an IP address.  The IP address is then used to reach the named host.  DNS provides a number of additional functions beyond host name-to-address mapping including reverse DNS (host address-to-name mapping), virtual host names (a single host with multiple host names), load balancing (multiple hosts all sharing at least one common name), and email server address mapping. DNS and its mapping functions are useful in that users only need to know the name of the host and are not required to remember more cumbersome IP addresses.  Applications typically accept either host names or addresses, and if given a host name, will automatically attempt to resolve it into an address.

86.    Many of the undergraduate courses I teach deal with at least the topics of general network communication.  For example, CS176A, "Introduction to Computer Communication Networks," uses the OSI and TCP/IP stacks as an outline for discussing the layers, functions of each, and common protocols.  CS176B, "Network Computing," is more "hands-on" and involves exploring and using debugging tools to understand the operation of the Internet.  CS176B also includes a significant amount of application development and network-based code development. Both courses use Wireshark (see www.wireshark.org), a tool for collecting and analyzing network packets transmitted across Internet links.

87.    In the courses I have taught over the last 20 years, I have used a textbook entitled "Computer Networking: A Top-Down Approach," by James F. Kurose and Keith W. Ross.  Over the years, several editions of this book have been published.  As each version becomes available, I have used the most up-to-date version.  For the most recent course where I used this textbook (Winter 2019, *see* http://www.cs.ucsb.edu/~almeroth/classes/W19.176B/), I used the 7th edition.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

This textbook covers many of the topics covered above and contains information typical of what I teach my students.

### D.    Network Architecture

88.    With a basic understanding of protocols and how they work together to facilitate communication in a network, I will next address the features of computer networks.  Computers either connect to a network directly or connect to a Local Area Network (LAN) of computers which then connects to a larger network.

89.    For home users connected to an Internet Service Provider (ISP) they usually connect to the Internet with some kind of modem.  A modem is a modulator-demodulator that is able to convert data transmitted as 1s and 0s over a network.  First, there might be a network of devices in a home, ranging from PCs to mobile devices to home appliances.  These devices will typically connect to a network over a LAN, including possibly a wireless LAN.  The modem connects to the Internet via a telephone network running DSL or a cable network running DOCSIS.  From there, their ISP connects to other ISPs and backbone networks.  Figure 1.9 from Kurose and Ross shows such an example.



**Figure 1.9** ♦ A typical home network

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

90.    The Internet is a "network of networks."  Instead of a single network, it is composed of many networks connected to each other.  The term "Internet" comes from "inter-network" which refers to the concept of connecting smaller networks to form larger networks. The concept is not new.  A similar organization of networks happens in telephone and/or cellular calls.  There are many different service providers and if one person with one service provider calls another person with a different service provider, the call must transit through multiple networks.

91.    Kurose and Ross, in Figure 1.3, shows an example of various kinds of user networks connected to ISPs and then those users able to communicate over different ISPs to a server in an enterprise network.  Where Figure 1.3 is a small-scale example, the actual Internet spans the globe and is composed of hundreds of millions of devices.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Figure 1.3** ◆ End-system interaction

92.     Figure 1.3 also focuses on the entire network, including the access network, i.e., how users connect to the network. A figure that focuses more on the core of the network is Figure 1.15. As shown in this figure there are many networks, each performing a different set of functions. The "access ISP" provides the connectivity for users to connect to the network. Access ISPs are connected to the global Internet by Regional or National (not shown) ISPs. The "Tier 1 ISPs" provide connectivity between these different types of networks. The connections

29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

between these networks happen through "direct peering" where two network providers connect

through a direct link or through an Inter-eXchange Point (IXP). An IXP is a facility where

network providers can co-locate equipment with other network providers, thereby making it

easier for the networks to be connected to each other. Ultimately, the network of networks

provides connectivity between users and content providers.



**Figure 1.15** ♦ Interconnection of ISPs

93. As Figure 1.3 from Kurose and Ross shows, there are devices in the network

which facilitate the transfer of information between computers. There are a variety of types of

devices in the Internet, ranging from repeaters, bridges, hubs, switches, routers, and gateways.

Each performs a specific function, but all generally support the idea of figuring out which path

(i.e., set of connections) data should flow to transit from a source to a destination.

94. Network devices are specialized computers that logically create the "crossroads"

of Internet connection points. A network device, especially a switch or router, will have many

connections to other network devices—either other switches or routers, or to users' computers.

These network devices receive packets of data; examine the headers; and determine where the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

packets should be sent.  Network devices often include several or many connections to other devices and so have to decide which of the devices to forward the received packets to.  A useful analogy is driving a car and coming to an intersection.  At the intersection, the driver of the car (or the network device in the Internet) has to decide which way to go.  The process of data being sent from a source to a destination is a process of packets (a car) following routes (roads) between network devices (intersections) and being routed through a series of roads (network path).

95.    This analogy is illustrative in other ways.  For example, one type of network device that will be discussed in more detail later is a firewall.  In a networking sense, firewalls receive packets sent through a network and inspect them either to ensure they meet the requirements to be sent through a network and/or whether they contain any data that may actually be computer code intended to harm the network or the recipient.  Firewalls are able to quickly inspect packets that they receive and determine whether they should be forwarded or not. In the car analogy above, the idea is a security gate where the credentials of those in a vehicle are checked to make sure they are allowed into a facility.

96.    An ISP's subscribers connect to the Internet in multivariate ways for different purposes.  One way that an ISP's customers may connect to the network is by installing and using a set top box in their home.  The coax cable that runs from the set top box then connects to the ISP's Access Network.  The Access Network is a Hybrid Fiber Coax (HFC) network running the Data Over Cable Service Interface Specification (DOCSIS) protocol.  Customers in a neighborhood are connected via the HFC network to a Cable Modem Termination System (CMTS).  From there a set of Access Networks are connected through a Metro Network to a Regional Data Center (RDC).  The RDC connects to multiple Metro Networks and provides

connections between customers if they communicate directly. Multiple Regional Data Centers are connected together via a Backbone Network. This is a high-speed network that provides connectivity between Data Centers and also connectivity to the rest of the Internet. Connectivity to the rest of the Internet can happen through Direct Peering or through Transit Providers via an IntereXchange Point (IXP).

97.     Many ISPs use a tiered network architecture to connect its customers to the rest of the Internet. The Access Networks connect users in the first step. From there, traffic can be distributed to other cities. Traffic will stay on an ISP's network if the communication is between two ISP subscribers. But if one of the source and destination are not in the same network, then traffic will have to flow through a Direct Peer or an IXC. For example, a subscriber watching a Netflix movie would receive the audio and video data through a Direct Peer between Netflix and the ISP.

### E.    A Day in the Life of a Packet

98.     As a way of describing all of the important steps that go into the steps of delivering data from a source to destination, imagine a scenario where a user has a picture to send to a friend. First, there are many different ways it can be sent. For example, it could be sent through a web application like Facebook. It could be uploaded to a file-sharing site like Instagram. It could be sent as an email attachment. It could be uploaded to a public server and then a link sent. Almost all of these scenarios require sending the image across a network like the Internet.

99.     Which of these applications are used has little impact on what happens to the data as it travels from the source to the destination. For example, the image starts as a file stored on the sender's computer. Whatever application is used will establish a connection with the destination, whether it is a server where the image will be stored for access or sent directly to a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

destination user.  The application will divide the data into a sequence of packets.  Packets sent across the Internet are typically in the range of 500 to 1500 bytes in size, though they can both be smaller or larger.  Smaller packets are used if there is less data to send.  Larger packets are used if there is more data to send, but larger packets are typically broken into smaller sizes by the network itself.

100.    Once an application has prepared a packet of data to be sent, the data is made available to the next protocol in the stack, for example TCP.  Assuming TCP has already set up a connection with the destination, it simply prepends its protocol header.  The TCP header includes information about what the source and destination ports are as well as information to support the reliable delivery of the data (e.g., sequence numbers and acknowledgement numbers).  Port numbers are used to distinguish which application in a destination computer should receive the data.  There are 65,535 ports available for use.  Some applications have well known ports that are reserved only for use by the applications for which they are reserved.  The port number range 1 to 1023 are reserved for well-known applications.  Port numbers in the range 1024 to 65,535 can be used by any application.

101.    Once the TCP header has been added, an IP header is prepended to the combination of the TCP header and application data.  One of the most important fields contained in the IP header is the destination address. It identifies the destination computer and is used by the switches and routers in the Internet to determine which way a packet will flow through a network.  An IP address is analogous to street address, city, state, and zip code on an envelope where the TCP port is analogous to the name of the person within the destination to which the letter is addressed.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

102.    The next protocol to be added is the Data Link layer header.  As described above, the Data Link layer is responsible for delivery data across a single hop and the protocols used at the Data Link layer are specialized for that one hop.  Data Link layer protocols include WiFi (802.11), Ethernet, DOCSIS, DSL, etc.  If a user is sitting in a coffee shop accessing the Internet through their phone, an 802.11 header is prepended.  If a user is at home and sending data through the ISP's network, a DOCSIS header is added.

103.    The process described so far and how I have described it is how I teach my students in my networking class.  As one example of a demonstrative I use to teach my students is the following:



104.    At this point, a packet consists of a Data Link layer header, then an IP header, then a TCP header, then the application data, which itself might have its own header information.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

The packet is then sent across a first network link, whether it is over the air for a wireless link or via a coaxial cable like in a cable network. The packet will then be received by some kind of network device, including for example, a switch or router. An ISP might use a Cable Modem Termination System (CMTS), which includes routing functionality. This first network link over which the packet as sent and received represents the first hop of the path from the packet's source to its destination.

105.    Because the function of the Data Link layer is only to facilitate data delivery across a single hop, once the network device at the end of the first hop receives the packet, there is no longer a need for the existing Data Link layer header. Instead, a new Data Link layer header is needed to facilitate delivery of the packet across the next hop along the path to the packet's destination. The network device that received this packet therefore removes the existing Data Link layer header and adds a new one. The new Data Link layer header is specific to the link over which the packet will travel next, i.e., the second hop of the network. This network device will also look at information in the different headers to determine what that link should be. For example, a router will look at the destination IP address and determine on what link the packet should be sent.

106.    The process of network devices in the Internet receiving packets, removing one Data Link layer header, determining an outgoing link on which to send a packet, and adding the appropriate Data Link layer header can happen millions of times a second in Internet routers. Because network devices must handle so many packets so quickly, they are specially designed to perform the task as efficiently as possible and as fast as possible.

107.    An ISP, or like just about any other company offering Internet services, is part of this process. The ISP will receive packets from one of its customers and decide where to route

the packet.  For the next several hops through the network, the packet will traverse equipment

owned and operated by the ISP.  If the destination is also an ISP customer, it will be routed

wholly on the ISP's network before reaching the destination.  If the destination user is a

customer of another ISP, the first ISP will hand the packet off to a different network provider,

either through a direct connection or through an IXP.  As a hint to the vast size and complexity

of the Internet, the network provider to which the first ISP sends the packet might not be the

destination's service provider.  A packet might need to traverse many hops and multiple service

providers before reaching its destination.

108.    In a process similar to what was just described for a customer sending data

packets, an ISP customer might be a recipient of data packets sent to one of its customers.  In this

case, the ISP receives data from one of its own customers or from another service provider and

that data is routed to its final destination, i.e., the home of one of its customers.

109.    As mentioned above, one network device in the Internet can receive, process, and

send millions of packets per second.  These millions of packets equate to billions of bits

transferred each second of each day all year long. With thousands of customers and many high-

speed links, each router in the ISP network must operate on each packet it receives in

microseconds.  To support the bandwidth demands of its customers, an ISP is able to purchase

network equipment from a variety of vendors.

**F.    DRM Solutions**

110.    With the rising popularity in the Internet and Internet-based media in the 90s and

early 2000s, figuring out methods to protect that media became an increasingly important task.

Digital content was inherently easier to copy than previously used physical mediums, such as

VHS tapes or CD-ROMs (which often needed special tools to copy).  Digital Rights Media, or

"DRM," protections were developed as a means to protect such digital media.  "DRM

technology encrypts the digital content and thus prevents the illegal distribution or use of the digital content in all stages (i.e., creation, distribution, use, and disposal) of its life cycle" such as by "enabl[ing] only an authorized user with an encryption key to decrypt and use encrypted content" so that, "even if the encrypted content is illegally distributed, it cannot be used without the encryption key."  U.S. Pat. App. 2008/0098481.  One such DRM solution, Microsoft Windows Media DRM, was launched in 1999 and had been used in "more than 7.5 million transactions for secure music and video" by 2001.

https://news.microsoft.com/2001/06/13/microsoft-drm-technologies-establish-foundation-for-emerging-internet-music-video-and-ebooks-industries/.  A mobile version of the Windows Media DRM was launched in 2004 to protect music downloaded from Napster.  Another popular DRM solution was the FairPlay DRM utilized by Apple on the iTunes Store, which was launched by April 2003, to protect content on Apple devices such as the iPod.

111.    Such DRM protections became even more important in the wake of Internet-based media streaming services, such as Amazon Unbox (rebranded as Amazon Video On Demand) and Netflix, as well as television recording devices such as Digital Video Recorders ("DVRs").  These services allowed users to not only stream digital content, but in certain cases, would allow content to be stored on hard drives stored within the users' homes.  For example, DirecTV sold a DVR receiver called "Genie" that had over 1 TB of internal storage, allowing users to record media content.

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_recei ver?lpos=Header:3.  Such devices needed to make use of various DRM protections, such as encryption or password protection, to ensure that digital content stored within a user's home would be securely protected.  These services were available throughout the 2000s, with Amazon

Unbox launching in 2006, Netflix streaming launching in 2007, TiVo Premiere and DISH 722k

launching in 2010, and DirecTV Genie and Dish Network Hopper launching in 2012 and 2013.

## VII.    OVERVIEW OF THE ASSERTED PATENTS

### A.    The '400 Patent

112.    U.S. Patent No. 9,424,400 was filed on December 15, 2014 as U.S. Pat. App. No.

14/571,178 and issued on August 23, 2016.  The '400 patent was filed as a continuation of U.S.

Pat. App. No. 13/460,805, which was filed on April 30, 2012 and issued as U.S. Patent No.

8,914,634 on December 16, 2014.

113.    The '400 patent is directed to a system involving a "kiosk" that has "a first data interface

configured to communicate with a portable data storage device," "a second data interface

configured to communicate, over a network, with a remote trusted server," and a processor

configured to conduct an authorization process of the end-user device.  The authorization process

consists of three steps, where the processor would (1) "obtain a unique identifier from the

portable data storage device, wherein the unique identifier is specific to the portable data storage

device and is concealed by the portable data storage device," (2) "authenticate the portable data

storage device, using at least the unique identifier, by communicating with the remote trusted

server over the second data interface," and (3) "in response to the authentication, provide to the

portable data storage device an encrypted first media content and a corresponding access key."

The patent generally claims that this invention was intended to serve as a solution to the

"security weaknesses" of other existing DRM systems, which "have been circumvented."  '400

patent at col. 1, ll. 23-25, 33.  The patent explained that on these existing DRM systems, users

could "copy and distribute digital content," especially content "downloaded or stored on a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

storage device." *Id.* at col. 1, ll. 29-32.  The patent claims to solve this problem and enable "secure copying or transfer of content." *Id.* at col. 2, ll. 35-37.

114.    The '400 patent explained that the patent could be implemented as a "self-service computer terminal." '400 patent at col. 6, ll. 37-39.  For instance, the kiosk could comprise "various user interface equipment, such as a keyboard, display, etc. to allow use of the kiosk." *Id.* at ll. 41-43.

### B.    The '667 Patent

115.    U.S. Patent No. 10,447,667 was filed on April 16, 2018 as U.S. Pat. App. No. 15/954,359 and issued on October 15, 2019.  The '667 patent was filed as a continuation of U.S. Pat. App. No. 14/615,367, which was filed on February 5, 2015 and issued as U.S. Patent No. 9,948,618 (the "'618 Patent").

116.    The '667 patent is directed to a system involving "[a] network attached storage device" that has "a first region accessible by a user of the local network and a secure region," as well as a "processor configured to control access to the secure region of the storage based on instructions received from a remote content provider." '667 patent at Abstract.  This was meant to serve as a solution to the issue of "bandwidth throttling," or the "intentional slowing of internet service by an Internet Service Provider (ISP)." *Id.* at 1:18-20.  ISPs sometimes used bandwidth throttling "in an attempt to regulate network traffic and minimize bandwidth congestion." *Id.* at 1:20-22.  According to the patent, bandwidth throttling could "limit[] a user's upload and download rates on programs such as video streaming," which could "cause deterioration in a display of the received transmission" by causing "the end display to hie-up or stall while waiting for the next packet." *Id.* at 1:22-30.

117.    The patent claimed that existing solutions were insufficient because display devices themselves either had "very limited display buffers" or were not sufficiently secure to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

prevent "content from being misappropriated from the buffer." *Id.* at 1:31-38. The '667 patent's "network attached storage device" allegedly solved this problem by allowing content providers to buffer streaming content in the user's own home while maintaining control over the content. *Id.* at 2:29-51. This storage device would have a larger buffer than display devices, so could buffer more content at once, and would utilize security measures that allowed "control of the media [to] be maintained by the stream content provider." *Id.* Once the content was buffered onto the storage device, it could be played back "without the hiccups or stalling due to throttling, because the content is already buffered and can be viewed without being streamed over the Internet." *Id.*

## VIII.  CLAIM CONSTRUCTION

118.  I understand that the Court has issued a claim construction order in this case, construing a number of claim terms for both Asserted Patents. The table below lists these constructions:

| Claim Term | The Court's Construction |
|---|---|
| "kiosk" ('400 Patent) | "any device used to access and distribute content provided by the system" |
| "portable data storage device" ('400 Patent) | "a storage device that can be easily carried or moved about" |
| "authenticate the portable data storage device, using at least the unique identifier" ('400 Patent) | "confirming that the portable data storage device is trusted using at least the unique identifier" |
| "provide to the portable data storage device . . . a corresponding access key" ('400 Patent) | "provide to the portable data storage device . . . a key to decrypt the first media content" |
| "public environment" ('400 Patent) | "location accessible by the public" |
| "secure region" ('667 Patent) | "a region of the NAS device to which access is controlled" |
| "receive an indication of the NAS device having a secure region" ('667 Patent) | "receive an indication of the presence of a secure region within the NAS device" |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent) | No construction necessary |

119.    I have reviewed each of the constructions listed in the Court's order and the table above and have applied these constructions to my analysis in this Report.

## IX.    SUMMARY OF THE CITED PRIOR ART REFERENCES

### A.    The '400 Patent

#### 1.    U.S. Patent No. 8,600,062 ("Rae")

120.    U.S. Patent No. 8,600,062 ("Rae") was filed on July 20, 2010 as U.S. Pat. App. No. 12/840,160 and issued on December 13, 2013.  Rae was filed as a continuation of U.S. Pat. App. No. 61/226,973, which was filed on July 20, 2009.

121.    Rae is directed to a system for "over-encrypting symmetrically pre-encrypted content for off-line delivery to playback devices using portable media drives."  Rae at 1:66-2:1.  Rae discloses "a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content, and a playback device configured to communicate with a portable media drive and to communicate with the headend via a network."  Rae at 2:59-65.  In another embodiment of the invention, "each playback device includes a processor containing a private key assigned to the playback device by a conditional access system, generating a content key and over-encrypting at least a portion of the symmetrically pre-encrypted content in response to the request, obtaining a public key for each playback device, encrypting a copy of the content key using the public key of each playback device associated with the user account, and

delivering the over-encrypted content and the at least one encrypted copy of the content key to a

playback device associated with the user account."  Rae at 2:7-20.

### 2.    U.S. Patent No. 2008/0279533 ("Buttars")

122.    U.S. Patent No. 2008/0279533 ("Buttars") was filed on April 25, 2008 as U.S.

Pat. App. No. 12/150,151 and issued on November 13, 2008.  Buttars was filed as a continuation

of provisional application No. 60/914,280, filed on Apr. 26, 2007, provisional application No.

60/914,282, filed on Apr. 26, 2007, provisional application No. 60/914,283, filed on Apr. 26,

2007, and provisional application No. 60/914,286, filed on Apr. 26, 2007.

123.    Buttars is directed to a system for "securing digital data in a highly available state within a

Portable Data Storage Device (Storage Device), and subsequently making that data available for

use through a corresponding Playback Device" where the data is prepared and encrypted with a

Digital Rights Management (DRM) application.  *See* Buttars at Abstract, [0015].  In the

preferred embodiment, the invention relates to "any number of processor-enabled flash-drive

memory storage devices (Storage Device) combined with any number of processor-enabled

playback devices (Playback Device), and processor-enabled distribution kiosks (Kiosks) used to

distribute and play-back motion pictures and other audio/video data, programs or works" with

"several layers of physical, software and hardware security methods to both the devices and to

the data files."  Buttars at [0020].

### 3.    U.S. Patent No. 2003/0014630 ("Spencer")

124.    U.S. Patent No. 2003/0014630 ("Spencer") was filed on June 27, 2001 as U.S.

Pat. App. No. 09/894,972 and issued on January 16, 2003.

125.    Spencer is directed to a system for "delivery of media content."  Spencer at [0006].

Specifically, Spencer describes: "A communication channel is established between a particular

digital media playback device and a content server on which media content is stored."  Spencer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

at [0006]. The system uses "[d]evice-identifying information relating to the digital media playback device" to "determine[] whether the requested media content is playable on the digital media playback device." Spencer at [0006]. Then, "[i]f the requested media content is playable on the digital media playback device, the requested media content and metadata associated with the media content are obtained, the obtained media content is formatted based on the device-identifying information into a format that can be played back on the digital media playback device and the formatted media content is distributed through the communication channel to the digital media playback device." Spencer at [0006].

**B.      The '667 Patent**

      **1.      U.S. Patent Pub. No. 2003/0001978 ("Smith")**

126.    U.S. Patent Pub. No. 2003/0001978 ("Smith") was filed on June 12, 2002 as U.S. Pat. App. No. 10/167,760 and published on January 2, 2003. Smith was filed as a continuation of provisional application No. 60/297,843, filed on June 12, 2001.

127.    Smith is directed to "computer-based methods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed." Smith at [0008]. Smith disclosed "an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of digital content, such as streamed video data." *Id.* at [0028].

      **2.      U.S. Patent Pub. No. 2010/0325675 ("Smoyer")**

128.    U.S. Patent Pub. No. 2010/0325678 ("Smoyer") was filed on June 18, 2009 as U.S. Pat. App. No. 12/487,163 and published on December 23, 2010.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

129.    Smoyer is directed to "an improved system and method for storing data content from a service provider to an electronic device associated with a network subscriber." Smoyer at [0010]. Smoyer disclosed that "[t]he principles of the present disclosure provide a system and method for pushing a variety of video, audio and/or data files onto the service provider reserved memory of an electronic device associated with a network subscriber." *Id.* at [0026]. In Smoyer's invention, "the service provider has complete control over the management of the service provider reserved memory 404. Accordingly, the service provider alone is able to push files, delete files and make any necessary changes to service provider memory 404. Because the subscriber has no control over service provider memory 404 and cannot add any information onto it, the service provider is guaranteed a certain amount of memory is available on STB 400 to the service provider. In some embodiments, the subscriber is not even aware of the existence of service provider memory 404." *Id.* at [0029].

### 3.    The SCSA System

130.    In 2012, Western Digital, SanDisk, Warner Brothers, and 20th Century Fox formed the Secure Content Storage Association ("SCSA") with the intention of "creat[ing] storage and transfer solutions for high definition and premium copyright-protected content on hard drives, flash memory products and solid state drives." https://web.archive.org/web/20150919160346/http://www.vidity.com/index.php?aam_media=20 14/12/SCSA_Contributor-Release_12-12-13-final.pdf. Specifically, SCSA created a "robust solution" (the "SCSA System")[4] that "enables premium digital entertainment content, including

---

[4]  I understand that, as former Western Digital employee David Blankenbeckler testified, the SCSA System was sometimes referred to as Vidity or Project Phenix, including in some of the materials I cite below. Blankenbeckler Tr. 184:6-24. For clarity's sake, I use the single term "SCSA System" wherever possible.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

high bitrate 1080p Full HD and Ultra HD content, to be securely transferred and viewed across various devices, including smart TVs, PCs and mobile devices."  *Id.*

131.    The SCSA System allowed "consumers to buy, store and playback HD Versions of movies and TV shows at home."  https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.  Specifically, the SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk storage," "securely stor[ing] a copy of [] premium digital movies on local hard drives and flash memory based solutions which c[ould] then be accessed for local playback across all SCSA App-enabled devices including smartphones, tablets, TV's set-top boxes, computers, game consoles, USB flash drives, and uSD cards."  *Id.*;

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20 14/12/SCSA_CRI-release-FINAL.pdf.  This process allowed display devices to "render content ten times faster than streaming media on 'over the top Internet.'"  https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.

132.    Mr. Blankenbeckler testified that SCSA was created to "secure digital delivery and playback ecosystems for ultra premium content."  Blankenbeckler Tr. 155:11-25. Specifically, movie studios "wanted to sell premium content" using "an ownership model" instead of a "streaming" or "rental model."  *Id.* 158:20-159:5.  However, the studios felt that the existing "content managed DRM systems" were not "good enough for their premium content." *Id.* 159:6-9.  For example, studios were worried that existing solutions could lead to unauthorized content access; for example, "if [they] put [content] out on a Blu-ray disc, people could rip the Blu-ray disc, and then it would be all over the world."  *Id.* 161:20-162:7.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

133.    To solve this problem and create "a system [studios] could put [content] on that wouldn't be ripped," SCSA "designed from scratch a new DRM system" (the "SCSA System")[5] that utilized a "security module built into the storage devices, which is really what differentiated it from a lot of the other DRM systems out there," since existing systems typically only had "the player" (not the storage device) "do[] stuff to enforce DRM." *Id.* 161:20-165:15.  Because the SCSA storage device also enforced DRM, studios could send content directly to the storage device, which resided in a user's home, without needing to worry that the user could improperly access or rip the content. *Id.* 168:1-170:21.  Then, when a user wanted to play a particular content file, the storage device would utilize a "license key and license file" that were also stored on the device to enable the content playback. *Id.*  173:17-174:13.

134.    Development on the SCSA System began no later than 2012; it was marketed to the public no later than March 1, 2012.  https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.  The SCSA System was therefore offered for public use more than a year before the priority date of the '667 patent and is prior art to the '667 patent.

135.    Mr. Blankenbeckler confirmed that development on the SCSA System began no later than 2012 when SCSA was founded and finalization of the system began no later than 2013. Blankenbeckler Tr. 156:4-157:7.  Additionally, the SCSA System was publicly demonstrated no later than January 2014, during the Consumer Electronics Show ("CES 2014").  *Id.* 183:1-21.

136.    The following documents describe the functionality of the SCSA System:

    a.    Blankenbeckler Tr.

---

[5]   I understand that the SCSA System was sometimes referred to as Vidity or Project Phenix, including in some of the materials I cite below.  Blankenbeckler Tr. 184:6-24.  For clarity's sake, I use the single term "SCSA System" wherever possible.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

        i.  Mr. Blankenbeckler is a former employee of Western Digital and was "Western Digital's primary technical representative to SCSA." Blankenbeckler Tr. 25:22-24. Mr. Blankenbeckler provided an extensive description of the SCSA System in his deposition and confirmed that the SCSA System prototype demonstrated at CES 2014 were "exactly as [he] described" throughout the deposition. *Id.* 183:1-21.

    b.  Ryan Tr.

        i.  Mr. Ryan is a current employee of Western Digital and worked in the same WDLabs team as Mr. Blankenbeckler. Ryan Tr. 72:12-20. As part of his work at Western Digital, Mr. Ryan gave a presentation on the various projects WDLabs was working on, which included the SCSA System. *Id.* 128:15-133:15.

    c.  Ybarra Tr.

        i.  Mr. Ybarra is a former employee of Western Digital and was "a technologist" who helped create "specification, participate[d] in review, feedback, analysis, and subsequent delivery of a product [] that meets the requirements that SCSA has established." Ybarra Tr. 19:12-22.

    d.  https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/

137.    This press release is titled "DRM: Secure Content Storage Association Launches Project Phenix" and dated March 1, 2012. The information in this document is consistent with Mr. Blankenbeckler's testimony concerning the SCSA System.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

    a.   https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?a
am_media=2014/12/SCSA_CRI-release-FINAL.pdf

138.    This press release is titled "Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise" and dated September 6, 2012.  The information in this document is consistent with Mr. Blankenbeckler's testimony concerning the SCSA System.

    a.   https://web.archive.org/web/20150919160346/http://www.vidity.com/index.php?a
am_media=2014/12/SCSA_Contributor-Release_12-12-13-final.pdf

139.    This press release is titled "Leading Companies Join SCSA to Offer Secure Solution for Delivery of Highest-Quality Premium Digital Content" and dated December 12, 2013.  The information in this document is consistent with Mr. Blankenbeckler's testimony concerning the SCSA System.

    a.   WD-VIASAT-NDCA00011702

        i.   A presentation titled "SCSA Overview," dated June 19, 2014, with Dave Blankenbeckler listed as the author/presenter.  Mr. Blankenbeckler testified about this document and confirmed that the information discussed therein is consistent with the operation of the CES 2014 prototype of the SCSA System.  Blankenbeckler Tr. 154:17-209:4.  I understand that this document was produced by Plaintiffs.

    b.   WD-VIASAT-NDCA00014363

        i.   A document titled "SCSA, LLC Specification: System Design Specification" and dated July 26, 2017.  The information in this document

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

is consistent with Mr. Blankenbeckler's testimony concerning the SCSA System. I understand that this document was produced by Plaintiffs.

### 4. The DirecTV DVR Systems

140. As described above, DVRs were common and popular by the mid-2000s, years before the priority date of the '667 patent.

141. DirecTV was a satellite television provider that offered DVR receivers; for example, the "HR23" and "Genie" receivers.

142. The DirecTV DVR Systems made use of receiver devices that could store entertainment content such as recorded shows or movies and could keep such content secure, all while being physically located in a customer's home. *See*

https://web.archive.org/web/20130524082009/http://www.directv.com/technology/genie?lpos=Header:3;

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3; https://hometheaterreview.com/directv-hr23-satellite-receiver-and-hd-dvr-reviewed/;

https://web.archive.org/web/20100526233741/http://www.directv.com/DTVAPP/content/directv/dvr_scheduler;

https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule;

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf; https://www.engadget.com/2012-12-29-directv-genie-whole-home-dvr-review.html; https://www.wired.com/2013/03/directv-genie/.

143. DirecTV's HR23 was available at least as early as March 4, 2010 (https://hometheaterreview.com/directv-hr23-satellite-receiver-and-hd-dvr-reviewed/) and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DirecTV's Genie was available at least as early as December 29, 2012

(https://www.engadget.com/2012-12-29-directv-genie-whole-home-dvr-review.html).

     144.   The following documents describe the functionality of the DirecTV DVR

Systems:

    a.   https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule

       i.   This webpage is titled "What is DIRECTV" and is dated May 26, 2010. It describes the functionality of DirecTV DVRs as of its date. I understand that this webpage was publicly available.

    b.   https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf

       i.   This document is titled "Non-DVR Receivers User Guide" and is dated December 4, 2010. Though it is generally directed to non-DVR receivers, it does include some discussion of DVR receivers such as the "H23" receiver.

          https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf at 58. I understand that this document was publicly available.

    c.   https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3

       i.   This webpage is titled "DIRECTV Plus HD DVR" and is dated May 26, 2013. It describes the functionality of DirecTV DVRs as of its date. I understand that this webpage was publicly available.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### 5.    The DISH DVR Systems

145.    DISH was another satellite television provider that offered DVR receivers; for example, the "ViP 622," "ViP 722," and "Hopper"/"Joey" receivers.

146.    The DISH DVR Systems made use of receiver devices that could store entertainment content such as recorded shows or movies and could keep such content secure, all while being physically located in a customer's home.  *See* https://about.dish.com/news-releases?item=123253;

https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf; http://www.laaudiofile.com/vip722.html;

https://www.cnet.com/reviews/dish-network-vip-hd-dvr-review/;

https://ir.dish.com/index.php/static-files/ebd18806-dd60-4270-b034-38a455433434;

https://about.dish.com/2006-08-24-DISH-Network-TM-Warner-Bros-Home-Entertainment-Group-Sign-Video-On-Demand-Movie-Deal-Video-On-Demand-and-Pay-Per-View-Movies-Now-Available-on-DISH-Network; https://my.dish.com/support/receivers/vip722k;

https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System;

https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html; https://www.engadget.com/2012-01-09-dish-network-announces-hopper-dvr-system-joey-set-top-box-laun.html; https://www.cnet.com/tech/tech-industry/dish-aims-high-with-new-hopper-dvr-high-speed-satellite-broadband-service/.

147.    DISH's ViP 622 was available at least as early as August 24, 2006 (https://about.dish.com/2006-08-24-DISH-Network-TM-Warner-Bros-Home-Entertainment-Group-Sign-Video-On-Demand-Movie-Deal-Video-On-Demand-and-Pay-Per-View-Movies-Now-Available-on-DISH-Network), DISH's ViP 722 was available at least as early as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

September 9, 2007

(https://web.archive.org/web/20070909030420/http:/www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf), and DISH's Hopper/Joey was available at least as early as January 9, 2012 (https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System).

148.    The following documents describe the functionality of the DISH DVR Systems:

    a.    https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf

          i.    This document is titled "ViP722 DVR" and is dated September 9, 2007.  It includes discussion of DISH's ViP722 DVR receiver.  I understand that this document was publicly available.

    b.    https://about.dish.com/news-releases?item=123253

          i.    This press release is titled "DISH Network Introduces New High Definition DVR to Complement Nation's Largest HD Package."  It announces "the introduction of [DISH's] newest high definition (HD) DVR, the ViP722."  I understand that this press release was publicly available.

    c.    https://web.archive.org/web/20220920123159/https://my.dish.com/support/receivers/vip722k

          i.    This webpage is titled "HD Duo DVR."  It includes discussion of the "722k, 722, and 622 receivers."  I understand that this webpage was publicly available.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

d.  https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System

   i.  This press release is titled "DISH Introduces Hopper and Joey - Next Generation Whole-Home HD DVR Entertainment System."  It announces the introduction of DISH's "whole-home definition DVR entertainment system featuring the award-winning Hopper and Joey."  I understand that this webpage was publicly available.

e.  https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html

   i.  This article is titled "Dish Hopper whole-home DVR review" and is dated April 30, 2012.  It discusses DISH's new Hopper whole-home DVR.  I understand that this article was publicly available.

f.  https://web.archive.org/web/20191210002320/http://www.laaudiofile.com/vip722.html

   i.  This article is titled "Product Review (January 2008) – Dish Network ViP 722 High Definition Satellite DVR" and is dated January 2008.  It discusses DISH's new "ViP722 High Definition satellite receiver."  I understand that this article was publicly available.

g.  DISH_VIASATSUB_000144

   i.  This document is titled "dish – Hopper – Installation Guide" and is dated 2014.  It is "a resource that can guide [technicians of DISH systems] when installing a Hopper Whole-Home HD DVR system."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DISH_VIASATSUB_000144 at 145.  I understand that this document was produced by DISH.

h.  DISH_VIASATSUB_000365

   i.  This document is titled "DishONLINE-IPTV Movie Download – Quick Facts" and is dated July 11, 2007.  It describes DISH's "Internet Protocol Television, or IPTV," service, which is available on "compatible DISH Network receivers" including the "ViP622 DVR" and "ViP722 DVR." DISH_VIASATSUB_000365 at 365.  I understand that this document was produced by DISH.

i.  DISH_VIASATSUB_000394

   i.  This document is titled "DVR External Hard Disk Drive Storage" and is dated August 13, 2008.  It describes the ability to "[e]xpand the recording storage capacity of ViP612 DVR, ViP622 DVR, and ViP722 DVR satellite receivers by connecting a compatible external USB 2.0 hard disk drive."  DISH_VIASATSUB_000394 at 394.  I understand that this document was produced by DISH.

j.  DISH_VIASATSUB_000396

   i.  This document is titled "VOD/DVR Content Protection: STB Implementation" and is dated October 9, 2006.  It describes the "options and choices of DVR/VOD content [] encryption/decryption implementations" on "Echostar DVR set-top boxes," including the "ViP622."  DISH_VIASATSUB_000396 at 399.  I understand that this document was produced by DISH.

### 6.    The TiVo DVR System

149.    TiVo was a DVR company that developed and offered DVRs independently of a specific satellite television provider; for example, TiVo offered DVR receivers such as "TiVo Premiere" (the "TiVo DVR System").

150.    The TiVo DVR System made use of receiver devices that could store entertainment content such as recorded shows or movies and could keep such content secure, all while being physically located in a customer's home.  *See* https://www.engadget.com/2010-03-02-dnptivo-premiere-and-premiere-xl-usher-in-a-brand-new-interface.html; https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

151.    TiVo's TiVo Premiere was available at least as early as March 2, 2010. https://www.engadget.com/2010-03-02-dnptivo-premiere-and-premiere-xl-usher-in-a-brand-new-interface.html.

152.    The following documents describe the functionality of the TiVo DVR System:

a.    https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html

   i.    This webpage is titled "The next revolution from the original TV revolutionaries" and is dated April 20, 2010.  It discusses the TiVo Premiere and TiVo Premiere XL.  I understand that this webpage was publicly available.

b.    XPERI_000009

   i.    This document is titled "Submission of New Content Protection Technology: TiVoGuard for Mobile Devices" and is dated December 15, 2011 (as corrected April 2, 2012).  It is an "application … for approval of

55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TiVoGuard for Mobile Devices content protection technology."

XPERI_000009 at 11.  I understand that this document was produced by

TiVo.

c.  XPERI_000042

    i.  This document is titled "TiVo Multi Room Streaming (MRS) White

Paper."  It "defines TiVo's multi-room streaming ('MRS') feature, which

permits real-time streaming of programs between TiVo-enabled digital

video recorders ('DVRs'), or from a TiVo-enabled DVR to a TiVo-

enabled client set-top device that is not a DVR, such as a digital cable

tuner set-top device or IP-based thin client."  XPERI_000042 at 44.  I

understand that this document was produced by TiVo.

d.  XPERI_000058

    i.  This document is titled "Submission of New Digital Output and Content

Protection Technology: The TiVoGuard Content Protection System" and

is dated September 15, 2010.  It is an "application … for approval of

digital outputs protected by TiVo's TiVoGuard content protection

technology within secure TiVo environments."  XPERI_000058 at 60.  I

understand that this document was produced by TiVo.

e.  XPERI_000130

    i.  This document is titled "TiVoGuard – TiVo Content Protection System."

It defines TiVo's TiVoGuard feature, which "protects TiVo's ability to

require payment for provisioning the TiVo service and to terminate the

service in the case of, *e.g.*, non-payment." XPERI_000130 at 132. I understand that this document was produced by TiVo.

## X.    INVALIDITY ANALYSIS

153.    I have been asked to analyze several prior art references to the Asserted Patents and provide an opinion as to whether such references anticipate and/or render obvious the asserted claims of the Asserted Patents.

154.    Based on my analysis, each of the prior art references discussed below anticipate and/or render obvious all asserted claims of the Asserted Patents. Below, I explain my analysis for each claim and reference in turn.

### A.    The '400 Patent

#### 1.    U.S. Patent No. 8,600,062 ("Rae")

155.    U.S. Patent No. 8,600,062 ("Rae") anticipates and renders obvious every asserted claim of the '400 patent.

156.    A POSITA would have been motivated to combine Rae with either Buttars or Spencer because they all are directed towards inventions with a similar purpose: enabling the secure transfer of media content from one storage device to another storage device. A POSITA evaluating Rae would naturally consider other similar patents, and to the extent one of the patents contained features missing from others, a POSITA would have been motivated to incorporate such features with the other patents.

157.    Generally, the '400 patent is directed to a digital rights management system for transferring or distributing media content. Specifically, the independent claims of the '400 patent are directed to a kiosk for transferring or distributing secure media content to a portable storage device (or a method of same) by communicating with the storage device and remote trusted server, obtaining a unique, concealed identifier from the portable storage device, authenticating the storage device

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

through a trusted server using at least the unique identifier, and providing the encrypted media and a corresponding access key. The dependent claims add trivial variations to these elements, including the kiosk comprising local data storage (claims 2 and 10), the kiosk wherein the second data interface is a network interface (claims 6 and 13), and the kiosk wherein the kiosk is located in a public environment (claims 8 and 17). These features are an inherent or obvious part of a DRM system. A POSITA would have been motivated to combine each of these features as part of a limited number of design options that confer known benefits while yielding predictable results.

158.    Rae, Buttars, and Spencer all teach similar techniques employed for DRM systems and thus the teachings of any one reference are applicable to other references in that same field. *See, e.g.*, Rae at 2:59-67 ("A further embodiment of the invention includes a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content, and a playback device configured to communicate with a portable media drive and to communicate with the headend via a network, where the playback device includes a processor containing a private key issued to the playback device by the conditional access system."); Buttars at [0020] ("One embodiment of the invention relates to any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and processor-enabled distribution kiosks (Kiosks) used to distribute and play-back motion pictures and other audio/video data, programs or works."); Spencer at [0006] ("In general, in one aspect, this invention provides methods, apparatus, and systems, including computer program products, implementing and using techniques for delivery

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

of media content. . . . Based on the device-identifying information, it is determined whether the requested media content is playable on the digital media playback device.").

159.    A POSITA would have been motivated and found it obvious to apply references teaching certain specific techniques—e.g., transferring or distributing media content from a kiosk to a portable data storage device, obtaining a specific unique identifier from the portable data storage device that is concealed by the portable data storage device, authenticating the portable data storage device using at least the unique identifier by communicating with the remote trusted server, in response to authentication, providing the portable data storage device with the encrypted media content and an access key—to other references that relate to secure content distribution systems and apparatuses generally because all references teach distributing or transferring secure content for storage or playback, and it would have been a trivial exercise to consult the references that taught more specific aspects of a to fill in less specific disclosures in other references. A POSITA would have also been motivated and found it obvious to replace and/or combine a reference's exact set of features, components, and configurations in a particular secure media distribution system/apparatus with the teachings regarding other features, components, and configurations used in other secure media distribution systems/apparatuses for all the reasons provided above. These modifications would have been a simple substitution of one known element for another, which would have obtained predictable results because it was already well known in the art of secure media distribution systems. The substitution of one component or configuration for another would not have changed the principle of operation for either reference in any combination because the references all use similar mechanisms for a similar purpose of: designing a secure media distribution system/apparatus. A POSITA would have been motivated to combine these teachings, and to make these replacements, because all of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the techniques were widely used for conventional DRM systems or systems for distributing secure media content.

> a)    **Claim 1 of the '400 Patent is anticipated and rendered obvious by Rae.**

> (1)    **1[pre]. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:**

160.    I understand that the '400 patent discloses a "kiosk" that "provision[s] secure media content to a plurality of portable data storage devices" as well as satisfies the remaining limitations of the '400 patent.

161.    Rae describes an "off-line content delivery system that utilizes portable media drives to transport protected content from *kiosks* to playback devices in accordance with embodiments of the invention." Rae at 4:55-58 (emphasis added). In one embodiment, Rae discloses a "*kiosk* configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content, and a playback device configured to communicate with a portable media drive and to communicate with the headend via a network, where the playback device includes a processor containing a private key issued to the playback device by the conditional access system." Rae at 2:59-67 (emphasis added).

162.    Rae discloses a "*kiosk* . . . configured to issue protected content to the portable media drive by retrieving symmetrically pre-encrypted content corresponding to user selections from the storage device." Rae at 3:1-2 (emphasis added).

163.    Rae's "kiosk" constitutes the '400 patent's "kiosk for provisioning secure media content to a plurality of portable data storage devices."

164.    The term "portable media drive" in Rae is described as a "storage device . . . used to obtain content from a kiosk for playback."  Rae at 5:19-21.

165.    Rae's "portable media drive" is the '400 patent's "portable data storage device" to which the kiosk provisions secure media content.

166.    The term "protected content" in Rae is described as including "multimedia such as movies, television shows, and other combinations of audio and/or video information."  Rae at 1:18-20.  Rae teaches that this content may be "over-encrypted" and thus secure.  Rae at 2:35.

167.    Rae's "protected content" is the '400 patent's "secure media content" that is provisioned by the kiosk.

168.    Rae also performs each of the following steps, as discussed below.  Rae therefore had at least one kiosk comprising each of the following limitations.

### (2)    1[a]. a first data interface configured to communicate with a portable data storage device;

169.    I understand that the '400 patent discloses a "first data interface" that is "configured to communicate with a portable data storage device."  I understand that Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "first data interface" limitation simply if it is "configured to communicate with a portable data storage device," such an "LAN and WiFi interfaces."  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 19-24.  Therefore, under Plaintiffs' theory of infringement, any component that is "configured to communicate with a portable data storage device" would meet the "first data interface" limitation.

170.    Rae describes a "*processing system* configured to communicate with a portable media drives via a *communication port*."  Rae at 3:53-55 (emphases added).  As Rae's Figure 5a depicts, Rae teaches "processes for issuing protecting content to a portable media drive based

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

upon availability of public keys utilized during the over-encrypting processes in accordance with an embodiment of the invention." Rae at 5:5-8. Figure 5a is shown below:



FIG. 5a

171.    Rae describes how the "communication port" is "configured to communicate with a portable data storage device," with communications including the kiosk being "configured to receive a portable media drive," *id.* at 2:59-64, being "configured to issue protected content to the portable media drive by retrieving symmetrically pre-encrypted content corresponding to user selections from the storage device," *id.* at 3:1-18, being "configured to communicate with a portable media drives via a communication port," *id.* at 3:53-55, being "configured to obtain the public key for each playback device associated with the user account from a portable media drive via the communication port," *id.* at 4:19-22, and being configured to "issue additional protect content to the portable media drive," *id.* at 7:62-8:2, among others. Rae's "processing system"—specifically, the "communication port"—is thus the '400 patent's "first data interface" that is configured to communicate with a portable data storage device.

172.     The term "portable media drive" in Rae is described as a "storage device . . . used to obtain content from a kiosk for playback."  Rae at 5:19-21.

173.     Rae's "portable media drive" is the '400 patent's "portable data storage device" to which the first data interface is configured to communicate.

> **(3)     1[b]. a second data interface configured to communicate, over a network, with a remote trusted server; and**

174.     I understand that the '400 patent discloses a "second data interface" that is "configured to communicate, over a network, with a remote trusted server."  I understand that Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "second data interface" limitation simply if it is "configured to communicate, over a network, with a remote trusted server."  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 26-34.  I also understand that Plaintiffs have alleged, for infringement purposes, that a server on the ground that provisions media content to the kiosk constitutes a "remote trusted server."  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 26, 29, 31.  Therefore, under Plaintiffs' theory of infringement, any component that is "configured to communicate, over a network, with a remote trusted server" would meet the "second data interface" limitation.

175.     Rae describes a "*kiosk* configured to . . . communicate with a headend including a conditional access system via a network."  Rae at 2:59-62 (emphasis added).  As Rae's Figure 1 depicts, Rae teaches a system where the "kiosk" communicates with the "headend" and its "Conditional

Access System / DRM." Figure 1 is shown below:



FIG. 1

176.    Rae describes how the kiosk communicates with the headend, including for the purposes of "Kiosk Certificate(s) Retrieval" and "Pre-Encrypted Movies" delivery. *See* Rae at Fig. 1.

177.    Rae's "kiosk" is the '400 patent's "second data interface" that is configured to communicate with a remote trusted server over a network.

178.    To the extent Rae did not practice this claim, it would have been obvious to combine Rae with the teachings of another reference such as U.S. Patent No. 2003/0014630 ("Spencer"). Spencer describes a system for "delivery of media content" through a "communication channel . . . between a particular digital media playback device and a content server on which media content is stored." Spencer at Abstract. Specifically, Spencer discloses a "computer network between the users and the content server [which] can be any type of computer network ranging in size from a local area network to the Internet." *Id.* at [0034]; *see also id.* at [0025] ("At the remote side of the closed loop system, the web server is the part of the content server

that is used to provide a user interface between the users that are connected to the computer network and the application server, which constitutes the central part of the content server . . ."). Spencer describes a network between end-user devices and a remote content server, and a network between a kiosk and a remote content server would also be obvious to a POSITA. Spencer's "computer network" therefore renders obvious the '400 patent's "second data interface" that is configured to communicate with a remote trusted server over a network. A POSITA would have been motivated to consult references such as Spencer that disclose known options for securely distributing media content.

179.    The term "headend" in Rae is depicted as including the "File Storage," which may be remotely located.  Rae at 5:19-21.  For instance, "[i]n many embodiments, the kiosk receives the pre-encrypted content via other methods including but not limited to via a media drive, a DVD, and/or a firmware update. As can readily be appreciated, the manner in which the kiosk receives pre-encrypted content and the way in which the kiosk retrieves the pre-encrypted content from local and/or *remote storage* in accordance with embodiments of the invention is dependent upon the specific application."  Rae at 6:64-7:4 (emphasis added).

180.    Applying Plaintiffs' theory that a server on the ground that provisions media content to the kiosk constitutes a "remote trusted server" within the meaning of the '400 patent (*see* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 26, 29, 31), Rae's "headend" is the '400 patent's "remote trusted server" with which the second data interface is configured to communicate.

### (4)    1[c]. a processor configured to:

181.    I understand that the '400 patent discloses a "processor" that is configured to satisfy each of the following limitations, as discussed below.

182.    Rae describes a "processing system" such as but not limited to "a personal computer such as an iMac manufactured by Apple Computer Inc. of Cupertino, Calif., running OSX and configured using appropriate software to perform the kiosk functions described herein."  Rae at 5:67-6:5.

183.    Rae's "processing system" is the '400 patent's "processor" configured to perform each of the following steps, as discussed below.

> **(5)    1[d]. obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

184.    I understand that the '400 patent discloses a "unique identifier" that is "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device.  Specifically, the '400 patent discloses a kiosk that "*obtain[s] a unique identifier* from the portable data storage device, wherein the unique identifier is *specific to* the portable data storage device and is *concealed by* the portable data storage device."

185.    I understand that Plaintiffs have nonetheless alleged, for infringement purposes, that a "unique identifier" satisfies the requirements of the '400 patent so long as it corresponds to an end-user device regardless of whether the identifier is obtained from, specific to, or concealed by the end-user device (Viasat strongly disagrees).  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 39-45.  Therefore, under Plaintiffs' theory of infringement, any unique identifier of the end-user device—even if it is not "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device—would meet the "unique identifier" limitation.

186.    Rae explains that "playback device IDs" are used to "uniquely identify the playback devices associated with the public keys."  *See* Rae at 8:35-40 ("The encrypted copies of the content keys,

and associated with each playback device are then used to create a store file along with the

playback device IDs or other information such as certificate IDs used by the CA system to

uniquely identify the playback devices associated with the public keys.").  Rae explains that "the

kiosk is able to obtain information concerning the playback devices associated with a user

account from the subscriber management system."  *See* Rae at 7:30-33.  The playback device IDs

are separate and distinct from the playback device's public key; rather, "[t]he kiosk can use the

identities of the playback devices associated with the user's account to retrieve a public key for

each playback device."  *See* Rae at 7:33-35.  Thus, Rae's "playback device ID" is the '400

patent's "unique identifier."

187.    The text of the '400 patent claims requires that the "unique identifier" be "obtained from" the

end-user device, "specific to" the end-user device, and "concealed by" the end-user device, as

noted above.  Rae discloses a "unique identifier" that aligns with the '400 patent claims.

188.    Rae discloses a "locally stored private key" for "each playback device that participates in the

system."  Rae at 5:27-37.  Rae explains that the private keys may be first pre-provisioned to the

end-user devices, independent from any communications with the system disclosed by Rae, and

the kiosk obtains the keys from the end-user device during the authentication process.  *See* Rae at

7:30-38 ("In several embodiments, the CA [Conditional Access] system issues certificates and

private keys at the time of manufacture of playback devices . . . Alternatively, playback devices

may be pre-provisioned with a key pair and a certificate in a factory.").  Rae explains that these

keys are "*unique* . . . for each playback device."  *See* Rae at 5:45-55 ("Due to the unique keys for

each playback device, there is control over which devices a given user can use to playback the

content."). Rae explains that the private key is concealed within the secure central processing

unit of the end-user device.  *See* Rae at 11:46-47 ("[To detect] that a media drive is connected to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the playback device . . . [t]he private key associated with the device's certificate is *extracted from the secure CPU* . . .") (emphasis added).  Thus, Rae's "private key" also discloses the '400 patent's "unique identifier."

189.    To the extent Rae did not practice this claim, it would have been obvious to combine Rae with the teachings of another reference such as U.S. Patent No. 2003/0014630 ("Spencer"). Spencer describes a system for "delivery of media content" through a "communication channel . . . between a particular digital media playback device and a content server on which media content is stored."  Spencer at Abstract.  Specifically, Spencer discloses a method comprising "[o]btaining device-identifying information," which includes a unique identification number from the playback device, a unique identification number of a digital storage medium in the playback device, or a serial number.  *Id.* at [0007] ("Obtaining device-identifying information can include obtaining a unique identification number from the digital media playback device. Obtaining device-identifying information can include obtaining a unique identification number of a digital Storage medium in the digital media playback device. The unique identification number can be a Serial number."); *see also id.* at [0030] ("Before a user can start using the closed-loop delivery system, he or she has to provide personal information and information relating to his or her digital media playback device(s). Examples of such information include user name, address, age, email address, registered devices (unique identifier, make, model), user profile information, and so on.").  A POSITA would have been motivated to consult references such as Spencer that disclose known options for securely distributing media content.

190.    Spencer's "unique identification number" also discloses the '400 patent's "unique identifier."

> **(6)**      **1[e]. authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

191.    The '400 patent discloses an "authentication" requirement where the processor authenticates the end-user device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface.  I understand that Plaintiffs have alleged, for infringement purposes, that a system authenticates an end-user device using at least the unique identifier when the unique identifier is confirmed "known and approved" before the device is "allowed to download content."  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 51.  Elsewhere in their infringement contentions, Plaintiffs have defined, for infringement purposes, "authentication" simply as "the collection of the unique identifier required to access the services" regardless of any communications with a remote trusted server over the second data interface.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 57 (". . . in response to the authentication (*i.e.*, the collection of the unique identifier required to access the services) . . .").  Therefore, under Plaintiffs' theory of infringement, any "authentication" process that verifies that the end-user device is known and approved using a unique identifier, prior to being allowed to download content, satisfies this limitation.

192.    Rae discloses an authentication process where "[w]hen the portable media drive is connected to a kiosk at a retail location, the kiosk *authenticates the user* and *enables the user to select one or more pieces of content to transfer* to the portable media drive."  Rae at 5:19-29.  Specifically, Rae describes how a unique identifier is used in its authentication process: "When a portable media drive is presented to the kiosk, the kiosk performs a process in order to issue content to the portable media drive.  The process includes determining whether the user has a user account and detecting whether the portable media drive has been presented to the off-line content delivery

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

system.  The kiosk *looks up the user's ID and associated Unique IDs for the user's playback devices* on a subscriber management system at the headend."  Rae at 9:39-51 (emphasis added). Then, after obtaining the user's ID, the system then obtains "device certificates for the playback devices associated with a user" and "verifies them against a locally stored certificate revocation list.  Assuming the certificates are not on the revocation list, the process proceeds using the device certificates obtained from the portable media drive."  Rae at 10:56-11:1.  The CA system then "provide[s] an encrypted Entitlement Control Message (ECM), which can be used by an authorized playback device to access the protected content" or "a separate Entitlement Management Message (EMM), which enables a playback device authorized to playback the content to decrypt the ECM and playback the on-demand content."  Rae at 1:40-46.  Rae also discloses that the kiosk communicates with a remote trusted server, as Plaintiffs understand that term for infringement, in Rae's authentication process when it "looks up the user's ID and associated Unique IDs for the user's playback devices on a *subscriber management system at the headend,*" which is located remotely.  Rae at 9:39-51 (emphasis added).  This process is depicted in the "Entitlement Checks" arrow between the Conditional Access System and the Subscriber

Management System in Figure 1, as shown below:



FIG. 1

193.    Rae's authentication process involves "using at least the unique identifier," as described in

the claim limitation," because the "unique keys for each playback device" "control which

devices a given user can use to playback the content."  Rae at 5:45-55.  Rae's authentication

process involves "communicating with the remote trusted server over the second data interface,"

as described in the claim limitation, because the kiosk communicates with the remote

"Conditional Access System / DRM" to retrieve certificates and pre-encrypted movies to conduct

the authentication process and the remote "Subscriber Management System" to verify which

end-user devices are authorized to access the encrypted media content.  *See* Rae at Fig. 1.  Rae

explains that when an end-user device is presented to the kiosk, the kiosk "fetche[s]" the "device

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

certificates for the playback devices associated with the user . . . from the CA system at the headend." Rae at 9:51-55.

194.    Rae's authentication process—whereby Rae's kiosk uses a unique identifier and communicates with a Conditional Access System or DRM system to authenticate an end-user device—satisfies the '400 patent's "authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" limitation.

>    (7)    **1[f]. in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.**

195.    I understand that the '400 patent discloses an "in response to the authentication" requirement where the processor provides an "encrypted first media content" and "corresponding access key" to the end-user device following the authentication process.  I understand that Plaintiffs have alleged, for infringement purposes, that the providing of any encrypted media content and an access key used to decrypt that content, in response to an authenticated request, satisfies this limitation.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 57-61.  Specifically, Plaintiffs have alleged, for infringement purposes, that even when a DRM license server—not the kiosk—provides the corresponding access key, the claim limitation is satisfied.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 59 ("Apple's FairPlay streaming DRM provides a corresponding access key to the media content.").  Therefore, under Plaintiffs' theory of infringement, any process that provides the encrypted media content and an access key used to decrypt that media content to the end-user device after verifying that the end-user device is trusted satisfies the limitation.

196.    Rae discloses a kiosk that provides "the over-encrypted content and the encrypted copies of each content key to the portable media drive" following the authentication of the end-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

user device. Rae at 3:65-67. The media content and access key are provided in response to successful authentication of the end-user device—as evidenced by the presence of device certificates—after the end-user device is provided to a kiosk. *See* Rae at 7:62-8:2 ("When a portable media drive that includes device certificates is provided to a kiosk, the kiosk can use the certificates to issue additional protected content to the portable media drive.").

197.    Specifically, Rae explains that when an end-user device is presented to the kiosk and a valid device certificate is obtained from the CA system, "[u]nique content keys (DEKs) are then randomly generated." Rae at 9:55-69. These DEKs are then used to over-encrypt the symmetrically pre-encrypted content. *Id.* at 9:62-64. "A copy of each content key is then encrypted using the public key associated with each playback device." *Id.* at 9:64-66. Ultimately, "the over-encrypted pieces of content, and a store file containing the public key encrypted content keys, and the device certificates are written to the portable media drive." *Id.* at

73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

9:66-10:2.  This process is depicted in Figure 5c below:



FIG. 5c

198.    I understand that the '400 patent requires that a kiosk provide both an "encrypted first media content" and "corresponding access key" to the end-user device following the authentication process.  Rae operates in that fashion.

199.    Rae discloses a "kiosk" that provides both the encrypted media content and the corresponding access key, as the encrypted media content and the corresponding access key are provided *together* to the end-user device: "In many embodiments, the store file [which contains the public key encrypted content keys] is *not separate* from the over-encrypted pieces of content."  *Id.* at 10:2-4 (emphasis added).  Indeed, "[t]he public key encrypted content keys can for example be appended to the over-encrypted pieces of content as metadata."  *Id.* at 10:4-6.  The end-user device may even "verify" that the encrypted media content and the corresponding access key both come from a single valid kiosk if that kiosk signs the store file.  *Id.* at 10:7-11

("Optionally, the kiosk may sign the store file such that a playback device can verify that the content and the keys come from a valid kiosk (e.g. to prevent the use of unauthorized kiosks) and to check the integrity of the key file.").

200.    Rae's provisioning of the media content and corresponding access key—whereby Rae's kiosk provides the over-encrypted pieces of content and a store file containing the public key encrypted content keys to the end-user device—satisfies the '400 patent's "authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" limitation.

> **b)     Claim 2 of the '400 Patent is anticipated and rendered obvious by Rae.**
>
> **(1)     The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content.**

201.    As explained above, Rae discloses a kiosk that "compris[es] a local data storage storing a plurality of encrypted media content."  Additionally, Rae discloses embodiments of the invention where "the storage device is *local* to the kiosk," Rae at 3:19-20 (emphasis added), and where "the storage device containing the symmetrically pre-encrypted content is a *local* storage device," Rae at 4:1-3 (emphasis added).  I understand that, for purposes of infringement, Plaintiffs have alleged that an "attached" data storage device—even if it is "external"—storing a plurality of encrypted media content systems satisfies this claim.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 69.  Therefore, under Plaintiffs' theory of infringement, Rae satisfies this limitation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**c)    Claim 6 of the '400 Patent is anticipated and rendered obvious by Rae.**

**(1)    The kiosk of claim 1, wherein the second data interface is a network interface.**

202.    As explained above, Rae discloses a kiosk that "wherein the second data interface is a network interface."  *See* Rae at 2:59-62 ("A further embodiment of the invention includes a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system *via a network* . . ."); Rae at 4:4-7 ("In a still further additional embodiment, the kiosk configured to communicate with the storage device containing the symmetrically pre-encrypted content via a network connection."); Rae at 4:15-19 ("In yet another embodiment again, the kiosk is configured to obtain the public key for each playback device associated with the user account from a conditional access system via a network connection.").  I understand that, for purposes of infringement, Plaintiffs have alleged that any device involving "network access" includes "a network interface" and satisfies this claim.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 27, 71.  Therefore, under Plaintiffs' theory of infringement, Rae satisfies this limitation.

**d)    Claim 8 of the '400 Patent is anticipated and rendered obvious by Rae.**

**(1)    The kiosk of claim 1, wherein the kiosk is located in a public environment.**

203.    As explained above, Rae discloses a "kiosk" to which a user may connect a portable media drive "at a retail location" and where the user can "select one or more pieces of content to transfer to the portable media drive."  Rae at 5:23-26.  A retail location where a human user may interface with the kiosk is a "public environment."  I understand that, for purposes of infringement, Plaintiffs have alleged that a kiosk located in an environment easily accessible to paying members of the public, such as a "commercial aircraft cabin," satisfies this claim.  *See*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 71.  Therefore, under Plaintiffs'

theory of infringement, Rae satisfies this limitation.

e) **Claim 9 of the '400 Patent is anticipated and rendered obvious by Rae.**

(1) **9[pre]. A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising:**

204.    Claim 9 of the '400 patent is invalid for all reasons described above regarding

Claim 1 of the '400 patent.

(2) **9[a]. establishing communications with a portable data storage device over a first data interface;**

205.    Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of

the '400 patent.

(3) **9[b]. establishing communications with a remote trusted server via a second data interface over a network;**

206.    Claim 9 of the '400 patent is invalid for all reasons described above regarding

Claim 1 of the '400 patent.

(4) **9[c]. obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device:**

207.    Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of

the '400 patent.

(5) **9[d]. authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

208.    Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of

the '400 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(6) **9[e]. in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key.**

209.    Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

> **f)    Claim 10 of the '400 Patent is anticipated and rendered obvious by Rae.**
>
> (1)    **The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content.**

210.    Claim 10 of the '400 patent is invalid for all reasons described above regarding Claim 2 of the '400 patent.

> **g)    Claim 13 of the '400 Patent is anticipated and rendered obvious by Rae.**
>
> (1)    **The method of claim 9, wherein the second data interface is a network interface.**

211.    Claim 13 of the '400 patent is invalid for all reasons described above regarding Claim 6 of the '400 patent.

> **h)    Claim 17 of the '400 Patent is anticipated and rendered obvious by Rae.**
>
> (1)    **The method of claim 9, wherein the kiosk is located in a public environment.**

212.    Claim 17 of the '400 patent is invalid for all reasons described above regarding Claim 8 of the '400 patent.

## 2.    U.S. Patent No. 2008/0279533 ("Buttars")

213.    U.S. Patent No. 2008/0279533 ("Buttars") anticipates and renders obvious every asserted claim of the '400 patent.

214.    A POSITA would have been motivated to combine Buttars with Rae or Spencer for the same reasons a POSITA would have been motivated to combine Rae with Buttars or Spencer, as described above.

          **a)**         **Claim 1 of the '400 Patent is anticipated and rendered obvious by Buttars.**

             **(1)**      **1[pre]. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:**

215.    I understand that the '400 patent discloses a "kiosk" that "provision[s] secure media content to a plurality of portable data storage devices" as well as satisfies the remaining limitations of the '400 patent.

216.    Buttars describes "a method and apparatus for secure retrieval, storage and playback or use of video, audio, multimedia and other data on a variety of non-volatile storage media." Buttars at [0007]. In one embodiment, Buttars discloses "any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and processor-enabled distribution kiosks (Kiosks) used to distribute and play-back motion pictures and other audio/video data, programs or works." Buttars at [0020]. Figure 3 of Buttars, which includes the kiosk, storage device, and playback device, is shown below:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Figure 3

217.    Buttars discloses content that is encrypted after being received from the content owner, as shown in Figure 1 below.  *See* Buttars at [0028] ("Prior to distributing the Content to the distribution Kiosks, the Content receives a layer of Hardware Encryption (700) and also receives its associated encrypted License Object (320) after which it is passed to the remote

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Distributed Media Storage locations (800) in Kiosks or regional data centers.").



Figure 1

218.    Buttars discloses "processor-enabled distribution *kiosks* (Kiosks) used to distribute and play-back motion pictures and other audio/video data, programs or works." Buttars at [0020] (emphasis added).

219.    Buttars' "kiosk" constitutes the '400 patent's "kiosk for provisioning secure media content to a plurality of portable data storage devices."

220.    The term "storage device" in Buttars is described as "any number of processor-enabled flash-drive memory storage devices (Storage Device)."  Buttars at [0020].  The term

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"storage device" in Buttars is also defined as shorthand for "Portable Data Storage Device (Storage Device)." Buttars at [0015], [0035].

221.    Buttars' "storage device" is the '400 patent's "portable data storage device" to which the kiosk provisions secure media content.

222.    The term "content" in Buttars is defined to include media content such as "motion pictures, audio, musical works, video." Buttars at [0005] ("As used in this description and in the appended claims, the word 'Content' means; all digital data, including but not limited to motion pictures, audio, musical works, video, video games, multi-media, interactive media, data files, programs and other works stored as digital data files."). The content is then secured by "utilizing a combination of physical, software, and hardware security and encryption methodologies to create multiple layers of onerous barriers to those desiring illicit access to the stored data, but through the novel security architecture used in the invention, the data is highly available to legitimate users." Buttars at [0015]; *see also* Buttars at [0028], Figure 1.

223.    Buttars' "content" is the '400 patent's "secure media content" that is provisioned by the kiosk.

224.    Buttars also performs each of the following steps, as discussed below. Buttars therefore had at least one kiosk comprising each of the following limitations.

> **(2)     1[a]. a first data interface configured to communicate with a portable data storage device;**

225.    I understand that the '400 patent discloses a "first data interface" that is "configured to communicate with a portable data storage device." I understand that Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "first data interface" limitation simply if it is "configured to communicate with a portable data storage device," such as "LAN and WiFi interfaces." *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A, at 19-24. Therefore, under Plaintiffs' theory of infringement, any component that is "configured to communicate with a portable data storage device" would meet the "first data interface" limitation.

226.  Buttars describes a kiosk configured to communicate with a portable data storage device via a data interface. Specifically, in one embodiment, Buttars discloses, "if a user connects a legitimate Storage Device to a legitimate Playback Device or Kiosk, then the devices begin communication over a *hardware encrypted interface*. The user enters a secret PIN code through the Graphic User Interface (GUI) of either the Playback Device or Kiosk." Buttars at [0023] (emphasis added). As Buttars' Figure 3 depicts, as shown below, Buttars teaches a "kiosk" that is configured to communicate with the storage device, with communications including "key verification and account verification," transfer of "movie files," and "personal profile updates."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

227.    Buttars' "hardware encrypted interface" is the '400 patent's "first data interface" that is

configured to communicate with a portable data storage device.



Figure 3

228.    The term "storage device" in Buttars is described as a storage device to which "Kiosk stores

encrypted Content files for distribution . . . upon demand."  Buttars at claim 1(c).  The term

"storage device" in Buttars is also defined as shorthand for "Portable Data Storage Device

(Storage Device)."  Buttars at [0015], [0035].

229.    Buttars' "storage device" is the '400 patent's "portable data storage device" to which the first

data interface of the kiosk is configured to communicate.

> **(3)    1[b]. a second data interface configured to communicate, over a network, with a remote trusted server; and**

230.    I understand that the '400 patent discloses a "second data interface" that is

"configured to communicate, over a network, with a remote trusted server."  I understand that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "second data interface" limitation simply if it is "configured to communicate, over a network, with a remote trusted server." *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 26-34.  I also understand that Plaintiffs have alleged, for infringement purposes, that a server on the ground that provisions media content to the kiosk constitutes a "remote trusted server." *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 26, 29, 31 (". . . a remote trusted server (*e.g.*, Viasat AWS servers, content provider servers, Viasat data center, content management server) . . ."). Therefore, under Plaintiffs' theory of infringement, any component that is "configured to communicate, over a network, with a remote trusted server" would meet the "second data interface" limitation.

231. Buttars describes a kiosk configured to communicate with a remote trusted server.  Buttars describes how the kiosk communicates with "Distributed Media Storage locations" or "regional data centers" to receive encrypted content.  *See* Buttars at [0028] ("Prior to distributing the Content to the distribution Kiosks, the Content receives a layer of Hardware Encryption (700) and also receives its associated encrypted License Object (320) after which it is passed to the remote Distributed Media Storage locations (800) in Kiosks or regional data centers.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

232.    The "Distributed Media Storage" is depicted in Figure 1, as shown below.



Figure 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

233.    The "Primary Data Center" and "Regional Data Centers" are depicted in Figure 2, as shown below.



Figure 2

234.    Buttars discloses "*remote* Distributed Media Storage locations in Kiosks or regional data centers."  Buttars at [0028] (emphasis added).  Buttars' "Distributed Media Storage locations" and "regional data centers" are thus the '400 patent's "remote trusted server" with which the second data interface are configured to communicate.

### (4)    1[c]. a processor configured to:

235.    I understand that the '400 patent discloses a "processor" that is configured to satisfy each of the following limitations, as discussed below.

236.    Buttars describes a "processor-enabled" kiosk.  *See* Buttars at [0020] ("One embodiment of the invention relates to any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and *processor-enabled distribution kiosks (Kiosks)* used to distribute and play-back motion pictures and other audio/video data, programs or works.") (emphasis added).  Buttars' "processor" is thus the '400 patent's "processor" configured to perform each of the following steps, as discussed below.

> **(5)    1[d]. obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

237.    The '400 patent claims recite a "unique identifier" that is "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device.  Specifically, the '400 patent discloses a kiosk that "*obtain[s] a unique identifier* from the portable data storage device, wherein the unique identifier is *specific to* the portable data storage device and is *concealed by* the portable data storage device."

238.    I understand that Plaintiffs have alleged, for infringement purposes, that a "unique identifier" satisfies the requirements of the '400 patent so long as it corresponds to an end-user device regardless of whether the identifier is obtained from, specific to, or concealed by the end-user device.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 39-45.  Under Plaintiffs' theory of infringement, any unique identifier of the end-user device—even if it is not "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device—would meet the "unique identifier" limitation.

239.    Buttars explains that a "Playback Device key" is used to uniquely identify a particular playback device.  *See* Buttars at [0025] ("[W]hen the customer docks the Storage Device into the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Playback Device, the customer's Playback Device key is loaded into the security module on the Storage Device, and the Playback Device key is examined for authenticity (the digital signature and the chain of trust are verified) by the processor on-board the Storage Device.").

240.    To the extent Buttars did not practice this claim, it would have been obvious to a POSITA to instead use a "Storage Device key" to uniquely identify a particular storage device, in the same manner that the "Playback Device key" uniquely identifies a particular playback device as described above.

241.    To the extent Buttars did not practice this claim, it would have been obvious to combine Buttars with the teachings of another reference such as U.S. Patent No. 2003/0014630 ("Spencer").

242.    Spencer describes a system for "delivery of media content" through a "communication channel . . . between a particular digital media playback device and a content server on which media content is stored." Spencer at Abstract. Specifically, Spencer disclosed a method comprising "[o]btaining device-identifying information" including "obtaining a unique identification number from the digital media playback device." *Id.* at [0007]; *see also id.* at [0030] ("Before a user can start using the closed-loop delivery system, he or she has to provide personal information and information relating to his or her digital media playback device(s). Examples of such information include user name, address, age, email address, registered devices (unique identifier, make, model), user profile information, and so on."). Spencer's "unique identification number" discloses a "unique identifier."

243.    The unique identifier disclosed by the '400 patent was a well-known way to authenticate portable data storage devices by the time the '400 patent was filed. *See, e.g.*, Spencer at [0007] ("Advantageous implementations can include one or more of the following features. Obtaining

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

device-identifying information can include obtaining a unique identification number from the digital media playback device. Obtaining device-identifying information can include obtaining a unique identification number of a digital storage medium in the digital media playback device. The unique identification number can be a serial number."); *id.* at [0015] ("[A]uthenticating the device-identifying information with a client application program; authenticating the client application with a content server application program; and establishing a communication channel between the digital media playback device and the content server if both authentications are successful."). It would have been obvious to a POSITA to combine Buttars with Spencer.

> **(6)**     **1[e]. authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

244.     I understand that the '400 patent discloses an "authentication" requirement where the processor authenticates the end-user device using at least the unique identifier and by communicating with the remote trusted server over the second data interface.  I understand that Plaintiffs have alleged, for infringement purposes, that a system authenticates an end-user device using at least the unique identifier when the unique identifier is confirmed "known and approved" before the device is "allowed to download content."  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 51.  Elsewhere in their infringement contentions, Plaintiffs have defined, for infringement purposes, "authentication" simply as "the collection of the unique identifier required to access the services" regardless of any communications with a remote trusted server over the second data interface.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 57 (". . . in response to the authentication (*i.e.*, the collection of the unique identifier required to access the services) . . .").  Therefore, under Plaintiffs' theory of infringement, any "authentication" process that verifies that the end-user device is known and

approved using a unique identifier, prior to being allowed to download content, satisfies this

limitation.

245.    Buttars discloses an authentication process where the kiosk authenticates that a storage

device is trusted prior to transferring media content and encryption keys.  *See* Buttars at [0032]

("From the Content distribution Kiosk, Content files are moved to Storage Devices only after

verification of the devices, encryption keys, and user accounts, and any updates to Personal

Profiles affecting security settings are affected."); *see also* Buttars at [0034] ("At the Kiosk, the

Storage Device is Authenticated, and the communication between chips on the devices, as well

as the communication between the devices themselves is Link Encrypted ensuring the Content is

never exposed in an unprotected state. External to all of the preceding methods, physical security

layers are applied, including but not limited to impedance monitoring of the interface pins on the

Storage Device, placement of false traces on all PCB's, and encasement of the PCB's in X-

Ray/MRI resistant resin.").

246.    To the extent Buttars did not practice this claim, it would have been obvious to a POSITA to

apply the same security measures used to examine a Playback Device for authenticity and instead

apply the security measures to examine a Storage Device for authenticity.

247.    As described above, the unique identifier disclosed by the '400 patent was a well-known way

to authenticate portable data storage devices by the time the '400 patent was filed. *See, e.g.*,

Spencer at [0007].

248.    For instance, Buttars discloses using the Playback Device keys to verify that the Playback

Device is trusted.  *See* Buttars at [0025] ("[W]hen the customer docks the Storage Device into

the Playback Device, the customer's Playback Device key is loaded into the security module on

the Storage Device, and the Playback Device key is examined for authenticity (the digital

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

signature and the chain of trust are verified) by the processor on-board the Storage Device.").

Buttars also describes a variety of security routines used to verify that the Playback Device is

trusted: "In this embodiment, initial docking between a Storage Device and a corresponding

Playback Device, initiates a series of physical security routines (listed below) after which the

stored public keys are exchanged, initiating the authentication of the license object, with control

of the authentication process done by both the on-board processor of the Storage Device and the

on-board processor of the Playback Device. . . . Applicable physical security measures include,

but are not limited to impedance monitoring, random assignment of physical pins used for data

transfer, data-masking with false data, chip-to-chip link encryption, use of Printed Circuit Board

(PCB) masking layers, false traces, and X-Ray/Magnetic Resonance Imaging (MRI) resistant

resin encasement of the PCB(s)." Buttars at [0015]. It would be obvious to a POSITA to use

these same security routines to verify that the Storage Device is trusted.

249.    This authentication process involves "using at least the unique identifier," as described in the

claim limitation, because it uses the "Playback Device key" that uniquely identifies the Playback

Device, as described above. Buttars at [0015]. This authentication process involves

"communicating with the remote trusted server over the second data interface," as described in

the claim limitation.

250.    To the extent Buttars did not practice this claim, it would have been obvious to combine

Buttars with the teachings of another reference such as Rae. As described above, Rae discloses

an authentication process—whereby Rae's kiosk communicates with a Conditional Access

System or DRM system to authenticate an end-user device—thus satisfies the '400 patent's

"authenticate the portable data storage device, using at least the unique identifier, by

communicating with the remote trusted server over the second data interface" limitation. A

POSITA would have been motivated to consult references such as Rae that disclose known

options for securely distributing media content.

> ### (7) 1[f]. in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

251.    I understand that the '400 patent discloses an "in response to the authentication"

requirement where the processor provides an "encrypted first media content" and "corresponding

access key" to the end-user device following the authentication process.  I understand that

Plaintiffs have alleged, for infringement purposes, that the providing of any encrypted media

content and an access key used to decrypt that content, in response to an authenticated request,

satisfies this limitation.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 57-

61.  Specifically, Plaintiffs have alleged, for infringement purposes, that even when a DRM

license server—not the kiosk—provides the corresponding access key, the claim limitation is

satisfied.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 59 ("Apple's

FairPlay streaming DRM provides a corresponding access key to the media content.").

Therefore, under Plaintiffs' theory of infringement, any process that provides the encrypted

media content and an access key used to decrypt that media content to the end-user device after

verifying that the end-user device is trusted satisfies the limitation.

252.    Buttars discloses a kiosk that provides the "Content file" and "Content key" to the

end-user device following the authentication of the end-user device. *See* Buttars at [0025].

Specifically, Buttars explains that the media content and access key are provided in response to

successful authentication of the end-user device after the end-user device is provided to a kiosk.

*See* Buttars at [0025] ("If the Playback Device is verified as legitimate, then the security module

decrypts the Content file symmetric key using it's [sic] own private key; it then immediately

encrypts it using the Playback Device's public key. Thus, the only time the Content file's key is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

in a decrypted state is inside the hardware security module. The Content file and the newly encrypted Content key are loaded onto the Storage Device, in addition to the License Object data (which itself is also encrypted and digitally signed by the Kiosk, with a chain of trust from the head-end).").  This process occurs "in response to the authentication" because the "Content files are moved to Storage Devices *only after* verification of the devices . . ."  Buttars at [0032] (emphasis added).

253.    The '400 patent claims state that the kiosk provides an "encrypted first media content" and "corresponding access key" to the end-user device following the authentication process.  Even so, Buttars satisfies this claim limitation.

254.    Buttars discloses a single kiosk that stores and provides the "movie and key" together.  *See* Buttars at [0024] ("When a Content file is sent to a Kiosk for distribution to Storage Devices, the Content file's key is digitally signed by the head-end and encrypted using the public key of the kiosk, so that only the kiosk can decrypt and use the key. When the *kiosk receives the movie and key*, it simply *stores them* in encrypted form on it's [sic] storage media.") (emphases added).

255.    Buttars' provisioning of the media content and corresponding access key— whereby Buttars' kiosk provides the encrypted content file and a Content key (encrypted by a Playback Device public key) to the end-user device—thus satisfies the '400 patent's "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key" limitation.

**b)** **Claim 2 of the '400 Patent is anticipated and rendered obvious by Buttars.**

**(1)** **The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content.**

256.    As explained above, Buttars discloses a kiosk that "compris[es] a local data storage storing a plurality of encrypted media content."  Additionally, Buttars discloses embodiments of the invention where the content is stored locally on the kiosk's own storage media.  *See* Buttars at [0024] ("When a Content file is sent to a Kiosk for distribution to Storage Devices, the Content file's key is digitally signed by the head-end and encrypted using the public key of the kiosk, so that only the kiosk can decrypt and use the key. When the kiosk receives the movie and key, *it simply stores them in encrypted form on it's [sic] storage media*.") (emphasis added).  I understand that, for purposes of infringement, Plaintiffs have alleged that an "attached" data storage device—even if it is "external"—storing a plurality of encrypted media content systems satisfies this claim.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 69.  Therefore, under Plaintiffs' theory of infringement, Buttars satisfies this limitation.

**c)** **Claim 6 of the '400 Patent is anticipated and rendered obvious by Buttars.**

**(1)** **The kiosk of claim 1, wherein the second data interface is a network interface.**

257.    As explained above, Buttars discloses a kiosk "wherein the second data interface is a network interface." Specifically, Buttars' process of "examin[ing]" the "Playback Device key . . . for authenticity (the digital signature and the chain of trust are verified" discloses a network interface that satisfies this limitation. *See* Buttars at [0025] ("In this embodiment, when a customer rents or purchases a Content file, the encrypted file key is loaded into the Kiosk's hardware security module. Additionally, when the customer docks the Storage Device into the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Playback Device, the customer's Playback Device key is loaded into the security module on the Storage Device, and the Playback Device key is examined for authenticity (the digital signature and the chain of trust are verified) by the processor on-board the Storage Device. If the Playback Device is verified as legitimate, then the security module decrypts the Content file symmetric key using it's own private key; it then immediately encrypts it using the Playback Device's public key.").

258.    To the extent Buttars did not practice this claim, it would have been obvious to combine Buttars with the teachings of another reference such as Rae.  As explained above, Rae discloses a kiosk that "wherein the second data interface is a network interface."  *See* Rae at 2:59-62 ("A further embodiment of the invention includes a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system *via a network* . . ."); Rae at 4:4-7 ("In a still further additional embodiment, the kiosk configured to communicate with the storage device containing the symmetrically pre-encrypted content via a network connection."); Rae at 4:15-19 ("In yet another embodiment again, the kiosk is configured to obtain the public key for each playback device associated with the user account from a conditional access system via a network connection.").  I understand that, for purposes of infringement, Plaintiffs have alleged that any device involving "network access" includes "a network interface" and satisfies this claim.  *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 27, 71.  Therefore, under Plaintiffs' theory of infringement, Buttars combined with Rae thus satisfies the '400 patent's "authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" limitation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

> **d)** **Claim 8 of the '400 Patent is anticipated and rendered obvious by Buttars.**
>
> **(1)** **The kiosk of claim 1, wherein the kiosk is located in a public environment.**

259.    As explained above, Buttars discloses a "kiosk" located at the site of a "retailer." *See* Buttars at Figure 2. The "Retailer and Kiosks" are depicted in Figure 2 as shown below. Additionally, Buttars describes media content as being "highly available" through distribution kiosks. *See* Buttars at [0020].



Figure 2

260.    A retail location where a human user may interface with the kiosk is a "public environment." I understand that, for purposes of infringement, Plaintiffs have alleged that a kiosk located in an environment easily accessible to the public, such as a "commercial aircraft cabin," satisfies this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

claim. *See* Plaintiffs' March 22, 2024 Infringement Contentions, Exh. A, at 71. Therefore, under Plaintiffs' theory of infringement, Buttars satisfies this limitation.

> **e)** **Claim 9 of the '400 Patent is anticipated and rendered obvious by Buttars.**

> **(1)** **9[pre]. A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising:**

261. Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

> **(2)** **9[a]. establishing communications with a portable data storage device over a first data interface;**

262. Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

> **(3)** **9[b]. establishing communications with a remote trusted server via a second data interface over a network;**

263. Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

> **(4)** **9[c]. obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device:**

264. Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

> **(5)** **9[d]. authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

265. Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

      **(6)**    **9[e]. in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key.**

266.    Claim 9 of the '400 patent is invalid for all reasons described above regarding Claim 1 of the '400 patent.

      **f)**    **Claim 10 of the '400 Patent is anticipated and rendered obvious by Buttars.**

      **(1)**    **The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content.**

267.    Claim 10 of the '400 patent is invalid for all reasons described above regarding Claim 2 of the '400 patent.

      **g)**    **Claim 13 of the '400 Patent is anticipated and rendered obvious by Buttars.**

      **(1)**    **The method of claim 9, wherein the second data interface is a network interface.**

268.    Claim 13 of the '400 patent is invalid for all reasons described above regarding Claim 6 of the '400 patent.

      **h)**    **Claim 17 of the '400 Patent is anticipated and rendered obvious by Buttars.**

      **(1)**    **The method of claim 9, wherein the kiosk is located in a public environment.**

269.    Claim 17 of the '400 patent is invalid for all reasons described above regarding Claim 8 of the '400 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

B.    **The '667 Patent**

1.    **U.S. Patent Pub. No. 2003/0001978 ("Smith")**

a)    **Claim 1 of the '667 Patent is anticipated and rendered obvious by Smith.**

(1)    **1[pre]. A media streaming system comprising:**

270.    Smith discloses "[m]ethods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed are provided. Example embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of streamed digital content. The EDC creates or identifies a secure storage location and stores the data stream in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques. The EDC also optionally supports various requirements for complying with the usage limitations typically associated with DRM data content. In one embodiment, the enhanced display controller is a modified set-top display (device) driver that includes a VBI decoder, mechanisms (e.g., code) for securely storing and retrieving digital content, a display obfuscation/encryption mechanism, and a secure data repository. Methods and systems for displaying dynamic, floating graphics using an EDC are also provided. These graphics may be used to as interfaces to invoke the secure storage and playback mechanisms of the EDC and to navigate through display spaces presented on the television display." Smith at Abstract.

271.    It explains that "[t]he present invention relates to methods and systems for enhancing display functionality in a television set-top box environment and in particular, to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

methods and systems for the secure storage and display of digital data content, and the creation and display of dynamic floating navigational graphics." Smith at [0002].

272.    Figure 2B of Smith shows this process. It is "an example block diagram of dataflow in an example enhanced display controller. In typical operation, the device driver 230 decodes instructions from the input source (digital) content streams 235 coming through input sources 204, such as using VBI decoder 231 and DRM service 233, and determines whether (and what kind of) secure storage is needed. The device driver 230 then assigns, using the storage allocation and retrieval facility 232, a secure storage area (for example, secure buffer 214 in storage repository 205) to the stream and stores the data in the assigned area. When replaying the stream, the device driver 230 determines the secure storage that corresponds to the requested data and retrieves the digital content streaming it to the display 206. When obfuscation and/or encryption techniques are employed, the device driver 230 uses the display encryption and obfuscation service 234 and retrieves and applies as necessary authentication keys that are stored in a secure repository (known only to the driver 230)":



*Fig. 2B*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Smith at [0030], Fig. 2B.

> **(2)    1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and**

273.    Smith discloses that "[e]mbodiments of the present invention provide computer-based methods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed. Television set-top boxes are manufactured with hardware and/or software that provide a variety of functionality, including for example, PVR capabilities that allow a user to store and later replay digital data as it is being transmitted to a television display. FIG. 1 is a block diagram of a typical set-top box environment used as a PVR with techniques of the present invention. Set-top box 101 receives input from one or more (heterogeneous or homogeneous) input sources 110, such as analog broadcast data 110A, digital data via (wireless) satellite 110B, or digital data via (wired) cable 110C, and displays such data on television display 120. The data may include a broadcast program 120A and other data, such as dynamic floating graphics (DFG) 120B, as will be discussed further below." Smith at [0026]. Figure 1 shows this system:



*Fig. 1*

102

Smith at Fig. 1.

274.    Smith also explains that "[e]xample embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local, remote, or networked storage device and stores the data stream in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques, such as those described in co-owned U.S. Patent Application No._____, entitled 'Method and System for Maintaining Secure Data Input and Output,' filed on Jun. 10, 2002. The EDC also optionally supports various requirements for complying with the usage terms and conditions typically associated with DRM data content. Thus, unauthorized access is minimized because the EDC controls all aspects of storing the data securely, including any de-obfuscation or compliance processing, thus minimizing any transfer of data to other processes/code. In one embodiment, the enhanced display controller is a modified set-top box display (device) driver that includes a VBI decoder, mechanisms (e.g., code) for securely storing and retrieving digital content, a display obfuscation/encryption mechanism, and a secure data repository. Although discussed primarily with respect to software, one skilled in the art will recognize that embodiments of the EDC may be equivalently implemented as hardware or software."  Smith at [0028].

275.    Similarly, Smith states that, "[a]lthough PVR capability is commonly implemented in set-top box form, PVRs can also be implemented in a computing system that enables the display of digital broadcast content on a TV screen, such as in conjunction with a personal computer. Examples of these PVRs include advanced TV-tuner cards that are placed in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

such computers (e.g., ATI All-in-Wonder Radeon graphics card) and software-based solutions (e.g., Intervideo's WinDVR) which work with existing TV-tuner cards to give a PC PVR features."  Smith at [0006].  Because of this, "[e]mbodiments of the present invention provide computer-based methods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed. Example embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box or PVR, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local or networked storage device and stores the data content in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data content using standard (or proprietary) encryption techniques, and/or obfuscation techniques."  *Id.* at [0008].

> **(3)    1[b] one or more hardware processors configured to:**

276.    Smith disclosed each of the following steps, as discussed below.  Smith therefore disclosed at least one hardware processor configured to do so.

> **(4)    1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

277.    Smith discloses that "[e]mbodiments of the present invention provide computer-based methods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed. Example embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box or PVR, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

location on a local or networked storage device and stores the data content in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data content using standard (or proprietary) encryption techniques, and/or obfuscation techniques." Smith at [0008]. For example, "[i]n one embodiment, a secure storage location is created from storage known only to the EDC. In one such embodiment, this storage is on a local storage device; in another embodiment this storage is on a remote storage device. In yet another embodiment, the storage is located over a network." *Id.* at [0009].

278. Smith also discloses that "[e]xample embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local, remote, or networked storage device and stores the data stream in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques, such as those described in co-owned U.S. Patent Application No._____ , entitled 'Method and System for Maintaining Secure Data Input and Output,' filed on Jun. 10, 2002. The EDC also optionally supports various requirements for complying with the usage terms and conditions typically associated with DRM data content. Thus, unauthorized access is minimized because the EDC controls all aspects of storing the data securely, including any de-obfuscation or compliance processing, thus minimizing any transfer of data to other processes/code. In one embodiment, the enhanced display controller is a modified set-top box display (device) driver that includes a VBI decoder, mechanisms (e.g., code) for securely storing and retrieving digital content, a display obfuscation/encryption mechanism, and a secure data repository. Although discussed primarily

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

with respect to software, one skilled in the art will recognize that embodiments of the EDC may be equivalently implemented as hardware or software." Smith at [0028].

279.    Figure 2A illustrates this process; it shows "an example block diagram of a set-top box environment that contains an enhanced display controller that uses the enhanced security techniques of the present invention. In FIG. 2A, the enhanced display controller is shown as a device driver 230 executing the memory 203 in set-top box 201. The device driver 230 interacts with a persistent storage device 205 (for example, flash memory) through a storage device hardware interface 240, to store the digital content and to retrieve such content for display. The device driver 230 interacts with the television display 206 through a display hardware interface 240. The device driver 230 uses secure storage locations and secure display areas that are known only to the device driver when storing and displaying the data":



*Fig. 2A*

Smith at [0029], Fig. 2A.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

280. Figure 2B shows a similar system; it shows "an example block diagram of dataflow in an example enhanced display controller. In typical operation, the device driver 230 decodes instructions from the input source (digital) content streams 235 coming through input sources 204, such as using VBI decoder 231 and DRM service 233, and determines whether (and what kind of) secure storage is needed. The device driver 230 then assigns, using the storage allocation and retrieval facility 232, a secure storage area (for example, secure buffer 214 in storage repository 205) to the stream and stores the data in the assigned area. When replaying the stream, the device driver 230 determines the secure storage that corresponds to the requested data and retrieves the digital content streaming it to the display 206. When obfuscation and/or encryption techniques are employed, the device driver 230 uses the display encryption and obfuscation service 234 and retrieves and applies as necessary authentication keys that are stored in a secure repository (known only to the driver 230)."  Smith at [0030].

      **(5)**      **1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

281. Smith discloses that "[e]mbodiments of the present invention provide computer-based methods and systems for enhancing the storage and display of video data and other digital content in a set-top box or other television environment so that such data is securely stored and displayed. Example embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box or PVR, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local or networked storage device and stores the data content in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data content using standard (or proprietary) encryption techniques, and/or obfuscation techniques."  Smith at [0008].  For example, "[i]n one embodiment, a secure storage

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

location is created from storage known only to the EDC. In one such embodiment, this storage is on a local storage device; in another embodiment this storage is on a remote storage device. In yet another embodiment, the storage is located over a network." *Id.* at [0009].

282. Smith also discloses that "[e]xample embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local, remote, or networked storage device and stores the data stream in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques, such as those described in co-owned U.S. Patent Application No._____ , entitled 'Method and System for Maintaining Secure Data Input and Output,' filed on Jun. 10, 2002. The EDC also optionally supports various requirements for complying with the usage terms and conditions typically associated with DRM data content. Thus, unauthorized access is minimized because the EDC controls all aspects of storing the data securely, including any de-obfuscation or compliance processing, thus minimizing any transfer of data to other processes/code. In one embodiment, the enhanced display controller is a modified set-top box display (device) driver that includes a VBI decoder, mechanisms (e.g., code) for securely storing and retrieving digital content, a display obfuscation/encryption mechanism, and a secure data repository. Although discussed primarily with respect to software, one skilled in the art will recognize that embodiments of the EDC may be equivalently implemented as hardware or software."  Smith at [0028].

283. Figure 2A illustrates this process; it shows "an example block diagram of a set-top box environment that contains an enhanced display controller that uses the enhanced security

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

techniques of the present invention. In FIG. 2A, the enhanced display controller is shown as a device driver 230 executing the memory 203 in set-top box 201. The device driver 230 interacts with a persistent storage device 205 (for example, flash memory) through a storage device hardware interface 240, to store the digital content and to retrieve such content for display. The device driver 230 interacts with the television display 206 through a display hardware interface 240. The device driver 230 uses secure storage locations and secure display areas that are known only to the device driver when storing and displaying the data":



*Fig. 2A*

Smith at [0029], Fig. 2A.

284.    Figure 2B shows a similar system; it shows "an example block diagram of dataflow in an example enhanced display controller. In typical operation, the device driver 230 decodes instructions from the input source (digital) content streams 235 coming through input sources 204, such as using VBI decoder 231 and DRM service 233, and determines whether (and what kind of) secure storage is needed. The device driver 230 then assigns, using the storage

allocation and retrieval facility 232, a secure storage area (for example, secure buffer 214 in storage repository 205) to the stream and stores the data in the assigned area. When replaying the stream, the device driver 230 determines the secure storage that corresponds to the requested data and retrieves the digital content streaming it to the display 206. When obfuscation and/or encryption techniques are employed, the device driver 230 uses the display encryption and obfuscation service 234 and retrieves and applies as necessary authentication keys that are stored in a secure repository (known only to the driver 230)."  Smith at [0030].

### (6)    1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.

285.    Smith discloses that, "[i]n an example embodiment of the present invention, the VBI is used to set secure storage flags at the network or head-end of the video stream, which can be decoded and recognized by the VBI decoding mechanism of the EDC to recognize a request for secure storage and, optionally, parameters associated with that request. FIG. 4 is an example block diagram of a video stream containing vertical blanking intervals used for security and DRM flags. Frames 402 of the data stream 401 are separated by an interval of time (VBIs) 403. Each VBI 403 may contain one or more flags such as secure storage flag 404."  Smith at [0033].

286.    For example, Fig. 3 shows "a secure storage routine of an example enhanced display controller. In step 301, the controller (EDC) determines whether the input source coming in requires or is requesting secure digital storage. One mechanism for requesting secure storage or levels of security is through the use of flags embedded in the digital content stream itself. For example, in current set-top box systems, digital content streams, such as video streams, typically include a vertical blanking interval (VBI) between each frame of data in the stream. The VBI was originally designed to overcome technical limitations in television display hardware that existed at the time. Specifically, the blanking interval was typically used to 'sync' up a program

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that wasn't displaying properly on a particular television display. Such limitations have been since overcome with advances in digital TV technology, but the VBI standard has remained. Thus, blank intervals still exist in streamed television content and can by used by the network or head-end of a digital content stream to encode additional data to be recognized by hardware or software at the receiving end of the video stream. Existing examples of such use of data encoded within the VBI include the transmission of closed-captioning data and secondary audio program (SAP) data, such as an alternate 'soundtrack' for a movie in a secondary language." Smith at [0032]. "In step 302, when the controller recognizes that the input source has designated secure storage, then in step 303 the EDC to determines and assigns a secure space, otherwise continues its normal stream buffering strategy (without secure storage). The secure space may be newly created or may be assigned from an already used pool of spaces, depending upon the storage allocation technique used. In step 304, the EDC associates the storage with the digital content stream for later retrieval. In step 305, if the instructions have indicated that an authentication key is to be used, then an appropriate authentication key is retrieved and associated with the secure storage. Depending on the flag being recognized (or, upon the receipt of specific other instructions that indicate the location of the authentication key), the key may be dynamically created, retrieved from local storage, or retrieved from an appropriate remote server. In step 306, an identifier for the digital content stream is generated or retrieved. Preferably, the name of the content is decoded from the VBI (Line 21 Field 2 EDS/XDS, or from other VBI lines determined by the head-end and the application on the display device). The identifier, the location of the secure storage space, and the authentication key may be stored external to the secure space that is associated with the content stream, and in a location known only to the display driver. Such external storage further enhances the ability for the data to be maintained securely. In step 307,

the EDC writes the digital content stream to the secure storage space using the determined

authentication key to encrypt or otherwise obfuscate the video stream, and then returns." *Id.* at

[0034].

287.    Fig. 2B also shows the "dataflow in an example enhanced display controller. In

typical operation, the device driver 230 decodes instructions from the input source (digital)

content streams 235 coming through input sources 204, such as using VBI decoder 231 and

DRM service 233, and determines whether (and what kind of) secure storage is needed. The

device driver 230 then assigns, using the storage allocation and retrieval facility 232, a secure

storage area (for example, secure buffer 214 in storage repository 205) to the stream and stores

the data in the assigned area. When replaying the stream, the device driver 230 determines the

secure storage that corresponds to the requested data and retrieves the digital content streaming it

to the display 206. When obfuscation and/or encryption techniques are employed, the device

driver 230 uses the display encryption and obfuscation service 234 and retrieves and applies as

necessary authentication keys that are stored in a secure repository (known only to the driver

230)."  Smith at [0030].

> **b)** **Claim 2 of the '667 Patent is anticipated and rendered obvious by Smith.**
>
> > **(1)** **2. The media streaming system of claim 1, wherein the separate display device comprises a smart television.**

288.    Smith discloses that "[s]et-top boxes, as commonly used with television systems

(TVs), are electronic devices that provide a means for decoding and tuning digital (broadcast)

signals and formatting them for display on conventional television screens. As used today, set-

top boxes often provide support for both digital and analog broadcasts, as digital television has

not yet completely replaced analog broadcasting. Digital broadcasting has enabled more

sophisticated record and playback mechanisms above and beyond traditional approaches that use

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

videocassette recorders (VCRs) to record TV shows on video tapes for delayed or archived playback. In particular, a television set-top box may be manufactured as a Personal Video Recorder (PVR) (example companies include TIVO and Replay TV), which allows a user to store (record) and later replay (playback) digital broadcast data as it is being transmitted to a television display. PVRs are also referred to by other terms such as digital video recorders or smart TV." Smith at [0004].

> c)   **Claim 3 of the '667 Patent is anticipated and rendered obvious by Smith.**
>
> (1)   **3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.**

289.   To the extent Smith did not practice this claim, it would have been obvious to combine it with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan"). McDysan describes a system that "provide[s] under-the-bottom time-shifted delivery of video content" that "download[s] and store[s] non-real time video content … at a customer premise." McDysan at [0012]. Specifically, McDysan disclosed a method for "enabl[ing] the scheduling and coordinating of under-the-bottom time-shifted distribution of non-real time video content (e.g., OTT video content, pre-recorded video content, previous episodes, media-oriented advertisements, etc.) during idle time periods of network 100 (e.g., at night, during low traffic, etc.)." *Id.* at [0020]. This allowed the video content to be delivered "when network 100 is not experiencing congestion." *Id.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

    **d)**    **Claim 4 of the '667 Patent is anticipated and rendered obvious by Smith.**

    **(1)**    **4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

290.    Smith discloses that "[e]xample embodiments provide an enhanced display controller (EDC) that executes in an electronic device, such as a set-top box, to provide secure storage and playback of digital content, such as streamed video data. The EDC creates or identifies a secure storage location on a local, remote, or networked storage device and stores the data stream in that secure location in a secure manner, thereby minimizing unauthorized access. In addition, the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques, such as those described in co-owned U.S. Patent Application No._____ , entitled 'Method and System for Maintaining Secure Data Input and Output,' filed on Jun. 10, 2002. The EDC also optionally supports various requirements for complying with the usage terms and conditions typically associated with DRM data content. Thus, unauthorized access is minimized because the EDC controls all aspects of storing the data securely, including any de-obfuscation or compliance processing, thus minimizing any transfer of data to other processes/code. In one embodiment, the enhanced display controller is a modified set-top box display (device) driver that includes a VBI decoder, mechanisms (e.g., code) for securely storing and retrieving digital content, a display obfuscation/encryption mechanism, and a secure data repository. Although discussed primarily with respect to software, one skilled in the art will recognize that embodiments of the EDC may be equivalently implemented as hardware or software."  Smith at [0028].

291.    Figure 2B illustrates this; it shows "an example block diagram of dataflow in an example enhanced display controller. In typical operation, the device driver 230 decodes

instructions from the input source (digital) content streams 235 coming through input sources 204, such as using VBI decoder 231 and DRM service 233, and determines whether (and what kind of) secure storage is needed. The device driver 230 then assigns, using the storage allocation and retrieval facility 232, a secure storage area (for example, secure buffer 214 in storage repository 205) to the stream and stores the data in the assigned area. When replaying the stream, the device driver 230 determines the secure storage that corresponds to the requested data and retrieves the digital content streaming it to the display 206. When obfuscation and/or encryption techniques are employed, the device driver 230 uses the display encryption and obfuscation service 234 and retrieves and applies as necessary authentication keys that are stored in a secure repository (known only to the driver 230)":



*Fig. 2B*

Smith at [0030]; Fig. 2B.

**e)** **Claim 5 of the '667 Patent is anticipated and rendered obvious by Smith.**

**(1)** **5. The media streaming system of claim 1, wherein the one or more processors are further configured to: cause the NAS device to use encryption that secures the digital content to the secure region.**

292.     Smith discloses that "the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques." Smith at [0028].

**f)** **Claim 6 of the '667 Patent is anticipated and rendered obvious by Smith.**

**(1)** **6. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region.**

293.     Smith discloses that "the VBI is used to set secure storage flags at the network or head-end of the video stream, which can be decoded and recognized by the VBI decoding mechanism of the EDC to recognize a request for secure storage and, optionally, parameters associated with that request. FIG. 4 is an example block diagram of a video stream containing vertical blanking intervals used for security and DRM flags. Frames 402 of the data stream 401 are separated by an interval of time (VBIs) 403. Each VBI 403 may contain one or more flags such as secure storage flag 404." Smith at [0033]. Additionally, Smith discloses that "the playback application (or other playback mechanism) notifies the EDC driver (or the EDC driver detects) when the content playback time or usage count limit has been reached. Upon receipt of an indication that this limit has been reached, the controller calls a delete function to delete the content from the secure storage location. Alternatively, the playback application (or the EDC playback routine) may request a renewal or extension of time or of usage count limits, providing a renewal procedure has been specified and is available (see, for example, steps 606-

608 in FIG. 6). This renewal may be accomplished for example, by obtaining input from the user or by contacting the head-end automatically, if an automatic process is defined. To achieve such functionality, as indicated during secure storage (FIG. 6), an additional flag may be included with the transmission of the digital content stream from the head-end to indicate the ability to request a renewal or extension of the time or of usage count limits. This indication is received and stored by the EDC, and the EDC indicates to the playback application that a renewal or extension request may be sent to the head-end when the indicated timer or usage count limit is reached. In addition, a user may submit a self-initiated request for renewal or extension to the playback application. The new playback time allotted in response to the request for renewal may be the same as the originally allotted time, or a new value may be sent from the head-end, decoded by the EDC playback or storage routine, and stored in a location accessible to the mechanism for playback. Variations of these techniques may also be applied to the secure storage techniques described with reference to FIG. 6, if the EDC does not attempt renewal automatically."  Smith at [0042].

> **g)**     **Claim 7 of the '667 Patent is anticipated and rendered obvious by Smith.**
>
> **(1)**     **7. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an encryption type used in the secure region.**

294.    Smith discloses that "the EDC supports the secure display of the data stream using standard (or proprietary) encryption techniques, and/or obfuscation techniques."  Smith at [0028].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

       **h)**    **Claim 11 of the '667 Patent is anticipated and rendered obvious by Smith.**

       **(1)**    **11[pre]. A method of transmitting media content from a media streaming system, the method comprising:**

295.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

       **(2)**    **11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);**

296.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

       **(3)**    **11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

297.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

       **(4)**    **11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and**

298.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

       **(5)**    **11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.**

299.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

        **i)**    **Claim 12 of the '667 Patent is anticipated and rendered obvious by Smith.**

              **(1)**    **12. The method of claim 11, wherein transmitting the media content to the secure region comprises: time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.**

300.    Claim 12 of the '667 patent is invalid for all reasons described above regarding Claim 3 of the '667 patent.

        **j)**    **Claim 13 of the '667 Patent is anticipated and rendered obvious by Smith.**

              **(1)**    **13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

301.    Claim 13 of the '667 patent is invalid for all reasons described above regarding Claim 4 of the '667 patent.

        **k)**    **Claim 14 of the '667 Patent is anticipated and rendered obvious by Smith.**

              **(1)**    **14. The method of claim 11 further comprising: causing the NAS device to use encryption that secures the media content to the secure region.**

302.    Claim 14 of the '667 patent is invalid for all reasons described above regarding Claim 5 of the '667 patent.

        **l)**    **Claim 15 of the '667 Patent is anticipated and rendered obvious by Smith.**

              **(1)**    **15. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an amount of data stored in the secure region.**

303.    Claim 15 of the '667 patent is invalid for all reasons described above regarding Claim 6 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

    **m)**    **Claim 16 of the '667 Patent is anticipated and rendered obvious by Smith.**

        **(1)**    **16. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an encryption type used in the secure region.**

304.    Claim 17 of the '667 patent is invalid for all reasons described above regarding Claim 7 of the '667 patent.

    **2.**    **U.S. Patent Pub. No. 2010/0325675 ("Smoyer")**

    **a)**    **Claim 1 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

        **(1)**    **1[pre]. A media streaming system comprising:**

305.    Smoyer discloses "[a] system and method for utilizing a secured service provider memory are disclosed. An electronic device is associated with a subscriber and is in communication with a data distribution network configured to deliver data by a service provider to the subscriber. The data distribution network comprises a server in communication with the data distribution network and the server configured to deliver a stream of data over the data distribution network. The electronic device comprises a first memory communicatively connected to the server. The first memory is configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is configured to receive and store data from the server, though the second memory is accessible only by the service provider." Smoyer at Abstract.

306.    As Smoyer explains, "[w]ith the development of Internet protocol television (IPTV), communication companies are establishing networks for subscribers to watch video content. Generally, IPTV describes a system where a digital television service is delivered using Internet protocol (IP) over a network. The network used for IPTV may include the public Internet or a private IP network controlled by an IPTV service provider via a broadband

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

connection known as digital subscriber lines (DSL), where the digital subscriber lines typically include conventional telephone lines with copper wire into households. Alternatively, the digital subscriber line may be fiber to the premises (FTTP). Telecommunication service provider companies that have begun offering DSL have limited bandwidth resources, particularly when delivering video over existing copper wire infrastructures." Smoyer at [0002].  Therefore, Smoyer "provides an improved system and method for storing data content from a service provider to an electronic device associated with a network subscriber." *Id.* at [0010].

307.    Smoyer shows this system in Fig. 4:



Smoyer at Fig. 4.

> **(2)    1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and**

308.    Smoyer discloses that, "[w]ith the development of Internet protocol television (IPTV), communication companies are establishing networks for subscribers to watch video content. Generally, IPTV describes a system where a digital television service is delivered using

Internet protocol (IP) over a network. The network used for IPTV may include the public

Internet or a private IP network controlled by an IPTV service provider via a broadband

connection known as digital subscriber lines (DSL), where the digital subscriber lines typically

include conventional telephone lines with copper wire into households. Alternatively, the digital

subscriber line may be fiber to the premises (FTTP). Telecommunication service provider

companies that have begun offering DSL have limited bandwidth resources, particularly when

delivering video over existing copper wire infrastructures."  Smoyer at [0002].

309.    Smoyer illustrates the existing prior art systems in Fig. 1, which is "an illustration

of a conventional system 100 that is configured to deliver VOD. As shown, a provider 102 is

communicatively connected to a head-end server 106. Server 106 is used to store video content

delivered to it from service provider 102. The server 106 is also capable of delivering video

content 104 over a network 108, such as the internet or public/private packet switched network

(PSN), for example. As shown, server 106 is configured to transmit video content in the form of

data packets 104. The server 106 delivers the video content 104 via the network 108 to a DSL

access multiplexer (DSLAM) 110. The DSLAM 110 operates to connect subscribers to the

network 108, host video streams/Internet group management protocol (IGMP), and provide

Ethernet transport of the video content. The DSLAM 110 further operates as a multiplexer to

distribute the video content 104 through communication lines 112 a-112 n to set top boxes (STB)

114 a-114 n (collectively 114). Additionally, the DSLAM 110 may also communicate VOD

requests from a particular STB 114 to the server 106 via network 108":

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Fig. 1
(Prior Art)

Smoyer at [0003]; Fig. 1.

310.    Smoyer explains that, unlike the prior art systems, "[t]he principles of the present disclosure provide a system and method for pushing a variety of video, audio and/or data files onto the service provider reserved memory of an electronic device associated with a network subscriber. The disclosed system and method allows a service provider to push data to the 'edge' of an IP network, where the data can then be accessed by the subscriber. The disclosed system and method reduces valuable core network peak bandwidth and processing resources by increasing the amount of information locally available to the subscriber. Additionally, the local pushed data is readily available to the subscriber for fast and reliable access."  Smoyer at [0011].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

For example, "[t]he processing unit 602 may be in communication with a memory 606. The memory 606 may be a random access memory, flash memory, or any other memory type. The processing unit 602 may also be in communication with an input/output (I/O) unit 608 that is configured to communicate with a television or other electronic display, remote control, network, or other devices, such as a DVD, DVR, or any other local or network located device. The processing unit 602 may additionally be in communication with a storage unit 610 that is configured to store data files in data repositories 612 a-612 n (collectively 612)." *Id.* at [0034].

### (3)   1[b] one or more hardware processors configured to:

311.   Smoyer disclosed each of the following steps, as discussed below.  Smoyer therefore disclosed at least one hardware processor configured to do so.

### (4)   1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

312.   Smoyer disclosed that "[t]he principles of the present disclosure provide a system and method for pushing a variety of video, audio and/or data files onto the service provider reserved memory of an electronic device associated with a network subscriber. The disclosed system and method allows a service provider to push data to the 'edge' of an IP network, where the data can then be accessed by the subscriber. The disclosed system and method reduces valuable core network peak bandwidth and processing resources by increasing the amount of information locally available to the subscriber. Additionally, the local pushed data is readily available to the subscriber for fast and reliable access."  Smoyer at [0011].  This system utilized "an electronic device [that] is associated with a subscriber and is in communication with a data distribution network configured to deliver data by a service provider to the subscriber. The data distribution network comprises a server in communication with the data distribution network and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the server configured to deliver a stream of data over the data distribution network. The electronic device comprises a first memory communicatively connected to the server. The first memory is configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is configured to receive and store data from the server, though the second memory is accessible only by the service provider." *Id.* at [0012].

313.    Fig. 4 illustrates this device; it depicts "the disclosed system and network locally available to the subscriber. Subscriber electronic device 400 is generally illustrated by the dashed line and comprises both subscriber accessible memory 402 and service provider reserved memory 404. As illustrated, subscriber accessible memory 402 and service provider reserved memory 404 may be portioned areas of a common memory. In another embodiment, subscriber accessible memory 402 is separate and distinct from service provider reserved memory 404. Alternatively, service provider reserved memory 404 is a section of memory addresses reserved for the service provider. In some embodiments, memories 402 and 404 are non-volatile memory components of electronic device 400, such as, but not limited to, a hard disk drive, RAM, or ROM. Non-volatile memories retain stored memory when power is lost. In one embodiment, memories 402 and 404 are configured to store media content files and other forms of information, such as software patches. Media content files may comprise one or more media files, such as, but not limited to, a video and/or audio file. In one embodiment, subscriber accessible memory 402 is communicatively connected with service provider reserved memory 404. In one embodiment, electronic device 400 is a STB":

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Fig. 4

Smoyer at [0027]; Fig. 4.

> **(5)    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

314.    Smoyer discloses that "the device 300 includes a processing unit 302, which may be formed of one or more processors, that executes software 304. The software 304, depending upon the system functionality, may be configured to store and (i) manage information, such as video content and/or (ii) manage interaction with an end-user to download video programming and images for display on a television or other electronic display." Smoyer at [0007]. Smoyer's system allows for "pushing a variety of video, audio and/or data files onto the service provider reserved memory of an electronic device associated with a network subscriber. The disclosed system and method allows a service provider to push data to the 'edge' of an IP network, where the data can then be accessed by the subscriber. The disclosed system and method reduces valuable core network peak bandwidth and processing resources by increasing the amount of information locally available to the subscriber. Additionally, the local pushed data is readily available to the subscriber for fast and reliable access." *Id.* at [0011].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

315.     Smoyer's data "may include, but is not limited to, video content, music content, software data, software patches, picture content, etc. In one embodiment, system device 600 is a STB. In another embodiment, system device 600 is a DVR. As shown, the device 600 includes a processing unit 602, which may be formed of one or more processors, that executes software 604. The software, depending upon the system functionality, may be configured to store and (i) manage information, such as video content, (ii) manage routing of video streams, (iii) locate and store existing video streams and/or (iv) manage interaction with an end-user to download video programming and images for display on a television or other electronic display. Software 604 may also include a memory space management component." Smoyer at [0032]. "In one embodiment, the service provider has complete control over the management of the service provider reserved memory 404. Accordingly, the service provider alone is able to push files, delete files and make any necessary changes to service provider memory 404. Because the subscriber has no control over service provider memory 404 and cannot add any information onto it, the service provider is guaranteed a certain amount of memory is available on STB 400 to the service provider. In some embodiments, the subscriber is not even aware of the existence of service provider memory 404." *Id.* at [0029].

> **(6)     1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.**

316.     Smoyer disclosed that "[t]he principles of the present disclosure provide a system and method for pushing a variety of video, audio and/or data files onto the service provider reserved memory of an electronic device associated with a network subscriber. The disclosed system and method allows a service provider to push data to the 'edge' of an IP network, where the data can then be accessed by the subscriber. The disclosed system and method reduces valuable core network peak bandwidth and processing resources by increasing the amount of

127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

information locally available to the subscriber. Additionally, the local pushed data is readily available to the subscriber for fast and reliable access." Smoyer at [0011]. This system utilized "an electronic device [that] is associated with a subscriber and is in communication with a data distribution network configured to deliver data by a service provider to the subscriber. The data distribution network comprises a server in communication with the data distribution network and the server configured to deliver a stream of data over the data distribution network. The electronic device comprises a first memory communicatively connected to the server. The first memory is configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is configured to receive and store data from the server, though the second memory is accessible only by the service provider." *Id.* at [0012].

317.    Fig. 4 illustrates this device; it depicts "the disclosed system and network locally available to the subscriber. Subscriber electronic device 400 is generally illustrated by the dashed line and comprises both subscriber accessible memory 402 and service provider reserved memory 404. As illustrated, subscriber accessible memory 402 and service provider reserved memory 404 may be portioned areas of a common memory. In another embodiment, subscriber accessible memory 402 is separate and distinct from service provider reserved memory 404. Alternatively, service provider reserved memory 404 is a section of memory addresses reserved for the service provider. In some embodiments, memories 402 and 404 are non-volatile memory components of electronic device 400, such as, but not limited to, a hard disk drive, RAM, or ROM. Non-volatile memories retain stored memory when power is lost. In one embodiment, memories 402 and 404 are configured to store media content files and other forms of information, such as software patches. Media content files may comprise one or more media

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

files, such as, but not limited to, a video and/or audio file. In one embodiment, subscriber

accessible memory 402 is communicatively connected with service provider reserved memory

404. In one embodiment, electronic device 400 is a STB":



*Fig. 4*

318.    Smoyer at [0027]; Fig. 4.

> **b)    Claim 2 of the '667 Patent is anticipated and rendered obvious by Smoyer.**
>
> > **(1)    2. The media streaming system of claim 1, wherein the separate display device comprises a smart television.**

319.    Smoyer discloses that "the device 300 includes a processing unit 302, which may

be formed of one or more processors, that executes software 304. The software 304, depending

upon the system functionality, may be configured to store and (i) manage information, such as

video content and/or (ii) manage interaction with an end-user to download video programming

and images for display on a television or other electronic display." Smoyer at [0007].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

    c)    **Claim 3 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

    (1)    **3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.**

320.    To the extent Smoyer did not disclose this claim, it would have been obvious to combine it with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan"). McDysan describes a system that "provide[s] under-the-bottom time-shifted delivery of video content" that "download[s] and store[s] non-real time video content … at a customer premise." McDysan at [0012]. Specifically, McDysan disclosed a method for "enabl[ing] the scheduling and coordinating of under-the-bottom time-shifted distribution of non-real time video content (e.g., OTT video content, pre-recorded video content, previous episodes, media-oriented advertisements, etc.) during idle time periods of network 100 (e.g., at night, during low traffic, etc.)." *Id.* at [0020]. This allowed the video content to be delivered "when network 100 is not experiencing congestion." *Id.*

    d)    **Claim 4 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

    (1)    **4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

321.    Smoyer discloses that [s]ubscriber electronic device 400 is generally illustrated by the dashed line and comprises both subscriber accessible memory 402 and service provider reserved memory 404. As illustrated, subscriber accessible memory 402 and service provider reserved memory 404 may be portioned areas of a common memory. In another embodiment, subscriber accessible memory 402 is separate and distinct from service provider reserved memory 404. Alternatively, service provider reserved memory 404 is a section of memory

addresses reserved for the service provider. In some embodiments, memories 402 and 404 are

non-volatile memory components of electronic device 400, such as, but not limited to, a hard

disk drive, RAM, or ROM. Non-volatile memories retain stored memory when power is lost. In

one embodiment, memories 402 and 404 are configured to store media content files and other

forms of information, such as software patches. Media content files may comprise one or more

media files, such as, but not limited to, a video and/or audio file. In one embodiment, subscriber

accessible memory 402 is communicatively connected with service provider reserved memory

404. In one embodiment, electronic device 400 is a STB":



*Fig. 4*

Smoyer at [0027]; Fig. 4.

322.    Similarly, Smoyer explains that, "[i]n one embodiment, the service provider has

complete control over the management of the service provider reserved memory 404.

Accordingly, the service provider alone is able to push files, delete files and make any necessary

changes to service provider memory 404. Because the subscriber has no control over service

provider memory 404 and cannot add any information onto it, the service provider is guaranteed

a certain amount of memory is available on STB 400 to the service provider. In some

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

embodiments, the subscriber is not even aware of the existence of service provider memory 404." Smoyer at [0029]. For example, "server 706 is configured to stream video content to STBs 714 associated with network 708. Upon receipt of the list of additional subscribers, server 706 may be configured to both deliver the video content to (1) the initial requester of the video and (2) the additional subscribers indicated by database 707 as being likely interested. In one embodiment, server 706 may 'push' the particular video content to the service provider specific memory of the STBs associated with potentially interested subscribers. As used herein, the term 'push' means that the data will be stored either on the service provider reserved memory space of the STB or on any other memory device dedicated to the service provider. In one embodiment, the subscriber does not have access to the pushed data or video content." *Id.* at [0040].

> e) **Claim 5 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

> (1) **5. The media streaming system of claim 1, wherein the one or more processors are further configured to: cause the NAS device to use encryption that secures the digital content to the secure region.**

323. Smoyer discloses that, "[i]n one aspect of the present disclosure, an electronic device is associated with a subscriber and is in communication with a data distribution network configured to deliver data by a service provider to the subscriber. The data distribution network comprises a server in communication with the data distribution network and the server configured to deliver a stream of data over the data distribution network. The electronic device comprises a first memory communicatively connected to the server. The first memory is configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is configured to receive and store data from the server, though the second memory is accessible only by the service provider." Smoyer at [0012].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

f)    **Claim 6 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

(1)    **6. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region.**

324.    Smoyer discloses that [s]ubscriber electronic device 400 is generally illustrated by the dashed line and comprises both subscriber accessible memory 402 and service provider reserved memory 404. As illustrated, subscriber accessible memory 402 and service provider reserved memory 404 may be portioned areas of a common memory. In another embodiment, subscriber accessible memory 402 is separate and distinct from service provider reserved memory 404. Alternatively, service provider reserved memory 404 is a section of memory addresses reserved for the service provider. In some embodiments, memories 402 and 404 are non-volatile memory components of electronic device 400, such as, but not limited to, a hard disk drive, RAM, or ROM. Non-volatile memories retain stored memory when power is lost. In one embodiment, memories 402 and 404 are configured to store media content files and other forms of information, such as software patches. Media content files may comprise one or more media files, such as, but not limited to, a video and/or audio file. In one embodiment, subscriber accessible memory 402 is communicatively connected with service provider reserved memory 404. In one embodiment, electronic device 400 is a STB":

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Smoyer at [0027]; Fig. 4.

325.    Similarly, Smoyer explains that, "[i]n one embodiment, the service provider has complete control over the management of the service provider reserved memory 404. Accordingly, the service provider alone is able to push files, delete files and make any necessary changes to service provider memory 404. Because the subscriber has no control over service provider memory 404 and cannot add any information onto it, the service provider is guaranteed a certain amount of memory is available on STB 400 to the service provider. In some embodiments, the subscriber is not even aware of the existence of service provider memory 404." Smoyer at [0029].  For example, "[t]he processing unit 602 may further be in communication with a storage unit 614 that is configured to store data files in data repositories 616 a-616 n (collectively 616). Storage unit 610 is in communicative connection with storage unit 614 such that data may be transferred between the storage units. In one embodiment, data repositories 616 represent the memory only accessible by the service provider. Therefore, the service provider is ensured a specified amount of storage space to work with remotely. As described herein, the service provider specific data repositories 616 and/or memory may be used

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

by a service provider to push video content and/or other forms of data to system device 600. In one embodiment, the service provider may push software patches to the system device 600. This functionality allows a service provider to ensure that each subscriber device has the most up-to-date software and complete functionality, all without the subscribers needing to perform any updates themselves." *Id.* at [0035].

326.    Smoyer also discloses that "the server 706 may check for available memory capacity on the service provider specific memory of a particular STB. In one form, old video content may be deleted if there is not sufficient memory available for new, pushed video content. It is further contemplated that the service provider specific memory of the STB is dedicated for pushed video content." Smoyer at [0042].  "In one embodiment, the service provider, server 906, trickle server 907 and/or processor 908 may periodically determine whether stored segment 909 has been accessed. If the stored segment 909 has gone unused for a specific number of days or weeks, the service provider may determine that the stored segment 909 should be deleted from the service provider reserved memory." *Id.* at [0052].

**g)    Claim 7 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

**(1)    7. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an encryption type used in the secure region.**

327.    Smoyer discloses that, "[i]n one aspect of the present disclosure, an electronic device is associated with a subscriber and is in communication with a data distribution network configured to deliver data by a service provider to the subscriber. The data distribution network comprises a server in communication with the data distribution network and the server configured to deliver a stream of data over the data distribution network. The electronic device comprises a first memory communicatively connected to the server. The first memory is

configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is configured to receive and store data from the server, though the second memory is accessible only by the service provider." Smoyer at [0012].

### h) Claim 11 of the '667 Patent is anticipated and rendered obvious by Smoyer.

#### (1) 11[pre]. A method of transmitting media content from a media streaming system, the method comprising:

328.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

#### (2) 11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);

329.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

#### (3) 11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

330.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

#### (4) 11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and

331.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**(5)**     **11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.**

332.     Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**i)**     **Claim 12 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

**(1)**     **12. The method of claim 11, wherein transmitting the media content to the secure region comprises: time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.**

333.     Claim 12 of the '667 patent is invalid for all reasons described above regarding Claim 3 of the '667 patent.

**j)**     **Claim 13 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

**(1)**     **13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

334.     Claim 13 of the '667 patent is invalid for all reasons described above regarding Claim 4 of the '667 patent.

**k)**     **Claim 14 of the '667 Patent is anticipated and rendered obvious by Smoyer.**

**(1)**     **14. The method of claim 11 further comprising: causing the NAS device to use encryption that secures the media content to the secure region.**

335.     Claim 14 of the '667 patent is invalid for all reasons described above regarding Claim 5 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### l) Claim 15 of the '667 Patent is anticipated and rendered obvious by Smoyer.

#### (1) 15. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an amount of data stored in the secure region.

336.     Claim 15 of the '667 patent is invalid for all reasons described above regarding Claim 6 of the '667 patent.

### m) Claim 16 of the '667 Patent is anticipated and rendered obvious by Smoyer.

#### (1) 16. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an encryption type used in the secure region

337.     Claim 16 of the '667 patent is invalid for all reasons described above regarding Claim 7 of the '667 patent.

### 3. The SCSA System

338.     The SCSA System anticipates and/or renders obvious every asserted claim of the '667 patent.

### a) Claim 1 of the '667 Patent is anticipated and rendered obvious by the SCSA System

#### (1) 1[pre]. A media streaming system comprising:

339.     The SCSA System allowed "consumers to buy, store and playback HD Versions of movies and TV shows at home." https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/. Specifically, the SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk storage," "securely stor[ing] a copy of [] premium digital movies on local hard drives and flash memory based solutions which c[ould] then be accessed for local playback across all SCSA App-enabled devices including smartphones, tablets, TV's set-top boxes, computers, game consoles, USB flash drives, and uSD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

cards." *Id.*;

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20

14/12/SCSA_CRI-release-FINAL.pdf.  This process allowed display devices to "render content

ten times faster than streaming media on 'over the top Internet.'"  https://www.etcentric.org/drm-

secure-content-storage-association-launches-project-phenix/.

340.    The SCSA System consisted of a few different components, as depicted in the

diagram below (annotated to indicate the order of steps):



WD-VIASAT-NDCA00011702 at 716.

341.    As described in the diagram above and by Mr. Blankenbeckler in his deposition,

the SCSA System operated in nine general steps.  Blankenbeckler Tr. 150-208.  **First**, a movie

studio would prepare content, such as a movie, by applying whatever security measures they

chose, such as encoding, watermarking, encryption, and more.  *Id.* 168:1-170:21.  **Second**, once

the content was prepared, it would be given to a retailer who would handle actual sales and

distribution of the content.  *Id.*  **Third**, the studio would send security information for the content

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

to the "SCSA License Server," a special server managed by SCSA. *Id. **Fourth*** and ***fifth***, a user with a properly configured SCSA storage device would navigate to the SCSA app on their playback device, such as a TV, and purchase the content. *Id. **Sixth***, the retailer would communicate with the License Server to acquire a "transaction handle," which acted as a receipt for the transaction. *Id. **Seventh***, the retailer would would send the content to the storage device along with the transaction handle. *Id. **Eighth***, the app on the playback device would contact the License Server using the transaction handle, and the License Server would return a license key and license file that would be stored on the storage device. *Id. **Ninth***, the app on the playback device would use the license key and license file to enable playback of the content. *Id.*

> **(2)    1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and**

342.    The SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk storage," such as "local hard drives and flash memory based solutions." https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/; https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20 14/12/SCSA_CRI-release-FINAL.pdf.  A POSITA would understand that "downloading" media involves transmitting such media over a wide area network (WAN), such as the Internet, to a local area network (LAN), such as a user's home WiFi network.

343.    I understand that, for infringement purposes, Plaintiffs are alleging that a USB-connected hard drive (a direct attached storage device) satisfies this limitation.  Therefore, under Plaintiffs' theory of infringement, the SCSA System satisfies this limitation whether "local hard drives and flash memory based solutions" refers to direct attached storage or network attached storage.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

344.    The documentation and deposition testimony from Plaintiffs further confirm that the SCSA System used USB-connected storage devices.  Blankenbeckler Tr. 177:3-14; Ryan Tr. 131:13-132:24.  The documentation and deposition testimony from Plaintiffs also confirms that the SCSA System used network attached storage devices:

### 4.2.9    SCSA Player as SCSA Network Attached Storage Device

An SCSA Player, which has SCSA Storage that is embedded or attached via any of the directly attached (i.e., non-network) interfaces defined for SCSA, shall make such storage discoverable to other SCSA Players on the LAN under the conditions described below. In this mode of operation, the SCSA Player shall expose the embedded or directly attached SCSA Storage in a manner that is indistinguishable from that of an SCSA Network Attached Storage Device, based on the SCSA Player Type described in the table below.

| SCSA Player Type | When Player has embedded or directly attached SCSA Storage present, it shall/should be discoverable to other SCSA Players on the LAN: |
|---|---|
| Battery-powered SCSA Players | Should |
| SCSA Software Players running on a General Purpose Computing Platform | Should |
| All other SCSA Players | Shall |

WD-VIASAT-NDCA00014363 at 410; *see also* Blankenbeckler Tr. 165:16-166:3.

### (3)    1[b] one or more hardware processors configured to:

345.    The SCSA System performed each of the following steps, as discussed below. The SCSA System therefore had at least one hardware processor configured to do so.

### (4)    1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

346.    The SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk devices" that could "securely store a copy of [] premium digital movies."

https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/;

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20

14/12/SCSA_CRI-release-FINAL.pdf.

347.    I understand that Plaintiffs have alleged, for infringement purposes, that a storage

device satisfies this claim if there are security measures applied to the entire device.  Therefore,

under Plaintiffs' theory of infringement, a storage device that could "securely store" media

would meet the "secure region" requirement of this limitation.

348.    The documentation and deposition testimony from Plaintiffs further confirm that

the SCSA System's storage devices were generally secure through the use of encryption.

Blankenbeckler Tr. 175:4-176:16.  Moreover, the documentation and deposition testimony from

Plaintiffs demonstrate that the SCSA System's storage devices had both a "user data area" (a

user accessible region) and a "nonuser area" (a secure region).  WD-VIASAT-NDCA00011702

at 725; Blankenbeckler Tr. 177:15-179:21.

349.    The SCSA System's storage devices "then c[ould] be accessed for local playback

across all SCSA App-enabled devices including smartphones, tablets, TV's, set-top boxes,

computers, game consoles, USB flash drives, and uSD cards."

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20

14/12/SCSA_CRI-release-FINAL.pdf.  Assuming these devices have a "secure region" as

discussed above, their ability to be "accessed for local playback" lets them serve as a "buffer for

streaming media."  This buffer would allow the media to be streamed on any of the "separate

display devices" enumerated above, some of which, such as a smartphone, tablet, or smart TV,

would be connected to the "local area network."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

350.    Additionally, as the SCSA System was only supposed to let users to "download cloud-based media to compliant WD and SanDisk devices," a POSITA would have understood that the SCSA System likely utilized some means of determining whether the target download destination was such a device.  A POSITA would have understood that one method for doing so would have involved having the storage device share some data indicating that it was a properly configured device, such as a variable indicating that the storage device is encrypted.  I understand that, for purposes of infringement, Plaintiffs have previously alleged that ███████ ████████████████████████████ satisfies the claimed "indication" of this limitation, so under any such theory of infringement by Plaintiffs, it would have been obvious to a POSITA at the time that such an "indication" (a variable sharing data to confirm that a storage device is properly configured to work with a certain system—for example, by being encrypted) would have been obvious, and a simple design choice to a POSITA.

351.    The documentation and deposition testimony from Plaintiffs further confirm that the SCSA System did make use of such a variable.  As Mr. Blankenbeckler testified, the SCSA System "checked to make sure it was an SCSA storage device because … it would be a bad user experience if somebody bought a non-SCSA drive and bought the movie" and then couldn't "get a license file because [it was] not an SCSA drive."  Blankenbeckler Tr. 179:25-180:24, 181:17-182:1, 192:22-193:8.  Specifically, the storage device of the SCSA System sends a "nonce" value to the rest of the system, which is a "security use once parameter" used to indicate that the "communication by the receiver says you are encrypting."  Ybarra Tr. 152:12-156:11.  This variable establishes communications "between the storage device and the servers that build the device."  *Id.*  If this nonce variable is not included, the message from the storage device "will be rejected."  *Id.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

352.    Furthermore, the SCSA System was intended to allow users to playback the downloaded media content using the "SCSA App" on properly "enabled" and "approved" devices. https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_CRI-release-FINAL.pdf; https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.  I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that "access to the secure region is controlled by the media streaming system."  Therefore, under the theory of infringement Plaintiffs have previously articulated in certain infringement contentions served in this litigation, the SCSA System satisfies this limitation.

353.    The documentation and deposition testimony from Plaintiffs further confirm that the SCSA System controls access to the secure region under Plaintiffs' theory of infringement discussed above.  For example, because the "SCSA storage device can be a Western Digital HDD," it could be "plugged into and access from a computer."  Blankenbeckler Tr. 175:4-176:16.  However, because the content was not being accessed through "an SCSA player," "there[ would be] no way to play it back" or "derive the decryption keys."  *Id.*

> **(5)    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

354.    As explained above, the SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk devices" that could "securely store a copy of [] premium digital movies" and which "c[ould] be accessed for local playback across all SCSA App-enabled devices including smartphones, tablets, TV's, set-top boxes, computers, game consoles, USB flash drives, and uSD cards."  https://www.etcentric.org/drm-secure-content-storage-association-

launches-project-phenix/;

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20 14/12/SCSA_CRI-release-FINAL.pdf.  For the reasons explained above, under Plaintiffs' theory of infringement discussed above, downloading this media to the discussed "WD and SanDisk devices" satisfies this claim limitation.

355.    The documentation and deposition testimony from Plaintiffs further confirm that content could be transmitted to the SCSA storage device as described above.  Blankenbeckler Tr. 170:1-7, 173:4-16.

> **(6)    1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.**

356.    As discussed above, SCSA System was intended to allow users to playback the downloaded media content using the "SCSA App" on properly "enabled" and "approved" devices.

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20 14/12/SCSA_CRI-release-FINAL.pdf; https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.

357.    The documentation and deposition testimony from Plaintiffs further confirm that, in addition to the content, a license file and license key are sent to the SCSA storage device, and that without this information, a user will be unable to playback the content stored on the device. Blankenbeckler Tr. 173:4-176:16, 177:15-179:21.

358.    Therefore, under Plaintiffs' theory of infringement discussed above, the license file and license key are "instructions" transmitted to the storage device that control streaming access to their associated content.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**b)** **Claim 2 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)** **2. The media streaming system of claim 1, wherein the separate display device comprises a smart television.**

359.    The SCSA System allowed content to be "viewed across various devices, including smart TVs."

https://web.archive.org/web/20150919160346/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_Contributor-Release_12-12-13-final.pdf.

360.    The documentation and deposition testimony from Plaintiffs further confirm that the display device could be a smart TV.  Blankenbeckler Tr. 169:17-25, 173:9-13, 188:8-24, 192:10-15, 202:4-18.

**c)** **Claim 3 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)** **3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.**

361.    To the extent the SCSA System did not practice this claim, it would have been obvious to combine it with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan").  McDysan describes a system that "provide[s] under-the-bottom time-shifted delivery of video content" that "download[s] and store[s] non-real time video content … at a customer premise."  McDysan at [0012].  Specifically, McDysan disclosed a method for "enabl[ing] the scheduling and coordinating of under-the-bottom time-shifted distribution of non-real time video content (e.g., OTT video content, pre-recorded video content, previous episodes, media-oriented advertisements, etc.) during idle time periods of network 100 (e.g., at night, during low traffic, etc.)."  *Id.* at [0020].  This allowed the video content to be delivered "when network 100 is not experiencing congestion."  *Id.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**d)  Claim 4 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)  4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

362.    As explained above, the SCSA System was intended to allow users to playback downloaded media content using the "SCSA App" on properly "enabled" and "approved" devices. https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_CRI-release-FINAL.pdf; https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/.    I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim.  Therefore, under Plaintiffs' theory of infringement discussed above, the SCSA System satisfies this limitation.

363.    The documentation and deposition testimony from Plaintiffs further confirm that the SCSA System's secure region is inaccessible without permission from the system under Plaintiffs' theory of infringement.  Blankenbeckler Tr. 175:4-176:16.

**e)  Claim 5 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)  5. The media streaming system of claim 1, wherein the one or more processors are further configured to: cause the NAS device to use encryption that secures the digital content to the secure region.**

364.    The SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk devices" that could "securely store a copy of [] premium digital movies." https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/; https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20

14/12/SCSA_CRI-release-FINAL.pdf.    It would have been obvious to a POSITA that

encryption could be one method of ensuring that WD and SanDisk devices were "compliant" and

could "securely store" downloaded media.

365.    The documentation and deposition testimony from Plaintiffs further confirm that

the SCSA System utilized encryption on its storage devices.  Blankenbeckler Tr. 173:4-176:16,

177:15-179:21.

> **f)    Claim 6 of the '667 Patent is anticipated and rendered obvious by the SCSA System**
>
> **(1)    6. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region.**

366.    As discussed above, the SCSA System allowed users to "download cloud-based

media to compliant WD and SanDisk devices" that could "securely store a copy of [] premium

digital movies."  https://www.etcentric.org/drm-secure-content-storage-association-launches-

project-phenix/;

https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=20

14/12/SCSA_CRI-release-FINAL.pdf.  It is unclear what Plaintiffs allege satisfies this claim for

infringement purposes, but Plaintiffs seemingly allege that simply selecting media to store on a

storage device is sufficient to meet this claim.  On such a theory of infringement, the SCSA

System practices this claim under Plaintiffs' theory of infringement.

367.    The documentation and deposition testimony from Plaintiffs further confirm that

the SCSA System selects what media to store on a storage device.  Blankenbeckler Tr. 170:1-7,

173:4-16, 177:15-179:21.

**g)** **Claim 7 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)** **7. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an encryption type used in the secure region.**

368. The SCSA System allowed users to "download cloud-based media to compliant WD and SanDisk devices" that could "securely store a copy of [] premium digital movies." https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/; https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_CRI-release-FINAL.pdf.   It would have been obvious to a POSITA that different movie providers could have different security requirements, and that one way to accommodate those requirements would be to allow different levels or types of encryption to be used on storage devices.

369. It is unclear what Plaintiffs allege satisfies this claim for infringement purposes, but Plaintiffs seemingly allege that simply using encryption is sufficient to meet this claim.  On such a theory of infringement, the SCSA System practices this claim under Plaintiffs' theory of infringement.

370. The documentation and deposition testimony from Plaintiffs further confirm that the SCSA System utilized encryption on its storage devices.  Blankenbeckler Tr. 173:4-176:16, 177:15-179:21.

**h)** **Claim 11 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)** **11[pre]. A method of transmitting media content from a media streaming system, the method comprising:**

371. Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**(2)    11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);**

372.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**(3)    11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

373.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**(4)    11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and**

374.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**(5)    11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.**

375.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**i)    Claim 12 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)    12. The method of claim 11, wherein transmitting the media content to the secure region comprises: time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.**

376.    Claim 12 of the '667 patent is invalid for all reasons described above regarding Claim 3 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**j)    Claim 13 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)    13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

377.    Claim 13 of the '667 patent is invalid for all reasons described above regarding Claim 4 of the '667 patent.

**k)    Claim 14 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)    14. The method of claim 11 further comprising: causing the NAS device to use encryption that secures the media content to the secure region.**

378.    Claim 14 of the '667 patent is invalid for all reasons described above regarding Claim 5 of the '667 patent.

**l)    Claim 15 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)    15. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an amount of data stored in the secure region.**

379.    Claim 15 of the '667 patent is invalid for all reasons described above regarding Claim 6 of the '667 patent.

**m)    Claim 16 of the '667 Patent is anticipated and rendered obvious by the SCSA System**

**(1)    16. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an encryption type used in the secure region.**

380.    Claim 16 of the '667 patent is invalid for all reasons described above regarding Claim 7 of the '667 patent.

4.    **The DirecTV DVR Systems**

381.    The DirecTV DVR Systems, including at least the HR23, anticipate and/or render obvious every asserted claim of the '667 patent.

382.    To the extent the DirecTV DVR Systems are missing any limitations from the '667 asserted claims, it would have been obvious to combine the DirecTV DVR Systems with the TiVo DVR System and, to the extent the TiVo DVR System contained such features, a POSITA would have been motivated to incorporate such features into the DirecTV DVR Systems.

a)    **Claim 1 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

(1)    **1[pre]. A media streaming system comprising:**

383.    The DirecTV DVR Systems, including at least the HR23, allowed users to "[r]ecord [their] favorite shows" and watch recorded content from any room in their house:



https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule;

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf.

384.    To the extent the DirecTV DVR Systems do not disclose this limitation, the TiVo DVR System allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

> **(2)    1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and**

385.    The DirecTV DVR Systems, including at least the HR23, allowed users to "connect[ their] HD DVR to the Internet" to receive media content such as "thousands of movies and shows."

https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule.  DirecTV DVRs, including at least the HR23, would be connected to a user's "home network" via a wired Ethernet connection, a AC powerline connection, or a wireless WiFi connection.

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf at 114.  DirecTV content would therefore be sent via a wide area network, the Internet, to a network attached storage device, the DVR, which connected to a local area network, the user's home network.

386.    To the extent the DirecTV DVR Systems do not disclose this limitation, the TiVo DVR System allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.  Content would therefore be transmitted to the TiVo DVR via wide area networks, such as cable or broadband.

387.    The documentation produced by TiVo further confirms that the TiVo DVR System's DVRs were located on a local area network, such as a user's "home network." XPERI_000042 at 44.  TiVo DVRs were connected to "remote servers operated by TiVo" and needed to periodically contact such servers "as a condition of maintaining access to the TiVo service"; they did so via "a broadband connection."  XPERI_000058 at 62-63.  Accordingly, TiVo DVRs were connected to the network through either a direct network connection or a USB connection to a network-connected device; either way, TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement.

**(3)    1[b] one or more hardware processors configured to:**

388.    The DirecTV DVR Systems performed each of the following steps, as discussed below.  The DirecTV DVR Systems therefore had at least one hardware processor configured to do so.

**(4)    1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

389.    The DirecTV DVR Systems, including at least the HR23, allowed users to "[r]ecord [their] favorite shows," which would be transmitted to the DVR and could be played

back onto a separate display device, such as a TV.

https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule.  The DirecTV DVR Systems, including at least the HR23, also allowed parents to "[c]ontrol what [their] children c[ould] watch," which means that the content stored on the DVR was kept secure.

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3.

390.    I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device.  Therefore, under Plaintiffs' theory of infringement, a storage device that could control what media could be accessed would meet the "secure region" requirement of this limitation.

391.    The DirecTV DVR Systems, including at least the HR23, also allowed users to "[r]ecord shows in HD."

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3.  "[I]n order to be able to view [such] HD channels," however, users had to "subscribe to HD Access."

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf at 3.  I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that "access to the secure region is controlled by the media streaming system."  Therefore, under Plaintiffs' theory of infringement, the DirecTV DVR Systems controlled "access to the" DVRs.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

392.    Additionally, the DirecTV DVR Systems, including at least the HR23, offered

different functionality depending on which DVR was used.

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_recei

ver?lpos=Header:3.  I understand that, for purposes of infringement, Plaintiffs have alleged that

data indicating a device's model satisfies the claimed "indication" of this limitation, so under

Plaintiffs' own theory of infringement, the DirecTV DVR Systems meet this limitation.

393.    To the extent the DISH DVR Systems do not disclose this limitation, the

documentation produced by TiVo confirms that the TiVo DVR System also satisfied this

limitation.  The TiVo DVR System made use of a feature called "TiVoGuard," which

"protect[ed] TiVo's ability to require payment for provisioning the TiVo service and terminate

the service in the case of, *e.g.*, non-payment."  XPERI_000130 at 132.  "As part of its basic

security mechanisms, TiVoGuard employs encryption and decryption to protect secrets and

protect data from unauthorized use."  *Id.*

394.    As discussed above, I understand that Plaintiffs have alleged, for infringement

purposes, that a storage device satisfies this claim if there are security measures applied to the

entire device.  Therefore, under Plaintiffs' theory of infringement, a storage device that utilizes

encryption would meet the "secure region" requirement of this limitation.

395.    Moreover, "[a]s a condition for maintaining connectivity with the TiVo service, a

TiVo Device and a TiVo-Activated Mobile Device must periodically contact remote servers

operated by TiVo and housed at secure facilities."  XPERI_000009 at 13.  I understand that, for

purposes of infringement, Plaintiffs have alleged that a message from a storage device indicating

that the device is the proper type of device for storing content satisfies the claimed "indication"

of this limitation, so under Plaintiffs' own theory of infringement, such an indication would have been obvious.

396.    The TiVo DVR System also limited a user's playback of "a particular store Controlled Content [to] a single device in the TiVo ecosystem." *Id.* at 14.  The TiVo DVR System's various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard all served to control access to the content stored on the TiVo devices, at least under Plaintiffs' theory of infringement.

       **(5)**      **1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

397.    As discussed above, the DirecTV DVR Systems, including at least the HR23, allowed users to "[r]ecord [their] favorite shows," which would be transmitted to the DVR. https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule.

398.    To the extent the DirecTV DVR Systems do not disclose this limitation, as discussed above, the TiVo DVR System allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming." https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

       **(6)**      **1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.**

399.    As discussed above, the DirecTV DVR Systems, including at least the HR23, controlled streaming access to content from "HD channels" recorded on users' DVRs depending on whether the user was "subscribe[d] to HD Access."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf at 3.

400.    To the extent the DirecTV DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System controlled streaming access to content stored on the TiVo devices.  As discussed above, the TiVo DVR System made use of various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard.  It would have been obvious to a POSITA that instructions would have had to be transmitted to TiVo devices regarding these security measures.  For example, one type of TiVo device is a "TiVo-Activated Mobile Device," which is a mobile device that "downloads a TiVo Application from the mobile device manufacturer's application store" and receives a "device credential … from the TiVo service."  XPERI_000009 at 18.  This device credential is used to "access recordings from a TiVo Device to which an anchor has been established."  *Id.* at 19.  The TiVo Application and device credentials are both examples of instructions that are transmitted by the TiVo DVR System, at least under Plaintiffs' theory of infringement.

> **b)    Claim 2 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**
>
> > **(1)    2. The media streaming system of claim 1, wherein the separate display device comprises a smart television.**

401.    The DirecTV DVR Systems, including at least the HR23, allowed users to play back DVR content "[f]rom anywhere," utilizing, for example, mobile apps.

https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule;

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

402.    To the extent the DirecTV DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System allowed mobile device running a "TiVo Application" to access TiVo-recorded content.  XPERI_000009 at 18.  It would have been obvious to a POSITA that one type of playback device that could run a TiVo application and play back DVR content would have been a smart television.

### c)    Claim 3 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems

#### (1)    3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.

403.    To the extent the DirecTV DVR Systems did not practice this claim, it would have been obvious to combine them with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan").  McDysan describes a system that "provide[s] under-the-bottom time-shifted delivery of video content" that "download[s] and store[s] non-real time video content … at a customer premise."  McDysan at [0012].  Specifically, McDysan disclosed a method for "enabl[ing] the scheduling and coordinating of under-the-bottom time-shifted distribution of non-real time video content (e.g., OTT video content, pre-recorded video content, previous episodes, media-oriented advertisements, etc.) during idle time periods of network 100 (e.g., at night, during low traffic, etc.)."  *Id.* at [0020].  This allowed the video content to be delivered "when network 100 is not experiencing congestion."  *Id.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

> **d)** **Claim 4 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**
>
> > **(1)** **4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

404.    As discussed above, the DirecTV DVR Systems, including at least the HR23, controlled streaming access to content from "HD channels" recorded on users' DVRs depending on whether the user was "subscribe[d] to HD Access."

https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf at 3.  I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim.  Therefore, under Plaintiffs' theory of infringement discussed above, such HD content recorded on the DVRs would have been inaccessible to a user without permission, such as if they were not subscribed to HD Access.

405.    To the extent the DirecTV DVR Systems do not disclose this limitation, as discussed above, the documentation produced by TiVo confirms that the TiVo DVR System controlled streaming access to content stored on the TiVo devices.  The TiVo DVR System made use of various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard.  Any content recorded on a TiVo device would have therefore been inaccessible to a user without permission from the system.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**e)** **Claim 5 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

**(1)** **5. The media streaming system of claim 1, wherein the one or more processors are further configured to: cause the NAS device to use encryption that secures the digital content to the secure region.**

406.    To the extent the DirecTV DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System practiced this claim.  The TiVo DVR System made use of a feature called "TiVoGuard," which "protect[ed] TiVo's ability to require payment for provisioning the TiVo service and terminate the service in the case of, *e.g.*, non-payment."  XPERI_000130 at 132.  "As part of its basic security mechanisms, TiVoGuard employs encryption and decryption to protect secrets and protect data from unauthorized use."  *Id.*  For example, TiVoGuard generated, "[f]or each recorded or streaming program," "a unique, random 128-bit lead encryption key and a lead signing key" that were used to encrypt "the entire media clip" so that "only encrypted segments" were saved "to a device's internal hard disk, or an external storage device."  *Id.* at 145-46.

**f)** **Claim 6 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

**(1)** **6. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region.**

407.    As discussed above, the DirecTV DVR Systems, including at least the HR23, allowed users "[r]ecord [their] favorite shows," which would be transmitted to the DVR. https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule.  It is unclear what Plaintiffs allege satisfies this claim for infringement purposes, but Plaintiffs seemingly allege that simply selecting media to store on a storage device

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

is sufficient to meet this claim. Therefore, the DirecTV DVR Systems practice this claim under Plaintiffs' theory of infringement.

408.    To the extent the DirecTV DVR Systems do not disclose this claim, as discussed above, the TiVo DVR System also allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

> **g)** **Claim 7 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**
>
> **(1)** **7. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an encryption type used in the secure region.**

409.    To the extent the DirecTV DVR Systems do not disclose this claim, the documentation produced by TiVo confirms that the TiVo DVR System practiced this claim. The TiVo DVR System made use of a feature called "TiVoGuard," which "protect[ed] TiVo's ability to require payment for provisioning the TiVo service and terminate the service in the case of, *e.g.*, non-payment." XPERI_000130 at 132. "As part of its basic security mechanisms, TiVoGuard employs encryption and decryption to protect secrets and protect data from unauthorized use." *Id.* For example, TiVoGuard generated, "[f]or each recorded or streaming program," "a unique, random 128-bit lead encryption key and a lead signing key" that were used to encrypt "the entire media clip" so that "only encrypted segments" were saved "to a device's internal hard disk, or an external storage device." *Id.* at 145-46.

410.    The TiVo DVR System's security protocols utilized multiple different types of encryption. For example, each TiVo Device generated a "master encryption key" using the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Blowfish cryptographic cypher," but for each of the media clips being encrypted, the TiVo

Device would use "the AES block cipher in ECB mode on a 16-byte, 128-bit block size." *Id.* at

144-45.  Therefore, the TiVo Devices were provided instructions to set the proper type of

encryption depending on the use case.

> **h)** **Claim 11 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

> **(1)** **11[pre]. A method of transmitting media content from a media streaming system, the method comprising:**

411.    Claim 11 of the '667 patent is invalid for all reasons described above regarding

Claim 1 of the '667 patent.

> **(2)** **11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);**

412.    Claim 11 of the '667 patent is invalid for all reasons described above regarding

Claim 1 of the '667 patent.

> **(3)** **11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

413.    Claim 11 of the '667 patent is invalid for all reasons described above regarding

Claim 1 of the '667 patent.

> **(4)** **11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and**

414.    Claim 11 of the '667 patent is invalid for all reasons described above regarding

Claim 1 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**(5)     11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.**

415.     Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

**i)     Claim 12 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

**(1)     12. The method of claim 11, wherein transmitting the media content to the secure region comprises: time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.**

416.     Claim 12 of the '667 patent is invalid for all reasons described above regarding Claim 3 of the '667 patent.

**j)     Claim 13 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

**(1)     13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

417.     Claim 13 of the '667 patent is invalid for all reasons described above regarding Claim 4 of the '667 patent.

**k)     Claim 14 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

**(1)     14. The method of claim 11 further comprising: causing the NAS device to use encryption that secures the media content to the secure region.**

418.     Claim 14 of the '667 patent is invalid for all reasons described above regarding Claim 5 of the '667 patent.

    **l)**    **Claim 15 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

        **(1)**    **15. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an amount of data stored in the secure region.**

419.    Claim 15 of the '667 patent is invalid for all reasons described above regarding Claim 6 of the '667 patent.

    **m)**    **Claim 16 of the '667 Patent is anticipated and rendered obvious by the DirecTV DVR Systems**

        **(1)**    **16. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an encryption type used in the secure region.**

420.    Claim 16 of the '667 patent is invalid for all reasons described above regarding Claim 7 of the '667 patent.

    **5.**    **The DISH DVR Systems**

421.    The DISH DVR Systems, including at least the ViP722, anticipate and/or render obvious every asserted claim of the '667 patent.

422.    To the extent the DISH DVR Systems are missing any limitations from the '667 asserted claims, it would have been obvious to combine the DISH DVR Systems with the TiVo DVR System and, to the extent the TiVo DVR System contained such features, a POSITA would have been motivated to incorporate such features into the DISH DVR Systems.

    **a)**    **Claim 1 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

        **(1)**    **1[pre]. A media streaming system comprising:**

423.    The DISH DVR Systems, including at least the ViP722, also allowed users to "record … live television" to play back later:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf; https://about.dish.com/news-releases?item=123253;

https://my.dish.com/support/receivers/vip722k; https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System.

424.    To the extent the DISH DVR Systems do not disclose this limitation, the TiVo DVR System allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

> **(2)    1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and**

425.    The DISH DVR Systems, including at least the ViP722, utilized "satellite TV tuners" for receiving live television, "Bluetooth for linking to devices such as wireless headphones," and could also be connected to the Internet "to get access to additional TV shows and movies." https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System;

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

https://my.dish.com/support/receivers/vip722k.  DISH content would therefore be sent via a wide

area network, satellite/the Internet, to a network attached storage device, the DVR, which

connected to a local area network, the user's home and Bluetooth networks.

426.    Additionally, the DISH DVR Systems, including at least the ViP722, had the

ability to connect an "external hard drive" to further "expand their DVR recording capacity."

https://about.dish.com/news-releases?item=123253.  I understand that, for infringement

purposes, Plaintiffs are alleging that a USB-connected hard drive satisfies this limitation.

Therefore, under Plaintiffs' theory of infringement, the DISH DVR Systems' use of a USB-

connected drive satisfies this limitation.

427.    The documentation produced by DISH further confirms that the DISH DVR

Systems could transmit content over the Internet to a DVR.  For example, the DishONLINE

service is an Internet Protocol Television, or IPTV, service that allowed users to access "movie

downloads," which would also users to download "[m]ovies that may not be available via

satellite" to "compatible DISH Network receivers connected to a broadband Internet service,"

including the ViP622 and ViP722.  DISH_VIASATSUB_000365 at 365.

428.    To the extent the DISH DVR Systems do not disclose this limitation, the TiVo

DVR System allowed users to "find programs from many sources," including "cable,"

"YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and

"[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-

premiere/index.html.  Content would therefore be transmitted to the TiVo DVR via wide area

networks, such as cable or broadband.

429.    The documentation produced by TiVo further confirms that the TiVo DVR System's DVRs were located on a local area network, such as a user's "home network." XPERI_000042 at 44.  TiVo DVRs were connected to "remote servers operated by TiVo" and needed to periodically contact such servers "as a condition of maintaining access to the TiVo service"; they did so via "a broadband connection."  XPERI_000058 at 62-63.  Accordingly, TiVo DVRs were connected to the network through either a direct network connection or a USB connection to a network-connected device; either way, TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement.

   **(3)  1[b] one or more hardware processors configured to:**

430.    The DISH DVR Systems performed each of the following steps, as discussed below.  The DISH DVR Systems therefore had at least one hardware processor configured to do so.

    **(4)  1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

431.    The DISH DVR Systems, including at least the ViP722, allowed users to connect a USB drive to their DVR to further expand their recording capacity. https://about.dish.com/news-releases?item=123253.  When such drives were first connected to a DVR, "the DVR identifies it and asks the user to proceed," as "[t]he user is required to format the hard drive (through the ViP722 box) to properly accept the encrypted files from the DVR." http://www.laaudiofile.com/vip722.html.  "[O]nce the formatting process is complete," the DVR was forced to reboot.  *Id.*

432.    I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device.  Therefore,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

under Plaintiffs' theory of infringement, a storage device that has been formatted to be able to accept encrypted files would meet the "secure region" requirement of this limitation.

433.    I understand that, for purposes of infringement, Plaintiffs have alleged that information indicating whether a drive is properly formatted to be able to accept encrypted files satisfies the claimed "indication" of this limitation, so under Plaintiffs' own theory of infringement, the DISH DVR Systems meet this limitation.

434.    The DISH DVR Systems, including at least the Hopper/Joey, also allowed parents to use "parental controls" to "lock down what [kids] can view in their room while not in [their parents'] purview."

https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html.  I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that "access to the secure region is controlled by the media streaming system."  Therefore, under Plaintiffs' theory of infringement, the DISH DVR Systems satisfy this limitation.

435.    The documentation produced by DISH further confirms that the DISH DVR Systems could control access to the DVRs.  For example, "content on the hard drive can only be viewed using the receiver it came from" or "a compatible receiver or replacement receiver on the account."  DISH_VIASATSUB_000394 at 395.  As recorded content could only be accessed under DISH's terms, the DISH DVR Systems control access to the DVRs under Plaintiffs' theory of infringement.

436.    Additionally, content downloaded using DishONLINE could be either rented, purchased, or freely accessed.  DISH_VIASATSUB_000365 at 365.  Purchased content could be

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

viewed at any time, but rented or free content would be automatically erased from the drive upon

an expiration point.  *Id.*  As such rented and free content could only be accessed under DISH's

terms, the DISH DVR Systems control access to the DVRs under Plaintiffs' theory of

infringement.

437.    To the extent the DISH DVR Systems do not disclose this limitation, the

documentation produced by TiVo confirms that the TiVo DVR System also satisfied this

limitation.  The TiVo DVR System made use of a feature called "TiVoGuard," which

"protect[ed] TiVo's ability to require payment for provisioning the TiVo service and terminate

the service in the case of, *e.g.*, non-payment."  XPERI_000130 at 132.  "As part of its basic

security mechanisms, TiVoGuard employs encryption and decryption to protect secrets and

protect data from unauthorized use."  *Id.*

438.    As discussed above, I understand that Plaintiffs have alleged, for infringement

purposes, that a storage device satisfies this claim if there are security measures applied to the

entire device.  Therefore, under Plaintiffs' theory of infringement, a storage device that utilizes

encryption would meet the "secure region" requirement of this limitation.

439.    Moreover, "[a]s a condition for maintaining connectivity with the TiVo service, a

TiVo Device and a TiVo-Activated Mobile Device must periodically contact remote servers

operated by TiVo and housed at secure facilities."  XPERI_000009 at 13.  I understand that, for

purposes of infringement, Plaintiffs have alleged that a message from a storage device indicating

that the device is the proper type of device for storing content satisfies the claimed "indication"

of this limitation, so under Plaintiffs' own theory of infringement, such an indication would have

been obvious.

440.    The TiVo DVR System also limited a user's playback of "a particular store Controlled Content [to] a single device in the TiVo ecosystem." *Id.* at 14.  The TiVo DVR System's various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard all served to control access to the content stored on the TiVo devices, at least under Plaintiffs' theory of infringement.

> **(5)    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

441.    As discussed above, the DISH DVR Systems, including at least the ViP722, allowed users to "record … live television" on either the DVR itself or on the USB-connected drive to play back later.

https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf; https://about.dish.com/news-releases?item=123253.

442.    To the extent the DISH DVR Systems do not disclose this limitation, as discussed above, the TiVo DVR System allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

> **(6)    1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.**

443.    As discussed above, the DISH DVR Systems, including at least the ViP722, controlled streaming access to content stored on the DVRs and USB-connected drive through encryption and the use of parental controls.  http://www.laaudiofile.com/vip722.html;

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html.

444.    The documentation produced by DISH further confirms that the DISH DVR Systems controlled streaming access to content stored on the DVRs and USB-connected drive. For example, "content on the hard drive can only be viewed using the receiver it came from" or "a compatible receiver or replacement receiver on the account."  DISH_VIASATSUB_000394 at 395.

445.    Additionally, content downloaded using DishONLINE could be either rented, purchased, or freely accessed.  DISH_VIASATSUB_000365 at 365.  Purchased content could be viewed at any time, but rented or free content would be automatically erased from the drive upon an expiration point.  *Id.*

446.    I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim.  Therefore, under Plaintiffs' theory of infringement discussed above, the DISH DVR Systems meet this claim.

447.    To the extent the DISH DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System controlled streaming access to content stored on the TiVo devices.  As discussed above, the TiVo DVR System made use of various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard.  It would have been obvious to a POSITA that instructions would have had to be transmitted to TiVo devices regarding these security measures.  For example, one type of TiVo device is a "TiVo-Activated Mobile Device," which is a mobile device that "downloads a TiVo Application from the mobile device manufacturer's application

172

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

store" and receives a "device credential … from the TiVo service." XPERI_000009 at 18. This device credential is used to "access recordings from a TiVo Device to which an anchor has been established." *Id.* at 19. The TiVo Application and device credentials are both examples of instructions that are transmitted by the TiVo DVR System, at least under Plaintiffs' theory of infringement.

        **b)**    **Claim 2 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

            **(1)**    **2. The media streaming system of claim 1, wherein the separate display device comprises a smart television.**

448.    The DISH DVR Systems, including at least the Hopper/Joey, allowed users to play back DVR content "on their computer, tablet or smartphone wherever they go" using the DISH Remote Access App. https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System.

449.    The documentation produced by DISH further confirms that the DISH DVR Systems could play back recorded content on smart televisions. For example, the Hopper/Joey receivers offered a service called "Virtual Joey," which was "a software app that seamlessly provides the core functionality of a Joey receiver on a third-party device that hosts app, such as a smart TV." DISH_VIASATSUB_000144 at 151.

450.    To the extent the DISH DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System allowed mobile device running a "TiVo Application" to access TiVo-recorded content. XPERI_000009 at 18. It would have been obvious to a POSITA that one type of playback device that could run a TiVo application and play back DVR content would have been a smart television.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

c)    **Claim 3 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

(1)    **3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.**

451.    To the extent the DISH DVR Systems did not practice this claim, it would have been obvious to combine them with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan"). McDysan describes a system that "provide[s] under-the-bottom time-shifted delivery of video content" that "download[s] and store[s] non-real time video content … at a customer premise." McDysan at [0012]. Specifically, McDysan disclosed a method for "enabl[ing] the scheduling and coordinating of under-the-bottom time-shifted distribution of non-real time video content (e.g., OTT video content, pre-recorded video content, previous episodes, media-oriented advertisements, etc.) during idle time periods of network 100 (e.g., at night, during low traffic, etc.)." *Id.* at [0020]. This allowed the video content to be delivered "when network 100 is not experiencing congestion." *Id.*

d)    **Claim 4 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

(1)    **4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

452.    As discussed above, the DISH DVR Systems, including at least the ViP722, controlled streaming access to content stored on the DVRs and USB-connected drive through encryption and the use of parental controls. http://www.laaudiofile.com/vip722.html; https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html. I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this

claim. Therefore, under Plaintiffs' theory of infringement discussed above, any such content recorded on the DVRs or USB-connected drives would have been inaccessible to a user without permission, such as if they were not accessing it through the correct app or did not have the proper parental permission.

453. The documentation produced by DISH further confirms that the DISH DVR Systems controlled streaming access to content stored on the DVRs and USB-connected drive. For example, "content on the hard drive can only be viewed using the receiver it came from" or "a compatible receiver or replacement receiver on the account." DISH_VIASATSUB_000394 at 395. Under Plaintiffs' theory of infringement discussed above, any content recorded on the DVRs or USB-connected drives would have therefore been inaccessible to a user without permission from the system.

454. Additionally, content downloaded using DishONLINE could be either rented, purchased, or freely accessed. DISH_VIASATSUB_000365 at 365. Purchased content could be viewed at any time, but rented or free content would be automatically erased from the drive upon an expiration point. *Id.* Under Plaintiffs' theory of infringement discussed above, any such expired content stored on the DVRs or USB-connected drives would have therefore been inaccessible to a user without permission.

455. To the extent the DISH DVR Systems do not disclose this limitation, as discussed above, the documentation produced by TiVo confirms that the TiVo DVR System controlled streaming access to content stored on the TiVo devices. The TiVo DVR System made use of various security measures, including limiting playback devices, requiring contact with TiVo's servers, and TiVoGuard. Any content recorded on a TiVo device would have therefore been inaccessible to a user without permission from the system.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

e)    **Claim 5 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

(1)    **5. The media streaming system of claim 1, wherein the one or more processors are further configured to: cause the NAS device to use encryption that secures the digital content to the secure region.**

456.    The DISH DVR Systems, including at least the ViP722, stored files on the DVR and USB-connected drive in an encrypted format, and the files could not be saved on either device unless it was properly configured and formatted to accept such files.

http://www.laaudiofile.com/vip722.html.

457.    The documentation produced by DISH further confirms that the DISH DVR Systems stored files in an encrypted format.  For example, "[o]n Echostar DVR set-top boxes, the FVOD and VOD-lite events are stored on the HDD encrypted" and "regular DVR contents (including PPV) will be encrypted too on the HDD."  DISH_VIASATSUB_000396 at 399.

458.    To the extent the DISH DVR Systems do not disclose this limitation, the documentation produced by TiVo confirms that the TiVo DVR System practiced this claim.  The TiVo DVR System made use of a feature called "TiVoGuard," which "protect[ed] TiVo's ability to require payment for provisioning the TiVo service and terminate the service in the case of, *e.g.*, non-payment."  XPERI_000130 at 132.  "As part of its basic security mechanisms, TiVoGuard employs encryption and decryption to protect secrets and protect data from unauthorized use."  *Id.*  For example, TiVoGuard generated, "[f]or each recorded or streaming program," "a unique, random 128-bit lead encryption key and a lead signing key" that were used to encrypt "the entire media clip" so that "only encrypted segments" were saved "to a device's internal hard disk, or an external storage device."  *Id.* at 145-46.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### f) Claim 6 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems

#### (1) 6. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region.

459.    As discussed above, the DISH DVR Systems, including at least the ViP722, also allowed users to "record … live television" to play back later.

https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf.    It is unclear what Plaintiffs allege satisfies this claim for infringement purposes, but Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim.  Therefore, the DISH DVR Systems practice this claim under Plaintiffs' theory of infringement.

460.    To the extent the DISH DVR Systems do not disclose this claim, as discussed above, the TiVo DVR System also allowed users to "find programs from many sources," including "cable," "YouTube," or "Netflix, Amazon Video On Demand, or Blockbuster On Demand," and "[r]ecord[] up to 45 hours of HD programming."

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html.

### g) Claim 7 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems

#### (1) 7. The media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an encryption type used in the secure region.

461.    The DISH DVR Systems, including at least the ViP722, stored files on the DVR and USB-connected drive in an encrypted format, and the files could not be saved on either device unless it was properly configured and formatted to accept such files.

http://www.laaudiofile.com/vip722.html.  The DISH DVR Systems could additionally store

multiple types of content, such as HD programming, SD programming, and On Demand

programming.  https://about.dish.com/news-releases?item=123253.

462.    The documentation produced by DISH further confirms that the DISH DVR

Systems stored files in an encrypted format.  For example, "[o]n Echostar DVR set-top boxes,

the FVOD and VOD-lite events are stored on the HDD encrypted" and "regular DVR contents

(including PPV) will be encrypted too on the HDD."  DISH_VIASATSUB_000396 at 399.

Different types of content utilize different types of encryption.  For example, FVOD contents

utilize "single-key DVB-CSA scrambled" encryption, with over-encryption in the form of

"scrambling the FVOD working table, which guarantees the FVOD content be played back only

on the STB where the content is purchased.  *Id.*  VOD-lite contents and regular DVR contents,

on the other hand, are encrypted through "unique key TDES (or AES)" encryption.  *Id.*

Therefore, the DVR and USB-connected drive were provided instructions to set the proper type

of encryption depending on the content.

463.    To the extent the DISH DVR Systems do not disclose this claim, the

documentation produced by TiVo confirms that the TiVo DVR System practiced this claim.  The

TiVo DVR System made use of a feature called "TiVoGuard," which "protect[ed] TiVo's ability

to require payment for provisioning the TiVo service and terminate the service in the case of,

*e.g.*, non-payment."  XPERI_000130 at 132.  "As part of its basic security mechanisms,

TiVoGuard employs encryption and decryption to protect secrets and protect data from

unauthorized use."  *Id.*  For example, TiVoGuard generated, "[f]or each recorded or streaming

program," "a unique, random 128-bit lead encryption key and a lead signing key" that were used

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

to encrypt "the entire media clip" so that "only encrypted segments" were saved "to a device's internal hard disk, or an external storage device." *Id.* at 145-46.

464.    The TiVo DVR System's security protocols utilized multiple different types of encryption. For example, each TiVo Device generated a "master encryption key" using the "Blowfish cryptographic cypher," but for each of the media clips being encrypted, the TiVo Device would use "the AES block cipher in ECB mode on a 16-byte, 128-bit block size." *Id.* at 144-45. Therefore, the TiVo Devices were provided instructions to set the proper type of encryption depending on the use case.

### h)    Claim 11 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems

#### (1)    11[pre]. A method of transmitting media content from a media streaming system, the method comprising:

465.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

#### (2)    11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);

466.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

#### (3)    11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

467.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

> **(4)    11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and**

468.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

> **(5)    11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.**

469.    Claim 11 of the '667 patent is invalid for all reasons described above regarding Claim 1 of the '667 patent.

> **i)    Claim 12 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

> **(1)    12. The method of claim 11, wherein transmitting the media content to the secure region comprises: time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.**

470.    Claim 12 of the '667 patent is invalid for all reasons described above regarding Claim 3 of the '667 patent.

> **j)    Claim 13 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

> **(1)    13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.**

471.    Claim 13 of the '667 patent is invalid for all reasons described above regarding Claim 4 of the '667 patent.

      **k)**    **Claim 14 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

          **(1)**    **14. The method of claim 11 further comprising: causing the NAS device to use encryption that secures the media content to the secure region.**

472.    Claim 14 of the '667 patent is invalid for all reasons described above regarding Claim 5 of the '667 patent.

      **l)**    **Claim 15 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

          **(1)**    **15. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an amount of data stored in the secure region.**

473.    Claim 15 of the '667 patent is invalid for all reasons described above regarding Claim 6 of the '667 patent.

      **m)**    **Claim 16 of the '667 Patent is anticipated and rendered obvious by the DISH DVR Systems**

          **(1)**    **16. The method of claim 11 further comprising: providing instructions to the NAS device for controlling an encryption type used in the secure region.**

474.    Claim 16 of the '667 patent is invalid for all reasons described above regarding Claim 7 of the '667 patent.

## XI.   LACK OF SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

475.    I have been asked to analyze whether I am aware of any secondary considerations of non-obviousness of the Asserted Patents.

476.    I understand that Viasat served an interrogatory requesting "whether Plaintiffs contend there are secondary considerations or objective indicia of nonobviousness that should be considered by the Court in connection with its determination pursuant to 35 U.S.C. § 103 of the validity of each asserted claim of the Patents-in-Suit" (Interrogatory No. 5) and that Plaintiffs

have not provided any substantive response.  Therefore, I understand that Plaintiffs are not asserting that any such secondary considerations of non-obviousness exist.

477.    Moreover, I am not aware of any secondary considerations of non-obviousness of the Asserted Patents.  Specifically, I am not aware of: (1) any commercial success of any products practicing the Asserted Patents; (2) any long-felt but unmet need fulfilled by the Asserted Patents; (3) any industry skepticism, praise, or acceptance concerning the Asserted Patents; (4) any unexpected results caused by the Asserted Patents; (5) any failure of others to achieve the goals of the Asserted Patents; or (6) any copying of the Asserted Patents.  *See, e.g.*, Blankenbeckler Tr. at 126:1-129:5; Ryan Tr. at 123:4-127:24; Jenkins Tr. at 122:3-123:23.

478.    To the extent Plaintiffs are permitted to offer opinions concerning any alleged secondary considerations of non-obviousness, I reserve the right to supplement the above opinions.

## XII.    NON-INFRINGING ALTERNATIVES

479.    I have been asked to analyze several proposed alternatives to the Accused Products, which I understand Plaintiffs are accusing of infringement.

480.    Based on my analysis, each of the alternatives discussed below would not infringe the Asserted Patents and would be commercially acceptable.  In this section, I explain my analysis for each alternative in turn.

### A.    The '400 Patent

#### 1.    Substituting or Publicizing Any Concealed Unique Identifiers

481.    I understand that Plaintiffs have alleged that the Accused Products "obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device" because Viasat documents include references to source code variables, such as ███████████

██████████████, etc. *See* Plaintiffs' Mar. 22, 2024 Infringement Contentions, Ex. A at 39-45; Plaintiffs' Jan. 3, 2025 Infringement Contentions, Ex. A at 40-47.

482.    I disagree with Plaintiffs' allegations that any of the cited variables meet the '400 patent's "unique identifier" limitation where the "unique identifier" is "obtained from," "specific to," and "concealed by" a portable data storage device, which I am prepared to address in further detail in response to any report served by Plaintiffs' expert(s) containing such allegations.  The DRM systems used by the Accused Products do not uniquely identify any end-user device, nor do they collect any information about specific devices for purposes of knowing where to route content.  *See* O'Sullivan Trans. at 108:12-109:7, 110:9-15.

483.    However, even assuming Plaintiffs are correct, these cited variables could easily be publicized without altering their functionality in any visible or notable way.  From a customer's perspective, publicizing any of these variables would not alter the functionality of the Accused Products in any visible or notable way.

484.    Even if the Accused Products used a "unique identifier" that is "obtained from," "specific to," and "concealed by" a portable data storage device, none of the Accused Products utilize such a variable for purposes of *authenticating* any end-user device.

485.    Even if such a variable was utilized to authenticate an end-user device, it would be a straightforward change for Viasat to instead replace the variable in the source code with any other identifier of the device that is not "obtained from," "specific to," or "concealed" by the device. Viasat could publish the accused variable rather than conceal any allegedly-concealed value that is utilized. In fact, at least some of these values are already publicly identifiable.

486.    I understand from testimony from Finn Hughes that these changes could be implemented by one engineer in approximately less than 2 hours of development time to code such an API and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

approximately 2 days of development time to fully test and deploy the API.  *See, e.g.*, Hughes Trans. at 160:22-163:7.  Based on my experience and review of Viasat's source code and documentation, I agree with Mr. Hughes' estimate.

### 2. Localizing Any Remote Trusted Servers

487.    I understand that Plaintiffs have alleged that the Accused Products "authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface." *See* Plaintiffs' Mar. 22, 2024 Infringement Contentions, Ex. A at 46-57; Plaintiffs' Jan. 3, 2025 Infringement Contentions, Ex. A at 26-37.

488.    In each of the Accused Products, the media content is transmitted to end-user devices by a local "onboard" server—not a server located remotely. *See, e.g.*, VIASAT_00006471 at -491-492 ("Stream media from ViaSat's onboard server . . ."); VIASAT_00000618 at -623 (showing "Application Server" that delivers content to the user device as onboard the aircraft).

489.    In each of the Accused Products, third-party DRM license servers provide a DRM license. The third-party DRM license servers on the S4 are local, not "remote" servers. *See, e.g.*, VIASAT_00006471 at -499 (showing "DRM License Server" as part of the local "onboard server"); VIASAT_00000618 at -623 (showing "DRM System" as onboard the aircraft, not remote); VIASAT_00014554 (W-IFE Content Security Whitepaper - Rev D) (showing "DRM System" as within the "Aircraft").

490.    As Plaintiffs' own cited documents show, the DRM license servers that Viasat utilizes are locally onboard the aircraft. *See, e.g.*, VIASAT_00006471 at -499 (showing the "DRM License Server" and "██████████" located within the "Onboard Server").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

491.    However, even assuming Plaintiffs are correct to the extent Plaintiffs are permitted to accuse ██████ servers as the "remote trusted server" (a theory of infringement that would not work, for multiple reasons), Viasat also had the ability to use a DRM system that does not communicate with any "remote trusted server" for authentication purposes without altering the functionality of the Accused Products in any material way. Indeed, this is already happening.

492.    Viasat has long used local ██████ and ██████ implementations on aircraft for DRM. Viasat's recent ██████ of the ██████ DRM system—████████████████ ████████████████—serves as evidence of just how easily Viasat can (and did) replace remote servers with local servers.

493.    ████████████████████████████████████ ████████ As Mr. O'Sullivan testified, the ██████████████ ████████████████████████████ ████████████████████████████ ██████████████t." O'Sullivan Trans. at 82:24-83:8. Additionally, ██████████ ██████████████████████████ ██████████████████████████ ██████████████ *Id.* at 83:25-84:4.

494.    This solution is a commercially acceptable non-infringing alternative because passengers receive an identical (and sometimes better) user experience, whereby user devices can still obtain DRM licenses from local DRM servers even if a commercial airplane travels through a dead zone without Internet connectivity.

495.    I understand from testimony from Finn Hughes and Des O'Sullivan that the ███████████

███████████████████ has already been implemented via less than 10 lines of code in

approximately 2 days of development time.  *See, e.g.*, Hughes Trans. at 163:8-166:20;

O'Sullivan Trans. at 82:1-84:4.  I also understand that the ████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████. *Id.*  For the remaining airlines, ████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████. *Id.*  Based on my experience and review of Viasat's source code and

documentation, I agree with Mr. Hughes' and Mr. O'Sullivan's estimate.

### 3.    Not Providing Any Corresponding Access Key

496.    I understand that Plaintiffs have alleged that the Accused Products "in response to

the authentication, provide to the portable data storage device an encrypted first media content

and a corresponding access key." *See* Plaintiffs' Mar. 22, 2024 Infringement Contentions, Ex. A

at 57-65; Plaintiffs' Jan. 3, 2025 Infringement Contentions, Ex. A at 61-70.

497.    I disagree with Plaintiffs' allegations that Viasat's third-party DRM license

servers, such as ███████████ DRM and the ███████████████, meet the '400 patent's

"provide . . . an encrypted first media content and a corresponding access key" limitation, which

I am prepared to address in further detail in response to any report served by Plaintiffs' expert(s)

containing such allegations.

498.    In each of the Accused Products, the Application Server provides the encrypted media

content to the end-user device. Media content is uploaded ████████████████████████

████████████████████████████████████████████████████████████████████████

█████████" VIASAT_00014554 at -560 (W-IFE Content Security Whitepaper - Rev D). An

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"automated pipeline" pushes the media content files from the ███████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* The media content files are then processed via ██████

██████████████████████████████████████████████████████ *Id.*

499.    In each of the Accused Products, the DRM keys are sent to the end-user device by the DRM license server. *See* VIASAT_00014554 at -560 ("The decryption keys are managed by the on-board DRM system . . .").

500.    The Application Server stores and provides all media content sent to the end-user device, while the third-party DRM license server provides the corresponding access key to decrypt media content. *See* VIASAT_00014554 at -560 (showing "DRM keys" provided via the DRM System to the end user, while the "Content" is provided via the Application Server to the end user). The Application Server and the DRM license servers are two separate components of the Accused Products. *See id*. There is no single component of the Accused Products that provides *both* the encrypted media content and the corresponding access key.

501.    However, even assuming that the encrypted media content and corresponding access key were provided to the end-user device by a single component of Viasat's W-IFE system, Viasat's W-IFE system could easily be designed such that there is no single component that is a "kiosk" that provides both the "encrypted first media content" *and* the "corresponding access key" to a portable data storage device. As Finn Hughes explained, Viasat could "relocate the licensed servers and the token API to be cloud servers rather than locally" such that the license request and token request would not occur on the S4 server onboard. *See* Hughes Trans. at 167:5-25.

502.    This solution would not alter the functionality of the Accused Products in any noticeable way when an airplane is in a "connected" state, and would operate in the same manner as ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

The "corresponding access key" can be delivered from a DRM license server that does not constitute a "kiosk" or even onboard the aircraft at all. Even if the playback would face occasional dead zones when the DRM servers were to be relocated to be on the cloud servers, this functionality is exactly "███████████████████████." Hughes Trans. at 168:17-18. Viasat had the ability to make the change to cloud servers without altering the functionality of the Accused Products in any notable way.

503.    I understand from testimony from Finn Hughes that these changes could be implemented by two engineers in approximately two weeks to 3 months of development time. *See, e.g.*, Hughes Trans. at 167:5-168:18. Based on my experience and review of Viasat's source code and documentation, I agree with Mr. Hughes' estimate.

**B.    The '667 Patent**

**1.    Removing ███████████████████**

504.    I understand that Plaintiffs served a set of infringement contentions on January 3, 2025 which advanced several new theories of infringement for both Asserted Patents.  I also understand that Plaintiffs filed a motion for leave to amend their contentions consistent with their January 3 supplement, which the Court denied as untimely.  Therefore, I understand that the operative set of infringement contentions is Plaintiffs' March 22, 2024 contentions, and that Plaintiffs are not proceeding on the new infringement theories set forth in their January 3 supplement.

505.    One of the new theories alleged by Plaintiffs in their January 3 supplement is that the Accused Products "receive an indication of the NAS device having a secure region" because

those products use █████████████████████████████████████████████

that "indicates the presence of a secure region" when ████ Plaintiffs' Jan. 3, 2025 Infringement

Contentions, Ex. B at 48-49.  I do not see this same theory in Plaintiffs' March 22, 2024

contentions, which did not reference ████████████████████████████ at all.

See Plaintiffs' Mar. 22, 2024 Infringement Contentions, Ex. B.  Therefore, I understand that

Plaintiffs are not advancing any arguments relying on ████████████████.  However, to the

extent Plaintiffs attempt to do so, and to the extent ████████████████ satisfies the '667

patent's "indication" limitation (it does not, based on my review of the Jan. 3, 2025 Infringement

Contentions), such a variable could easily be removed from the Accused Products without

altering their functionality in any visible or notable way.

    506.    As Jason Neri described in his deposition, in each of the Accused Products, the

████████████████ is managed by a client application called ████████████ which runs on an in-

flight or in-home modem.  Neri Tr. 36:8-24.  The modem communicates with and manages a

storage device that is used to cache entertainment content.  *Id.*  The ████████ application is

responsible for ████████████████████████████████████████████

████████████████████████ *Id.* 163:4-169:21.  The ████████ variable within ████████████

███████████████████████████████████████████

████████ *Id.*  Specifically, when the storage device is mounted onto the modem, the ████████

application checks whether █████████████████████████████████

███████████████████████████ *Id.* ██████████████████████████████

████████ *Id.* 186:15-187:5.  ████████████████ *Id.* 185:13-186:11.  The ████████does

not actually know whether ████████████████████; only whether it has ████████████

████ *Id.* 166:4-8; 184:11-185:3.

507.    In the aviation use case for VCDS, this variable already serves no purpose. Specifically, "[i]n the aviation use case, the host platform mounts the storage device using ████, and therefore ██████████████████████████." *Id.* 185:4-10.  Because ████████████ ████████████████████████████, it can be removed without having any effect on functionality; from a customer's perspective, the system would perform in an identical manner if this change were made.  The solution would require minimal effort.

508.    In the residential use case for VCDS, often referred to as "Stream," this variable serves only a minimal purpose.  To use Viasat's Stream offering, customers are sent a pre-configured and encrypted hard drive, often referred to as a "Hub," which they plug into their Viasat modem.  *Id.* 189:13-18.  As described above, the modem, which runs the ████████ application, ████████████████████████████████████████████ ████████████████████████.  *Id.* 167:2-169:7.  This variable is merely a failsafe, though, as all Hubs are encrypted by Viasat before being sent to the customer.  *Id.* 169:13-16, 189:16-18.  Therefore, eliminating this check would not affect the security of Viasat's Stream offering, as the Hub would still be encrypted.  The system would perform in a materially identical manner if this change were made.  Again, removing the "encrypted" variable from this use case would require ensuring there were no stray references to the variable elsewhere in the code and would require minimal effort.

509.    I understand from Dan Newman that these changes could be implemented in approximately four weeks of development with a development cost of approximately $100,000.  Newman Tr. 111:16-115:4.  Based on my experience and review of Viasat's source code and documentation, I agree with Mr. Newman's estimate.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### 2.   Unencrypting Storage Drives

510.   I understand that Plaintiffs have alleged that the Accused Products include a "NAS decide having a secure region" because those products utilize encrypted hard drives. Plaintiffs' Mar. 22, 2024 Infringement Contentions, Ex. B at 14-27.

511.   I disagree with Plaintiffs allegations that a storage device meets the '667's patent's "secure region" limitation simply because it is encrypted, which I am prepared to address in further detail in response to any report served by Plaintiffs' expert(s) containing such allegations.[6]  However, even assuming Plaintiffs are correct, these storage devices could easily be unencrypted without altering the functionality of the Accused Products in any visible or notable way.

512.   The entertainment content stored on the Accused Products' storage devices is often protected using DRM security, which means that even if it were stored in an unencrypted format, it would be unusable without permission from whoever enabled the DRM security. VIASAT_00006779 at 6804.  Therefore, the encryption is a redundancy, and storing the information in an unencrypted format would only have a minor effect on the security of the Accused Products.

513.   However, as an additional measure, the individual content files could still be encrypted prior to being placed on the unencrypted drive.  Doing so would mean the drive itself is not necessarily "secure," let alone has a "secure region," but would offer the exact same level of protection as the Accused Products currently do.

---

[6]  Plaintiffs infringement contentions provide no support for their allegations that the S4 servers used in Viasat's IFE offering are encrypted, and Jason Neri testified that the ███████████ application "doesn't know if ██████████████████████████████████████████████████████."  Neri Tr. 166:4-8.  For the purposes of this section of my report, I assume that all storage devices used by the Accused Products are encrypted.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

514.    From a customer's perspective, both of these alternatives would perform in a materially identical manner as the current Accused Products.

515.    From a technical perspective, these changes could be implemented very easily. The first alternative, removing all encryption, would require very little modification to the existing system as it would just require any encryption on the storage devices to be deactivated. The second alternative, removing encryption from the storage devices and encrypting files individually, would require the same deactivation with the additional step of adding encryption and decryption logic to the vcds-client.

516.    I understand from Dan Newman that these changes could be implemented in approximately three months of development with a development cost of approximately $500,000.  Newman Tr. 115:5-117:21.  Based on my experience and review of Viasat's source code and documentation, I agree with Mr. Newman's estimate.

## XIII.  CONCLUSION

517.    I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

DATED:  March 24, 2025

*Kevin C Almeroth*

_____

Kevin C. Almeroth, Ph.D.

# EXHIBIT A

# Kevin C. Almeroth

Professor Emeritus
Department of Computer Science
University of California
Santa Barbara, CA 93106-5110
(805)636-1123 (office)
(805)893-8553 (fax)
almeroth@cs.ucsb.edu (email)
http://www.cs.ucsb.edu/~almeroth (WWW URL)

## Education

**Ph.D.**    June 1997 *Georgia Institute of Technology*  Computer Science

*Dissertation Title*: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia Systems

*Minor*: Telecommunications Public Policy

**M.S.**    June 1994 *Georgia Institute of Technology*  Computer Science

*Specialization*: Networking and Systems

**B.S.**    June 1992 *Georgia Institute of Technology*  Information and Computer Science
**(high honors)**    *Minors*: Economics, Technical Communication, American Literature

## Employment History

| | | |
|---|---|---|
| Professor Emeritus | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Nov 2020 -- present |
| Professor | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 2005 -- Oct 2020 |
| Associate Dean | College of Engineering<br>University of California<br>Santa Barbara, CA | Mar 2007 -- Aug 2009 |
| Vice Chair | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 2000 -- Nov 2005 |

| | | |
|---|---|---|
| Associate Professor | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 2001 -- Jun 2005 |
| Assistant Professor | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 1997 -- Jun 2001 |
| Graduate Researcher | Broadband Telecommunications Center<br>Georgia Center for Adv Telecom Tech<br>Atlanta, GA | Sep 1996--Jun 1997 |
| Graduate Intern | IBM<br>T.J. Watson Research Labs<br>Hawthorne, NY | Jun 1995--Sep 1995 |
| Support Specialist | Office of Information Technology<br>Georgia Institute of Technology<br>Atlanta, GA | Sep 1995--Jun 1997 |
| Research Assistant | College of Computing<br>Georgia Institute of Technology<br>Atlanta, GA | Jan 1994--Mar 1994 |
| Graduate Intern | Hitachi Telecommunications<br>Norcross, GA | Jun 1992--Sep 1992 |
| Undergraduate Intern | IBM<br>Research Triangle Park, NC | Jun 1989--Sep 1989<br>Jun 1990--Sep 1990<br>Mar 1991--Sep 1991 |

## Industry Technical Advising

| | | |
|---|---|---|
| Board of Directors | The New Media Studio<br>Santa Barbara, CA | Nov 2006 -- present |
| Co-Founder &<br>Chairman of the Board | Santa Barbara Labs, LLC<br>Santa Barbara, CA | Sep 2007 --<br>Dec 2009 |
| Board of Advisors | Techknowledge Point<br>Santa Barbara, CA | May 2001 --<br>Dec 2007 |
| Technical Advisory Board | Occam Networks, Inc.<br>Santa Barbara, CA | May 2000 --<br>Dec 2010 |
| Board of Advisors | Airplay Inc.<br>San Francisco, CA | Jun 2005 --<br>Aug 2009 |
| Consultant | Lockheed Martin Corporation<br>San Jose, CA | Nov 1999 --<br>Jun 2009 |

| Board of Advisors | Santa Barbara Technology Group<br>Santa Barbara, CA | Sep 2000 --<br>Dec 2004 |
| Board of Directors | Virtual Bandwidth, Inc.<br>Santa Barbara, CA | Nov 2000 --<br>Jun 2001 |
| Board of Advisors &<br>Affiliated Scientist | Digital Fountain<br>San Francisco, CA | Jan 2000 --<br>Dec 2001 |
| Senior Technologist | IP Multicast Initiative, Stardust Forums<br>Campbell, CA | Jun 1998 --<br>Dec 2000 |

# I. Teaching

## A. Courses Taught

| CS 176A | Intro to Computer Communication Networks | Fall 1997, Fall 1998, Fall 2002, Fall 2003, Fall 2004, Spring 2005, Spring 2006, Spring 2007, Spring 2008, Fall 2008, Fall 2009, Fall 2010, Fall 2011, Fall 2012, Fall 2013, Fall 2014, Spring 2017, Spring 2018, Spring 2020, Fall 2020 |
| CS 176B | Network Computing | Winter 2000, Winter 2001, Winter 2002, Winter 2012, Winter 2014, Winter 2015, Winter 2018, Winter 2019, Winter 2020 |
| MAT 201B | Media Networks and Services | Fall 1999, Fall 2000, Fall 2001, Fall 2003 |
| CS 276 | Distributed Computing and Computer Networks | Winter 1999, Spring 2000, Fall 2002, Fall 2005, Fall 2018 |
| CS 290I | Networking for Multimedia Systems | Winter 1998, Spring 1999, Fall 2004, Winter 2010 |
| CS 595N | Technology and Society | Winter 2005, Fall 2005, Spring 2006, Fall 2006, Spring 2007, Fall 2007, Spring 2008, Fall 2008, Spring 2009 |
| CS 595N | Economic Systems Seminar | Winter 2004, Spring 2004, Winter 2005, Spring 2005 |
| CS 595N | Networking Seminar | Winter 1999, Fall 1999, Winter 2003, Winter 2019 |
| CS 595N | Wireless Networking & Multimedia Seminar | Fall 2000 |
| CS 595I | Systems Design and Implementation Seminar | Fall 1999, Fall 2000, Winter 2001, Spring 2001, Winter 2002, Spring 2002 |

## B. Other Teaching Experience

- *The Evolution of Advanced Networking Services: From the ARPAnet to Internet2*, Instructor, Summer 2001. Short course taught at Escuela de Ciencias Informatica (ECI) sponsored by the Universidad de

Buenos Aires.

- *Johns Hopkins Center for Talented Youth*, Instructor, Summer 1994. CTY is a program to teach gifted high school students the fundamentals of computer science.

- *Georgia Institute of Technology*, Graduate Teaching Assistant, Sep 1994--Sep 1996. Worked as a TA for 12 quarters teaching 7 different courses (4 undergraduate and 3 graduate).

## C. Ph.D. Students Advised [14 graduated]

14. Daniel Havey
    Research Area: *Throughput and Delay on the Packet Switched Internet*
    Date Graduated: Winter 2015
    First Position: Microsoft
13. Lara Deek (co-advised with E. Belding)
    Research Area: *Resource-Efficient Wireless Systems for Emerging Wireless Networks*
    Date Graduated: Summer 2014
    First Position: Post Doc, UIUC
12. Mike Wittie
    Research Area: *Towards Sustained Scalability of Communication Networks*
    Date Graduated: Summer 2011
    First Position: Assistant Professor, Montana State University
11. Allan Knight
    Research Area: *Supporting Integration of Educational Technologies and Research of Their Effects on Learning*
    Date Graduated: Summer 2009
    First Position: Research Scientist, Citrix Online
10. Hangjin Zhang
    Research Area: *Towards Blended Learning: Educational Technology to Improve and Assess Teaching and Learning*
    Date Graduated: Spring 2009
    First Position: Microsoft
9. Gayatri Swamynathan
    Dissertation Title: *Towards Reliable Reputations for Distributed Applications*
    Date Graduated: Spring 2008
    First Position: Zynga
8. Amit Jardosh (co-advised with E. Belding)
    Dissertation Title: *Adaptive Large-Scale Wireles Networks: Measurements, Protocol Designs, and Simulation Studies*
    Date Graduated: Fall 2007
    First Position: Yahoo!
7. Khaled Harras
    Dissertation Title: *Protocol and Architectural Challenges in Delay and Disruption Tolerant Networks*
    Date Graduated: Summer 2007
    First Position: Assistant Professor, Carnegie Mellon University
6. Krishna Ramachandran (co-advised with E. Belding)
    Dissertation Title: *Design, Deployment, and Management of High-Capacity Wireless Mesh Networks*

Date Graduated: Winter 2006
First Position: Research Scientist, Citrix Online

5. Robert Chalmers
Dissertation Title: *Improving Device Mobility with Intelligence at the Network Edge*
Date Graduated: Summer 2004
First Position: President and CEO, Limbo.net

4. Prashant Rajvaidya
Dissertation Title: *Achieving Robust and Secure Deployment of Multicast*
Date Graduated: Spring 2004
First Position: President and CTO, Mosaic Networking

3. Sami Rollins
Dissertation Title: *Overcoming Resource Constraints to Enable Content Exchange Applications in Next-Generation Environments*
Date Graduated: Spring 2003
First Position: Assistant Professor, Mount Holyoke College

2. Srinivasan Jagannathan
Dissertation Title: *Multicast Tree-Based Congestion Control and Topology Management*
Date Graduated: Spring 2003
First Position: Consultant, Kelly & Associates

1. Kamil Sarac
Dissertation Title: *Supporting a Robust Multicast Service in the Global Infrastructure*
Date Graduated: Spring 2002
First Position: Assistant Professor, UT-Dallas

## D. M.S. Students Advised (Thesis/Project Option) [19 graduated]

19. Neer Shey
Research Area: *Analyzing Content Distribution Through Opportunistic Contact for Smart Cellular Phones*
Date Graduated: Spring 2010

18. Camilla Fiorese
Research Area: *Analysis of a Pure Rate-Based Congestion Control Algorithm*
Date Graduated: Summer 2009

17. Brian Weiner
Research Area: *Multi-Socket TCP: A Simple Approach to Improve Performance of Real-Time Applications over TCP*
Date Graduated: Fall 2007

16. Avijit Sen Mazumder
Research Area: *Facilitating Robust Multicast Group Management*
Date Graduated: Fall 2005

15. Rishi Matthew
Thesis Title: *Providing Seamless Access to Multimedia Content on Heterogeneous Platforms*
Date Graduated: Summer 2004

14. Camden Ho
Research Area: *Tools and Techniques for Wireless Network Management*
Date Graduated: Spring 2004

13. Amit Jardosh (co-advised with E. Belding)
Research Area: *Realistic Environment Models for Mobile Network Evaluation*
Date Graduated: Spring 2004

12. Nitin Solanki
    Research Area: *SongWand: A Wireless Barcode Scanner Using Bluetooth Technology*
    Date Graduated: Winter 2004

11. Vrishali Wagle (co-advised with E. Belding)
    Research Area: *An Ontology-Based Service Discovery Mechanism*
    Date Graduated: Winter 2004

10. Uday Mohan
    Thesis Title: *Scalable Service Discovery in Mobile Ad hoc Networks*
    Date Graduated: Spring 2003

9. Krishna Ramachandran
    Thesis Title: *Ubiquitous Multicast*
    Date Graduated: Spring 2003

8. John Slonaker
    Thesis Title: *Inductive Loop Signature Acquisition Techniques*
    Date Graduated: Spring 2002

7. Mohammad Battah
    Thesis Title: *Dedicated Short-Range Communications Intelligent Transportation Systems Protocol (DSRC-ITS)*
    Date Graduated: Spring 2002

6. Kevin Vogel
    Thesis Title: *Integrating E-Commerce Applications into Existing Business Infrastructures*
    Date Graduated: Spring 2001

5. Sami Rollins
    Thesis Title: *Audio XmL: Aural Interaction with XML Documents*
    Date Graduated: Winter 2000

4. Andy Davis
    Thesis Title: *Stream Scheduling for Data Servers in a Scalable Interactive TV System*
    Date Graduated: Spring 1999

3. David Makofske
    Thesis Title: *MHealth: A Real-Time Graphical Multicast Monitoring Tool*
    Date Graduated: Winter 1999

2. Prashant Rajvaidya
    Thesis Title: *MANTRA: Router-Based Monitoring and Analysis of Multicast Traffic*
    Date Graduated: Winter 1999

1. Alex DeCastro (co-advised with Yuan-Fang Wang)
    Thesis Title: *Web-Based Collaborative 3D Modeling*
    Date Graduated: Winter 1998

## E. Teaching Awards

2006-2007 UCSB Academic Senate Distinguished Teaching Award
2004-2005 Computer Science Outstanding Faculty Member
2000-2001 UCSB Spotlight on Excellence Award
1999-2000 Computer Science Outstanding Faculty Member (co-recipient)
1998-1999 Computer Science Outstanding Faculty Member (co-recipient)
1997-1998 Computer Science Outstanding Faculty Member

## II. Research

## A. Journal Papers, Magazine Articles, Books, and Book Chapters

62. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "A Practical Framework for 802.11 MIMO Rate Adaptation," Computer Networks, vol. 83, num. 6, pp. 332-348, June 2015.

61. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "Intelligent Channel Bonding in 802.11n WLANs," IEEE Transactions on Mobile Computing, vol. 13, num. 6, pp. 1242-1255, June 2014.

60. H. Zhang and K. Almeroth, "Alternatives for Monitoring and Limiting Network Access to Students in Network-Connected Classrooms," Journal of Interactive Learning Research (JILR), vol. 24, num. 3, pp. 237-265, July 2013.

59. M. Tavakolifard and K. Almeroth, "A Taxonomy to Express Open Challenges in Trust and Reputation Systems," Journal of Communications, vol. 7, num. 7, pp. 538-551, July 2012.

58. M. Tavakolifard and K. Almeroth, "Social Computing: An Intersection of Recommender Systems, Trust/Reputation Systems, and Social Networks," IEEE Network, vol. 26, num. 4, pp. 53-58, July/August 2012.

57. M. Tavakolifard, K. Almeroth, and P. Ozturk, "Subjectivity Handling of Ratings for Trust and Reputation Systems: An Abductive Reasoning Approach," International Journal of Digital Content Technology and its Applications (JDCTA), vol. 5, num. 11, pp. 359-377, November 2011.

56. R. Raghavendra, P. Acharya, E. Belding and K. Almeroth, "MeshMon: A Multi-Tiered Framework for Wireless Mesh Network Monitoring," Wireless Communications and Mobile Computing (WCMC) Journal, vol. 11, num. 8, pp. 1182-1196, August 2011.

55. A. Knight and K. Almeroth, "Automatic Plagiarism Detection with PAIRwise 2.0," Journal of Interactive Learning Research (JILR), vol. 22, num. 3, pp. 379-400, July 2011.

54. V. Kone, M. Zheleva, M. Wittie, B. Zhao, E. Belding, H. Zheng, and K. Almeroth, "AirLab: Consistency, Fidelity and Privacy in Wireless Measurements," ACM Computer Communications Review, vol. 41, num. 1, pp. 60-65, January 2011.

53. G. Swamynathan, K. Almeroth, and B. Zhao, "The Design of a Reliable Reputation System," Electronic Commerce Research Journal, vol. 10, num. 3-4, pp. 239-270, December 2010.

52. P. Acharya, A. Sharma, E. Belding, K. Almeroth and K. Papagiannaki, "Rate Adaptation in Congested Wireless Networks through Real-Time Measurements," IEEE Transactions on Mobile Computing, vol. 9, num. 11, pp. 1535-1550, November 2010.

51. R. Raghavendra, E. Belding, K. Papagiannaki, and K. Almeroth, "Unwanted Link Layer Traffic in Large IEEE 802.11 Wireless Networks," IEEE Transactions on Mobile Computing, vol. 9, num. 9, pp. 1212-1225, September 2010.

50. H. Zhang and K. Almeroth, "Moodog: Tracking Student Activity in Online Course Management Systems," Journal of Interactive Learning Research (JILR), vol. 21, num. 3, pp. 407-429, July 2010.

49. R. Chertov and K. Almeroth, "Qualitative Comparison of Link Shaping Techniques," International Journal of Communication Networks and Distributed Systems, vol. 5, num. 1/2, pp. 109-129, July 2010.

48. A. Knight and K. Almeroth, "Fast Caption Alignment for Automatic Indexing of Audio," International Journal of Multimedia Data Engineering and Management, vol. 1, num. 2, pp. 1-17, April-June 2010.

47. K. Harras and K. Almeroth, "Scheduling Messengers in Disconnected Clustered Mobile Networks," Ad Hoc & Sensor Wireless Networks, vol. 9, num. 3-4, pp. 275-304, March-April 2010.

46. A. Jardosh, K. Papagiannaki, E. Belding, K. Almeroth, G. Iannaccone, and B. Vinnakota, "Green WLANs: On-Demand WLAN Infrastructures," ACM Journal on Mobile Networks and Applications (MONET), vol. 14, num. 6, pp. 798-814, December 2009.

45. M. Wittie, K. Harras, K. Almeroth, and E. Belding, "On the Implications of Routing Metric Staleness in Delay Tolerant Networks," Computer Communications Special Issue on Delay and Disruption Tolerant Networking, vol. 32, num. 16, pp. 1699-1709, October 2009.

44. K. Harras, L. Deek, C. Holman, and K. Almeroth, "DBS-IC: An Adaptive Data Bundling System for Intermittent Connectivity," Computer Communications Special Issue on Delay and Disruption Tolerant Networking, vol. 32, num. 16, pp. 1687-1698, October 2009.

43. S. Karpinski, E. Belding, K. Almeroth, and J. Gilbert, "Linear Representations of Network Traffic," ACM Journal on Mobile Networks and Applications (MONET), vol. 14, num. 4, pp. 368-386, August 2009.

42. K. Harras and K. Almeroth, "Controlled Flooding in Disconnected Sparse Mobile Networks," Wireless Communications and Mobile Computing (WCMC) Journal, vol. 9, num. 1, pp. 21-33, January 2009.

41. R. Mayer, A. Stull, K. DeLeeuw, K. Almeroth, B. Bimber, D. Chun, M. Bulger, J. Campbell, A. Knight, and H. Zhang, "Clickers in College Classrooms: Fostering Learning with Questioning Methods in Large Lecture Classes," Contemporary Educational Psychology, vol. 34, num. 1, pp. 51-57, January 2009.

40. A. Knight, K. Almeroth, and B. Bimber, "Design, Implementation and Deployment of PAIRwise," Journal of Interactive Learning Research (JILR), vol. 19, num. 3, pp. 489-508, July 2008.

39. A. Garyfalos and K. Almeroth, "Coupons: A Multilevel Incentive Scheme for Information Dissemination in Mobile Networks," IEEE Transactions on Mobile Computing, vol. 7, num. 6, pp. 792-804, June 2008.

38. I. Sheriff, K. Ramachandran, E. Belding, and K. Almeroth, "A Multi-Radio 802.11 Mesh Network Architecture," ACM Journal on Mobile Networks and Applications (MONET), vol. 13, num. 1-2, pp. 132-146, April 2008.

37. M. Bulger, R. Mayer, K. Almeroth, and S. Blau, "Measuring Learner Engagement in Computer-Equipped College Classrooms," Journal of Educational Multimedia and Hypermedia, vol. 17, num. 2, pp. 129-143, April 2008.

36. G. Swamynathan, B. Zhao, and K. Almeroth, "Exploring the Feasibility of Proactive Reputations," Concurrency and Computation: Practice and Experience, vol. 20, num. 2, pp. 155-166, February 2008.

35. G. Swamynathan, B. Zhao, K. Almeroth, and H. Zheng, "Globally Decoupled Reputations for Large

Distributed Networks," Advances in Multimedia, vol. 2007, pp. 1-14, 2007.

34. R. Mayer, A. Stull, J. Campbell, K. Almeroth, B. Bimber, D. Chun and A. Knight, "Overestimation Bias in Self-reported SAT Scores," Educational Psychology Review, vol. 19, num. 4, pp. 443-454, December 2007.

33. P. Namburi, K. Sarac and K. Almeroth, "Practical Utilities for Monitoring Multicast Service Availability," Computer Communications Special Issue on Monitoring and Measurement of IP Networks, vol. 29, num. 10, pp. 1675-1686, June 2006.

32. R. Chalmers, G. Krishnamurthi and K. Almeroth, "Enabling Intelligent Handovers in Heterogeneous Wireless Networks," ACM Journal on Mobile Networks and Applications (MONET), vol. 11, num. 2, pp. 215-227, April 2006.

31. H. Lundgren, K. Ramachandran, E. Belding, K. Almeroth, M. Benny, A. Hewatt, A. Touma and A. Jardosh, "Experience from the Design, Deployment and Usage of the UCSB MeshNet Testbed," IEEE Wireless Communications, vol. 13, num. 2, pp. 18-29, April 2006.

30. R. Mayer, K. Almeroth, B. Bimber, D. Chun, A. Knight and A. Campbell, "Technology Comes to College: Understanding the Cognitive Consequences of Infusing Technology in College Classrooms," Educational Technology, vol. 46, num. 2, pp. 48-53, March-April 2006.

29. A. Garyfalos and K. Almeroth, "A Flexible Overlay Architecture for Mobile IPv6 Multicast," Journal on Selected Areas in Communications (JSAC) Special Issue on Wireless Overlay Networks Based on Mobile IPv6, vol. 23, num. 11, pp. 2194-2205, November 2005.

28. K. Sarac and K. Almeroth, "Monitoring IP Multicast in the Internet: Recent Advances and Ongoing Challenges," IEEE Communications, vol. 43, num. 10, pp. 85-91, October 2005.

27. K. Sarac and K. Almeroth, "Application Layer Reachability Monitoring for IP Multicast," Computer Networks, vol. 48, num. 2, pp. 195-213, June 2005.

26. A. Jardosh, E. Belding, K. Almeroth and S. Suri, "Real-world Environment Models for Mobile Network Evaluation," Journal on Selected Areas in Communications Special Issue on Wireless Ad hoc Networks, vol. 23, num. 3, pp. 622-632, March 2005.

25. S. Rollins and K. Almeroth, "Evaluating Performance Tradeoffs in a One-to-Many Peer Content Distribution Architecture," Journal of Internet Technology, vol. 5, num. 4, pp. 373-387, Fall 2004.

24. K. Sarac and K. Almeroth, "Tracetree: A Scalable Mechanism to Discover Multicast Tree Topologies in the Network," IEEE/ACM Transactions on Networking, vol. 12, num. 5, pp. 795-808, October 2004.

23. K. Sarac and K. Almeroth, "A Distributed Approach for Monitoring Multicast Service Availability," Journal of Network and Systems Management, vol. 12, num. 3, pp. 327-348, September 2004.

22. P. Rajvaidya, K. Ramachandran and K. Almeroth, "Managing and Securing the Global Multicast Infrastructure," Journal of Network and Systems Management, vol. 12, num. 3, pp. 297-326, September 2004.

21. P. Rajvaidya and K. Almeroth, "Multicast Routing Instabilities," IEEE Internet Computing, vol. 8, num. 5, pp. 42-49, September/October 2004.

20. D. Johnson, R. Patton, B. Bimber, K. Almeroth and G. Michaels, "Technology and Plagiarism in the

University: Brief Report of a Trial in Detecting Cheating," Association for the Advancement of Computing in Education (AACE) Journal, vol. 12, num. 3, pp. 281-299, Summer 2004.

19. R. Chalmers and K. Almeroth, "A Security Architecture for Mobility-Related Services," Journal of Wireless Personal Communications, vol 29, num. 3, pp. 247-261, June 2004.

18. B. Stiller, K. Almeroth, J. Altmann, L. McKnight, and M. Ott, "Pricing for Content in the Internet," Computer Communications, vol. 27, num. 6, pp. 522-528, April 2004.

17. S. Rollins and K. Almeroth, "Lessons Learned Deploying a Digital Classroom," Journal of Interactive Learning Research (JILR), vol. 15, num. 2, pp. 169-185, April 2004.

16. S. Jagannathan and K. Almeroth, "A Dynamic Pricing Scheme for E-Content at Multiple Levels-of-Service," Computer Communications, vol. 27, num. 4, pp. 374-385, March 2004.

15. K. Almeroth, "Using Satellite Links in the Delivery of Terrestrial Multicast Traffic," Internetworking and Computing over Satellites, Kluwer Academic Publishers, 2003.

14. R. Chalmers and K. Almeroth, "On the Topology of Multicast Trees," IEEE/ACM Transactions on Networking, vol. 11, num. 1, pp. 153-165, January 2003.

13. S. Jagannathan, J. Nayak, K. Almeroth, and M. Hofmann, "On Pricing Algorithms for Batched Content Delivery Systems," Electronic Commerce Research and Applications Journal, vol. 1, num. 3-4, pp. 264-280, Fall 2002.

12. D. Makofske and K. Almeroth, "Multicast Sockets: Practical Guide for Programmers," Morgan Kaufmann Publishers, November 2002.

11. S. Jagannathan and K. Almeroth, "Price Issues in Delivering E-Content On-Demand," ACM Sigecom Exchanges, vol. 3, num. 2, pp. 18-27, May 2002.

10. D. Makofske and K. Almeroth, "From Television to Internet Video-on-Demand: Techniques and Tools for VCR-Style Interactivity," Software: Practice and Experience, vol. 31, num. 8, pp. 781-801, July 2001.

9. K. Sarac and K. Almeroth, "Supporting Multicast Deployment Efforts: A Survey of Tools for Multicast Monitoring," Journal on High Speed Networking, Special Issue on Management of Multimedia Networking, vol. 9, num. 3/4, pp. 191-211, March 2001.

8. K. Almeroth, "Adaptive, Workload-Dependent Scheduling for Large-Scale Content Delivery Systems," Transactions on Circuits and Systems for Video Technology, Special Issue on Streaming Video, vol. 11, num. 3, pp. 426-439, March 2001.

7. D. Makofske and K. Almeroth, "Real-Time Multicast Tree Visualization and Monitoring," Software: Practice and Experience, vol. 30, num. 9, pp. 1047-1065, July 2000.

6. M. Ammar, K. Almeroth, R. Clark and Z. Fei, "Multicast Delivery of WWW Pages," Electronic Commerce Technology Trends: Challenges and Opportunities, IBM Press, February 2000.

5. K. Almeroth, "The Evolution of Multicast: From the MBone to Inter-Domain Multicast to Internet2 Deployment," IEEE Network Special Issue on Multicasting, vol. 10, num. 1, pp. 10-20, January/February 2000.

4. K. Almeroth and M. Ammar, "An Alternative Paradigm for Scalable On-Demand Applications: Evaluating and Deploying the Interactive Multimedia Jukebox," IEEE Transactions on Knowledge and Data Engineering Special Issue on Web Technologies, vol. 11, num. 4, pp 658-672, July/August 1999.

3. K. Almeroth and M. Ammar, "The Interactive Multimedia Jukebox (IMJ): A New Paradigm for the On-Demand Delivery of Audio/Video," Computer Networks and ISDN Systems, vol. 30, no. 1, April 1998.

2. K. Almeroth and M. Ammar, "Multicast Group Behavior in the Internet's Multicast Backbone (MBone)," IEEE Communications, vol. 35, no. 6, pp. 124-129, June 1997.

1. K. Almeroth and M. Ammar, "On the Use of Multicast Delivery to Provide a Scalable and Interactive Video-on-Demand Service," Journal on Selected Areas of Communication (JSAC), vol. 14, no. 6, pp. 1110-1122, August 1996.


## B. Conference Papers with Proceedings (refereed)

89. D. Havey and K. Almeroth, "Active Sense Queue Management (ASQM)," *IFIP Networking Conference*, Toulouse, FRANCE, May 2015.

88. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "Joint Rate and Channel Width Adaptation in 802.11 MIMO Wireless Networks," IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), New Orleans, LA, USA, June 2013.

87. D. Havey and K. Almeroth, "Fast Wireless Protocol: A Network Stack Design for Wireless Transmission," *IFIP Networking Conference*, Brooklyn, New York, USA, May 2013.

86. M. Tavakolifard, J. Gulla, K. Almeroth, J. Ingvaldsen, G. Nygreen, and E. Berg, "Tailored News in the Palm of Your HAND: A Multi-Perspective Transparent Approach to News Recommendation," *Demo Track at the International World Wide Web Conference (WWW)*, Rio de Janeiro, BRAZIL, May 2013.

85. S. Patterson, M. Wittie, K. Almeroth, and B. Bamieh, "Network Optimization with Dynamic Demands and Link Prices," *Allerton Conference*, Monticello, Illinois, USA, October 2012.

84. D. Havey, R. Chertov, and K. Almeroth, "Receiver Driven Rate Adaptation," *ACM Multimedia Systems Conference (MMSys)*, Chapel Hill, North Carolina, USA, February 2012.

83. M. Tavakolifard and K. Almeroth, "Trust 2.0: Who to Believe in the Flood of Online Data?" *International Conference on Computing, Networking and Communications (ICNC)*, Maui, Hawaii, USA, January 2012.

82. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "The Impact of Channel Bonding on 802.11n Network Management," *ACM CoNEXT*, Tokyo, JAPAN, December 2011.

81. L. Deek, X. Zhou, K. Almeroth, and H. Zheng, "To Preempt or Not: Tackling Bid and Time-based Cheating in Online Spectrum Auctions," *IEEE Infocom*, Shanghai, CHINA, April 2011.

80. M. Wittie, V. Pejovic, L. Deek, K. Almeroth, and B. Zhao, "Exploiting Locality of Interest in Online Social Networks," *ACM CoNEXT*, Philadelphia, Pennsylvania, USA, November 2010.

79. R. Chertov and K. Almeroth, "Using BGP in a Satellite-Based Challenged Network Environment,"

*IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, Boston, Massachusetts, USA, June 2010.

78. R. Chertov, D. Havey and K. Almeroth, "MSET: A Mobility Satellite Emulation Testbed," *IEEE Infocom*, San Diego, California, USA, March 2010.

77. B. Stone-Gross, A. Moser, C. Kruegel, E. Kirda, and K. Almeroth, "FIRE: FInding Rogue nEtworks," *Annual Computer Security Applications Conference (ACSAC)*, Honolulu, Hawaii, USA, December 2009.

76. M. Wittie, K. Almeroth, E. Belding, I. Rimac, and V. Hilt, "Internet Service in Developing Regions Through Network Coding," *IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, Rome, ITALY, June 2009.

75. R. Chertov and K. Almeroth, "High-Fidelity Link Shaping," *International Conference on Testbeds and Research Infrastructures for the Development of Networks and Communities (TRIDENTCOM)*, Washington DC, USA, April 2009.

74. L. Deek, K. Almeroth, M. Wittie, and K. Harras, "Exploiting Parallel Networks Using Dynamic Channel Scheduling," *International Wireless Internet Conference (WICON)*, Maui, Hawaii, USA, November 2008.

73. D. Havey, E. Barlas, R. Chertov, K. Almeroth, and E. Belding, "A Satellite Mobility Model for QUALNET Network Simulations," *IEEE Military Communications Conference (MILCOM)*, San Diego, California, USA, November 2008.

72. J. Kayfetz and K. Almeroth, "Creating Innovative Writing Instruction for Computer Science Graduate Students," *ASEE/IEEE Frontiers in Education (FIE) Conference*, Saratoga Springs, New York, USA, October 2008.

71. G. Swamynathan, B. Zhao, K. Almeroth, and S. Rao, "Towards Reliable Reputations for Dynamic Networked Systems," *IEEE International Symposium on Reliable Distributed Systems (SRDS)*, Napoli, ITALY, October 2008.

70. B. Stone-Gross, D. Sigal, R. Cohn, J. Morse, K. Almeroth, and C. Krugel, "VeriKey: A Dynamic Certificate Verification System for Public Key Exchanges," *Conference on Detection of Intrusions and Malware & Vulnerability Assessment (DIMVA)*, Paris, FRANCE, July 2008.

69. P. Acharya, A. Sharma, E. Belding, K. Almeroth, K. Papagiannaki, "Congestion-Aware Rate Adaptation in Wireless Networks: A Measurement-Driven Approach," *IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, San Francisco, California, USA, June 2008.

68. A. Jardosh, P. Suwannatat, T. Hollerer, E. Belding, and K. Almeroth, "SCUBA: Focus and Context for Real-time Mesh Network Health Diagnosis," *Passive and Active Measurement Conference (PAM)*, Cleveland, Ohio, USA, April 2008.

67. B. Stone-Gross, C. Wilson, K. Almeroth, E. Belding, H. Zheng, K. Papagiannaki, "Malware in IEEE 802.11 Wireless Networks," *Passive and Active Measurement Conference (PAM)*, Cleveland, Ohio, USA, April 2008.

66. R. Raghavendra, E. Belding, K. Papagiannaki, and K. Almeroth, "Understanding Handoffs in Large IEEE 802.11 Wireless Networks," *Internet Measurement Conference (IMC)*, San Diego, California,

USA, October 2007.

65. M. Wittie, B. Stone-Gross, K. Almeroth and E. Belding, "MIST: Cellular Data Network Measurement for Mobile Applications," *IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets)*, Raleigh, North Carolina, USA, September 2007.

64. S. Karpinski, E. Belding, K. Almeroth, "Wireless Traffic: The Failure of CBR Modeling," *IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets)*, Raleigh, North Carolina, USA, September 2007.

63. A. Knight, K. Almeroth, H. Zhang, R. Mayer, and K. DeLeeuw, "Data Cafe: A Dining Car Approach to Educational Research Data Management and Distribution," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Vancouver, CANADA, June 2007.

62. H. Zhang, K. Almeroth, A. Knight, M. Bulger, and R. Mayer, "Moodog: Tracking Students' Online Learning Activities," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Vancouver, CANADA, June 2007.

61. M. Bulger, K. Almeroth, R. Mayer, D. Chun, A. Knight, H. Collins, "Effects of Instructor Engagement on Student Use of a Course Management System," Assocation for Psychological Science (APS) Annual Conference, Washington DC, USA, May 2007.

60. R. Mayer, A. Stull, K. Almeroth, B. Bimber, D. Chun, M. Bulger, J. Campbell, Allan Knight, and H. Zhang, "Using Technology-Based Methods to Foster Learning in Large Lecture Classes: Evidence for the Pedagogic Value of Clickers," *American Educational Research Association (AERA) Annual Conference*, Chicago, Illinois, USA, April 2007.

59. K. Ramachandran, I. Sheriff, E. Belding, and K. Almeroth, "Routing Stability in Static Wireless Mesh Networks," *Passive and Active Measurement Conference (PAM)*, Louvain-la-neuve, BELGIUM, April 2007.

58. G. Swamynathan, T. Close, S. Banerjee, R. McGeer, B. Zhao, and K. Almeroth, "Scalable Access Control For Web Services," *International Conference on Creating, Connecting and Collaborating through Computing (C5)*, Kyoto, JAPAN, January 2007.

57. A. Knight, M. Bulger, K. Almeroth, and H. Zhang, "Is Learning Really a Phone Call Away? Knowledge Transfer in Mobile Learning," *World Conference on Mobile Learning (mLearn)*, Banff, Alberta, CANADA, October 2006.

56. J. Kurian, K. Sarac, and K. Almeroth, "Defending Network-Based Services Against Denial of Service Attacks," *International Conference on Computer Communication and Networks (IC3N)*, Arlington, Virginia, USA, October 2006.

55. A. Jardosh, K. Sanzgiri, E. Belding and K. Almeroth, "IQU: Practical Queue-Based User Association Management for WLANs--Case Studies, Architecture, and Implementation," ACM Mobicom, Marina del Rey, California, USA, September 2006.

54. C. Holman, K. Harras, and K. Almeroth, "A Proactive Data Bundling System for Intermittent Mobile Connections," IEEE International Conference on Sensor and Ad Hoc Communications and Networks (SECON), Reston, Virginia, USA, September 2006.

53. G. Banks, M. Cova, V. Felmetsger, K. Almeroth, R. Kemmerer and G. Vigna, "SNOOZE: toward a Stateful NetWOrk prOtocol fuzZEr," *Information Security Conference (ISC)*, Samos Island, GREECE,

September 2006.

52. K. Harras and K. Almeroth, "Inter-Regional Messenger Scheduling in Delay Tolerant Mobile Networks," *IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM)*, Niagara Falls, New York, USA, June 2006.

51. M. Bulger, R. Mayer, and K. Almeroth, "Engaged By Design: Using Simulation to Promote Active Learning," **Outstanding Paper** at the *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

50. A. Knight, K. Almeroth, R. Mayer, D. Chun, and B. Bimber, "Observations and Recommendations for Using Technology to Extend Interaction," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

49. H. Zhang, and K. Almeroth, "A Simple Classroom Network Access Control System," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

48. K. Harras and K. Almeroth, "Transport Layer Issues in Delay Tolerant Mobile Networks," *IFIP Networking Conference*, Coimbra, PORTUGAL, May 2006.

47. R. Mayer, A. Stull, J. Campbell, K. Almeroth, B. Bimber, D. Chun and A. Knight, "Some Shortcomings of Soliciting Students' Self-Reported SAT Scores," *American Educational Research Association (AERA) Annual Conference*, San Francisco, California, USA, April 2006.

46. K. Ramachandran, E. Belding, K. Almeroth, and M. Buddhikot, "Interference-Aware Channel Assignment in Multi-Radio Wireless Mesh Networks," *IEEE Infocom*, Barcelona, SPAIN, April 2006.

45. A. Jardosh, K. Ramachandran, K. Almeroth, and E. Belding, "Understanding Congestion in IEEE 802.11b Wireless Networks," *ACM/USENIX Internet Measurement Conference (IMC)*, Berkeley, California, USA, October 2005.

44. H. Zhang, K. Almeroth and M. Bulger, "An Activity Monitoring System to Support Classroom Research," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Montreal, Quebec, CANADA, pp. 1444-1449, June 2005.

43. Z. Xiang, H. Zhang, J. Huang, S. Song and K. Almeroth, "A Hidden Environment Model for Constructing Indoor Radio Maps," *IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM)*, Taormina, ITALY, June 2005.

42. K. Harras, K. Almeroth and E. Belding, "Delay Tolerant Mobile Networks (DTMNs): Controlled Flooding in Sparse Mobile Networks," *IFIP Networking Conference*, Waterloo, Ontario, CANADA, May 2005.

41. A. Garyfalos and K. Almeroth, "Coupons: Wide Scale Information Distribution for Wireless Ad Hoc Networks," *IEEE Global Telecommunications Conference (Globecom) Global Internet and Next Generation Networks Symposium*, Dallas, Texas, USA, pp. 1655-1659, December 2004.

40. A. Knight and K. Almeroth, "DeCAF: A Digital Classroom Application Framework," *IASTED International Conference on Communications, Internet and Information Technology (CIIT)*, St. Thomas, US Virgin Islands, November 2004.

39. P. Namburi, K. Sarac and K. Almeroth, "SSM-Ping: A Ping Utility for Source Specific Multicast,"

*IASTED International Conference on Communications, Internet and Information Technology (CIIT)*, St. Thomas, US Virgin Islands, November 2004.

38. K. Ramachandran, E. Belding and K. Almeroth, "DAMON: A Distributed Architecture for Monitoring Multi-hop Mobile Networks," *IEEE International Conference on Sensor and Ad Hoc Communications and Networks (SECON)*, Santa Clara, California, USA, October 2004.

37. A. Garyfalos and K. Almeroth, "Coupon Based Incentive Systems and the Implications of Equilibrium Theory," *IEEE Conference on Electronic Commerce (CEC)*, San Diego, California, USA, pp. 213-220, July 2004.

36. A. Knight, K. Almeroth and B. Bimber, "An Automated System for Plagiarism Detection Using the Internet," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Lugano, Switzerland, pp. 3619-3625, June 2004.

35. H. Zhang and K. Almeroth, "Supplement to Distance Learning: Design for a Remote TA Support System," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Lugano, Switzerland, pp. 2821-2830, June 2004.

34. U. Mohan, K. Almeroth and E. Belding, "Scalable Service Discovery in Mobile Ad hoc Networks," *IFIP Networking Conference*, Athens, Greece, pp. 137-149, May 2004.

33. V. Thanedar, K. Almeroth and E. Belding, "A Lightweight Content Replication Scheme for Mobile Ad hoc Environments," *IFIP Networking Conference*, Athens, Greece, pp. 125-136, May 2004.

32. R. Chalmers and K. Almeroth, "A Mobility Gateway for Small-Device Networks," *IEEE International Conference on Pervasive Computing and Communications (PerCom)*, Orlando, Florida, USA, March 2004.

31. A. Jardosh, E. Belding, K. Almeroth and S. Suri, "Towards Realistic Mobility Models For Mobile Ad hoc Networks," *ACM Mobicom*, San Diego, California, USA, September 2003.

30. K. Sarac, P. Namburi and K. Almeroth, "SSM Extensions: Network Layer Support for Multiple Senders in SSM," *International Conference on Computer Communication and Networks (IC3N)*, Dallas, Texas, USA, October 2003.

29. K. Ramachandran and K. Almeroth, "MAFIA: A Multicast Management Solution for Access Control and Traffic Filtering," *IEEE/IFIP Conference on Management of Multimedia Networks and Services (MMNS)*, Belfast, Northern Ireland, September 2003.

28. J. Humfrey, S. Rollins, K. Almeroth, and B. Bimber, "Managing Complexity in a Networked Learning Environment," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, pp. 60-63, June 2003.

27. K. Almeroth, S. Rollins, Z. Shen, and B. Bimber, "Creating a Demarcation Point Between Content Production and Encoding in a Digital Classroom," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, pp. 2-5, June 2003.

26. M. Kolsch, K. Kvilekval, and K. Almeroth, "Improving Speaker Training with Interactive Lectures," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, June 2003.

25. P. Rajvaidya and K. Almeroth, "Analysis of Routing Characteristics in the Multicast Infrastructure,"

*IEEE Infocom*, San Francisco, California, USA, April 2003.

24. S. Rollins and K. Almeroth, "Pixie: A Jukebox Architecture to Support Efficient Peer Content Exchange," *ACM Multimedia*, Juan Les Pins, FRANCE, December 2002.

23. S. Rollins, R. Chalmers, J. Blanquer, and K. Almeroth, "The Active Information System(AIS): A Model for Developing Scalable Web Services," *IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA)*, Kauai, Hawaii, USA, August 2002.

22. S. Rollins and K. Almeroth, "Seminal: Additive Semantic Content for Multimedia Streams," *IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA)*, Kauai, Hawaii, USA, August 2002.

21. B. Stiller, K. Almeroth, J. Altmann, L. McKnight, and M. Ott, "Content Pricing in the Internet," *SPIE ITCom Conference on Internet Performance and Control of Network Systems (IPCNS)*, Boston, Massachusetts, USA, July 2002.

20. S. Jagannathan, J. Nayek, K. Almeroth and M. Hofmann, "A Model for Discovering Customer Value for E-Content," *ACM International Conference on Knowledge Discovery and Data Mining (SIGKDD)*, Edmonton, Alberta, CANADA, July 2002.

19. S. Rollins and K. Almeroth, "Deploying and Infrastructure for Technologically Enhanced Learning," **Outstanding Paper** at the *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Denver, Colorado, USA, pp. 1651-1656, June 2002.

18. P. Rajvaidya and K. Almeroth, "Building the Case for Distributed Global Multicast Monitoring," *Multimedia Computing and Networking (MMCN)*, San Jose, California, USA, January 2002.

17. S. Jagannathan and K. Almeroth, "An Adaptive Pricing Scheme for Content Delivery Systems," *IEEE Global Internet*, San Antonio, Texas, USA, November 2001.

16. K. Sarac and K. Almeroth, "Providing Scalable Many-to-One Feedback in Multicast Reachability Monitoring Systems," *IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS)*, Chicago, Illinois, USA, October 2001.

15. S. Jagannathan and K. Almeroth, "The Dynamics of Price, Revenue and System Utilization," *IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS)*, Chicago, Illinois, USA, October 2001.

14. A. Kanwar, K. Almeroth, S. Bhattacharyya, and M. Davy, "Enabling End-User Network Monitoring via the Multicast Consolidated Proxy Monitor," *SPIE ITCom Conference on Scalability and Traffic Control in IP Networks (STCIPN)*, Denver, Colorado, USA, August 2001.

13. S. Jagannathan and K. Almeroth, "Using Tree Topology for Multicast Congestion Control," *International Conference on Parallel Processing (ICPP)*, Valencia, SPAIN, September 2001.

12. P. Rajvaidya and K. Almeroth, "A Router-Based Technique for Monitoring the Next-Generation of Internet Multicast Protocols," *International Conference on Parallel Processing (ICPP)*, Valencia, SPAIN, September 2001.

11. R. Chalmers and K. Almeroth, "Modeling the Branching Characteristics and Efficiency Gains of Global Multicast Trees," *IEEE Infocom*, Anchorage, Alaska, USA, April 2001.

10. R. Chalmers and K. Almeroth, "Developing a Multicast Metric," *Global Internet*, San Francisco, California, USA, December 2000.

9. K. Sarac and K. Almeroth, "Monitoring Reachability in the Global Multicast Infrastructure," *IEEE International Conference on Network Protocols (ICNP)*, Osaka, JAPAN, November 2000.

8. K. Almeroth, "A Long-Term Analysis of Growth and Usage Patterns in the Multicast Backbone (MBone)," *IEEE INFOCOM*, Tel Aviv, ISRAEL, March 2000.

7. K. Almeroth, K. Obraczka and D. De Lucia, "A Lightweight Protocol for Interconnecting Heterogeneous Devices in Dynamic Environments," *IEEE International Conference on Multimedia Computing and Systems (ICMCS)*, Florence, ITALY, June 1999.

6. K. Almeroth and M. Ammar, "The Interactive Multimedia Jukebox (IMJ): A New Paradigm for the On-Demand Delivery of Audio/Video," **Best Paper** at *the Seventh International World Wide Web Conference (WWW)*, Brisbane, AUSTRALIA, April 1998.

5. K. Almeroth, M. Ammar and Z. Fei, "Scalable Delivery of Web Pages Using Cyclic Best-Effort (UDP) Multicast," *IEEE INFOCOM*, San Francisco, California, USA, June 1998.

4. K. Almeroth and M. Ammar, "Delivering Popular Web Pages Using Cyclic Unreliable Multicast (Extended Abstract)," *SPIE Conference on Voice, Video and Data Communications*, Dallas, Texas, USA, November 1997.

3. K. Almeroth, A. Dan, D. Sitaram and W. Tetzlaff, "Long Term Resource Allocation in Video Delivery Systems," *IEEE INFOCOM*, Kobe, JAPAN, April 1997.

2. K. Almeroth and M. Ammar, "On the Performance of a Multicast Delivery Video-On-Demand Service with Discontinuous VCR Actions," *International Conference on Communications (ICC)*, Seattle, Washington, USA, June 1995.

1. K. Almeroth and M. Ammar, "A Scalable, Interactive Video-On-Demand Service Using Multicast Communication," *International Conference on Computer Communication and Networks (IC3N)*, San Francisco, California, USA, September 1994.


# C. Workshop Papers (refereed)

34. M. Tavakolifard, J. Gulla, K. Almeroth, F. Hopfgartner, B. Kille, T. Plumbaum, A. Lommatzsch, T. Brodt, A. Bucko, and T. Heintz, "Workshop and Challenge on News Recommender Systems," *ACM RecSys News Recommender Systems (NRS) Workshop and Challange*, Hong Kong, CHINA, October 2013.

33. M. Tavakolifard, K. Almeroth, and J. Gulla, "Does Social Contact Matter? Modelling the Hidden Web of Trust Underlying Twitter," *ACM International Workshop on Social Recommender Systems (SRS)*, Rio de Janeiro, BRAZIL, May 2013.

32. D. Johnson, E. Belding, K. Almeroth and G. van Stam, "Internet Usage and Performance Analysis of a Rural Wireless Network in Macha, Zambia," *ACM Networked Systems for Developing Regions (NSDR) Workshop*, San Francisco, California, USA, June 2010.

31. D. Havey, R. Chertov, and K. Almeroth, "Wired Wireless Broadcast Emulation," *International*

*Workshop on Wireless Network Measurement (WiNMee)*, Seoul, Korea, June 2009.

30. R. Raghavendra, P. Acharya, E. Belding, and K. Almeroth, "MeshMon: A Multi-Tiered Framework for Wireless Mesh Network Monitoring," *ACM Mobihoc Wireless of the Students, by the Students, for the Students Workshop (S3)*, New Orleans, Louisiana, USA, May 2009.

29. G. Swamynathan, C. Wilson, B. Boe, B. Zhao, and K. Almeroth, "Do Social Networks Improve e-Commerce: A Study on Social Marketplaces," *ACM Sigcomm Workshop on Online Social Networks (WOSN)*, Seattle, Washington, USA, August 2008.

28. R. Raghavendra, E. Belding, and K. Almeroth, "Antler: A Multi-Tiered Approach to Automated Wireless Network Management," *IEEE Workshop on Automated Network Management (ANM)*, Phoenix, Arizona, USA, April 2008.

27. S. Karpinski, E. Belding, and K. Almeroth, "Towards Realistic Models of Wireless Workload," *International Workshop on Wireless Network Measurement (WiNMee)*, Limassol, CYPRUS, April 2007.

26. K. Harras, M. Wittie, K. Almeroth, and E. Belding, "ParaNets: A Parallel Network Architecture for Challenged Networks," *IEEE Workshop on Mobile Computing Systems and Applications (HotMobile)*, Tucson, Arizona, USA, February 2007.

25. H. Caituiro-Monge, K. Almeroth, M. del Mar Alvarez-Rohena, "Friend Relay: A Resource Sharing Framework for Mobile Wireless Devices," *ACM International Workshop on Wireless Mobile Applications and Services on WLAN Hotspots (WMASH)*, Los Angeles, California, September 2006.

24. G. Swamynathan, Ben Y. Zhao and K. Almeroth, "Exploring the Feasibility of Proactive Reputations," *International Workshop on Peer-to-Peer Systems (IPTPS)*, Santa Barbara, California, USA, February 2006.

23. G. Swamynathan, Ben Y. Zhao and K. Almeroth, "Decoupling Service and Feedback Trust in a Peer-to-Peer Reputation System," *International Workshop on Applications and Economics of Peer-to-Peer Systems (AEPP)*, Nanjing, CHINA, November 2005.

22. K. Ramachandran, M. Buddhikot, G. Chandranmenon, S. Miller, E. Belding, and K. Almeroth, "On the Design and Implementation of Infrastructure Mesh Networks," *IEEE Workshop on Wireless Mesh Networks (WiMesh)*, Santa Clara, California, USA, September 2005.

21. A. Jardosh, K. Ramachandran, K. Almeroth and E. Belding, "Understanding Link-Layer Behavior in Highly Congested IEEE 802.11b Wireless Networks," Sigcomm Workshop on Experimental Approaches to Wireless Network Design and Analysis (EWIND), Philadelphia, Pennsylvania, USA, August 2005.

20. A. Sen Mazumder, K. Almeroth and K. Sarac, "Facilitating Robust Multicast Group Management," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Skamania, Washington, USA, June 2005.

19. Y. Sun, I. Sheriff, E. Belding and K. Almeroth, "An Experimental Study of Multimedia Traffic Performance in Mesh Networks," MobiSys International Workshop on Wireless Traffic Measurements and Modeling (WitMeMo), Seattle, Washington, USA, June 2005.

18. K. Ramachandran, K. Almeroth and E. Belding, "A Framework for the Management of Large-Scale Wireless Network Testbeds," International Workshop on Wireless Network Measurement (WiNMee),

Trentino, ITALY, April 2005.

17. A. Garyfalos, K. Almeroth and K. Sanzgiri, "Deployment Complexity Versus Performance Efficiency in Mobile Multicast," *International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWiM)*, San Jose, California, USA, October 2004.

16. C. Ho, K. Ramachandran, K. Almeroth and E. Belding, "A Scalable Framework for Wireless Network Monitoring," *ACM International Workshop on Wireless Mobile Applications and Services on WLAN Hotspots (WMASH)*, Philadelphia, Pennsylvania, USA, October 2004.

15. A. Garyfalos, K. Almeroth and J. Finney, "A Hybrid of Network and Application Layer Multicast for Mobile IPv6 Networks," *International Workshop on Large-Scale Group Communication (LSGC)*, Florence, ITALY, October 2003.

14. A. Garyfalos, K. Almeroth and J. Finney, "A Comparison of Network and Application Layer Multicast for Mobile IPv6 Networks," *ACM Workshop on Modeling, Analysis and Simulation of Wireless and Mobile Systems (MSWiM)*, San Diego, California, USA, September 2003.

13. S. Jagannathan, and K. Almeroth, "Pricing and Resource Provisioning for Delivering E-Content On-Demand with Multiple Levels-of-Service," *International Workshop on Internet Charging and QoS Technologies (ICQT)*, Zurich, SWITZERLAND, October 2002.

12. S. Rollins, K. Almeroth, D. Milojicic, and K. Nagaraja, "Power-Aware Data Management for Small Devices," *Workshop on Wireless Mobile Multimedia (WoWMoM)*, Atlanta, GA, USA, September 2002.

11. K. Almeroth, S. Bhattacharyya, and C. Diot, "Challenges of Integrating ASM and SSM IP Multicast Protocol Architectures," *International Workshop on Digital Communications: Evolutionary Trends of the Internet (IWDC)*, Taormina, ITALY, September 2001.

10. K. Sarac and K. Almeroth, "Scalable Techniques for Discovering Multicast Tree Topology," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Port Jefferson, New York, USA, June 2001.

9. P. Rajvaidya, K. Almeroth and K. Claffy, "A Scalable Architecture for Monitoring and Visualizing Multicast Statistics," *IFIP/IEEE International Workshop on Distributed Systems: Operations & Management (DSOM)*, Austin, Texas, USA, December 2000.

8. S. Jagannathan, K. Almeroth and A. Acharya, "Topology Sensitive Congestion Control for Real-Time Multicast," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Chapel Hill, North Carolina, USA, June 2000.

7. K. Sarac and K. Almeroth, "Supporting the Need for Inter-Domain Multicast Reachability," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Chapel Hill , North Carolina, USA, June 2000.

6. D. Makofske and K. Almeroth, "MHealth: A Real-Time Multicast Tree Visualization and Monitoring Tool," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Basking Ridge New Jersey, USA, June 1999.

5. K. Almeroth and Y. Zhang, "Using Satellite Links as Delivery Paths in the Multicast Backbone (MBone)," *ACM/IEEE International Workshop on Satellite-Based Information Services (WOSBIS)*, Dallas, Texas, USA, October 1998.

4. M. Ammar, K. Almeroth, R. Clark and Z. Fei, "Multicast Delivery of Web Pages OR How to Make Web Servers Pushy," *Workshop on Internet Server Performance (WISP)*, Madison, Wisconsin, USA, June 1998.

3. K. Almeroth and M. Ammar, "Prototyping the Interactive Multimedia Jukebox," *Mini-conference on Multimedia Appliances, Interfaces, and Trials--International Conference on Communications (ICC)*, Montreal, Quebec, CANADA, June 1997.

2. K. Almeroth and M. Ammar, "Collection and Modeling of the Join/Leave Behavior of Multicast Group Members in the MBone," *High Performance Distributed Computing Focus Workshop (HPDC)*, Syracuse, New York, USA, August 1996.

1. K. Almeroth and M. Ammar, "The Role of Multicast Communication in the Provision of Scalable and Interactive Video-On-Demand Service," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Durham, New Hampshire, USA, April 1995.

# D. Non-Refereed Publications

8. K. Almeroth, E. Belding, M. Buddhikot, G. Chandranmenon, S. Miller, and K. Ramachandran, "Infrastructure Mesh Networks," *U.S. Patent Application US20070070959 A1*, September 2005.

7. K. Almeroth, R. Caceres, A. Clark, R. Cole, N. Duffield, T. Friedman, K. Hedayat, K. Sarac, M. Westerlund, "RTP Control Protocol Extended Reports (RTCP XR)," *Internet Engineering Task Force (IETF) Request for Comments (RFC) 3611*, November 2003.

6. Z. Albanna, K. Almeroth, D. Meyer, and M. Schipper, "IANA Guidelines for IPv4 Multicast Address Allocation," *Internet Engineering Task Force (IETF) Request for Comments (RFC) 3171*, August 2001.

5. B. Quinn and K. Almeroth, "IP Multicast Applications: Challenges and Solutions," *Internet Engineering Task Force (IETF), Request for Comments (RFC) 3170*, September 2001.

4. K. Almeroth, L. Wei and D. Farinacci, "Multicast Reachability Monitor (MRM) Protocol," *Internet Engineering Task Force Internet Draft*, July 2000.

3. K. Almeroth and L. Wei, "Justification for and use of the Multicast Reachability Monitor (MRM) Protocol," *Internet Engineering Task Force Internet Draft*, March 1999.

2. K. Almeroth, "Managing IP Multicast Traffic: A First Look at the Issues, Tools, and Challenges," IP Multicast Initiative White Paper, San Jose, California, USA, February 1999.

1. K. Almeroth, K. Obraczka and D. De Lucia, "Pseudo-IP: Providing a Thin Network Protocol for Semi-Intelligent Wireless Devices," *DARPA/NIST Smart Spaces Workshop*, Gaithersburg, Maryland, USA, July 1998.

# E. Released Software Systems

19. ***A Multi-radio Wireless Mesh Network Architecture -- http://moment.cs.ucsb.edu/tic/.*** Released December 1, 2006 (with K. Ramachandran, I. Sheriff, and E. Belding). The software as part of a multi-

radio wireless mesh network that includes a Split Wireless Router that alleviates the interference that can occur between commodity radios within a single piece of hardware. The second is server software to perform channel assignment and communicate the assignments throughout the mesh network.

18. *AODV-Spanning Tree (AODV-ST) -- http://www.cs.ucsb.edu/~krishna/aodv-st/.* Released September 1, 2006 (with K. Ramachandran and E. Belding). AODV-ST is an extension of the well-known AODV protocol specifically designed for wireless mesh networks. The advantages of AODV-ST over AODV include support for high throughput routing metrics, automatic route maintenance for common-case traffic, and low route discovery latency.

17. *The Multicast Detective -- http://www.nmsl.cs.ucsb.edu/mcast_detective/.* Released September 1, 2005 (with A. Sen Mazumder). The multicast detective is a robust solution to determine the existence and nature of multicast service for a particular user. By performing a series of tests, a user can determine whether there is network support for multicast, and consequently, whether a multicast group join is likely to succeed.

16. *AutoCap: Automatic and Accurate Captioning -- http://www.nmsl.cs.ucsb.edu/autocap/.* Released August 1, 2005 (with A. Knight). AutoCap is a software system that takes as input an audio/video file and a text transcript. AutoCap creates captions by aligning the utterances in the audio/video file to the transcript. For those words that are not recognized, AutoCap estimates when the words were spoken along with an error bound that gives the content creator an idea of caption accuracy. The result is a collection of accurately time-stamped captions that can be displayed with the video.

15. *PAIRwise Plagiarism Detection System -- http://cits.ucsb.edu/pair/.* Released July 1, 2005 (with A. Knight). PAIRwise is a plagiarism detection system with: (1) an easy-to-use interface for submitting papers, (2) a flexible comparison engine that allows intra-class, inter-class, and Internet-based comparisons, and (3) an intuitive graphical presentation of results.

14. *DAMON Multi-Hop Wireless Network Monitoring -- http://moment.cs.ucsb.edu/damon/.* Released October 1, 2004 (with K. Ramachandran and E. Belding). DAMON is a distributed system for monitoring multi-hop mobile networks. DAMON uses agents within the network to monitor network behavior and send collected measurements to data repositories. DAMON's generic architecture supports the monitoring of a wide range of protocol, device, or network parameters.

13. *Multicast Firewall -- http://www.nmsl.cs.ucsb.edu/mafia/.* Released June 1, 2004 (with K. Ramachandran). MAFIA, a multicast firewall and traffic management solution, has the specific aim of strengthening multicast security through multicast access control, multicast traffic filtering, and DoS attack prevention.

12. *AODV@IETF Peer Routing Software-- http://moment.cs.ucsb.edu/aodv-ietf/.* Released November 1, 2003 (with K. Ramachandran and E. Belding). One of the first large-scale efforts to run the Ad hoc On demand Distance Vector (AODV) routing protocol in a public space (at the Internet Engineering Task Force (IETF)). The implementation includes a daemon that runs on both the Linux and Windows operating systems.

11. *Mobility Obstacles -- http://moment.cs.ucsb.edu/mobility/.* Released September 1, 2003 (with A. Jardosh, E. Belding, and S. Suri). The topology and movement of nodes in ad hoc protocol simulation are key factors in protocol performance. In this project, we have developed ns-2 simulation plug-ins that create more realistic movement models through the incorporation of obstacles. These obstacles are utilized to restrict both node movement and wireless transmissions.

10. *mwalk -- http://www.nmsl.cs.ucsb.edu/mwalk/.* Released December 1, 2000 (with R. Chalmers).

Mwalk is a collection of Java applications and Perl scripts which re-create a global view of a multicast session from mtrace and RTCP logs. Users to the site can download mwalk, examine the results of our analysis, or download data sets for use in simulations dependent on multicast tree characteristics.

9. ***MANTRA2 -- http://www.nmsl.cs.ucsb.edu/mantra/.*** Released December 1, 1999 (with P. Rajvaidya). This new version of MANTRA focuses on the visualization of inter-domain routing statistics. Working in conjunction with the Cooperative Association for Internet Data Analysis (CAIDA) we have developed advanced collection and visualization techniques.

8. ***MRM -- http://www.nmsl.cs.ucsb.edu/mrm/.*** Released October 1, 1999 (with K. Sarac). MRM is the Multicast Reachability Protocol. We have implemented an end-host agent that responds to MRM Manager commands. Our end-host agent works in conjunction with Cisco routers to detect and isolate multicast faults.

7. ***MANTRA -- http://www.nmsl.cs.ucsb.edu/mantra/.*** Released January 1, 1999 (with P. Rajvaidya). MANTRA is the Monitoring and Analysis of Traffic in Multicast Routers. It uses scripts to collect and display data from backbone multicast routers.

6. ***SDR Monitor -- http://www.nmsl.cs.ucsb.edu/sdr-monitor/.*** Released January 1, 1999 (with K. Sarac). The SDR Monitor receives e-mail updates from participants containing information about observed sessions in the MBone. A global view of multicast reachability is then constructed.

5. ***The MHealth tool -- http://www.nmsl.cs.ucsb.edu/mhealth/.*** Released September 1, 1998 (with D. Makofske). The mhealth tool graphically visualizes MBone multicast group trees and provides `health' information including end-to-end losses per receiver and losses on a per hop basis. The implementation required expertise in Java, the MBone tools, and Unix.

4. ***The MControl tool -- http://www.nmsl.cs.ucsb.edu/mcontrol/.*** Released August 1, 1998 (with D. Makofske). Mcontrol is a tool to provide VCR-based interactivity for live MBone sessions. The implementation required expertise in Java, the MBone tools, and Unix.

3. ***Interactive Multimedia Jukebox (IMJ) -- http://imj.ucsb.edu/.*** Released October 1, 1996. The IMJ combines the WWW and the MBone conferencing tools to provide a multi-channel video jukebox offering both instructional and entertainment programming on a wide scale. The implementation required expertise in HTML, Perl, C, the MBone tools, and Unix.

2. ***Mlisten -- http://www.cc.gatech.edu/computing/Telecomm/mbone/.*** Released September 1, 1995. A tool to continuously collect MBone multicast group membership information including number and location of members, membership duration, and inter-arrival time for all audio and video sessions. The implementation required expertise in C, Tcl/Tk, the MBone tools, and UNIX socket programming.

1. ***Audio-on-Demand (AoD)***. March 1, 1995. A server/client prototype to demonstrate interactivity in near VoD systems. The AoD server provides songs-on-demand and VCR-like functions via multicast IP over Ethernet. The implementation required expertise in C, OpenWindows programming, UNIX socket programming, and network programming.

# F. Tutorials, Panels and Invited Talks

- "25th Anniversary Panel," Network and Operating System Support for Digital Audio and Video (NOSSDAV), Portland, Oregon, USA, March 2015.

- "Sensing and Opportunistic Delivery of Ubiquitous Video in Health Monitoring, On-Campus and Social Network Applications," Workshop on Mobile Video Delivery (MoViD), Chapel Hill North Carolina, USA, February 2012.

- "Medium Access in New Contexts: Reinventing the Wheel?," USC Invited Workshop on Theory and Practice in Wireless Networks, Los Angeles, California, USA, May 2008.

- "The Wild, Wild West: Wireless Networks Need a New Sheriff," University of Florida CISE Department Lecture Series, Gainesville, Florida, USA, February 2008.

- "Distinguishing Between Connectivity, Intermittent Connectivity, and Intermittent Disconnectivity," Keynote at the ACM MobiCom Workshop on Challenged Networks (CHANTS), Montreal, CANADA, September 2007.

- "The Three Ghosts of Multicast: Past, Present, and Future," Keynote at the Trans-European Research and Education Networking Association (TERENA) Networking Conference, Lynby, DENMARK, May 2007.

- "Multicast Help Wanted: From Where and How Much?," Keynote at the Workshop on Peer-to-Peer Multicasting (P2PM), Las Vegas, Nevada, USA, January 2007.

- "The Confluence of Wi-Fi and Apps: What to Expect Next," Engineering Insights, UC-Santa Barbara, Santa Barbara, California, USA, October 2006.

- "Challenges, Opportunities, and Implications for the Future Internet," University of Minnesota Digital Technology Center, Minneapolis, Minnesota, USA, September 2006.

- "Wireless Technology as a Catalyst: Possibilities for Next-Generation Interaction," Santa Barbara Forum on Digital Transitions, Santa Barbara, California, USA, April 2006.

- "Challenges and Opportunities in an Internet with Pervasive Wireless Access," University of Texas--Dallas Computer Science Colloquium, Dallas, Texas, USA, March 2006.

- "Challenges and Opportunities with Pervasive Wireless in the Internet," Duke University Computer Science Colloquium, Durham, North Carolina, USA, February 2006.

- "The Span From Wireless Protocols to Social Applications," Intel Research Labs, Cambridge, United Kingdom, December 2005.

- "The Internet Dot.Com Bomb and Beyond the Dot.Com Calm," CSE IGERT and Cal Poly Lecture Series, San Luis Obispo, California, USA, October 2005.

- "Panel: Directions in Networking Research," IEEE Computer Communications Workshop (CCW), Irvine, California, USA, October 2005.

- "Economic Incentives for Ad Hoc Networks," KAIST New Applications Seminar, Seoul, South Korea, March 2004.

- "New Applications for the Next Generation Internet," Citrix Systems, Santa Barbara, California, USA, March 2004.

- "PI: The Imperfect Pursuit of Pure Pattern," CITS Visions in Technology Series, Santa Barbara,

California, USA, January 2004.

- "Panel: Core Networking Issues and Protocols for the Internet," National Science Foundation (NSF) Division of Advanced Networking Infrastructure and Research (ANIR) Principal Investigators Workshop, Washington DC, USA, March 2003.

- "Panel: Pricing for Content in the Internet," SPIE ITCom Internet Performance and Control of Network Systems, Boston, Massachusetts, USA, July 2002.

- "The Technology Behind Wireless LANs," Central Coast MIT Enterprise Forum, Santa Barbara, California, USA, March 2002.

- "Lessons Learned in the Digital Classroom," Center for Information and Technology Brown Bag Symposium, Santa Barbara, California, USA, March 2002.

- "The Evolution of Advanced Networking Services: From the ARPAnet to Internet2," California State University--San Luis Obispo CS Centennial Colloquium Series, San Luis Obispo, California, USA, February 2002.

- "Deployment of IP Multicast in Campus Infrastructures," Internet2 Campus Deployment Workshop, Atlanta, Georgia, USA, May 2001.

- "Multicast: Is There Anything Else to Do?," Sprint Research Retreat, Miami, Florida, USA, May 2001.

- "The Evolution of Next-Generation Internet Services and Applications," Government Technology Conference 2001 (GTC) for the Western Region, Sacramento, California, USA, May 2001.

- "I2 Multicast: Not WIDE-scale Deployment, FULL-scale Deployment," Closing Plenary, Internet2 Member Meetings, Washington, D.C., USA, March 2001.

- "Panel: Beyond IP Multicast," Content Delivery Networks (CDN), New York, New York, USA, February 2001.

- "Viable Multicast Pricing & Business Models for Wider-Scale Deployment," Content Delivery Networks (CDN), New York, New York, USA, February 2001.

- "IP Multicast: Modern Protocols, Deployment, and Management," Content Delivery Networks (CDN), New York, New York, USA, February 2001 & San Jose, California, USA, December 2001.

- "Under the Hood of the Internet," Technology 101: Technology for Investors, Center for Entrepreneurship & Engineering Management, November 2000.

- "Understanding Multicast Traffic in the Internet," (1) University of Virginia, (2) University of Maryland, and (3) Columbia University, September 2000.

- "The Bad, The Ugly, and The Good: The Past, Present, and Future of Multicast," Digital Fountain, San Francisco, California, USA, August 2000.

- "Implications of Source-Specific Multicast (SSM) on the Future of Internet Content Delivery," Occam Networks, Santa Barbara, California, USA, August 2000.

- "Introduction to Multicast Routing Protocols," UC-Berkeley Open Mash Multicast Workshop, Berkeley, California, USA, July 2000.

- "Efforts to Understand Traffic and Tree Characteristics," University of Massachusetts--Amherst Colloquia, Amherst, Massachusetts, USA, May 2000.

- "Monitoring Multicast Traffic," Sprint Research Retreat, Half Moon Bay, California, USA, April 2000.

- "What is the Next Generation of Multicast in the Internet?," HRL Laboratories, Malibu, California, USA, January 2000.

- "Mission and Status of the Center for Information Technology and Society (CITS)," Intel Research Council, Portland, Oregon, USA, September 1999.

- "Multicast at a Crossroads," IP Multicast Initiative Summits and Bandwidth Management Workshops, San Francisco, CA, USA, (1) October 1999; (2) February 2000; and (3) June 2000.

- "IP Multicast: Modern Protocols, Deployment, and Management," Networld+Interop: (1) Las Vegas, Nevada, USA--May 2000; (2) Tokyo, JAPAN--June 2000; (3) Atlanta, Georgia, USA--September 2000; (4) Las Vegas, Nevada, USA--May 2001; (5) Las Vegas, Nevada, USA--May 2002.

- "IP Multicast: Practice and Theory" (w/ Steve Deering), Networld+Interop: (1) Las Vegas, Nevada, USA--May 1999; (2) Tokyo, JAPAN--June 1999; and (3) Atlanta, Georgia, USA--September 1999.

- "Internet2 Multicast Testbeds and Applications," Workshop on Protocols for High Speed Networks (PfHSN), Salem, Massachusetts, USA, August 1999.

- "IP Multicast: Protocols for the Intra- and Inter-Domain," Lucent Technologies, Westford, Massachusetts, USA, August 1999.

- "Internet2 Multicast Testbeds and Applications," NASA Workshop: Bridging the Gap, Moffett Field, California, USA, August 1999.

- "The Evolution of Next-Generation Services and Applications in the Internet," Tektronix Distinguished Lecture Series, Portland, Oregon, USA, May 1999.

- "Multicast Applications and Infrastructure in the Next Generation Internet," CENIC 99 Workshop on Achieving Critical Mass for Advanced Applications, Monterey, California, USA, May 1999.

- "Multicast Traffic Monitoring and Analysis Work at UCSB" (w/ P. Rajvaidya), Workshop on Internet Statistics and Metrics Analysis (ISMA), San Diego, California, USA, April 1999.

- "How the Internet Works: Following Bits Around the World," Science Lite, Santa Barbara General Affiliates and Office of Community Relations, California, USA, February 1999.

- "Managing Multicast: Challenges, Tools, and the Future," IP Multicast Initiative Summit, San Jose, California, USA, February 1999.

- "The Future of Multicast Communication and Protocols," Internet Bandwidth Management Summit (iBAND), San Jose, California, USA, November 1998.

- "An Overview of IP Multicast: Applications and Deployment," (1) Workshop on Evaluating IP Multicast as the Solution for Webcasting Real-Time Networked Multimedia Applications, New York, New York, USA, July 1998; and (2) Satellites and the Internet Conference, Washington, D.C., USA, July 1998.

- "IETF Developments in IP Multicast," IP Multicast Initiative Summit, San Jose, California, USA, February 1998.

- "An Introduction to IP Multicast and the Multicast Backbone (MBone)" vBNS Technical Meeting sponsored by the National Center for Network Engineering (NLANR), San Diego, California, USA, February 1998.

- "Using Multicast Communication to Deliver WWW Pages" Computer Communications Workshop (CCW '97), Phoenix, Arizona, USA, September 1997.


## G. Research Funding

- K. Almeroth, "Packet Scheduling Using IP Embedded Transport Instrumentation," Cisco Systems Inc., $100,000, 3/1/13-8/31/14.

- K. Almeroth, E. Belding and S.J. Lee, "GOALI: Maximizing Available Bandwidth in Next Generation WLANs", National Science Foundation (NSF), $101,088, 10/1/13-9/30/14.

- K. Almeroth and E. Belding, "GOALI: Intelligent Channel Management in 802.11n Networks," National Science Foundation (NSF), $51,000, 10/1/10-9/30/11.

- B. Zhao, K. Almeroth, H. Zheng, and E. Belding, "NeTS: Medium: Airlab: Distributed Infrastructure for Wireless Measurements," National Science Foundation (NSF), $700,000, 9/1/09-8/13/13.

- K. Almeroth, E. Belding and T. Hollerer, "NeTS-WN: Wireless Network Health: Real-Time Diagnosis, Adaptation, and Management," National Science Foundation (NSF), $600,000, 10/1/07-9/30/10.

- K. Almeroth, "Next-Generation Service Engineering in Internet2," University Consortium for Advanced Internet Development (UCAID), $1,254,000, 7/1/04-6/30/09 (reviewed and renewed each year).

- B. Manjunath, K. Almeroth, F. Bullo, J. Hespanha, T. Hollerer, C. Krintz, U. Madhow, K. Rose, A. Singh, and M. Turk, "Large-Scale Multimodal Wireless Sensor Network," Office of Naval Research Defense University Research Instrumentation Program (DURIP), $655,174, 4/14/08-4/14/09.

- K. Almeroth and E. Belding, "Improving Robustness in Evolving Wireless Infrastructures," Intel Corporation, $135,000, 7/1/06-6/30/09 (reviewed and renewed for second and third year).

- K. Almeroth and K. Sarac, "Bridging Support in Mixed Deployment Multicast Environments," Cisco Systems Inc., $100,000, 9/1/07-8/31/08.

- K. Sarac and K. Almeroth, "Building the Final Piece in One-to-Many Content Distribution," Cisco Systems Inc., $95,000, 9/1/06-8/31/07.

- E. Belding, K. Almeroth and J. Gibson, "Real-Time Communication Support in a Ubiquitous Next-Generation Internet," National Science Foundation (NSF), $900,000, 10/1/04-9/30/07.

- K. Almeroth and K. Sarac, "Improving the Robustness of Multicast in the Internet," Cisco Systems Inc., $80,000, 9/1/04-8/31/05.

- R. Mayer, B. Bimber, K. Almeroth and D. Chun, "Assessing the Pedagogical Implications of Technology in College Courses," Mellon Foundation, $350,000, 7/1/04-6/30/07.

- B. Bimber, A. Flanagin and C. Stol, "Technological Change and Collective Association: Changing Relationships Among Technology, Organizations, Society and the Citizenry," National Science Foundation (NSF), $329,175, 7/1/04-6/30/07.

- K. Almeroth and B. Bimber, "Plagiarism Detection Techniques and Software," UCSB Instructional Development, $22,000, 7/1/04-6/30/05.

- K. Almeroth, "Student Travel Support for the 14th International Workshop on Network and Operating Systems Support for Digital Audio and Video (NOSSDAV)," National Science Foundation (NSF), $10,000, 5/1/04-8/31/04.

- K. Almeroth, "An Automated Indexing System for Remote, Archived Presentations," QAD Inc., $25,000, 5/1/04-6/30/05.

- K. Almeroth and M. Turk, "A Remote Teaching Assistant Support System," Microsoft, $40,000, 1/1/04-6/30/05.

- K. Almeroth, "Supporting Multicast Service Functionality in Helix," Real Networks, $30,000, 9/1/03-6/30/04.

- K. Almeroth and E. Belding, "Service Discovery in Mobile Networks," Nokia Summer Research Grant (U. Mohan), $10,240, 7/1/03-9/30/03.

- K. Almeroth, D. Zappala, "Building a Global Multicast Service," Cisco Systems Inc., $100,000, 1/1/03-6/30/04.

- K. Almeroth, "Developing A Dynamic Protocol for Candidate Access Router Discovery," Nokia Graduate Student Fellowship (R. Chalmers), $26,110, 9/01/02-6/30/03.

- B. Bimber and K. Almeroth, "The Role of Collaborative Groupware in Organizations," Toole Family Foundation, $182,500 ($20,000 cash plus $162,500 in software), 9/1/02-8/30/07.

- B. Manjunath, et al., "Digital Multimedia: Graduate Training Program in Interactive Digital Multimedia," National Science Foundation (NSF), $2,629,373, 4/1/02-3/31/07.

- J. Green, K. Almeroth, et al., "Inquiry in the Online Context: Learning from the Past, Informing the Future," UCSB Research Across Disciplines, $10,000, 9/1/01-8/31/02.

- K. Almeroth, "Monitoring and Maintaining the Global Multicast Infrastructure," Cisco Systems Inc., $54,600, 7/1/01-6/30/02.

- R. Kemmerer, K. Almeroth, et al., "Hi-DRA High-speed, Wide-area Network Detection, Response, and Analysis," Department of Defense (DoD), $4,283,500, 5/1/01-4/30/06.

- A. Singh, K. Almeroth, et al., "Digital Campus: Scalable Information Services on a Campus-wide Wireless Network," National Science Foundation (NSF), 1,450,000, 9/15/00-12/31/04.

- K. Almeroth, "Visualizing the Global Multicast Infrastructure," UC MICRO w/ Cisco Systems Inc., $85,438, 7/1/00-6/30/02.

- H. Lee, K. Almeroth, et al., "Dynamic Sensing Systems," International Telemetering Foundation, $260,000, 07/01/00-06/30/04.

- B. Bimber and K. Almeroth, "Funding for the Center on Information Technology and Society," $250,000 from Dialogic (an Intel Company) and $250,000 from Canadian Pacific.

- K. Almeroth, "CAREER: From Protocol Support to Applications: Elevating Multicast to a Ubiquitous Network Service," National Science Foundation (NSF), $200,000, 9/1/00-8/31/04.

- K. Almeroth, "Characterizing Multicast Use and Efficiency in the Inter-Domain," Sprint Advanced Technology Laboratories, $62,500, 3/1/00-6/30/01.

- K. Almeroth, "Producing the Next Generation of Multicast Monitoring and Management Protocols and Tools," UC MICRO w/ Cisco Systems Inc., $124,500, 7/1/99 - 6/30/01.

- K. Almeroth, "Utilizing Satellite Links in the Provision of an Inter-Wide Multicast Service," HRL Laboratories, $20,000, 7/1/99 - 6/30/00.

- T. Smith, K. Almeroth, et al., "Alexandria Digital Earth Prototype," National Science Foundation, $5,400,000, 4/1/99-3/31/04.

- V. Vesna, K. Almeroth, et al., "Online Public Spaces: Multidisciplinary Explorations in Multi-User Environments (OPS:MEME), Phase II," UCSB Research Across Disciplines, $50,000, 9/1/98-8/31/99.

- K. Almeroth, "Techniques and Analysis for the Provision of Multicast Route Management," UC MICRO w/ Cisco Systems Inc., $97,610, 7/1/98 - 6/30/00.

- K. Almeroth, "Capturing and Modeling Multicast Group Membership in the Multicast Backbone (MBone)," UC MICRO w/ Hughes Research Labs, $19,146, 7/1/98 - 12/31/99.

- K. Almeroth, "Building a Content Server for the Next Generation Digital Classroom," UCSB Faculty Research Grant, $5,000, 7/1/98-6/31/99.


## H. Research Honors and Awards

- IEEE Fellow Status, 2013
- Finalist for Best Paper Award, IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON), June 2008
- Best Paper Award, Passive and Active Measurement (PAM) Conference, April 2007
- Outstanding Paper Award, World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA), June 2006
- IEEE Senior Member Status, 2003
- Finalist for Best Student Paper Award, ACM Multimedia, December 2002
- Outstanding Paper Award, World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA), June 2002
- Computing Research Association (CRA) Digital Government Fellowship, 2001
- National Science Foundation CAREER Award, 2000
- Best Paper Award, 7th International World Wide Web Conference, April 1998

# III. Service

## A. Professional Activities

### 1. Society Memberships

Member, Association for Computing Machinery (ACM): 1993-present
Member, ACM Special Interest Group on Communications (SIGComm): 1993-present
Fellow, Institute of Electrical and Electronics Engineers (IEEE): 1993-present
Member, IEEE Communications Society (IEEE ComSoc): 1993-present
Member, American Society for Engineering Education (ASEE): 2003-2006

### 2. Review Work for Technical Journals and Publishers

NSF CISE research proposals, IEEE/ACM Transactions on Networking, IEEE/ACM Transactions on Computers, IEEE/ACM Transactions on Communications, IEEE Transactions on Circuits and Systems for Video Technology, IEEE Transactions on Parallel and Distributed Systems, IEEE Transactions on Multimedia, IEEE Communications, IEEE Communications Letters, IEEE Network, IEEE Internet Computing, IEEE Multimedia, IEEE Aerospace & Electronics Systems Magazine, ACM Transactions on Internet Technology, ACM Transactions on Multimedia Computing, Communications and Applications, ACM Computing Surveys, ACM Computer Communications Review, ACM Computeres in Entertainment, ACM/Springer Multimedia Systems Journal, AACE Journal of Interactive Learning (JILR), International Journal of Computer Mathematics, Journal of Communications and Networks, Journal of Parallel and Distributed Computing, Journal of Network and Systems Management, Journal of High Speed Networking, Journal of Communications and Networks, Journal on Selected Areas in Communications, Journal of Wireless Personal Communications, Personal Mobile Communications, Annals of Telecommunications, International Journal of Wireless and Mobile Computing, Pervasive and Mobile Computing (PMC), Wireless Networks Journal, Computer Networks Journal, Cluster Computing, Computer Communications, Mobile Computing and Communications Review, Performance Evaluation, Software--Practice & Experience, Information Processing Letters, ACM Sigcomm, ACM Multimedia, ACM Network and System Support for Digital Audio and Video Workshop (NOSSDAV), ACM Sigcomm Workshop on the Economics of Peer-to-Peer Systems (P2PEcon), ACM Sigcomm Workshop on Challenged Networks (CHANTS), IEEE Infocom, IEEE Globecom, IEEE Global Internet (GI) Symposium, IEEE Globecom Automatic Internet Symposium, IEEE Globecom Internet Services and Enabling Technologies (IS&ET) Symposium, IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM), IEEE International Conference on Network Protocols (ICNP), IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON), IEEE International Conference on Multimedia and Exposition (ICME), IEEE International Conference on Communications (ICC), IEEE International Conference on Parallel and Distributed Systems (ICPADS) IEEE International Symposium on High-Performance Distributed Computing (HPDC), IEEE International Conference on Distributed Computing Systems (ICDCS), IEEE International Workshop on Quality of Service (IWQoS),

IEEE/IFIP Network Operations and Management Symposium (NOMS), IFIP/IEEE International Symposium on Integrated Network Management (IM), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), IEEE Aerospace & Electronics Systems Magazine, SPIE Conference on Multimedia Computing and Networking (MMCN), IFIP Networking, IASTED International Conference on Information Systems and Databases (ISD), IASTED International Conference on Communications, Internet, and Information Technology, IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA), IASTED International Conference on European Internet and Multimedia Systems and Applications (EuroIMSA), IASTED International Conference on Communications and Computer Networks (CCN), IASTED International Conference on Software Engineering and Applications (SEA), International Conference on Computer and Information Science (ICIS), International Association for Development of the Information Society (IADIS) International Conference on the WWW/Internet, Workshop on Network Group Communication (NGC), International Conference on Next Generation Communication (CoNEXT), International Conference on Parallel Processing (ICPP), International Conference on Computer Communications and Networks (IC3N), International Workshop on Hot Topics in Peer-to-Peer Systems (Hot-P2P), International Workshop on Wireless Network Measurements (WiNMee), International Workshop on Incentive-Based Computing (IBC), International Workshop on Multi-hop Ad Hoc Networks (REALMAN), International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWIM), International Packet Video (PV) Workshop, High Performance Networking Conference (HPN), International Parallel Processing Symposium (IPPS), International Symposium on Innovation in Information & Communication Technology (ISIICT), Workshop on Coordinated Quality of Service in Distributed Systems (COQODS), Pearson Education (Cisco Press) Publishers, Macmillan Technical Publishing, and Prentice Hall Publishers.

## 3. Conference Committee Activities

### Journal/Magazine Editorial Board
IEEE Transactions on Mobile Computing (TMC): 2006-2011, 2017-2020 (Associate Editor-in-Chief)
IEEE Networking Letters: 2018-2021
IEEE Transactions on Network and Service Management (TNSM): 2015-2021
Journal of Network and Systems Management (JNSM): 2011-present
IEEE/ACM Transactions on Networking (ToN): 2003-2009, 2013-2017
ACM Computers in Entertainment: 2002-2015
IEEE Network: 1999-2012
AACE Journal of Interactive Learning Research (JILR): 2003-2012
IEEE Transactions on Mobile Computing (TMC): 2006-2011
ACM Computer Communications Review (CCR): 2006-2010

### Journal/Magazine Guest Editorship

IEEE Journal on Selected Areas in Communications (JSAC) Special Issue on "Delay and Disruption Tolerant Wireless Communication", June 2008
Computer Communications Special Issue on "Monitoring and Measuring IP Networks", Summer 2005
Computer Communications Special Issue on "Integrating Multicast into the Internet", March 2001

**Conference/Workshop Steering Committee**

    IEEE International Conference on Network Protocols (ICNP): 2007-present
    ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006-present
    IEEE Global Internet (GI) Symposium: 2005-2013, 2018-present
    International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2001-2020, 2005-2011 (chair), 2012-2020 (co-chair)
    IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2005-2009

**Conference/Workshop Chair**

    International Conference on Communication Systems and Networks (COMSNETS): 2014 (co-chair)
    ACM International Conference on Next Generation Communication (CoNext): 2013 (co-chair)
    ACM RecSys News Recommender Systems (NRS) Workshop and Challange: 2013 (co-chair)
    ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006 (co-chair)
    IEEE International Conference on Network Protocols (ICNP): 2003 (co-chair), 2006
    International Workshop on Wireless Network Measurements (WiNMee): 2006 (co-chair)
    IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2002 (co-chair)
    International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2002 (co-chair), 2003 (co-chair)
    IEEE Global Internet (GI) Symposium: 2001 (co-chair), 2018 (co-chair)
    International Workshop on Networked Group Communication (NGC): 2000 (co-chair)

**Program Chair**

    International Conference on Computer Communication and Networks (ICCCN): 2015 (Track co-chair) International Conference on Communication Systems and Networks (COMSNETS): 2010
    IEEE International Conference on Network Protocols (ICNP): 2008 (co-chair)
    IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON): 2007 (co-chair)
    IFIP Networking: 2005 (co-chair)

**Posters/Demonstrations Chair**

    ACM Sigcomm: 2012 (co-chair)

**Student Travel Grants Chair**

    ACM Sigcomm: 2010 (co-chair)

**Publicity Chair**

    IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2004 (co-chair)

**Keynote Chair**

    IEEE Infocom: 2005 (co-chair)

**Local Arrangements Chair**

Internet2 "Field of Dreams" Workshop: 2000

**Tutorial Chair**

ACM Multimedia: 2000
IEEE International Conference on Network Protocols (ICNP): 1999

**Panel/Session Organizer**

NSF ANIR PI 2003 Panel on "Core Networking Issues and Protocols for the Internet"
CCW 2001 Session on "Multicast/Peer-to-Peer Networking"
NOSSDAV 2001 Panel on "Multimedia After a Decade of Research"
NGC 2000 Panel on "Multicast Pricing"

**Technical Program Committee**

IEEE International Conference on Network Protocols (ICNP): 1999, 2000, 2001, 2003, 2004, 2005, 2006, 2007, 2008, 2009 (Area Chair), 2010 (Area Chair), 2011 (Area Chair), 2012 (Area Chair), 2013, 2014 (Area Chair), 2015 (Area Chair), 2016 (Area Chair), 2017 (Area Chair), 2018 (Area Chair), 2019 (Area Chair), 2020 (Area Chair), 2021 (Area Chair)
International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019
ACM Multimedia (MM): 2001, 2003, 2004, 2005 (short paper), 2006, 2007, 2008, 2008 (short paper), 2010, 2011, 2012, 2013, 2015, 2016, 2017, 2018, 2019, 2023, 2024
IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON): 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011 (Area Chair), 2012 (Area Chair), 2013, 2014 (Area Chair), 2015, 2016 (Area Chair), 2017, 2018, 2019
IEEE/IFIP Network Operations and Management Symposium (NOMS): 2004, 2006, 2010
IEEE Infocom: 2004, 2005, 2006, 2008, 2009, 2010 (Area Chair), 2011 (Area Chair), 2012 (Area Chair)
IFIP Networking: 2004, 2005, 2006, 2007, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2022
IEEE International Conference on Communications (ICC) Next Generation Networking and Internet Symposium (NGNI): 2018, 2019
ACM Workshop on Mobile Video (MoVid): 2014, 2015, 2016, 2017
ACM Student Research Competition (SRC) Grand Finals: 2014
Mobile and Social Computing for Collaborative Interactions (MSC): 2014
IEEE Conference on Communications and Network Security (CNS): 2013
IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM): 2005, 2006, 2007, 2008, 2009, 2010
ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006, 2008, 2009, 2010, 2011, 2012, 2016, 2017, 2018, 2019
IEEE International Conference on Distributed Computing Systems (ICDCS): 2006, 2010, 2011, 2012, 2013
International Workshop on Wireless Network Measurements (WiNMee): 2006, 2008, 2010
ACM Sigcomm: 2004 (poster), 2008 (poster), 2010
IEEE International Conference on Computer Communication and Networks (IC3N): 2008, 2009, 2010, 2011, 2012
International Conference on Communication Systems and Networks (COMSNETS): 2009,

2010, 2011, 2012, 2013
International Conference on Sensor Networks (SENSORNETS): 2012
International Workshop on Social and Mobile Computing for Collaborative Environments
(SOMOCO): 2012
Workshop on Scenarios for Network Evaluation Studies (SCENES): 2009, 2010, 2011
ACM Multimedia Systems (MMSys): 2010, 2011, 2012, 2015, 2016, 2017, 2018, 2019,
2020, 2021, 2022
IEEE Internation Symposium on Multimedia (ISM): 2016
IEEE International Conference on Pervasive Computing and Communications (PerCom):
2010
IEEE Wireless Communications and Networking Conference (WCNC): 2010, 2011
ACM International Symposium on Mobility Management and Wireless Access
(MobiWac): 2010, 2011
International Conference on Computing, Networking and Communications, Internet
Services and Applications Symposium (ICNC-ISA): 2012, 2013
IEEE WoWMoM Workshop on Hot Topics in Mesh Networking (HotMesh): 2010, 2011,
2012, 2013
IEEE Workshop on Pervasive Group Communication (PerGroup): 2010
ACM International Conference on Next Generation Communication (CoNEXT): 2005,
2006, 2007, 2009, 2012
IEEE International Conference on Broadband Communications, Networks, and Systems
(BroadNets) Wireless Communications, Networks and Systems Symposium: 2007, 2008,
2009
IEEE International Conference on Broadband Communications, Networks, and Systems
(BroadNets) Internet Technologies Symposium: 2007, 2008, 2009
International Workshop on Mobile and Networking Technologies for Social Applications
(MONET): 2008, 2009
Extreme Workshop on Communication-The Midnight Sun Expedition (ExtremeCom):
2009
IEEE International Workshop on Cooperation in Pervasive Environments (CoPE): 2009
International Workshop on the Network of the Future (FutureNet): 2009, 2010, 2011, 2012
IEEE International Conference on Multimedia and Exposition (ICME): 2010
SPIE Conference on Multimedia Computing and Networking (MMCN): 2004, 2008
ACM Sigcomm Workshop on the Economics of Networks, Systems, and Computation
(NetEcon): 2008
IEEE International Conference on Communications (ICC): 2008
IEEE International Conference on Mobile Ad-hoc and Sensor Systems (MASS): 2008
IFIP/IEEE International Symposium on Integrated Network Management (IM): 2005,
2007
Global Internet (GI) Symposium: 2001, 2002, 2004, 2006, 2007, 2022, 2023
IEEE/ACM International Conference on High Performance Computing (HiPC): 2007
ACM International Symposium on Mobile Ad Hoc Networking and Computing
(MobiHoc): 2007
IEEE Workshop on Embedded Systems for Real-Time Multimedia (ESTIMedia): 2007
IEEE/IFIP Wireless On Demand Network Systems and Services (WONS): 2007
IFIP/IEEE International Conference on Management of Multimedia Networks and
Services (MMNS): 2001, 2002, 2003, 2004, 2005, 2006
IASTED International Conference on European Internet and Multimedia Systems and
Applications (EuroIMSA): 2004, 2006
IEEE International Conference on Parallel and Distributed Systems (ICPADS): 2005, 2006
IEEE Globecom Internet Services and Enabling Technologies (IS&ET) Symposium: 2006

International Workshop on Incentive-Based Computing (IBC): 2006
IEEE International Workshop on Quality of Service (IWQoS): 2006, 2014, 2015
International Workshop on Multi-hop Ad Hoc Networks (REALMAN): 2006
IEEE Globecom Automatic Internet Symposium: 2005
ACM Sigcomm Workshop on the Economics of Peer-to-Peer Systems (P2PEcon): 2005
International Conference on Parallel Processing (ICPP): 2001, 2003, 2004
International Packet Video (PV) Workshop: 2002, 2003, 2004
IEEE International Symposium on High-Performance Distributed Computing (HPDC): 2004
International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWIM): 2004
International Symposium on Innovation in Information & Communication Technology (ISIICT): 2004
Workshop on Coordinated Quality of Service in Distributed Systems (COQODS): 2004
IASTED International Conference on Networks and Communication Systems (NCS): 2004
IASTED International Conference on Communications, Internet, and Information Technology (CIIT): 2004
IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA): 2003, 2004
International Workshop on Networked Group Communication (NGC): 1999, 2000, 2001, 2002, 2003
International Association for Development of the Information Society (IADIS) International Conference on the WWW/Internet: 2003
International Conference on Computer and Information Science (ICIS): 2003
Human.Society@Internet: 2003
IASTED International Conference on Communications and Computer Networks (CCN): 2002
The Content Delivery Networks (CDN) Event: 2001
IP Multicast Initiative Summit: 1998, 1999, 2000
Corporation for Education Network Initiatives in California (CENIC): 1999
Internet Bandwidth Management Summit (iBAND): 1998, 1999

## B. Technical Activities

### 1. Working Groups

Internet2 Working Group on Multicast, Chair: 1998-2005
IEEE Communications Society Internet Technical Committee (ITC), Conference Coordinator: 2000-2004
IETF Multicast Directorate (MADDOGS), Member: 1999-2001
IASTED Technical Committee on the Web, Internet and Multimedia, Member: 2002-2005
Internet Engineering Task Force (IETF), various working groups: 1995-present

### 2. Meeting Support Work

Internet Engineering Task Force MBone broadcasts: 1995-2005

Conference MBone broadcasts: Sigcomm '99, and '00
Interop+Networld Network Network Operations Center (NOC) Team Member: 1995-1997
ACM Multimedia technical staff: 1994

## C. University of California Committees

### 1. Department of Computer Science Committees

Public Relations: 2005-2006 (chair 2005-2006), 2009-2011 (chair 2009-2011)
Strategic Planning: 2000-2002, 2003-2006, 2009-2011
Undergraduate Advising and Affairs: 2006-2007, 2014-2015
Vice Chair: 2000-2005
Graduate Admissions: 2000-2005 (chair 2000-2005), 2011-2012
Graduate Affairs: 2000-2005 (co-chair 2000-2005)
Teaching Administration: 2000-2005
Facilities: 1997-2001 (chair 1999-2000), 2006-2007
External Relations: 1999-2002
Computer Engineering Public Relations: 2011-2012
Computer Engineering Awards: 2011-2012
Computer Engineering Administration/Recruiting: 1998-2001
Computer Engineering Lab and Computer Support: 1998-2001
Faculty Recruiting: 1999-2002
Graduate Advising: 1998-1999, 2000-2005

### 2. University Committees

Member, Campus Budget and Planning: 2013-2015
Faculty, Cognitive Science Program: 2006-2020
Faculty, Technology Management Program (TMP): 2003-2014
Faculty, Media Arts and Technology (MAT) Program: 1998-2014
Faculty, Computer Engineering Degree Program: 1998-2020
Steering Committee, Center for Information Technology and Society (CITS): 2012-2020
Associate Director, Center for Information Technology and Society (CITS): 1999-2012
Member, Campus Committee on Committees: 2010-2013
Member, Campus Income and Recharge Committee: 2010-2013
Member, College of Engineering Executive Committee: 2010-2012 (chair 2011-2012),
2014-2015 (chair 2014-2015)
Member, Distinguished Teaching Award Committee: 2009, 2010, 2011
Member, Campus Classroom Design and Renovation Committee: 2003-2010
Member, ISBER Advisory Committee: 2008-2011
Member, Fulbright Campus Review Committee: 2007
Member, Faculty Outreach Grant Program Review Committee: 2007
Executive Vice Chancellor's Information Technology Fee Committee: 2005-2006
Council on Research and Instructional Resources: 2003-2006
Executive Vice Chancellor's Working Group on Graduate Diversity: 2004-2005
Member, Engineering Pavillion Planning Committee: 2003-2005
Information Technology Board: 2001-2004

Executive Committee, Center for Entrepreneurship & Engineering Management (CEEM): 2001-2004

### 3. System Wide Committees

UCSB Representative to the Committee on Information Technology and Telecommunications Policy (ITTP): 2003-2005
UCSB Representative to the Executive Committee, Digital Media Innovation (DiMI): 1998-2003

## D. Georgia Tech Committees and Service (while a graduate student)

Graduate Student Body President: 1994-1995
Georgia Tech Executive Board: 1994-1995
Georgia Tech Alumni Association Executive Committee: 1994-1995
Dean of Students National Search Committee: 1995
Institute Strategic Planning Committee: 1994-1996

Cases in last 4 years I have been deposed or testified at hearing/trial:

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 9,912,983 (IPR2019-01306) [Resideo Technologies, Inc. v. Innovation Sciences, LLC]. 04/2019-05/2020.

➢ A deposition in Sprint Communications Company LP v. Charter Communications, Inc. et al. (17-1734-RGA, D. Del.). 01/2018-06/2020.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 9,369,741 (IPR2019-00231), 9,621,956 (IPR2019-00281), and 9,118,948 (IPR2019-01421) [Comcast Cable Communications, LLC v. Rovi Guides Inc.]. 02/2019-07/2020.

➢ Depositions and claim construction tutorial in Netfuel, Inc. v. Cisco Systems, Inc. (5:18-cv-2352-EJD, N. D. Cal) 09/2018-08/2020.

➢ A deposition in Inter Partes Review of U.S. Patent No. 9,663,659 (IPR2019-00992) [Cisco Systems, Inc. v. NetFuel, Inc.]. 09/2018-09/2020.

➢ A deposition in Monarch Network Solutions, LLC v. Cisco Systems, Inc. (2:20-cv-00015-JRG, E. D. Tex.). 08/2020-09/2020.

➢ A deposition in Finjan, Inc. v. Rapid7, Inc. (1:18-cv-01519-MN, D. Del.). 01/2020-09/2020.

➢ A deposition in Finjan, Inc. v. SonicWall, Inc. (5:17-cv-04467-BLF-HRL, N. D. Cal.). 10/2019-10/2020.

➢ Depositions and trial testimony in TQ Delta, LLC v. 2Wire, Inc. (1:13-cv-01835-RGA, D. Del.). 03/2017-11/2020.

➢ A deposition in Linksmart Wireless Technology, LLC v. Gogo, LLC and Panasonic Avionics Corp (8:18-cv-00654-JAK-JDE and 8:18-cv-00662-JAK-JDE). 02/2020-12/2020.

➢ A deposition and trial testimony in Certain Audio Players and Controllers, Components, Thereof and Products Containing the Same (ITC Inv. No. 337-TA-1191) [Sonos, Inc. v. Google LLC and Alphabet, Inc.]. 11/2019-02/2021.

➢ A deposition in Finjan, Inc. v. Cisco Systems, Inc. (5:17-cv-00072-BLF-SVK, N. D. Cal). 02/2019-02/2021.

➢ A deposition and trial testimony in Gigamon, Inc. v. Apcon, Inc. (2:19-cv-300-JRG, E. D. Tex.). 09/2019-04/2021.

➢ A deposition in Certain IP Camera Systems including Video Doorbells and Components Thereof (US ITC Inv. No. 337-TA-1242) [SkyBell Technologies, Inc., SB IP Holdings, LLC, and Eyetalk365, LLC v. SimpliSafe, Inc., Arlo Technologies, Inc., and Vivint Smart Home, Inc.]. 02/2021-09/2021.

➢ A deposition in Warner Records, Inc. et al. v. Charter Communications, Inc. (19-cv-00874-RBJ-MEH, D. Colo.). 11/2019-10/2021.

➢ A deposition and trial testimony in VideoShare, LLC v. Google LLC (6:19-cv-00663-ADA, W. D. Tex.). 06/2021-11/2021.

➢ A deposition in The Chamberlain Group, LLC v. Overhead Door Corp. (2:21-cv-0084, E. D. Tex.). 11/2021-12/2021.

➢ Depositions in Contour IP Holding, LLC v. GoPro, Inc. (17-cv-04738-WHO, N. D. Cal.). 10/2019-12/2021.

➢ A deposition in Chewy, Inc. v. International Business Machines Corporation (1:21-cv-1319-JSR, S. D.N.Y.). 04/2021-02/2022.

➢ A deposition in Flexiworld Technologies, Inc. v. Roku, Inc. (6:20-cv-00819-ADA, W. D. Tex.). 10/2021-02/2022.

➢ A deposition in Proven Networks, LLC v. NetApp, Inc. (6:20-cv-00369-ADA, W. D. Tex.). 08/2020-03/2022.

➢ Trial testimony in Two Way Media LTD v. Telefonica (517/2017-X, Barcelona, Spain). 12/2015-05/2022.

➢ A deposition and claim construction hearing testimony in Peloton Interactive, Inc. v. Icon Health and Fitness, Inc. (1:20-cv-00662-RGA, D. Del.). 10/2020-05/2022.

➢ Depositions in Icon Health and Fitness, Inc. v. Peloton Interactive, Inc. (20-1386-RGA, D. Del.). 10/2020-05/2022.

➢ A deposition and hearing testimony in UMG Recordings, Inc., et al. v. Bright House Networks, LLC (8:19-cv-00710-MSS-TGW, M. D. Fla.). 11/2019-05/2022.

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 9,860,198 (IPR2021-00882) and 10,728,192 (IPR2021-00883) [Meta Platforms, Inc. v. Wrinkl Inc.]. 12/2021-06/2022.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 8,166,081 (IPR2021-01267), 8,688,028 (IPR2021-01303), 8,903,307 (IPR2021-01305), and 8,200,203 (IPR2021-01371) [Hyundai Motor America v. StratosAudio, Inc.]. 06/2021-08/2022.

➢ A deposition and trial testimony in Shopify, Inc. v. Express Mobile, Inc. (1:19-cv-00439-RGA, D. Del.). 05/2020-08/2022.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 9,291,475 (IPR2022-00708 and IPR2023-00031); 9,602,608 (IPR2022-00709); 7,484,008 (IPR2022-00857); and 6,832,283 (IPR2022-0970) [Toyota Motor Corp. and American Honda Motor Co, Inc. v. Intellectual Ventures II LLC]. 01/2022-02/2023.

➢ A deposition and trial testimony in Express Mobile, Inc. v. GoDaddy.com, LLC (1:19-cv-01937-RGA, D. Del.). 05/2020-03/2023.

➢ A deposition in Inter Partes Review of U.S. Patent No. 9,182,231 (IPR2022-00586) [Qualcomm Inc. v. FedEx Corporate Services, Inc.]. 09/2021-04/2023.

➢ A deposition in WebRoot, Inc. and Open Text, Inc. v. Trend Micro, Inc. (22-cv-00239-ADA-DTG, W. D. Tex.). 06/2022-04/2023.

➢ Depositions and trial testimony in Sonos, Inc. v. Google LLC (6:20-cv-881-ADA, W. D. Tex.; 3:20-cv-06754-WHA, N. D. Cal.; and 3:21-cv-07559-WHA, N. D. Cal.). 11/2019-05/2023.

- Depositions and trial testimony in <u>Personal Audio, LLC</u> v. Google, Inc. (1:17-cv-01751-VAC-CJB, D. Del).  03/2018-06/2023.

- A deposition and trial testimony in Centripetal Networks, Inc. v. <u>Cisco Systems, Inc.</u> (2:18-cv-00094, E. D. Va.). 01/2019-06/2023.

- A deposition in Orckit Corp v. <u>Cisco Systems, Inc.</u> (2:22-cv-276, E. D. Tex.).  05/2023-06/2023.

- A deposition and trial testimony in <u>Touchstream Technologies, Inc.</u> v. Google, LLC (6:21-cv-00569-ADA, W. D. Tex.).  08/2022-07/2023.

- A deposition in Inter Partes Review of U.S. Patent No. 8,784,113 (IPR2022-01439) [<u>Go1 Pty, Ltd.</u> v. OpenSesame, Inc.].  01/2022-09/2023.

- A deposition and trial testimony in SB IP Holdings, LLC v. <u>Vivint Smart Home, Inc.</u> (4:20-cv-00886-ALM, E. D. Tex.).  12/2021-10/2023.

- Depositions and trial testimony in <u>Alacritech, Inc.</u> v. Centurylink Communications LLC; Winstron Corporation, Dell, Inc.  (2:16-cv-693-RWS, 2:16-cv-692-RWS, 2:16-cv-695-RWS, E. D. Tex.).  04/2016-10/2023.

- A deposition in Inter Partes Review of U.S. Patent Nos. 9,503,498 (IPR2023-00185); 9,516,091 (IPR2023-00186); and 8,924,457 (IPR2023-00187) [Bright Data LTD v. <u>Oxylabs, UAB</u>].  06/2020-11/2023.

- Trial testimony in <u>GoodRx, Inc.</u> v. Famulus Health LLC (AAA Ref. No. 01-23-000-5919).  06/2023-11/2023.

- A deposition in Entropic Communications LLC v. <u>Charter Communications, Inc.</u> (2:22-cv-00125-JRG, E. D. Tex.).  03/2023-12/2023.

- Depositions in Post-Grant Review of U.S. Patent No. 10,782,951 (PGR2021-00096) and 11,157,256 (PGR2022-00053) [<u>IronSource Ltd.</u> v. Digital Turbine, Inc.].  05/2021-12/2023.

- Trial testimony in Certain Wi-Fi Routers, Wi-Fi Devices, Mesh Wi-Fi Network Devices, and Hardware and Software Components Thereof (US ITC Inv. No. 337-TA-1361) [Netgear v. <u>TP-Link</u>]. 05/2023-01/2024.

- A deposition in Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same (US ITC Inv. No. 337-TA-1265E) [<u>iFit Inc., FreeMotion Fitness, Inc. and NordicTrack, Inc.</u> v. DISH DBS Corporation, DISH Technologies LLC, and Sling TV LLC]. 10/2023-02/2024.

- Depositions in <u>TQ Delta, LLC</u> v. AdTran, Inc. (14-cv-954-RGA, 15-cv-121-RGA, D. Del). 03/2017-present.

- A deposition in <u>Motorola Solutions, Inc.</u> v. Hytera Communications Corp. LTD (1:17-cv-01972, N. D. Ill.).  04/2017-present.

- Depositions and trial testimony in Luminati Networks Ltd. v. <u>UAB Tesonet and UAB Metacluster LT</u> (2:18-cv-00299-JRG, E. D. Tex.); Luminati Networks Ltd. v. <u>Teso LT, UAB; Oxysales, UAB; and Metacluster LT, UAB</u>, (2:19-cv-00395-JRG, E. D. Tex.); Luminati Networks Ltd. v. <u>Code 200, UAB; Oxysales, UAB; and Metacluster LT, UAB</u> (2:19-cv-00396-JRG, E. D. Tex.); Bright Data Networks Ltd. v. <u>Tefincom S.A.</u> (2:19-cv-

00414-JRG, E. D. Tex.); Metacluster LT, UAB v. Bright Data Ltd. (2:23-cv-00011-JRG-RSP, E. D. Tex.); Bright Data Ltd. v. Oxylabs, UAB (2:23-cv-00171-JRG-RSP, E. D. Tex.). 06/2020-present.

➢ A deposition in FirstFace Co, LTD v. Apple, Inc (3:18-cv-02245-JD, N. D. Cal.). 05/2022-present.

➢ A deposition in WSOU Investments, LLC v. Cisco Systems, Inc. (6:20-cv-00128-ADA, W. D. Tex.). 03/2021-present.

➢ A deposition in Zilkr Cloud Technologies, LLC v. Cisco Systems, Inc. (2:22-cv-00166-JRG-RSP, E. D. Tex.). 02/2023-present.

➢ A deposition in Inter Partes Review of U.S. Patent No. 8,072,968 (IPR2022-00890) [IBM Corp. v. Ebates Performance Marketing, Inc.]. 06/2022-present.

➢ A deposition in Omnitracs, LLC v. Platform Science, Inc. (3:20-cv-0958-CAB-DDL, S. D. Cal.). 05/2023-present.

➢ Depositions in IBM Corp. v. Rakuten, Inc. and Ebates Performance Marketing, Inc (21-461-VAC, D. Del.). 06/2022-present.

➢ A deposition in STA Group, LLC v. Motorola Solutions, Inc. (2:22-cv-00381-JRG-RSP, E. D. Tex.). 05/2023-present.

➢ A deposition in NEC Corporation v. Peloton Interactive, Inc. (1-22-cv-00987-CJB, D. Del.). 08/2023-present.

➢ A deposition in Antonio McKinney et al. v. Corsair Gaming, Inc. (3:22-cv-00312-CRB, N. D. Cal.). 07/2023-present.

➢ A deposition in Lionra Technologies Limited v. Fortinet, Inc. (2:22-cv-00322-JRG-RSP, E. D. Tex.). 02/2023-present.

➢ A deposition in VidStream, LLC v. X, formerly Twitter, Inc. (3:16-cv-0764-N, N. D. Tex.). 07/2016-present.

# EXHIBIT B

## Materials Considered

**Patents, Patent Applications, and Prosecution Histories**
- U.S. Patent No. 9,424,400
- U.S. Patent No. 10,447,667
- U.S. Patent No. 8,600,062 ("Rae")
- U.S. Patent No. 2008/0279533 ("Buttars")
- U.S. Patent No. 2003/0014630 ("Spencer")
- U.S. Patent Pub. No. 2003/0001978 ("Smith")
- U.S. Patent Pub. No. 2010/0325675 ("Smoyer")
- U.S. Pat. App. Pub. No. 2007/0133795
- U.S. Pat. App. Pub. No. 2007/0265978
- U.S. Pat. App. Pub. No. 2008/0279386
- U.S. Pat. App. Pub. No. 2009/0113496
- U.S. Pat. App. Pub. No. 2011/0271306
- U.S. Pat. App. Pub. No. 2011/0173653
- U.S. Pat. App. Pub. No. 2013/0243399

**Deposition Transcripts & Exhibits**
- Blankenbeckler, David
- Edillon, Edwin
- Hesselink, Lambertus
- Houda, Greg
- Hughes, Finn
- Jenkins, Dean
- John, Soji
- Lambert, Cecilia
- Munoz-Talcott, Michelle
- Neri, Jason
- Newman, Dan
- O'Sullivan, Des
- Ryan, Robert
- Slater, Josh
- Tuli, Ajai
- Wilson, Kendall
- Ybarra, Danny

**Written Discovery**
- Plaintiffs' February 23, 2023 Infringement Contentions
- Plaintiffs' March 22, 2024 Infringement Contentions
- Plaintiffs' January 3, 2025 Proposed Infringement Contentions
- Viasat's April 10, 2024 Invalidity Contentions
- Viasat's April 19, 2024 Supplemental Invalidity Contentions
- Plaintiffs' March 1, 2024 Damages Contentions

- Viasat's April 2, 2024 Responsive Damages Contentions

**Case Documents**
- Plaintiffs' Complaint, Docket No. 1
- Plaintiffs' Amended Complaint, Docket No. 38
- Plaintiffs' Amended Complaint, Docket No. 73
- Viasat's Answer to Amended Complaint, Docket No. 81
- Plaintiffs' Opening Claim Construction Brief, Docket No. 103
- Viasat's Responsive Claim Construction Brief, Docket No. 104
- Plaintiffs' Responsive Claim Construction Brief, Docket No. 105
- Court's Claim Construction Order, Docket No. 120

**Source Code**
- Viasat source code produced

**Production Documents**
- VIASAT_00006471
- VIASAT_00000618
- VIASAT_00014554
- VIASAT_00006779

**Public Documents**
- https://about.dish.com/2006-08-24-DISH-Network-TM-Warner-Bros-Home-Entertainment-Group-Sign-Video-On-Demand-Movie-Deal-Video-On-Demand-and-Pay-Per-View-Movies-Now-Available-on-DISH-Network
- https://about.dish.com/news-releases?item=123253
- https://hometheaterreview.com/directv-hr23-satellite-receiver-and-hd-dvr-reviewed/
- https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo-premiere/index.html
- https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf
- https://web.archive.org/web/20130524082009/http://www.directv.com/technology/genie?lpos=Header:3
- https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_CRI-release-FINAL.pdf
- https://web.archive.org/web/20150919160346/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_Contributor-Release_12-12-13-final.pdf
- https://web.archive.org/web/20191210002320/http://www.laaudiofile.com/vip722.html
- https://web.archive.org/web/20230405081544/https://www.engadget.com/2012-04-30-dish-hopper-whole-home-dvr-review.html
- https://www.cnet.com/reviews/dish-network-vip-hd-dvr-review/
- https://www.cnet.com/tech/tech-industry/dish-aims-high-with-new-hopper-dvr-high-speed-satellite-broadband-service/
- https://www.engadget.com/2010-03-02-dnptivo-premiere-and-premiere-xl-usher-in-a-brand-new-interface.html

- https://www.engadget.com/2012-01-09-dish-network-announces-hopper-dvr-system-joey-set-top-box-laun.html
- https://www.engadget.com/2012-12-29-directv-genie-whole-home-dvr-review.html
- https://www.etcentric.org/drm-secure-content-storage-association-launches-project-phenix/
- https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System
- https://www.wired.com/2013/03/directv-genie/
- https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf
- https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3
- https://web.archive.org/web/20100526233741/http://www.directv.com/DTVAPP/content/directv/dvr_scheduler
- https://ir.dish.com/index.php/static-files/ebd18806-dd60-4270-b034-38a455433434
- https://web.archive.org/web/20220920123159/https://my.dish.com/support/receivers/vip722k