# EXHIBIT B

**Filed Under Seal**

**Highly Confidential - Attorneys' Eyes Only**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | | |
|---|---|---|
| SANDISK TECHNOLOGIES, INC. et al., | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | |
| VIASAT, INC., | § § § | |
| Defendant. | § § § § § § § § § § § § § § | Case No. 5:22-cv-4376 |

---

**EXPERT INFRINGEMENT REPORT OF DR. WILLIAM C. EASTTOM II (CHUCK EASTTOM) Ph.D., D.Sc.**

---

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table of Contents**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ..................................................................................................2

        A.      Qualifications...........................................................................................2

        B.      Prior Testimony .......................................................................................5

        C.      Compensation ..........................................................................................5

III.    LEGAL PRINCIPLES .........................................................................................6

        A.      Validity ....................................................................................................6

        B.      Obviousness.............................................................................................6

        C.      Motivation to Combine ............................................................................8

        D.      Person of Ordinary Skill in the Art .........................................................8

IV.     MATERIAL REVIEWED ...................................................................................11

V.      BACKGROUND OF TECHNOLOGY AND PATENTS-IN-SUIT...................12

VI.     SUMMARY OF VIASAT'S CITED PRIOR ART REFERENCES..................13

        A.      The '400 Patent......................................................................................13

                U.S. Patent No. 8,600,062 ("Rae").......................................................13

                U.S. Patent No. 2008/0279533 ("Buttars") .........................................14

                U.S. Patent No. 2003/0014630 ("Spencer").........................................15

        B.      The '667 Patent......................................................................................17

                U.S. Patent Pub. No. 2003/0001978 ("Smith") ...................................24

                U.S. Patent Pub. No. 2010/0325675 ("Smoyer") ...............................26

                The SCSA System ("SCSA")...............................................................27

                The DirecTV DVR System ("DirecTV") ..............................................28

                The DISH DVR System ("DISH")........................................................28

                The TiVo DVR System ("TiVo").........................................................31

                U.S. Pat. Pub. No. 2012/0131623 ("McDysan")................................31

VII.    VALIDITY ANALYSIS OF THE '400 PATENT...............................................33

        A.      Claim Construction.................................................................................33

        B.      General Comments .................................................................................33

        C.      Validity of '400 Patent in Light of Rae .................................................38

                1[pre]. A kiosk for provisioning secure media content to a plurality of
                portable data storage devices, the kiosk comprising: ..............................38

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1[a] a first data interface configured to communicate with a portable data storage device; ........................................................................................41

1[b] a second data interface configured to communicate, over a network, with a remote trusted server; and ....................................................43

1[c] a processor configured to: ..................................................................45

1[d] obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device; ...................45

1[e] authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and....................................................48

1[f] in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key. ..................................................................................................52

2. The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content. .........................................53

6. The kiosk of claim 1, wherein the second data interface is a network interface. ...................................................................................54

8. The kiosk of claim 1, wherein the kiosk is located in a public environment ...................................................................................55

9[pre] A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising:........55

9[a] establishing communications with a portable data storage device over a first data interface; ...............................................................59

9[b] establishing communications with a remote trusted server via a second data interface over a network; ......................................................60

9[c] obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device; ...................60

9[d] authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and............................................................63

9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key. ...................................................................................67

10. The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content............................68

13. The method of claim 9, wherein the second data interface is a network interface. ...................................................................................69

17. The method of claim 9, wherein the kiosk is located in a public
environment. ..................................................................................69

D.    Validity of '400 Patent In Light of Buttars ............................................69

1[pre]. A kiosk for provisioning secure media content to a plurality of
portable data storage devices, the kiosk comprising: ...............................70

1[a] a first data interface configured to communicate with a portable data
storage device; ...........................................................................75

1[b] a second data interface configured to communicate, over a network,
with a remote trusted server; and ...................................................77

1[c] a processor configured to: .................................................................79

1[d] obtain a unique identifier from the portable data storage device,
wherein the unique identifier is specific to the portable data storage
device and is concealed by the portable data storage device;...................79

1[e] authenticate the portable data storage device, using at least the unique
identifier, by communicating with the remote trusted server over
the second data interface; and..................................................82

1[f] in response to the authentication, provide to the portable data storage
device an encrypted first media content and a corresponding access
key. ..........................................................................................84

2. The kiosk of claim 1, further comprising a local data storage storing a
plurality of encrypted media content. ...........................................85

6. The kiosk of claim 1, wherein the second data interface is a network
interface. ..................................................................................85

8. The kiosk of claim 1, wherein the kiosk is located in a public
environment ..............................................................................87

9[pre] A method for provisioning secure media content to a plurality of
portable data storage devices from a kiosk, the method comprising:.........88

9[a] establishing communications with a portable data storage device over
a first data interface; ..................................................................88

9[b] establishing communications with a remote trusted server via a
second data interface over a network;.............................................90

9[c] obtaining a unique identifier from the portable data storage device,
wherein the unique identifier is specific to the portable data storage
device and is concealed by the portable data storage device;...................92

9[d] authenticating the portable data storage device, using at least the
unique identifier, by communicating with the remote trusted server
over the second data interface; and...............................................94

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key. .......................................................................94

10. The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content...........................95

13. The method of claim 9, wherein the second data interface is a network interface. ......................................................................................96

17. The method of claim 9, wherein the kiosk is located in a public environment. ...........................................................................................98

VIII.    VALIDITY ANALYSIS OF THE '667 PATENT....................................................100

A.    Claim Construction..............................................................................100

B.    Validity of '667 Patent In Light of Smith in view of McDysan.........................100

1.    Lack of Motivation to Combine ...........................................100

2.    Lack of Substantive Discussions ..........................................102

3.    Lack of Disclosures ..............................................................105

C.    Validity of '667 Patent In Light of Smoyer in view of McDysan.......................126

1.    Lack of Motivation to Combine ...........................................126

2.    Lack of Substantive Discussions ..........................................128

3.    Lack of Disclosures ..............................................................129

D.    Validity of '667 Patent In Light of The SCSA System in view of McDysan .....149

1.    Lack of Motivation to Combine ...........................................149

2.    Insufficient Support ..............................................................151

3.    Lack of Disclosures ..............................................................153

E.    Validity of '667 Patent In Light of DirecTV DVR System in view of TiVo DVR System further in view of McDysan .......................................175

1.    Lack of Motivation to Combine ...........................................175

2.    Insufficient Support ..............................................................178

3.    Lack of Disclosures ..............................................................182

F.    Validity of '667 Patent In Light of DISH DVR System in view of TiVo DVR System further in view of McDysan ........................................203

1.    Lack of Motivation to Combine ...........................................203

2.    Insufficient Support ..............................................................206

3.    Lack of Disclosures ..............................................................210

IX.    NON-INFRINGING ALTERNATIVES................................................................233

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

|       |     |                                                                                 |      |
|-------|-----|---------------------------------------------------------------------------------|------|
|       | A.  | '400 Patent – "Substituting or Publicizing Any Concealed Unique Identifiers".... | 233  |
|       | B.  | '400 Patent – "Localizing Any Remote Trusted Servers".........................   | 234  |
|       | C.  | '400 Patent – "Not Providing Any Corresponding Access Key"...................    | 235  |
|       | D.  | '667 Patent – "Removing the 'Encrypted' Boolean" ...........................     | 236  |
|       | E.  | '667 Patent – "Removing the 'Secure Region'"................................     | 239  |
| X.    |     | OBJECTIVE INDICIA OF NONOBVIOUSNESS ........................................     | 241  |
|       | A.  | Commercial Success.............................................................  | 241  |
|       | B.  | Long-Felt Need..................................................................  | 243  |
| XI.   |     | OPINIONS AND CONCLUSIONS ................................................         | 246  |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      I have been asked to evaluate issues related to the validity of U.S. Patent No.

9,424,400 ("'400 patent") and U.S. Patent No. 10,447,667 ("'667 patent") in the

above captioned matter and to form independent expert, scientific opinions on

those issues. My opinions and conclusions are not related in any way to my

compensation for the time spent on this matter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.    BACKGROUND

### A.    Qualifications

2.    I have almost 30 years of experience in the computer science industry including extensive experience with computer science involving networks, authentication, and cybersecurity. I have authored 44 computer science books, including textbooks used at over 60 universities around the world. I also have authored over 80 research papers and am an inventor with 27 patents, including patents related to computer networking.

3.    I hold a Doctor of Science (D.Sc.) degree in Cyber Security from Capitol Technology University (Dissertation Topic: "A Comparative Study of Lattice Based Algorithms for Post Quantum Computing"). I also hold a Doctor of Philosophy (Ph.D.) in Technology (focused on nanotechnology; Dissertation Topic: "The Effects of Complexity on Carbon Nanotube Failures") from Capitol Technology University. I also have a Doctor of Philosophy (Ph.D.) in Computer Science from the University of Portsmouth (Dissertation Topic: topic "A Systematic Framework for Network Forensics Using Graph Theory"). I also have four master's degrees (one in Applied Computer Science, one in Education, one in Strategic and Defense Studies, and one in Systems Engineering).

4.    I am currently an Adjunct Lecturer for Georgetown teaching graduate courses in requirements engineering, artificial intelligence, cyber threat intelligence, and cryptography. I am also an adjunct for Vanderbilt University teaching graduate computer science courses, specifically quantum computing, software engineering, and digital forensics.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

5.      I am a Senior member and Distinguished Speaker for the Association of

Computing Machinery (ACM) and a Senior Member and Distinguished Visitor of

the Institute for Electrical and Electronics Engineering (IEEE). The IEEE is the

world's largest and most preeminent engineering organization. Among other

activities, the IEEE creates industry standards for a wide range of engineering

disciplines, including software development standards. I am also a Distinguished

Visitor of the IEEE. I have been involved in IEEE standards creation for several

years.

6.      I worked on the DevOps 2675 standards group from 2017 to 2019.

7.      I am also currently the Vice Chair of the IEEE p23026 Standards Group "Systems

and Software Engineering -- Engineering and Management of Websites for

Systems, Software, and Services Information."

8.      I was the Chair of IEEE P3123 Standard for Artificial Intelligence and Machine

Learning (AI/ML) Terminology and Data Formats from 2021 to 2024.

9.      I am also a member of the IEEE Engineering in Medicine and Biology Standards

Committee. Standard for a Unified Terminology for Brain-Computer Interfaces

P2731 from 2020 to present.

10.     I am very familiar with network protocols, routers, switches, servers, IPv4, IPv6,

Network models and concepts (TCP/IP, OSI, etc.), telecommunications, and

network management. Networking protocols including ANT+, Bluetooth, Zigbee,

6LowPAN, etc. I am also familiar with video related networking protocols such as

Quadrature Amplitude Modulation (QAM), Carrierless amplitude phase

modulation (CAP), and other related protocols.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

11.  I am also experienced with satellite communications including L-Band (1-2 GHz): Used for GPS, maritime, and aviation communications; S-Band (2-4 GHz): Used for weather and some scientific satellites; C-Band (4-8 GHz): Used for satellite TV and VSAT systems; X-Band (8-12 GHz): Used primarily for military and deep-space communication; Ku-Band (12-18 GHz): Used for satellite broadcasting and internet services; Ka-Band (26.5-40 GHz): Used for high-speed satellite internet and advanced communication systems; Modulation: BPSK, QPSK, 8PSK, 16QAM, etc. Protocols such as LTP (Licklider Transmission Protocol).

12.  I have extensive experience in cryptography. I have authored books and research papers on cryptography:

13.  Easttom, C. (2020). Modern Cryptography: Applied Mathematics for Encryption and Information Security 2nd Edition. New York City, New York: Springer Press

14.  Easttom, C. (2011). The RSA Algorithm - The ups and Downs. CryptoMagazine.

15.  Easttom, C. (2017). An Overview of Quantum Cryptography with Lattice Based Cryptography. IOSR Journal of Mathematics, 13(6).

16.  Easttom, C., Ibrahim, A, Chefronov, C., Alsmadi, I., Hanson, R. (2020). Towards a deeper NTRU analysis: a multi modal analysis. International Journal on Cryptography and Information Security (IJCIS). 10(2).

17.  Easttom, C. (2017). An Overview of Key Exchange Protocols. IOSR Journal of Mathematics (IOSR-JM). 13(4). DOI: 10.9790/5728-1304021618.

18.  Easttom, C. (2018). A Generalized Methodology for Designing Non-Linear Elements in Symmetric Cryptographic Primitives. In Computing and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Communication Workshop and Conference (CCWC), 2018 IEEE 8th Annual. IEEE.

19.    In addition to the summary, I have provided here, I describe my qualifications, issued patents, publications, and experience as an expert witness in greater detail in my curriculum vitae ("CV") attached as Exhibit A.

**B.    Prior Testimony**

20.    In the past 5 years I have testified on 47 occasions in hearings, trials and depositions. My entire record of testifying is in my curriculum vitae (Exhibit A).

**C.    Compensation**

21.    I am being compensated at my usual rate of $550/hour. My compensation is not contingent upon the outcome of this case or upon my opinions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### III.    LEGAL PRINCIPLES

22.    I am not an attorney and do not offer legal opinions. The following subsections simply describe my understanding of relevant legal principles.

### A.    Validity

23.    I understand that each claim of a patent is presumed to be valid. Dependent claims shall also be presumed valid even if they depend upon an invalid claim.

24.    35 U.S. Code § 282 states, "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

### B.    Obviousness

25.    I understand that a patent claim is invalid if the differences between the subject matter and the prior art are such that the subject matter as a whole would have been obvious to a POSA at the time of the alleged invention. I further understand that an obviousness analysis involves a review of the scope and content of the asserted prior art; the differences between the prior art and the claims at issue; the level of ordinary skill in the pertinent art; and objective indicia of non-obviousness (i.e., secondary considerations), such as long-felt but unsolved needs, failure of others, industry praise, commercial success, and skepticism of others in the field.

26.    In determining obviousness based on a combination of prior art references, I also understand that evidence of a reason to combine the teachings is required to make

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the combination. Any evidence that one or more of the references would have taught away from the claimed invention at the time of the invention must also be considered.

27.    I have been informed that the following rationales, among others, may support a conclusion of obviousness:

- the combination of familiar elements according to known methods to yield predictable results;

- the simple substitution of one known element for another to obtain predictable results;

- the use of known techniques to improve similar methods or apparatuses in the same way;

- the application of a known technique to a known method or apparatus ready for improvement to yield predictable results;

- the choice of a particular solution from a finite number of identified, predictable solutions with a reasonable expectation of success;

- the use of known work in one field of endeavor in either the same field or a different one based on design incentives or other market forces, if the variations are predictable to one of ordinary skill in the art; and

- the following of some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

28.    I also understand that secondary considerations such as long-felt but unsolved needs, failure of others, praise, skepticism, and commercial success are relevant to determining obviousness.

29.    I understand that there must be evidence showing an articulated reasoning with rational underpinnings to support a motivation to combine teachings and to support the legal conclusion of obviousness. However, I understand that proposed modifications which would render the prior art unsatisfactory for its intended

purposes or change the principal operation of the reference do not render a claim obvious.

30.  Moreover, if prior art indicates that the invention would not have worked for its intended purpose, or otherwise teaches away from the invention, then a claim would not be obvious. A reference teaches away when a Person of Ordinary Skill in the Art, or POSA, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim.

**C.    Motivation to Combine**

31.  It is my understanding that a motivation to combine must meet certain requirements. It is not sufficient for an expert to simply state there is a motivation to combine. Instead, there must be a clearly articulated reason to combine. In order to satisfy these requirements, the articulated motivation to combine should include the following:

- the prior art included each element claimed, although not necessarily in a single prior art reference, with the only difference between the claimed invention and the prior art being the lack of actual combination of the elements in a single prior art reference;

- one of ordinary skill in the art could have combined the elements as claimed by known methods, and that in combination, each element merely performs the same function as it does separately; and

- one of ordinary skill in the art would have recognized that the results of the combination were predictable.

**D.    Person of Ordinary Skill in the Art**

32.  I understand that certain issues in patent law must be addressed from the perspective of a "person having ordinary skill in the art." I have been informed that this hypothetical person having ordinary skill in the art (POSITA) is one who

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

thinks along the line of conventional wisdom in the art and rather than one who undertakes to innovate. I have further been informed that certain factors that may be considered in deciding the level of skill in the art include the type of problems encountered in the art, the sophistication of the technology, and the education level of active workers in the field.

33.    A POSITA at the claimed priority date of the '400 and '667 patents would be one with a bachelor's degree in a computer-related field (computer science, computer engineering, systems engineering, etc.) with at least three years of experience including experience with digital rights management. More education could substitute for experience, and vice versa. For example, someone without an engineering degree, but 5 years of experience, could qualify as a POSITA, similarly someone with less than 1 year of experience but a master's degree could also qualify as a POSITA. I would have qualified at least as a POSITA at the relevant time and know what would be known to a POSITA at the relevant time.

34.    In Dr. Almeroth's report he asserted that a Person of Ordinary Skill in the Art "would have had education in computer science or electrical engineering and experience in the field of media streaming and transmitting multimedia content between devices, as well as knowledge of the scientific literature concerning the same. The education and experience levels may vary between persons of ordinary skill, with some persons holding a basic Bachelor's degree with three years of relevant work experience, and others holding a Masters or Ph.D. but having one to two years of experience." Almeroth Report, ¶33.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

35.     Adopting Dr. Almeroth's definition would not change my opinion. However, I believe his definition is inadequate because it makes no mention of digital rights management or securing the streaming media. In the '400 patent, claim element 1[pre] states "A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising". Authentication is part of claim 1e, 1f, 9d, and 9e. Claim 1f, 2, and 10 describe encrypted media. In the '667 patent a secure region is an important part (claim 1c, 1d, 4,11b, 12, 13, and 15). Encryption is a part of the claim limitations for claims 5, 7, 14, and 16.

36.     One with experience in digital rights management would have an understanding of secure media content, encryption, and authentication. It is not clear that one of ordinary skill in the art as defined by Dr. Almeroth would have that understanding.

37.     Furthermore, Dr. Almeroth states that one of ordinary skill in the art would have "knowledge of the scientific literature." However, Dr. Almeroth also states one of ordinary skill in the art could a person with "a basic Bachelor's degree with three years of relevant work experience". In my experience, one with a Bachelor's degree and three years of experience rarely if ever consults scientific literature. He or she may be quite familiar with trade journals, but not scientific literature.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.    MATERIAL REVIEWED

38.    In addition to the materials reviewed and identified in connection with my

opening expert report, I also considered the following:

U.S. Patent 9,424,400 and file wrapper.

U.S. Patent 10,447,667 and file wrapper.

Dr. Almeroth's report on his opinions regarding invalidity dated March 24, 2025,

("Almeroth Report") and all references and citations therein.

U.S. Patent No. 8,600,062 ("Rae")

U.S. Patent Pub. No. 2003/0001978 ("Smith")

U.S. Patent Pub. No. 2010/0325675 ("Smoyer")

U.S. Patent Pub. No. 2008/0279533 ("Buttars")

The Court's September 20, 2024 Claim Construction Order

All references cited in this report

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## V.     BACKGROUND OF TECHNOLOGY AND PATENTS-IN-SUIT

39.     I provided background discussions on the related technology and the patents-in-suit in my March 24, 2025 report on Viasat's infringement. I incorporate that section here by reference.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VI.    SUMMARY OF VIASAT'S CITED PRIOR ART REFERENCES

### A.    The '400 Patent

**U.S. Patent No. 8,600,062 ("Rae")**

40.    Examining the Rae patent, it would be immediately clear to a POSITA that it is directed to an entirely different class of solution than the '400 patent. Rae is entitled "Off-line content delivery system with layered encryption" and describes this as "[t]he term off-line content delivery system refers to a system that involves the delivery of digital content using some form of fixed media Such as an optical storage device, or a portable media drive. In an off-line content delivery system, the delivery of the content relies upon the physical transportation of the fixed media. In many instances, off-line content delivery systems can overcome bandwidth limitations imposed by existing network infrastructure. Accordingly, companies such as Netflix, Inc. of Los Gatos, Calif. have achieved considerable success delivering DVDs to subscribers via the postal service." (Rae 1:24-33).

41.    The '400 patent depends on network communications with a first and second data interface ('400 claim 1 and claim 9). Rae is fundamentally using small, fixed media, not network communications. In fact, Rae uses Netflix DVDs as an analogy. Indeed, Rae teaches away from and explains the disadvantages of obtaining content over network communications (Rae 1:21-34;) Rae does discuss an embodiment that has an access system that provides conditional access (Rae 2:59-65; 4:15-17). Ray also has an additional embodiment with a kiosk configured to communicate with a storage device containing the symmetrically pre-encrypted content (Rae 4:4-7). Rae discloses that the playback device could be a network connected device such as a mobile phone (Rae 5:45-47).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

42.     The kiosk of Rae is also quite different from the kiosk of the '400 patent. In Rae, a kiosk is configured to receive a portable media device (Rae 2:59-67). Rae has an embodiment wherein the kiosk generates a content key and encrypts a copy of that key (Rae 2:67 - 3:18).

43.     Rae specifically states that the kiosk can be implemented on a personal computer such as an iMac (Rae 5:57-6:5).

44.     The '400 patent in claim 1 states "A kiosk for provisioning secure media content to a plurality of portable data storage devices…" Rae, in claim 6 states "An off-line content delivery system, comprising: a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content;" In Rae the portable media is physically connected to the kiosk.

**U.S. Patent No. 2008/0279533 ("Buttars")**

45.     Buttars describes itself as "The invention is a process and apparatus for securing and retrieving digital data with a Portable Data Storage Device (PDSD) and Playback Device (PD). The PDSD-PD employs software and hardware security and encryption as barriers to those desiring illicit access to the stored data. Data is prepared with a Digital Rights Management (DRM) application which assigns a license object to the data and encrypts it using a Private Key managed Advanced Encryption Standard (AES) algorithm with 256-bit complexity. Private Keys are stored inside secured Field PGAs, PDSD, or PD. Another layer of AES encryption with 256-bit complexity is applied to the DRM license object using Public Key Infrastructure. Initial docking between a PDSD and PD initiates a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sequence of routines and authentication. Interruption of the key exchange,

authentication, or physical security measures may result in a lockout and/or the

deletion of PDSD data. Potential applicable physical security measures are

described." (Buttars, Abstract).

**U.S. Patent No. 2003/0014630 ("Spencer")**

46.　　　Spencer is directed towards music delivery (Spencer, 0003, 0004). The media of

Spencer can have metadata including metadata regarding usage rights (Spence,

0013). In Spencer, the device is authenticated with the application, and then the

application is authenticated with a content server (Spencer 0015). One goal of

Spencer is to save disk space at the user end, by storing content at the server

(Spencer, 0016).

47.　　　 Figure 1 is a schematic showing a delivery system according to Spencer:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**FIG. 1**

48.

Spencer discloses an extensive infrastructure. In one embodiment Spencer

requires: "The content server (160) includes a web server (135), an application

server (140), a user database (145), a content database (150), a device database

(165) and a license server (170) with an associated usage rights database (155)."

(Spencer, 0025).

16

49.  In Spencer, the web server is a core part of the content server "At the remote side of the closed loop system, the web server (135) is the part of the content server (160) that is used to provide a user interface between the users that are connected to the computer network (130) and the application server (140), which constitutes the central part of the content server, as will be seen below. A user can view web pages that are related to the closed loop delivery system, either in a web browser on his or her computer, or on a simplified display on a playback device, such as a home stereo or a personal digital assistant (PDA), for example." (Spencer, 0025). The web server is also disclosed in Spencer, 0027, 0028, 0027, 0079, 0080, and Fig. 1.

50.  A POSITA would readily understand that the web server is core to Spencer. This means that one would have to account for the web server if one wished to combine Spencer with any other prior art. Prior art that is not web based and does not use a web server or web content would be difficult to combine with Spencer.

**B.    The '667 Patent**

51.  The '667 patent, entitled "Secure stream buffer on network attached storage," was filed on April 16, 2018, and issued on October 15, 2019. The '667 patent claims priority to application no. 14/15,367, which was filed on February 2, 2015. Dean M. Jenkins and Robert P. Ryan are the named inventors of the '667 Patent.

52.  The abstract to the '667 Patent states the following:

- A network attached storage device coupled to a local network and including a network interface configured to receive digital content from a remote content provider outside the local network. The network attached storage device includes storage having a first region accessible by a user of the local network and a secure region. The network attached storage device includes a processor coupled to the storage, the processor configured to control access to the secure

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

region of the storage based on instructions received from a remote content provider.

53.    As the background section of the '667 patent explains, "Bandwidth throttling," which is "the intentional slowing of internet service," '667 patent at 1:18-20, was employed by network providers to the detriment of video streaming. *Id*. at 1:22-30. The effect of bandwidth throttling is that the Internet "pipe" becomes smaller; and sometimes, it is too slow to support the transmission of video media content for playback in real-time.

54.    Mr. Jenkins explained this problem at his deposition:

- Q Can you describe the '667 patent at a high level?

- A So back in, I want to think, 2014, there was a lot of talk about net neutrality and a lot of internet server providers, or ISPs as we call them were -- they had the ability to throttle streams. Most of the ISPs were also cable providers; in other words, providing cable TV access. And so they had the ability to throttle their internet access on a selected basis. So however they wanted to, they could do this. And that was what the net neutrality was all about. And I saw this as a way to bring -- my patent as a way to bring value to our NAS box at the time.

- Q Okay. Let me ask a different question:  When you were working on the '667 patent back in 2013, 2014, what set that apart from other solutions that already existed?

- A So as I described, I was upset that the internet service providers were throttling the consumer. And I didn't like that. And there was also this net neutrality that was trying to get passed in Congress, but it was having issues. And I said this is a way to circumvent all of that and provide a way of doing that. And I did not know of another -- another way of doing that at the time. And it -- like I said, it brings a value-add to the Western Digital product.

Jenkins Tr. at 56:22-57:11, 61:8-21.

55.    Co-inventor Mr. Ryan similarly testified as follows:

- A Yeah. What we were looking for -- Dean and I were the coinventors. Dean actually had the original spark of the internet bandwidth is tight and content is big and too big for that pipe.

- So we were going to create a new market for the hard drive to go into that was an ability to buffer the streaming service, so you could start a movie and tell it, "You know what, I want to watch this movie."

- You wait ten minutes. It's buffering, buffering, and buffering, and then you could actually watch the movie ten minutes later and you'd have buffered up enough content you wouldn't have frame skipping.

- That was the -- the main gist of it was to get around that internet service crunching of your data.

- And then -- and then we kind of expanded it to oh, you know we could have people preload content as well, but the first premise was just that capability to buffer.

- Last night, we were watching something, direct stream app on a Fire Stick, and the thing got horribly pixilated. And my wife was like, "Why does this thing look horrible?" I'm like, well, had this patent gone through and we actually had this buffer, then we'd watch it a little bit delayed, but it would be clean, you know, so that was...

Ryan Tr. at 58:3-22; *see also*, *id.*, 59:10-24, 60:2-16, 78:12-19.

56.    Thus, the inventors sought to solve the problem of providing media content through a narrow Internet "pipe" that did not have sufficient bandwidth to transmit media content for playback in real-time (*i.e.*, video streaming). While most high-speed Internet connections in the United States today have sufficient bandwidth to support video streaming, some Internet connections do not. Significantly, satellite internet, even today, is plagued by throughput, bandwidth, and capacity concerns; particularly so when satellite Internet is used for media-streaming in aircraft because of the number of passengers on board, the strict requirements for small and lightweight multi-directional antennas, and the difficulties in transmitting data through unpredictable environments associated with airplanes.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

57.    The inventors therefore came up with the solution defined in the '667 patent to solve the problems associated with transmitting media content through a narrow Internet "pipe." The '667 patent explains:

- Network streaming of media content such as movies and televisions shows, among other types of content, has become commonplace. At times, network providers, such as ISPs limit or throttle certain streaming hosts, for example, to extract financial gains for providing Quality of Service (QoS).

- Aspects presented herein provide a way to maintain smaller sizes of buffers on display device and to maintain control over content while ensuring that content can be viewed without deterioration due to throttling through the use of a Network Attached Storage (NAS) device having a secure portion for buffering streaming content. Such a NAS device may be used, e.g., as part of a home network to provide for private buffering of streaming content for any number of display devices.

- As most display devices have very limited buffering capability, such buffering at a NAS device may help to ensure QoS at the display device.

- Additionally, by buffering the media at the NAS device, the media content can be viewed without the hiccups or stalling due to throttling, because the content is already buffered and can be viewed without being streamed over the Internet.

- Control of the media may be maintained by the stream content provider through the security employed by the secure portion of the storage device. This portion may be secured, e.g., by designating the media as private. Access to the private buffer may be sold on a subscription model to streaming content providers.

- Additionally, individual display devices do not require additional buffering capability thereby avoiding an increase in cost for the devices that would be involved in increasing the size of their buffers.

'667 patent, 2:23-55.

58.    Similarly, at his deposition, Mr. Jenkins explained:

- Okay. So I came up with a concept if  internet service providers were going to throttle and make your experience streaming any kind of video painful, such as, you know, buffering, you'd hiccupping in your -- you'd have an unsteady video display, I saw that as a way I could add some value to our network attached storage by holding back an area of storage and making it encrypted and unavailable to the user who bought the network attached storage, but

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

providing it to a content provider such as a Netflix or Hulu or there's various ones out there.

- And, therefore -- I think at the time, 2014, Netflix was one of the prominent ones. And I believe at the time, you also could queue up or tell them which videos or movies that you were going to be looking at.

- And so with that knowledge, Netflix could queue those things up and put them on this area, secure area that I was describing inside the NAS box because the content provider would have access to that, where the user wouldn't. And then when you went to display something, typically a Netflix client, which would be running on a Samsung -- on any television, HDTV or a Netflix box, there's various ways of doing that, it would contact, through your home network, this piece of storage and spin off this encrypted data so it could display it on your TV and you could watch a movie.

- So it was a way of getting around any kind of internet service provider throttling, any kind of slow pipe you could -- you could force feed the stuff into the home into the NAS box.

- So it provided added value to the NAS box that Western Digital could -- you know, be worthwhile to them; it could sell more NAS boxes.

- . . .

- The NAS box is a component of the entire system. Like, when I was conceiving this, Netflix is the -- on one end feeding it, and then the NAS box has the secure region. Netflix can talk to it and have it there.

- So they're serving something up and controlling that feed in. And then the NAS box is a small server, also, feeding it to the display device, making sure that it never starves the display device so you don't have any hiccups.

Jenkins Tr. at 57:15-59:1, 97:9-18; *see also*, *id*. at 110:3-14.

59.    In particular, the '667 patent discloses a streaming media system that transmits

media content over a wide area network ("WAN"; for example, the Internet) to a

network attached storage ("NAS"). The NAS device is connected to both the

WAN and the NAS over a local area network ("LAN"). This is shown, for

example, in Fig. 3 of the '667 patent reproduced below, which illustrates a NAS

device 306 connected to a User Network 310 and to the ISP Network 304. *See*

*also* '667 patent at 4:46-50. The NAS device 306 is also in communication with a remote content provider 302 (or "Stream Provider") through the ISP Network 304.



**FIG. 3**

60.    As shown in Fig. 3, the NAS device 306 has a user accessible storage 322 and a secure region 324. The '667 patent explains that the remote content provider 302 may transmit media content that is then stored in the secure region 324 of the NAS device 306. Moreover, the NAS device "controls access to secure region 324 of the storage based on instructions received from a remote content provider." '667 patent at 5:5-10. The '667 patent explains:

61.    The secure memory region 210 of NAS device 206 may be configured as a buffer for receiving steaming content for the at least one display device 208 in a manner controlled by the stream content provider 202. Display devices 208 may have minimal buffer storage for a number of reasons. For example, the cost of the display device may be reduced by requiring a smaller amount of buffer storage in the display device. Additionally, content providers may prefer smaller buffers in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

display devices because this allows them to maintain control of their content by providing smaller amounts at a time to the display device.

62.     By providing a larger buffer in the secure region of the NAS device 206, 306 that can be used by the display device enables the content provider 202, 302 to use burst transmission to stream the content in larger bursts than might be possible for transmissions to a smaller buffer. Also, as the streamed content continues to be controlled by the streamed content provider, the stream content provider can use burst transmission without risking misappropriation of the streamed content by the user.

63.     For example, once a user requests content from a stream content provider via a display device 208, the NAS device 206 may negotiate with the stream content provider 202 to receive the desired content and to buffer an encrypted stream of the content in the secure region 210. Such negotiation may include, e.g., informing the stream content provider of a secure region within the NAS device that is not accessible by a user. The NAS device may inform the stream content provider of the available size of the secure region or may negotiate with the stream content provider to agree on a size of a secure buffer. Among other negotiated aspects, the NAS device may negotiate with the stream content provider to agree on a length of time for which the content will be retained at the secure region of the NAS device, requirements for the user to access the streamed content, whether the streamed data is encrypted, and keys for accessing encrypted content. For example, requirements for accessing the streamed content may be time based, user based, etc. If the streamed content is encrypted, a description key

may also be obtained. The keys may be obtained based on payment, a license server, etc. The NAS device 206 may then present the streamed content from the secure region to the display device 208 as encrypted content. '667 patent, 4:15-46.

64.    In summary, the '667 patent describes a method of caching content on a local storage device such that separate display devices receive the content from the cache upon request, as opposed to that request being sent through the entire content delivery system.

65.    It is my opinion that a POSITA would have appreciated that some of the key benefits of the technology patented by the '667 patent to Viasat's infringing systems include the following:

66.    One benefit of the '667 patent is that, by storing the media content in the secure region of the NAS device (*i.e.,* Viasat's S4 server or Viasat's hub), the system of claim 1 and the method of claim 9 reduce the required internet bandwidth associated with media streaming and reduce the total volume of data that needs to be transmitted over the WAN (e.g., over a satellite) if the media content is played back multiple times by one more of devices connected to the NAS device over the LAN. A second benefit of the '667 patent is that media content can also be transmitted over the WAN (e.g., a satellite) during off-peak hours and stored for later playback during peak hours, which is an added benefit of claims 1 and 9 of the'667 and a specific benefit of claims 3 and 12.

**U.S. Patent Pub. No. 2003/0001978 ("Smith")**

67.    A POSITA would immediately note that Smith is related to set top boxes and television. This is specialized equipment dedicated to showing video. This can be seen in Figure 2A of Smith:

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Fig. 2A*

68.    This is also explicitly stated in Smith: "The present invention relates to methods and systems for enhancing display functionality in a television set-top box environment and in particular, to methods and systems for the secure storage and display of digital data content, and the creation and display of dynamic floating navigational graphics." (Smith, 0002).

69.    Smith implements DRM in a very specific and limited way: "In one embodiment, the EDC detects digital content that is protected using Digital Rights Management (DRM) and coordinates the secure storage and playback procedures with usage limits specified by associated DRM data. Upon detection that usage limits have been exceeded, the EDC can cause a renewal process to be initiated if one is available. In addition, the EDC can destroy (e.g., erase) the data when appropriate, because the EDC controls its storage and display. In one

25

embodiment, a flag is inserted into the digital content to indicate DRM protection.
In another embodiment, the head-end or server encodes the content according to
the DRM scheme, and the encoded content is automatically recognized by the
EDC." (Smith, 0012)

70.    Claim 1 of Smith is illustrative of the intent and purpose of Smith:

- A method in an electronic device associated with a

- television display comprising:

- upon determining a request to securely store digital content from an input
  stream associated with the device, assigning a secure storage area and
  associating the area with an identifier of the content stream;

- and streaming the content to the assigned storage area in a secure manner;

- and upon determining a request to securely play back previously

- stored digital content, determining the storage area associated with the
  previously

- stored digital content;

- and securely playing back the previously stored digital content from the
  determined area.

**U.S. Patent Pub. No. 2010/0325675 ("Smoyer")**

71.    Smoyer describes itself as "The present invention provides an improved system
and method for storing data content from a service provider to an electronic
device associated with a network subscriber. content from the determined area."
(Smoyer, 0010). Figure 4 of Smoyer is helpful in describing the system:

72.    The illustrative embodiment of Smoyer is also informative: "In the illustrated
embodiment, electronic device 400 is communicatively connected to the network
via virtual circuit 406. Virtual circuit 406 comprises a subscriber virtual LAN
(VLAN) 408 and service provider VLAN 410. Subscriber VLAN 408 is

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

communicatively connected to subscriber accessible memory 402. Similarly, service provider VLAN 410 is communicatively connected to service provider reserved memory 404. VLANs 408 and 410 are configured to deliver video, audio and/or data content over the network to subscriber memory 402 and service provider memory 404, respectively. Further, VLANs 408 and 410 are configured to provide upstream and downstream data access between STB 400 and the service provider. The service provider may configure VLAN 410 such that the service provider has access to service provider memory 404 at all times." (Smoyer, 0028).

**The SCSA System ("SCSA")**

73.     The document "Security System Specification" beginning at WD-Viasat-NDCA00014131 describes playback of encrypted content files: "For content to be playable, the file system on the storage device needs to contain both the encrypted content file(s) as well as a valid license file." *Id.* at 145. Moreover, to allow playback of encrypted content files in the file system of the storage device, the storage device needs to have the required license file(s) and license key(s)." *Id.* at 146.

74.     The SCSA Security System Specification, beginning at WD-Viasat-NDCA00014131, explains that content download does not require a "secure session," and that "No security is required for this process." *Id.* at 145. By contrast, the Security System Specification explains that for "the license file and license key provisioning to occur, the storage device (via a conduit) first connects to the license server. . . [and] the license server and storage device then perform a public key handshake." *Id.* at 147. The license file is "A file, generated by the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SCSA License Server, specific to an SCSA Storage device. It contains the necessary and sufficient descriptive and cryptographic information to enable playback on an SCSA Player," WD-Viasat-NDCA00014363 at 376, and the "License Key is a key from which the Content encryption key is derived. The License Key is stored in the License Server database." *Id.*

**The DirecTV DVR System ("DirecTV")**

75.     Viasat alleges that DirecTV began offering TiVo-based DVRs around 1999 and later developed its own DirecTV Plus DVRs, which by the mid-2000s allowed HD recording, dual tuners, and more.

76.     The following excerpt from DirectTV in 2010 describes their product offerings "Introducing the DIRECTV® Whole Home DVR — one DVR that lets you record and watch your favorite TV shows on up to 15 TVs in your home. This service lets you record, delete, pause and rewind your favorite shows from any TV, in any room — with one DVR. That means you can start watching in one room, pause and finish in another. You can't get this revolutionary entertainment experience with cable or DISH Network. It's only available from DIRECTV."[1]

**The DISH DVR System ("DISH")**

77.     Dish Network (DISH, an acronym for DIgital Sky Highway) is an American direct broadcast satellite television provider. It was originally introduced and currently owned by EchoStar (then a different company) on March 4, 1996. Its

---

[1] https://web.archive.org/web/20100620090500/http://www.directv.com/DTVAPP/content/directv/technology/wholehome?ICID=PRHP-SLOT4-MRV&lid=PRHP_promo2_MRV

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

primary competitor is DirecTV[2]. It began with a limited offering in rural and semi-urban areas where cable television had limited reach, setting itself apart as a technological alternative to cable. Dish TV initially used the INSAT-2E satellite and later migrated to more advanced satellites for better signal and service quality. At launch, it offered about 48 channels, including a mix of entertainment, movies, news, and regional content. Over time, the offerings expanded. Users needed a proprietary set-top box and a small dish antenna for receiving broadcasts[3,4]. Dish offered a range of different set top boxes[5]:



---

2 https://logos.fandom.com/wiki/Dish_Network

3 https://about.dish.com/company-info

4 https://www.companieshistory.com/dish-network-corporation/

5 https://web.archive.org/web/20101227004515/http://www.dishnetwork.com/receivers/dvr/default.aspx

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY





78.    Features varied widely from one set top box to another.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**The TiVo DVR System ("TiVo")**

79.    Founded in 1997, TiVo had, by 2010, become a widely known company for DVR services. It offered a subscription-based service combined with hardware that allowed users to record, pause, and rewind live television. The following excerpt from TiVo in 2010[6] describes their product offerings



**U.S. Pat. Pub. No. 2012/0131623 ("McDysan")**

80.    McDysan was directed towards providing video services. Using time shifted services (i.e. using periods of low bandwidth utilization) was part of their technology (McDysan, 0013). The McDysan system could provide IPTV and Video on Demand (McDysan, 0013).

81.    McDysan used a rather complex system, depicted in Figure 1from McDysan:

---

6 https://web.archive.org/web/20100811014251/http://www.tivo.com/products/tivo-premiere/index.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



FIG. 1

82.    McDysan describes Figure 1 as follows "FIG. 1 is a diagram of an example network 100 in which systems and/or methods described herein may be implemented. As illustrated, network 100 may include a super head end (SHE) 102 that includes a satellite dish (SAT) 104, content delivery network (CDN) storage 105, and a subscription/selection/search management (SSSM) server 106; a video hub office (VHO) 108 that includes CDN storage 110 and a SSSM server 112; a video serving office (VSO) 114 that includes a broadcast delivery system 116, a switched delivery system 118, and CDN storage 120; a customer premise 122 that includes a STB 124, a broadband home router (BHR) 126, a home media device (HMD) 128, a television (TV) 130, and a user device (UD) 132." (McDysan, 0015).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VII.    VALIDITY ANALYSIS OF THE '400 PATENT

83.    In the following subsections I detail my opinions responsive to the opinions raised by Dr. Almeroth related to validity of the '400 patent, examining each ground Dr. Almeroth raised in his opening expert report from the perspective of a POSITA as discussed above.

### A.    Claim Construction

84.    Throughout my analysis, I applied the Court's construction in every case where the Court has construed a term. Where the Court did not construe a term, I used the plain and ordinary meaning of that term to a POSITA. The following are the Court's constructions:

| Claim Term | Adopted Construction |
|---|---|
| "kiosk" ('400 Patent) | "any device used to access and distribute content provided by the system" |
| "portable data storage device" ('400 Patent) | "a storage device that can be easily carried or moved about" |
| "authenticate the portable data storage device, using at least the unique identifier" ('400 Patent) | "confirming that the portable data storage device is trusted using at least the unique identifier" |
| "provide to the portable data storage device … a corresponding access key" ('400 Patent) | "provide to the portable data storage device … a key to decrypt the first media content" |
| "public environment" ('400 Patent) | "location accessible by the public" |

### B.    General Comments

85.    Dr. Almeroth has a section discussing the Internet (Almeroth Report, ¶¶ 60-65). I agree with Dr. Almeroth's general description of the Internet. However, Dr. Almeroth does not articulate any relevance to the current matter, nor do I see one. Neither the '400 patent nor the '667 patent claim to have invented the Internet. Dr. Almeroth then has a section discussing network protocols (Almeroth Report,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

¶¶ 66-70). Again, I agree with Dr. Almeroth's description of network protocols. Dr. Almeroth then presents a section on network layer stacks (Almeroth Report, ¶¶ 71-87). Again, I agree with Dr. Almeroth's description of protocol stacks including his comparison of the OSI model and the TCP/IP model.

86.     I note that throughout Dr. Almeroth's discussion of his opinions on invalidity, he depends heavily on preliminary infringement contentions.[7] For example, stating "Therefore, under Plaintiffs' theory of infringement, Rae satisfies this limitation." (Almeroth Report, ¶ 202). Dr. Almeroth makes similar statements elsewhere in his report, indicating that is opinions on invalidity are dependent upon his understanding of the plaintiff's infringement theories (Almeroth Report, ¶¶ 169, 174, 185, 191, 195, 201, 203, 225,230, 238, 244, 251, 256, 258, 260, 343, 347, 350, 352, 353, 354, 358, 362, 363, 366, 369, 387, 390, 391, 392, 394, 395, 396, 400, 404, 407, 426, 429, 432, 433, 434, 435, 438, 439, 440, 446, 452, 453, 454, and 459). To the extent that Dr. Almeroth has misunderstood the infringement contentions, his invalidity analysis would also be flawed.

87.     Dr. Almeroth states "A POSITA would have been motivated to combine Rae with either Buttars or Spencer because they all are directed towards inventions with a similar purpose: enabling the secure transfer of media content from one storage device to another storage device. A POSITA evaluating Rae would naturally consider other similar patents, and to the extent one of the patents contained

---

[7] Dr. Almeroth only cites to the March 22, 2024, Infringement Contentions by Sandisk and does not consider the February 23, 2023, and January 3, 2025, Infringement Contentions in his invalidity sections.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

features missing from others, a POSITA would have been motivated to incorporate such features with the other patents." (Almeroth Report, ¶ 157)

88.    I first note that any such combination ignores the multitude of fundamental differences between the three patents that would prevent the motivation of such combination. Buttars views a kiosk as a playback device (Buttars, 0022, 0023, Claim 3, claim 4). Rae has a kiosk that is not a playback device and depends on portable media such as CD's (Rae 6:19-24; 6:60-7:4). Spencer does not disclose a kiosk.

89.    Rae discloses a local connection between the kiosk and portable drives (3:19-20; 4:1-3; claim 7; claim 19). Buttars kiosk is a playback device and does not communicate with a storage device over a LAN, WiFi, nor any network. Spencer does transmit audio files over a network, but does not have a kiosk

90.    Spencer is about delivering music. For example, using a personal juke box on the personal computer (Spencer,0005). Encrypted content is optional in Spencer (0007).

91.    A POSITA would readily understand that Buttars, Rae, and Spenser are not directed towards the same purpose. Furthermore, given Buttars has a kiosk/playback device and Spenser has no kiosk, it is not even clear how a POSITA would combine them, and there certainly would be no motivation to do so. Dr. Almeroth does not identify specific elements of the asserted prior art he would combine. He simply states a POSITA would be motivated to combine them.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

92.    Despite the apparent differences in the technical challenges each of Buttars, Rae, and Spenser seeks to solve, Dr. Almeroth liberally uses Spenser as a gap-filler in his analysis without any explanation of how a POSITA would view such combination or gap-filling as beneficial, as I will explain in detail in relevant elements below.

93.    Dr. Almeroth's report has the word 'combine' 29 times. However, there is not one instance in his report where Dr. Almeroth articulates any advantage or improvement any combination would provide. Put another way, Dr. Almeroth does not state why a POSITA would want to combine prior art elements.

94.    As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show *a motivation to combine*, which Dr. Almeroth does not do.

95.    I also note that while Dr. Almeroth's report has a section on legal standards, he does not discuss the standards for motivation to combine and his analysis does not reflect an understanding of the standards for motivation to combine. The United States Patent office describes the following in its discussion of obviousness[8]:

- Combining prior art elements according to known methods to yield predictable results.

- Simple substitution of one known element for another to obtain predictable results.

- Use of known technique to improve similar devices (methods, or products) in the same way;

---

[8] https://www.uspto.gov/web/offices/pac/mpep/s2143.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

- "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

- Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;

- Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

96.     It is unclear if Dr. Almeroth has not been informed of these elements, forgot to put them in the legal standards section of his report, or chose not to apply them in his analysis because he believes there is actually no motivation to combine when the correct legal standard is applied.

97.     In Dr. Almeroth's specific proposed combinations he never states that any combination would have yielded predictable results, was the combining of known techniques, or even that the POSITA would have had an expectation of success in making a given combination. In paragraph 159 of his report, Dr. Almeroth makes general reference to some of these elements.

98.     In his discussion of legal principles, Dr. Almeroth states "It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶ 57). However, throughout his discussion of alleged prior art combinations, Dr. Almeroth never discusses

how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

**C.    Validity of '400 Patent in Light of Rae**

99.    I first note that Dr. Almeroth does not argue that Rae anticipates any of the claim limitations of claim 1 the '400 patent. Rather, he argues that the claim limitations of claim 1 of the '400 patent would be obvious in light of Rae. I agree that Rae does not anticipate any part of claim 1 of the '400 patent, nor any other claim. I disagree that Rae renders obvious claim 1 or any other claim of the '400 patent. My basis for this disagreement is described in reference to each claim limitation.

**1[pre]. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:**

100.    Dr. Almeroth points to Rae 4:55-58. That section of Rae states: "FIG. 1 illustrates an off-line content delivery system that utilizes portable media drives to transport protected content from kiosks to playback devices in accordance with embodiments of the invention."

101.    A POSITA would immediately recognize that the kiosk of Rae has portable media drives to transport content. This is a completely different type of kiosk than is disclosed in the '400 patent. Rae makes it clear that its kiosk uses DVD players (Rae 6:19-24; 6:60-7:4) and compares itself to Netflix delivering DVDs via mail (Rae 1:31-33). This is even more clear when Rae states: "The term off-line content delivery system refers to a system that involves the delivery of digital

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

content using some form of fixed media Such as an optical storage device, or a portable media drive." (Rae 1:23-26). The only mention of DVDs in the '400 patent is to disavow them: "Conventional DVD and Blue ray discs did not contain such features to authenticate or establish trust with a player or download server" ('400 3:33-34). A POSITA would readily understand that Rae embraces an "off-line" methodology of distributing video (DVD's, Blue Ray, etc.) that is disavowed by the '400 patent, therefore Rae teaches away from and provides a different solution to the '400 patent.

102.    Dr. Almeroth then points to an excerpt from Rae "…the kiosk is configured to issue protected content to the portable media drive…" (Rae 3:1-2). I agree with Dr. Almeroth that this is what is stated in this excerpt from Rae, however, a POSITA would see that this again is using a portable media drive such as optical disks, which is not how the '400 kiosk functions.

103.    Dr. Almeroth cites Rae at 5:19-21, but this is a fragment, the entire section is: "In many embodiments, a portable media drive or storage device is used to obtain content from a kiosk for playback via one or more playback devices. In several embodiments, the portable media drive and the playback devices are associated with a specific user account. *When the portable media drive is connected to a kiosk at a retail location*, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." (Rae 5:19-26, emphasis added). In the section of Rae that Dr. Almeroth cites, Rae is requiring the portable media to be physically connected to a kiosk. This is not only different than the kiosk of the '400 patent, it is inferior to it. A POSITA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would recognize that the network connectivity used in the '400 is more flexible than Rae.

104.    Dr. Almeroth then asserts that Rae's "protected content" is the '400 patent's "secure media content" that is provisioned by the kiosk.' (Dr. Almeroth, ¶ 167). This ignores the important role that authentication plays in the '400 patent. Rae mentions authenticate or authentication only three times:

- "When the portable media drive is connected to a kiosk at a retail location, ***the kiosk authenticates the user*** and enables the user to select one or more pieces of content to transfer to the portable media drive." (Rae 5:23-26, emphasis added).

- "A process utilized by a kiosk when issuing protected content to a portable media drive in accordance with an embodiment of the invention is illustrated in FIG. 2. The process 30 includes ***authenticating the user*** via a user interface and receiving (32) VOD selections from the user." (Rae 6:44-48, emphasis added)

- "In addition, systems in accordance with embodiments of the invention can involve the initial registration of a portable media drive so that the drive is always used to provide the device certificates to the kiosk. In such systems***, user authentication*** can occur at the kiosk and/or at the playback device." (Rae 11:10-15, emphasis added)

105.    Each of these involves the physical connection to the kiosk. Furthermore, each of these is authenticating a user, not a device. This is quite different than the robust authentication that is a substantial part of the '400 patent. A few examples are given here:

- "In this embodiment, a trusted server that is authenticated and trusted by both storage devices brokers the transfer of content." ('400 Abstract)

- "In another embodiment, the DRM system enables secure copying or transfer of content and/or content metadata, for example, from one storage device to another storage device via a trusted server. In this embodiment, the transfer of the content and the content metadata is brokered by a trusted server that is authenticated and trusted by both sets of storage devices. The trusted server may be a separate entity of the DRM system or may be a component or function of an existing server of the DRM system." ('400 2:48-56)

40

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "In one embodiment, two-way authentication is employed, for example, using public key infrastructure ("PKI") and public key certificate-based authentication to ensure that entities in the system are trusted." ('400 3:23-26)

- "As noted, two-way mutual authentication may be employed between entities to establish secure communications channels for exchanging and distributing the content. Each item of content may also be issued a digital certificate." ('400 3:48-52)

106.    In addition to these examples, claim elements 1e, 1f, 9d, and 9e of the '400 disclose the kiosk involved in authentication. A POSITA would recognize that encryption is indeed part of secure media, but only part. Rae lacks the robust authentication disclosed in the '400 and Rae only authenticates the user, not the storage device. These are just two very clear differences between the kiosk of Rae and the kiosk of the '400 patent. And Dr. Almeroth does not suggest combining Rae with anything to meet this claim limitation.

107.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[a] a first data interface configured to communicate with a portable data storage device;**

108.    In reference to this claim limitation, Dr. Almeroth points to claim 18 of Rae "processing system configured to communicate with a portable media drives via a communication port" (Almeroth Report, ¶ 170). Dr. Almeroth then points to Figure 5a, which I have copied here:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



FIG. 5a

109.    As can be seen, the communication port connecting to the media drive is not a

data interface, it is rather a local connection. The figure clearly shows 104 Detect

Media Connected. This is described as "The process 100 includes determining

(102) whether the user has a user account and detecting (104) whether the

portable media drive" (Rae, 9:41-43)

42

110.    That the storage device is local, is disclosed throughout Rae (3:19-20;4:1-3; claim 7; claim 19). This is made quite clear specifically in reference to Figure 5a, which Dr. Almeroth referenced "The operation of a kiosk when issuing content when a network connection is available in accordance with an embodiment of the invention is illustrated in FIG.5a. In the illustrated embodiment, the kiosk 12 locally stores three pieces of symmetrically pre-encrypted content 90.92, and 94. ***When a portable media drive 14 is presented to the kiosk, the kiosk performs a process*** 100 in order to issue content to the portable media drive." (Rae 9:31-42, emphasis added)

111.    Furthermore, the communication with a remote server in the '400 patent is part of the process to authenticate the portable storage. As will be seen in claim elements 1d and 1e, this does not happen in Rae. Any first data interface that may exist in Rae is not a LAN or Wi-Fi interface, it is in fact a directly local connection much like plugging a drive into a machine and does not perform the functions of the first data interface in the '400 patent.

112.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[b] a second data interface configured to communicate, over a network, with a remote trusted server; and**

113.    Dr. Almeroth states Rae's "kiosk" is the '400 patent's "second data interface" that is configured to communicate with a remote trusted server over a network.' (Almeroth Report, ¶ 177). The kiosk itself cannot be the second data interface. The '400 is clear that the kiosk has both a first and second data interface and cannot logically be either of those interfaces. The claim language is quite clear

that "the kiosk comprising...a first data interface ...a second data interface...a processor". Stating that the kiosk is the second data interface is simply nonsensical and completely ignores the claim language of the '400 patent.

114. Dr. Almeroth does not actually point to an interface on the kiosk of Rae that he asserts is the second data interface.

115. Dr. Almeroth then asserts it would have been obvious to combine Spencer with Rae (Dr. Almeroth). I first note that Dr. Almeroth provides no reason a POSITA would make such a combination. He points to no advantage such a combination provides. I also note that Dr. Almeroth does not state what elements of Rae and Spencer he proposes to combine.

116.  Dr. Almeroth further states "Spencer describes a network between end-user devices and a remote content server, and a network between a kiosk and a remote content server would also be obvious to a POSITA." (Almeroth Report, ¶178).

117. A POSITA would not have been motivated to combine Spencer and Rae. Spencer uses a remote content server because one goal of Spencer is to save disk space at the user end, by storing content at the server (Spencer, 0016). Rae uses offline storage, particularly optical storage (Rae 1:23-26; 6:19-24; 6:64-66;). Rae does not require nor benefit from the remote content server of Spencer. There simply is no reason for a POSITA to combine the remote server of Spencer with Rae, and thus there is no reason to combine any network interface of Spencer with Rae.

118. As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show *a motivation to*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*combine*, which Dr. Almeroth does not do. For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[c] a processor configured to:**

119.    I agree with Dr. Almeroth, that Rae discusses a processor. However, as will be shown in the following claim elements, the processor of Rae does not perform the limitations of the '400 patent. It is not sufficient to merely show that an asserted prior art has a processor. Many devices have computer processors. Rather the processor must function as the processor described in the claims of the '400 patent. Rae fails to disclose this functionality.

120.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[d] obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

121.    For this claim limitation, Dr. Almeroth points to playback device ID's and specifically to Rae 8:35-40. However, Dr. Almeroth only points to a portion of a sentence stating: "Rae explains that 'playback device IDs' are used to uniquely identify the playback devices associated with the public keys." (Almeroth Report, ¶186). The entire sentence is: "The encrypted copies of the content keys 70, and 72 associated with each playback device are then used to create a store file along with the ***playback device IDs or other information such as certificate IDs used by the CA system to uniquely identify the playback devices*** associated with the public keys." (Rae, 8:35-40, emphasis added).

122.    It is quite clear that the segment of Rae that Dr. Almeroth points to does not disclose a processor in a kiosk identifying anything. Rather the CA system is

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

identifying devices. A POSITA would readily understand that a CA is a certificate authority. Such CA's issue and validate cryptographic keys.

123.    Dr. Almeroth then states: "The text of the '400 patent claims requires that the unique identifier" be "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device, as noted above. Rae discloses a "unique identifier" that aligns with the '400 patent claims." (Almeroth Report, ¶ 187). However, the storage device that Dr. Almeroth is pointing to is not an end-user device. In fact, according to Rae, the storage device may be located at the headend: "In a still further embodiment of the invention, the storage device is located at the headend." (Rae 3:21-22)

124.    While Rae does disclose that the storage device **could be** local to the kiosk, it can also be at the headend. A POSITA would readily understand that the fact that the storage device can be at the headend makes it quite clear that it is not an end user device.

125.    It should also be noted that Dr. Almeroth does not even attempt to show that the playback device ID he is asserting meets the unique ID claim limitation, is concealed.

126.    Dr. Almeroth then asserts that it would be obvious to combine Rae with Spencer (Almeroth Report, ¶ 189). Dr. Almeroth does not identify specific elements of either Spencer or Rae he wishes to combine. It is unclear if he is proposing combining the two in their entirety. If so, it is not even clear that would be possible.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

127.   Dr. Almeroth asserts that "Specifically, Spencer discloses a method comprising "[o]btaining device-identifying information," which includes a unique identification number from the playback device, a unique identification number of a digital storage medium in the playback device, or a serial number Id. at [0007]." (Almeroth Report, ¶ 189). What Spencer discloses is "receiving device-identifying information relating to the particular digital media playback device through the communication channel; receiving a request for media content to be delivered to the digital media playback device; ***determining, based on the device-identifying information, whether the requested media content is playable on the digital media playback device***;" (Spencer, claim 1, emphasis added).

128.   A POSITA would understand that determining whether media content is playable on a device merely requires that the device type be identified. It need not be unique. This is why Spencer paragraph 0007 that Dr. Almeroth relies on, uses the word 'can' 4 times in a single paragraph. Spencer does not ***require*** a unique identifier. However, a POSITA would readily see that a unique identifier does not improve the purpose of Spencer, and therefore any combination of Rae and Spencer would still not fulfill this claim limitation.

129.   As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show ***a motivation to combine***, which Dr. Almeroth does not do. Certainly, any such combination would not be combining prior art elements according to known methods to yield

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

predictable results. Dr. Almeroth also does not assert that a POSITA would have had an expectation of success in making any such combination.

130.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[e] authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

131.    In reference to the unique ID, Dr. Almeroth points first to playback device IDs as the unique identifier (Almeroth Report, ¶ 186). Dr. Almeroth then asserts that the private key is the unique identifier (Almeroth Report, ¶ 188). However, neither is used to authenticate the portable storage device.

132.    In reference to this claim limitation, Dr. Almeroth states "[w]hen the portable media drive is connected to a kiosk at a retail location, ***the kiosk authenticates the user*** and enables the user to select one or more pieces of content to transfer to the portable media drive." Rae at 5:19-29." (Almeroth Report, ¶ 192, emphasis added). A POSITA would first note that the very section of Rae that Dr. Almeroth cites is authenticating ***the user***, not the portable storage device. A POSITA would also note that neither the playback device ID nor the private key are used in this authentication.

133.    Dr. Almeroth continues stating "The kiosk looks up the ***user's ID*** and associated Unique IDs for the user's playback devices on a subscriber management system at the headend." Rae at 9:39-51 (emphasis added)." Again, the user id is the first part of this process. It is the user that is being authenticated. Then after the user is authenticated, the associated playback device IDs are retrieved. It is clear that in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Rae, the device IDs are not being used to authenticate but rather are being retrieved after the user is authenticated.

134.    In fact, in paragraph 192 of his report, Dr. Almeroth makes this very point (emphasis added):

135.    Rae discloses an authentication process where "[w]hen the portable media drive is connected to a kiosk at a retail location, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." Rae at 5:19-29. Specifically, Rae describes how a unique identifier is used in its authentication process: "When a portable media drive is presented to the kiosk, the kiosk performs a process in order to issue content to the portable media drive. The process includes ***determining whether the user has a user account*** and detecting whether the portable media drive has been presented to the off-line content delivery system. The kiosk looks up the user's ID and associated Unique IDs for the user's playback devices on a subscriber management system at the headend." Rae at 9:39-51 (emphasis added). Then, after obtaining the user's ID, the system then obtains "device certificates for the playback devices associated with a user" and "verifies them against a locally stored certificate revocation list. Assuming the certificates are not on the revocation list, the process proceeds using the device certificates obtained from the portable media drive." Rae at 10:56-11:1.

136.    A POSITA would understand that the items Dr. Almeroth has asserted meet the object ID limitation (playback device ID and private key) are not used to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

authenticate. Rather the user is authenticated, then certain additional information is retrieved.

137.    Furthermore, what Dr. Almeroth points to as the authentication process of Rae, is done entirely by the kiosk, not through the use of any information from any remote server. The very portions of Rae that Dr. Almeroth cites to state that the kiosk looks up the user id and that this is done ***offline***, thus no communication with a remote server is even possible.

138.    Dr. Almeroth states: "This process is depicted in the "Entitlement Checks" arrow between the Conditional Access System and the Subscriber Management System in Figure 1, as shown below:" (Almeroth Report, ¶ 192). It is unclear why Dr. Almeroth puts "entitlement checks' in quotes. The term entitlement appears 18 times in Rae, never entitlement checks. Entitlement Control Messages (ECM)s are mentioned in Rae. Furthermore Figure 1 is shown here:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*FIG. 1*

139.    The communication from the Kiosk to the Conditional Access System/DRM is

not part of authentication of a portable data storage device. Rather it is part of

retrieving certificates for the kiosk "The process completes (122) by closing the

session with the portable media drive. Optionally, the kiosk may sign the store file

Such that a playback device can verify that the content and the keys come from a

valid kiosk (e.g. to prevent the use of unauthorized kiosks) and to check the

integrity of the key file. In this case, the kiosk stores its own certificate on the

media drive as well, and the playback device possesses the root CA certificate in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

order to verify the kiosk certificate (and the corresponding certificate chain)."

(Rae, 10:6-16)

140.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**1[f] in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.**

141.    A POSITA would first note that as Rae does not disclose authenticating the storage device, nothing can occur as a response to authenticating the storage device.

142.    In reference to this claim limitation, Dr. Almeroth states "Rae discloses a kiosk that provides "the over-encrypted content and the encrypted copies of each content key to the portable media drive" following the authentication of the end user device. Rae at 3:65-67."

143.    I first note that Rae 3:65-67 is not even a complete sentence. The entire paragraph in question is given here "A still further embodiment again includes a processing system configured to communicate with a portable media drives via a communication port. In addition, the processing system is configured to retrieve symmetrically pre-encrypted content stored on a storage device in response to a user request received via a user interface, the processing system is configured to over-encrypt at least a portion of each piece of retrieved content using a content key, the kiosk is configured to obtain a public key assigned to at least one playback device associated with a user account, the kiosk is configured to encrypt a copy of each content key using the public key assigned to each playback device associated with the user account, and the kiosk is configured to write the over-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

encrypted content and the encrypted copies of each content key to a portable media drive via the communication port." (Rae 3:52-67).

144.    The first thing a POSITA would notice from this, is that none of this is in response to the authentication. Furthermore, Rae is quite clear, "the processing system is configured to retrieve symmetrically pre-encrypted content stored on a storage device". This is not providing to the portable data storage device an encrypted first media content and a corresponding access key. Rather Rae is disclosing retrieving content *from the* storage device. The kiosk then over encrypts the content. No content is being provided to the storage device.

145.    In paragraph 197 of his report, Dr. Almeroth actually describes the over encrypting process. However, again, Dr. Almeroth does not point to any content being provided *to the* portable storage, nor does he show that this is in any way in response to any authentication of a storage device.

146.    For at least these reasons, Rae does not anticipate or render obvious claim 1 of the '400 patent.

**2. The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content.**

147.    I first note that as has been described in detail, Rae does not disclose or render obvious the claim limitations of claim 1, therefore any kiosk in Rae is not the kiosk of claim 1 and claim 2 is not anticipated or obvious for at least the same reasons set forth above for claim 1.

148.    In Dr. Almeroth's analysis he ignored what a storage device is in Rae "The term off-line content delivery system refers to a system that involves the delivery of digital content using some form of fixed media Such as an optical storage device,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

or a portable media drive." (Rae 1:23-26). Rae also discloses DVD players (Rae 6:19-24; 6:60-7:4) and compares itself to Netflix delivering DVD's via mail (Rae 1:31-33).

149.    A POSITA would also understand that optical storage typically has a single movie (an exception is with television series wherein more than one episode may be on a single disk). This is not a plurality of encrypted media content.

150.    For at least these reasons, Rae does not anticipate or render obvious claim 2 of the '400 patent.

**6. The kiosk of claim 1, wherein the second data interface is a network interface.**

151.    As has been shown, in detail, Rae does not anticipate nor render obvious claim1, upon which claim 6 is dependent. Therefore, any data interface, is not an interface of the kiosk of claim 1 and claim 6 is not anticipated or obvious for at least the same reasons set forth above for claim 1.

152.    Furthermore, Dr. Almeroth points to Rae at 4:4-7 for this claim limitation. That passage states: "In a still further additional embodiment, the kiosk configured to communicate with the storage device containing the symmetrically pre-encrypted content via a network connection." (Rae 4:4-7). In the '400 patent, it is the first data interface (claim 1a) that is configured to communicate with the storage device. The second data interface is configured to communicate, over a network, with a remote trusted server (claim 1b). Therefore, at least Rae 4:4-7 cannot be the second data interface. Dr. Almeroth has conflated the two data interfaces of the '400 patent.

153.    Dr. Almeroth also points to Rae 2:59-62, which is a different communication. In his discussion of claim 6, Dr. Almeroth does not clarify if he believes both are the

second data interface of if one or the other is the second data interface.

Furthermore, in claim 1b, Dr. Almeroth argued that the kiosk itself is the second

interface. Dr. Almeroth appears to have a different opinion of the second interface

in claim 6 than he did in claim 1b.

154.    For at least these reasons, Rae does not anticipate or render obvious claim 6 of the

'400 patent.

**8. The kiosk of claim 1, wherein the kiosk is located in a public environment**

155.    I first note that as has been described in detail, Rae does not disclose or render

obvious the claim limitations of claim 1. Therefore, any kiosk that may be

disclosed by Rae is not the kiosk of claim 1 and claim 8 is not anticipated or

obvious for at least the same reasons set forth above for claim 1.

156.    I would agree with Dr. Almeroth that Rae mentions a kiosk located at a retail

location. However, as has been shown previously in this report, the Kiosk of Rae

is substantially different from the kiosk of the '400 patent.

157.    For at least these reasons, Rae does not anticipate or render obvious claim 8 of the

'400 patent.

**9[pre]  A method for provisioning secure media content to a plurality of portable
data storage devices from a kiosk, the method comprising:**

158.    For all the elements of claim 9, Dr. Almeroth simply points back to claim 1.

Where appropriate, I have repeated my discussion from the elements of claim 1.

159.    Dr. Almeroth points to Rae 4:55-58. That section of Rae states "FIG. 1 illustrates

an off-line content delivery system that utilizes portable media drives to transport

protected content from kiosks to playback devices in accordance with

embodiments of the invention."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

160.    A POSITA would immediately recognize that the kiosk of Rae has portable media drives to transport content. This is a completely different type of kiosk than is disclosed in the '400 patent. Rae makes it clear that its kiosk uses DVD players (Rae 6:19-24; 6:60-7:4) and compares itself to Netflix delivering DVD's via mail (Rae 1:31-33). This is even more clear when Rae states "The term off-line content delivery system refers to a system that involves the delivery of digital content using some form of fixed media Such as an optical storage device, or a portable media drive." (Rae 1:23-26). The only mention of DVD's in the '400 patent is to disavow them "Conventional DVD and Blue ray discs did not contain such features to authenticate or establish trust with a player or download server" ('400 3:33-34).

161.    Dr. Almeroth then points to an excerpt from Rae "…the kiosk is configured to issue protected content to the portable media drive…" (Rae 3:1-2). I agree with Dr. Almeroth that this is what is disclosed in Rae, however, a POSITA would see that this again is using a portable media drive, which is not how the '400 kiosk functions.

162.    Dr. Almeroth cites Rae at 5:19-21, but this is a fragment, the entire section is "In many embodiments, a portable media drive or storage device is used to obtain content from a kiosk for playback via one or more playback devices. In several embodiments, the portable media drive and the playback devices are associated with a specific user account. When the portable media drive is connected to a kiosk at a retail location, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." (Rae

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

5:19-26, emphasis added). In the section of Rae that Dr. Almeroth cites, Rae is requiring the portable media to be physically connected to a kiosk. This is not only different than the kiosk of the '400 patent, it is inferior to it. A POSITA would recognize that the network connectivity used in the '400 is more flexible than Rae.

163.    Dr. Almeroth then asserts that Rae's "protected content" is the '400 patent's "secure media content" that is provisioned by the kiosk.' (Dr. Almeroth, 167). This ignores the important role that authentication plays in the '400 patent. Rae mentions authenticate or authentication only three times:

164.    "When the portable media drive is connected to a kiosk at a retail location, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." (Rae 5:23-26).

165.    "A process utilized by a kiosk when issuing protected content to a portable media drive in accordance with an embodiment of the invention is illustrated in FIG. 2. The process 30 includes authenticating the user via a user interface and receiving (32) VOD selections from the user." (Rae 6:44-48)

166.    "In addition, systems in accordance with embodiments of the invention can involve the initial registration of a portable media drive so that the drive is always used to provide the device certificates to the kiosk. In such systems, user authentication can occur at the kiosk and/or at the playback device." (Rae 11:10-15)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

167.    Each of these involves the physical connection to the kiosk. This is quite different than the robust authentication that is a substantial part of the '400 patent. A few examples are given here:

168.    "In this embodiment, a trusted server that is authenticated and trusted by both storage devices brokers the transfer of content." ('400 Abstract)

169.    "In another embodiment, the DRM system enables secure copying or transfer of content and/or content metadata, for example, from one storage device to another storage device via a trusted server. In this embodiment, the transfer of the content and the content metadata is brokered by a trusted server that is authenticated and trusted by both sets of storage devices. The trusted server may be a separate entity of the DRM system or may be a component or function of an existing server of the DRM system." ('400 2:48-56)

170.    "In one embodiment, two-way authentication is employed, for example, using public key infrastructure ("PKI") and public key certificate-based authentication to ensure that entities in the system are trusted." ('400 3:23-26)

171.    "As noted, two-way mutual authentication may be employed between entities to establish secure communications channels for exchanging and distributing the content. Each item of content may also be issued a digital certificate." ('400 3:48-52)

172.    In addition to these examples, claim elements 1e, 1f, 9d, and 9e of the '400 disclose the kiosk involved in authentication. A POSITA would recognize that encryption is indeed part of secure media, but only part. Rae lacks the robust authentication disclosed in the '400.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

173.    For at least these reasons, Rae does not anticipate or render obvious claim 9 of the '400 patent.

174.    See also claim element 1a.

**9[a] establishing communications with a portable data storage device over a first data interface;**

175.    In reference to this claim limitation, Dr. Almeroth points to claim 18 of Rae "processing system configured to communicate with a portable media drives via a communication port" (Almeroth Report, ¶ 170). Dr. Almeroth then points to Figure 5a, which I have copied here:

176.    As can be seen the connections with the headend, may indeed use a network interface, however the communication port connecting to the media drive is not a data interface, it is rather a local connection.

177.    That the storage device is local, is disclosed throughout Rae (3:19-20;4:1-3; claim 7; claim 19). This is made quite clear specifically in reference to Figure 5a, which Dr. Almeroth referenced:  "The operation of a kiosk when issuing content when a network connection is available in accordance with an embodiment of the invention is illustrated in FIG.5a. In the illustrated embodiment, the kiosk 12 locally stores three pieces of symmetrically pre-encrypted content 90.92, and 94. When a portable media drive 14 is presented to the kiosk, the kiosk performs a process 100 in order to issue content to the portable media drive." (Rae 9:31-42, emphasis added)

178.    For at least these reasons, Rae does not anticipate or render obvious claim 9 of the '400 patent.

179.    *See also* claim element 1a.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**9[b] establishing communications with a remote trusted server via a second data interface over a network;**

180. Dr. Almeroth states Rae's "kiosk" is the '400 patent's "second data interface" that is configured to communicate with a remote trusted server over a network.' (Almeroth Report, ¶ 177). The kiosk itself cannot be the second data interface. The '400 is clear that the kiosk has both a first and second date interface and cannot logically be either of those interfaces.

181. Dr. Almeroth does not actually point to an interface on the kiosk of Rae that he asserts is the second data interface.

182. For at least these reasons, Rae does not anticipate or render obvious claim 9 of the '400 patent.

183. *See also* claim element 1b.

**9[c] obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

184. For this claim limitation, Dr. Almeroth points to playback device ID's and specifically to Rae 8:35-40. However, Dr. Almeroth only points to a portion of a sentence stating: "Rae explains that 'playback device IDs' are used to uniquely identify the playback devices associated with the public keys." (Almeroth Report, ¶ 186). The entire sentence is: "The encrypted copies of the content keys 70, and 72 associated with each playback device are then used to create a store file along with the ***playback device IDs or other information such as certificate IDs used by the CA system to uniquely identify the playback devices*** associated with the public keys." (Rae, 8:35-40, emphasis added).

185.    It is quite clear that the segment of Rae that Dr. Almeroth points to does not disclose a processor in a kiosk identifying anything. Rather the CA system is identifying devices. A POSITA would readily understand that a CA is a certificate authority. Such CA's issue and validate cryptographic keys.

186.    Dr. Almeroth then states: "The text of the '400 patent claims requires that the unique identifier" be "obtained from" the end-user device, "specific to" the end-user device, and "concealed by" the end-user device, as noted above. Rae discloses a "unique identifier" that aligns with the '400 patent claims." (Almeroth Report, ¶ 187). However, the storage device that Dr. Almeroth is pointing to is not an end-user device. In fact, according to Rae, the storage device may be located at the headend: "In a still further embodiment of the invention, the storage device is located at the headend." (Rae 3:21-22)

187.    While Rae does disclose that the storage device *could be* local to the kiosk, it can also be at the headend. A POSITA would readily understand that the fact that the storage device can be at the headend makes it quite clear that it is not an end user device.

188.    It should also be noted that Dr. Almeroth does not even attempt to show that the playback device ID he is asserting meets the unique ID claim limitation, is concealed.

189.    Dr. Almeroth then asserts that it would be obvious to combine Rae with Spencer (Almeroth Report, ¶ 189). Dr. Almeroth does not identify specific elements of either Spencer or Rae he wishes to combine. It is unclear if he is proposing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

combining the two in their entirety. If so, it is not even clear that would be possible.

190.    Dr. Almeroth asserts that "Specifically, Spencer discloses a method comprising "[o]btaining device-identifying information," which includes a unique identification number from the playback device, a unique identification number of a digital storage medium in the playback device, or a serial number Id. at [0007]." (Almeroth Report, ¶ 189). What Spencer discloses is "receiving device-identifying information relating to the particular digital media playback device through the communication channel; receiving a request for media content to be delivered to the digital media playback device; ***determining, based on the device-identifying information, whether the requested media content is playable on the digital media playback device***;" (Spencer, claim 1, emphasis added).

191.    A POSITA would understand that determining whether media content is playable on a device merely requires that the device type be identified. It need not be unique. This is why Spencer paragraph 0007 that Dr. Almeroth relies on, uses the word 'can' 4 times in a single paragraph. Spencer does not ***require*** a unique identifier. However, a POSITA would readily see that a unique identifier does not improve the purpose of Spencer, and therefore any combination of Rae and Spencer would still not fulfill this claim limitation.

192.    As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show ***a motivation to combine***, which Dr. Almeroth does not do. Certainly, any such combination

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would not be combining prior art elements according to known methods to yield predictable results. Dr. Almeroth also does not assert that a POSITA would have had an expectation of success in making any such combination.

193.    For at least these reasons, Rae does not anticipate or render obvious claim 9 of the '400 patent.

194.    *See also* claim elements 1d and 1e.

**9[d] authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

195.    In reference to the unique ID, Dr. Almeroth points first to playback device IDs as the unique identifier (Almeroth Report, ¶ 186). Dr. Almeroth then asserts that the private key is the unique identifier (Almeroth Report, ¶ 188).

196.    In reference to this claim limitation, Dr. Almeroth states "[w]hen the portable media drive is connected to a kiosk at a retail location, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." Rae at 5:19-29." (Almeroth Report, ¶ 192). A POSITA would first note that the very section of Rae that Dr. Almeroth cites is authenticating the user, not the portable storage device. A POSITA would also note that neither the playback device ID nor the private key are used in this authentication.

197.    Dr. Almeroth continues stating "The kiosk looks up the user's ID and associated Unique IDs for the user's playback devices on a subscriber management system at the headend." Rae at 9:39-51 (emphasis added)." Again, the user id is the first part of this process. It is the user that is being authenticated. Then after the user is authenticated, the associated playback device IDs are retrieved. It is clear that in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Rae, the device IDs are not being used to authenticate but rather are being retrieved after the user is authenticated.

198.   In fact, in paragraph 192 of his report, Dr. Almeroth makes this very point (emphasis added):

199.   Rae discloses an authentication process where "[w]hen the portable media drive is connected to a kiosk at a retail location, the kiosk authenticates the user and enables the user to select one or more pieces of content to transfer to the portable media drive." Rae at 5:19-29. Specifically, Rae describes how a unique identifier is used in its authentication process: "When a portable media drive is presented to the kiosk, the kiosk performs a process in order to issue content to the portable media drive. The process includes determining whether the user has a user account and detecting whether the portable media drive has been presented to the off-line content delivery system. The kiosk looks up the user's ID and associated Unique IDs for the user's playback devices on a subscriber management system at the headend." Rae at 9:39-51 (emphasis added). Then, after obtaining the user's ID, the system then obtains "device certificates for the playback devices associated with a user" and "verifies them against a locally stored certificate revocation list. Assuming the certificates are not on the revocation list, the process proceeds using the device certificates obtained from the portable media drive." Rae at 10:56-11:1.

200.   A POSITA would understand that the items Dr. Almeroth has asserted meet the object ID limitation (playback device ID and private key) are not used to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

authenticate. Rather the user is authenticated, then certain additional information is retrieved.

201.    Furthermore, what Dr. Almeroth points to as the authentication process of Rae, is done entirely by the kiosk, not by any remote server. The very portions of Rae that Dr. Almeroth cites to, state that the kiosk looks up the user id and that this is done offline, thus no communication with a remote server is even possible.

202.    Dr. Almeroth states This process is depicted in the "Entitlement Checks" arrow between the Conditional Access System and the Subscriber Management System in Figure 1, as shown below:' (Almeroth Report, ¶ 192). It is unclear why Dr. Almeroth puts "entitlement checks' in quotes. The term entitlement appears 18 times in Rae, never entitlement checks. Entitlement Control Messages (ECM)s are mentioned in Rae. Furthermore Figure 1 is shown here:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



FIG. 1

203.    The communication from the Kiosk to the Conditional Access System/DRM is

not part of authenticating a portable data storage device. Rather it is part of

retrieving certificates for the kiosk "The process completes (122) by closing the

session with the portable media drive. Optionally, the kiosk may sign the store file

Such that a playback device can verify that the content and the keys come from a

valid kiosk (e.g. to prevent the use of unauthorized kiosks) and to check the

integrity of the key file. In this case, the kiosk stores its own certificate on the

media drive as well, and the playback device possesses the root CA certificate in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

order to verify the kiosk certificate (and the corresponding certificate chain)."

(Rae, 10:6-16)

204.    For at least these reasons, Rae does not anticipate or render obvious claim 9 of the

         '400 patent.

205.    *See also* claim element 1e.

**9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key.**

206.    In reference to this claim limitation, Dr. Almeroth states "Rae discloses a kiosk

         that provides "the over-encrypted content and the encrypted copies of each

         content key to the portable media drive" following the authentication of the end

         user device. Rae at 3:65-67."

207.    I first note that Rae 3:65-67 is not even a complete sentence. The entire paragraph

         in question is given here "still further embodiment again includes a processing

         system configured to communicate with a portable media drives via a

         communication port. In addition, the processing system is configured to retrieve

         symmetrically pre-encrypted content stored on a storage device in response to a

         user request received via a user interface, the processing system is configured to

         over-encrypt at least a portion of each piece of retrieved content using a content

         key, the kiosk is configured to obtain a public key assigned to at least one

         playback device associated with a user account, the kiosk is configured to encrypt

         a copy of each content key using the public key assigned to each playback device

         associated with the user account, and the kiosk is configured to write the over-

         encrypted content and the encrypted copies of each content key to a portable

         media drive via the communication port." (Rae 3:52-67).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

208.   The first thing a POSITA would notice is that none of this is in response to the authentication. Furthermore, Rae is quite clear, "the processing system is configured to retrieve symmetrically pre-encrypted content stored on a storage device". This is not providing to the portable data storage device an encrypted first media content and a corresponding access key. Rather Rae is disclosing retrieving content from the storage device. The kiosk then over encrypts the content. No content is being provided to the storage device.

209.   In paragraph 197 of his report, Dr. Almeroth actually describes the over encrypting process. However, again, Dr. Almeroth does not point to any content being provided to the portable storage, nor does he show that this is in any way in response to the authentication.

210.   For at least these reasons, Rae does not anticipate or render obvious claim 9 of the '400 patent.

211.   *See also* claim element 1f.

**10. The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content**

212.   In Dr. Almeroth's analysis he ignored what a storage device is in Rae "The term off-line content delivery system refers to a system that involves the delivery of digital content using some form of fixed media Such as an optical storage device, or a portable media drive." (Rae 1:23-26). Rae also discloses DVD players (Rae 6:19-24; 6:60-7:4) and compares itself to Netflix delivering DVD's via mail (Rae 1:31-33).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

213.    A POSITA would understand that optical storage typically has a single movie (an exception is with television series wherein more than one episode may be on a single disk). This is not a plurality of encrypted media content.

214.    For at least these reasons, Rae does not anticipate or render obvious claim 10 of the '400 patent. Further, claim 10 is not anticipated or obvious for at least the same reasons set forth above for claim 9.

215.    *See also* claim 2.

**13. The method of claim 9, wherein the second data interface is a network interface.**

216.    Dr. Almeroth states Rae's "kiosk" is the '400 patent's "second data interface" that is configured to communicate with a remote trusted server over a network.' (Almeroth Report, ¶ 177). The kiosk itself cannot be the second data interface. The '400 is clear that the kiosk has both a first and second date interface and cannot logically be either of those interfaces.

217.    Dr. Almeroth does not actually point to an interface on the kiosk of Rae that he asserts is the second data interface.

218.    For at least these reasons, Rae does not anticipate or render obvious claim 19 of the '400 patent.

219.    See also claim elements 1b and 9b.

**17. The method of claim 9, wherein the kiosk is located in a public environment.**

220.    Claim 17 is not anticipated or obvious for at least the same reasons set forth above for claim 9.

**D.    Validity of '400 Patent In Light of Buttars**

221.    I first note that Dr. Almeroth does not assert that Buttars anticipates any claim element of the '400 patent. Rather, Dr. Almeroth argues Buttars renders claim

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

elements of the '400 patent obvious. I do agree with Dr. Almeroth that Buttars does not anticipate any of the asserted claim limitations of the '400 patent. I disagree with Dr. Almeroth that Buttars renders the asserted claim limitations obvious, and my reasons for that disagreement are described in the following subsections.

**1[pre]. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:**

222.    While Buttars does describe a kiosk, Dr. Almeroth ignores the numerous and substantial differences between the kiosk of the '400 patent and the kiosk of Buttars. Dr. Almeroth points to Figure 3 in Buttars to illustrate its kiosk:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



Figure 3

223.  Figure 3 is discussed beginning in paragraph 32 of Buttars: "From the Content

distribution Kiosk (100), Content files (120) are moved to Storage Devices (200)

only after verification of the devices, encryption keys, and user accounts (110),

and any updates to Personal Profiles (130) affecting security settings are affected.

When the Storage Device (200) is docked into a Playback Device (300), the

Storage Device is verified (230), and the Content Data is streamed (210) to the

Playback Device (300). If the Playback Device (300) is connected to the web,

then the Storage Device verification (230) will include a security update to

71

confirm the validity of the Storage Device, as well as Personal Profile Updates

(220)".

224.    Figure 1c in the '400 patent shows its kiosk:



**FIG. 1C**

225.    A POSITA would immediately note several substantial differences. The ***kiosk***,

106 of the '400 patent has a connection to the network. In Buttars, the ***playback***

***device*** 300 ***may have*** a connection to the web e (Buttars, 0032).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

226. In the '400 patent, a storage device is a prominent part of the system "For example, as shown, the client system 106 may comprise a primary storage device 110 and a secondary storage device 112. The primary storage device 110, for example, may be a hard disk drive, a flash memory drive, a hybrid drive, etc. Such storage devices are known to those skilled in the art. In another embodiment, the storage device may be a network attached storage." ('400 4:35-43). However, in Buttars, Figure 3 has arrows that are bidirectional and unidirectional. One can see that there is a bidirectional connection from the storage device to the personal profile updates, and those updates have a bidirectional connection with the kiosk. But movie files only move from the kiosk to the storage device.

227. Dr. Almeroth states "Buttars' "kiosk" constitutes the '400 patent's "kiosk for provisioning secure media content to a plurality of portable data storage devices." (Almeroth Report, ¶ 219). However, Dr. Almeroth does not point to anything in Buttar's kiosk that is provisioning content at all, much less secure media content.

228. Dr. Almeroth points to Buttars "Prior to **distributing the Content to the distribution Kiosks**, the Content receives a layer of Hardware Encryption (700) and also receives its associated encrypted License Object (320) after which it is passed to the remote Distributed Media Storage locations (800) in Kiosks or regional data centers" (Buttars, 0028, emphasis added). However, the excerpt from Buttars that Dr. Almeroth points to shows the kiosk receiving content, not distributing it.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

229.    The word 'kiosk' appears 40 times in Buttars, including labels on figures. This provides ample opportunity for a POSITA to understand what Buttars means by the term kiosk. In fact, Buttars repeatedly uses the phrase 'Playback Device or kiosk' (Buttars 0017,0022, 0023, claim 3, claim 4). Buttars repeatedly discusses content being put on its kiosk (0024,0028, 0030, claim 6). It would be quite clear to a POSITA that one can use a kiosk to view content. The kiosk of Buttars, unlike the '400, is in fact a playback device.

230.    The only suggestion of distribution by the kiosk is found in two places in Buttars. The first is the following "One embodiment of the invention relates to any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and processor enabled distribution kiosks (Kiosks) used to ***distribute and play-back motion*** pictures and other audio/video data, programs or works." (Buttars, 0020,emphasis added). Again, this clearly states that the kiosk itself will play back movies as well as other content. The kiosk of Buttars is not distributing content to storage devices, it is instead actually displaying content.

231.    The second part of Buttars that could possibly be interpreted as the kiosk distributing content is in reference to Figure 3: "From the Content distribution Kiosk (100), Content files (120) are moved to Storage Devices (200) only after verification of the devices, encryption keys, and user accounts (110), and any updates to Personal Profiles (130) affecting security settings are affected. When the ***Storage Device (200) is docked into a Playback Device (300), the Storage Device is verified (230), and the Content Data is streamed (210) to the Playback***

74

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Device (300).* If the Playback Device (300) is connected to the web, then the

Storage Device verification (230) will include a security update to confirm the

validity of the Storage Device, as well as Personal Profile Updates (220)."

(Buttars, 0032 emphasis added). I first note that while Dr. Almeroth does refer to

Figure 3, he does not cite this part of Buttars. I further note that this does not

disclose the kiosk distributing content. Rather the kiosk is used in verifying the

storage device, and the content is streamed from the storage device to the

playback device. This is further confirmed by Figure 3. In that figure the kiosk is

involved in verification, but then content moves from the storage device to a

personal playback device, without going to or through the kiosk.

232. While Buttars and the '400 patent share the word kiosk, the kiosk

implementations are substantially different. In addition to the differences outlined

here, other differences become apparent as additional claim limitations are

examined.

233. For at least these reasons, Buttars does not anticipate or render obvious claim 1 of

the '400 patent.

**1[a] a first data interface configured to communicate with a portable data storage device;**

234. Dr. Almeroth points to a portion of paragraph 23 of Buttars. The entire paragraph

is given here "In this embodiment, if a user connects a legitimate Storage Device

to a legitimate Playback Device or Kiosk, *then the devices begin communication*

*over a hardware encrypted interface*. The user enters a secret PIN code through

the Graphic User Interface (GUI) of either the Playback Device or Kiosk. After

the PIN is entered, the Playback Device or Kiosk copy its own digitally signed

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

public key onto the Storage Device. This key is signed by the security module in the Playback Device or Kiosk, and also at the point of manufacture using a "chain of trust" approach, ensuring that entities attempting to gain illicit access to the data on the Storage Device cannot impersonate a genuine Playback Device or Kiosk." (Buttars, 0023, emphasis added)

235.   I first note that this paragraph is again, using kiosk and playback device interchangeably. Furthermore, the role of any communication with the playback device or kiosk is to provide a digitally signed key for authentication purposes.

236.   Furthermore, Dr. Almeroth himself states "Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "first data interface" limitation simply if it is "configured to communicate with a portable data storage device," such as "LAN and WiFi interfaces."" (Almeroth Report, ¶ 225). Dr. Almeroth has not even attempted to show that any connection between the kiosk and a storage device is over a LAN, WiFi, or any sort of network. What is described is a 'hardware encrypted connection'. A POSITA would further note that the words **lan, wan, network**, or **wi-fi** do not even appear in Buttars.

237.   Dr. Almeroth then states "The term "storage device" in Buttars is described as "any number of processor enabled flash-drive memory storage devices (Storage Device)." Buttars at [0020]. The term "storage device" in Buttars is also defined as shorthand for "Portable Data Storage Device (Storage Device)." Buttars at [0015], [0035]." (Almeroth, 222). I agree with Dr. Almeroth on this issue. However, a POSITA would recognize that a flash drive memory device is a

device that is physically plugged in to connect and communicate[9,10,11,] A typical flash drive is shown here☐



238.    Communication with such a device is not over a LAN, WiFi, nor any network.

239.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of the '400 patent.

**1[b] a second data interface configured to communicate, over a network, with a remote trusted server; and**

240.    I first note that while 'over a network' is part of this claim limitation, Dr. Almeroth does not even attempt to establish this. I note that the words ***network'***, ***lan***, and ***wan*** do not appear in Buttars. The word Internet does appear, 8 times in fact. All of these are in the description of prior art. Buttars clearly disavows

---

9 https://guides.library.msstate.edu/c.php?g=1333380&p=9820351

10 https://www.ttu.edu/cybersecurity/community/digital-life/digital-valuables/drives.php

11 https://www.unm.edu/~tbeach/terms/figures/flashdrive.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

internet distribution "Internet distribution has been fraught with several issues each of which discourages content owners from distributing high-value content through this channel. " (Buttars, 0013).

241.    Dr. Almeroth does not point to a second data interface configured to communicate over a network, because no such network is disclosed in Buttars.

242.    Dr. Almeroth points to a small portion of paragraph 28 of Buttars. The full paragraph is given here:

243.    "In an embodiment of the invention, an original, full definition content file is secured from the Content owner (Studio, Distributor, or other) and, in the case of film media (100), it is sent to a Tele-Cine service provider ((200) who converts the film media to digital format where it's then sent to a Media Capture facility (210)where it is loaded to an array of secured storage drives. In the case of digital media, *the file (120) or disk (110) is sent directly to the Media Capture* facility (210), where the Content is encoded using an Encoder (220). The encoded media is then encrypted using Symmetrical Encryption (500) and sent to the secured, permanent Media Storage facility (600). Using a Public NSDE Key Generator (300), PKI keys are generated and stored in a *physically secured storage drive* (310). License Objects are generated and encrypted using a DRM License Object Encryption process (320), and the PKI keys are pulled from the Public Key Storage drive (310). Symmetrical Encryption keys are generated using a Symmetrical Key Generator (400), and passed to a secured Symmetrical Key Storage drive (410). When the encoded Content passes from the Encoder (220) to the Symmetrical Encryption engine (500), the symmetrical encryption keys are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

passed from the Symmetrical Key Storage (410) and associated with the

encrypted Content files prior to being passed to the Media Storage drives (600).

***Prior to distributing the Content to the distribution Kiosks, the Content receives***

***a layer of Hardware Encryption*** (700) and also receives its associated encrypted

License Object (320) after which it is passed to the remote Distributed Media

Storage locations (800) in Kiosks or regional data centers (Buttars, 0028,

emphasis added)" (Buttars, 0028, emphasis added)

244.    Every transfer in this paragraph is clearly a physical transfer. There is no

indication of network communications and no ***remote*** trusted server.

245.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of

the '400 patent.

**1[c] a processor configured to:**

246.    While I agree with Dr. Almeroth that Buttars does have a processor, as will be

seen with the following claim limitations, the processor of Buttars is not

configured to perform the functions of the '400 patent processor. It is not

sufficient to simply identify that a processor exists, processors of a wide range of

configurations exist in many different technologies. What is required is a

processor that performs the same functions as the processor of the '400 patent.

247.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of

the '400 patent.

**1[d] obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

248.    Dr. Almeroth states "Buttars explains that a "Playback Device key" is used to

uniquely identify a particular playback device. See Buttars at [0025]" (Dr.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Almeroth, 239). The very paragraph Dr. Almeroth points to state this is the ***customer's Playback Device key***. At most, it may identify a customer, but not a device.

249. It should also be noted that the word 'unique' only appears once in Buttars "In this embodiment, the Content is encoded and encrypted at the head-end using a strong symmetric key (using the AES system), and each Content file is given a random, unique key." (Buttars, 0024).

250. Dr. Almeroth then states "To the extent Buttars did not practice this claim, it would have been obvious to a POSITA to instead use a "Storage Device key" to uniquely identify a particular storage device, in the same manner that the "Playback Device key" uniquely identifies a particular playback device as described above."

251. However, this statement ignores the purpose of Buttars, and the disclosures found in Buttars. For example, in paragraph 23, which Dr. Almeroth cites elsewhere "In this embodiment, if a user connects a legitimate Storage Device to a legitimate Playback Device or Kiosk, then the devices begin communication over a hardware encrypted interface. ***The user enters a secret PIN code*** through the Graphic User Interface (GUI) of either the Playback Device or Kiosk." (Buttars, 0023, emphasis added). It is the users PIN code that is being authenticated, thus the user is being authenticated.

252. The user centric nature of Buttars is shown throughout Buttars. As another example, "The security and copy-protection of the invention secures the data in a

highly-effective manner while simultaneously ***providing users access to the data
with minimal obtrusiveness from the security***." (Buttars, 0021, emphasis added).

253.    Another example is "***If the License Object indicates the user is allowed*** to view
the Content file, the security module then decrypts the symmetric key using its
private key" (Buttars, 0026, emphasis added).

254.    Uniquely identifying the storage device would be unnecessary to Buttars. The
goal of Buttars is to identify a user, so the user can access content. There simply is
no impetus in Buttars to uniquely identify the storage device.

255.    Dr. Almeroth states that it would have been obvious to combine Buttars with
Spencer. I first note that Dr. Almeroth does not identify any specific elements of
Buttars and Spencer he intends to combine. From the wording of his reports, it
appears he is suggesting combining the two in their totality. It is not even clear
that such a combination would be possible. Certainly, a POSITA attempting to
combine the two in their entirety would not be combining prior art elements
according to known methods. Nor would a POSITA have an expectation of
success.

256.    However, if in fact, Dr. Almeroth meant to write that he would combine a unique
identifier, that would still have not been obvious. Using a unique identifier in
Spencer is optional and not central to its function (Buttars, 0007). And as has been
explained, Buttars does not require nor benefit from uniquely identifying the
storage device. Even combining Buttars and Spencer would still not yield the
unique identifier of the '400 patent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

257.    As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show *a motivation to combine*, which Dr. Almeroth does not do.

258.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of the '400 patent.

**1[e] authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

259.    As was explained in reference to claim element 1d, Buttars does not have a unique identifier from the portable storage device, and therefore cannot authenticate the portable data storage device using at least the unique identifier.

260.    Dr. Almeroth points to Buttars paragraph 22, the entire paragraph is shown here "[0032] From the Content distribution Kiosk (100), Content files (120) are moved to Storage Devices (200) only after verification of the devices, encryption keys, and user accounts (110), and any updates to Personal Profiles (130) affecting security settings are affected. When the Storage Device (200) is docked into a Playback Device (300), the Storage Device is verified (230), and the Content Data is streamed (210) to the Playback Device (300). If the Playback Device (300) is connected to the web, then the Storage Device verification (230) will include a security update to confirm the validity of the Storage Device, as well as Personal Profile Updates (220)."

261.    Nothing in the paragraph indicates any unique identifier is used in the process of verifying the storage device.

262.    Dr. Almeroth then asserts it would have been obvious to combine Buttars with Raw. De. Almeroth does not identify any particular elements he wishes to combine. It may be that Dr. Almeroth is suggesting combining the two (Buttars and Rae) in their entirety. It is not clear that such a combination would be possible. Certainly, a POSITA attempting to combine the two in their entirety would not be combining prior art elements according to known methods. Nor would a POSITA have an expectation of success.

263.    In the event that Dr. Almeroth is somehow suggesting that authentication elements of one be combined with the other, this still would not meet the claim limitation. As has been explained, Buttars does not authenticate using a unique ID of a portable storage device. And as was pointed out in reference to Rae, the items Dr. Almeroth has asserted meet the object ID limitation (playback device ID and private key) are not used to authenticate. Rather the user is authenticated, then certain additional information is retrieved.

264.    Even if a POSITA would combine Rae and Buttars, such a combination would not be authenticating the portable storage device using a unique ID. Furthermore, Dr. Almeroth does not identify any improvement or advantage a POSITA would gain from such a combination. Put another way, Dr. Almeroth does not discuss **why** a POSITA would even consider such a combination.

265.    As with other combinations, Dr. Almeroth provides no information on why a POSITA would want to combine the two systems. My understanding is that to propose a combination to invalidate prior art, one must show **a motivation to combine**, which Dr. Almeroth does not do.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

266.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of the '400 patent.

**1[f] in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.**

267.    The first thing a POSITA would notice is that as Buttars does not authenticate the storage device, there can be no activity in response to said authentication.

268.    For this claim limitation, Dr. Almeroth points to Buttars 0025 (Almeroth Report, ¶252). The entire paragraph is given here "In this embodiment, when a customer rents or purchases a Content file, the encrypted file key is loaded into the Kiosk's hardware security module. Additionally, when the customer docks the Storage Device into the Playback Device, the customer's Playback Device key is loaded into the security module on the Storage Device, and the Playback Device key is examined for authenticity (the digital signature and the chain of trust are verified) by the processor on-board the Storage Device. If *__the Playback Device is verified as legitimate, then the security module decrypts the Content file symmetric key using its own private key; it then immediately encrypts it using the Playback Device's public key__*. Thus, the only time the Content file's key is in a decrypted state is inside the hardware security module. The Content file and the newly encrypted Content key are loaded onto the Storage Device, in addition to the License Object data (which itself is also encrypted and digitally signed by the Kiosk, with a chain of trust from the head-end)." (Buttars, 0025, emphasis added)

269.    A POSITA would readily understand that this is not disclosing the kiosk providing any media content, encrypted or otherwise. The content is already on the storage device, it is simply authenticated and signed by the kiosk.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

270.    For at least these reasons, Buttars does not anticipate or render obvious claim 1 of the '400 patent.

**2. The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content.**

271.    For this claim limitation, Dr. Almeroth points to paragraph 24 of Buttars. The entire paragraph is given here "In this embodiment, the Content is encoded and encrypted at the head-end using a strong symmetric key (using the AES system), and each Content file is given a random, unique key. When a Content file is sent to a Kiosk for distribution to Storage Devices, the Content file's key is digitally signed by the head-end and encrypted using the public key of the kiosk, so that only the kiosk can decrypt and use the key. When the kiosk receives the movie and key, it simply stores them in encrypted form on its storage media." (Buttars, 0024). A POSITA would see that this is disclosing the ***kiosk*** storing encrypted media content, and possibly distributed to storage devices. Claim 2 is not anticipated or obvious over Buttars or the proposed combination for the same reason claim 1 is not anticipated or rendered obvious. Further, for at least these reasons, Buttars does not anticipate or render obvious claim 2 of the '400 patent.

**6. The kiosk of claim 1, wherein the second data interface is a network interface.**

272.    Claim 6 is not invalid for all of the reasons claim 1 is not invalid. Moreover, I first note that while 'over a network' is part of this claim limitation, Dr. Almeroth does not even attempt to establish this. I note that the words 'network', 'lan', and 'wan' do not appear in Buttars. The word Internet does appear, 8 times in fact. All of these are in the description of prior art. Buttars clearly disavows internet distribution "Internet distribution has been fraught with several issues each of

which discourages content owners from distributing high-value content through this channel. " (Buttars, 0013).

273. Dr. Almeroth does not point to a second data interface configured to communicate over a network, because no such network is disclosed in Buttars.

274. Dr. Almeroth points to a small portion of paragraph 28 of Buttars. The full paragraph is given here:

275. "In an embodiment of the invention, an original, full definition content file is secured from the Content owner (Studio, Distributor, or other) and, in the case of film media (100), it is sent to a Tele-Cine service provider ((200) who converts the film media to digital format where it's then sent to a Media Capture facility (210)where it is loaded to an array of secured storage drives. In the case of digital media, *the file (120) or disk (110) is sent directly to the Media Capture* facility (210), where the Content is encoded using an Encoder (220). The encoded media is then encrypted using Symmetrical Encryption (500) and sent to the secured, permanent Media Storage facility (600). Using a Public NSDE Key Generator (300), PKI keys are generated and stored in a *physically secured storage drive* (310). License Objects are generated and encrypted using a DRM License Object Encryption process (320), and the PKI keys are pulled from the Public Key Storage drive (310). Symmetrical Encryption keys are generated using a Symmetrical Key Generator (400), and passed to a secured Symmetrical Key Storage drive (410). When the encoded Content passes from the Encoder (220) to the Symmetrical Encryption engine (500), the symmetrical encryption keys are passed from the Symmetrical Key Storage (410) and associated with the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

encrypted Content files prior to being passed to the Media Storage drives (600).

***Prior to distributing the Content to the distribution Kiosks, the Content receives a layer of Hardware Encryption*** (700) and also receives its associated encrypted License Object (320) after which it is passed to the remote Distributed Media Storage locations (800) in Kiosks or regional data centers (Buttars, 0028, emphasis added)" (Buttars, 0028, emphasis added)

276.   Every transfer in this paragraph is clearly a physical transfer. There is no indication of network communications.

277.   For at least these reasons, Buttars does not anticipate or render obvious claim 6 of the '400 patent.

**8. The kiosk of claim 1, wherein the kiosk is located in a public environment**

278.   Claim 8 is not invalid for all of the reasons claim 1 is not invalid. In addition, Buttars does not disclose that the kiosk is in a public environment, but due to the fact that Buttars frequently describes the kiosk being used as a playback device, it is possible that a kiosk according to Buttars is located in a public environment.

279.   Dr. Almeroth relies on Figure 3, which displays 'retailer and kiosk 420''. However, Buttars describes the retailer stating "Storage Devices and Playback Devices are manufactured at CEM facilities (400) and distributed through a variety of distribution relationships (410), to retail facilities (420), and from there to the Consumer (440) through a variety of retail channels (430). " (Buttars, 0030)

280.   A POSITA would understand that being at a retail facility does not necessarily mean available to the public. Merchandise at retail locations is frequently secured awaiting purchase.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

281.    For at least these reasons, Buttars does not anticipate or render obvious claim 8 of the '400 patent.

**9[pre]  A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising:**

282.    Buttars does not anticipate or render obvious claim 9 of the '400 patent for at least the reasons described above for claim element 1a.

**9[a] establishing communications with a portable data storage device over a first data interface;**

283.    For claim 9 elements, Dr. Almeroth simply points back to claim 1, therefore were appropriate I repeat discussion and evidence from claim 1 limitations and Claim 9 is not invalid for all of the reasons I addressed above for claim 1.

284.    Dr. Almeroth points to a portion of paragraph 23 of Buttars. The entire paragraph is given here: "In this embodiment, if a user connects a legitimate Storage Device to a legitimate Playback Device or Kiosk, then the devices begin communication over a hardware encrypted interface. The user enters a secret PIN code through the Graphic User Interface (GUI) of either the Playback Device or Kiosk. After the PIN is entered, the Playback Device or Kiosk copy its own digitally signed public key onto the Storage Device. This key is signed by the security module in the Playback Device or Kiosk, and also at the point of manufacture using a "chain of trust" approach, ensuring that entities attempting to gain illicit access to the data on the Storage Device cannot impersonate a genuine Playback Device or Kiosk." (Buttars, 0023)

285.    I first note that this paragraph is again, using kiosk and playback device interchangeably. Furthermore, the role of any communication with the playback device or kiosk is to provide a digitally signed key for authentication purposes.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

286.    Furthermore, Dr. Almeroth himself states "Plaintiffs have, for infringement purposes, alleged that a component would satisfy the "first data interface" limitation simply if it is "configured to communicate with a portable data storage device," such as "LAN and WiFi interfaces."" (Almeroth Report, ¶ 225). Dr. Almeroth has not even attempted to show that any connection between the kiosk and a storage device is over a LAN, WiFi, or any sort of network.

287.    Dr. Almeroth then states "The term "storage device" in Buttars is described as "any number of processor enabled flash-drive memory storage devices (Storage Device)." Buttars at [0020]. The term "storage device" in Buttars is also defined as shorthand for "Portable Data Storage Device (Storage Device)." Buttars at [0015], [0035]." (Almeroth, 222). I agree with Dr. Almeroth on this issue. However, a POSITA would recognize that a flash drive memory device is a device that is physically plugged in to connect and communicate. A typical flash

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



drive is shown here:

Communication with such a device is not over a LAN, WiFi, nor any network.

288.    For at least these reasons, Buttars does not anticipate or render obvious claim 9 of

the '400 patent.

289.    *See also* claim element 1a.

**9[b] establishing communications with a remote trusted server via a second data
interface over a network;**

290.    I first note that while 'over a network' is part of this claim limitation, Dr.

Almeroth does not even attempt to establish this. I note that the words 'network',

'lan', and 'wan' do not appear in Buttars. The word Internet does appear, 8 times

in fact. All of these are in the description of prior art. Buttars clearly disavows

internet distribution "Internet distribution has been fraught with several issues

each of which discourages content owners from distributing high-value content

through this channel. " (Buttars, 0013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

291.    Dr. Almeroth does not point to a second data interface configured to communicate over a network, because no such network is disclosed in Buttars.

292.    Dr. Almeroth points to a small portion of paragraph 28 of Buttars. The full paragraph is given here:

293.    "In an embodiment of the invention, an original, full definition content file is secured from the Content owner (Studio, Distributor, or other) and, in the case of film media (100), it is sent to a Tele-Cine service provider ((200) who converts the film media to digital format where it's then sent to a Media Capture facility (210)where it is loaded to an array of secured storage drives. In the case of digital media, *the file (120) or disk (110) is sent directly to the Media Capture* facility (210), where the Content is encoded using an Encoder (220). The encoded media is then encrypted using Symmetrical Encryption (500) and sent to the secured, permanent Media Storage facility (600). Using a Public NSDE Key Generator (300), PKI keys are generated and stored in a *physically secured storage drive* (310). License Objects are generated and encrypted using a DRM License Object Encryption process (320), and the PKI keys are pulled from the Public Key Storage drive (310). Symmetrical Encryption keys are generated using a Symmetrical Key Generator (400), and passed to a secured Symmetrical Key Storage drive (410). When the encoded Content passes from the Encoder (220) to the Symmetrical Encryption engine (500), the symmetrical encryption keys are passed from the Symmetrical Key Storage (410) and associated with the encrypted Content files prior to being passed to the Media Storage drives (600). *Prior to distributing the Content to the distribution Kiosks, the Content receives*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*a layer of Hardware Encryption* (700) and also receives its associated encrypted License Object (320) after which it is passed to the remote Distributed Media Storage locations (800) in Kiosks or regional data centers (Buttars, 0028, emphasis added)" (Buttars, 0028, emphasis added)

294.    Every transfer in this paragraph is clearly a physical transfer. There is no indication of network communications.

295.    For at least these reasons, Buttars does not anticipate or render obvious claim 9 of the '400 patent.

296.    *See also* claim element 1b.

**9[c] obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;**

297.    Dr. Almeroth states "Buttars explains that a "Playback Device key" is used to uniquely identify a particular playback device. See Buttars at [0025]" (Dr. Almeroth, 239). The very paragraph Dr. Almeroth points to states this is the 'customer's Playback Device key'. At most, it may identify a customer, but not a device.

298.    It should also be noted that the word 'unique' only appears once in Buttars "In this embodiment, the Content is encoded and encrypted at the head-end using a strong symmetric key (using the AES system), and each Content file is given a random, unique key." (Buttars, 0024)

299.    Dr. Almeroth then states "To the extent Buttars did not practice this claim, it would have been obvious to a POSITA to instead use a "Storage Device key" to uniquely identify a particular storage device, in the same manner that the

"Playback Device key" uniquely identifies a particular playback device as described above."

300. However, this statement ignores the purpose of Buttars and the disclosures found in Buttars. For example, in paragraph 23, which Dr. Almeroth cites elsewhere "In this embodiment, if a user connects a legitimate Storage Device to a legitimate Playback Device or Kiosk, then the devices begin communication over a hardware encrypted interface. ***The user enters a secret PIN code*** through the Graphic User Interface (GUI) of either the Playback Device or Kiosk." (Buttars, 0023, emphasis added). It is the users PIN code that is being authenticated, thus the user is being authenticated.

301. The user centric nature of Buttars is shown throughout Buttars. As another example "The security and copy-protection of the invention secures the data in a highly-effective manner while simultaneously ***providing users access to the data with minimal obtrusiveness from the security***." (Buttars, 0021, emphasis added).

302. Another example is "***If the License Object indicates the user is allowed*** to view the Content file, the security module then decrypts the symmetric key using its private key" (Buttars, 0026, emphasis added).

303. Uniquely identifying the storage device would be contrary to Buttars. The goal of Buttars is to identify a user, so the user can access content.

304. For at least these reasons, Buttars does not anticipate or render obvious claim 9 of the '400 patent.

305. *See also* claim elements 1d and 1e.

**9[d] authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and**

306.    As was explained in reference to claim 1d, Buttars does not have a unique identifier from the portable storage device, and therefore cannot authenticate the portable data storage device using at least the unique identifier.

307.    Dr. Almeroth points to Buttars paragraph 22, the entire paragraph is shown here "[0032] From the Content distribution Kiosk (100), Content files (120) are moved to Storage Devices (200) only after verification of the devices, encryption keys, and user accounts (110), and any updates to Personal Profiles (130) affecting security settings are affected. When the Storage Device (200) is docked into a Playback Device (300), the Storage Device is verified (230), and the Content Data is streamed (210) to the Playback Device (300). If the Playback Device (300) is connected to the web, then the Storage Device verification (230) will include a security update to confirm the validity of the Storage Device, as well as Personal Profile Updates (220)."

308.    Nothing in the paragraph indicates any unique identifier is used in the process of verifying the storage device.

309.    For at least these reasons, Buttars does not anticipate or render obvious claim 9 of the '400 patent.

310.    *See also* claim element 1e.

**9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key.**

311.    For this claim limitation, Dr. Almeroth points to Buttars 0025 (Almeroth Report, ¶ 252). The entire paragraph is given here "In this embodiment, when a customer

rents or purchases a Content file, the encrypted file key is loaded into the Kiosk's

hardware security module. Additionally, when the customer docks the Storage

Device into the Playback Device, the customer's Playback Device key is loaded

into the security module on the Storage Device, and the Playback Device key is

examined for authenticity (the digital signature and the chain of trust are verified)

by the processor on-board the Storage Device. If ***the Playback Device is verified

as legitimate, then the security module decrypts the Content file symmetric key

using its own private key; it then immediately encrypts it using the Playback

Device's public key***. Thus, the only time the Content file's key is in a decrypted

state is inside the hardware security module. The Content file and the newly

encrypted Content key are loaded onto the Storage Device, in addition to the

License Object data (which itself is also encrypted and digitally signed by the

Kiosk, with a chain of trust from the head-end)." (Buttars, 0025, emphasis added)

312.    A POSITA would readily understand that this is not disclosing the kiosk

providing any media content, encrypted or otherwise. The content is already on

the storage device, it is simply authenticated and signed by the kiosk.

313.    For at least these reasons, Buttars does not anticipate or render obvious claim 9 of

the '400 patent.

314.    *See also* claim element 1f.

**10. The method of claim 9, wherein the kiosk comprises a local data storage storing
a plurality of encrypted media content**

315.    Claim 10 is not anticipated or obvious over Buttars for at least the reasons

provided for claim 9. In addition, for this claim limitation, Dr. Almeroth points to

paragraph 24 of Buttars. The entire paragraph is given here "In this embodiment,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Content is encoded and encrypted at the head-end using a strong symmetric key (using the AES system), and each Content file is given a random, unique key. When a Content file is sent to a Kiosk for distribution to Storage Devices, the Content file's key is digitally signed by the head-end and encrypted using the public key of the kiosk, so that only the kiosk can decrypt and use the key. When the kiosk receives the movie and key, it simply stores them in encrypted form on its storage media." (Buttars, 0024).

316.    A POSITA would see that this is disclosing the kiosk storing encrypted media content, and possibly distributed to storage devices.

317.    For at least these reasons, Buttars does not anticipate or render obvious claim 10 of the '400 patent.

318.    *See also* claim 2.

**13. The method of claim 9, wherein the second data interface is a network interface.**

319.    Claim 13 is not anticipated or obvious over Buttars for at least the reasons provided for claim 9. In addition, I first note that while 'over a network' is part of this claim limitation, Dr. Almeroth does not even attempt to establish this. I note that the words 'network', 'lan', and 'wan' do not appear in Buttars. The word Internet does appear, 8 times in fact. All of these are in the description of prior art. Buttars clearly disavows internet distribution "Internet distribution has been fraught with several issues each of which discourages content owners from distributing high-value content through this channel. " (Buttars, 0013).

320.    Dr. Almeroth does not point to a second data interface configured to communicate over a network, because no such network is disclosed in Buttars.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

321.    Dr. Almeroth points to a small portion of paragraph 28 of Buttars. The full

paragraph is given here:

322.    "In an embodiment of the invention, an original, full definition content file is

secured from the Content owner (Studio, Distributor, or other) and, in the case of

film media (100), it is sent to a Tele-Cine service provider ((200) who converts

the film media to digital format where it's then sent to a Media Capture facility

(210)where it is loaded to an array of secured storage drives. In the case of digital

media, *the file (120) or disk (110) is sent directly to the Media Capture* facility

(210), where the Content is encoded using an Encoder (220). The encoded media

is then encrypted using Symmetrical Encryption (500) and sent to the secured,

permanent Media Storage facility (600). Using a Public NSDE Key Generator

(300), PKI keys are generated and stored in a *physically secured storage drive*

(310). License Objects are generated and encrypted using a DRM License Object

Encryption process (320), and the PKI keys are pulled from the Public Key

Storage drive (310). Symmetrical Encryption keys are generated using a

Symmetrical Key Generator (400), and passed to a secured Symmetrical Key

Storage drive (410). When the encoded Content passes from the Encoder (220) to

the Symmetrical Encryption engine (500), the symmetrical encryption keys are

passed from the Symmetrical Key Storage (410) and associated with the

encrypted Content files prior to being passed to the Media Storage drives (600).

*Prior to distributing the Content to the distribution Kiosks, the Content receives*

*a layer of Hardware Encryption* (700) and also receives its associated encrypted

License Object (320) after which it is passed to the remote Distributed Media

Storage locations (800) in Kiosks or regional data centers (Buttars, 0028, emphasis added)" (Buttars, 0028, emphasis added)

323.    Every transfer in this paragraph is clearly a physical transfer. There is no indication of network communications.

324.    For at least these reasons, Buttars does not anticipate or render obvious claim 13 of the '400 patent.

325.    *See also* claim elements 1b and 9b.

**17. The method of claim 9, wherein the kiosk is located in a public environment.**

326.    Claim 17 is not anticipated or obvious over Buttars for at least the reasons provided for claim 9. In addition, Buttars does not disclose that the kiosk is in a public environment, but due to the fact that Buttars frequently describes the kiosk being used as a playback device, it is possible that a kiosk according to Buttars is located in a public environment.

327.    Dr. Almeroth Relies on Figure 3, which displays 'retailer and kiosk 420''. However, Buttars describes the retailer stating "Storage Devices and Playback Devices are manufactured at CEM facilities (400) and distributed through a variety of distribution relationships (410), to retail facilities (420), and from there to the Consumer (440) through a variety of retail channels (430). " (Buttars, 0030

328.    A POSITA would understand that being at a retail facility does not necessarily mean available to the public. Merchandise at retail locations is frequently secured awaiting purchase.

329.    For at least these reasons, Buttars does not anticipate or render obvious claim 17 of the '400 patent.

330.    *See also* claim 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VIII.  VALIDITY ANALYSIS OF THE '667 PATENT

331.    In the following subsections I detail my validity analysis of the '667 patent, examining each ground Dr. Almeroth raised in his opening expert report.

### A.    Claim Construction

332.    Throughout my analysis, I applied the Court's construction in every case where the Court has construed a term. Where the Court did not construe a term, I used the plain and ordinary meaning of that term. The following are the Court's constructions:

| Claim Term | Adopted Construction |
|---|---|
| "secure region" ('667 Patent) | "a region of the NAS device to which access is controlled" |
| "receive an indication of the NAS device having a secure region" ('667 Patent) | "receive an indication of the presence of a secure region within the NAS device" |
| "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent) | No construction necessary |

### B.    Validity of '667 Patent In Light of Smith in view of McDysan

#### 1.    Lack of Motivation to Combine

333.    Dr. Almeroth opines that Smith discloses all elements but for claim 3 of the '667 patent. Almeroth Report, ¶¶ 270–304. For claim 3, Dr. Almeroth fails to provide support that Smith discloses that claim, and instead argues for obviousness based on Smith in combination with the teachings of McDysan. Almeroth Report, ¶ 289.

334.    Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine the two references. Indeed, Dr. Almeroth fails to even recite the word (or variations thereof) "motivate" in discussing his proposed combination. Almeroth Report, ¶¶ 270–304. It is my understanding that Viasat has the burden of

providing support on why a POSITA would have been motivated to combine

Smith and McDysan. And as Viasat's expert, Dr. Almeroth should have provided

the basis of this combination, and has failed to provide such.

335.    Furthermore, Dr. Almeroth does not state or even suggest what elements of

McDysan he proposes be combined with Smith. McDysan requires a rather

extensive infrastructure (McDysan, 0015-0023; Fig.1). There is no indication in

Dr. Almeroth's report if he wishes to integrate that entire extensive infrastructure

into Smith. Certainly, a POSITA attempting to combine the extensive

infrastructure of McDysan with some other prior art, would not be combining

prior art elements according to known methods. Nor would a POSITA have an

expectation of success.

336.    Furthermore, Smith is directed to "Methods and systems for enhancing the storage

and display of video data and other digital content in a set-top box or other

television environment so that such data is securely stored and displayed are

provided." (Smith, Abstract). Smith further describes itself as "Embodiments of

the present invention provide computer-based methods and systems for enhancing

the storage and display of video data and other digital content in a set-top box or

other television environment so that such data is securely stored and displayed.

Example" (Smith,0008). A POSITA would find no benefit to combining

McDysan, in whole or part, with Smith. Dr. Almeroth has not pointed to anything

in McDysan that would benefit or improve Smith.

337.    In his discussion of legal principles, Dr. Almeroth states "It is further my

understanding that a proper obviousness analysis focuses on what was known or

obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶¶ 57). However, throughout his discussion of alleged prior art combinations, Dr. Almeroth never discusses how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

338.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine Smith and McDysan, I reserve the right to respond.

**2.      Lack of Substantive Discussions**

339.    Dr. Almeroth fails to provide substantive discussions on his opinion and merely pulls in block quotes from this reference with very limited text that are not quotes. Almeroth Report, ¶¶ 270–272. In failing to engage in substantive discussions of his interpretation of the quoted text, Dr. Almeroth fails to specifically point out what he opines in Smith as disclosing elements corresponding to each claim element at issue.

340.    For example, in his discussion of Smith, Dr. Almeroth does nothing more than simply copy-paste over block quotes directly from the Smith reference. Almeroth Report, ¶¶ 270–294. He does not explain <u>what</u> in Smith corresponds to the elements of the claim, let alone describe <u>how</u> the cites quotes from Smith disclose the limitations.

341.   In many instances there is no discussion or analysis at all. One example of this is Dr. Almeroth's segment on Smith in relation to claim 1c of the '667. This segment has approximately 735 words, of which only the following are not copy and pasted from Smith:

- Paragraph 277

- Smith discloses that

- Id. at [0009].

- Paragraph 278

- Smith also discloses that

- Smith at [0028].

- Paragraph 279

- Figure 2A illustrates this process; it shows

- Paragraph 280

- Figure 2B shows a similar system; it shows

- Smith at [0030].

342.   There is no analysis, no discussion, no opinion on how a POSITA would view Smith in relation to this claim, and not even any conclusions. Dr. Almeroth never states if he believes Smith anticipates this claim element or if he believes Smith renders obvious this claim limitation.

343.   This is common for almost all of Dr. Almeroth's report regarding Smith. There is no analysis, no discussion, no opinion on how a POSITA would view Smith in relation to a particular claim element. In fact, in almost all instances, Dr. Almeroth fails to even state a conclusion. Dr. Almeroth does not state if he believes Smith anticipates or renders obvious a given claim limitation. This is true

for claim elements 1a, 1b, 1c, 1d, 1e, 2, 4, 5, 6, and 7. For claims 11, 12, 13, 14, 15, and 16 Dr. Almeroth simply refers back to previous claims.

344.    I disagree that Dr. Almeroth has shown that Smith either anticipates or renders obvious any of these claim limitations. Dr. Almeroth has not even identified what elements in Smith he feels relate to the claims of the '667 patent.

345.    The sole claim element that does not follow this copy-pasting of Smith quotes is claim element 1[b], where Dr. Almeroth states "Smith disclosed each of the following steps, as discussed below. Smith therefore disclosed at least one hardware processor configured to do so." Almeroth Report, ¶ 276. Yet again, Dr. Almeroth fails to succinctly describe what in Smith satisfies this limitation. Almeroth Report, ¶ 276. While he notes that his discussions on following elements will show how Smith discloses this limitation, those following segments do nothing more than merely copy-paste blocks of quotes from Smith without engaging in his interpretation of those quoted text. Again, by doing so Dr. Almeroth fails to point out what in Smith discloses the claimed hardware processor that is configured to do the steps in claim elements 1[c] through 1[e]. Almeroth Report, ¶¶ 277–287.

346.    I note that Dr. Almeroth, when discussing legal principles, states "I understand that anticipation must be shown by clear and convincing evidence." (Almeroth Report, ¶ 45). I agree with Dr. Almeroth on this issue. However, as has been shown in this report, Dr. Almeroth fails to do this. He simply copies and pastes segments from asserted prior art without any discussion, analysis, or explanation. This is not clear and convincing evidence. Based on Dr. Almeroth's own

understanding of anticipation, he has failed to show that the asserted prior art anticipates any of the claim limitations of the '667 patent.

347.    Should Dr. Almeroth provide explanations on his interpretation of the copy-pasted quotes, or further elaborate on what in the prior art corresponds to the elements of the claims and how the combination here anticipates and/or renders obvious the claims of the '667 patent, I reserve the right to respond.

### 3.    Lack of Disclosures

348.    Dr. Almeroth opines that the combination of Smith in view of McDysan invalidates the '667 patent asserted claims. Almeroth Report, ¶¶ 270–304. Yet the disclosures in these references do not support Dr. Almeroth's arguments.

349.    For example, with respect to claim limitation 1[a] "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 273–275.

350.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region **within** the NAS device. Claim Construction Order (Dkt. 120), 21. While the block quote

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in Dr. Almeroth's report seems to discuss different types of secure storage devices, Dr. Almeroth's discussion (or lack thereof) on Smith does not support that these devices have such indication. In other words, the storage devices listed in the block quote in Dr. Almeroth's report do not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶ 274.

351.    As another example, with respect to claim limitation 1[c] which recites "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 277–280.

352.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smith does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

353.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with a secure region, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region (in the NAS device). The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *in* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 277–280.

354.    While it is unclear what Dr. Almeroth contends as the claimed indication, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show an indication of the NAS device that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to explain which disclosure in Smith discloses this indication of a secure region within the NAS device, nor do the excerpted quotes from Smith disclose such indication. Almeroth Report, ¶¶ 277–280.

355.    Dr. Almeroth also fails to show that Smith discloses a separate display device on the local area network. Based on the disclosures Dr. Almeroth cites to, if he is relying on the television (display) 206 as satisfying this element, that is not sufficient. Almeroth Report, ¶ 279. Yet Dr. Almeroth cites to portions of Smith that states that the television display 206 interacts with the device driver 230 through a display hardware interface, and fails to provide additional context of how this television is on the local area network. Almeroth Report, ¶ 279. While interactions through hardware interfaces does not necessarily mean that a display is not on local area network, the lack of affirmative proof in Dr. Almeroth's report

supports that Dr. Almeroth failed to show Smith discloses a separate display device on the local area network.

356.    In addition, Dr. Almeroth does not explain *what* in Smith discloses that access to the secure region is controlled by the media streaming system. Dr. Almeroth fails to explain which disclosure in Smith he believes discloses this access control, nor do the excerpted quotes from Smith disclose such control. Almeroth Report, ¶¶ 277–280.

357.    As another example, with respect to claim limitation 1[d] which recites "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 281–284.

358.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the secure region within the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 281–284.

359.    Dr. Almeroth also fails to show that Smith discloses the claimed separate display device (on the local area network). Based on the disclosures Dr. Almeroth cites to, it seems he is relying on the television (display) 206 as satisfying this element. Almeroth Report, ¶ 283. Yet Dr. Almeroth cites to portions of Smith that states

that the television display 206 interacts with the device driver 230 through a display hardware interface, and fails to provide additional context of how this television is on the local area network. Almeroth Report, ¶ 283. While interactions through hardware interfaces does not necessarily mean that a display is not on local area network, the lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to show Smith discloses a separate display device on the local area network.

360.    In a further example, with respect to claim limitation 1[e] which recites "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 285–287.

361.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smith does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

362.    With respect to claim 2, which recites "the media streaming system of claim 1, wherein the separate display device comprises a smart television," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the Smith reference, arguing it discloses this limitation. Almeroth Report, ¶ 288. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

363.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the claimed separate display device (which, per discussions above, is required to be on the local area network) as recited in claim 2. Based on the disclosures Dr. Almeroth cites to, it seems he is relying on digital broadcast data as it is being transmitted to a television display as satisfying this element. Almeroth Report, ¶ 288. Yet Dr. Almeroth, in previous limitations regarding separate display device, cites to portions of Smith that states that the television display 206 interacts with the device driver 230 through a display hardware interface, and fails to provide additional context of how this television is on the local area network. *See*, e.g., Almeroth Report, ¶ 279. While interactions through hardware interfaces does not necessarily mean that a display is not on local area network, the lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

show Smith discloses a separate display device on the local area network. In addition, the disclosures Dr. Almeroth points to does not show that Smith discloses a smart television. Just because a TV may be connected to a television set-top box does not mean that this TV is necessarily a smart TV. Dr. Almeroth fails to engage in discussions to explain why Smith discloses a smart TV.

364.    For example, with respect to claim 3 which recites "the media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 289. As such, Dr. Almeroth is conceding that Smith does not disclose this limitation.

365.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine Smith with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

366.    For example, with respect to claim 4 which recites "the media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 290–291. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

367.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's that appear in his discussion of the secure storage requirement of claims 1 and 4 do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1). Almeroth Report, ¶¶ 290-291. Further, the quotes from Smith that Dr. Almeroth points to are directed to enhanced display controller performing certain functions, and lack disclosures on how a

user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 290-291.

368.    With respect to claim 5 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to cause the NAS device to use encryption that secures the digital content to the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single sentence quote from the Smith reference, arguing this sentence discloses this limitation. Almeroth Report, ¶ 292. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

369.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 5. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

370.    For example, with respect to claim 6 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide

instructions to the NAS device for controlling an amount of data stored in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶ 293. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

371.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 6. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

372.    For example, with respect to claim 7 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed

combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single sentence quote from the Smith reference, arguing this sentence discloses this limitation. Almeroth Report, ¶ 294. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

373.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 7. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

374.    For example, with respect to claim element 11[a], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 296. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[a]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 273–275.

375. While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. While the block quote in Dr. Almeroth's report seems to discuss different types of secure storage devices, Dr. Almeroth's discussion (or lack thereof) on Smith does not support that these devices have such indication. In other words, the storage devices listed in the block quote in Dr. Almeroth's report do not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶ 274.

376. For example, with respect to claim element 11[b], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 297. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[c]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 277–280.

377. While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS

116

device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region **within** the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smith does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

378.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with a secure region, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region (in the NAS device). The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region **in** the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 277–280.

379.    While it is unclear what Dr. Almeroth contends as the claimed indication, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show an indication of the NAS device that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region **within** the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to explain which disclosure in Smith discloses this indication of a secure region within the NAS device, nor do the excerpted quotes from Smith disclose such indication. Almeroth Report, ¶¶ 277–280.

380.    Dr. Almeroth also fails to show that Smith discloses a separate display device on the local area network. Based on the disclosures Dr. Almeroth cites to, if he is relying on the television (display) 206 as satisfying this element, that is not sufficient. Almeroth Report, ¶ 279. Yet Dr. Almeroth cites to portions of Smith

that states that the television display 206 interacts with the device driver 230 through a display hardware interface, and fails to provide additional context of how this television is on the local area network. Almeroth Report, ¶ 279. While interactions through hardware interfaces does not necessarily mean that a display is not on local area network, the lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to show Smith discloses a separate display device on the local area network.

381.    In addition, Dr. Almeroth does not explain what in Smith discloses that access to the secure region is controlled by the media streaming system. Dr. Almeroth fails to explain which disclosure in Smith he believes discloses this access control, nor do the excerpted quotes from Smith disclose such control. Almeroth Report, ¶¶ 277–280.

382.    For example, with respect to claim element 11[c], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 298. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[d]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 281–284.

383.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the secure region within the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 281–284.

384.   Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. The Court construed 'secure region' to mean 'a region of the NAS device to which access is controlled'. Furthermore, the Court construed 'receive an indication of the NAS device having a secure region' as 'receive an indication of the presence of a secure region within the NAS device'.. Dr. Almeroth's discussion (or lack thereof) on Smith does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

385.   Dr. Almeroth also fails to show that Smith discloses the claimed separate display device (on the local area network). Based on the disclosures Dr. Almeroth cites to, it seems he is relying on the television (display) 206 as satisfying this element. Almeroth Report, ¶ 283. Yet Dr. Almeroth cites to portions of Smith that state that the television display 206 interacts with the device driver 230 through a display hardware interface, and fails to provide additional context of how this television is on the local area network. Almeroth Report, ¶ 283. While interactions through hardware interfaces do not necessarily mean that a display is

119

not on local area network, the lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to show Smith discloses a separate display device on the local area network.

386.    For example, with respect to claim element 11[d], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 299. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[e]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 285–287.

387.    While it is unclear what Dr. Almeroth contends are the disclosures in Smith that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smith does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

388.    For example, with respect to claim 12, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 3 of the '667 patent. Almeroth Report, ¶ 300. Claim 12 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

regarding Claim 3 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 3. For this claim, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 289. As such, Dr. Almeroth is conceding that Smith does not disclose this limitation.

389.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine Smith with McDysan, let alone whether this combination renders obvious claim 12. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

390.    For example, with respect to claim 13, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 4 of the '667 patent. Almeroth Report, ¶ 301. Claim 13 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 4 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 4. For this claim, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 290–291. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation is based on disclosures from Smith.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

391.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 13. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's that appear in his discussion of the secure storage requirement of claims 1 and 4 do not show a secure region in the NAS device. The excerpts only reference the storage itself as "secure" and fail to disclosure a secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11). Almeroth Report, ¶¶ 290-291. Further, the quotes from Smith that Dr. Almeroth points to are directed to enhanced display controller performing certain functions, and lack disclosures on how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 290-291.

392.    For example, with respect to claim 14, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 5 of the '667 patent. Almeroth Report, ¶ 302. Claim 14 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 5 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 5. For this claim, Dr. Almeroth excerpts a single sentence quote from the Smith reference, arguing this sentence discloses this limitation. Almeroth Report, ¶ 292. As such, it is my understanding

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

393. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 14. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

394. For example, with respect to claim 15, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 6 of the '667 patent. Almeroth Report, ¶ 303. Claim 15 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 6 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims elements 1[e] and 6. For this claim, Dr. Almeroth excerpts several block quotes from the Smith reference, arguing those segments disclose this limitation. Almeroth Report, ¶ 293. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

395.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 15. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

396.    For example, with respect to claim 16, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 7 of the '667 patent. Almeroth Report, ¶ 304. Claim 16 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 7 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims 4, 6, and 7. For this claim, Dr. Almeroth excerpts a single sentence quote from the Smith reference, arguing this sentence discloses this limitation. Almeroth Report, ¶ 294. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smith.

397.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or

renders obvious this claim. Dr. Almeroth fails to show that Smith discloses the secure region (which requires the indication limitation discussed above) as required by claim 16. It is my opinion that the excerpted Smith quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss that the storage itself as "secure" and fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

398.  I further note that in none of the claim limitations does Dr. Almeroth state whether he believes that claim limitation is anticipated, rendered obvious, or both. Dr. Smith makes a blanket statement at the beginning stating 'Claim 1 of the '667 Patent is anticipated and rendered obvious by Smith." However, he contradicts these blanket assertions. For example, in reference to claim 3, Dr. Almeroth states "Claim 3 of the '667 Patent is anticipated and rendered obvious by Smith" but then also states "To the extent Smith did not practice this claim, it would have been obvious to combine it with the teachings of another reference such as US Pat. App. Pub. No. 2012/0131623 ("McDysan")" (Almeroth Report, ¶ 289). However, in discussing legal principles, Dr. Almeroth states "I understand that a prior art reference 'anticipates' an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily present or implied)." (Almeroth Report, ¶ 44). By combining Smith with McDysan, it is clear that this cannot be anticipation, yet he still asserts that "Claim 3 of the '667 Patent is ***anticipated and rendered obvious*** by Smith" (emphasis added).

399.    For at least these reasons, the identified claims of the '667 patent are valid over the proposed challenges from Dr. Almeroth based on Smith alone or in combination.

C.    **Validity of '667 Patent In Light of Smoyer in view of McDysan**

1.    **Lack of Motivation to Combine**

400.    Dr. Almeroth opines that Smoyer discloses all elements but for claim 3 of the '667 patent. Almeroth Report, ¶¶ 305–337. For claim 3, Dr. Almeroth fails to provide support that Smoyer discloses that claim, and instead argues for obviousness based on Smoyer in combination with the teachings of McDysan. Almeroth Report, ¶ 320.

401.    Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine the two references. Indeed, Dr. Almeroth fails to even recite the word (or variations thereof) "motivate" in discussing his proposed combination. Almeroth Report, ¶¶ 305–337. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine Smoyer and McDysan. And as Viasat's expert, Dr. Almeroth should have provided the basis of this combination, and has failed to provide such.

402.    Furthermore, Dr. Almeroth does not state or even suggest what elements of McDysan he proposes be combined with Smoyer. McDysan requires a rather extensive infrastructure (McDysan, 0015-0023; Fig. 1). There is no indication in Dr. Almeroth's report if he wishes to integrate that extensive infrastructure into Smoyer. Certainly, a POSITA attempting to combine the extensive infrastructure of McDysan with some other prior art, would not be combining prior art elements

according to known methods. Nor would a POSITA have an expectation of success.

403.    Dr. Almeroth has further provided no reason or motivation why a POSITA would wish to make a combination of any part of Smoyer with any Part of McDysan. Dr. Almeroth has not articulated any advantage or benefit from such a combination. A POSITA would find no benefit to combining McDysan, in whole or part, with Smoyer. Dr. Almeroth has not pointed to anything in McDysan that would benefit or improve Smoyer.

404.    In his discussion of legal principles, Dr. Almeroth states "It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶¶ 57). However, throughout his discussion of alleged prior art combinations, Dr. Almeroth never discusses how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

405.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine Smoyer and McDysan, I reserve the right to respond.

### 2.    Lack of Substantive Discussions

406.    Dr. Almeroth fails to provide substantive discussions on his opinion, and merely pulls in block quotes from this reference with very limited text that are not quotes. Almeroth Report, ¶¶ 305–307. In failing to engage in substantive discussions of his interpretation of the quoted text, Dr. Almeroth fails to specifically point out what he opines in Smoyer as disclosing elements corresponding to each claim element at issue.

407.    For example, in his discussion of Smoyer, Dr. Almeroth does nothing more than simply copy-paste over block quotes directly from the Smoyer reference. Almeroth Report, ¶¶ 305–327. He does not explain <u>what</u> in Smoyer corresponds to the elements of the claim, let alone describe <u>how</u> the cited quotes from Smoyer disclose the limitations.

408.    There is no analysis, no discussion, no opinion on how a POSITA would view Smoyer in relation to this claim, and not even any conclusions. Dr. Almeroth never states if he believes Smoyer anticipates this claim element or if he believes Smoyer renders obvious this claim limitation.

409.    This is common for almost all of Dr. Almeroth's report regarding Smoyer. There is no analysis, no discussion, no opinion on how a POSITA would view Smoyer in relation to a particular claim element. In fact, in almost all instances, Dr. Almeroth fails to even state a conclusion. Dr. Almeroth does not state if he believes Smoyer anticipates or renders obvious a given claim limitation. This is true for claim elements 1a, 1b, 1c, 1d, 1e, 2, 4, 5, 6, and 7. For claims 11, 12, 13, 14, 15, and 16 Dr. Almeroth simply refers back to previous claims.

410.    I disagree that Dr. Almeroth has shown that Smoyer either anticipates or renders obvious any of these claim limitations.

411.    The sole claim element that does not follow this copy-pasting of Smoyer quotes is claim element 1[b], where Dr. Almeroth states "Smoyer disclosed each of the following steps, as discussed below. Smoyer therefore disclosed at least one hardware processor configured to do so." Almeroth Report, ¶ 311. Yet again, Dr. Almeroth fails to succinctly describe what in Smoyer satisfies this limitation. Almeroth Report, ¶ 311. While he notes that his discussions on following elements will show how Smoyer discloses this limitation, those following segments do nothing more than merely copy-paste blocks of quotes from Smoyer without engaging in his interpretation of those quoted text. Again, by doing so Dr. Almeroth fails to point out what in Smoyer discloses the claimed hardware processor that is configured to do the steps in claim elements 1[c] through 1[e]. Almeroth Report, ¶¶ 311–318.

412.    Should Dr. Almeroth provide explanations on his interpretation of the copy-pasted quotes, or further elaborate on what in the prior art corresponds to the elements of the claims and how the combination here anticipates and/or renders obvious the claims of the '667 patent, I reserve the right to respond.

**3.    Lack of Disclosures**

413.    Dr. Almeroth opines that the combination of Smoyer in view of McDysan invalidates the '667 patent. Almeroth Report, ¶¶ 305–337. Yet the disclosures in these references do not support Dr. Almeroth's arguments.

414.    For example, with respect to claim limitation 1[a] "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

network attached storage (NAS) device operating on a local area network (LAN)," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 308–310.

415.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. While the block quote in Dr. Almeroth's report seems to discuss different types of storage devices, Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support that these devices have such indication. In other words, the storage devices listed in the block quote in Dr. Almeroth's report do not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 308–310.

416.    As another example, with respect to claim limitation 1[c] which recites "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from

the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 312–313.

417.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

418.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with a secure region, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region (in the NAS device). The excerpts only discuss memory but Dr. and fails to disclose a secure region *in* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 312–313.

419.    While it is unclear what Dr. Almeroth contends as the claimed indication, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show an indication of the NAS device that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120),

21. Dr. Almeroth fails to explain which disclosure in Smoyer discloses this indication of a secure region within the NAS device, nor do the excerpted quotes from Smoyer disclose such indication. Almeroth Report, ¶¶ 312–313.

420. Dr. Almeroth also fails to show that Smoyer discloses a separate display device on the local area network. Based on the disclosures Dr. Almeroth cites to, if he is relying on "television or other electronic display" as satisfying this element, that is not sufficient. Almeroth Report, ¶¶ 310, 314.

421. In addition, Dr. Almeroth does not explain what in Smoyer discloses that access to the secure region is controlled by the media streaming system. Dr. Almeroth fails to explain which disclosure in Smoyer he believes discloses this access control, nor do the excerpted quotes from Smoyer disclose such control. Almeroth Report, ¶¶ 312–313.

422. As another example, with respect to claim limitation 1[d] which recites "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 314–315.

423. While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the secure region within the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region in the NAS device. The excerpts only discuss memory but fails to disclose *secure* region

*within* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 314–315.

424.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. The Court construed "secure region" to mean "a region of the NAS device to which access is controlled." Furthermore, the Court construed "receive an indication of the NAS device having a secure region" as "receive an indication of the presence of a secure region within the NAS device." Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

425.    Dr. Almeroth also fails to show that Smoyer discloses the claimed separate display device (on the local area network). Based on the disclosures Dr. Almeroth cites to, it seems he is relying on the "television or other electronic display" as satisfying this element. Almeroth Report, ¶¶ 314–315. The lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to show Smoyer discloses a separate display device on the local area network.

426.    In a further example, with respect to claim limitation 1[e] which recites "transmit instructions to the NAS device to control streaming access to the digital content

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

stored on the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 316–318.

427.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

428.    With respect to claim 2 which recites "the media streaming system of claim 1, wherein the separate display device comprises a smart television," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the Smoyer reference, arguing it discloses this limitation. Almeroth Report, ¶ 319. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

429.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the claimed separate display device (which, per discussions above, is required to be on the local area network) as recited in claim 2. Based on the disclosures Dr. Almeroth cites to, it seems he is relying on "display on a television or other electronic display" as satisfying this element. Almeroth Report, ¶ 319. Yet that is not sufficient support for why this display in Smoyer is purportedly a smart television. Dr. Almeroth fails to engage in discussions to explain why Smoyer discloses a smart TV.

430.    For example, with respect to claim 3 which recites "the media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 320. As such, Dr. Almeroth is conceding that Smoyer does not disclose this limitation.

431.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

renders obvious this claim. Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine Smoyer with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

432.    For example, with respect to claim 4 which recites "the media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 321–322. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

433.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report that appear in his discussion of the secure storage requirement of claims 1 and 4 do not show a secure region in the NAS device. The excerpts discuss only memory, yet Dr. Almeroth does not explain the

secure aspect of that memory, and he further fails to disclosure a secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1). Almeroth Report, ¶¶ 321–322. Further, the quotes from Smoyer that Dr. Almeroth points to lack disclosures on how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 321–322.

434.    With respect to claim 5 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to cause the NAS device to use encryption that secures the digital content to the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single sentence quote from the Smoyer reference, arguing this sentence discloses this limitation. Almeroth Report, ¶¶ 323. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

435.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 5. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory, yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure

secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

436.    For example, with respect to claim 6 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 324–326. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

437.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 6. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

438.    For example, with respect to claim 7 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single sentence quote from the Smoyer reference, arguing this sentence discloses this limitation. Almeroth Report, ¶¶ 327. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

439.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 7. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 1).

440.    As another example, with respect to claim element 11[a], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of

the '667 patent. Almeroth Report, ¶ 329. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[a]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 308–310.

441.   While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. While the block quote in Dr. Almeroth's report seems to discuss different types of storage devices, Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support that these devices have such indication. In other words, the storage devices listed in the block quote in Dr. Almeroth's report do not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 308–310.

442.   As another example, with respect to claim element 11[b], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 330. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[c]. For this

limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 312–313.

443.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

444.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with a secure region, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a secure region (in the NAS device). The excerpts only discuss memory but Dr. and fails to disclose a secure region *in* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 312–313.

445.    While it is unclear what Dr. Almeroth contends as the claimed indication, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show an indication of the NAS device that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence

of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120),

21. Dr. Almeroth fails to explain which disclosure in Smoyer discloses this

indication of a secure region within the NAS device, nor do the excerpted quotes

from Smoyer disclose such indication. Almeroth Report, ¶¶ 312–313.

446.    Dr. Almeroth also fails to show that Smoyer discloses a separate display device

on the local area network. Based on the disclosures Dr. Almeroth cites to, if he is

relying on "television or other electronic display" as satisfying this element, that

is not sufficient. Almeroth Report, ¶¶ 310, 314.

447.    In addition, Dr. Almeroth does not explain what in Smoyer discloses that access

to the secure region is controlled by the media streaming system. Dr. Almeroth

fails to explain which disclosure in Smoyer he believes discloses this access

control, nor do the excerpted quotes from Smoyer disclose such control. Almeroth

Report, ¶¶ 312–313.

448.    As another example, with respect to claim element 11[c], Dr. Almeroth, for this

limitation, merely references his arguments described above regarding Claim 1 of

the '667 patent. Almeroth Report, ¶ 331. My responses to Dr. Almeroth's

arguments regarding Claim 1 are described above, and are applicable to Dr.

Almeroth's argument here. *See also* discussions on claim element 1[d]. For this

limitation, Dr. Almeroth excerpts several block quotes from the Smoyer

reference, arguing those segments disclose this limitation. Almeroth Report,

¶¶ 314–315.

449.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that

correspond with the secure region within the NAS device, it is my opinion that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

excerpted quotes in Dr. Almeroth's report do not show a secure region in the NAS device. The excerpts only discuss memory but fails to disclose *secure* region *within* the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 314–315.

450.    Further, while it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. The Court construed "secure region" to mean "a region of the NAS device to which access is controlled." Furthermore, the Court construed "receive an indication of the NAS device having a secure region" as "receive an indication of the presence of a secure region within the NAS device." Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

451.    Dr. Almeroth also fails to show that Smoyer discloses the claimed separate display device (on the local area network). Based on the disclosures Dr. Almeroth cites to, it seems he is relying on the "television or other electronic display" as satisfying this element. Almeroth Report, ¶¶ 314–315. The lack of affirmative proof in Dr. Almeroth's report supports that Dr. Almeroth failed to show Smoyer discloses a separate display device on the local area network.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

452.    As another example, with respect to claim element 11[d], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 332. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[e]. For this limitation, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing that those segments disclose this limitation. Almeroth Report, ¶¶ 316–318.

453.    While it is unclear what Dr. Almeroth contends are the disclosures in Smoyer that correspond with the NAS device, it is my opinion that the excerpted quotes in Dr. Almeroth's report do not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on Smoyer does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

454.    For example, with respect to claim 12, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 3 of the '667 patent. Almeroth Report, ¶ 333. Claim 12 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 3 are described above, and are applicable to Dr. Almeroth's

argument here. *See also* discussions on claim 3. For this claim, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 320. As such, Dr. Almeroth is conceding that Smoyer does not disclose this limitation.

455.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine Smoyer with McDysan, let alone whether this combination renders obvious claim 12. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

456.    For example, with respect to claim 13, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 4 of the '667 patent. Almeroth Report, ¶ 334. Claim 13 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 4 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 4. For this claim, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 321–322. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

457.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 13. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's that appear in his discussion of the secure storage requirement of claims 1 and 4 do not show a secure region in the NAS device. The excerpts discuss only memory, yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11). Almeroth Report, ¶¶ 321–322. Further, the quotes from Smoyer that Dr. Almeroth points lack disclosures on how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 321–322.

458.    For example, with respect to claim 14, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 5 of the '667 patent. Almeroth Report, ¶ 335. Claim 14 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 5. For this claim, Dr. Almeroth excerpts a single sentence quote from the Smoyer reference, arguing this sentence discloses this limitation. Almeroth Report, ¶¶ 323. As such, it is my

understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

459.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 14. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory, yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

460.    For example, with respect to claim 15, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 6 of the '667 patent. Almeroth Report, ¶ 336. Claim 15 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim elements 1[e] and 6. For this claim, Dr. Almeroth excerpts several block quotes from the Smoyer reference, arguing those segments disclose this limitation. Almeroth Report, ¶¶ 324–326. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

461.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 15. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

462.    For example, with respect to claim 16, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 7 of the '667 patent. Almeroth Report, ¶ 337. Claim 16 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims 4, 6, and 7. For this claim, Dr. Almeroth excerpts a single sentence quote from the Smoyer reference, arguing this sentence discloses this limitation. Almeroth Report, ¶¶ 327. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from Smoyer.

463.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr.

Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth fails to show that Smoyer discloses the secure region (which requires the indication limitation discussed above) as required by claim 16. It is my opinion that the excerpted Smoyer quotes in Dr. Almeroth's report related to the secure storage do not show a secure region in the NAS device. The excerpts only discuss memory yet Dr. Almeroth does not explain the secure aspect of these memory, and he further fails to disclosure secure region *within* the NAS device, especially in which there is an associated indication thereof (as required by claim 11).

464.   For at least these reasons, the identified claims of the '667 patent are valid over the proposed challenges from Dr. Almeroth based on Smoyer alone or in combination.

**D.    Validity of '667 Patent In Light of The SCSA System in view of McDysan**

   **1.    Lack of Motivation to Combine**

465.   Dr. Almeroth opines that SCSA discloses all elements but for claim 3 of the '667 patent. Almeroth Report, ¶¶ 338–380. For claim 3, Dr. Almeroth fails to provide support that SCSA discloses that claim, and instead argues for obviousness based on SCSA in combination with the teachings of McDysan. Almeroth Report, ¶ 361.

466.   Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine the two references. Indeed, Dr. Almeroth fails to even recite the word (or variations thereof) "motivate" in discussing his proposed combination. Almeroth Report, ¶¶ 337–380. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SCSA and McDysan. And as Viasat's expert, Dr. Almeroth should have provided the basis of this combination, and has failed to provide such.

467. SCSA (Secure Content Storage Association) sought to solve the problem of "meet Studio requirements" for security over media content that the studios provide (WD-Viasat-NDCA00011702 at 706). Part of the way SCSA accomplished this was via a license server (WD-Viasat-NDCA00014363 at 376). McDysan is focused on using idle bandwidth to download content. A POSITA would find no benefit to combining McDysan, in whole or part, with SCSA. Dr. Almeroth has not pointed to anything in McDysan that would benefit or improve SCSA.

468. Furthermore, Dr. Almeroth does not state or even suggest what elements of McDysan he proposes be combined with SCSA. McDysan requires a rather extensive infrastructure (McDysan, 0015-0023; Fig.1). There is no indication in Dr. Almeroth's report if he wishes to integrate that extensive infrastructure into SCSA. Certainly, a POSITA attempting to combine the extensive infrastructure of McDysan with some other prior art, would not be combining prior art elements according to known methods. Nor would a POSITA have an expectation of success.

469. In his discussion of legal principles, Dr. Almeroth states "It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶ 57). However, throughout

his discussion of alleged prior art combinations, Dr. Almeroth never discusses how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

470.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine SCSA and McDysan, I reserve the right to respond.

## 2.    Insufficient Support

471.    Dr. Almeroth, for SCSA, relies on a range of documents from different sources and dates. An exemplary issue with Dr. Almeroth's cited material is reliance on mix-and-match of material which may or may not accurately reflect the functionalities of SCSA at the time of interest.

472.    Dr. Almeroth seems to be pointing to a vague range of projects under the guise of SCSA. Almeroth Report, ¶¶ 130-139. In Dr. Almeroth's discussions of claim limitations, Dr. Almeroth mentions "SCSA System" as the anticipating and/or obviousness prior art reference. Almeroth Report, ¶¶ 338–380. Dr. Almeroth admits that SCSA System can mean many different things (referring to Vidity and Project Phenix), and instead of identifying the specific version and/or product, he chooses to lump a range of diverging products under the single term "SCSA System." Almeroth Report, ¶¶ 133. Instead of maintaining consistency and succinctly pointing out which version of SCSA is the prior art he intends to rely on, Dr. Almeroth points to material from different time frames, as seen below:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- https://www.etcentric.org/drm-secure-content-storageassociation-launches-project-phenix/.

  o This seems to be blog-type article from 2012 simply discussing SCSA, which notes SCSA "already has its **first** project underway," which suggests the potential of multiple iterations and versions of SCSA. This first SCSA is referred to as Project Phenix in this article.



**DRM: Secure Content Storage Association Launches Project Phenix**
By Karla Robinson
March 1, 2012

- https://web.archive.org/web/20150919095416/http://www.vidity.com/index.php?aam_media=2014/12/SCSA_CRI-release-FINAL.pdf.

  o This is an archived website directed a pdf from presumably 2014. The URL of this link mentions Vidity.

  *Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise*

  *CRI to provide content security expertise to seamlessly enable fast, easy and secure access to locally stored digital content across multiple devices*

  **SAN FRANCISCO, CA, UNITED STATES – September 06, 2012** –Cryptography Research, Inc. (CRI), a division of Rambus (NASDAQ: RMBS), today announced it has been selected by the Secure Content Storage Association (SCSA) to provide security leadership and expertise to the SCSA efforts. The SCSA is a consortium of companies in the entertainment and storage space founded by SanDisk (NASDAQ: SNDK), Twentieth Century Fox, Warner Bros., and WD, a Western Digital (NASDAQ: WDC) company, to provide consumers with new ways to build digital home libraries. The SCSA's Project Phenix (working title) initiative will give consumers an easier and faster way to organize, store and move their high definition digital movies and TV shows across multiple devices.

- WD-VIASAT-NDCA00011702

  o This is a presentation from 2014. As Mr. David Blankenbeckler clarified, SCSA involved features that were not included in soft launch (which was around 2014/2015) but included in hard launch (which was around 2015/2016). Mr. Blankenbeckler Jan. 22, 2025 Deposition at

157:19-158:19. I understand that this document is not necessarily the specification of SCSA.

473.    As such, Dr. Almeroth fails to provide adequate support for his arguments regarding SCSA.

474.    Should Viasat later provide additional material related to this combination, I reserve the right to respond.

### 3.    Lack of Disclosures

475.    Dr. Almeroth opines that the combination of SCSA in view of McDysan invalidates the '667 patent. Almeroth Report, ¶¶ 338–380. Yet the disclosures in these references do not support Dr. Almeroth's arguments.

476.    For example, with respect to claim limitation 1[a] "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 342–344.

477.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for infringement purposes, Plaintiffs are alleging that a USB-connected hard drive (a direct attached storage device) satisfies this limitation." Almeroth Report, ¶¶ 343.

478.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as a network interface adaptor, a NAS device, and each element

has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

479.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

480.    Dr. Almeroth fails to discuss what in SCSA is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious of such indication. In other words, the storage which Dr. Almeroth discusses for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 342–344.

481.    As another example, with respect to claim limitation 1[c] which recites "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 346–353.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

482. Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device." Almeroth Report, ¶ 347.

- "I understand that, for purposes of infringement, Plaintiffs have previously alleged that a variable indicating that a storage device is encrypted satisfies the claimed "indication" of this limitation." Almeroth Report, ¶ 350.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that 'access to the secure region is controlled by the media streaming system.'" Almeroth Report, ¶ 352.

483. Simply put, these assumptions are not quite true. As discussed below, this limitation has many elements, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

484. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

485. With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure

region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

486.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region within the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 346–353.

487.    With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶ 350.

488.    For example, with respect to claim limitation 1[d] which recites "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 354–355.

489. With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 354–355.

490. With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

491. For example, with respect to claim limitation 1[e] which recites "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 356–358.

492. With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

'667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

493. For example, with respect to claim 2 which recites "the media streaming system of claim 1, wherein the separate display device comprises a smart television," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1.

494. For example, with respect to claim 3 which recites "the media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 361. As such, Dr. Almeroth is conceding that SCSA do not disclose this limitation.

495. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth failed to provide any substantive

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

discussions on why a POSITA would have been motivated to combine SCSA with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

496.    For example, with respect to claim 4 which recites "the media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 362–363. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

497.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 404.

498.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

499. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

500. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 362–363. Further, Dr. Almeroth does not explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 362–363.

501. For example, with respect to claim 5 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to cause the NAS device to use encryption that secures the digital content to the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 364–365. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

502. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 5, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 364–365.

503. For example, with respect to claim 6 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an amount of data stored in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 366–367. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

504. Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 366.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

505. Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

506. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

507. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 366–367.

508. For example, with respect to claim 7 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed

combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 368–370. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

509.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply using encryption is sufficient to meet this claim." Almeroth Report, ¶ 369.

510.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, the secure region, and each element has specific requirements, including instructions for controlling encryption type. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

511.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

512.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the

secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 368–370.

513.  For example, with respect to claim element 11[a], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 372. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[a]. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 342–344.

514.  Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for infringement purposes, Plaintiffs are alleging that a USB-connected hard drive (a direct attached storage device) satisfies this limitation." Almeroth Report, ¶¶ 343.

515.  Simply put, this is not correct. As discussed below, this limitation has many elements, such as a network interface adaptor, a NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

516.  Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

517.    Dr. Almeroth fails to discuss what is in SCSA is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious of such indication. In other words, the storage which Dr. Almeroth discusses for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 342–344.

518.    For example, with respect to claim element 11[b], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 373. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[c]. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 346–353.

519.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device." Almeroth Report, ¶ 347.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "I understand that, for purposes of infringement, Plaintiffs have previously alleged that a variable indicating that a storage device is encrypted satisfies the claimed "indication" of this limitation." Almeroth Report, ¶ 350.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that 'access to the secure region is controlled by the media streaming system.'" Almeroth Report, ¶ 352.

520.    Simply put, these assumptions are not quite true. As discussed below, this limitation has many elements, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

521.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

522.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

523.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS

device). Dr. Almeroth fails to discuss what is the secure region within the NAS device, especially in which there is an associated indication thereof. Almeroth Report, ¶¶ 346–353.

524. With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶ 350.

525. For example, with respect to claim element 11[c], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 374. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[d]. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 354–355.

526. With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated

indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 354–355.

527.     With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

528.     For example, with respect to claim element 11[d], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 375. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[e]. For this limitation, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 356–358.

529.     With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure

region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

530.    For example, with respect to claim 12, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 3 of the '667 patent. Almeroth Report, ¶ 376. Claim 12 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 3 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 3. For this claim, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 361. As such, Dr. Almeroth is conceding that SCSA do not disclose this limitation.

531.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine SCSA with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

532.    For example, with respect to claim 13, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 4 of the '667 patent.

Almeroth Report, ¶ 377. Claim 13 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 4 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 4. For this claim, Dr. Almeroth relies on material directed to SCSA. Almeroth Report, ¶¶ 362–363. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

533.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 404.

534.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

535.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

536.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 362–363. Further, Dr. Almeroth does not explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 362–363.

537.  For example, with respect to claim 14, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 5 of the '667 patent. Almeroth Report, ¶ 378. Claim 14 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 5. For this claim, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 364–365. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

538.  As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 5, it is my opinion that Dr.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 364–365.

539.　For example, with respect to claim 15, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 6 of the '667 patent. Almeroth Report, ¶ 379. Claim 15 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim elements 1[e] and 6. For this limitation, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 366–367. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

540.　Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 366.

541.　Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads),

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

542.     Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

543.     As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 366–367.

544.     For example, with respect to claim 16, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 7 of the '667 patent. Almeroth Report, ¶ 380. Claim 16 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims 4, 6, and 7. For this claim, Dr. Almeroth relies on material regarding SCSA. Almeroth Report, ¶¶ 368–370. As such, it is my understanding the Dr. Almeroth arguments with respect to this limitation are based on disclosures from SCSA.

545. Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply using encryption is sufficient to meet this claim." Almeroth Report, ¶ 369.

546. Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, the secure region, and each element has specific requirements, including instructions for controlling encryption type. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

547. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

548. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 368–370.

549.    For at least these reasons, the identified claims of the '667 patent are valid over the proposed challenges from Dr. Almeroth based on SCSA alone or in combination.

**E.    Validity of '667 Patent In Light of DirecTV DVR System in view of TiVo DVR System further in view of McDysan**

**1.    Lack of Motivation to Combine**

550.    Dr. Almeroth opines that DirecTV alone anticipates and/or render obvious all elements but for claim 3 of the '667 patent. Almeroth Report, ¶¶ 381–420. He further opines that to the extent DirecTV is missing a limitation, that the combination of DirecTV with TiVo would render the claims of the '667 patent obvious. Almeroth Report, ¶ 381.

551.    Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine DirecTV with TiVo. Dr. Almeroth merely makes conclusory statements that a POSITA would have been motivated to incorporate TiVo DVR features into DirecTV, without any further discussion or support. Almeroth Report, ¶ 382. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine DirecTV and TiVo. And as Viasat's expert, Dr. Almeroth should have provided the basis of this combination, and has failed to provide such.

552.    I first note that some of the links to Archive.org for TiVo and DirecTV that Dr. Almeroth refers to do not work. For example, in paragraph 386 of Dr. Almeroth's report he refers to

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo premiere/index.html. When attempting to visit that link what is displayed is:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



553.    I do note that in Dr. Almeroth's report he identifies TIVO DVR system (Almeroth Report, ¶ 387) and DirecTV DVR (Almeroth Report, ¶ 385). I agree with Dr. Almeroth that both systems are digital video records (DVR's). However, this is precisely why a POSITA would not be motivated to combine them. Both products offer the same service. Combining two DVR systems offers no improvement, no advantage, and no benefit.

554.    Both the TiVo and DirecTV products are DVRs that allow recording two programs at once, both allow recording of a substantial amount of video. The two products offer the same services. There is no reason for a POSITA to even consider combining them.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

555.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine DirecTV and TiVo, I reserve the right to respond.

556.    For claim 3, Dr. Almeroth fails to provide support that DirecTV (nor TiVo) discloses that claim, and instead argues for obviousness based on DirecTV in combination with the teachings of McDysan. Almeroth Report, ¶ 403.

557.    Dr. Almeroth fails to provide why a POSITA would have been motivated to combine the two references. Indeed, Dr. Almeroth fails to even recite the word (or variations thereof) "motivate" in discussing his proposed combination. Almeroth Report, ¶ 403. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine DirecTV and McDysan. And as Viasat's expert, Dr. Almeroth should have provided the basis for this combination, and has failed to provide such.

558.    Dr. Almeroth does not state or even suggest what elements of McDysan he proposes be combined with DirecTV. McDysan requires a rather extensive infrastructure (McDysan, 0015-0023; Fig. 1). There is no indication in Dr. Almeroth's report if he wishes to integrate that extensive infrastructure into DirecTV. Certainly, a POSITA attempting to combine the extensive infrastructure of McDysan with some other prior art, would not be combining prior art elements according to known methods. Nor would a POSITA have an expectation of success.

559.    Dr. Almeroth has further provided no reason or motivation why a POSITA would wish to make a combination of any part of DirecTV with any Part of McDysan. Dr. Almeroth has not articulated any advantage or benefit from such a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

combination. A POSITA would find no benefit to combining McDysan, in whole or part, with DirecTV. Dr. Almeroth has not pointed to anything in McDysan that would benefit or improve DirecTV.

560.    In his discussion of legal principles, Dr. Almeroth states "It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶ 57). However, throughout his discussion of alleged prior art combinations, Dr. Almeroth never discusses how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

561.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine DirecTV and McDysan, I reserve the right to respond.

### 2.    Insufficient Support

562.    Dr. Almeroth, for DirecTV, relies on a range of documents from different sources and dates. Three exemplary issues with Dr. Almeroth's cited material are (1) reliance on mix-and-match of material for different products within DirecTV DVR product grouping, (2) reliance on material directed to non-DVR products as support for Dr. Almeroth's arguments related to the DVR products, and (3) reliance on urls which leads to dead links.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

563.    Dr. Almeroth seems to be pointing to two different DirecTV DVR receivers as

potential prior art—HR23 and Genie. Almeroth Report, ¶¶ 111, 141. In Dr.

Almeroth's discussions of claim limitations, Dr. Almeroth mentions "DirecTV

DVR Systems, including at least the HR23," as the anticipating and/or

obviousness prior art reference. Almeroth Report, ¶¶ 381–420. Instead of

maintaining consistency and succinctly pointing out which version of the

DirecTV product is the prior art he intends to rely on, Dr. Almeroth points to

material from different time frames, on different products. He even relies on

documents that are neither the HR23 nor Genie for propositions "including at

least the HR23," Almeroth Report, ¶¶ 381–420, as seen below:

- https://web.archive.org/web/20130524082009/http://www.directv.com/technology/genie?lpos=Header:3

    o   This seems to be an archived website directed to a product called
        DirecTV Genie receiver, and *not* of DirecTV HR23.



- https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3

    o   This is an archived website directed to a product called DirecTV Plus
        HD DVR Receiver, which is a *different* product from the DirecTV
        Genie receiver discussed in the link above. And further different from
        DirecTV HR 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



564.    Further, Dr. Almeroth cites to **non-DVR** material to support his opinions which (presumably) are directed to the DirecTV DVR system. Two exemplary DirecTV related material cited in Dr. Almeroth's limitation by limitation section (Almeroth Report, ¶¶ 381–420) are below:

- https://web.archive.org/web/20100526233747/http://www.directv.com/DTVAPP/content/directv/tv_on_your_schedule

  - This seems to be an archived website directed DirecTV DVR functionalities.

- https://web.archive.org/web/20101204100504/http://www.directv.com/learn/pdf/System_Manuals/DIRECTV/DTV_SDHDReceiver.pdf

  - As seen below, this document is for "**non-DVR** receivers", and not the DVR receivers of which Dr. Almeroth contends is prior art.



- o Indeed, this document is about non-DVR receivers. As seen in the screenshot below, even discussions on DVR services are about non-DVR receivers accessing DVR functionality through DVR receivers.



565. In addition, Dr. Almeroth relies on links that no longer have substantive content related to DirecTV. In doing so Dr. Almeroth failed to provide support for the earliest date which he contends the DirecTV DVR was available. The two links for which Dr. Almeroth relies on as support for public availability of the two DirecTV DVR receivers (Almeroth Report, ¶ 143), the HR23 (based on the home theater review link below) and the Genie (based on engadget link below), are both dead ends. There is no content related to DirecTV DVR linked to those urls, as seen below:

- https://hometheaterreview.com/directv-hr23-satellite-receiver-and-hd-dvrreviewed/

  - o This link leads to a 404 page not found error message.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# 404 Page Not Found

## There's nothing here!

- https://www.engadget.com/2012-12-29-directv-geniewhole-home-dvr-review.html

    o This link results in an error message nothing "Sorry, the page you're looking for can't be found."



566. Dr. Almeroth states he is referring to the DVR system but then picks and chooses excerpts from disparate systems and versions. Dr. Almeroth does not state he is proposing combining all of these, rather he simply treats them all as one product, which they are not.

567. As such, Dr. Almeroth fails to provide adequate support for his arguments regarding the DirecTV DVR system.

568. Should Viasat later provide additional material related to this combination, I reserve the right to respond.

### 3.    Lack of Disclosures

569. Dr. Almeroth opines that the combination of DirecTV DVR in view of TiVo DVR further in view of McDysan invalidates the '667 patent. Almeroth Report, ¶¶ 381–

420. Yet the disclosures in these references do not support Dr. Almeroth's arguments.

570.    For example, with respect to claim limitation 1[a] "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 385–387.

571.    Dr. Almeroth fails to discuss what is in DirecTV and/or TiVo is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. The sole discussion Dr. Almeroth provides on storage device is the unsupported (i.e., no citation for support) statement that "TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement." Almeroth Report, ¶ 387. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious such indication. In other words, the storage which Dr. Almeroth discusses for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 385–387.

572.    For example, with respect to claim limitation 1[c] which recites "receive an indication of the NAS device having a secure region comprising a buffer for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 389–396.

573.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device." Almeroth Report, ¶¶ 390, 394.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that 'access to the secure region is controlled by the media streaming system.'" Almeroth Report, ¶ 391.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that data indicating a device's model satisfies the claimed 'indication' of this limitation." Almeroth Report, ¶ 392.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that a message from a storage device indicating that the device is the proper type of device for storing content satisfies the claimed "indication" of this limitation. Almeroth Report, ¶ 395.

574.    Simply put, these assumptions are not true. As discussed below, this limitation has many elements, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

575.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025, report, which I incorporate here by reference.

576.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

577.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth, with no citation nor support, makes a conclusory statement that "under Plaintiffs' theory of infringement, a storage device that could control what media could be accessed would meet the "secure region" requirement of this limitation." Almeroth Report, ¶¶ 390. Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 389–396.

578.    With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶¶ 389–396.

579. For example, with respect to claim limitation 1[d] which recites "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 397–398.

580. With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 397-398.

581. With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

582.    For example, with respect to claim limitation 1[e] which recites "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 399–400.

583.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

584.    For example, with respect to claim 2 which recites "the media streaming system of claim 1, wherein the separate display device comprises a smart television," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1.

585.    For example, with respect to claim 3 which recites "the media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a

time with more available bandwidth on a connection to the NAS device," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 403. As such, Dr. Almeroth is conceding that DirecTV and TiVo do not disclose this limitation.

586.   As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine DirecTV and/or TiVo with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

587.   For example, with respect to claim 4 which recites "the media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 404–405.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

588.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 404.

589.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

590.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

591.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 404-405. Further, Dr. Almeroth does not

explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 404-405.

592. For example, with respect to claim 5 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to cause the NAS device to use encryption that secures the digital content to the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶ 406. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

593. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 5, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶ 406.

594. For example, with respect to claim 6 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an amount of data stored in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶¶ 407–408. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

595.  Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 407.

596.  Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

597.  Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

598.  As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 407–408.

599.    For example, with respect to claim 7 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶¶ 409–410. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

600.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 409–410.

601.   For example, with respect to claim element 11[a], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 412. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[a]. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 385–387.

602.   Dr. Almeroth fails to discuss what is in DirecTV and/or TiVo is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region ***within*** the NAS device. Claim Construction Order (Dkt. 120), 21. The sole discussion Dr. Almeroth provides on storage device is the unsupported (i.e., no citation for support) statement that "TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement." Almeroth Report, ¶ 387. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious such indication. In other words, the storage which Dr. Almeroth discusses for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 385–387.

603.   For example, with respect to claim element 11[b], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 413. My responses to Dr. Almeroth's

arguments regarding Claim 1 are described above, and are applicable to Dr.
Almeroth's argument here. *See also* discussions on claim element 1[c]. For this
limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo.
Almeroth Report, ¶¶ 389–396.

604. Dr. Almeroth makes several inaccurate statements on Sandisk's infringement
theories. For example, he demonstrates his lack of understanding on Viasat's
infringement of the '667 patent by stating the following, without any citation or
support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a
  storage device satisfies this claim if there are security measures applied to the
  entire device." Almeroth Report, ¶¶ 390, 394.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that
  requiring a user to access content through using Viasat's systems satisfies the
  limitation requiring that 'access to the secure region is controlled by the media
  streaming system.'" Almeroth Report, ¶ 391.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that
  data indicating a device's model satisfies the claimed 'indication' of this
  limitation." Almeroth Report, ¶ 392.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that a
  message from a storage device indicating that the device is the proper type of
  device for storing content satisfies the claimed "indication" of this limitation.
  Almeroth Report, ¶ 395.

605. Simply put, these assumptions are not true. As discussed below, this limitation
has many element, such as the NAS device, a secure region, an indication of the
NAS device, and each element has specific requirements. By failing to understand
the appropriate interpretation of the claims (i.e., Sandisk's infringement reads),
Dr. Almeroth fails to support how his proposed reference and/or combination
anticipates and/or renders obvious this limitation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

606.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025, report, which I incorporate here by reference.

607.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

608.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth, with no citation nor support, makes a conclusory statement that "under Plaintiffs' theory of infringement, a storage device that could control what media could be accessed would meet the "secure region" requirement of this limitation." Almeroth Report, ¶¶ 390. Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 389–396.

609.    With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in

this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶¶ 389–396.

610.    For example, with respect to claim element 11[c], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 414. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[d]. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 397–398.

611.    With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 397-398.

612.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure

region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

613.    For example, with respect to claim element 11[d], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 415. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[e]. For this limitation, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 399–400.

614.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

615.    For example, with respect to claim 12, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 3 of the '667 patent. Almeroth Report, ¶ 416. Claim 12 is not invalid at least for all of the reasons I

addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 3 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 3. For this claim, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 403. As such, Dr. Almeroth is conceding that DirecTV and TiVo do not disclose this limitation.

616.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine DirecTV and/or TiVo with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

617.    For example, with respect to claim 13, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 4 of the '667 patent. Almeroth Report, ¶ 417. Claim 13 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 4 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 4. For this claim, Dr. Almeroth relies on material directed to DirecTV and TiVo. Almeroth Report, ¶¶ 404–405.

618.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 404.

619. Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

620. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

621. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 404-405. Further, Dr. Almeroth does not explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 404-405.

622. For example, with respect to claim 14, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 5 of the '667 patent. Almeroth Report, ¶ 418. Claim 14 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 5. For this claim, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶ 406. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

623. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 5, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶ 406.

624. For example, with respect to claim 15, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 6 of the '667 patent. Almeroth Report, ¶ 419. Claim 15is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's

argument here. *See also* discussions on claim elements 1[e] and 6. For this claim, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶¶ 407–408. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

625.   Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 407.

626.   Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

627.   Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

628.   As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 407–408.

629.    For example, with respect to claim 16, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 7 of the '667 patent. Almeroth Report, ¶ 420. Claim 16 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims 4, 6, and 7. For this claim, Dr. Almeroth relies on material only from TiVo. Almeroth Report, ¶¶ 409–410. As such, Dr. Almeroth is conceding that DirecTV does not disclose this limitation.

630.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 409–410.

631.   For at least these reasons, the identified claims of the '667 patent are valid over the proposed challenges from Dr. Almeroth based on DirecTV alone or in combination.

**F.    Validity of '667 Patent In Light of DISH DVR System in view of TiVo DVR System further in view of McDysan**

   **1.    Lack of Motivation to Combine**

632.   Dr. Almeroth opines that DISH alone anticipates and/or render obvious all elements but for claim 3 of the '667 patent. Almeroth Report, ¶¶ 421–474. He further opines that to the extent DISH is missing a limitation, that the combination of DISH with TiVo would render the claims of the '667 patent obvious. Almeroth Report, ¶ 422.

633.   Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine DISH with TiVo. Dr. Almeroth merely makes conclusory statements that a POSITA would have been motivated to incorporate TiVo DVR features into DISH, without any further discussion or support. Almeroth Report, ¶ 422. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine DISH and TiVo. And as Viasat's expert, Dr. Almeroth should have provided the basis of this combination, and has failed to provide such.

634.   I first note that some of the links to Archive.org for TiVo and Dish that Dr. Almeroth refers to do not work. For example, in paragraph 424 of Dr. Almeroth's report he refers to

https://web.archive.org/web/20100420113405/http://www.tivo.com/products/tivo premiere/index.html. When attempting to visit that link what is displayed is:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



635.    I do note that in Dr. Almeroth's report he identifies TIVO DVR system (Almeroth Report, ¶ 424) and DISH DVR (Almeroth Report, ¶ 423). I agree with Dr. Almeroth that both systems are digital video records (DVR's). However, this is precisely why a POSITA would not be motivated to combine them. Both products offer the same service. Combining two DVR systems offers no improvement, no advantage, and no benefit.

636.    Both the TiVo and DISH products are DVRs that allow recording two programs at once, both allow recording of a substantial amount of video. The two products offer the same services. There is no reason for a POSITA to even consider combining them.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

637.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine DISH and TiVo, I reserve the right to respond.

638.    For claim 3, Dr. Almeroth fails to provide support that DISH (nor TiVo) discloses that claim, and instead argues for obviousness based on DISH in combination with the teachings of McDysan. Almeroth Report, ¶ 451.

639.    Yet Dr. Almeroth fails to provide why a POSITA would have been motivated to combine the two references. Indeed, Dr. Almeroth fails to even recite the word (or variations thereof) "motivate" in discussing his proposed combination. Almeroth Report, ¶ 451. It is my understanding that Viasat has the burden of providing support on why a POSITA would have been motivated to combine DISH and McDysan. And as Viasat's expert, Dr. Almeroth should have provided the basis of this combination, and has failed to provide such.

640.    Dr. Almeroth does not state or even suggest what elements of McDysan he proposes be combined with DISH. McDysan requires a rather extensive infrastructure (McDysan, 0015-0023; Fig. 1). There is no indication in Dr. Almeroth's report if he wishes to integrate that extensive infrastructure into DISH. Certainly, a POSITA attempting to combine the extensive infrastructure of McDysan with some other prior art, would not be combining prior art elements according to known methods. Nor would a POSITA have an expectation of success.

641.    Dr. Almeroth has further provided no reason or motivation why a POSITA would wish to make a combination of any part of DISH with any Part of McDysan. Dr. Almeroth has not articulated any advantage or benefit from such a combination. A

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

POSITA would find no benefit to combining McDysan, in whole or part, with DISH. Dr. Almeroth has not pointed to anything in McDysan that would benefit or improve DISH.

642.    In his discussion of legal principles, Dr. Almeroth states "It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art at the time of the alleged invention. Accordingly, I understand that any need or problem known in the field of endeavor at the time of alleged invention can provide a reason for combining the elements in the manner claimed." (Almeroth Report, ¶ 57). However, throughout his discussion of alleged prior art combinations, Dr. Almeroth never discusses how a POSITA would view the various art, never discusses any need or problem that would provide a reason for combining the elements. In most cases, Dr. Almeroth fails to even disclose what elements he wishes to combine. Based on Dr. Almeroth's own understanding of motivation to combine, he has failed to demonstrate any motivation to combine.

643.    Should Viasat later provide the basis for its belief that a POSITA would have been motivated to combine DISH and McDysan, I reserve the right to respond.

## 2.    Insufficient Support

644.     Dr. Almeroth, for DISH, relies on a range of documents from different sources and dates. Three exemplary issues with Dr. Almeroth's cited material are (1) reliance on mix-and-match of material for different products within DISH DVR product grouping and (2) reliance on urls which leads to dead links.

645.    Dr. Almeroth seems to be pointing to three different DISH DVR receivers as potential prior art—ViP 622, ViP 722, and Hopper / Joey receivers. Almeroth

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Report, ¶ 146. In Dr. Almeroth's discussions of claim limitations, Dr. Almeroth mentions "DISH DVR Systems, including at least the ViP772," as the anticipating and/or obviousness prior art reference. Almeroth Report, ¶¶ 421–474. Instead of maintaining consistency and succinctly pointing out which version of the DISH product is the prior art he intends to rely on, Dr. Almeroth points to material from different time frames, on different products. For example, Dr. Almeroth cites to diverging ranges of materials, including a link that no longer seems to support his propositions:

- https://web.archive.org/web/20070909030420/http://www.dishnetwork.com/downloads/pdf/product_brochures/722_brochure.pdf;

  o This seems to be an archived website directed to ViP 722.

- https://about.dish.com/news-releases?item=123253;

  o This seems to be an announcement article directed to ViP 772.

- https://my.dish.com/support/receivers/vip722k

  o This link just redirects the viewer to general support page at https://support.dish.com/, and nothing specific to ViP 772

- https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System

  o This seems to be an announcement article directed to Hopper and Joey, **not** of ViP 772.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



- DISH_VIASATSUB_000396

    o This seems to be a document on EchoStar DVR, and Dr. Almeroth fails to explain which DISH product relates to this document.

- DISH_VIASATSUB_000144

    o This seems to be an installation guide for Hopper.

646.    Dr. Almeroth states he is referring to the DISH DVR system but then picks and chooses excerpts from disparate systems and versions. Dr. Almeroth does not state he is proposing combining all of these, rather he simply treats them all as one product, which they are not.

647.    In addition, Dr. Almeroth relies on links that no longer have substantive content related to DISH. In doing so Dr. Almeroth failed to provide support for his propositions for DISH, including the earliest date which he contends the DISH DVR was available, as seen below:

- https://about.dish.com/newsreleases?item=123253

    o This link leads to a Not Found error message.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Not Found

The requested page could not be found

- http://www.laaudiofile.com/vip722.html

  o   Browser cannot find the server.



## This site can't be reached

Check if there is a typo in www.laaudiofile.com.

DNS_PROBE_FINISHED_NXDOMAIN

- https://ir.dish.com/index.php/static-files/ebd18806-dd60-4270-b034-38a455433434

  o   Browser cannot find the server.



## This site can't be reached

Check if there is a typo in ir.dish.com.

DNS_PROBE_FINISHED_NXDOMAIN

- https://my.dish.com/support/receivers/vip722k

  o   This link just redirects the viewer to general support page at
      https://support.dish.com/

648.   As such, Dr. Almeroth fails to provide adequate support for his arguments regarding the DISH DVR system.

649.   Should Viasat later provide additional material related to this combination, I reserve the right to respond.

### 3.      Lack of Disclosures

650.   Dr. Almeroth opines that the combination of DISH DVR in view of TiVo DVR further in view of McDysan invalidates the '667 patent. Almeroth Report, ¶¶ 421–474. Yet the disclosures in these references to not support Dr. Almeroth's arguments.

651.   For example, with respect to claim limitation 1[a] "a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN)," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 425–429.

652.   Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for infringement purposes, Plaintiffs are alleging that a USB-connected hard drive satisfies this limitation." Almeroth Report, ¶ 426.

653.   Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the

appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

654.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

655.    Dr. Almeroth fails to discuss what is in DISH and/or TiVo is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. The sole discussion Dr. Almeroth provides on storage device is the unsupported (i.e., no citation for support) statement that "TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement." Almeroth Report, ¶ 429. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious of such indication. In other words, the storage which Dr. Almeroth discuss for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 425–429.

656.    For example, with respect to claim limitation 1[c] which recites "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system," it is my opinion that Dr. Almeroth's proposed combination does not disclose this

limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 431–440.

657.  Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device". Almeroth Report, ¶¶ 432, 438.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that information indicating whether a drive is properly formatted to be able to accept encrypted files satisfies the claimed "indication" of this limitation." Almeroth Report, ¶ 433.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that 'access to the secure region is controlled by the media streaming system.'" Almeroth Report, ¶ 434.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that a message from a storage device indicating that the device is the proper type of device for storing content satisfies the claimed "indication" of this limitation. Almeroth Report, ¶ 439.

658.  Simply put, these assumptions are not true. As discussed below, this limitation has many elements, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

659.  Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

660.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

661.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth, with no citation nor support, makes a conclusory statement that "under Plaintiffs' theory of infringement, a storage device that could control what media could be accessed would meet the "secure region" requirement of this limitation." Almeroth Report, ¶¶ 438. Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 431–440.

662.    With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶¶ 431–440.

663.    For example, with respect to claim limitation 1[d] which recites "transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 441–442.

664.    With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 441–442.

665.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support

disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

666.    For example, with respect to claim limitation 1[e] which recites "transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 443–447.

667.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 446.

668.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, the buffer, the NAS device, and each element has specific requirements such as controlling streaming access. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

669.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

670.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 1 of the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

'667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

671.    For example, with respect to claim 2 which recites "the media streaming system of claim 1, wherein the separate display device comprises a smart television," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1.

672.    For example, with respect to claim 3 which recites "the media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 451. As such, Dr. Almeroth is conceding that DISH and TiVo do not disclose this limitation.

673.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. In addition, Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine DISH and/or TiVo with McDysan, let alone

whether this combination renders obvious claim 3. As such, Dr. Almeroth failed to explain how his proposed combination would have rendered obvious this claim limitation.

674.    For example, with respect to claim 4 which recites "the media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 452–455.

675.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 452.

676.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

677.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

678.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 452–455. Further, Dr. Almeroth does not explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 452–455.

679.    For example, with respect to claim 5 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to cause the NAS device to use encryption that secures the digital content to the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 456–458.

680.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication

limitation discussed above) as required by claim 5, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 456–458.

681.    For example, with respect to claim 6 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to: provide instructions to the NAS device for controlling an amount of data stored in the secure region," it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 459–460.

682.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 459.

683.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

684. Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

685. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 1, and additionally Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 459–460.

686. For example, with respect to claim 7 which recites "the media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region," it is my opinion that Dr. Almeroth's proposed combination does not disclose this limitation. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 461–464.

687. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 1 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication

limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 461–464.

688.    For example, with respect to claim element 11[a], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 466. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[a]. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 425–429.

689.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for infringement purposes, Plaintiffs are alleging that a USB-connected hard drive satisfies this limitation." Almeroth Report, ¶ 426.

690.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr.

Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

691.   Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

692.   Dr. Almeroth fails to discuss what is in DISH and/or TiVo is a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. The sole discussion Dr. Almeroth provides on storage device is the unsupported (i.e., no citation for support) statement that "TiVo DVRs were network attached storage devices under Plaintiffs' theory of infringement." Almeroth Report, ¶ 429. Dr. Almeroth's discussion (or lack thereof) on this combination does not support that the proposed combination discloses or makes obvious of such indication. In other words, the storage which Dr. Almeroth discuss for this limitation does not satisfy the requirements of a NAS device as claimed in the '667 patent. Almeroth Report, ¶¶ 425–429.

693.   For example, with respect to claim element 11[b], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 467. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[c]. For this

limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 431–440.

694.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that Plaintiffs have alleged, for infringement purposes, that a storage device satisfies this claim if there are security measures applied to the entire device". Almeroth Report, ¶¶ 432, 438.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that information indicating whether a drive is properly formatted to be able to accept encrypted files satisfies the claimed "indication" of this limitation." Almeroth Report, ¶ 433.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies the limitation requiring that 'access to the secure region is controlled by the media streaming system.'" Almeroth Report, ¶ 434.

- "I understand that, for purposes of infringement, Plaintiffs have alleged that a message from a storage device indicating that the device is the proper type of device for storing content satisfies the claimed "indication" of this limitation. Almeroth Report, ¶ 439.

695.    Simply put, these assumptions are not true. As discussed below, this limitation has many elements, such as the NAS device, a secure region, an indication of the NAS device, and each element has specific requirements. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

696.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

697.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

698.    With respect to a secure region, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth, with no citation nor support, makes a conclusory statement that "under Plaintiffs' theory of infringement, a storage device that could control what media could be accessed would meet the "secure region" requirement of this limitation." Almeroth Report, ¶¶ 438. Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 431–440.

699.    With respect to indication of the NAS device it is my opinion that Dr. Almeroth failed to show what in his proposed combination is the indication that satisfies the requirements of the claims. Per the Claim Construction Order, the indication in this limitation is that of the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth fails to discuss what in

his proposed combination would satisfy the requirements for indication of a secure region within the NAS device, as opposed to that on entire devices. Almeroth Report, ¶¶ 431–440.

700.    For example, with respect to claim element 11[c], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 468. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[d]. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 441–442.

701.    With respect to the secure region within the NAS device, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 441–442.

702.    With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support

disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

703.    For example, with respect to claim element 11[d], Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 1 of the '667 patent. Almeroth Report, ¶ 469. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim element 1[e]. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 443–447.

704.    Dr. Almeroth makes several inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 446.

705.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, the buffer, the NAS device, and each element has specific requirements such as controlling streaming access. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

706.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

707. With respect to the NAS device, it is my opinion that what is in Dr. Almeroth's report with respect to this combination does not show a NAS device that satisfies the requirements of the claims. Among the requirements within claim 11 of the '667 patent, the NAS device must have an indication that it has a secure region. Per the Claim Construction Order, this indication requires the presence of a secure region *within* the NAS device. Claim Construction Order (Dkt. 120), 21. Dr. Almeroth's discussion (or lack thereof) on this combination does not support disclosure of a NAS device that satisfies the requirements of a NAS device as claimed in the '667 patent.

708. For example, with respect to claim 12, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 3 of the '667 patent. Almeroth Report, ¶ 470. Claim 12 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 3 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 3. For this limitation, Dr. Almeroth excerpts a single block quote from the McDysan reference, arguing it discloses this limitation. Almeroth Report, ¶ 451. As such, Dr. Almeroth is conceding that DISH and TiVo do not disclose this limitation.

709. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. In addition, Dr. Almeroth failed to provide any substantive discussions on why a POSITA would have been motivated to combine DISH and/or TiVo with McDysan, let alone whether this combination renders obvious claim 3. As such, Dr. Almeroth failed

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to explain how his proposed combination would have rendered obvious this claim limitation.

710.    For example, with respect to claim 13, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 4 of the '667 patent. Almeroth Report, ¶ 471. Claim 13 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 4 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 4. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 452–455.

711.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "I understand that, for purposes of infringement, Plaintiffs have alleged that requiring a user to access content through using Viasat's systems satisfies this claim." Almeroth Report, ¶ 452.

712.    Simply put, this is not correct. As discussed below, this limitation has many elements, such as the NAS device, a secure region, and each element has specific requirements, including the secure region being inaccessible to the user without permission. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads), Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

713.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

714.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) being inaccessible by a user as required by claim 4, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 452–455. Further, Dr. Almeroth does not explain how a user supposedly makes the secure region inaccessible. Almeroth Report, ¶¶ 452–455.

715.    For example, with respect to claim 14, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 5 of the '667 patent. Almeroth Report, ¶ 472. Claim 14 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim 5. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 456–458.

716.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

limitation discussed above) as required by claim 5, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 456–458.

717.    For example, with respect to claim 15, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 6 of the '667 patent. Almeroth Report, ¶ 473. Claim 15 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claim elements 1[e] and 6. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 459–460.

718.    Dr. Almeroth makes inaccurate statements on Sandisk's infringement theories. For example, he demonstrates his lack of understanding on Viasat's infringement of the '667 patent by stating the following, without any citation or support:

- "…Plaintiffs seemingly allege that simply selecting media to store on a storage device is sufficient to meet this claim." Almeroth Report, ¶ 459.

719.    Simply put, this is not correct. As discussed below, this limitation has many element, such as the NAS device, a secure region, and each element has specific requirements, including instructions for controlling data. By failing to understand the appropriate interpretation of the claims (i.e., Sandisk's infringement reads),

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dr. Almeroth fails to support how his proposed reference and/or combination anticipates and/or renders obvious this limitation.

720.    Note that I explained Sandisk's infringement theory with respect to the '667 patent in my March 24, 2025 report, which I incorporate here by reference.

721.    As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 6, it is my opinion that it is not invalid at least for all of the reasons I addressed above for claim 11, and additionally Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 459–460.

722.    For example, with respect to claim 16, Dr. Almeroth, for this limitation, merely references his arguments described above regarding Claim 7 of the '667 patent. Almeroth Report, ¶ 474. Claim 16 is not invalid at least for all of the reasons I addressed above for claim 11. My responses to Dr. Almeroth's arguments regarding Claim 1 are described above, and are applicable to Dr. Almeroth's argument here. *See also* discussions on claims 4, 6, and 7. For this limitation, Dr. Almeroth relies on material directed to DISH and TiVo. Almeroth Report, ¶¶ 461–464.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

723. As discussed above, Dr. Almeroth failed to show how the proposed combination anticipates and/or renders obvious claim 11 of the '667 patent. Dr. Almeroth also fails to show how the proposed combination anticipates and/or renders obvious this claim. With respect to the secure region (which requires the indication limitation discussed above) as required by claim 7, it is my opinion that Dr. Almeroth failed to show what in his proposed combination corresponds to a secure region (in the NAS device). Dr. Almeroth fails to discuss what is the secure region *within* the NAS device, especially in which there is an associated indication thereof (as opposed to treating the secure region as the entire storage device). Almeroth Report, ¶¶ 461–464.

724. For at least these reasons, the identified claims of the '667 patent are valid over the proposed challenges from Dr. Almeroth based on DISH alone or in combination.

## IX. NON-INFRINGING ALTERNATIVES

725.    Viasat, via Dr. Almeroth's March 24, 2025, Report, raised several alleged non-infringing alternatives. However, these do not differ significantly than the non-infringing alternatives raised in Viasat's responses to plaintiff's second set of interrogatories. Viasat's Third Supplemental Objections & Responses to Plaintiff's Second Set of Interrogatories (Nos. 9-15) dated February 6, 2025 (pages 18-25) ("Viasat's NIA Response"). I incorporate my opinion expressed in my March 24 Report regarding those alleged Non-Infringing Alternatives herewith. Further, I will address each of Dr. Almeroth's arguments in this section and reserve the right to elaborate further.

726.    Dr. Almeroth has not attempted to establish that any of those NIAs would have been available to Viasat at the time of the hypothetical negotiation for the two different asserted patents. While Dr. Almeroth describes changes Viasat allegedly could make to its existing product, he does not show that Viasat could have made those changes at the relevant period of time.

### A.    '400 Patent – "Substituting or Publicizing Any Concealed Unique Identifiers"

727.    Dr. Almeroth first contends that the Accused Products are non-infringing because they do not "obtain a unique identifier ... where the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device." Almeroth Report, ¶¶ 482, 484. But as I have explained in my March 24 Report, it is my opinion that the Accused Products infringe and thus, they are not non-infringing alternatives.

728.        Dr. Almeroth then contends that changes could be made so that identifiers are not

a "unique identifier" that is "obtained from" "specific to" and "concealed by the PED,

and argues that the changes would require less than two hours to code an API and

approximately two days to fully test and deploy the API. Almeroth Report, ¶¶ 485-86.

But Dr. Almeroth does not provide any details to show that such a change or set of

changes would actually work or would satisfy the content owners. He hastily claims that

the changes can be made but does not even provide an example of such identifier that is

not unique to the device, not obtained from the device, not specific to the device, or not

concealed by the device. Dr. Almeroth does not establish that any airline customers

would find the vague solution acceptable nor that the content owners would allow it

given the importance of protecting the content at issue (stored movies/TV shows, Live

content and on demand movies and TV shows). Moreover, as I discussed in my March 24

Report, in various use cases of the Asserted Products, the ███████████████

███████ containing the unique identifier of the device is scrambled and hashed, making

fundamental changes to the transmission of ████████ throughout the system is not a

simple substitution work that can be done in hours. It would take months if not years for a

large group of engineers to implement. Further, as I discussed in my March 24 Report,

the W-IFE system of Viasat also uses a █████████████ that is unique to the device,

and that ████████ is also a unique identifier, making changes to this ████████

███ would violate DRM policy and is therefore commercially unacceptable. Thus, the

vague proposal is not shown to be a commercially acceptable non-infringing alternative.

**B.      '400 Patent – "Localizing Any Remote Trusted Servers"**

729.        Dr. Almeroth contends that Viasat could use a DRM system that does not

communicate with any remote trusted server and alleges that its ██████ and ████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

implementations are examples. Almeroth Report, ¶¶ 487-95. As explained in my March 24 Report, however, Viasat's implementation that uses ███████ and ███████ is still infringing, because it is reliant on communication with remote trusted servers to obtain necessary updates to the DRM policies that are used for authentication purposes. Dr. Almeroth does not identify any example of a DRM authentication system that is completely disconnected from a trusted remote server that would operate for its intended purpose for a continuous amount of time. Therefore, Dr. Almeroth's proposal is not a non-infringing alternative and certainly not a commercially acceptable alternative, because DRM policies need to be updated with content updates.

### C.    '400 Patent – "Not Providing Any Corresponding Access Key"

730.    Dr. Almeroth first contends that the Accused Products are non-infringing, because the Application Server sends the media content files and the DRM Server sends the access key, and hence "no single component of the Accused Product that provides both the encrypted media content and the corresponding access key." Almeroth Report, ¶¶ 497-500. This is incorrect, because the claim language does not require a "single component" to do both. Claim 1 requires a kiosk having a processor that is configured to provide both the encrypted media content and the corresponding access key, and independent claim 9 as a method claim does not require any specific component to carry out either. As I explained in my March 24 Report, the Accused Products across use cases infringe.

731.    Dr. Almeroth next contends that Viasat could "relocate the licensed servers and the token API to be cloud servers rather than local[ servers]" such that the license request and token request would not occur on the S4 server onboard. Almeroth Report, ¶ 501. This proposal still infringes, because the claims do not require that the license request and

token request occur onboard. As explained in my March 24 Report, the Accused Products infringe regardless of the license server's location. Furthermore, this proposal directly contradicts Dr. Almeroth's proposal in the preceding section to move license servers onboard.

732.    Dr. Almeroth, based on testimony from Mr. Finn Hughes, estimates that it would take two engineers to make this change in two weeks to 3 months, but again, it is not even clear what specific changes are to be made by the two engineers, and it is clear that this estimate would not include testing with customers or implementation on customer aircraft. Mr. Hughes Deposition at 167:5-169:18.

733.    When asked about this proposal at deposition, Mr. Hughes explained that such proposed change (that the contentions do not explain in detail) would involve having all of the encrypted content and the keys be delivered "from the cloud." He alleged that is what the ██████ solution currently does. Mr. Hughes Deposition at 167:5-169:18.

734.    But, Mr. Hughes also acknowledged that ████████████████████████ ██████████████. Therefore Dr. Almeroth's proposal is not a commercially acceptable solution at least to Viasat.

### D.    '667 Patent – "Removing the 'Encrypted' Boolean"

735.    Dr. Almeroth contends that ██████████████████████████ ████████████ does not infringe in the aviation use cases. Almeroth Report, ¶¶ 504-07. But as explained in my March 24 Report, it is an indication and the Accused Products do infringe.

736.    Dr. Almeroth next argues that "such a variable could easily be removed from the Accused Product without altering their functionality in any visible or notable way." Almeroth Report, ¶ 505. Specifically, Dr. Almeroth states that in the aviation use case,

███████████████████████████████████ and for the home use case, even though ██████████████████ it could be changed to do so or be removed. Almeroth Report, ¶ 507. I disagree.

737. As explained in detail in my March 24 Report, Viasat actually uses an indication of a NAS device having a secure region. This actually is an important part of the Viasat system. First, identifying if a region is encrypted or otherwise secure such as by having separate regions where encrypted content is stored would provide an indication that decryption keys must be identified to access the data in that region. Furthermore, regions that can only be accessed after authentication, including tokens provide a protected space to store media, and the indicator of a secure storage region identifies for any sub-system accessing that region, that security steps must be taken to access the files in that region.

738. Dr. Almeroth does not go into any details on how its system would be modified to remove ████████ or what that means. The ████████████ is checked by many different pieces of code and if ████████ had no value, the system would likely fail. It then says that the "variable" could be removed. It is not clear if Viasat is alleging that ████████████ would be removed entirely or if it would be changed in some way. Without those details, it is unlikely to be realistic. Moreover, it is not clear if this change was something that could have been performed at the time of the hypothetical negotiation or not.

739. It is also not clear how the system could function without an identification of a secure region, and provides no real analysis of what would happen if it either removed the ███████████████████████████ in the home use, it would be clear to a POSITA that not only is having a secure region important, but having an indication of a secure region is also important. Indeed, the stored content, the on-demand content and the Live

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

TV content is also copyrighted and DRM-protected material that requires different levels of protection based on the type of content and the requirements of the owners of the content. One important requirement is ensuring that the content cannot be copied in unencrypted form. Viasat's contentions do not explain how it would achieve a satisfactory level of protection for its content if it removed the requirement of providing an indication as required in the claims. Moreover, the ███████████ is used in many places in the source code, such that the value is not as important as the existence of ████████ to indicate that there is a ██████ available for storage of the content – thus, regardless of its value, it is an indication of the existence of a secure storage location because it only has a value if that storage location is connected and the VCDS client is programmed to look for the presence of the ███████ – regardless of its value – as an indication of a secure storage location. Thus, changing the value of ████████ would still infringe. And while the contention says that end users would not be impacted by this proposed change in functionality, Viasat failed to present any contention that the owners of the content would find the solution acceptable. For example, would the movie and TV studios whose content Viasat is handling accept a solution where the VCDS client is transmitting the content to a storage device that may not be secure. Indeed, it is my view that the owners of that content would not find the proposed change to be acceptable.

740.    Further, Dr. Almeroth estimates that the changes proposed could be achieved in four weeks of time and about $100,000 in cost. Almeroth Report, ¶ 509. But such time and cost estimates are not backed up by any documentary evidence. The sole source of this estimate was Mr. Newman. Mr. Newman Deposition at 111:16-112:8. When asked at deposition, Mr. Newman said it was based on his experience. *Id.* Importantly, the time

estimated is just the time to make the changes and test it internally. *Id.* at 112:9-115:4.

Yet Viasat also indicated that it always tests changes with customers before it is rolled

out to every system. For example, Viasat is testing its Live TV operations with Delta on

five planes and that test has been ongoing for months and is still not concluded. Mr. Neri

Deposition at 66:7-68:7; Mr. Newman Deposition at 56:5-58:7. Therefore, the four-week

time estimate is likely significantly shorter than any realistic timeframe between when

Viasat would intend to change the system and when it could actually be implemented on

every airplane and home in its network of customers. Further, for in-the-air and in-home

users, Viasat has not indicated how it could roll out such changes to systems that are in

operation and how long that process would take, or the cost associated with that roll out.

It is likely that the change that Viasat is proposing could not be implemented over-the-air

and would require manually updating every in-home user's equipment and every system

on every airplane in service. This is even more reason why the proposed change is not a

commercially acceptable non-infringing solution.

### E.      '667 Patent – "Removing the 'Secure Region'"

741.      Dr. Almeroth contends that the Accused Products do not have a NAS device with

a "secure region." Almeroth Report, ¶ 511. But, as discussed in my March 24 Report, the

Accused Products do have an NAS device with the required "secure region ..." and thus

infringe. Viasat's Accused Products do indeed have a secure region comprising a buffer

for streaming media, and it is an important part of their system.

742.      Next, Dr. Almeroth contends that the media content stored is often protected

using DRM security, and the storage encryption is redundant and can be removed with "a

minor effect on the security of the Accused Products." Almeroth Report, ¶ 512. Further,

Dr. Almeroth argues that the storage drive can be left unencrypted and therefore is not

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"secure" and does not have a "secure region." Almeroth Report, ¶ 513.  But again, Dr. Almeroth does not go into details on how Viasat would implement this change. The content file is still DRM secured, as Dr. Almeroth admits, and it is likely that each file would still be encrypted either individually or in an encrypted zip file, for example. Therefore, depending on the change proposed, the system likely would still have a secure region because that is what is used to protect this content. Indeed, Mr. Hughes testified, as discussed above, that the movies and TV shows are stored as DRM-encrypted packaged files in separate sub-folders such that the separate sub-folders are thus secure regions. Mr. Hughes Feb. 28 Deposition at 105:4-16. Contrary to Viasat's contention, there would still be a separate region because the system does not store DRM-encrypted packaged files in the same sub-folder as any unencrypted content

743.    For this proposed change, Dr. Almeroth estimates that it would take three months and $500,000 to implement the above discussed change. Almeroth Report, ¶ 516. And the sole source of support for that estimate is from Mr. Dan Newman. That time and cost estimate does not include any testing with airlines or deployment according to Mr. Daniel Newman. Mr. Newman Feb. 7 Deposition at 115:13-117:5. Mr. Newman also testified that this proposed change likely would have to be done manually and he did not include any estimate of what that would cost. Thus, Viasat has not substantiated what the purported estimate on the total cost of this alleged design around would be and also has not provided any indication that the solution would be acceptable to the airline customers. For these additional reasons, it is my opinion that this is not a commercially acceptable non-infringing alternative.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## X.    OBJECTIVE INDICIA OF NONOBVIOUSNESS

744.    As I indicated in my opening report, I provided thoughts on objective indicia of non-obviousness of the Asserted Patents. For completeness, I repeat my discussion in this section.   I have been asked to provide opinions regarding the existence of objective indicia of non-obviousness of the Asserted Patents. I understand that certain objective evidence is relevant to the issue of obviousness. I understand that such evidence, sometimes referred to as "secondary considerations," may include evidence of commercial success of the claimed invention, industry praise, long-felt but unsolved needs, failure of others, and unexpected results. I understand that there must be a "nexus" between the objective indicia of non-obviousness and the claimed invention, considering the invention as a whole.

745.    As explained below, it is my opinion that objective indicia of non-obviousness are present for the Asserted Patents.

### A.    Commercial Success

746.    I understand that Viasat's W-IFE, Live-TV and InFlight and Home OnDemand features that operate on the Accused Systems for both patents have been commercially successful for Viasat. ███████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ I understand from a conversation with Lauren Kindler that these numbers were determined from reviewing VIASAT_0013272 and VIASAT_00052299.

747.    In my opinion, the commercial success of the Accused Systems is in large part attributable to Viasat's use of the claimed inventions of the Asserted Systems. As

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

discussed above in Section V, which I incorporate here, the Asserted Patents contribute to at least the following benefits:

748.    The '400 patent enables Viasat to deliver stored movies and TV shows from the airplane in Use Cases 1-3 and that the home user receives in Use Case 4 are provided only to authenticated devices without having to update any authentication rules manually on the airplane for Use Cases 1-3 or in the user's homes for Use Case 4. For DRM-protected content, that enables delivery of content on the airplane without having to manually update those DRM rules and policies to the airplane. Without use of a remote server to supply information used to authenticate a user device before providing the content to the user device, Viasat would have to manually update the policies and rules used for authentication at a greater expense and inconvenience given the number of aircraft that would need to be manually updated and the number of individual Stream users for Use Case 4. That capability is a point that can be emphasized to Viasat's customers who do not have to be inconvenienced by allowing a third-party access to its airplanes to perform the manual updates. VIASAT_00003234 (Presentation entitled "VCDS Overview" dated February 2020) at 235 ███████.

749.    Similarly, the '667 patent enables Viasat to ensure that the content (e.g., IPTV, IFE, or home content) that it receives for playback is stored securely in a NAS device, such that it can be retrieved and replayed to avoid retransmissions of the same content over Viasat's bandwidth constrained satellite network infrastructure.

For example, VIASAT_00100497 explains 

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████." VIASAT_00100497 at

502. Importantly, Viasat explains that its Live TV offering "needs to scale to high

peak demand." VIASAT_00100497 at 506. Viasat's bandwidth constrained

network would likely not be able to support demand for streaming IPTV, IFE, and

home content without the use of the caching functionality which is enabled by the

claimed features of the '667 patent.



Figure 2. Viasat Satellite Network – Satellite CDN with Multicast + Caching

## B.    Long-Felt Need

750.    The '400 patent mentions several problems with existing DRM solutions that did

not rely on a remote trusted server (like the '400 patent). '400 patent at 1:32-35. At

the same time, "content owners demanded a very high level of protection for their

content. So they demanded the highest level of protection possible." Ybarra Tr. at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

101:24-102:2. Thus, there was a clear and long-felt need for a DRM solution that would be acceptable to the media content owners, such that the media content owners would allow for their content to be stored on a hard drive and accessible to end-users. By making the media content accessible to end-users, the media content was at a risk of being pirated unless a "high[] level of protection" was offered by the DRM solution. The '400 patent's DRM solution provided such a solution.

751.    The '667 patent mentions several problems that were well known prior to the '667 patent, and which the '667 patent solved. The '667 discusses bandwidth constrained internet pipes, and in particular, pipes that were constrained using throttling as a way of controlling bandwidth. Throttling was indeed a common method of controlling bandwidth.[12,13,14] However, throttling frequently lead to dissatisfied users.[15] In some cases, instances of throttling were determined to be illegal.[16]  There was a long felt need to be able to manage bandwidth usage, without throttling. Customers frequently reported issues with streaming quality of service[17,18]  However, while "net neutrality" was presented as a solution for

---

[12] https://www.codeproject.com/Articles/18243/Bandwidth-throttling

[13] https://ventspace.wordpress.com/2010/10/02/confirmed-clear-wimax-bandwidth-throttling/

[14] https://www.cbc.ca/news/science/crtc-to-decide-on-new-rules-for-internet-service-providers-1.841549

[15] http://news.bbc.co.uk/2/hi/technology/8077839.stm

[16] https://www.cnet.com/tech/tech-industry/fcc-formally-rules-comcasts-throttling-of-bittorrent-was-illegal/

[17] https://www.dell.com/community/en/conversations/windows-general/streaming-video-problems/647e82c8f4ccf8a8de2543d4

[18] https://www.prestosports.com/common-issues-while-live-broadcasting-live-sports-how-to-fix-them/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

throttling (*see* Jenkins Tr. at 56:22-57:11, 61:8-21), there was a strong need for a solution to the problem of the internet pipe being too narrow to transmit media content at the volume and quality demanded by users. The '667 provided such a solution.

752.    It should be noted that while streaming video on flights is now common, before the '667 and '400 patents it was not. While stored single movies have been offered in flight for many years, the first email was sent from an airplane in flight in 2001.[19]

753.    Since 2010 streaming in flight has grown.[20]  Being able to effectively stream video while maintaining quality of service, and avoiding throttling have been problems for many years, and represent a long felt need for a solution.

---

[19] https://imagikcorp.com/brief-history-flight-entertainment/

[20] https://aviationforaviators.com/2024/11/30/in-flight-entertainment-systems/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## XI.    OPINIONS AND CONCLUSIONS

754.    Based on the evidence cited in this report, my analysis explained in this report, and my education, experience, and training, I have formed several expert opinions:

755.    It is my expert opinion that the asserted claims of the '400 patent are valid, including in light of the arguments and prior art discussed in Dr. Almeroth's Opening Invalidity Report.

756.    It is my expert opinion that the asserted claims of the '667 patent are valid, including in light of the arguments and prior art discussed in Dr. Almeroth's Opening Invalidity Report.

757.    It is also my opinion that Dr. Almeroth has not identified any commercially acceptable non-infringing alternatives available at the time of the alleged hypothetical negotiation.

758.    It is also my opinion that there are objective indicia of non-obviousness for both of the '400 and '667 patents.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Plano, Texas on the ⎯14th of April⎯ 2025.

Dr. William C. Easttom II