QUINN EMANUEL URQUHART & SULLIVAN, LLP
Steven Cherny (*pro hac vice*)
stevencherny@quinnemanuel.com
Patrick D. Curran (Bar No. 241630)
patrickcurran@quinnemanuel.com
Hannah Dawson (*pro hac vice*)
hannahdawson@quinnemanuel.com
Tzivya H. Beck (*pro hac vice*)
tzivyabeck@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100
Facsimile:   (617) 712-7200

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Nicola R. Felice (*pro hac vice*)
nicolafelice@quinnemanuel.com
Anastasia M. Fernands (*pro hac vice*)
anastasiafernands@quinnemanuel.com
Vanessa Blecher (*pro hac vice*)
vanessablecher@quinnemanuel.com
Alicia Lai (*pro hac vice*)
alicialai@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Attorneys for Defendant Viasat, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> VIASAT, INC., <br><br> Defendant. | Case No.: 4:22-cv-4376-HSG <br><br> **DEFENDANT VIASAT, INC.'S RESPONSE IN OPPOSITION TO SANDISK'S DAUBERT MOTION TO EXCLUDE CERTAIN OPINIONS OF GARETH MACARTNEY, PH.D [DKT. 208]** <br><br> ▮▮▮▮▮▮▮▮▮▮ <br><br> **Hearing** <br> Date: August 21, 2025 <br> Time: 2:00 pm <br> Judge: Hon. Haywood S. Gilliam, Jr. <br> Courtroom: 2, 4th Fl. <br>     1301 Clay Street <br>     Oakland, CA 94612 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. LEGAL STANDARD ............................................................................................................2

III. ARGUMENT .........................................................................................................................3

    A. Plaintiffs Challenged Only Three Paragraphs of Dr. Macartney's Report ................3

    B. Paragraph 121: Dr. Macartney's Analysis Of The ▮▮▮ Agreement Is Admissible ...................................................................................................................3

    C. Paragraph 76: Dr. Macartney's Opinions On The Arconics Agreement Are Admissible ...................................................................................................................6

    D. If Necessary, Viasat's Technical Expert Would Opine that Both the ▮▮▮ (Paragraph 121) and Arconics (Paragraph 76) Agreements are Technically Comparable ................................................................................................................9

    E. Paragraph 87: Dr. Macartney's Critiques of Ms. Kindler's "Bitrate" Opinions Are Admissible ...................................................................................................................9

IV. CONCLUSION ....................................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .................................................................................................. 7

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
   No. 14-CV-62369, 2016 WL 9402395 (S.D. Fla. May 3, 2016),
   *vacated in part on other grounds*, 876 F.3d 1350 (Fed. Cir. 2017) ........................................... 8

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
   No. CV 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018) ....................................... 6, 8

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020). ................................................................................................ 8

*Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*,
   No. CV H-15-0656, 2016 WL 7188657 (S.D. Tex. Dec. 12, 2016) .......................................... 8

*Casillas v. Fresno*,
   No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747 (E.D. Cal. Feb. 13, 2019) ......................... 11

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
   No. 15-CV-02177-SI, 2017 WL 4772348 (N.D. Cal. Oct. 23, 2017) ................................... 2, 6

*Dalen Prods., Inc. v. Harbor Freight Tools, USA*,
   No. 3:07-CV-179, 2010 WL 3083543 (E.D. Tenn. Aug. 5, 2010) ......................................... 11

*Ericsson, Inc. v. D-Link Systems, Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ................................................................................................ 6

*Fractus, S.A. v. Samsung Elecs. Co.*,
   876 F. Supp. 2d 802 (E.D. Tex. 2012) ..................................................................................... 5

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .............................................................................................. 3, 8

*Image Processing Techs., LLC v. Samsung Elecs. Co., Ltd.*,
   No. 2:20-cv-00050-JRG-RSP, 2020 WL 2499736 (E.D. Tex. May 14, 2020) ..................... 6, 7

*Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*,
   391 F. Supp. 3d 959 (N.D. Cal. 2019) ...................................................................................... 3

*Krommenhock v. Post Foods, LLC*,
   334 F.R.D. 552 (N.D. Cal. 2020) .............................................................................................. 3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................... 2

*Palantir Techs. Inc. v. Abramowitz*,
    No. 19-cv-06879-BLF, 2022 U.S. Dist. LEXIS 255622 (N.D. Cal. Nov. 3,
    2022) .................................................................................................................................. 5

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ......................................................................................... 2, 3

*TVIIM, LLC v. McAfee, Inc.*,
    No. 13-CV-04545-HSG, 2015 WL 4148354 (N.D. Cal. July 9, 2015) ............................ 6, 7

*Vidstream, LLC v. Twitter, Inc.*,
    No. 3:16-CV-00764-N, 2025 WL 624514 (N.D. Tex. Feb. 25, 2025) ................................. 5

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
    No. CV 11-515-LPS-CJB, 2015 WL 12731924 (D. Del. Nov. 4, 2015) ............................ 9

**Rules & Statutes**

Fed. R. Evid. 702 ........................................................................................................................ 2

## I. INTRODUCTION

Plaintiffs seek to exclude three paragraphs in the rebuttal expert report of Dr. Gareth Macartney, Viasat's damages expert. According to Plaintiffs, Dr. Macartney offered "technical" opinions in these paragraphs that are outside his qualifications. But Dr. Macartney offered no technical opinions; he offers properly supported *economic* opinions well within his expertise.

First, Plaintiffs seek to exclude Dr. Macartney's opinion (¶ 121) regarding Viasat's agreement with ▮▮▮. Plaintiffs allege that specific DRM software that Viasat licenses from ▮▮▮—software called "▮▮▮"—infringes the '400 patent. Plaintiffs' infringement contentions call out ▮▮▮" by name, and Plaintiffs' infringement expert Dr. Easttom likewise specifically accuses ▮▮▮ of infringement. Dr. Macartney examined the economic terms of Viasat's software license agreement with ▮▮▮ and specifically identified the financial line item identified as ▮▮▮ license" in that agreement. Dr. Macartney then used the amount Viasat actually pays for its ▮▮▮ license" as part of his economic analysis. Incredibly, Plaintiffs now claim that, even though they specifically accuse ▮▮▮ of infringement by name, Dr. Macartney nonetheless needed a technical expert to opine that ▮▮▮ is comparable to the patented technology. This makes no sense. Because ▮▮▮ is accused of infringement, ▮▮▮ is not just *comparable* to the technology at issue—it *is the* technology at issue. Courts routinely allow damages experts to do precisely what Dr. Macartney did: analyze the financial terms of a license agreement covering the specific technology accused of infringement.

Second, Plaintiffs seek to exclude Dr. Macartney's opinion (¶ 76) concerning Viasat's acquisition of Arconics. Plaintiffs accuse Viasat's "wireless in-flight entertainment" or "W-IFE" product of infringement. Arconics created the technology for the W-IFE product that is accused of infringement, and Viasat purchased that entire company for $21.6 million. Dr. Macartney opined that this purchase price is an economic "reality check" on Ms. Kindler's damages assertions: Viasat would be unlikely, from an economic perspective, to pay Western Digital significantly more to license two patents that allegedly cover features of the W-IFE product than what Viasat paid for the entire company (including the product itself). That is not a technical opinion, it is an economic one.

Third, Plaintiffs claim that Dr. Macartney's discussion (¶ 87) of "bitrate" (the rate at which data is transferred in a streaming media transmission) is an impermissible "technical" opinion. But Western Digital's own damages expert opines extensively on bitrate—indeed, much of her economic analysis is based on it. And Ms. Kindler nowhere identifies any "technical" basis for her opening report's opinions regarding bitrate. Dr. Macartney was simply *responding* to Ms. Kindler's (flawed) calculation of the supposed "bitrate" for video data transfers in the accused product. As he explained, the appropriate "bitrate" Ms. Kindler should have applied is one already specifically listed in Viasat's contracts with its customers. Dr. Macartney also explained that Ms. Kindler's much higher calculated "bitrate" ignored both the contracts and the realities of data compression. But merits aside, Plaintiffs cannot have it both ways. Either "bitrate" is something **both** economic experts can address, or "bitrate" is a technical issue that **neither** damages expert can address. If Dr. Macartney is insufficiently technical to say Ms. Kindler's calculated "bitrate" was wrong, certainly Ms. Kindler lacks the technical qualifications to calculate "bitrate" in the first instance.

Viasat respectfully requests that the Court deny Plaintiffs' Daubert motion and permit Dr. Macartney to testify regarding the three challenged paragraphs in his rebuttal report.

## II. LEGAL STANDARD

"Federal Rule of Evidence 702 permits expert testimony where '(a) a scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.'" *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 4772348, at *1 (N.D. Cal. Oct. 23, 2017) (quoting Fed. R. Evid. 702). "'[T]he test of reliability is *flexible*' … and the trial court has discretion to decide … whether the testimony is reliable, based on the 'particular circumstances of the particular case.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) and *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

A party seeking to exclude an expert's opinions under Rule 702 is "required" to "identify with … specificity the paragraphs, pages, or subject matters … that they want excluded," "tied to

the evidence supporting that specific exclusion request." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 585 n.29 (N.D. Cal. 2020). The inquiry into the admissibility of an expert opinion is a "flexible one" where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. Partnership v. Microsoft Corp.,* 598 F.3d 831, 852 (Fed. Cir. 2010).

## III.  ARGUMENT

### A.  Plaintiffs Challenged Only Three Paragraphs of Dr. Macartney's Report

As a threshold matter, Plaintiffs specifically challenge only three paragraphs—paragraphs 76, 87, and 121. *See id.* at 2. This is therefore the full extent of testimony at issue; a party seeking exclusion must identify with specificity "the paragraphs, pages, or subject matters" they seek to exclude. *Krommenhock*, 334 F.R.D. at 585 n.29. Any request to exclude opinions beyond the three cited paragraphs of Dr Macartney's rebuttal report should be denied summarily. *Id.* (denying request to exclude where challenged material was not identified with specificity). Viasat's arguments in this opposition are therefore directed to the three paragraphs Plaintiffs actually challenge.[1]

### B.  Paragraph 121: Dr. Macartney's Analysis Of The ▬▬ Agreement Is Admissible

Plaintiffs seek to exclude Dr. Macartney's discussion of Viasat's license agreement with ▬▬. Viasat licenses from ▬▬ the DRM software (called ▬▬ or ▬▬ DRM") that Plaintiffs accuse of infringing the '400 patent. Dr. Macartney therefore considered the financial terms of Viasat's license with ▬▬ as part of his economic analysis. This should not be

---

[1] If Plaintiffs later claim in their reply brief that additional paragraphs not identified in the opening brief are at issue, those arguments are improper. *See, e.g., Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*, 391 F. Supp. 3d 959, 969 n.3 (N.D. Cal. 2019) (finding new arguments and evidence in reply briefing had been "waived" because "[i]t is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers").

1  controversial. Yet Plaintiffs now claim Dr. Macartney is prohibited from considering Viasat's
2  license to the accused DRM software unless a technical expert first says the accused technology is
3  "comparable" to the patents Plaintiffs are asserting. Mot. 7-8.
4  　　　　Plaintiffs' argument is odd, and a bit circular: if there are any damages awarded in this case,
5  it will be *because* Plaintiffs showed their patents are comparable (in fact, identical) to the accused
6  products. This is not a circumstance where two similar but distinct technologies are being compared,
7  and the degree of technical comparability must be determined; Viasat's agreement with ▬▬
8  concerns the *very same software* (the ▬▬▬ software) that Plaintiffs accuse of infringement. It is
9  therefore not merely "comparable"—it is, on its face, *identical*.
10 　　　　For example, Plaintiffs' infringement contentions explicitly accuse the exact same ▬▬
11 ▬▬ software licensed in the ▬▬ agreement that Dr. Macartney relies on. Dkt. 146-3 at 50.

[redacted block]

18 *Id.* Dr. Easttom, Plaintiffs' own technical expert, likewise specifically accuses this ▬▬
19 software as infringing the '400 patent in his expert report. Dkt. 211-6 ¶ 270. Viasat's technical
20 expert, Dr. Kevin Almeroth, agrees that ▬▬ is accused; as he explained in his April 14, 2025
21 report: "Viasat's W-IFE system uses ▬▬, '▬▬▬▬▬▬▬▬▬▬▬
22 ▬▬'" for its DRM pursuant to the ▬▬ Agreement. Ex. A ¶¶ 43-44. Dr. Almeroth further
23 explained that the ▬▬ Agreement between Viasat and ▬▬ covers the accused technology for
24 the '400 patent: "the ▬▬▬▬▬▬▬▬ are [a] ▬▬ functionality under the Viasat-
25 ▬▬ agreement that Plaintiffs allege to correspond with the accused functionality and to practice
26 the Asserted Patents." *Id.* ¶ 44. Dr. Almeroth further explains that the "▬▬ license… accounts
27 for ▬▬▬▬▬▬▬" under "the Viasat-▬▬ agreement." *Id.*
28

1    Thus, "████" is not simply "comparable" to what is accused—"████ *is* what Plaintiffs
2    accuse. It is more than defensible for Dr. Macartney to look at market pricing for ████ in
3    assessing damages.
4    Dr. Macartney uses the financial terms of Viasat's agreement with ████—and specifically,
5    the percentage of that license payment ████████████████ tied to line items labeled
6    "████ license"—as a data point for the value of the relevant DRM technology. Dkt. 209-3 ¶ 121;
7    Ex. B (excerpt from Macartney work papers); *see also* Ex. A (Almeroth Rpt.) ¶¶ 43-44; Dkt. 208-4
8    at '03. This type of economic analysis is routinely allowed. *See, e.g., Palantir Techs. Inc. v.*
9    *Abramowitz*, No. 19-cv-06879-BLF, 2022 U.S. Dist. LEXIS 255622, at *35 (N.D. Cal. Nov. 3,
10   2022) (concluding that "showing of baseline comparability" was met where "the licenses [we]re
11   drawn to the technology at issue," and "denying [defendant]'s motion to exclude"); *Fractus, S.A. v.*
12   *Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 837 (E.D. Tex. 2012) (rejecting challenge to reliance on
13   licenses, and argument that licenses relied on were not comparable, where "[a]ll of the licenses
14   relate[d] to the technology," and reasoning that "[t]he jury was free to weigh the probative value of
15   these licenses in determining the proper reasonable royalty rate").
16   Plaintiffs' assertion (Mot. 7-8) that the ████ agreement is not comparable if the agreement
17   does not provide an itemized list of *patent* rights conveyed is also incorrect. Patent licenses are not
18   the only agreements that are relevant in a hypothetical negotiation; an expert "may rely on other
19   types of agreements when they are 'closely comparable, and the expert expressly addresses the
20   differences between those negotiations and any hypothetical negotiations.'" *Vidstream, LLC v.*
21   *Twitter, Inc.*, No. 3:16-CV-00764-N, 2025 WL 624514, *2-*4 (N.D. Tex. Feb. 25, 2025) (denying
22   motion to exclude patentee's damages expert's testimony on reasonable royalty damages and
23   finding an enterprise services agreement comparable). Particularly relevant here, reliance on another
24   type of agreement—such as a services agreement—is permissible where the agreement "involves
25   access to the technology embodied by the asserted patents." *Id.* (citations omitted). Plaintiffs' own
26   infringement expert's opinions establish that ████ technology ("████") is the accused
27   technology. Thus, under Plaintiffs' theory, the ████ agreement necessarily provides Viasat access
28

to the alleged patented technology. Any fights over the degree of comparability go to weight and credibility, and can be assessed by the jury at trial.

### C. Paragraph 76: Dr. Macartney's Opinions On The Arconics Agreement Are Admissible

Dr. Macartney's reliance on Viasat's agreement to purchase the accused W-IFE product by purchasing the company that made the W-IFE product (Arconics) was proper economic analysis. Plaintiffs' own damages expert discussed this same transaction and agrees that the Arconics purchase allowed Viasat to "integrate W-IFE services into its existing IFC offering." Ex. ## (Kindler) ¶ 22. The Arconics agreement is thus not merely comparable to what Plaintiffs are accusing—the agreement is the purchase agreement for the very same W-IFE business Plaintiffs accuse. Dr. Macartney's use of that agreement as a "reality check" against Plaintiffs' inflated damages calculations is logical and admissible without any separate "technical" opinion.

To rely on an agreement, an expert need only show that an agreement is "sufficiently comparable to the hypothetical license at issue," "not [that it is] perfectly analogous." *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 4772348, at *3 (N.D. Cal. Oct. 23, 2017) (quoting *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014)) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."). "[N]o authority requir[es] experts to use … magic words" to establish this baseline. *See TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2015 WL 4148354, at *3 (N.D. Cal. July 9, 2015) (denying *Daubert* motion premised on the fact that Defendants' expert had failed to establish economic comparability). Licenses to the asserted patents or to embodiments of the claimed invention routinely satisfy the baseline comparability test for admissibility. *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, No. CV 15-152-RGA, 2018 WL 5729732, at *3 (D. Del. Nov. 2, 2018) (admitting testimony where "[l]icense and the hypothetical negotiation relate to substantially the same portfolio of patents"); *Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017 WL 4772348 (N.D. Cal. Oct. 23, 2017) (admitting damages expert's reliance on license "for the commercial embodiment" of the asserted patent); *cf. Image Processing Techs., LLC v. Samsung Elecs. Co., Ltd.*, 2:20-cv-00050-JRG-RSP,

2020 WL 2499736 (E.D. Tex. May 14, 2020) (admitting damages testimony and recognizing that "methodology of valuing infringed features based on comparable features in the marketplace has already been endorsed by the Federal Circuit"). Once "baseline comparability" has been shown, "any dispute about the '*degree* of comparability' of the two transactions **should be left to the jury to decide**." *TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2015 WL 4148354, at *3 (N.D. Cal. July 9, 2015) (quoting *ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.,* 694 F.3d 1312, 1333 (Fed. Cir. 2012)) (emphasis added).

The Arconics agreement clearly satisfies the "baseline comparability" standard. Indeed, as Plaintiffs' own damages expert acknowledged, Viasat's $21.6 million purchase of the entirety of Arconics included the very W-IFE product that is accused in this case. Dkt. 208-2 ¶¶ 12-13; *accord* Ex. C (Kindler Rpt.) ¶ 22. This agreement—which encompassed exactly what Plaintiffs accuse—is more than "baseline" comparable.

Dr. Macartney's analysis of this purchase agreement was economic, not technical. Dr. Macartney used multiple sources of evidence to confirm that the $21.6 million purchase price for Arconics included the technology Plaintiffs accuse in this case. For example, the press release Viasat and Arconics issued when Viasat acquired Arconics confirmed that Viasat acquired wireless in-flight entertainment technology: Viasat received "the Arconics App Suite, which spanned wireless In-flight Entertainment (IFE), Electronic Flight Bag (EFB), Airline Document Management and Cabin Management solutions, to communicate and share data with the aircraft and, using available connectivity, to connect with ground systems across mobile or avionics platforms." Dkt. 208-2 ¶ 12. Viasat engineer Finn Hughes, who previously worked at Arconics until it was acquired by Viasat, likewise testified about Arconics' wireless IFE offering, including Arconics source code ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. D at 35:12-37:23, 188:7-23. Dr. Macartney also relied on multiple sources—the deposition of Joshua Slater, the deposition of Des O'Sullivan, an interview with Viasat employee Daniel Newman, and an interview with Viasat's technical expert, Kevin Almeroth—to confirm his understanding of the transaction and the technologies included. Dkt. 208-2 ¶¶ 12-13 & nn.34-40; *id.* ¶ 76 & nn.265-266. As one example, Dr. Macartney relied on the deposition of Josh Slater (*see id.* nn.35, 36, 265), the Viasat engineer in charge of the in-flight-

entertainment product owner at the time of the Arconics acquisition, who explained that Arconics offered a "previously-built solution" for Viasat's "in-flight entertainment product," which Viasat "integrated … with [its] systems"—specifically its "in-flight connectivity and other applications, servers, and software." Ex. E (Slater Dep. Tr.) at 36:9-25 (cited Dkt. 208-2 n.34); *id.* ¶ 36:9-37:19 (cited Dkt. 208-2 n.38). Dr. Macartney also conferred with Daniel Newman and Kevin Almeroth to confirm his understanding that the accused technologies represent a "small fraction" of what Viasat received from Arconics, meaning that only a fraction of the $21.6 million purchase price was attributable to W-IFE—and making a $21.6 million "reality check" highly conservative. Dkt. 208-2 ¶ 76. Consideration of such real-world evidence is not only permissible but routinely permitted.[2]

Plaintiffs appear to dispute (Mot. 8-9) the ***degree*** of comparability, but such disagreements "go to the testimony's weight, … not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). To the extent that Plaintiffs wish to levy critiques of Dr. Macartney's analyses, cross-examination is the proper vehicle. *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, No. CV 15-152-RGA, 2018 WL 5729732, at *3 (D. Del. Nov. 2, 2018) (degree of technological comparability was "a factual dispute, not a methodological issue[,]" so "[t]he soundness of the logic behind [the damages expert's] conclusion is an issue for the jury").

---

[2] *Bio-Rad* is instructive. In that case, the district court rejected a *Daubert* challenge to a damages expert who opined that "no adjustment would be necessary in order to account for technical comparability, as both the … [l]icense and the hypothetical negotiation relate to substantially the same portfolio of patents." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, No. CV 15-152-RGA, 2018 WL 5729732, at *3 (D. Del. Nov. 2, 2018). On appeal, the Federal Circuit affirmed the district court's decision to permit the damages expert to testify and its finding of "baseline comparability" for the licenses the damages expert relied on, since the licenses covered patents related to microfluids, which was the same subject matter as the asserted patents. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, at 1372-74 (Fed. Cir. 2020). *See also Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, No. 14-CV-62369, 2016 WL 9402395, at *5 (S.D. Fla. May 3, 2016), *vacated in part on other grounds*, 876 F.3d 1350 (Fed. Cir. 2017) (rejecting argument that licensing proposal was insufficiently comparable where it "offer[ed] to license …. the same technology covered by the patents-in-suit"); *Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*, No. CV H-15-0656, 2016 WL 7188657, at *7-*8 (S.D. Tex. Dec. 12, 2016) (denying motion to exclude accused infringer's damages expert opinion, and rejecting contention that the expert's opinion, which relied on a license agreement to an alleged non-technologically comparable product, rendered the damages opinion inadmissible, where the party could "present[s] evidence at trial to prove those underlying assumptions" about technological comparability).

**D.     If Necessary, Viasat's Technical Expert Would Opine that Both the ▮▮▮ (Paragraph 121) and Arconics (Paragraph 76) Agreements are Technically Comparable**

Even if Plaintiffs were correct (and they are not) that Dr. Macartney needed a technical expert to say the magic word that the ▮▮▮ and Arconics are "comparable," the proper remedy would not be exclusion. Where only a "short addendum" is needed to "establish[] a 'discernible link' between the licensed technology and claimed invention" the "equities favor allowing such a supplemental report." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. CV 11-515-LPS-CJB, 2015 WL 12731924, at *7 (D. Del. Nov. 4, 2015) (declining to exclude expert who was required to support comparability but failed to do so). Plaintiffs' requested relief is not proportional or equitable here. Plaintiffs were, and are, on notice that the ▮▮▮ and Arconics agreements were relevant and address comparable technology—indeed, they expressly accused the ▮▮▮ technology. *See, e.g.,* Dkt. 201-3 ¶ 514 (noting Viasat's use of ▮▮▮▮▮▮▮▮▮▮ And their own damages expert's opening report cites both agreements as documents she "reviewed and considered." Ex. C, App'x. B, at p. 5 (citing VIASAT_00016483 - 00017758, inclusive of the Arconics acquisition agreement at VIASAT_00016488-7758); *id.*, (citing VIASAT_00014400 - 00014415, the ▮▮▮ agreement). Ms. Kindler also cited and discussed primary and secondary sources for additional context about the Arconics agreement, including SEC filings, internal Viasat materials, and third-party analysis and coverage of the same—leading her to conclude that since "Arconics provided W-IFE services[,]" "the acquisition … allowed [Viasat] to integrate W-IFE services into its existing IFC offering." *Id.* ¶¶ 21-22 & nn.47-52. In those circumstances, even if some additional "magic words" were required before Dr. Macartney could consider the economic terms of the agreements (and no "magic words" were required), Viasat should be permitted to supplement to provide any additional linkage the Court may deem necessary. Exclusion is thus not appropriate.

**E.     Paragraph 87: Dr. Macartney's Critiques of Ms. Kindler's "Bitrate" Opinions Are Admissible**

Finally, Plaintiffs challenge Dr. Macartney's critique of "certain inputs" to Ms. Kindler's calculations on "bitrate," claiming that when Ms. Kindler talks about "bitrate," it is a ***damages*** opinion, but that when Dr. Macartney talks about "bitrate," it is a ***technical*** opinion based on

"technical expertise he does not have." Mot. 9. This is meritless. Ms. Kindler and Dr. Macartney are both economists. They both have experience in the same field. Neither possesses a technical degree or purports to offer technical opinions. If Dr. Macartney cannot discuss "bitrate" or critique Ms. Kindler's calculation of "bitrate" because doing so requires "technical expertise," then Ms. Kindler *likewise* cannot address "bitrate"—and her own opinions on "bitrate" (which are offered extensively throughout her opening report) should be excluded for the same reason.

Plaintiffs' double standard is clear from the nature of this dispute. Ms. Kindler relied on two documents to offer opinions about "bitrate" issues: a Viasat webpage concerning residential service and a resolution requirement from a Viasat contract with an airline customer. Ex. C ¶ 175.b.ii, nn.698-701. The Kindler Report does not cite any written opinion from any technical expert, nor any conversation with any technical witness, to support her opinion concerning the "bitrate" purportedly required by Viasat.[3] *Id.* Either Ms. Kindler's opinions on bitrate (unsupported by any technical foundation) are nevertheless permissible or, if Plaintiffs' arguments to the contrary are correct, Ms. Kindler's opinions on bitrate must also be excluded as unreliable.

Plaintiffs' specific argument concerning Dr. Macartney's discussion of "compression" fares no better. In background discussion, Ms. Kindler purports to identify certain "software strategies" for increasing capacity, including "Compression techniques," citing one article and no expert opinions as support. *Id.* ¶ 47, n.166. Dr. Macartney addresses Ms. Kindler's failure to discuss compression when she calculates inflated bitrates. Indeed, the portion of Dr. Macartney's rebuttal that Plaintiffs seek to exclude is simply the observation that Ms. Kindler's bandwidth opinions do *not* take compression into account. Dkt. 209-3 ¶ 87. If Ms. Kindler is qualified to select inputs on which to rely to calculate bitrates, Dr. Macartney is qualified to point out what was *not* considered

---

[3] Plaintiffs state in a footnote (Mot. 9 n.2) that Ms. Kindler apparently had some conversation with Sandisk's technical expert regarding bitrate, but only *after* Dr. Macartney served his rebuttal report. Of course, reliance on such a conversation is improper; Ms. Kindler's report was required to set forth a complete statement of opinions and the bases for those opinions by the scheduling order's deadline for opening expert reports. Her report contains *no* technical discussion of bitrate of any kind, Ex. C ¶ 175.b.ii, nn.698-701, and obviously could not disclose a conversation that occurred after her report was served. In any event, even this undisclosed and untimely conversation does not render either Ms. Kindler's or Dr. Macartney's opinions regarding "bitrate" technical.

in any such opinions. *Dalen Prods., Inc. v. Harbor Freight Tools, USA*, No. 3:07-CV-179, 2010 WL 3083543, at *6 (E.D. Tenn. Aug. 5, 2010) (rejecting effort to exclude rebuttal report on damages on same topic as affirmative report, where both experts were "equally qualified to opine" on the disputed topic); *see also Casillas v. Fresno*, No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747, at *9 (E.D. Cal. Feb. 13, 2019) ("Plaintiffs argue that any exclusion of [their expert's] opinions would be unfair, given that Defendants have proffered their own … expert whose report, they argue, similarly attempts to decide the facts. Though Plaintiffs have not submitted a motion in limine as to this expert, Defendants' expert is expected to play by the same rules. Defendants' … expert appears to have based his opinions on the same information relied upon by … plaintiffs' expert[.]").

Moreover, in the paragraph that Plaintiffs seek to exclude, Dr. Macartney explained that Ms. Kindler's "estimate overstates data usage by disregarding standard video compression, ***inconsistent with service agreements***." Dkt. 209-3 ¶ 87 (emphasis added). In the next paragraph, Dr. Macartney then explains that the service agreement in question, ▮▮▮▮▮ *Id.* ¶ 88. No calculations requiring technical expertise or knowledge of compression are necessary to determine what bitrates are cosnsistent with those stated in Viasat's actual service agreement. In the ▮▮▮▮▮t, the parties agreed to ▮▮▮▮▮. *See id.* 87 & Figure 9. As Figure 9 shows, ▮▮▮▮▮. The parties to the ▮▮▮▮▮ agreement agreed to ▮▮▮▮▮—bitrates that are all significantly lower than Ms. Kindler's calculated bitrates. Dr. Macartney's critique of Ms. Kindler, and reliance on the terms of the ▮▮▮▮▮, are squarely within the scope of his expertise.

## IV.   CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion to exclude paragraphs 76, 87, and 121 of Dr. Macartney's opinions.

DATED: June 23, 2025                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                        By  */s/ Patrick D. Curran*
                                            Patrick D. Curran
                                            *Attorneys for Defendant Viasat Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2025, a copy of the foregoing document was served via e-mail to all counsel of record who have appeared in this matter.

DATED: June 23, 2025                    By  /s/ *Patrick D. Curran*
                                            Patrick D. Curran