L. Kieran Kieckhefer (SBN 251978)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94105-0921
Telephone: 415.393.8337
Email: KKieckhefer@gibsondunn.com

Robert A. Vincent (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3281
RVincent@gibsondunn.com

Lillian J. Mao (SBN 267410)
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5307
LMao@gibsondunn.com

Ahmed ElDessouki (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2345
AElDessouki@gibsondunn.com

Brian M. Buroker (*pro hac vice*)
Shuo J. Zhang (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M St, N.W.
Washington DC 20036-4504
BBuroker@gibsondunn.com
SZhang@gibsondunn.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et. al., <br><br> Plaintiffs, <br><br> v. <br><br> VIASAT, INC, <br><br> Defendants | Case No. 4:22-CV-4376-HSG-PHK <br><br> **SANDISK'S OPPOSITION TO VIASAT'S MOTION TO STRIKE LAUREN KINDLER'S MAY 5, 2025 SUPPLEMENTAL EXPERT REPORT** <br><br> Date:     August 21, 2025 <br> Time:     2:00 p.m. <br> Dept.:    Courtroom 2, 4th Floor <br> Judge:   Hon. Haywood S. Gilliam, Jr. |

**TABLE OF CONTENTS**

Page

I. BACKGROUND ................................................................................................................. 1

II. ARGUMENT ...................................................................................................................... 3

    A. Ms. Kindler's Updated Calculations Using Viasat's Newly Produced Spreadsheets Are Proper. ........................................................................................ 4

    B. Ms. Kindler's Updated Calculations Using An Alternative Bitrate Are Proper. .......... 6

    C. Viasat Is Not Prejudiced By The Supplemental Report. ............................................... 8

III. CONCLUSION ................................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aylus Networks, Inc. v. Apple Inc.*,
2015 WL 6667460 (N.D. Cal. Nov. 2, 2015) ................................................................................9

*Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*,
2025 WL 980830 (N.D. Cal. Apr. 1, 2025) .................................................................................4

*Cellspin Soft, Inc. v. Garmin Int'l, Inc.*,
No. 17-CV-05934-YGR, 2021 WL 12171867 (N.D. Cal. Dec. 21, 2021) ...............................7, 8

*Luke v. Fam. Care & Urgent Med. Clinics*,
323 F. App'x 496 (9th Cir. 2009) ................................................................................................4

*Medtronic Vascular, Inc. v. Abbott Cardiovascular Sys., Inc.*,
2009 WL 2058245 (N.D. Cal. July 13, 2009) ..........................................................................7, 9

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
2019 WL 468809 (N.D. Cal. Feb. 6, 2019) .................................................................................5

*Pac. Info. Res., Inc. v. Musselman*,
No. C06-2306 ..............................................................................................................................5

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
No. 20-MD-02966-RS (SVK), 2024 WL 4789136 (N.D. Cal. Nov. 14, 2024) ...........................4

**Rules**

Fed. R. Civ. P. 26(e) ...........................................................................................................................3

Viasat's motion to strike Ms. Kinder's May 5, 2025 supplemental damages report should be denied. Ms. Kindler properly supplemented her damages calculations under Federal Rule of Civil Procedure 26 to account for new information—information that she lacked in preparing her opening report because Viasat improperly withheld it during discovery. After the Court granted Sandisk's motion to compel, Viasat produced hundreds of spreadsheets at 3:13 p.m. the day Ms. Kindler's opening expert report was due. Ms. Kindler has not changed any of the theories and methodologies disclosed in her 181-page opening report served on March 24, 2025—and Viasat does not contend otherwise. Her 22-page supplemental report simply explains her analysis regarding the nearly 400 spreadsheets that Viasat belatedly produced, plugs that data into her previous analysis, and provides updated calculations using the new numbers. Ms. Kindler also provides certain updated calculations that replace one of her input values with a different value that Viasat's expert asserted should be used instead, again without changing her theories or methodology. Sandisk served Ms. Kindler's supplemental report on May 5, 2025, four days before her deposition. Viasat had the opportunity to depose Ms. Kindler about her supplemental report but deliberately chose not to. Alternatively, if Viasat wanted more time, Viasat could have requested additional time to review the supplemental report and to briefly postpone Ms. Kindler's deposition. Viasat also failed to do that. Under these circumstances, Ms. Kindler's supplemental report should be permitted in its entirety.

## I.    BACKGROUND

During discovery, Viasat withheld hundreds of spreadsheets containing financial information that would have aided in a complete computation of damages. During the deposition of Viasat's corporate designee, Sandisk learned that Viasat kept monthly reports on the fees charged to each airline customer, and quarterly reports on the profitability of the accused products. *See* Dkt. 159 at 2. Sandisk promptly demanded the production of this information, which was plainly responsive to Sandisk's discovery requests about financials. Viasat refused, and Sandisk moved to compel on February 7, 2025. *Id.* On March 14, 2025, the Court ordered Viasat to produce the documents. Dkt. 183.

Meanwhile, Ms. Kindler and her team were working on preparing her opening report on damages, due March 24, 2025. Ms. Kindler's opening report was a significant effort: Ms. Kindler spent about 75 to 100 hours working on her report, and she was assisted by a team of eight analysts

and other personnel who spent more than that. Mao Decl., Ex. 3 (Kindler Dep.), 19:9-15, 26:21-27:16. The main body of Ms. Kindler's opening report is 181 pages long, and it is accompanied by over 100 pages of supporting tables and appendices (not counting her CV and list of materials reviewed). Mao Decl., ¶ 4.

At 3:13 p.m. the same day that Sandisk served Ms. Kindler's opening report, Viasat produced the court-ordered financial information, which turned out to be nearly 400 spreadsheets, consisting of 1.6 Gigabytes of data. *Id.*, ¶ 3. It was plainly impossible for Ms. Kindler and her team to analyze those hundreds of spreadsheets and account for them in her opening expert report, which was due that day and served mere hours later. Ms. Kindler noted the fact of the production in her opening report, stated that she had not yet reviewed or considered the information, and "reserve[d] the ability to review these files and update [her] analyses and opinions as needed." *Id.*, Ex. 1 (Kindler Op. Rep.) at 3 n.5.

After Sandisk served Ms. Kindler's expert report, Viasat asked for Ms. Kindler's "workbooks" in native Excel format "containing the calculations and formulas" that Ms. Kindler used—even though the formulas are explicitly stated in the tables served with her opening report. Mao Decl., Ex. 4 at 4-5. The requested materials took some effort to prepare because Viasat had not previously requested them, and Ms. Kindler's team ensured a clean and well-organized production folder with a clear mapping of analyses to exhibits. Mao Decl., ¶ 8. Sandisk provided the workbooks to Viasat a week later on April 2, 2025. *Id.*, Ex. 4 at 1.

Ms. Kindler and her team also began analyzing the hundreds of new spreadsheets shortly after she issued her opening report. Dkt. 200-3 (Kindler Dep.), 29:2-11. "[I]t took time to get through all the files," after which Ms. Kindler and her team determined which of her calculations should be updated, and began preparing her supplemental report. *Id.* at 30:18-24. Most of the new production consisted of "Invoice Support" files showing, on a monthly basis, the aircraft and passenger data for services provided to Viasat's airline passengers over a four-year period. Mao Decl., Ex. 2 (Kindler Supp. Rep.), ¶ 4. Ms. Kindler and her team compiled this data and compared it to her prior estimates of the number of aircraft and sessions—which the newly produced data confirmed had been reasonable estimates—and then used the newly available data to update, for example, her estimates and calculations of W-IFE and IPTV sessions, data sent, and cost savings from using the '667 patent. *Id.*,

2

SANDISK'S OPPOSITION TO VIASAT'S MOTION TO STRIKE SUPPLEMENTAL KINDLER REPORT
CASE NO. 4:22-CV-4376-HSG-PHK

Gibson, Dunn & Crutcher LLP

¶¶ 4-5, 7-16. Viasat also produced additional information about its revenues and cost of goods sold, which Ms. Kindler used to calculate actual gross profit margins—again showing that her prior estimates were reasonable and in fact *lower* than the actual values—that she then incorporated into her damages calculations. *Id.* ¶ 6.

On April 14, 2025, Viasat served a rebuttal expert report on damages from Dr. Macartney. Among Dr. Macartney's opinions, he criticized Ms. Kindler's use of a particular bitrate (1.55 Mbps) that she had used to calculate damages for the asserted '667 patent relating to the accused IPTV use case. Dkt. 200-7, ¶¶ 87-89. Dr. Macartney asserted that 750kbps (or 0.75 Mbps) was the appropriate bitrate. *Id.*, ¶ 89.

Ms. Kindler's supplemental expert report, served on May 5, 2025, addresses Viasat's belatedly produced financial data as described above, as well as the alleged use of an incorrect bitrate. Because Ms. Kindler's supplemental report only updates calculations but does not change any of her underlying theories or methodology, the report is only 22 pages, plus the supporting charts updated with new numbers. Mao Decl., ¶ 5.

Viasat took Ms. Kindler's deposition on May 9, 2025, beginning at 9:08 a.m. and concluding at 3:11 p.m. *Id.*, ¶ 6. Viasat asked Ms. Kindler about the preparation of her supplemental report and the analysis of Viasat's late-produced spreadsheets as an apparent set up for this motion, but chose not to introduce the supplemental report as an exhibit or to ask substantive questions about it. *Id.*, Ex. 3 (Kindler Dep.) at 5-6 (exhibit list); Dkt. 200-3, 29:2-31:20.

## II.   ARGUMENT

As Viasat acknowledges, Rule 26 includes a duty to timely supplement expert disclosures in light of newly discovered information. Fed. R. Civ. P. 26(e); Mot. at 5. Ms. Kindler's supplemental report falls squarely within that rule. Ms. Kindler's narrow supplementation—which simply provides updated calculations using new data, without changing her theories or methodology—was timely served after Viasat dumped hundreds of spreadsheets on Sandisk the day that Ms. Kindler's opening report was due, and after Dr. Macartney alleged a different bitrate should have been used in Ms. Kindler's calculations. Viasat's claims of prejudice ring hollow, since it had the opportunity to ask

Ms. Kindler about her supplemental report in her deposition and had ample time to address the supplemental report in its *Daubert* and summary judgment motions had it wished to do so.

### A. Ms. Kindler's Updated Calculations Using Viasat's Newly Produced Spreadsheets Are Proper.

There is no dispute that Viasat failed to produce responsive financial spreadsheets until the very day that Ms. Kindler issued her opening report. Upon receiving that information, Ms. Kindler and her team diligently analyzed the information—consisting of hundreds of spreadsheets—and updated her calculations. This is a classic example of the kind of supplementation not only permitted, but *required*, under Rule 26(e). *See, e.g.*, *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, 2025 WL 980830, at *2 (N.D. Cal. Apr. 1, 2025). Moreover, Sandisk did not need to modify the case schedule under Rule 16 to do so. *See id.*

In *Carl Zeiss*, the court explained that Rule 26(e) imposes "a duty to supplement [a party's] expert report up to the deadline for pretrial disclosures" and that a party need not move to reopen discovery in order to serve a supplemental report. *Id.* The court cautioned that supplemental reports cannot alter the theories in the original report, but it is permissible to "correct[] inaccuracies" or incorporate "information that was not available at the time of the initial disclosure." *Id.* (quoting *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009)). The court in *Carl Zeiss* permitted supplemental reports by the plaintiff's technical and damages experts to account for additional infringing sales that the defendant identified after opening reports had been served. *Id.* at *4. The court found that the supplemental reports "raise no concern" because they "merely extend the same logic in the experts' original reports to the additional sales." *Id.* at *3; *see also In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966-RS (SVK), 2024 WL 4789136, at *2 (N.D. Cal. Nov. 14, 2024) (permitting supplemental report where "the proffered supplemental report is not a new legal theory; it is an updated analysis of the impact of sales caps based upon updated sales information produced in May 2024"). Similarly, Ms. Kindler's report here simply extends the same logic to the additional sales data that Viasat belatedly produced, without changing any of her original theories.

Viasat's claims that Sandisk and Ms. Kindler did not act "timely" are not credible. Viasat mischaracterizes both Ms. Kindler's testimony and the caselaw. As to Ms. Kindler's testimony, Viasat ignores her testimony that "the analytics to support [the supplemental report] started shortly after

issuing my [opening report]," that "it took time to get through all the files," and laying out the timeline of analyzing the data and preparing her supplemental report. Dkt. 200-3, 29:2-31:20. Viasat ignores the volume of data that it improperly withheld—nearly 400 spreadsheets comprising 1.6 Gigabytes of data that Ms. Kindler and her team had to compile before they could even begin to analyze it. Instead of crediting the amount of work that had to be done, Viasat seizes on Ms. Kindler's comment that she and her team gave "priority" to "other things [they] had to do" (Mot. at 5)—ignoring that these "things" Ms. Kindler was referring to were the preparation of Excel and code files *that Viasat itself requested*. *Id.* at 31:14-18 ("[A]fter we issued my report, … Viasat requested all of our files, for example. And so some of those things would take priority over analyzing the new data.").

As to caselaw, Viasat makes a false comparison between the timeline in *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2019 WL 468809 (N.D. Cal. Feb. 6, 2019), and the present case. In *Oracle*, the plaintiff waited two months to notify the defendant of its *intent* to amend its expert reports. *Id.* at *3. The plaintiff did not seek to supplement until *five months* after it received the new information. *Id.* Here, Viasat was on notice of a potential supplementation *the day it served the production*—both from the fact that Sandisk explicitly sought the documents for damages purposes, and because Ms. Kindler stated that she had not yet had the opportunity to analyze the new information and reserved the right to supplement her report to account for the late production. Ms. Kindler issued her supplemental report six weeks later—which is no comparison to the five-month delay in *Oracle*—and was within the expert discovery period. Viasat's other case, *Pacific Information Resources*, also does not support its position. There, the expert's supplemental report sought to apply "additional methods of analyzing the relevant data" and the court found that analysis could have been performed in time to include it in the original report. *Pac. Info. Res., Inc. v. Musselman*, No. C06-2306 MMC (BZ), 2008 WL 2338505, at *1 (N.D. Cal. June 4, 2008). There was no showing that the expert "was analyzing data that had just become available, or that he was trying to correct any problems with his work that had surfaced during [his] deposition." *Id.* And even then, the court did not strike the supplemental report. *Id.* at *2. Here, there was no practical ability for Ms. Kindler to include the belatedly produced financial data in her opening report—she had to provide a supplement in order to

5

SANDISK'S OPPOSITION TO VIASAT'S MOTION TO STRIKE SUPPLEMENTAL KINDLER REPORT
Case No. 4:22-CV-4376-HSG-PHK

Gibson, Dunn & Crutcher LLP

account for such information. Her supplemental report applies her previously disclosed methodology to data that she and Sandisk did not possess until hours before her opening report was due.

Moreover, Viasat has no basis to criticize Ms. Kindler's timeline, since this is a situation of Viasat's own making. Had Viasat produced the financial spreadsheets it was supposed to during fact discovery, Ms. Kindler could have incorporated that information into her opening report. Instead, Viasat waited until the Court ordered production and set a deadline, then produced the documents "four days early" (Mot. at 3), apparently just so it could say that Sandisk had the documents when it served Ms. Kindler's opening report. But Viasat knew full well there was no way Ms. Kindler could possibly have reviewed and incorporated that information in the mere hours between Viasat's production and the opening report deadline. Viasat's position would render Sandisk's successful motion to compel a nullity: Sandisk sought production of the additional spreadsheets so that they could be used in calculating damages, and the Court agreed that they should be produced, yet now Viasat argues that Ms. Kindler cannot use them.[1]

As a result of Viasat's conduct, Sandisk and Ms. Kindler had to scramble to analyze *hundreds* of additional spreadsheets after the parties were already in the middle of expert discovery and engaged in other tasks including preparing native workbooks at Viasat's request, analyzing Dr. Macartney's rebuttal report, and preparing for both Dr. Macartney's and Ms. Kindler's depositions. Even under these circumstances, Ms. Kindler issued her supplemental report in time for Viasat to ask her about it during her deposition.

Ms. Kindler's updated calculations were timely and proper, and should not be stricken.

B.      **Ms. Kindler's Updated Calculations Using An Alternative Bitrate Are Proper.**

Ms. Kindler's updated calculations using Dr. Macartney's bitrates are similarly proper and should be permitted to stand. In the last four pages of her supplemental report, she notes that Dr. Macartney claims that 0.75 Mbps instead of 1.55 Mpbs is the appropriate bitrate to use in calculating Viasat's bandwidth cost savings for IPTV attributable to the '667 patent. Mao Decl., Ex. 2 (Kindler Supp. Rep.), ¶ 29. By way of background, Ms. Kindler's cost savings approach considers the fact that

---

[1] Viasat's complaint about the timing of Sandisk's motion to compel (Mot. at 7-8) was already considered by the Court in ordering Viasat to produce the disputed financials. Dkt. 183 at 12:4-6. Viasat's argument here is an improper request for reconsideration.

the '667 patent enables Viasat to send a single copy of IPTV content to an airplane, even if it is viewed by multiple passengers, thus saving the bandwidth that Viasat would otherwise have to expend in sending multiple copies of the IPTV content over the airplane's satellite connection. Mao Decl., Ex. 1 (Kindler Op. Rep.) ¶¶ 62-65. In order to calculate that bandwidth savings, Ms. Kindler relied on a 1.55 Mbps average bitrate for IPTV transmission, based on information publicly published by Viasat on a website directed to its customers. *Id.* ¶ 175 & n.700 (citing https://www.viasat.com/perspectives/satellite-internet/2022/the-ultimate-guide-to-streaming-with-satellite-internet/). For "illustrative purposes" in her rebuttal report, she plugs Dr. Macartney's proposed bitrate of 0.75 Mpbs into her previous calculations to obtain an alternative cost savings number—which is *lower* than her original number. Mao Decl., Ex. 2 (Kindler Supp. Rep.), ¶ 30. Again, Viasat does not contend that Ms. Kindler changed her damages theory. Instead, she performs the very same analysis provided in her opening report, substituting 0.75 for 1.55 in her calculations.

Also in these final four pages of her supplemental report, Ms. Kindler provides a third updated calculation that incorporates both the numbers from Viasat's newly produced financial information *and* Dr. Macartney's alleged bitrate. *Id.*, ¶ 32. Viasat's characterization of Ms. Kindler's brief discussion of Dr. Macartney's bitrate as the "majority" of her supplemental report (Mot. at 1) is completely inaccurate—more than 75% of the report was devoted to addressing Viasat's belated financials production.

Moreover, Viasat's argument that the bitrate-related portion of Ms. Kindler's report is an "unauthorized reply report" (*id.*) is legally incorrect. Courts have allowed discussion in supplemental expert reports that "clarif[y] or amplif[y] matters expressly referenced in the original report without revising or reversing [the original opinion]." *Medtronic Vascular, Inc. v. Abbott Cardiovascular Sys., Inc.*, 2009 WL 2058245, at *1 (N.D. Cal. July 13, 2009). That is what Ms. Kindler has done here: she stands by her original methodology, and even her originally adopted bitrate. However, she updates her calculations using Dr. Macartney's bitrate to show how that would impact the numbers.

This situation is distinguishable from *Cellspin Soft, Inc. v. Garmin Int'l, Inc.*, No. 17-CV-05934-YGR, 2021 WL 12171867 (N.D. Cal. Dec. 21, 2021), which Viasat cites. In *Cellspin*, it was undisputed that the plaintiff possessed the information used to prepare the supplemental report "long before" the

original report was prepared. *Id.* at *1. In addition, the plaintiff's expert in *Cellspin* substantively changed his opinions by adding data from another product to calculate a new royalty rate, and removing another set of products from his determination of a reasonable royalty rate. *Id.* at *1-2. In contrast, Ms. Kindler did not change her opinions, and she did not have Dr. Macartney's asserted bitrate until after her opening report. Ms. Kindler's simple providing of an alternative calculation bears no resemblance to the conduct in *Cellspin*.

Ms. Kindler's updated calculations using a new bitrate are proper, and should not be stricken.

### C. Viasat Is Not Prejudiced By The Supplemental Report.

Contrary to Viasat's arguments, Ms. Kindler's supplemental report should not be precluded under Rule 37(c)(1) because it was both substantially justified and harmless.

First, Ms. Kindler's supplemental report was substantially justified because, as discussed above, Sandisk received additional information that Viasat had improperly withheld earlier in the case. Although this data did not affect Ms. Kindler's theories and methodology, it did impact the bottom-line numbers she put forth in her opening report. Accordingly, Ms. Kindler updated her calculations using the new information that Viasat had just produced. Similarly, Ms. Kindler provided updated calculations to illustrate how her numbers would change if using Dr. Macartney's bitrate, which he identified in his rebuttal report. Indeed, it is common practice for damages experts to re-run their calculations using later-acquired numbers, such as when parties provide updated financials just before trial. Ms. Kindler's updated calculations, like the practice of updating damages numbers to use the latest financial data, did not involve any change to her theories or methodology.

Second, Viasat has not been prejudiced by Ms. Kindler's supplemental report. Viasat received Ms. Kinder's supplemental report—consisting of only 22 pages of double-spaced text explaining her analysis of Viasat's spreadsheets and her updated calculations—four days before Ms. Kindler's deposition. Again, Ms. Kindler did not introduce any new theories or methodology. Viasat and Dr. Macartney already had Ms. Kindler's spreadsheets showing the formulas she used, into which she simply plugged in different numbers. Thus, Viasat's claim that it "did not have adequate time" to analyze the report before Ms. Kindler's May 9 deposition are not credible.

Further, since Ms. Kindler did not offer any new opinions, Viasat's claims of prejudice relating

8

SANDISK'S OPPOSITION TO VIASAT'S MOTION TO STRIKE SUPPLEMENTAL KINDLER REPORT
CASE NO. 4:22-CV-4376-HSG-PHK

Gibson, Dunn & Crutcher LLP

to the other experts in the case are a red herring. With respect to technical issues, Viasat's only complaint is that Ms. Kindler explains, in a footnote, that she confirmed with Sandisk's technical expert that her original 1.55 Mpbs bitrate was a reasonable estimate. Dkt. 200-5 at 19 n.66. That limited conversation with Dr. Easttom has nothing to do with Viasat's newly produced spreadsheets or with Ms. Kindler's updated calculations using Dr. Macartney's bitrate—she does not rely on Dr. Easttom for her analysis of either. Nor did Ms. Kindler rely on Dr. Easttom for her original 1.55 Mbps estimate. Mao Decl., Ex. 1 (Kindler Op. Rep.) at 150-151 (deriving 1.55 Mbps bitrate based on Viasat webpage and Viasat-produced documents). As such, the updated calculations in Ms. Kindler's supplemental report do not necessitate any deposition of Dr. Easttom nor response from Dr. Almeroth, as Viasat claims to need (Mot. at 10), and there are no new "opinions" from Dr. Easttom to be struck (*id.* n.10). As to damages issues, there is similarly nothing to respond to, since all Ms. Kindler did was to plug in different numbers using formulas and methodology that had already been disclosed to Viasat. Notably, Viasat does not contend that Ms. Kindler misunderstood its newly produced financial data or identify any aspect of her use of those spreadsheets that would require a rebuttal.

Viasat had a full opportunity to explore Ms. Kindler's supplemental report during her deposition—and, in fact, asked her specific non-substantive questions about her supplemental report. Then Viasat deliberately chose not to mark the supplemental report as an exhibit and even ended the deposition early. Viasat's tactical head-in-the-sand approach belies its claims of prejudice. Moreover, had Viasat truly felt time-constrained, "the prejudice [could have been] cured by a lesser sanction" than exclusion of the supplemental report. *Medtronic*, 2009 WL 2058245 at *2. Viasat could have asked to delay Ms. Kindler's deposition, for example, or even asked for a short follow-up deposition on another day. *See id.*; *Aylus Networks, Inc. v. Apple Inc.*, 2015 WL 6667460, at *3 (N.D. Cal. Nov. 2, 2015) (finding disclosure harmless where defendant had opportunity to depose the expert about it, and plaintiff offered expert for a limited additional deposition if needed).

Thus, there is no prejudice to Viasat that justifies striking Ms. Kindler's supplemental report.

### III. CONCLUSION

For the foregoing reasons, Viasat's motion to strike Ms. Kindler's May 5, 2025 supplemental expert report should be denied.

/ / /

| | |
|---|---|
| Dated: June 23, 2025 | GIBSON, DUNN & CRUTCHER LLP |
| | */s/ L. Kieran Kieckhefer* |
| | L. Kieran Kieckhefer |
| | *Counsel for Plaintiffs* |