# EXHIBIT A

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | | |
|---|---|---|
| SANDISK TECHNOLOGIES, INC. et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| VIASAT, INC., | § | |
| | § | |
| Defendant. | § | Case No. 5:22-cv-4376 |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**EXPERT INFRINGEMENT REPORT OF DR. WILLIAM C. EASTTOM II (CHUCK EASTTOM) Ph.D., D.Sc.**

---

**Table of Contents**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 1

    A.      Qualifications .................................................................................... 1

    B.      Prior Testimony ................................................................................ 4

    C.      Compensation ................................................................................... 4

III.    LEGAL PRINCIPLES .................................................................................... 4

    A.      Direct Infringement........................................................................... 4

    B.      Indirect Infringement ....................................................................... 5

    C.      Literal Infringement ......................................................................... 5

    D.      Infringement Under The Doctrine of Equivalents ........................... 5

    E.      Practicing the Claimed Methods in the United States ...................... 6

    F.      Person of Ordinary Skill in the Art ................................................. 6

IV.     MATERIAL REVIEWED ............................................................................... 7

    A.      Source Code ...................................................................................... 9

V.      BACKGROUND OF TECHNOLOGY AND PATENTS-IN-SUIT ............... 14

    A.      Satellite Technology ....................................................................... 14

    B.      U.S. Patent No. 9,424,400.............................................................. 18

    C.      U.S. Patent No. 10,447,667............................................................ 22

VI.     INFRINGEMENT ANALYSIS ..................................................................... 38

    A.      Claim Construction ......................................................................... 38

    B.      Viasat Accused Systems ................................................................. 39

    C.      '400 Patent Direct Infringement .................................................... 50

        1.      1[pre] A kiosk for provisioning secure media content to a plurality
            of portable data storage devices, the kiosk comprising: .......................... 51

        2.      1[a] a first data interface configured to communicate with a
            portable data storage device;.................................................... 66

        3.      1[b] a second data interface configured to communicate, over a
            network, with a remote trusted server; and................................ 77

        4.      1[c] a processor configured to: ............................................... 82

        5.      1[d] obtain a unique identifier from the portable data storage
            device, wherein the unique identifier is specific to the portable data
            storage device and is concealed by the portable data storage
            device; ..................................................................................... 83

6.      1[e] authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and ........................................................... 95

7.      1[f] in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key ........................................................................ 106

8.      2. The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content. ..................................... 113

9.      6. The kiosk of claim 1, wherein the second data interface is a network interface. .................................................................................. 114

10.     8. The kiosk of claim 1, wherein the kiosk is located in a public environment ..................................................................................... 118

11.     9[pre]  A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising: .......................................................................................... 119

12.     9[a] establishing communications with a portable data storage device over a first data interface; ........................................................... 135

13.     9[b] establishing communications with a remote trusted server via a second data interface over a network; .................................................. 145

14.     9[c] obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device; ........................................................................................... 150

15.     9[d] authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and ............................................. 162

16.     9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key ........................................................................ 173

17.     10. The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content. .................. 182

18.     13. The method of claim 9, wherein the second data interface is a network interface. .................................................................................. 183

19.     17. The method of claim 9, wherein the kiosk is located in a public environment. .................................................................................... 188

D.      '667 Patent Direct Infringement ........................................................ 188

1.      1[pre] A media streaming system comprising: ....................................... 189

2.      1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached

storage (NAS) device operating on a local area network (LAN); and .......................................................................................... 196

3.    1[b] one or more hardware processors configured to: ............................ 201

4.    1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system; .................. 202

5.    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and ........................................................................................... 209

6.    1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer. ................................... 213

7.    2. The media streaming system of claim 1, wherein the separate display device comprises a smart television. .......................................... 217

8.    3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device. ..................... 220

9.    4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system......................................... 222

10.   5. The media streaming system of claim 1, wherein the one or more processors are further configured to:  cause the NAS device to use encryption that secures the digital content to the secure region. ................................................................................................. 224

11.   6. The media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an amount of data stored in the secure region. ........................................................................................ 232

12.   7. The media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region. ........................................................................................ 235

13.   11[pre] A method of transmitting media content from a media streaming system, the method comprising: ............................................ 241

14.   11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); ................................................................................ 248

15.   11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system; .................. 253

16.     11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and ........................................................................................................ 261

17.     11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer .................... 266

18.     12. The method of claim 11, wherein transmitting the media content to the secure region comprises:  time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device. ...................................... 270

19.     13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system. ...................................................... 272

20.     14. The method of claim 11 further comprising:  causing the NAS device to use encryption that secures the media content to the secure region. ............................................................................. 274

21.     15. The method of claim 11 further comprising:  providing instructions to the NAS device for controlling an amount of data stored in the secure region. ............................................................ 276

22.     16. The method of claim 11 further comprising:  providing instructions to the NAS device for controlling an encryption type used in the secure region. ....................................................... 280

E.    Indirect Infringement ....................................................................... 285

        a.      '400 Patent ................................................................. 285

        b.      '667 Patent ................................................................. 287

VII.    NON-INFRINGING ALTERNATIVES ......................................................... 290

A.    '400 Patent ........................................................................................ 290

B.    '667 Patent ........................................................................................ 296

VIII.   OBJECTIVE INDICIA OF NONOBVIOUSNESS ...................................... 303

A.    Commercial Success ......................................................................... 304

B.    Long-Felt Need .................................................................................. 306

IX.    SCSA AND THE '400 PATENT .................................................................. 308

X.    OPINIONS AND CONCLUSIONS .............................................................. 313

## I.    INTRODUCTION

1.    I have been asked to evaluate issues related to infringement of U.S. Patent 9,424,400 and U.S. 10,447,667, in the above captioned matter and to form independent expert, scientific opinions on those issues.  My opinions and conclusions are not related in any way to my compensation for the time spent on this matter.

## II.    BACKGROUND

### A.    Qualifications

2.    I have almost 30 years of experience in the computer science industry including extensive experience with computer science involving networks, authentication, and cybersecurity.  I have authored 44 computer science books, including textbooks used at over 60 universities around the world.  I also have authored over 80 research papers and am an inventor with 27 patents, including patents related to computer networking.

3.    I hold a Doctor of Science (D.Sc.) degree in Cyber Security from Capitol Technology University (Dissertation Topic:  "A Comparative Study of Lattice Based Algorithms for Post Quantum Computing").  I also hold a Doctor of Philosophy (Ph.D.) in Technology (focused on nanotechnology.  Dissertation Topic:  "The Effects of Complexity on Carbon Nanotube Failures") from Capitol Technology University.  I also have a Doctor of Philosophy (Ph.D.) in Computer Science from the University of Portsmouth (Dissertation Topic:  topic "A Systematic Framework for Network Forensics Using Graph Theory").  I also have four master's degrees (one in Applied Computer Science, one in Education, one in Strategic and Defense Studies, and one in Systems Engineering).

analysis and I may well have cited some of that source code in my opinions as additional support for my opinions.

66.     If the Court orders production of any additional source code, I reserve the right to supplement this report based on the newly produced source code.

## V.     BACKGROUND OF TECHNOLOGY AND PATENTS-IN-SUIT

### A.     Satellite Technology

67.     Satellite television is a broadcasting system that delivers television programming via communication satellites.  The signals are transmitted from a ground station to a geostationary or low-Earth orbit (LEO) satellite, which then relays the signals to satellite dishes on the Earth's surface.  Low Earth Orbit is typically at an altitude of 160 km to 2,000 km above Earth with an orbital period of approximately 90–120 minutes.[1]  This is contrasted with Medium Earth Orbit (MEO) that typically has an altitude of 2,000 km to 35,786 km and an orbital period of 2 to 12 hours.  Geostationary Orbit (GEO) is typically at an altitude of approximately 35,786 km and a period of 24 hours.[2,3]  This technology enables the distribution of television services over large geographic areas, including remote and rural locations where terrestrial broadcasting infrastructure may be limited.  The satellite, typically in geostationary orbit (~35,786 km above Earth), receives the uplinked signals.  The most common frequency bands used for uplinking are C-band (4–8 GHz) and Ku-band (12–18 GHz).  Signals are modulated (e.g., QPSK, 8PSK, or DVB-S2

---

[1]      https://spacedge.nss.org/course/view.php?id=81&lang=es&gad_source=1&gclid=Cj0KCQjwhYS_BhD2ARIsA
JTMMQbtdYq9derw7h0I-hEDeTkl8DWfpCh14xLMuDUqXl3gddZRN9Cyu84aAvYwEALw_wcB

[2] https://www.american.edu/sis/centers/security-technology/small-satellites-and-international-security.cfm

[3] https://ssdl1.gatech.edu/sites/default/files/ssdl-files/papers/conferencePapers/IAC-2009-D1.6.1.pdf

████████████████████████████

modulation) and transmitted at high frequencies (C-band, Ku-band, or Ka-band)

to the satellite.  DVB is Digital Video Broadcasting, and DVB-S2 is version 2.[4]

QPSK is Quadrature Phase Shift Keying (also known as quaternary PSK) is a type

of phase modulation technique where there are four states involved. It uses four

points on the constellation diagram, equispaced around a circle.[5,6]

68.     Satellite internet is a type of internet connection that uses satellites in space to

provide internet access.  It's especially useful in rural or remote areas, and in

mobile locations (such as aircrafts and ships) where traditional internet options

like fiber or cable are not available because ground cable infrastructure is not

practicable or impossible to implement.  Satellite internet providers include

Starlink (by SpaceX – uses low-Earth orbit satellites for lower latency);

HughesNet (USA); Viasat (USA).  Satellite internet uses the same technologies

and protocols previously described but directed towards providing internet access.

The internet traffic is facilitated using both standard protocols like TCP/IP,

HTTP, DNS and satellite-specific enhancements like TCP acceleration, PEPs

(Performance Enhancing Proxies), and DVB-S2 ((Digital Video Broadcasting

improved version).[7]

69.     Frequencies used for satellite communications include:  C-Band (4–8 GHz):

Used for long-range, high-penetration broadcasting, less affected by rain fade;

Ku-Band (12–18 GHz):  Common for direct-to-home (DTH) services, requires

---

[4] https://digitalcommons.usu.edu/smallsat/2019/all2019/288/

[5] https://propagation.ece.gatech.edu/ECE6390/project/Fall2010/Projects/group6/ExoBuzz/page1/page8/page8.html

[6] https://www.winlab.rutgers.edu/~narayan/Course/Wless/Lectures05/lect9.pdf

[7] https://web.eecs.umich.edu/~mingyan/pub/IJCS03.pdf

smaller dish sizes; Ka-Band (26.5–40 GHz).[8]  Used in newer satellite broadband

and high-definition services, susceptible to atmospheric interference.  Viasat's

ViaSat-1, ViasSat-2 and ViaSat-3 satellites are designed to support internet

traffic, and operate in the Ka-Band.[9]

70.    Satellite capacity for transmission, however, is significantly more limited than

capacity to transmission capacity over traditional fiber or cable internet.  Viasat

states on its website that "With satellite internet, network capacity is key."[10]

VIASAT_00074274 at 279 ("Capacity is king. . . Our available capacity is

Viasat's competitive advantage.").  Of note, ViaSat-1 has a 140Gbps transmission

capacity, ViaSat-2 has a 260Gbps transmission capacity, and ViaSat-3 Americas

has a 1Tbps transmission capacity.[11, 12] The available capacity is shared amongst

all users of the satellite; thus, exceeding its peak capacity limit remains a concern

---

[8]    https://science.nrao.edu/facilities/vla/docs/manuals/propvla/frequency-bands-and-samplers

[9]    https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-2/ ;
https://www.satellitetoday.com/technology/2016/12/19/viasat-boeing-complete-preliminary-design-review-viasat-3-satellites/; https://www.viasat.com/perspectives/corporate/2022/what-is-viasat3/;
https://www.viasat.com/perspectives/corporate/2021/all-the-things-viasat-manufactures-may-surprise-you/;
https://www.viasat.com/perspectives/corporate/2021/first-viasat-3-satellites-journey-to-space-starts-with-a-road-trip/; https://www.nytimes.com/2010/08/16/technology/16satellite.html;
https://web.archive.org/web/20120405060906/http://www.viasat.com/files/assets/news/web/Tech%20Overview_High_Cap_Sat.pdf; VIASAT_00078972 at 979;

[10]    With satellite internet, network capacity is key, September 7, 2021.  (https://www.viasat.com/perspectives/
corporate/2021/with-satellite-internet-network-capacity-is-key/)

[11]    ViaSat-1 led the innovation of a new class of Ka-band satellite systems.  (https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-1/); ViaSat-2 launched with nearly double the capacity of ViaSat-1.
(https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-2/); ViaSat-3 is satellite reimagined.
(https://www.viasat.com/about/what-we-do/satellite-fleet/viasat-3/

[12]    By contrast, and for example, in 2021 Google announced that it had a subsea cable called Grace hopper that
connected the US and UK, and which had a 340 Tbps capacity, which is the equivalent to "17.5 million people
streaming 4K video concurrently." https://www.telecomstechnews.com/news/googles-subsea-cable-grace-hopper-new-generation-transatlantic-connectivity/.  Another subsea cable launched by Meta in 2024, named
Anjana, connects the US and Spain and has a 500 Tbps capacity.
https://www.submarinenetworks.com/en/systems/trans-atlantic/anjana/meta-s-anjana-cable-lands-in-santander,-spain

for Viasat and must be carefully managed.  For example, despite its claims that
"available capacity is Viasat's competitive advantage," Viasat public and internal
documents show that Viasat's satellite network is capacity constrained, especially
during peak usage hours, and that the volume of data transmitted is a major
concern for Viasat.  *See e.g.*, Viasat Data Allowance Policy – Residential, January
17, 2024 (Satellite network is "more likely to become overloaded by heavy video
usage."); Viasat Network Management Policy ("During periods of congestion,
bandwidth intensive applications, such as video streaming…may be slowed more
than other applications.  As a result, the quality of video streaming may be
reduced and/or buffering may occur."); VIASAT_00006939 (describing how the



t); VIASAT_00005835 ("

); VIASAT_00005782 at 834-35 (

); *id*. at 036 ("

); VIASAT_00005782 at 835

*id*. at 906 ("

); VIASAT_00007344

(

███████████████████

"); Mr. Neri Feb. 5, 2025, Tr. at 21:21-22:12.  In fact, Viasat

developed the VCDS system for content delivery over its satellites with the

explicit goal of "████████████████████████

████████ VIASAT_00007343 (see below).  Importantly, Viasat explains that

its Live TV offering "██████████████████."  VIASAT_00100497

at 506.  In a 2024 document, Viasat noted that its Live TV offering "████████

█████████████████████████████████

███████████████████████████"

VIASAT_00100497 at 522-523



**B.     U.S. Patent No. 9,424,400**

71.     The '400 patent, entitled "Digital rights management system transfer of content

and distribution," was filed on December 15, 2014, and issued on August 23,

2016. The '400 patent claims priority to three applications which were filed on

April 10, April 20, and April 30, 2012.  David Blankenbeckler, Danny Ybarra,

and Lambertus Hesselink are the named inventors of the '400 Patent. The abstract

to the '400 patent states the following:

> The present invention relates to digital rights management (DRM) for content that may be downloaded and securely transferred from one storage to another storage. The storage may be a disk drive, or network attached storage. The storage performs cryptographic operations and provides a root of trust. The DRM system enables secure copying or transfer of content from one storage device to another storage device. In this embodiment, a trusted server that is authenticated and trusted by both storage devices brokers the transfer of content. The trusted server may be a separate entity of the DRM system or may be a component or function of an existing server of the DRM system. In another embodiment, the storage devices may transfer content in a peer-to-peer fashion. The transfer of content may be authorized and controlled based on a digital certificate associated with the content.

72.     The '400 patent enables the transfer of digital content, in part using secure

metadata ('400 patent, 2:14-19). The '400 patent discloses using secure peer to

peer transfer or using a trusted server ('400 patent, 2:36-56). The '400 patent also

discloses encrypting content ('400 patent, 2:65-67). The '400 patent discloses

binding content to a specific device ('400 patent, 3:4-7) as well as using the

public key infrastructure ("PKI") ('400 patent, 3:23-26).

73.     Figures 1C and 7C of the '400 depict an embodiment with a kiosk for distributing

content to a storage device according to one embodiment:



FIG. 1C

FIG. 7C

74.     The background of the '400 patent explains that "most DRM systems to date have security weaknesses and have been circumvented. Unfortunately, due to these weaknesses of current DRM systems, content companies have limited their offerings or have employed DRM systems that are difficult to use." '400 patent at 1:32-35.  Inventor Danny Y'barra further explained that "the content owners demanded a very high level of protection for their content. So they demanded the highest level of protection possible."  Tr. at 101:24-102:2.

75.     The '400 patent provides that:

> In one embodiment, digital content may be securely transferred via a trusted server from one storage device to another device. In particular, digital content may be transferred based on the transfer of secure metadata, such as keys, rights, etc., from one device to another. Once transfer of the secure metadata has been accomplished, the content may be copied or transferred as well. Digital rights management ("DRM") methods and systems are provided for controlled distribution, transfer, and playback of

20

████████████████████████████

digital content. For example, digital rights management ("DRM") methods and systems are provided for controlled distribution, for example via a kiosk, of digital content and playback of the digital content. The digital content may comprise the content itself plus metadata. The content may be text, documents, audio, video, multimedia, video games, etc. in any known format. The content metadata may be any data or information associated with the content that is used for handling of the content. The content metadata may be employed to provide for secure handling of the digital content and to provide DRM protections. The content metadata may also comprise one or more digital certificates.

. . .

All devices of the DRM system may be issued a certificate from one or more of the CA's. If needed, one embodiment may provide for full revocation of a certificate for an entity. As noted, two-way mutual authentication may be employed between entities to establish secure communications channels for exchanging and distributing the content. Each item of content may also be issued a digital certificate. This allows the content to play a role in determining whether a device can be trusted.

'400 patent at 2:15-34.

76.    Inventor Mr. Hesselink explained that the '400 patent "essentially addresses the problem of secure distribution of content, and it describes different ways in which this can be achieved." Tr. at 124:8-10.

77.    Similarly, Inventor Mr. Blankenbeckler explained that one of the benefits of the claimed "kiosk" is that the media content was downloaded on a local storage device, and that "one of the benefits, since it was downloaded and licensed, you didn't have to have a network connection to play it again. So I could -- you know, I could play it on an airplane, I could play it when I travel in my hotel room. So we tried to – all those use cases and make sure we had everything built in to do that, and the kiosk was one of those use cases." Tr. at 65:23-66:3. He also agreed that another benefit was that it "essentially provided more secure authentication

than existing products," and explained that it "It was really meant to prevent, you know, people illegally copying content. So it was more of an anti-piracy sort of a solution." Tr. at 67:1-5, 67:10-13. The inventors' goal was "to build a DRM system that the studios would allow us to put content on our drives with was the highest level of what we were trying to do." Tr. at 125:22-25.

78.     It is my opinion that the key benefits of the technology patented by the '400 patent to Viasat's infringing systems include the following:

79.     One benefit of the '400 patent is that it provides improved security for the media content through the encryption used. A related benefit is that the method and system of the '400 patent reduce unauthorized distribution of media content and piracy of the media content. This improved security reduced piracy, and encourages content creators, such as movie and TV studios, to allow their content to be stored on a local hard drive. For example, a presentation by Mr. Blankenbeckler dated June 19, 2014 states that "Studios feel existing Content management / DRM methods are not sufficient for their premium content." WD-Viasat-NDCA00011702 at 705. Viasat documents similarly noted that "In most cases media content will require addition encryption (required by movie studios)." VIASAT_00005782 at 835.

**C.     U.S. Patent No. 10,447,667**

80.     The '667 patent, entitled "Secure stream buffer on network attached storage," was filed on April 16, 2018, and issued on October 15, 2019. The '667 patent claims priority to application no. 14/15,367, which was filed on February 2, 2015. Dean M. Jenkins and Robert P. Ryan are the named inventors of the '667 Patent. The abstract to the '667 Patent states the following:

███████████████████████████████

> A network attached storage device coupled to a local network and
> including a network interface configured to receive digital content
> from a remote content provider outside the local network. The
> network attached storage device includes storage having a first
> region accessible by a user of the local network and a secure
> region. The network attached storage device includes a processor
> coupled to the storage, the processor configured to control access
> to the secure region of the storage based on instructions received
> from a remote content provider.

81.     As the Background section of the '667 patent explains, "Bandwidth throttling,"

which is "the intentional slowing of internet service," '667 patent at 1:18-20, was

employed by network providers to the detriment of video streaming. *Id*. at 1:22-

30. The effect of bandwidth throttling is that the Internet "pipe" becomes smaller;

and sometimes, it is too slow to support the transmission of video media content

for playback in real-time. Mr. Jenkins explained this problem at his deposition:

> **Q** Can you describe the '667 patent at a high level?
>
> **A** So back in, I want to think, 2014, there was a lot of talk about
> net neutrality and a lot of internet server providers, or ISPs as we
> call them were -- they had the ability to throttle streams. Most of
> the ISPs were also cable providers; in other words, providing cable
> TV access. And so they had the ability to throttle their internet
> access on a selected basis. So however they wanted to, they could
> do this. And that was what the net neutrality was all about. And I
> saw this as a way to bring -- my patent as a way to bring value to
> our NAS box at the time.
>
>                            . . .
>
> **Q** Okay. Let me ask a different question: When you were
> working on the '667 patent back in 2013, 2014, what set that apart
> from other solutions that already existed?
>
> **A** So as I described, I was upset that the internet service providers
> were throttling the consumer. And I didn't like that. And there
> was also this net neutrality that was trying to get passed in
> Congress, but it was having issues. And I said this is a way to
> circumvent all of that and provide a way of doing that. And I did
> not know of another -- another way of doing that at the time. And

23

███████████████████████████
███████████████████████████████

> it -- like I said, it brings a value-add to the Western Digital product.

Jenkins Tr. at 56:22-57:11, 61:8-21.

82.     Co-inventor Mr. Ryan similarly testified as follows:

> **A** Yeah.  What we were looking for -- Dean and I were the coinventors.  Dean actually had the original spark of the internet bandwidth is tight and content is big and too big for that pipe.
>
> So we were going to create a new market for the hard drive to go into that was an ability to buffer the streaming service, so you could start a movie and tell it, "You know what, I want to watch this movie."
>
> You wait ten minutes.  It's buffering, buffering, and buffering, and then you could actually watch the movie ten minutes later and you'd have buffered up enough content you wouldn't have frame skipping.
>
> That was the -- the main gist of it was to get around that internet service crunching of your data.
>
> And then -- and then we kind of expanded it to oh, you know we could have people preload content as well, but the first premise was just that capability to buffer.
>
> Last night, we were watching something, direct stream app on a Fire Stick, and the thing got horribly pixilated.  And my wife was like, "Why does this thing look horrible?" I'm like, well, had this patent gone through and we actually had this buffer, then we'd watch it a little bit delayed, but it would be clean, you know, so that was...

Ryan Tr. at 58:3-22; *see also*, *id.*, 59:10-24, 60:2-16, 78:12-19.

83.     Thus, the inventors sought to sought to solve the problem of providing media content through a narrow Internet "pipe" that did not have sufficient bandwidth to transmit media content for playback in real-time (*i.e.*, video streaming).  While most high-speed Internet connections in the United States today have sufficient bandwidth to support video streaming, some Internet connections do not.

████████████████████████

Significantly, satellite internet, even today, is plagued by throughput, bandwidth, and capacity concerns; particularly so when satellite internet is used for media-streaming in aircraft because of the number of passengers on board, the strict requirements for small and lightweight multi-directional antennas, and the difficulties in transmitting data through unpredictable environments associated with airplanes.[13,14]

84.    The inventors therefore came up with the solution defined in the '667 patent as a way to solve the problems associated with transmitting media content through a narrow Internet "pipe."  The '667 patent explains:

> Network streaming of media content such as movies and televisions shows, among other types of content, has become commonplace.  At times, network providers, such as ISPs limit or throttle certain streaming hosts, for example, to extract financial gains for providing Quality of Service (QoS).

> Aspects presented herein provide a way to maintain smaller sizes of buffers on display device and to maintain control over content while ensuring that content can be viewed without deterioration due to throttling through the use of a Network Attached Storage (NAS) device having a secure portion for buffering streaming content.  Such a NAS device may be used, e.g., as part of a home network to provide for private buffering of streaming content for any number of display devices.

> As most display devices have very limited buffering capability, such buffering at a NAS device may help to ensure QoS at the display device.

---

[13]    For example, due to capacity constraints imposed by delays in launching ViaSat-3 satellites, Viasat announced in August 2023 that it planned to shift away from residential internet services. Viasat moving away from consumer broadband, August 2, 2023.  (https://www.advanced-television.com/2023/08/02/viasat-moving-away-from-consumer-broadband/, viewed on March 4, 2025.)  *See also*, Viasat shares fall as slowing fixed broadband hurts revenue outlook, May 21, 2024.  (https://www.reuters.com/business/media-telecom/viasat-shares-fall-slowing-fixed-broadband-hurts-revenue-outlook-2024-05-21, viewed on February 25, 2025.); *see also* The Top 5 Disadvantages of Satellite Internet: What You Need to Consider (https://www.speednetlte.com/post/the-top-5-disadvantages-of-satellite-internet-what-you-need-to-consider#viewer-nvdt7268655).

[14]    Gomez, A Performance Evaluation of TCP BBRv2 Alpha (https://research.cec.sc.edu/files/ekfoury/files/a_performance_evaluation_of_tcp_bbrv2_alpha.pdf).

████████████████

Additionally, by buffering the media at the NAS device, the media content can be viewed without the hiccups or stalling due to throttling, because the content is already buffered and can be viewed without being streamed over the Internet.

Control of the media may be maintained by the stream content provider through the security employed by the secure portion of the storage device. This portion may be secured, e.g., by designating the media as private. Access to the private buffer may be sold on a subscription model to streaming content providers.

Additionally, individual display devices do not require additional buffering capability thereby avoiding an increase in cost for the devices that would be involved in increasing the size of their buffers.

'667 patent, 2:23-55.

85.    Similarly, at his deposition, Mr. Jenkins explained:

Okay. So I came up with a concept if internet service providers were going to throttle and make your experience streaming any kind of video painful, such as, you know, buffering, you'd hiccupping in your -- you'd have an unsteady video display, I saw that as a way I could add some value to our network attached storage by holding back an area of storage and making it encrypted and unavailable to the user who bought the network attached storage, but providing it to a content provider such as a Netflix or Hulu or there's various ones out there.

And, therefore -- I think at the time, 2014, Netflix was one of the prominent ones. And I believe at the time, you also could queue up or tell them which videos or movies that you were going to be looking at.

And so with that knowledge, Netflix could queue those things up and put them on this area, secure area that I was describing inside the NAS box

because the content provider would have access to that, where the user wouldn't. And then when you went to display something, typically a Netflix client, which would be running on a Samsung -- on any television, HDTV or a Netflix box, there's various ways of doing that, it would contact, through your home network, this piece of storage and spin off this encrypted data so it could display it on your TV and you could watch a movie.

███████████████████████████

So it was a way of getting around any kind of internet service provider throttling, any kind of slow pipe you could -- you could force feed the stuff into the home into the NAS box.

So it provided added value to the NAS box that Western Digital could -- you know, be worthwhile to them; it could sell more NAS boxes.

. . .

The NAS box is a component of the entire system. Like, when I was conceiving this, Netflix is the -- on one end feeding it, and then the NAS box has the secure region. Netflix can talk to it and have it there.

So they're serving something up and controlling that feed in. And then the NAS box is a small server, also, feeding it to the display device, making sure that it never starves the display device so you don't have any hiccups.

Jenkins Tr. at 57:15-59:1, 97:9-18; *see also*, *id*. at 110:3-14,

86. In particular, the '667 patent discloses a streaming media system that transmits media content over a wide area network ("WAN"; for example, the Internet) to a network attached storage ("NAS"). The NAS device is connected to both the WAN and the NAS over a local area network ("LAN"). This is shown, for example, in Fig. 3 of the '667 patent reproduced below, which illustrates a NAS device 306 connected to a User Network 310 and to the ISP Network 304. *See also* '667 patent at 4:46-50. The NAS device 306 is also in communication with a remote content provider 302 (or "Stream Provider") through the ISP Network 304.



**FIG. 3**

87.    As shown in Fig. 3, the NAS device 306 has a user accessible storage 322 and a secure region 324.  The '667 patent explains that the remote content provider 302 may transmit media content that is then stored in the secure region 324 of the NAS device 306.  Moreover, the NAS device "controls access to secure region 324 of the storage based on instructions received from a remote content provider." '667 patent at 5:5-10.  The '667 patent explains:

> The secure memory region 210 of NAS device 206 may be configured as a buffer for receiving steaming content for the at least one display device 208 in a manner controlled by the stream content provider 202.  Display devices 208 may have minimal buffer storage for a number of reasons.  For example, the cost of the display device may be reduced by requiring a smaller amount of buffer storage in the display device.  Additionally, content providers may prefer smaller buffers in display devices because this allows them to maintain control of their content by providing smaller amounts at a time to the display device.

> By providing a larger buffer in the secure region of the NAS device 206, 306 that can be used by the display device enables the content provider 202, 302 to use burst transmission to stream the content in larger bursts than might be possible for transmissions to a smaller buffer.  Also, as the streamed content continues to be controlled by the stream content provider, the

28

stream content provider can use burst transmission without risking misappropriation of the streamed content by the user.

For example, once a user requests content from a stream content provider via a display device 208, the NAS device 206 may negotiate with the stream content provider 202 to receive the desired content and to buffer an encrypted stream of the content in the secure region 210. Such negotiation may include, e.g., informing the stream content provider of a secure region within the NAS device that is not accessible by a user. The NAS device may inform the stream content provider of the available size of the secure region or may negotiate with the stream content provider to agree on a size of a secure buffer. Among other negotiated aspects, the NAS device may negotiate with the stream content provider to agree on a length of time for which the content will be retained at the secure region of the NAS device, requirements for the user to access the streamed content, whether the streamed data is encrypted, and keys for accessing encrypted content. For example, requirements for accessing the streamed content may be time based, user based, etc. If the streamed content is encrypted, a description key may also be obtained. The keys may be obtained based on payment, a license server, etc. The NAS device 206 may then present the streamed content from the secure region to the display device 208 as encrypted content.

'667 patent, 4:15-46.

88. In summary, the '667 patent describes a method of caching content on a local storage device such that separate display devices receive the content from the cache upon request, as opposed to that request being sent through the entire content delivery system.

89. It is my opinion that the key benefits of the technology patented by the '667 patent to Viasat's infringing systems include the following:

90. One benefit of the '667 patent is that, by storing the media content in the secure region of the NAS device (*i.e.,* Viasat's S4 server or Viasat's hub), the system of claim 1 and the method of claim 9 reduce the required internet bandwidth associated with media streaming and reduce the total volume of data that needs to

be transmitted over the WAN (e.g., over a satellite) if the media content is played back multiple times by one more of devices connected to the NAS device over the LAN. A second benefit of the '667 patent is that media content can also be transmitted over the WAN (e.g., a satellite) during off-peak hours and stored for later playback during peak hours, which is an added benefit of claims 1 and 9 of the'667 and a specific benefit of claims 3 and 12.

91. It is my opinion that the infringing Viasat systems benefit from this aspect of the invention, in particular as it relates to the IPTV use case which allows multiple passengers on the plane to watch that same live TV content that is stored on the S4 server without having to re-transmit over the satellite the same media content for each passenger. Moreover, if Viasat could not implement the technology of the '667 patent, it would need to re-transmit the media content to each passenger (i.e., at their own device and/or seatback device) that wishes to watch that media content. On a global level, Viasat would need to tranmist significantly more data over its satellite network to provide the same level of service – and availability of the service (e.g., IPTV and IFE distributions) and quality of service to airline and passengers would significantly deteriorate. For example, if a plane with 200 passengers is travelling at the time of the Superbowl, and 150 passengers wish to watch to the Superbowl, Viasat would need to transmit over its satellite the same media 150 times (once to each passenger) instead of just once (once to the whole plane, and that copy is cached in the NAS and then provided to each passenger that wishes to watch). This is illustrated in Viasat's own documentation, reproduced below.



VIASAT_00007343 at 354-355.

92.     For example, the VCDS delivers live video from the ground server if the content

is not stored on the plane, as indicated by ███████████████ in the diagram

below.  On the other hand, the VCDS delivers live video from the cache, and not

from the ground server when there is a ███████████  This is shown in the

diagram reproduced below.  VIASAT_00008738 – 9831, at 8760.  The first time

the content is requested, it will be absent from the local cache, resulting in what is

referred to as a ███████████"  The requested content will be delivered by the

███████████████████████████████████████

███████████  The video is then cached on board at the VCDS Client.  Thereafter,

successive requests for the file can be fulfilled by the ███████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████  Viasat documents refer to this as "caching";

which allows for media-content to be stored at a terminal near the end-user,

thereby allowing Viasat to avoid re-transmissions of the same content and to utilie

off-peak bandwidth more effectively.





93.  By delivering the media content from the cache, instead of the ground server,

Viasat does not need to re-transmit over its satellite network the content each time

a passenger on the same plane watches that content, which translates into

significant bandwidth savings for Viasat and a reduced latency for the end-users.

In particular, where many passengers in a plane watch the same live TV content, a

significant number of re-transmissions over the satellite network can be

prevented.  The ███████████████████████████████████████████

███████████████████████████████████████████████

Moreover, doing so results in an improved user experience, because of the

reduced latency, as there is a longer time lag associated with retrieving the media

content from the ground server as compared with transmitting content stored on

the cache (i.e., S4 server) to the passengers using the plane's LAN.

VIASAT_00100497 – 526, at 502 and 524; VIASAT_00007343 – 394, at 356.

94.    Based on my review of documentation and deposition testimony relating to

Viasat's systems, it is my understanding that bandwidth, throughput, and capacity

are significant constraints associated with transmitting data over Viasat's satellite

system and further demonstrates that Viasat considers bandwidth savings to be

critical.  For example, VIASAT_00006939 describes how the VCDS solution

saves bandwidth by reducing the number of copies of a broadcast that are sent.

VIASAT_00005835 states ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

Concerns about bandwidth and various approaches to conserving bandwidth are

discussed in Viasat documents, including the following:  VIASAT_00005782 at

834-35 (████████████████████████████████████████████

████████████ *id.* at 036 ████████████████████████████

████████████████); VIASAT_00005782 at 835 ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ *id.* at 906 ██████████████████████████

████████████████); VIASAT_00007344 (████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Mr. Neri similarly confirmed

that one of the advantages of the VCDS system was to save bandwidth.  (Mr. Neri Feb. 5, 2025, Tr. at 21:21-22:12).

95.    Other benefits from the reduced transmission of content over its satellite include large-scale improvements to Viasat's satellite network, including because network capacity is limited, and as such its satellite network is "more likely to become overloaded by heavy video usage."  *See* Viasat Data Allowance Policy – Residential, January 17, 2024;[15]  Viasat Network Management Policy ("During periods of congestion, bandwidth intensive applications, such as video streaming…may be slowed more than other applications.  As a result, the quality of video streaming may be reduced and/or buffering may occur.")[16] Similarly, for the delivery of live TV, Viasat notes that its bandwidth usage is considerable, and its approach relies upon subsequent users in a multicast group watching without any additional bandwidth consumption; which as I explain below, is the infringing functionality that Viasat has implemented.  *See* VIASAT_00100497 at 522; VIASAT_00008738 at 8760.  Thus, it is likely that without Viasat's use of the infringing functionality, its network would not be able to keep up with the bandwidth demands and traffic on its satellite network.  Thus, it is my opinion that Viasat's implementation of on-board content caching significantly enhances service reliability and resilience by ensuring content availability to users, even when satellite connectivity is compromised.

---

[15]  https://www.viasat.com/content/dam/us-site/legal/documents/Data_Allowance_Policy_Residential_v28_011724.pdf

[16]  https://www.viasat.com/content/dam/us-site/legal/documents/NetworkManagementPolicy_6_5.pdf.

96.     Yet another benefit of the '667 patent is that by allowing the media streaming system to control access to the secure region, the system of claim 1 and the method of claim 9 reduce the risk of piracy of the media content. This benefit is also enhanced when dependent claims 4, 5, 6, 7, 13, 14, 15, and 16 are implemented. In particular, this benefit is critical for storing studio content (e.g., movies and television shows) on a NAS device on planes (including as explained below under limitation 1[a] and 11[a], Viasat's S4 server for in-flight systems), to be accessed by passengers, or in users' homes (including as explained below under limitation 1[a] and 11[a], Viasat's hub), only to be accessed under the control of the media streaming system. As such, it is my opinion that the infringing Viasat systems benefit from this aspect of the invention. I understand that studios wish to retain strict control over media content that they author. For example, a presentation by Mr. Blankenbeckler dated June 19, 2014, states that "Studios feel existing Content management / DRM methods are not sufficient for their premium content." WD-Viasat-NDCA00011702 at 705. Viasat documents similarly noted that "In most cases media content will require addition encryption (required by movie studios)." VIASAT_00005782 at 835.

97.     Yet another benefit of the system of claim 1 and the method of claim 9 of the '667 patent is that the system and method enable remote, "no touch," "over the air" updates to media content stored on the NAS device (including as explained below under limitation 1[a] and 11[a], Viasat's S4 server for in-flight systems and it's hub for residential systems), for example, because the NAS device is connected to the WAN (e.g., over a satellite network), and is also secured using the security

████████████████████████████████

and anti-piracy aspects explained above of the '667 patent claims 1 and 9, and dependent claims 4, 5, 6, 7, 13, 14, 15, and 16.  As such, it is my opinion that the infringing Viasat systems benefit from this aspect of the invention, in particular as it relates to the IFE use case.  Indeed, it would not be commercially acceptable for Viasat to transmit studio content to a NAS device on a plane that does have the claimed "secure region" as passengers would have access to the media content without restriction, which would not be acceptable for the studios that provide the media content.  For example, a presentation by Mr. Blankenbeckler dated June 19, 2014, states that "Studios feel existing Content management / DRM methods are not sufficient for their premium content."  WD-Viasat-NDCA00011702 at 705.  Viasat documents similarly noted that "In most cases media content will require addition encryption (required by movie studios)."  VIASAT_00005782 at 835.  Moreover, Viasat's document indicate that it would not be commercially acceptable for Viasat to update the media content stored on its in-flight entertainment systems using a manual process, an especially considering that Viasat services hundreds, if not thousands, of aircrafts need to be updated monthly.  *See e.g.*, VIASAT_00014416 – 520 at 458 (████████████████████

████████████████████████████████████);

WD-Viasat-NDCA-00000204 at 205 ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████); VIASAT_00003288 at 320 ████████

████████████████████████████████



*id.* at 323, 324

); *id.* at 325

); *id.* at 326

VIASAT_00003234 (Presentation entitled "VCDS Overview" dated February 2020) at 235

); *id.* at 251

VIASAT_00006865 (VCDS Overview dated August 2018) (same); *id.* at 279

);

VIASAT_00003350 (AA - IFE IPTV) at 351

*id.* at 352

VIASAT_00006805 (VCDS Overview) at 815

"); *id.* at 816

███████████████████████

██████████████ Therefore, without the patented functionality of the '667 patent, Viasat would not be able to provide over the air updates (in particular, since as I explain below, there is no commercially acceptable non-infringing alternative), and would therefore not be able to meet any operational or contractual requirements to provide media content over the air. *See e.g.*, VIASAT_00014633 at 726, 737 (requiring Viasat to ██████████████████████ ███████████████████████████).

Given the lack of a commercially viable non-infringing alternative, which would not include manual updates, and the number of aircrafts that need to be updated (*i.e.*, hundreds of aircrafts), Viasat's content update percentage would very likely fall well below the ██████ threshold and Viasat would not be able to meet the SLA set forth is this agreement.

## VI.    INFRINGEMENT ANALYSIS

98.    In the following subsections I detail my infringement analysis, examining each claim limitation of each of the asserted claims.

### A.    Claim Construction

99.    Throughout my analysis, I applied the Court's construction in every case where the Court has construed a term. Where the Court did not construe a term, I used the plain and ordinary meaning of that term. The following are the Court's constructions:

| Claim Term | Adopted Construction |
|---|---|
| "kiosk" ('400 Patent) | "any device used to access and distribute content provided by the system" |
| "portable data storage device" ('400 Patent) | "a storage device that can be easily carried or moved about" |
| "authenticate the portable data storage device, using at least the unique identifier" ('400 Patent) | "confirming that the portable data storage device is trusted using at least the unique identifier" |
| "provide to the portable data storage device . . . a corresponding access key" ('400 Patent) | "provide to the portable data storage device . . . a key to decrypt the first media content" |
| "public environment" ('400 Patent) | "location accessible by the public" |
| "secure region" ('667 Patent) | "a region of the NAS device to which access is controlled" |
| "receive an indication of the NAS device having a secure region" ('667 Patent) | "receive an indication of the presence of a secure region within the NAS device" |
| "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent) | No construction necessary |

### B.    Viasat Accused Systems

100.    The diagram shown below proides a high-level schematic view of Viasat's

system:



https://www.viasat.com/content/dam/us-site/aviation/ documents/565522_In-

flight_Connectivity_011_aag.pdf

101.    The document VIASAT_0005782 at 798 provides one depiction of some of the

components of the Viasat systems:



102.    As can be seen above, certain components of the Viasat system are on the plane

(including the M3 Modem, the S4 Server, the wireless access points, one or more

power supplies, antenna and randome) and others are on the ground (including,

the VCDS ground servers, content provider servers, and AWS ground servers).

Importantly, to communicate between the plane and the ground, Viasat's System

relies on one or more satellites, including one or more of the ViaSat-1, ViaSat-2,

and ViaSat-3 satellites that I understand are operated by Viasat.

103.  Throughout VIASAT documentation, certain acronyms are used, these are defined here:

104.  W-IFE:  Wireless In Flight Entertainment

    a.  ACP:  Airline Customer Portal

    b.  MRP:  Mobility Retail Platform

    c.  MCP:  Mobility Common Platform

    d.  MSI:  Mobility Service Interface

    e.  ESI:  Entertainment Service Interface

105.  IFE:  In-flight entertainment

106.  OTA:  Over the Air

    a.  PED:  Personal Entertainment Device

    b.  CMS:  Customer Management System

107.  VCDS:  Viasat Content Delivery System

    a.  PML:  Portable Media Loader

108.  OTT:  Over the Top

109.  MSS:  Microsoft Smooth Streaming

110.  IPTV:  Live TV, Live Video, or IPTV offering by Viasat that provides access to television channels to portable electronic devices such as a consumer's mobile phone and also to seatback devices.  I understand from Viasat's Mr. Edillon that within Viasat they use the terms IPTV and Live TV interchangeably.

111.  VIASAT_00006471 at 499 provides yet another diagram of the IFE architecture:



112.    Beginning at VIASAT_0005782 at 797 is a description of the onboard
        components of the Viasat systems.  On that page is the following description "W-
        IFE consists of a suite of applications running in Docker containers.  It is
        deployed at the application layer on top of the Viasat Mobile Retail Platform
        (MRP)."

113.    The same document also discloses that S4 is the server installed in Viasat's
        American Airlines implementation.  I understand that the S4 Server is
        implemented in all current Viasat onboard content delivery systems.  In the
        aviation context, Mr. Daniel Newman explains that the S4 server and M3 modem
        constitute a terminal with storage. (Mr. Newman February 7, 2025, deposition,
        148:9-13).  VIASAT_0005782 at 798 states that ███████ is the server used in the
        ████████████████████.

114.    ████████████████████████████████████████████
        ████████████████████████████████████████████



(VIASAT_0005782 at 800)

115. ████████████████████████████████████████

████████████████████████████ (VIASAT_0005782 at 800)

116. ████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (VIASAT_0005782 at 800)

117. The Viasat Content Delivery Service (VCDS) is a cloud-hosted service that is responsible for transferring content from ████████████████████████ ████████████████████t (VIASAT_0005782 at 801), including content for Live TV and content for IFE (also referred to as distributions) and other types of content.  VIASAT_00008738 at 759-760.  The VCDS is a service delivery platform that is used to provide content to end-users in planes and homes.

118. VIASAT_0005782 at 806 states "The IFE Content Pipeline is a suite of scripts and configuration files that takes in media content such as Hollywood movies, music, and TV shows, processes the content, and uploads it to the IFE Content Management System (CMS)."

███████████████████████████

119.  The document VIASAT_0005782 at 927 describes various software development kits (SDKs) for passenger equipment; There is a ████████████████████ ████████████████████████████████████████ ████████████████████████████

120.  VIASAT-SC_000050 is a text document that was produced with the code.  This document explains that IFE content processing, starting with "The IFE content processing pipeline accepts TV, movies, music, and other content from providers, securely processes it and uploads to CMSs".  The document makes references to the Viasat Wiki page and explains that the content-db is a Mongo database used by the whole pipeline (VIASAT-SC_000051).

121.  VIASAT-SC_000065 is a text document that was produced with the code.  This document explains the IFE Content Management Server.  This document explains that the "onboard server is used to serve a read only copy of a snapshot generated by the CMS.  This snapshot contains information about the media content, such as movies, TV series and magazine, that users can access during a flight" (VIASAT-SC_000067).

122.  VIASAT_00005782 at 807 discusses the importance of Digital Rights Management "The movie studios are particularly sensitive about how their content is handled before DRM packaging, so any instance that handles unprotected content must adhere to tighter security requirements than any other part of IFE."

123.   VIASAT_00100497 explains Viasat's "Connected Seatback Experience," noting

that Viasat's "goal is to enable seatbacks to deliver the same capabilities as

PEDs," including the following capabilities:



VIASAT_00100497 at 500.



VIASAT_00100497 at 501.

124.   VIASAT_00100497 also explains that Viasat's "caching" functionality (which is

enabled using the claimed features of the '667 patent, including claims 1-7, 11-

16).  Witch caching, Viasat streams "IFE and streaming assets contents for

viewing from the local server on demand."  VIASAT_00100497 at 502.

Importantly, Viasat explains that its Live TV offering "needs to scale to high peak

demand."  VIASAT_00100497 at 506.  This document also explains the

"multicasting" functionality offered by the VCDS; that is, a single beam from the

45

satellite can provide media content to multiple planes and/or homes at that the same time.  That content is then stored in a cache in each plane and/or home, and then served to the user.  Thus, without the "caching" feature, which is enabled by using the claimed features of the '667 patent, the multicasting feature would be significantly less effective and would provide minimal benefits.  I understand from review of Viasat documentation that the multicasting and caching features are used by Viasat for Live TV and Distributions (as well as other types of media content).  VIASAT_00008738 at 759-760.



125.    VIASAT_00100497 at 516 also explains how its "Viasat Stream Server" (the M3/S4) receives Live TV, Viasat Wireless Distributions for IFE content, Stream OTT VOD, and Stream OTT Live content and serves that content to seatback devices and PEDs.



VIASAT_00100497 at 516.

126.    VIASAT_00006927 at 939-943 and 929 shows that live video without VCDS

would require individual copies of each program sent to each user:



127.    But with VCDS only one copy is sent:



128.     The same document has numerous slides showing that without using VCDS the in

flight entertainment would be quite problematic at best:



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

VIASAT_00006929

VIASAT_

## C.    '400 Patent Direct Infringement

129.    There are four use cases wherein Viasat's systems meet the claim limitations of the '400 patent.  Each use case is described for each claim limitation.  The use cases are 1) in-flight S-4 server pre-stored video content using VCDS ("Inflight-Pre-stored"); 2) OTT/video on Demand (e.g., Disney+) using VCDS ("Inflight OnDemand"); 3) IPTV/Live TV ("IPTV-Live"); and 4) Video on Demand via Disney+ provided by Stream for Home.  ("HomeOnDemand").

130.    For U.S.-based airlines, Southwest, United, American, Breeze and Porter have enabled use case 1 for customers on their airplanes.  Delta, JetBlue, Southwest and American have enabled use case 3 for customers on their airplanes.  JetBlue has enabled use case 2 as of October 2024 according to Mr. Neri and Delta has enabled use case 2 for five of its airplanes.

131.    Viasat's systems are also in use by non-U.S.-based airlines and used for use case

1 and 3, including Etihad (Use cases 1 and 3), Qantas Airways (Use Case 1),

Virgin Atlantic (Use Case 1), El Al Israel Airlines (Use Case 1), Malaysia

Airlines (Use Case 1), Royal Jordanian Airlines (Use Case 1), and China Airlines

(Use Case 1).

132.    I understand from Ms. Kindler that Viasat sells the systems to the airlines and

thus sells and offers to sell the systems identified below that meet the limitations

of the claims.  It also uses the claimed systems and methods for internal testing

purposes, including in Viasat's U.S. labs and in employee homes.  Mr. Neri

February 5, 2025, Deposition at 22:24-23:21.

      **1.**        **1[pre] A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:**

133.    I understand that the Court has determined that the preamble is limiting, and

Kiosk is construed as "any device used to access and distribute content provided

by the system."  Based on the Court's construction, and the evidence and analysis

presented in this report, it is my opinion that the VIASAT systems in all these use

cases meet this element:  1.  Prestored media for in-flight entertainment ("Inflight-

Pre-stored"); 2.  Video on Demand (e.g., Disney+) ("Inflight-OnDemand"); 3.

IPTV for in-flight entertainment ("IPTV-Live"); and 4.  Video on Demand (e.g.,

Disney+) provided by Stream for Home. ("HomeOnDemand").  Moreover, the

technology of the '400 patent allows Viasat to offer secure access to media

content streamed through the Infringing Use Cases discussed.

134.    For use cases 1 (Inflight-Pre-stored), 2 (Inflight-OnDemand), and 3 (IPTV-Live),

the VCDS running on the M3 modem in conjunction with the S4 server is a

device used to access and distribute content provided by the system and is therefore a kiosk.  It should be noted that in the March 2024 infringement contentions, the Kiosk was identified as "one or more modules of the IFE system; *e.g.*, one or more modules of Viasat's Network Access Unit ("NAU"), the Viasat's Mobile Application Server, or the Viasat S4 Server; *e.g.*, one or more modules of the Gateway system".  That is still the kiosk, however in this current report, I provide more detail.

135.    The document VIASAT_0005782 at 798 provides an overview of the VIASAT systems for at least use cases 1-3



136.    The preceding diagrams shows users with PED's accessing content from the Kiosk (M3 modem with VCDS client in conjunction with the S4 server).

███████████████████████

137.    The document VIASAT_00005782 at 800 begins describing IFE modules (2.1.4.5 IFE Components).  The VCDS client is identified among those components (2.1.4.5.12 VIASAT_00005782 at 801).  The kiosk provides secure media content in the form of encrypted media files.  Those files are provided to multiple portable data storage devices.  The multiple data storage devices are the seatback devices and the PEDs used by users on the airplanes.

138.    VIASAT_008738 at 760 has a diagram describing delivery of live video.  That diagram is shown here:



139.    In this diagram it can be seen that the process begins with a ███████████ ████████████████████████████████████████████████████ The process proceeds to step 9 wherein the file is sent back to the ███████████ ████████████████████████████████.  This is further disclosing a

device used to access and distribute content provided by the system.  It should be noted that Live TV includes IPTV.

140.    A diagram produced at VIASAT 00060099 at 112 shows the process of requesting IPTV from a seatback through delivery of the channel:



**Figure 4 IPTV Service Start and Stop**

141.    In use case 4 (HomeOnDemand), the kiosk is the combination of the Home Wi-Fi terminal including the modem and the attached storage drive. Mr. Neri testified

that SB2+ and Spock modems are used for residential users (Mr. Neri February 05, 2025, deposition 127:14-15).  Mr. Neri also confirmed that the VCDS client is the same for home or airline use (Mr. Neri February 05, 2025, deposition 101:4-8).  In use case 4 (HomeOnDemand), the kiosk provides secure media content in the form of encrypted media files.  Those files are provided to multiple portable data storage devices.  The multiple data storage devices are the smart TVs, tablets, computers, PEDs used at home.

142.    The document VIASAT_00005782 at 819 states "The Viasat Content Delivery Service (VCDS) manages the delivery of content from ███████████████  The ███████████████ service is responsible for transferring the content and a ███████████████ ███████████████████████████████████████████████ ███████  This is one example from documents produced by Viasat that demonstrates that the VCDS Client with the modem and S4 server is a device used to access and distribute content provided by the system.  This VCDS client document is applicable to all four use cases.

143.    The document VIASAT_0008738 at 743 states the following about VCDS generally and has elements relevant to all use cases (emphasis added):

> VCDS has multiple operational modes that address how video, or other high bandwidth *content may move through our network*:

144.    Live Video - Optimize the *delivery of live, streaming video over the internet for services like broadcast TV or sporting events*

145.   Video-on-Demand - Cache videos that subscribers watch on demand from sites like Netflix, Hulu, etc.

146.   Web Caching - Organically caching HTTP resources accessed by subscribers for things like common software downloads such as OS or game updates

147.   Distributions - Distribute curated content in advance to modems for scenarios like delivering a library of content to aircraft

148.   This document makes it clear that the VCDS client distributes media and is a device used to access and distribute content provided by the system. VIASAT_00008420 at 424 has a diagram describing delivery of prestored and on demand videos for Use Case 4 (HomeOnDemand):



149.   In that diagram, the ███████████████████████████████ ███████████ are shown accessing and distributing content provided by the system. Specifically, a smart phone, tablet, and a laptop are shown as a plurality of portable data storage devices.

56

████████████████████

150.    In addition to evidence in documents produced by Viasat, there is evidence in the source code of this claim limitation.  The file \███

████████████████████ (VIASAT_SC_0000164) handles requests for content. Mr. Neri confirmed that this file has functions related to the ████████████████████

████ (Mr. Neri February 05, 2025, deposition 171:21-172:22) The function

████████████████ (VIASAT_ SC_000169) takes in

████████████████████. This file demonstrates content being requested in conjunction with the ████████.  Code related to the ████████ is applicable to all four use cases.  The call tree for the function was produced as VIASAT_SC_0000029:



151.    The preceding code and code diagram demonstrate the ████████ is involved in requesting content.  The code also shows the ████████████████.  In Mr. Neri's February 5, 2025, deposition he confirmed that the ████████████

████████████████ (Mr. Neri Feb. 5, 2025 deposition at 156:19 – 157:21). Mr. Neri also confirmed that the ████████ is the same for home or airline use (Mr. Neri February 05, 2025, deposition 4-8).  In other words, this ████████ operates the same way for  all use cases.

152.    The code file ████████████████████████

VIASAT_ SC_0000033 is responsible for publishing the media content.  As one example is the function ████████████ VIASAT_ SC_0000034 which calls the

██████████████████████████
████████

function BuildPublishedDirectoryByFileID.  This code demonstrates that the VCDS client along with the modem and the S4 server are used to access and distribute content provided by the system.

153.   The call chain for the function publishContent was produced as VIASAT_0000030:



154.   The code file ██████████████████████████████

██████████████ (VIASAT-SC_000033) and the ████████

██████████████ (VIASAT-SC_000034) programmer comments state ████████

████████████████████████████████████████

████████████████.  This code further demonstrates that the ████████████

████████████████████████ are used to access and distribute content provided by the system.

155.   The file \████████████████████████████████████

████████████████████████ Programmer comments state: ████████████████

██████████████████████████.  This file also has the function

████████████████████████████████████████

██████████████████████████  The function ████████████████████

██████████████████ on VIASAT_0000220.  The function ████████████████████

███████████████████████████████

███████████████████████████████████

██████████████████████████ also on VIASAT_0000220.  These

functions show the █████████████████ .

156.  The file ████████████████████████████ VIASAT_0000249

████████████████████████ VIASAT_0000250, the ██████████

████████████████ VIASAT_0000251 ███████████████████████

VIASAT_0000254.  The file ███████████████████████████████

█████████████████ VIASAT_0000253 ████████████████████████

██████████████████████████ This code details the process by which the ████████

███████ ingests content which is one step in accessing and distributing content

provided by the system.

157.  It should be noted that VIASAT_ 0008745 states that █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

158.  In the airplane installation (use cases 1 (Inflight-Pre-stored) and 3 (IPTV-Live))

██████████████████████████████████████████████████████ (Mr.

Neri's February 05, 2025, Deposition 33:5-9).  The modem provides a mechanism

for communicating outside the aircraft, for example with VCDS server (Smarts)

on the ground.

159.  VIASAT_0008738 at 770 describes the process by which a VCDS client joins a

multicast:

    The sequence by which a VCDS client joins a multicast is then a multi-

step process:

████████████████
████████████████████

1. VCDS client starts running and registers with VCDS Smarts

2. VCDS client is provided a configuration by VCDS Smarts. This configuration points the VCDS client to a multicast control channel to join.

3. VCDS client joins the control channel multicast

4. VCDS starts a multicast session for file transfer

5. VCDS client listens on the control channel for multicast announcements regarding the file transfer multicast

6. VCDS client joins the file transfer multicast

160.  The preceding sequence discloses one way the VCDS client can obtain content to distribute to users in the aircraft.

161.  VIASAT_0005782 at 801 describes the VCDS system as follows: "The Viasat Content Delivery Service (VCDS) is a cloud-hosted service that is responsible for transferring content from CMS (via Amazon S3) over a satellite link to a modem device on the aircraft." The same document states "VCDS Client is a general name referring to the collection of scripts and applications that support VCDS service on the M3 modem." This code demonstrates that the VCDS-client with the modem and the S4 server are a device used to access and distribute content provided by the system.

162.  Moreover VIASAT_00006166 depicts content being delivered to user devices in an airplane (use cases 1, 3, and 4):



## ViaSat In-Cabin System

The existing ViaSat in-cabin system is focused around the NAU (Network Access Unit). The NAU acts as the router between the WAPs (Wireless Access Points) and the modem. The W-IFE system will need to be able to be run virtualized on the NAU, which will have storage space accessible to the W-IFE system.

The NAU manages all PED (Personal Electronic Device) sessions, including DHCP and Portal. The W-IFE solution will need to be integrated into the NAU such that existing PED sessions (over existing WAPs and local DHCP sessions) are used to serve on-board content to PEDs.

163.    VIASAT_00006471 at 532 further depicts the delivery of media content to a

plurality of portable data storage devices (use cases 1, 2, and 3):



164.    VIASAT_00006471 at 491 also discloses the limitations of claim 1 preamble:



165.    For at least these reasons, the Viasat systems meet the limitations of this claim

limitation for all four use cases.

166.  The Court construed the term "portable data storage device" to mean "a storage device that can be easily carried or moved about."  It is my opinion that end-user, semi-embedded, and seat back devices are portable data storage devices under the Court's construction as such devices can be "easily carried or moved about."  The fact that seat back devices are attached to the back of a seat does not change the nature of these devices; they are portable as they can be easily carried or moved about before and after being attached to the back of the seat.  The "seatback devices" even appearing embedded, are essentially smart tablets with one or two wires that can easily connect and disconnect for power and ethernet. For example, in a public document published by Panasonic Avionics, which Mr. O'Sullivan confirms to be one of the only two major seatback display screen providers on the market (Mr. Des O'Sullivan Feb. 26, 2025, Deposition at 91:21-92:11), an exemplary 16-inch "smart" seatback display unit is essentially a tablet with only two ports ("J1" and "J2") for power and ethernet data transmission. WD-Viasat-NDCA00015235 at 6289, 290. This figure shown on WD-Viasat-NDCA00015235 at 6290 shows the tablet with two ports:



Figure 1. 16-inch Smart Monitor (SM) - Component Description

167.   The display size may vary, but the essential construction of a tablet with two power and ethernet ports remain the same. For example, WD-Viasat-NDCA00015235 at 6291, 292 shows a variation of the display unit shown above but in a 24-inch size. The dimensions are larger, but the ports are the same.

168.   The installation and removal of such smart tablets only involves the screwing and unscrewing of a few of mounting screws, which hold the display unit onto a frame, and the plugging and unplugging of power and ethernet. In the same 16-inch and 24-inch smart tablet examples, there are 8 screws. WD-Viasat-NDCA00015235 at 6304, 6308.



Figure 4002. 16-inch Smart Monitor (SM) - Removal/Installation (Sheet 1 of 4)

169.   It is my opinion that these seatback devices, which are essentially smart tablets literally satisfy the claim element, because they "can be easily carried or moved about" and are therefore portable. A user or a staff member can easily carry this 16-inch tablet about after manually removing the screws and unplugging the two ports.

170.   To the extent the aforementioned end-user devices, semi embedded devices, and/or seatback devices, exemplified by the 16-inch and 24-inch tablets do not literally satisfy the requirements of the claimed portable data storage device, they perform the substantially the same function in substantially the same way to obtain substantially the same result as the claimed portable data storage device. The Patent teaches that the function of the portable data storage devices for media playback is to "remotely access the content and play it on a mobile device." '400 Patent 5:19-34. A semi-embedded or embedded seatback display unit carries out

65

this function: the seatback display units distributes media content away from the

kiosk onboard, which is remote from individual passenger seas, and to within

touch and viewing distances of individual users onboard seated in seats by

remotely accessing the content in the kiosk. The way of delivering media

according to the patent is a connection between the storage device and the kiosk

"via a secure connection." *Id*. The seatback devices, exemplified by the

Panasonic Avionics tablets discussed above, carry out this function via

substantially the same way: the embedded seatback display units are connected to

the kiosk securely via a wired connection and the semi-embedded display units

are connected to the kiosk via WAPs. *See* VIASAT_00006471 at 477. The result

of the portable data storage device according to the teachings of the Patent is that

kiosk distributes individual media content remotely away from the kiosk to

individual users.  The seatback display units achieve substantially the same

function. For example, these devices communicate with one or more modules of

the Viasat IFE, W-IFE, and/or Gateway systems. As I explained above, it is my

understanding that infringement can be met when the accused product satisfies the

function-way-result test.  It is my opinion that, if the seat back devices do not

literally meet the "portable data storage device" limitation, the seat back devices

meet the claim limitation under this function-way-result test.

171.    For at least these reasons, the Viasat systems meet the limitations of this claim

limitation for all four use cases under the doctrine of equivalents for seat back

devices.

**2.      1[a] a first data interface configured to communicate with a portable
data storage device;**

████████████████████████████

Proxy and Core Node.  A POSITA would appreciate that these devices have one or more hardware processors.

549.  As for the residential application, the VCDS system comprises processors on the home Spock/SB2+ Modem, the VCDS server including the Web Proxy and Core Node.  A POSITA would appreciate that these devices have one or more hardware processors.

550.  A CPU (Central Processing Unit) is disclosed multiple times in Viasat documentation including VIASAT_00005782 at 809, 989, 6018, 6010, 6081; VIASAT_00008738 at 816, 818, 822.

551.  Furthermore, one of ordinary skill in the art would understand that computer code requires a processor to execute.  Therefore, the computer code discussed in this report must execute on one or more processors.

552.  For at least these reasons, the Viasat systems meet the limitations of this claim limitation.

**4.      1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;**

553.  The VCDS client on M3 modem receives an indication of the NAS device, which is the S4 storage (NAS) generated according to an NFS configuration file when the M3 modem is booted up and received by VCDS client on M3.  The S4 storage comprises a buffer for streaming media.

554.  As one example of receiving an indication of a secure region, the ███████ ████████████████████████ (VIASAT-SC_0000242) has programmer comments that state "████████████████████████████████████████

202



. This is an example of an indication of a secure region.  This value is part of the VCDS code that indicates whether a region in the storage is secure.

555.  A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Mr. Neri Feb. 5, 2025, deposition at 164:1-166:13).[28]

556.  The ▮▮▮▮ value is used in multiple places in the code.  One example can be found in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ beginning at VIASAT_SC_0000212), which has the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (VIASAT_SC_0000242) takes in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ pointer.  This function checks to see ▮▮▮▮▮▮▮▮▮▮▮

557.  Another example is in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is just one example of the ▮▮▮▮▮▮▮▮▮▮▮ being used referenced throughout the source code.  This is an example of an indication of a secure region.

---

[28]  Mr. Neri also testified that the encrypted Boolean value is always set to false, and that this code was not implemented to check whether a storage device is encrypted. Mr. Neri Feb. 5, 2025 Deposition at 184:24-10. However based on my review of the source code I disagree. It is my opinion that the source code supports that this Boolean value reflects whether the relevant storage device is encrypted.  It should also be noted that there are multiple places in the code, many cited in this report, where this value is checked.



558.    Mr. Neri also testified that this encrypted value is set via comparing file paths. Mr. Neri Feb. 5, 2025, Deposition at 167:2-168:4.  An excerpt from that testimony is given here: ███████████████████████████

████████████████████████████████████████

███████████ Therefore, file paths are one example of an indication of the NAS device having a secure region.  This value is part of the VCDS code that indicates whether a region in the storage is secure.

559.    The source code production further supports this table-comparison resulting in confirming whether the storage device is encrypted.  For example, the ███████████ ████████████████████████ beginning at VIASAT-SC_0000374.  At VIASAT-SC_0000375, ████████████████████████ ████████████████████████ Programmer's comments state ████████████████████████ On the same page is also ████████████████████████ This value ████████████████████████ is another example of an indication of a secure region.  This value is part of the VCDS code that indicates whether a region in the storage is secure.

560.    The ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ . More specifically, ██████████████████ ████████████████████████ ████████████████████████

█████████████████████████████████

561.    Mr. Neri testified that the indication discussed in the paragraphs above was set by the file system in both the residential and the commercial aviation case (Mr. Neri February 05, 2025, deposition 169:3-21).  This is yet another example of an indication of a secure region.

562.    Mr. Hughes confirmed that there is a separate subfolder for each packed file, including a separate subfolder for the DRM-encrypted files (Mr. Hughes 28 February 2025 deposition 105:3-16).  The subfolder containing DRM-encrypted files is an example of a secure region.

563.    The PEDs and seatback systems are separate display devices on the LAN as described in VIASAT_00007973 at 012:



564.    Viasat's documents confirm that the S4 server, which is the claimed NAS device, has a secure region comprising a buffer for streaming media.  For example, the network terminal is shown to encrypt external storage devices VIASAT_00008738 at 766:

whatever is the latest protocol.

5. The Mobile network terminal shall support local download and upgrade of the VCDS Client application separately from the terminal image.
6. The network terminal shall provide the VCDS Client with internal storage for caching and serving content.
7. The Mobile network terminal shall support the capability to mount a network file system (NFS) on the cabin server.
8. The network terminal shall support the capability to mount attached external storage (e.g. HDD) f or caching and serving content.
9. The network terminal shall encrypt the attached external storage device.

565.  This is an example of a secure region.

566.  VIASAT_00007395 at 418 also describes a NAS with a secure region comprising a buffer for streaming media:

## Security and Compliance

› Encrypt all HDDs as part of "Defense in Depth"
› Protects our technology and the appearance of PII risks
› VCDS is already compliant with all 15 controls

› Interesting PII and URL concerns that need to be worked with compliance
› Viasat needs to use usage history to optimize the network
› Content Provider and Viasat want to exchange information to improve performance and experience

567.  Indeed, Viasat's witness, Mr. Daniel Newman confirmed that the VCDS client stores content received over the satellite network on a solid-state memory located on the S4 server (Mr. Newman Feb. 7, 2025, Deposition at 40:17-41:5).

568.  Mr. Jason Neri also stated that the S4 file system is the storage device for storing content. Mr. Neri Feb. 5, 2025 Deposition at 33:25-34:20, 112:24-113:8, 165:18-166:3.  The same storage device on the S4 server is used for prestored content and Live TV or Disney+ On Demand content. Mr. Neri Feb. 5, 2025 Deposition at 46:9-21.

569.  Further, Viasat's witness, Mr. Des O'Sullivan confirmed that the DRM protection needs to be added to the aircraft server to allow users to watch the media content.

**████████████████████████████**

Mr. O'Sullivan Feb. 26, 2025 Deposition at 47:1-7. For a user to access media content, the VCDS system must have DRM protection in the on-plane server, and the media content needs to be available with DRM capability. Mr. O'Sullivan Feb. 26, 2025 Deposition at 52:3-10. DRM protection is a form of security and therefore demonstrates a secure region.

570.   In context of PEDs, the DRM components verify the characteristics of a PED, and if appropriate characteristics are confirmed, the DRM API issues a token to the PED, which then triggers media streaming from the content stored onboard (i.e., on the S4 server) to that PED. Mr. O'Sullivan Feb. 26, 2025 Deposition at 61:11-22; 109:8-15; 110:16-24; 148:16-20.

571.   Indeed, different types of content (such as prestored content, IPTV or Disney+ content) are stored in different file locations within the same S4 server storage device. Mr. Neri Feb. 5, 2025 Deposition at 47:4-48:1, 74:21-25. For example, client requested content is stored in the folder called "staged" on the S4 server. Mr. Neri Feb. 5, 2025 Deposition at 37:5-12.

572.   Likewise, Mr. Hughes testified that movies and TV shows are stored as DRM-encrypted packaged files in separate sub-folders such that the separate sub-folders are thus secure regions. Mr. Hughes Feb. 28 Deposition at 105:4-16. The separate subfolder containing DRM encrypted packaged files is a secure region. As such, the sub-folder file paths are also an indication of a secure region.

573.   In the residential VCDS application, **████████████████**

**█████████████████████████████**

**███████████████████████████████**

████████████████████████████ Mr. Neri February 05, 2025, deposition 167:2-168:4).

Therefore, the mount file path is an indication of a secure region. The ████████

████████████████████████ is also an indication of a secure region.

574.    The indication of the NAS device secure region, in both in-flight and residential

applications, is also supported by Viasat's source code. With respect the claim

language regarding "secure region," encrypted portions of the storage would be

secure, whereas non-encrypted would not be secure. Therefore, that indication of

encryption is an indication of a secure region.

575.    The ██████████████████████████████████████████████

███████████████████████████████████

576.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████

577.    The structure itself is defined in ████████

████████████████████████████████ (beginning at

VIASAT_SC_0000189).

578.    The ████████████ is used in multiple places in the code. One example can be

found in the file \████████████████████████ (beginning at

VIASAT_SC_0000212), ████████████████████████████████████

(VIASAT_SC_0000242) ███████████████████

███████████████

579.    Another example is in the ████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

580.    Viasat's source code further confirms that the storage on VCDS has a buffer.  The

███████████████████████ (VIASAT_SC_0000249),

████████████████████████████

██████████████████████ A POSITA would

recognize that storage device includes a buffer.

581.    For at least these reasons, the Viasat systems meet the limitations of this claim

limitation.

**5.    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and**

582.    In both in-flight and residential applications, ████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

The stored media content is available to be played for playback on PEDs (in

general), / seatback systems (for in-flight applications), and/or home appliances

(for residential applications) from the respective buffers.  The ████████████

████████████████████████████

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed in Plano, Texas on the 24th of March 2025.

Dr. William C. Easttom II