# Exhibit 1

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA,
OAKLAND DIVISION

| | | |
|---|---|---|
| SANDISK TECHNOLOGIES, INC. et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| VIASAT, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | Case No. 5:22-cv-4376 |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**EXPERT INFRINGEMENT REPORT OF DR. WILLIAM C. EASTTOM II (CHUCK EASTTOM) Ph.D., D.Sc.**

---

████████████████████████████

**Table of Contents**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 1

    A.    Qualifications ............................................................................................ 1

    B.    Prior Testimony ........................................................................................ 4

    C.    Compensation ........................................................................................... 4

III.  LEGAL PRINCIPLES ........................................................................................ 4

    A.    Direct Infringement ................................................................................... 4

    B.    Indirect Infringement ................................................................................ 5

    C.    Literal Infringement .................................................................................. 5

    D.    Infringement Under The Doctrine of Equivalents .................................... 5

    E.    Practicing the Claimed Methods in the United States .............................. 6

    F.    Person of Ordinary Skill in the Art .......................................................... 6

IV.   MATERIAL REVIEWED .................................................................................. 7

    A.    Source Code .............................................................................................. 9

V.    BACKGROUND OF TECHNOLOGY AND PATENTS-IN-SUIT ................ 14

    A.    Satellite Technology ............................................................................... 14

    B.    U.S. Patent No. 9,424,400 ...................................................................... 18

    C.    U.S. Patent No. 10,447,667 .................................................................... 22

VI.   INFRINGEMENT ANALYSIS ......................................................................... 38

    A.    Claim Construction ................................................................................. 38

    B.    Viasat Accused Systems ......................................................................... 39

    C.    '400 Patent Direct Infringement ............................................................. 50

        1.    1[pre] A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising: .......................... 51

        2.    1[a] a first data interface configured to communicate with a portable data storage device; ..................................................................... 66

        3.    1[b] a second data interface configured to communicate, over a network, with a remote trusted server; and ................................................ 77

        4.    1[c] a processor configured to: ................................................................ 82

        5.    1[d] obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device; ..................................................................................................... 83

███████████████████
███████████████████████

6.      1[e] authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and ............................................................ 95

7.      1[f] in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key ...................................................................... 106

8.      2. The kiosk of claim 1, further comprising a local data storage storing a plurality of encrypted media content. .................................... 113

9.      6. The kiosk of claim 1, wherein the second data interface is a network interface. ................................................................................ 114

10.     8. The kiosk of claim 1, wherein the kiosk is located in a public environment ........................................................................................ 118

11.     9[pre]  A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising: ........................................................................................ 119

12.     9[a] establishing communications with a portable data storage device over a first data interface; ........................................................... 135

13.     9[b] establishing communications with a remote trusted server via a second data interface over a network; ................................................. 145

14.     9[c] obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device; ...................................................................................... 150

15.     9[d] authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and ............................................. 162

16.     9[e] in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key ...................................................................... 173

17.     10. The method of claim 9, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content. .................. 182

18.     13. The method of claim 9, wherein the second data interface is a network interface. ................................................................................ 183

19.     17. The method of claim 9, wherein the kiosk is located in a public environment. ....................................................................................... 188

D.      '667 Patent Direct Infringement ........................................................... 188

1.      1[pre] A media streaming system comprising: ..................................... 189

2.      1[a] a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached

storage (NAS) device operating on a local area network (LAN); and ............................................................................................... 196

3.    1[b] one or more hardware processors configured to: ............................ 201

4.    1[c] receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system; .................. 202

5.    1[d] transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and ............................................................................................ 209

6.    1[e] transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer. ................................... 213

7.    2. The media streaming system of claim 1, wherein the separate display device comprises a smart television. .......................................... 217

8.    3. The media streaming system of claim 1, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device. ..................... 220

9.    4. The media streaming system of claim 1, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system. ........................................ 222

10.   5. The media streaming system of claim 1, wherein the one or more processors are further configured to:  cause the NAS device to use encryption that secures the digital content to the secure region. ................................................................................................ 224

11.   6. The media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an amount of data stored in the secure region. ................................................................................... 232

12.   7. The media streaming system of claim 1, wherein the one or more processors are further configured to:  provide instructions to the NAS device for controlling an encryption type used in the secure region. ................................................................................... 235

13.   11[pre] A method of transmitting media content from a media streaming system, the method comprising: ............................................ 241

14.   11[a] establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); ................................................................................ 248

15.   11[b] receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system; .................. 253

HIGHLY CONFIDENTIAL                    iv

16.    11[c] transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and .................................................................................. 261

17.    11[d] transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.................. 266

18.    12. The method of claim 11, wherein transmitting the media content to the secure region comprises:  time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device. ...................................... 270

19.    13. The method of claim 11, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system. ................................................. 272

20.    14. The method of claim 11 further comprising:  causing the NAS device to use encryption that secures the media content to the secure region. ................................................................. 274

21.    15. The method of claim 11 further comprising:  providing instructions to the NAS device for controlling an amount of data stored in the secure region. ....................................................... 276

22.    16. The method of claim 11 further comprising:  providing instructions to the NAS device for controlling an encryption type used in the secure region.................................................. 280

E.    Indirect Infringement ....................................................... 285

    a.    '400 Patent                                                    285

    b.    '667 Patent                                                    287

VII.    NON-INFRINGING ALTERNATIVES ...................................... 290

A.    '400 Patent ....................................................................... 290

B.    '667 Patent ....................................................................... 296

VIII.    OBJECTIVE INDICIA OF NONOBVIOUSNESS ...................... 303

A.    Commercial Success ......................................................... 304

B.    Long-Felt Need ................................................................. 306

IX.    SCSA AND THE '400 PATENT ............................................... 308

X.    OPINIONS AND CONCLUSIONS ........................................... 313

than existing products," and explained that it "It was really meant to prevent, you know, people illegally copying content. So it was more of an anti-piracy sort of a solution." Tr. at 67:1-5, 67:10-13. The inventors' goal was "to build a DRM system that the studios would allow us to put content on our drives with was the highest level of what we were trying to do." Tr. at 125:22-25.

78.     It is my opinion that the key benefits of the technology patented by the '400 patent to Viasat's infringing systems include the following:

79.     One benefit of the '400 patent is that it provides improved security for the media content through the encryption used. A related benefit is that the method and system of the '400 patent reduce unauthorized distribution of media content and piracy of the media content. This improved security reduced piracy, and encourages content creators, such as movie and TV studios, to allow their content to be stored on a local hard drive. For example, a presentation by Mr. Blankenbeckler dated June 19, 2014 states that "Studios feel existing Content management / DRM methods are not sufficient for their premium content." WD-Viasat-NDCA00011702 at 705. Viasat documents similarly noted that "In most cases media content will require addition encryption (required by movie studios)." VIASAT_00005782 at 835.

**C.    U.S. Patent No. 10,447,667**

80.     The '667 patent, entitled "Secure stream buffer on network attached storage," was filed on April 16, 2018, and issued on October 15, 2019. The '667 patent claims priority to application no. 14/15,367, which was filed on February 2, 2015. Dean M. Jenkins and Robert P. Ryan are the named inventors of the '667 Patent. The abstract to the '667 Patent states the following:

███████████████████
██████████████████████

> A network attached storage device coupled to a local network and
> including a network interface configured to receive digital content
> from a remote content provider outside the local network.  The
> network attached storage device includes storage having a first
> region accessible by a user of the local network and a secure
> region.  The network attached storage device includes a processor
> coupled to the storage, the processor configured to control access
> to the secure region of the storage based on instructions received
> from a remote content provider.

81.     As the Background section of the '667 patent explains, "Bandwidth throttling,"

which is "the intentional slowing of internet service," '667 patent at 1:18-20, was

employed by network providers to the detriment of video streaming.  *Id*. at 1:22-

30.  The effect of bandwidth throttling is that the Internet "pipe" becomes smaller;

and sometimes, it is too slow to support the transmission of video media content

for playback in real-time.  Mr. Jenkins explained this problem at his deposition:

> **Q** Can you describe the '667 patent at a high level?
>
> **A** So back in, I want to think, 2014, there was a lot of talk about
> net neutrality and a lot of internet server providers, or ISPs as we
> call them were -- they had the ability to throttle streams.  Most of
> the ISPs were also cable providers; in other words, providing cable
> TV access.  And so they had the ability to throttle their internet
> access on a selected basis.  So however they wanted to, they could
> do this.  And that was what the net neutrality was all about.  And I
> saw this as a way to bring -- my patent as a way to bring value to
> our NAS box at the time.
>
> . . .
>
> **Q** Okay.  Let me ask a different question:  When you were
> working on the '667 patent back in 2013, 2014, what set that apart
> from other solutions that already existed?
>
> **A** So as I described, I was upset that the internet service providers
> were throttling the consumer.  And I didn't like that.  And there
> was also this net neutrality that was trying to get passed in
> Congress, but it was having issues.  And I said this is a way to
> circumvent all of that and provide a way of doing that.  And I did
> not know of another -- another way of doing that at the time.  And

███████████████████████
███████████████

it -- like I said, it brings a value-add to the Western Digital product.

Jenkins Tr. at 56:22-57:11, 61:8-21.

82.     Co-inventor Mr. Ryan similarly testified as follows:

> **A** Yeah.  What we were looking for -- Dean and I were the coinventors.  Dean actually had the original spark of the internet bandwidth is tight and content is big and too big for that pipe.
>
> So we were going to create a new market for the hard drive to go into that was an ability to buffer the streaming service, so you could start a movie and tell it, "You know what, I want to watch this movie."
>
> You wait ten minutes.  It's buffering, buffering, and buffering, and then you could actually watch the movie ten minutes later and you'd have buffered up enough content you wouldn't have frame skipping.
>
> That was the -- the main gist of it was to get around that internet service crunching of your data.
>
> And then -- and then we kind of expanded it to oh, you know we could have people preload content as well, but the first premise was just that capability to buffer.
>
> Last night, we were watching something, direct stream app on a Fire Stick, and the thing got horribly pixilated.  And my wife was like, "Why does this thing look horrible?" I'm like, well, had this patent gone through and we actually had this buffer, then we'd watch it a little bit delayed, but it would be clean, you know, so that was...

Ryan Tr. at 58:3-22; *see also*, *id.*, 59:10-24, 60:2-16, 78:12-19.

83.     Thus, the inventors sought to sought to solve the problem of providing media content through a narrow Internet "pipe" that did not have sufficient bandwidth to transmit media content for playback in real-time (*i.e.*, video streaming).  While most high-speed Internet connections in the United States today have sufficient bandwidth to support video streaming, some Internet connections do not.

███████████████████████████

Significantly, satellite internet, even today, is plagued by throughput, bandwidth, and capacity concerns; particularly so when satellite internet is used for media-streaming in aircraft because of the number of passengers on board, the strict requirements for small and lightweight multi-directional antennas, and the difficulties in transmitting data through unpredictable environments associated with airplanes.[13,14.]

84.    The inventors therefore came up with the solution defined in the '667 patent as a way to solve the problems associated with transmitting media content through a narrow Internet "pipe."  The '667 patent explains:

> Network streaming of media content such as movies and televisions shows, among other types of content, has become commonplace.  At times, network providers, such as ISPs limit or throttle certain streaming hosts, for example, to extract financial gains for providing Quality of Service (QoS).
>
> Aspects presented herein provide a way to maintain smaller sizes of buffers on display device and to maintain control over content while ensuring that content can be viewed without deterioration due to throttling through the use of a Network Attached Storage (NAS) device having a secure portion for buffering streaming content.  Such a NAS device may be used, e.g., as part of a home network to provide for private buffering of streaming content for any number of display devices.
>
> As most display devices have very limited buffering capability, such buffering at a NAS device may help to ensure QoS at the display device.

---

[13]    For example, due to capacity constraints imposed by delays in launching ViaSat-3 satellites, Viasat announced in August 2023 that it planned to shift away from residential internet services. Viasat moving away from consumer broadband, August 2, 2023.  (https://www.advanced-television.com/2023/08/02/viasat-moving-away-from-consumer-broadband/, viewed on March 4, 2025.)  *See also*, Viasat shares fall as slowing fixed broadband hurts revenue outlook, May 21, 2024.  (https://www.reuters.com/business/media-telecom/viasat-shares-fall-slowing-fixed-broadband-hurts-revenue-outlook-2024-05-21, viewed on February 25, 2025.); *see also* The Top 5 Disadvantages of Satellite Internet: What You Need to Consider (https://www.speednetlte.com/post/the-top-5-disadvantages-of-satellite-internet-what-you-need-to-consider#viewer-nvdt7268655).

[14]    Gomez, A Performance Evaluation of TCP BBRv2 Alpha (https://research.cec.sc.edu/files/ekfoury/files/a_performance_evaluation_of_tcp_bbrv2_alpha.pdf).

███████████████

Additionally, by buffering the media at the NAS device, the media content can be viewed without the hiccups or stalling due to throttling, because the content is already buffered and can be viewed without being streamed over the Internet.

Control of the media may be maintained by the stream content provider through the security employed by the secure portion of the storage device. This portion may be secured, e.g., by designating the media as private. Access to the private buffer may be sold on a subscription model to streaming content providers.

Additionally, individual display devices do not require additional buffering capability thereby avoiding an increase in cost for the devices that would be involved in increasing the size of their buffers.

'667 patent, 2:23-55.

85.    Similarly, at his deposition, Mr. Jenkins explained:

Okay. So I came up with a concept if internet service providers were going to throttle and make your experience streaming any kind of video painful, such as, you know, buffering, you'd hiccupping in your -- you'd have an unsteady video display, I saw that as a way I could add some value to our network attached storage by holding back an area of storage and making it encrypted and unavailable to the user who bought the network attached storage, but providing it to a content provider such as a Netflix or Hulu or there's various ones out there.

And, therefore -- I think at the time, 2014, Netflix was one of the prominent ones. And I believe at the time, you also could queue up or tell them which videos or movies that you were going to be looking at.

And so with that knowledge, Netflix could queue those things up and put them on this area, secure area that I was describing inside the NAS box

because the content provider would have access to that, where the user wouldn't. And then when you went to display something, typically a Netflix client, which would be running on a Samsung -- on any television, HDTV or a Netflix box, there's various ways of doing that, it would contact, through your home network, this piece of storage and spin off this encrypted data so it could display it on your TV and you could watch a movie.

26

So it was a way of getting around any kind of internet service provider throttling, any kind of slow pipe you could -- you could force feed the stuff into the home into the NAS box.

So it provided added value to the NAS box that Western Digital could -- you know, be worthwhile to them; it could sell more NAS boxes.

. . .

The NAS box is a component of the entire system.  Like, when I was conceiving this, Netflix is the -- on one end feeding it, and then the NAS box has the secure region.  Netflix can talk to it and have it there.

So they're serving something up and controlling that feed in.  And then the NAS box is a small server, also, feeding it to the display device, making sure that it never starves the display device so you don't have any hiccups.

Jenkins Tr. at 57:15-59:1, 97:9-18; *see also*, *id*. at 110:3-14,

86.     In particular, the '667 patent discloses a streaming media system that transmits media content over a wide area network ("WAN"; for example, the Internet) to a network attached storage ("NAS").  The NAS device is connected to both the WAN and the NAS over a local area network ("LAN").  This is shown, for example, in Fig. 3 of the '667 patent reproduced below, which illustrates a NAS device 306 connected to a User Network 310 and to the ISP Network 304.  *See also* '667 patent at 4:46-50.  The NAS device 306 is also in communication with a remote content provider 302 (or "Stream Provider") through the ISP Network 304.



**FIG. 3**

87.    As shown in Fig. 3, the NAS device 306 has a user accessible storage 322 and a

secure region 324.  The '667 patent explains that the remote content provider 302

may transmit media content that is then stored in the secure region 324 of the

NAS device 306.  Moreover, the NAS device "controls access to secure region

324 of the storage based on instructions received from a remote content provider."

'667 patent at 5:5-10.  The '667 patent explains:

> The secure memory region 210 of NAS device 206 may be
> configured as a buffer for receiving steaming content for the at
> least one display device 208 in a manner controlled by the stream
> content provider 202.  Display devices 208 may have minimal
> buffer storage for a number of reasons.  For example, the cost of
> the display device may be reduced by requiring a smaller amount
> of buffer storage in the display device.  Additionally, content
> providers may prefer smaller buffers in display devices because
> this allows them to maintain control of their content by providing
> smaller amounts at a time to the display device.
>
> By providing a larger buffer in the secure region of the NAS
> device 206, 306 that can be used by the display device enables
> the content provider 202, 302 to use burst transmission to stream
> the content in larger bursts than might be possible for
> transmissions to a smaller buffer.  Also, as the streamed content
> continues to be controlled by the stream content provider, the

stream content provider can use burst transmission without risking misappropriation of the streamed content by the user.

For example, once a user requests content from a stream content provider via a display device 208, the NAS device 206 may negotiate with the stream content provider 202 to receive the desired content and to buffer an encrypted stream of the content in the secure region 210. Such negotiation may include, e.g., informing the stream content provider of a secure region within the NAS device that is not accessible by a user. The NAS device may inform the stream content provider of the available size of the secure region or may negotiate with the stream content provider to agree on a size of a secure buffer. Among other negotiated aspects, the NAS device may negotiate with the stream content provider to agree on a length of time for which the content will be retained at the secure region of the NAS device, requirements for the user to access the streamed content, whether the streamed data is encrypted, and keys for accessing encrypted content. For example, requirements for accessing the streamed content may be time based, user based, etc. If the streamed content is encrypted, a description key may also be obtained. The keys may be obtained based on payment, a license server, etc. The NAS device 206 may then present the streamed content from the secure region to the display device 208 as encrypted content.

'667 patent, 4:15-46.

88.     In summary, the '667 patent describes a method of caching content on a local storage device such that separate display devices receive the content from the cache upon request, as opposed to that request being sent through the entire content delivery system.

89.     It is my opinion that the key benefits of the technology patented by the '667 patent to Viasat's infringing systems include the following:

90.     One benefit of the '667 patent is that, by storing the media content in the secure region of the NAS device (*i.e.,* Viasat's S4 server or Viasat's hub), the system of claim 1 and the method of claim 9 reduce the required internet bandwidth associated with media streaming and reduce the total volume of data that needs to

be transmitted over the WAN (e.g., over a satellite) if the media content is played back multiple times by one more of devices connected to the NAS device over the LAN. A second benefit of the '667 patent is that media content can also be transmitted over the WAN (e.g., a satellite) during off-peak hours and stored for later playback during peak hours, which is an added benefit of claims 1 and 9 of the'667 and a specific benefit of claims 3 and 12.

91.     It is my opinion that the infringing Viasat systems benefit from this aspect of the invention, in particular as it relates to the IPTV use case which allows multiple passengers on the plane to watch that same live TV content that is stored on the S4 server without having to re-transmit over the satellite the same media content for each passenger. Moreover, if Viasat could not implement the technology of the '667 patent, it would need to re-transmit the media content to each passenger (i.e., at their own device and/or seatback device) that wishes to watch that media content. On a global level, Viasat would need to tranmist significantly more data over its satellite network to provide the same level of service – and availability of the service (e.g., IPTV and IFE distributions) and quality of service to airline and passengers would significantly deteriorate. For example, if a plane with 200 passengers is travelling at the time of the Superbowl, and 150 passengers wish to watch to the Superbowl, Viasat would need to transmit over its satellite the same media 150 times (once to each passenger) instead of just once (once to the whole plane, and that copy is cached in the NAS and then provided to each passenger that wishes to watch). This is illustrated in Viasat's own documentation, reproduced below.



VIASAT_00007343 at 354-355.

92.    For example, the VCDS delivers live video from the ground server if the content

is not stored on the plane, as indicated by the ███████████ event in the diagram

below.  On the other hand, the VCDS delivers live video from the cache, and not

from the ground server when there is a ██████████"  This is shown in the

diagram reproduced below.  VIASAT_00008738 – 9831, at 8760.  The first time

the content is requested, it will be absent from the local cache, resulting in what is

referred to as a ████████████  The requested content will be delivered by the

████████████████████████████████████████

████████████  The video is then cached on board at the VCDS Client.  Thereafter,

successive requests for the file can be fulfilled by the ███████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████.  Viasat documents refer to this as "caching";

which allows for media-content to be stored at a terminal near the end-user,

thereby allowing Viasat to avoid re-transmissions of the same content and to utilie

off-peak bandwidth more effectively.



93.     By delivering the media content from the cache, instead of the ground server, Viasat does not need to re-transmit over its satellite network the content each time a passenger on the same plane watches that content, which translates into significant bandwidth savings for Viasat and a reduced latency for the end-users. In particular, where many passengers in a plane watch the same live TV content, a significant number of re-transmissions over the satellite network can be prevented.  The ███████████████████████████████████████████ ████████████████████████████████████████.

Moreover, doing so results in an improved user experience, because of the reduced latency, as there is a longer time lag associated with retrieving the media content from the ground server as compared with transmitting content stored on

██████████████████████████
██████

the cache (i.e., S4 server) to the passengers using the plane's LAN.

VIASAT_00100497 – 526, at 502 and 524; VIASAT_00007343 – 394, at 356.

94.    Based on my review of documentation and deposition testimony relating to

Viasat's systems, it is my understanding that bandwidth, throughput, and capacity

are significant constraints associated with transmitting data over Viasat's satellite

system and further demonstrates that Viasat considers bandwidth savings to be

critical.  For example, VIASAT_00006939 describes how the VCDS solution

saves bandwidth by reducing the number of copies of a broadcast that are sent.

VIASAT_00005835 states ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Concerns about bandwidth and various approaches to conserving bandwidth are

discussed in Viasat documents, including the following:  VIASAT_00005782 at

834-35 (██████████████████████████████████████

███████████ *id.* at 036 ██████████████████████████

█████████████████); VIASAT_00005782 at 835 ("██████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████); *id.* at 906 ████████████████████

██████████████"); VIASAT_00007344 (████████████████

████████████████████████████████████████████

████████████████████████████). Mr. Neri similarly confirmed

████████████████████████

that one of the advantages of the VCDS system was to save bandwidth.  (Mr. Neri

Feb. 5, 2025, Tr. at 21:21-22:12).

95.     Other benefits from the reduced transmission of content over its satellite include

large-scale improvements to Viasat's satellite network, including because network

capacity is limited, and as such its satellite network is "more likely to become

overloaded by heavy video usage."  *See* Viasat Data Allowance Policy –

Residential, January 17, 2024;[15]  Viasat Network Management Policy ("During

periods of congestion, bandwidth intensive applications, such as video

streaming…may be slowed more than other applications.  As a result, the quality

of video streaming may be reduced and/or buffering may occur.")[16] Similarly, for

the delivery of live TV, Viasat notes that its bandwidth usage is considerable, and

its approach relies upon subsequent users in a multicast group watching without

any additional bandwidth consumption; which as I explain below, is the infringing

functionality that Viasat has implemented.  *See* VIASAT_00100497 at 522;

VIASAT_00008738 at 8760.  Thus, it is likely that without Viasat's use of the

infringing functionality, its network would not be able to keep up with the

bandwidth demands and traffic on its satellite network.  Thus, it is my opinion

that Viasat's implementation of on-board content caching significantly enhances

service reliability and resilience by ensuring content availability to users, even

when satellite connectivity is compromised.

---

[15]   https://www.viasat.com/content/dam/us-
site/legal/documents/Data_Allowance_Policy_Residential_v28_011724.pdf

[16]   https://www.viasat.com/content/dam/us-site/legal/documents/NetworkManagementPolicy_6_5.pdf.

96.     Yet another benefit of the '667 patent is that by allowing the media streaming

system to control access to the secure region, the system of claim 1 and the

method of claim 9 reduce the risk of piracy of the media content.  This benefit is

also enhanced when dependent claims 4, 5, 6, 7, 13, 14, 15, and 16 are

implemented.  In particular, this benefit is critical for storing studio content (e.g.,

movies and television shows) on a NAS device on planes (including as explained

below under limitation 1[a] and 11[a], Viasat's S4 server for in-flight systems), to

be accessed by passengers, or in users' homes (including as explained below

under limitation 1[a] and 11[a], Viasat's hub), only to be accessed under the

control of the media streaming system.  As such, it is my opinion that the

infringing Viasat systems benefit from this aspect of the invention.  I understand

that studios wish to retain strict control over media content that they author.  For

example, a presentation by Mr. Blankenbeckler dated June 19, 2014, states that

"Studios feel existing Content management / DRM methods are not sufficient for

their premium content."  WD-Viasat-NDCA00011702 at 705.  Viasat documents

similarly noted that "In most cases media content will require addition encryption

(required by movie studios)."  VIASAT_00005782 at 835.

97.     Yet another benefit of the system of claim 1 and the method of claim 9 of the '667

patent is that the system and method enable remote, "no touch," "over the air"

updates to media content stored on the NAS device (including as explained below

under limitation 1[a] and 11[a], Viasat's S4 server for in-flight systems and it's

hub for residential systems), for example, because the NAS device is connected to

the WAN (e.g., over a satellite network), and is also secured using the security

and anti-piracy aspects explained above of the '667 patent claims 1 and 9, and
dependent claims 4, 5, 6, 7, 13, 14, 15, and 16.  As such, it is my opinion that the
infringing Viasat systems benefit from this aspect of the invention, in particular as
it relates to the IFE use case.  Indeed, it would not be commercially acceptable for
Viasat to transmit studio content to a NAS device on a plane that does have the
claimed "secure region" as passengers would have access to the media content
without restriction, which would not be acceptable for the studios that provide the
media content.  For example, a presentation by Mr. Blankenbeckler dated June 19,
2014, states that "Studios feel existing Content management / DRM methods are
not sufficient for their premium content."  WD-Viasat-NDCA00011702 at 705.
Viasat documents similarly noted that "In most cases media content will require
addition encryption (required by movie studios)."  VIASAT_00005782 at 835.
Moreover, Viasat's document indicate that it would not be commercially
acceptable for Viasat to update the media content stored on its in-flight
entertainment systems using a manual process, an especially considering that
Viasat services hundreds, if not thousands, of aircrafts need to be updated
monthly.  *See e.g.*, VIASAT_00014416 – 520 at 458 (

WD-Viasat-NDCA-00000204 at 205

; VIASAT_00003288 at 320

█████████████████████████████████████████

█████████████████████████ *id*. at 323, 324 ████████████████████████████████

███████████████████); *id*. at 325 ████████████  ████████████████████

████████████████████); *id*. at 326 ████████████████████████

████████████████████████████████████████

VIASAT_00003234 (Presentation entitled "VCDS Overview" dated February 2020) at 235 ("████████████████████████████████████

████████████████████████████████████

███████████████); *id*. at 251 ████████████████████████

████████████████████████████████████████

████████ VIASAT_00006865 (VCDS Overview dated August 2018) (same); *id*. at 279 ("████████████████████████████████████████

███████████████████████████████

VIASAT_00003350 (AA - IFE IPTV) at 351 ███████████████████

█████████████████████████████████████████

████████████████████████████████ *id*. at 352

███████████████████████████████████████

█████████████████ VIASAT_00006805 (VCDS Overview) at 815

██████████████████████████████████

█████████████████████████████████████████

█████████████████ *id*. at 816 ███████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████

████████████████████

update library.").  Therefore, without the patented functionality of the '667 patent,

Viasat would not be able to provide over the air updates (in particular, since as I

explain below, there is no commercially acceptable non-infringing alternative),

and would therefore not be able to meet any operational or contractual

requirements to provide media content over the air.  *See e.g.*, VIASAT_00014633

at 726, 737 (requiring Viasat to ████████████████████████████

█████████████████████████████████████████y).

Given the lack of a commercially viable non-infringing alternative, which would

not include manual updates, and the number of aircrafts that need to be updated

(*i.e.*, hundreds of aircrafts), Viasat's content update percentage would very likely

fall well below the ██████threshold and Viasat would not be able to meet the

SLA set forth is this agreement.


## VI.     INFRINGEMENT ANALYSIS

98.     In the following subsections I detail my infringement analysis, examining each

claim limitation of each of the asserted claims.

### A.     Claim Construction

99.     Throughout my analysis, I applied the Court's construction in every case where

the Court has construed a term.  Where the Court did not construe a term, I used

the plain and ordinary meaning of that term.  The following are the Court's

constructions:



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Plano, Texas on the 24th of March 2025.

Dr. William C. Easttom II