# Exhibit 2

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VIASAT, INC.,<br><br>Defendant. | Case No. 4:22-cv-04376-HSG |

**EXPERT REPORT OF LAUREN R. KINDLER**

**MARCH 24, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I. INTRODUCTION AND ASSIGNMENT ................................................................................1
II. QUALIFICATIONS AND EXPERIENCE ..............................................................................2
III. INFORMATION REVIEWED AND CONSIDERED ............................................................3
IV. SUMMARY OF OPINIONS ....................................................................................................3
V. OVERVIEW OF PARTIES .....................................................................................................7
    A. Sandisk ...........................................................................................................................7
    B. Viasat ............................................................................................................................10
VI. OVERVIEW OF SATELLITE SERVICES ..........................................................................16
    A. Residential Satellite Services .......................................................................................17
    B. In-Flight Satellite Services: IFC and IFE .....................................................................19
        1. IFC ..................................................................................................................... 20
        2. IFE ...................................................................................................................... 25
    C. Satellite Capacity ..........................................................................................................32
VII. THE PATENTS-IN-SUIT, ACCUSED SYSTEMS, AND INFRINGING USE CASES ....................................................................................................................................37
    A. Patents-in-Suit ...............................................................................................................37
        1. '667 Patent .......................................................................................................... 38
        2. '400 Patent .......................................................................................................... 41
    B. Overview of Accused Systems .....................................................................................42
    C. Overview of Infringing Use Cases ................................................................................54
VIII. Viasat's Revenues and Costs Associated with Satellite Services .........................................59
    A. Residential Services Revenues .....................................................................................59
    B. In-Flight Services Revenues .........................................................................................62
    C. Costs to Provide Satellite Services ...............................................................................74
IX. PATENT INFRINGEMENT ROYALTY DAMAGES .........................................................81
    A. No Less Than a Reasonable Royalty ............................................................................81
    B. Hypothetical Negotiation Framework and the *Georgia-Pacific* Factors ....................81
    C. Royalty Payment Structure ...........................................................................................83
    D. Hypothetical Negotiation Dates and Parties .................................................................83
    E. Royalty Rate: The *Georgia-Pacific* Analysis .............................................................84
        Factor 1: The royalties received by the patentee for the licensing of the patents in suit .................................................................. 85

Factor 2: The royalty rates paid by the licensee for the use of other patents comparable to the patents in suit. ........................ 86
Factor 3: The nature and scope of the licenses (e.g., exclusive vs. non-exclusive or restricted vs. non-restricted). ................... 86
Factor 4: The licensor's established policy regarding the licensing (or non-licensing) of its patents. ................................. 87
Factor 5: The commercial relationship between the licensor and licensee. .................................................................................. 87
Factor 6: The extent of derivative or convoyed (i.e., ancillary) sales. ..................................................................................... 88
Factor 7: The duration of the patent and the term of the license. .................. 94
Factor 8: The established profitability of the patented product and its commercial success. ....................................................... 94
Factor 9: The utility and advantages of the patented product over other modes or devices. .................................................... 100
Factor 10: The nature of the patented invention and the benefits to those who have used the invention. ..................................... 100
Factor 11: The extent to which the infringer has made use of the invention and evidence of the value of that use. ...................... 116
Factor 12: The portion of the profit or selling price of the invention that may be customary to allow for the use of the invention or analogous inventions. .......................................................... 127
Factor 13: The portion of the realizable profit credited to the invention as distinguished from non-patented elements. ........................ 147
Factor 14: The opinion of qualified experts. ................................................... 169
Factor 15: The amount a willing licensor (such as the patentee) and a willing licensee (such as the alleged infringer) would have agreed upon at the time of the infringement if both had reasonably and voluntarily attempted to reach an agreement. ................ 170

   F.   Outcome of the Hypothetical Negotiations ............................................................... 170
        1.  '667 Patent Value Indicators .................................................................. 173
        2.  '400 Patent Value Indicator .................................................................... 175
        3.  Outcome of the Hypothetical Negotiations ........................................... 176

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

178. First, as outlined in **Section VIII.B**, ███████████



."715

179. Under the American Airlines service agreement, ███████████

.716 (*See* **Figure 39**.)

---

[714] Viasat / Condor Discussion, July 6, 2022. (VIASAT_00073879 – 939, at 927.) (Bracketed text added for clarification.)

[715] Viasat / Condor Discussion, July 6, 2022. (VIASAT_00073879 – 939, at 927.)

[716]  *See* American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 697 – 698 and 720 – 722.) I observe similar SLC arrangements in the service agreements between Viasat and other airlines. For example, ███████████ (VIASAT_00015862 – 6050, at 5983.))



180. This ▮▮▮▮▮ provides a relevant proxy for the value assigned to ensuring reliable content delivery for American Airlines passengers. Whereas the total IPTV Fee may reflect the value of various components required for providing the service, such as Viasat's satellite and ground station infrastructure, content access, and efficient stream delivery, the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ provides an indication of the relative contribution of efficient delivery to Viasat's total IPTV revenue. This figure represents a lower bound for the value attributable to efficient content delivery, at least because (a) it is unlikely that customers would contract with Viasat for IPTV services if the service was unreliable and (b) ▮▮▮▮▮

---

[717] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 722.)

▬

181.     Based on a discussion with Dr. Easttom, I understand that Viasat could not have delivered the same availability and quality of IPTV service to its customer base (e.g., airlines) had it not used the '667 Patent and instead was required to serve a separate stream to each requesting passenger.[719]  Specifically, I understand that without its alleged use of the '667 Patent, ▬ ▬ [720]  However, I also understand that multi-casting, which is not an Accused Functionality, contributes to efficient content delivery.  Thus, as a next step, the contributions of the '667 Patent to IPTV delivery must be isolated.  As described above, 95.7% to 97.3% (based on IPTV take rates of 25% and 40%, respectively) of the total data distributed to passengers can be attributed to the benefits enabled by the '667 Patent.  That is, 95.7% to 97.3% of the satellite bandwidth savings (i.e., data that Viasat is able to distribute to passengers without additional data transmission over satellite) is attributable to the '667 Patent as opposed to multicasting.  Thus, a conservatively low estimate of the percentage of IPTV revenue attributable to the '667 Patent can be obtained by multiplying ▬ (reflecting an apportionment to efficient content delivery) by a further apportionment (to take into account Viasat's contributions, including the benefits attributable to multicasting) of 95% yielding a fully apportioned value of ▬.  (*See* **Exhibit 10.2**.)

---

[718] Specifically, ▬ ▬ ▬ (*See* American Airlines Service Agreement, October 1, 2020.  (VIASAT_00014633 – 831, at 723.))

[719] Easttom Report, § V.C.  Based on discussion with Dr. Easttom (Sandisk's technical expert).

[720] Easttom Report, § V.C.  Based on discussion with Dr. Easttom (Sandisk's technical expert).

182. Because this revenue apportionment uses as a starting point ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that Viasat would have otherwise been required to pay in the absence of its use of the '667 Patent, this portion of revenues directly translates to profits for Viasat. In other words, without the use of the '667 Patent, Viasat still would have needed to incur all of the same operational costs even to earn the ▮▮ of IPTV revenues excluded from my calculation (i.e., even to serve the small amount of IPTV data it could provide without the use of the '667 Patent).

### (ii)  Bandwidth Cost Savings

183. I understand the Viasat incurs a cost associated with each byte of data it sends OTA.[721] Thus, as an alternative to apportioning the revenue Viasat receives that is attributable the '667 Patent, the value of the benefits of the '667 Patent can also be analyzed by evaluating the cost savings associated with allowing for smaller amounts of data to be sent OTA. Under this approach, the parties at the hypothetical negotiation would look to quantify the costs that Viasat avoided incurring associated with sending the additional data that it would have otherwise had to send OTA but for its infringement of the '667 Patent.

184. As shown above in **Table 14**, I have estimated that Viasat sent ▮▮▮ TBs of data OTA for IPTV.[722] However, without the benefits of the '667 Patent, as shown in **Exhibit 10.1**, assuming a 25% IPTV take rate, I estimated that Viasat would have been required to send ▮▮▮ TBs (or ▮▮▮ TBs using a 40% take rate). The parties to the hypothetical negotiation for the '667 Patent would recognize that Viasat would experience significant bandwidth savings from its use of the '667 Patent. As described above (and summarized in **Exhibit 10.1**), assuming a 25%

---

[721] Based on discussion with Dr. Easttom (Sandisk's technical expert).
[722] **Exhibit 10.5**.

place while the Active Aircraft are connected to a Supplier Satellite."[748]  Under the agreement,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████.[749]

      202.    The agreement stipulates that ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

      ████████████████████████████████████████

      ███████████████████████████████████████████████████

      ███████████████████████████████████████████████████

---

[748] American Airlines Service Agreement, October 1, 2020.  (VIASAT_00014633 – 831, at 725.

[749] Delivered Titles are determined by "counting the number of successfully activated titles across the Target Aircraft" and Planned Titles are determined by "counting the number of published titles to be activated two (2) or more weeks after publish date with activation date within the month of record."  (*See* American Airlines Service Agreement, October 1, 2020.  (VIASAT_00014633 – 831, at 725 – 726.))

[750] American Airlines Service Agreement, October 1, 2020.  (VIASAT_00014633 – 831, at 723.)

[751] American Airlines Service Agreement, October 1, 2020.  (VIASAT_00014633 – 831, at 691.)



203. If Viasat were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ This ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ provides a relevant proxy for the value assigned to ensuring reliable and timely content updates for American Airlines ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. However, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is only one component of overall W-IFE fees charged to American Airlines as discussed in **Section VIII.B** and shown below in **Figure 42**.[753]

---

[752] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 726.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
[753] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



204. As shown in **Exhibit 5.4**, for the period from June 2021 – November 2024 (i.e., the period for which there is sufficient detail to identify ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇),[755] ▇▇▇▇▇▇▇▇▇▇▇▇ of total W-IFE revenue from American Airlines over that same period. Thus, applying ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ which provides a relevant proxy for the value assigned to ensuring reliable and timely content updates for American Airlines as a percentage of *total W-IFE revenue*. Whereas the ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ may reflect the value of various components required for providing the service, such as Viasat's satellite and ground station infrastructure, and content access, the fact that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ provides an indication of the relative contribution of the OTA content updates to Viasat's total W-IFE revenue.

---

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*See* American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 642, 691, and 743 – 746.) While Mr. Houda appears to have testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Thus, I have included in total W-IFE revenues ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Houda Deposition, pp. 74 – 75. *See also*, Viasat Invoice History. (VIASAT_00132724.xlsx.)

[754] American Airlines Service Agreement, October 1, 2020. (VIASAT_00014633 – 831, at 691.)

[755] As shown in **Exhibit 5.4**, this date range is based upon the invoice date for the various expenses. *See* Viasat Invoice History. (VIASAT_00132724.xlsx, at tab "Invoice History.")

205. Based on a discussion with Dr. Easttom, I understand that Viasat would not have been able to perform OTA content updates for airlines had it not used the '667 Patent. Specifically, I understand that without its alleged use of the '667 Patent, Viasat's content update percentage would fall well below the ▇ threshold as Viasat would not be able to perform the OTA updates ▇.[756] I further understand that through the content update process, all W-IFE (excluding IPTV) content that is ultimately distributed to passengers at the time of viewing comes from the local cache such that no further apportionment is needed.[757] Thus, ▇, represents a reasonable, fully apportioned estimate of the total W-IFE revenues attributable to the '667 Patent.

206. Because this revenue apportionment uses as a starting point ▇ ▇ ▇ this portion of revenues directly translates to profits for Viasat. In other words, without the use of the '667 Patent, Viasat still would have needed to incur all of the same operational costs even to earn the ▇ of W-IFE revenues excluded from my calculation.

    c.    '400 Patent

207. The analysis performed in *Georgia-Pacific* Factor 12 inherently apportions for the value of the licensed technology. As a result, to the extent this factor influences the royalty based on a hypothetical negotiation for the '400 Patent between Viasat and Western Digital, I have taken it into account in the analysis described in *Georgia-Pacific* Factor 12.

**Factor 14: The opinion of qualified experts.**

208. In forming my royalty damages opinions, I have considered the information available to date and performed my analyses using the information available to date. A listing of

---

[756] Easttom Report, § V.C. Based on discussion with Dr. Easttom (Sandisk's technical expert).

[757] Easttom Report, § V.C. Based on discussion with Dr. Easttom (Sandisk's technical expert).

222. My royalty damages opinions do not depend upon one specific analysis but are the result of the totality of the evidence that I have considered in this case, my analysis of the *Georgia-Pacific* factors, and my analysis of important economic and business considerations presented throughout my report and associated exhibits. The royalty damages presented above would compensate Sandisk for Viasat's alleged use of the Patents-in-Suit and would be appropriate and reasonable given the economic considerations discussed throughout my report.

\* \* \* \* \* \*

223. My analyses and opinions contained in this report are based on information available as of the date of my report. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the parties to this dispute and to supplement my opinions based on that review, if necessary.

*/s/ Lauren R. Kindler*

Lauren R. Kindler
March 24, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY