QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Steven Cherny (*pro hac vice*)
  stevencherny@quinnemanuel.com
  Patrick D. Curran (Bar No. 241630)
  patrickcurran@quinnemanuel.com
  Hannah E. Dawson (*pro hac vice*)
  hannahdawson@quinnemanuel.com
  Tzivya H. Beck (*pro hac vice*)
  tzivyabeck@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Nicola R. Felice (*pro hac vice*)
  nicolafelice@quinnemanuel.com
  Anastasia M. Fernands (*pro hac vice*)
  anastasiafernands@quinnemanuel.com
  Vanessa Blecher (*pro hac vice*)
  vanessablecher@quinnemanuel.com
  Alicia Lai (*pro hac vice*)
  alicialai@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone:   (212) 849-7000

*Attorneys for Defendant Viasat, Inc.*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC., et al.,<br><br>           Plaintiffs,<br>     v.<br>VIASAT, INC.,<br><br>           Defendant. | Case No.: 4:22-cv-4376-HSG<br><br>**DEFENDANT VIASAT, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF CHUCK EASTTOM AND LAUREN KINDLER**<br><br>Date: August 21, 2025<br>Time: 2:00 p.m. |

**TABLE OF CONTENTS**

Page

I. PLAINTIFFS ADMIT DR. EASTTOM OFFERED NO QUANTITATIVE ANALYSIS FOR HIS QUANTITATIVE OPINION CONCERNING A SPECIFIC NUMERIC THRESHOLD ................................................................................................2

II. PLAINTIFFS ADMIT MS. KINDLER HAS NO TECHNICAL SUPPORT FOR HER OPINIONS CONCERNING SERVICE LEVEL THRESHOLDS ..............................3

    A. Ms. Kindler is Not Qualified to Offer a Technical Opinion Concerning Purported Advantages from the '667 Patent .................................................3

    B. Dr. Easttom Offered No Opinion Concerning Viasat's Ability to Meet IPTV Service Level Thresholds ..................................................................5

III. CONCLUSION .................................................................................................................7

# TABLE OF AUTHORITIES

**Page**

**Cases**

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................................................... 3

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 3d 956 (N.D. Cal. 2025) ...................................................................................... 1

Plaintiffs' opposition (Dkt. 234-2, "Opp.") identifies no basis to admit either Dr. Easttom's opinions concerning a contractual "service level" threshold for W-IFE service, or Ms. Kindler's opinions that Viasat would not have been able to meet particular "service level" requirements for W-IFE and IPTV services without allegedly using the '667 patent. Indeed, Plaintiffs' own arguments establish that the challenged opinions are unreliable. *See Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025) ("An expert's opinions are 'inherently unreliable' if they do not rest on a sufficient factual foundation and are speculative.") (citations omitted).

The opinions at issue concern two different contractual commitments to meet two different levels of service for two different Viasat products that were being purchased by the same customer. The contract addresses the W-IFE product, and ranges for "▮▮▮▮▮▮▮▮" when updating W-IFE content, by establishing ranges of "success" for W-IFE ▮▮▮▮▮▮—the lowest of which is ▮▮▮▮▮ of ▮▮▮▮▮▮▮▮▮ in the specified period. *See* Dkt. 234-4 at 167-166, ¶ 202. The contract separately addresses the IPTV product, and ranges of "▮▮▮▮▮" of IPTV, where the lowest range of "▮▮▮▮▮" for the IPTV product is ▮▮▮▮▮▮▮▮ in the specified period. *Id.* at 155 (Figure 39). Performance in different ranges of either metric correspond to different contractual penalties in the form of service level credits (SLCs). *See id.*

Plaintiffs contend that although Dr. Easttom offered no quantitative analysis of Viasat's specific "▮▮▮▮▮▮▮▮" for W-IFE in any given time period, he should be allowed to offer the quantitative opinion that without the alleged use of the '667 patent technology, Viasat "would very likely fall below the ▮▮▮▮ [service level] threshold" for W-IFE ▮▮▮▮▮▮▮▮ in perpetuity. Opp. at 1, 4. This opinion about a numerical threshold is necessarily quantitative—yet Plaintiffs do not identify any methodology (reliable or otherwise) used to reach Dr. Easttom's quantitative assessment. Dr. Easttom's opinion that Viasat would not be able to meet this specific numerical service level threshold for W-IFE ▮▮▮▮▮▮, based solely on Dr. Easttom's status as an expert and without any quantitative analysis to explain the calculation, is textbook *ipse dixit* and should be excluded.

Plaintiffs further contend that even if Dr. Easttom's quantitative opinion is stricken, Ms. Kindler's opinion should not be stricken, because Ms. Kindler's opinions regarding **IPTV** service

VIASAT'S REPLY IN SUPPORT OF
MOTION TO EXCLUDE CERTAIN OPINIONS OF CHUCK EASTTOM AND LAUREN KINDLER

level thresholds "is not dependent upon Dr. Easttom's opinion." Opp. at 5.  But Ms. Kindler's report cites Dr. Easttom as the basis for her opinions on this issue. Ms. Kindler also testified in deposition that she was not offering any technical opinions on this or other points in dispute.  If Ms. Kindler is offering an opinion, independent of Dr. Easttom, concerning Viasat's technical ability to meet performance thresholds, Ms. Kindler is not qualified to offer such an opinion, and her testimony should be excluded for that reason.  If, on the other hand, Ms. Kindler is relying on Dr. Easttom for her opinion concerning whether Viasat could meet its service level commitments for IPTV ▮▮▮▮, her opinion should be excluded for relying on undisclosed "say so" from Dr. Easttom—especially since Dr. Easttom's report never mentions the contractual IPTV "▮▮▮▮" range on which Ms. Kindler relies.  Either way, Plaintiffs' unreliable *ipse dixit* testimony on service-level commitments and specific service level thresholds should be excluded.

I. **PLAINTIFFS ADMIT DR. EASTTOM OFFERED NO QUANTITATIVE ANALYSIS FOR HIS QUANTITATIVE OPINION CONCERNING A SPECIFIC NUMERIC THRESHOLD**

Plaintiffs argue that Dr. Easttom's opinions are "well-supported" by his "extensive" *qualitative* analysis of the purported benefits of the '667 patent and his "detailed understanding of Viasat's technology." Opp. at 2. Plaintiffs' purported support consists of Dr. Easttom's discussion of the '667 patent and his citation to "seven Viasat documents, with pincites and excerpts." Opp. at 3.  However, even the portions of those seven documents that Dr. Easttom includes in parentheticals at most refer to the *existence* of features or the *qualitative* advantages of such features.  *See* Dkt. 234-3 at ¶ 97, pages 36-37.  Nothing in any of the citations provides any *quantitative* details about how much slower manual updates would be as compared to over-the-air updates, and Dr. Easttom has not identified anything that suggests—let alone states—that manual updates would not be feasible to achieve certain levels of content update success.  *See id.* In fact, one of Dr. Easttom's own parenthetical citations quotes VIASAT_00006805 at 815 as stating "***Normally*** an operator visits every plane any time the content library of a wireless in-flight entertainment system needs to be update[d]."  *Id.* ¶ 97, page 37 (emphasis added).  Thus, Viasat's reference to manual updates as the "normal" practice for content updates is not misleading (as Plaintiffs contend, Opp. at fn. 1), and is supported by the very portions of the Viasat documents on which Dr. Easttom chose to rely.

Plaintiffs do not even try to argue that Dr. Easttom followed any discernable methodology in reaching his opinion that Viasat could not meet specific numerical thresholds for "█████ █████" for its W-IFE product. That alone warrants exclusion. *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) ("Experts must follow some discernable methodology, and may not be a black box into which data is fed at one end and from which an answer emerges at the other.") (quotation marks and citation omitted). Although Plaintiffs' assert that Dr. Easttom provided "detailed factual analysis" (Opp. at 4), his purported "analysis" is nothing more than a series of citations followed by his conclusion—with *no* explanation of how he made the leap from general statements (such as calling one method "slow") to the conclusion that, without practicing the '667 patent, Viasat would "likely" fall below the specific numerical threshold of ███ success for ███████████. *See* Dkt. 234-3 ¶ 97. "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (citation omitted).

## II. PLAINTIFFS ADMIT MS. KINDLER HAS NO TECHNICAL SUPPORT FOR HER OPINIONS CONCERNING SERVICE LEVEL THRESHOLDS

The portion of Plaintiffs' opposition addressing Ms. Kindler's opinion is, at best, muddy. Plaintiffs appear to be arguing that (1) Ms. Kindler, who has no technical expertise, formed an independent opinion as to the technical importance of the '667 patent for IPTV ███████, and at the same time, (2) Ms. Kindler relied on Dr. Easttom for a technical understanding of whether Viasat could meet service level commitments for IPTV ███████. Whichever is true, the opinions should be excluded. If Ms. Kindler is offering her own technical opinion, she is not qualified to do so by her own admission. Dkt. 234-5 at 180:8-25. If she relied on Dr. Easttom, she is improperly relying on opinions Dr. Easttom did not disclose in his report by the deadline.

### A. Ms. Kindler is Not Qualified to Offer a Technical Opinion Concerning Purported Advantages from the '667 Patent

Plaintiffs argue that "Ms. Kindler has repeatedly made clear that her analysis for the '667 patent is not dependent on Dr. Easttom's opinion that that [sic] Viasat would not meet the ███████

1 ▋ service-level thresholds." Opp. at 5.  Plaintiffs further assert that Ms. Kindler "explains"
2 "without any reference to information from Dr. Easttom" that the service level credits "'provide[] a
3 relevant proxy for the value assigned to ensuring reliable content delivery.'" *Id.* However, any
4 conclusion about what value is purportedly attributable to the patented invention is necessarily a
5 technical opinion that Ms. Kindler is not qualified to render, as evidenced by her own deposition
6 testimony:

> Q:   Now, you'd agree, you didn't independently analyze whether Viasat would or would not meet service level agreement thresholds and offer an opinion on that; right?  You relied on Dr. Easttom?
>
> A:   In part.  I mean, ***I'm not qualified to make that determination.*** I'm relying on him, but I'm also relying on the terms of the agreement and my -- my understanding of how important the '667 patent is to Viasat's ability to deliver content efficiently and reliably – sorry.
>
> Q:   And your understanding of how important you believe the '667 patent is to Viasat's ability to deliver content efficiently and reliably, that understanding comes from Dr. Easttom, right?  You didn't –
>
> A:   Yes.

Dkt. 234-5 at 180:8-25 (emphasis added).

    Further, Ms. Kindler's "starting point" for her revenue apportionment analysis begins with the assumption that Viasat would not be able to meet the contractual service levels.  In her IPTV opinions, Ms. Kindler expressly states that her "revenue apportionment uses as a starting point the value of avoided Service Level Credits (SLCs) that ***Viasat would otherwise have been required to pay in the absence of its use of the '667 Patent***." Dkt. 234-4 ¶ 182 (emphasis added).  It is impossible to conclude that Viasat would have had to pay specific SLCs without first establishing that, absent the alleged use of the '667 patent, Viasat would have missed the specific "▋" levels for its IPTV product in its contract with ▋.  But there is no analysis anywhere—not in Dr. Easttom's report, and not in Ms. Kindler's report—providing any foundation for the claim that service levels would fall in the ▋ range on which Ms. Kindler relies for her IPTV opinions.  Because there is no technical opinion supporting the conclusion that the practicing the '667 patent is required to meet more than ▋

▇▇▇▇ for the IPTV product, any analysis based on the "starting point" that Viasat would have been required to pay service level credits without using the patent should be excluded.

### B. Dr. Easttom Offered No Opinion Concerning Viasat's Ability to Meet IPTV Service Level Thresholds

Plaintiffs cite no opinion from Dr. Easttom concerning whether Viasat could meet its service level thresholds for IPTV "▇▇▇▇" without the purported benefits of the '667 patent. *See generally* Opp. There is nothing to cite.

Plaintiffs' argue that Ms. Kindler explained "her understanding from Dr. Easttom that 'Viasat could not have delivered the same availability and quality of IPTV service … had it not used the '667 Patent.'" Opp. at 5, citing Dkt. 234-4, ¶ 181. Tellingly, Plaintiffs do not quote the next sentence of Ms. Kindler's report, which states "[s]pecifically, I understand that without its alleged use of the '667 Patent, Viasat's availability would fall well below the ▇▇ threshold [*i.e.*, in the ▇▇▇▇ range of IPTV '▇▇▇▇']." Dkt. 234-4, ¶ 181. Ms. Kindler's only citation for this assertion is footnote 720, which states "Easttom Report § V.C. Based on discussion with Dr. Easttom (Sandisk's technical expert)." *Id.* fn. 720. Plaintiffs' opposition does not cite the Easttom report at all when explaining the "understanding" that Ms. Kindler purportedly obtained from Dr. Easttom.

Plaintiffs later argue that Dr. Easttom opined "that the '667 patent is beneficial … for streaming live IPTV content," citing to paragraphs 90-95 of Dr. Easttom's report. Opp. at 6. But there is no mention in those paragraphs of *how* beneficial, or of service levels, or of Viasat's ability to meet service levels. Dkt. 234-3 at ¶¶ 90-95. Saying that something is *qualitatively* beneficial is no substitute for a reliable methodology under Rule 702 to later *quantify how beneficial* it purportedly is.

1  Plaintiffs also assert that both the W-IFE and IPTV "services to ▮▮▮ involve a ▮▮▮
2  threshold" and that "Ms. Kindler's report shows that she accounted for the different metrics and
3  consequences." Opp. at 6, citing the Kindler report at p. 155, Figure 39 and page 167, Table 18.
4  But Ms. Kindler does not discuss an "▮▮▮ threshold" in connection with IPTV service levels.
5  W-IFE and IPTV are different products, with different numerical service levels specified in two
6  different sections of the contract. As shown below, Figure 39 from the ▮▮▮ agreement,

[Figure 39 redacted]

reproduced on page 155 of the Kindler Report, lays out ▮▮▮
▮▮▮." Dkt. 234-4 at Figure 39. Ms. Kindler relies on the
threshold for ▮▮▮ and the corresponding ▮▮ service level
credit (SLC) for that threshold as a "proxy" for the "value assigned to ensuring reliable content
delivery." *Id.* ¶ 179-180. Ms. Kindler asserts that, "without its alleged use of the '667 Patent,
Viasat's availability would fall well below the ▮▮ [IPTV "▮▮▮"] threshold," triggering a
▮▮ service level credit. *Id.* ¶ 181. However, as noted above, Ms. Kindler's only citation for this
assertion is footnote 720, which identifies only the Easttom report and a "discussion with Dr.
Easttom." And, as also discussed above, Dr. Easttom's report says nothing about ***any*** IPTV service
level threshold, and offers no opinion as to whether the "▮▮▮" of Viasat's IPTV product
would fall in the ▮▮▮ range (▮▮▮
▮▮▮) for any time period, much less perpetually, without the
purported use of the '667 patent.

What Dr. Easttom does discuss is an ▇ "▇" threshold for **W-IFE** (not a level of IPTV "▇"). Specifically, Dr. Easttom cites two pages of the ▇ ▇ agreement, VIASAT_00014633 at 726, 737, both of which concern only the W-IFE product—not the IPTV product. Dkt. 234-3 ¶ 97, page 38. VIASAT_00014633 at 726 is the same page that Ms. Kindler cites for her calculations in Table 18 on page 167 concerning W-IFE service level credits. Dkt. 234-4 at 167, Table 18. These opinions concerning the ▇ threshold for levels of W-IFE "▇" have nothing to do with levels of "▇" for the IPTV product—and in fact, as Ms. Kindler admits, falling in the lowest range of W-IFE "content update success" carries a ***different penalty*** (▇) than the ▇ penalty for falling into the lowest range of IPTV availability. *Id*. (calculating ▇ penalty for lowest level of W-IFE "▇"). Ms. Kindler's unsupported opinions based on the "starting point" that Viasat would otherwise have been required to pay any service level credits "in the absence of its use of the '667 Patent" should therefore be excluded as unreliable for multiple independent reasons. No expert provided any quantitative analysis to support any of those claims, and the jury should not hear unreliable *ipse dixit* from Plaintiffs' experts.

### III.   CONCLUSION

For the foregoing reasons and the reasons set forth in Viasat's Motion (Dkt. 206), Viasat respectfully requests that the Court exclude Dr. Easttom's opinions regarding the ▇ service-level agreements for W-IFE, as expressed in paragraph 97 of his report, as well as Ms. Kindler's unsupported opinions concerning service level credits for the W-IFE product or the IPTV product (*see* Dkt. 207-8, ¶¶ 12.a., 13.a. (including Table 2), 78 (including Figures 21 and 22), 177-182, 213.a.i., 218 (including Table 20), 220.a., 221.a. (including Table 21), and Exhibit 10.2).

DATED: July 3, 2025                          QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP

                                             By  /s/ *Patrick D. Curran*

                                             Patrick D. Curran
                                             *Attorneys for Defendant Viasat, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 3, 2025, a copy of the foregoing was filed with the Court using the Court's ECF system, which sent notice to all counsel of record.

DATED: July 3, 2025

By */s/ Patrick D. Curran*
Patrick D. Curran