# EXHIBIT A

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Steven Cherny (*pro hac forthcoming*)
  stevencherny@quinnemanuel.com
  Patrick Curran (Bar No. 241630)
  patrickcurran@quinnemanuel.com
  Nicola Felice (*pro hac forthcoming*)
  nicolafelice@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:    (617) 712-7100
Facsimile:    (617) 712-7200

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Jodie Cheng (Bar No. 292330)
  jodiecheng@quinnemanuel.com
  Gyushik (Kevin) Jang(Bar No. 337747)
  kevinjang@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

*Attorneys for Defendant Viasat, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| WESTERN DIGITAL TECHNOLOGIES, INC., WESTERN DIGITAL IRELAND LTD., SANDISK 3D IP HOLDINGS LTD., SANDISK TECHNOLOGIES LLC, SANDISK STORAGE MALAYSIA SDN. BHD.,<br><br>Plaintiff,<br><br>v.<br><br><br>VIASAT, INC.,<br><br>Defendant. | Case No. 4:22-cv-4376-HSG<br><br>**VIASAT, INC.'S SUPPLEMENTAL INVALIDITY CONTENTIONS** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

II.  THE '400 PATENT .................................................................................................... 3

    A.  35 U.S.C. § 102 ............................................................................................... 3

        1.  Prior Art Patents ................................................................................. 4

        2.  Prior Art Patent Applications ............................................................. 5

        3.  Prior Art Publications ......................................................................... 6

        4.  Prior Art Systems ............................................................................... 7

    B.  35 U.S.C. § 103 ............................................................................................... 8

        1.  Obviousness Combinations ................................................................. 9

        2.  Secondary Considerations ................................................................. 22

    C.  35 U.S.C. § 112 ............................................................................................. 24

        1.  Indefiniteness ................................................................................... 24

        2.  Priority and Lack of Written Description Under 35 U.S.C. § 112 ............. 24

        3.  Lack of Enablement Under 35 U.S.C. § 112 ...................................... 26

III.  THE '667 PATENT ................................................................................................. 27

    A.  35 U.S.C. § 102 ............................................................................................. 27

        1.  Prior Art Patents / Patent Applications ............................................. 27

        2.  Prior Art Publications ....................................................................... 29

        3.  Prior Art Systems ............................................................................. 31

    B.  35 U.S.C. § 103 ............................................................................................. 33

        1.  Obviousness Combinations ............................................................... 33

        2.  Secondary Considerations ................................................................. 48

    C.  35 U.S.C. § 112 ............................................................................................. 50

        1.  Indefiniteness ................................................................................... 50

        2.  Lack of Written Description Under 35 U.S.C. § 112 ......................... 51

        3.  Lack of Enablement Under 35 U.S.C. § 112 ...................................... 51

D.     35 U.S.C. § 101 ........................................................................................................ 52

VIASAT, INC.'S SUPPLEMENTAL INVALIDITY CONTENTIONS

Pursuant to Patent L.R. 3-3, Viasat, Inc. ("Viasat" or Defendant) hereby serves its Invalidity Contentions concerning U.S. Patent Nos. 9,424,400 (the "'400 patent") and 10,447,667 (the "'667 patent") on Plaintiffs.

# I. INTRODUCTION

On February 24, 2023, Plaintiffs served their initial Infringement Contentions, asserting the following claims (the "Asserted Claims"):

| Asserted Patents | Asserted Claims |
|---|---|
| '400 patent | 1, 2, 6, 8-10, 13 and 17 |
| '667 patent | 1-7 and 11-16 |
| U.S. Patent No. 8,504,834 ("the '834 patent") | 14, 15, 17, and 20 |

On March 22, 2024, Plaintiffs served their supplemental Infringement Contentions asserting the same claims for the '400 and '667 patents. Plaintiffs' supplemental Infringement Contentions did not assert infringement of the '834 patent because the Court dismissed that patent under 35 U.S.C. § 101. Dkt. No. 75.

Viasat incorporates by reference the accompanying invalidity claim charts for the '400 patent (exhibits titled with the "400" prefix) and invalidity claim charts for the '667 patent (exhibits titled with the "667" prefix). These charts show that the Asserted Claims of both of the Asserted Patents are invalid.

These invalidity contentions are based on Viasat's current knowledge, understanding, and belief as to the facts and information available as of the date of these contentions. Viasat reserves the right to pursue all other defenses that may be available to them, including but not limited to defenses that the Asserted Patents are unenforceable based on estoppel, waiver, acquiescence, inequitable conduct, patent misuse, patent exhaustion, express or implied license, or any other grounds.

Issues of invalidity may ultimately depend on claim construction, which is a question of law reserved for the Court. The asserted claims have not yet been construed by the Court in this case and thus Viasat has not yet had the opportunity to compare the Asserted Claims (as construed by the Court) with the prior art. Viasat reserves the right to amend or supplement the invalidity

contentions based on any claim construction positions that Plaintiffs may take in this case, or based on claim construction positions that the parties later agree to. Viasat further reserves the right to assert that a claim is indefinite, not enabled, or fails to meet the written description requirement based on any claim construction positions that Plaintiffs may take in this case or based on any claim construction that the Court may adopt in this case.

Plaintiffs appear to be interpreting the asserted claims of the Asserted Patents in a way that is inconsistent with the plain language of the claims, the patent specification, and the prosecution history of the Asserted Patents, in order to support their infringement theories. Unless otherwise noted, Viasat has applied the prior art to the asserted claims based on the interpretations that Plaintiffs have advanced to the extent those interpretations are discernible from their contentions, but in no way does this constitute an admission that those interpretations are correct. Additionally, to the extent that any of the prior art discloses the same functionality or feature of any of the accused products, Viasat's contentions on invalidity do not constitute an admission that either the prior art or the accused functionality falls within the scope of properly-construed claims. Viasat expressly reserves the right to show that any such feature or functionality does not practice any element of any of the asserted claims, and to argue in the alternative that if said feature or functionality is found to practice any element of any of the asserted claims of the Asserted Patents, then the prior art reference demonstrates that that the feature or functionality is not novel and that the claim is not patentable.

Attached as exhibits are representative claim charts that demonstrate how the asserted claims of the Asserted Patents are invalid in view of certain prior art references, identifying exemplary portions of each reference that disclose each limitation of the asserted claims. The references cited in the attached exhibits may disclose the limitations of the asserted claims of the Asserted Patents expressly and/or inherently.

Prior art references and prior art disclosures not included in these exemplary charts may become relevant as the case progresses. In particular, Viasat is currently unaware of the extent to which Plaintiffs will contend that limitations of the asserted claims are not disclosed in the prior art identified herein. To the extent that such an issue arises, Viasat reserves the right to identify additional teachings in the same references, or in other references, that anticipate or render obvious

the allegedly missing limitation. Moreover, while discovery in this action is not yet open, Viasat may seek discovery from Plaintiffs related to prior art contained in this disclosure. Viasat may also subpoena third parties believed to have information relevant to prior art contained in this disclosure. Viasat expressly reserves the right to amend, supplement, or modify this disclosure as additional information is obtained from third parties or from Plaintiffs.

While Viasat has identified exemplary portions of the prior art that disclose the subject matter of each limitation of each asserted claim, Viasat reserves the right to rely on other portions of the prior art references and in other publications and testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that a claim limitation is known or disclosed. Viasat further reserves the right to rely on uncited portions of the prior art references, other publications, and testimony to establish bases for combinations of certain cited references that render the asserted claims obvious, and to explain the background and state of the art at the time of the invention, the knowledge or understanding of a person of ordinary skill in the art ("POSITA"), and motivations to combine the prior art.

Viasat intends to rely on additional references and materials to explain the background and state of the art at the time of the invention, the knowledge of a POSITA, and motivations to combine the prior art, and Viasat reserves the right to do so. These references and materials include, but are not limited to, those listed on the face of the Asserted Patents and cited during the prosecution of the Asserted Patents.

Viasat reserves the right to amend or supplement these disclosures as appropriate as additional information becomes available, and as its discovery and this case proceed.

Given the extent and strength of the prior art discussed herein, as well as any additional references and materials Viasat relies on in the future, Viasat reserves all of its rights to seek attorneys' fees under 35 U.S.C. § 285.

## II.    THE '400 PATENT

### A.    35 U.S.C. § 102

To be anticipatory, a reference must describe, either expressly or inherently, each and every claim limitation and enable one of skill in the art to practice an embodiment of the claimed invention

without undue experimentation. A reference may anticipate inherently if a claim limitation that is not expressly disclosed "is necessarily present, or inherent, in the single anticipating reference." *In re Aoyama*, 656 F.3d 1293, 1337 (Fed. Cir. 2011) (quoting *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003)); *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1195 (Fed. Cir. 2003).

The asserted claims of the '400 patent are invalid as anticipated under 35 U.S.C. § 102 in view of at least each of the prior art references identified below and in Exhibits 400-1 through 400-7 ("the 400 Patent Charts"):

### 1. Prior Art Patents

| Patent Number | Country of Origin | Date of Issue | Short name |
|---|---|---|---|
| US6367019 | United States | Apr. 2, 2002 | Ansell |
| US6697944 | United States | Feb. 24, 2004 | Jones |
| US7178169 | United States | Feb. 13, 2007 | Salmonsen |
| US6640305 | United States | Oct. 28, 2003 | Kocher |
| US7840818 | United States | Nov. 23, 2010 | Sabet-Sharghi |
| US7110543 | United States | Sep. 19, 2006 | Miura |
| US7802109 | United States | Sep. 21, 2010 | Gouguenheim |
| US7493289 | United States | Feb. 17, 2009 | Verosub |
| US7305560 | United States | Dec. 4, 2007 | Giobbi |
| US8055910 | United States | Nov. 8, 2011 | Kocher |
| US8751825 | United States | June 10, 2014 | Diamond |
| US7810162 | United States | Oct. 5, 2010 | Lee |
| US9026804 | United States | May 5, 2015 (filed Feb. 24, 2006) | Durand |
| US8091137 | United States | Jan. 3, 2012 | Karp |
| US7865964 | United States | Jan. 4, 2011 | Narin |
| US7515710 | United States | Apr. 7, 2009 | Grab |
| US8539233 | United States | Sep. 17, 2013 (filed May 24, 2007) | Dubhashi |
| US8755521 | United States | June 17, 2014 (filed May 9, 2008) | Farrugia |
| US8762708 | United States | June 24, 2014 (filed Oct. 11, 2008) | Blankenbeckler |
| US8526798 | United States | Sep. 3, 2013 (filed Dec 23, 2009) | Hesselink |
| US8600062 | United States | Dec. 3, 2013 (filed Jul. 20, 2010) | Rae |
| US8887261 | United States | Nov. 11, 2014 (filed Dec. 9, 2010) | Cooppan |
| US9633391 | United States | Apr. 25, 2017 (filed | Klum |

| | | Oct. 6, 2011) | |
|---|---|---|---|
| US6640305 | United States | July 25, 2002 | Kocher |
| US8055910 | United States | February 8, 2007 | Kocher |
| US8898803 | United States | November 25, 2014 (filed on January 11, 2011) | Hostetter |
| US8977783 | United States | April 21, 2011 | Hahn |
| US10104046 | United States | March 28, 2013 (filed on September 27, 2011) | Boliek |
| US10621518 | United States | January 13, 2011 | Arnaud |
| US8683066 | United States | February 12, 2009 | Hurst |

### 2. Prior Art Patent Applications

| Patent Pub. No. | Country of Origin | Date of Publication | Short name |
|---|---|---|---|
| US20020012432 | United States | Jan. 31, 2002 | England |
| US20020152393 | United States | Oct. 17, 2002 | Thoma |
| US20020178376 | United States | Nov. 28, 2002 | Miura |
| US20030009681 | United States | Jan. 9, 2003 | Harada |
| US20030014630 | United States | Jan. 16, 2003 | Spencer |
| US20030126430 | United States | July 3, 2003 | Shimada |
| US20040186993 | United States | Sep. 23, 2004 | Fitzgerald |
| US20050027991 | United States | Feb. 3, 2005 | Difonzo |
| US20050237872 | United States | Oct. 27, 2005 | Nguyen |
| US20070226399 | United States | Sep. 27, 2007 | So |
| US20060059094 | United States | Mar. 16, 2006 | Oh (094) |
| US20070116268 | United States | May 24, 2007 | Kasahara |
| US20070174140 | United States | July 26, 2007 | Noonan |
| US20070220616 | United States | Sep. 20, 2007 | Oh (616) |
| US20070276760 | United States | Nov. 29, 2007 | Kanehara |
| US20070267474 | United States | Nov. 22, 2007 | Shen |
| US2007067910 | United States | Mar. 29, 2007 | Shen |
| US20080098481 | United States | Apr. 24, 2008 | Lee (481) |
| US20080228821 | United States | Sep. 18, 2008 | Mick |
| US20080279533 | United States | Nov. 13, 2008 | Buttars |
| US20090199303 | United States | Aug. 6, 2009 | Ahn |
| US20110123025 | United States | May 26, 2011 | Sullivan |
| US20100057563 | United States | Mar. 4, 2010 | Rauber |
| US20110265150 | United States | Oct. 27, 2011 | Spooner |
| US20130132733 | United States | May 23, 2013 (filed May 26, 2009) | Agrawal |
| PCT/US2009/069624 | United States | July 8, 2010 | Batson |

### 3.    Prior Art Publications

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Personal Mobile DRM Manager for Smart-Phones, Computers & Security, Volume 28, Issue 6, 2009, Pages 327-340, ISSN 0167-4048 | Sep 1, 2009 | S. Bhatt et al | Computer & Security |
| DRM & Security Enabling Mechanisms Leveraging User Centric Multimedia Convergence | Apr 5, 2012 | A. Fragopoulos et al | IntechOpen |
| DRM: Secure Content Storage Association Launches Project Phenix | Mar 1, 2012 | K. Robinson | etcentric |
| Ponceleon et al., "Enabling Secure Distribution of Digital Media to SD-Cards," MM'06, pp. 495-96 (October 23-27, 2006) | Oct 23, 2006 | D. Ponceleon et al | Association for Computing Machinary |
| Specifications for a Componetised Digital Rights Management (DRM) Framework | Sept. 4, 2005 | Arnab | Data Network Architecture Laboratory Department of Computer Science University of Cape Town |
| FLMP: a flexible license management protocol for digital rights management | 2005 | Zhang | Visual Communications and Image Processing |
| Enhanced Smart-card based License Management | 2003 | Atallah | The Computer Society |
| Software License Management with Smart Cards | 1999 | Aura | The USENIX Association |
| eMusic Installs World's First Digital Download Kiosk at Maxwell's | June 28, 2004 | eMusic | www.emusic.com |
| Carry a Concert Home in Your Pocket | March 4, 2004 | Walsh | www.nytimes.com |
| For here or to go? Downloading music on the move with an ultra reliable wireless Internet application | May 19, 2005 | Ghini | Computer Networks |
| EC-GATE: An Infrastructure for DRM | Dec. 10-12, 2003 | Mana | Conference: IASTED International Conference on Communications, Network, and Information Security |
| Industry grapples with MP3 dilemma | July 18, 1998 | Recce | The National Academy of Sciences |

| ISO/IEC 23009-1:2012(E) | January 5, 2012 | | ISO/IEC |
| Digital Kiosk Entertainment Distribution System Solution and Company Overview Presentation | December 2010 | Mark Donnigan | MOD Systems |

**4.    Prior Art Systems**

| Item | Date of Sale/Use/Offer | Person/Entity |
|---|---|---|
| Secure Content Storage Association (SCSA) | No later than Mar 1, 2012 | SCSA |
| Amazon Video On Demand | Sep 3, 2008 | Amazon |
| eMusic Digital Kiosk | No later than June 28, 2004 | eMusic |
| CRI's CryptoFirewall | September 2011 | CRI |
| Ultraviolet | September 2010 | Digital Entertainment Content Ecosystem (DECE) LLC, UVVU |
| Intertrust Digibox | October 10, 1997 | Intertrust |
| Intertrust Marlin | No later than October 7, 2010 | Intertrust |
| Discretix CryptoCell/Multi-Scheme DRM | No Later than February 15, 2008 | Discrtix |
| Intertrust Coral | January 11-13, 2007 | Intertrust |
| CPRM/CPPM | December 8, 2005 | 4C Entity, LLC, IBM, Intel, Matsushita, Toshiba |
| Verimatrix VCAS 3/MultiRights system | No later than September 9, 2010 | Verimatrix; Rae, Christopher; Kulakowski, Robert; Datta, Subrata; Oga, Eiji; Pauli, Nicolas; Olugbile, Akinwale Olugbemiga |
| Apple iTunes Music Store | No later than April 2003 | Apple |
| Flix on Stix | No Later than January 6, 2011 | Flix on Stix |
| Microsoft Windows Media DRM | Not later than April 1999 | Microsoft |
| Microsoft PlayReady | No later than 2000 | Microsoft |
| ContentGuard DRM | No later than April 2004 | ContentGuard, Xerox, Microsoft |
| Apple Fairplay DRM | No later than April 2003 | Apple |
| Apple TV | No later than April 2007 | Apple |
| Hulu | No later than March 2008 | NBC Universal/News Corporation |
| RealVideo 10/RealPlayer 15 | No later than November 2011 | RealNetworks |
| CinemaNow/RoxioNow | No later than December 2010 | Sonic Solutions |

| MovieLink | No later than June 2006 | MovieLink |
|---|---|---|
| Digital Kiosk Entertainment Distribution System | No later than December 2010 | MOD Systems |
| Mo2Go | No later than March 2012 | Mo-DV |
| Disney KeyChest | No later than January 2010 | Disney |

Each of these references qualifies as prior art to the '400 patent under at least 35 U.S.C. § 102(a)(1) and/or (a)(2). Any products that embodied the disclosures of these references also qualify as prior art to the '400 patent under § 102(a)(1).

These charts provide exemplary disclosures to identify specifically where and how in each prior art each limitation of each asserted claim is found. Additionally, Defendant incorporates by reference (as though set forth herein) and identifies all references cited on the face of the '400 patent, as well as during the prosecution of the '400 patent, as prior art that Defendant may rely upon.

Unless otherwise noted, the prior art reference(s) anticipate (or the obviousness combinations render obvious) the asserted claims based on Plaintiffs' incorrect interpretation of the claim limitation(s).

To the extent that any of these references is found not to disclose one or more elements of the Asserted Claims, Defendant reserves the right to use one or more of these references as prior art under 35 U.S.C. § 103.

**B.    35 U.S.C. § 103**

A claimed invention is obvious when a skilled artisan would have been motivated to modify a prior art reference, or combine the teaching of the prior art references to achieve the claimed invention, and the skilled artisan would have had a reasonable expectation of success in doing so. *See, e.g., Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). While an analysis of any teaching, suggestion, or motivation to combine elements from different prior art references is useful in an obviousness analysis, the overall

1  inquiry must be expansive and flexible, and must include the common sense and ordinary creativity

2  of a person having ordinary skill in the art as part of the analysis. *Id*. at 419–21.

3      Prior art references rendering the asserted claims of the '400 patent obvious, alone or in

4  combination with other references, are identified in the 400 Patent Charts, which include exemplary

5  claim charts for the '400 patent showing specific citations to relevant disclosures in those references.

6  Additional prior art references and disclosures that may be combined with each other and/or with

7  one or more of the references charted in the 400 Patent Charts are included in the chart titled "Exhibit

8  400-8: §103 References."

9      To the extent any limitation is deemed not to be exactly met, either explicitly or inherently,

10 by an item of prior art listed above and in the aforementioned exhibits, any purported differences

11 are such that the claimed subject matter as a whole would have been obvious to one skilled in the

12 art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled

13 in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness

14 under 35 U.S.C. § 103.

15          **1.    Obviousness Combinations**

16     The accompanying charts set forth the bases for anticipation and obviousness, identifying

17 the disclosures of each reference that can be combined on a limitation-by-limitation basis.  Each of

18 the 400 Patent Charts demonstrate that the charted reference anticipates and/or renders obvious,

19 based on its disclosures alone or in combination with the knowledge of a POSITA, each asserted

20 claim of the '400 patent.  The chart in "Exhibit 400-8: §103 References" identifies disclosures in

21 additional prior art references, any of which would be obvious to combine with each other and one

22 or more of the references charted in the 400 Patent Charts in a predictable way with a reasonable

23 expectation of success to render obvious the claimed invention at issue.

24     Generally, the '400 patent is directed to a digital rights management system for transferring

25 or distributing digital content, such as movies or music.  More specifically, the independent claims

26 of the '400 patent are directed to a kiosk for transferring or distributing secure media content to a

27 portable storage device (or a method of same) by communicating with the storage device and remote

28 trusted server, obtaining a unique, concealed identifier from the portable storage device,

1  authenticating the storage device through a trusted server using at least the unique identifier, and

2  providing the encrypted media and a corresponding access key.  The dependent claims add trivial

3  variations to these elements, including the kiosk comprising local data storage (claims 2 and 10),

4  the kiosk wherein the second data interface is a network interface (claims 6 and 13), the kiosk

5  wherein the kiosk is located in a public environment (claims 8 and 17).

6        As detailed below, these features are an inherent or obvious part of a digital rights

7  management ("DRM") system.  A POSITA would have been motivated to add each of these features

8  to any of the charted references as part of a limited number of design options that confer known

9  benefits while yielding predictable results.

10  **Distributing Secure Media Content to a Portable Storage Device**

11        All asserted claims of the '400 patent require a kiosk communicating with a portable data

12  storage device through one interface, authenticating the portable data storage device by

13  communicating with a remote trusted server over a network through another interface, and, in

14  response to authentication, providing the portable data storage device with encrypted media content

15  and an access key.  The asserted claims thus require authenticating the portable data storage device

16  prior to providing it with encrypted media content.  As the '400 patent itself appears to recognize,

17  however, the inventors of the '400 patent did not invent that concept.  *See* '400 patent 1:23-32.

18  Rather, authenticating a storage device before providing encrypted media content to that storage

19  device is a foundational technique used in many DRM systems.

20        In fact, nearly seven years before even the earliest alleged filing date of the '400 patent (to

21  which Viasat does not believe Western Digital is entitled) one patent application US2008/0098481

22  ("Lee 481," Filed on Sep. 24, 2007) described the basic DRM functions at that point as follows: "In

23  order to protect digital content, the DRM technology encrypts the digital content and thus prevents

24  the illegal distribution or use of the digital content in all stages (i.e., creation, distribution, use, and

25  disposal) of its life cycle. In addition, ***the DRM technology enables only an authorized user with***

26  ***an encryption key to decrypt and use encrypted content***. Therefore, even if the encrypted content

27  is illegally distributed, it cannot be used without the encryption key."  Lee 481 at [0006] (emphasis

28  added); *see also id.* Fig. 1 (below).

**FIG. 1**



It was also well established prior to the '400 patent's earliest alleged filing date that storage devices in a DRM system could be authenticated by communication with a remote trusted server, such as a license server, over a network. *See* Lee 481 at Fig. 1 (below), [0060] ("Accordingly, the download server 200 requests a user authentication server (not shown) to authenticate information (provided by, for example, the portable storage device 500) requested by the user. If the portable storage device 500 is not registered with the user authentication server, the user's request for downloading the selected content is rejected. That is, the download server 200 downloads the requested content only after the user registers the portable storage device 500 with the user authentication server."); *see also* Ponceleon et al., "Enabling Secure Distribution of Digital Media to SD-Cards," MM'06, pp. 495-96 (October 23-27, 2006), available at https://dl.acm.org/doi/pdf/10.1145/1180639.1180742?casatoken=Dza8YIOIAWwAAAAA:JpOYj ncgx6yHT3VFgk-ggEPUgFNsmWjtMz9l931a7fwqr-kj3ETaT5m9ijT32DxoyE7tmqxUgnCN ("Ponceleon") at Fig. 1 (below).

Figure 1: Secure Multimedia Distribution Architecture

The use of a kiosk, specifically, to distribute secure media was also well known by the time the '400 patent was filed. As an example, US20070174140 ("Noonan"), published on July 26, 2007, discloses a "kiosk," also referred to as a "point-of-sale system" for customer selection and transfer or multimedia content to a customer device, where the kiosk contains "a customer communication interface adapted to facilitate electronic communication between the kiosk and the customer device, and customer transaction logic adapted to facilitate customer selection and transfer of multimedia content from the multimedia library to the customer device via the communication interface." Noonan at Abstract, Fig. 1 (below); [0009]; *see also* U.S. Patent No. 8,600,062 ("Rae") at 2:59-67 ("A further embodiment of the invention includes a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content, and a playback device configured to communicate with a portable media drive and to communicate with the headend via a network, where the playback device includes a processor containing a private key issued to the playback device by the conditional access system."); U.S. Patent Pub. No. US2008/0279533 ("Buttars"; published November 13, 2008) ("One embodiment of the invention relates to any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and processor-enabled distribution kiosks (Kiosks) used to distribute and play-back motion pictures and other audio/video data, programs or works.").

Moreover, Buttars describes distributing media content from a kiosk to a variety of storage devices.  *See* Buttars at [0026], [0015], [0020], [0028], Fig. 1:



Figure 3

As is clear from at least Ponceleon and Noonan, kiosks and other devices used to access and distribute content had interfaces to render them capable of both communicating with a portable data storage device and communicating, over a network, with a license server.  *See* Ponceleon at 2 ("Kiosk client reads key management information from the SD card and sends them to the licensing server."); Noonan at Fig. 5, [0023] ("A local area network (LAN) 26 may be implemented at each kiosk 4. If the media caching server 10, the application server proxy 14 and the license server 16 are provided by separate machines or devices, the LAN 26 can be used to interconnect them. The LAN 26 also facilitates electronic communication between the kiosk and a customer device, such as a laptop or personal computer, a portable media storage and playback device (e.g., an IPOD® device), a gaming machine, a cellular telephone, etc. LAN interconnectivity may be provided by a network hub, switch, router, or other kiosk communication interface 28.  The communication interface 28

1  could include conventional (e.g., RJ-45) network plug-in jacks so that customer devices can connect

2  to the LAN via conventional (e.g. CAT 5) network cables or the like.").

3

4

5

6

7

8

9

10

11

12

13

14

15



16

17          And in addition to being described in various patents and publications, DRM-protected

18  media distribution to portable data storage devices was widely known and available in the market

19  years before the alleged invention claimed in the '400 patent.  For example, by 1999, Microsoft

20  launched Microsoft Windows Media DRM, which by 2001 had been used "in more than 7.5 million

21  transactions for secure music and video."  *See*   https://news.microsoft.com/2001/06/13/microsoft-

22  drm-technologies-establish-foundation-for-emerging-internet-music-video-and-ebooks-industries/

23  (June 13, 2001); *see also* US2003/0014630 Spencer at [0004-0005] ("One approach to making

24  recordings available to a larger group of customers is to receive orders and distribute music

25  electronically over a communications network, such as the Internet. A person can connect to a music

26  provider and download music over the Internet, either for free or for a fee.  A few examples of

27  common providers that make digital audio files available for downloading are RealNetworks Inc.,

28  Audible Inc., mp3.com Inc., and Emusic.com Inc. The downloaded music can be played back with

appropriate audio playback software on the user's computer, either while the user's computer is connected to the Internet (that is, through streaming playback of the audio data), or at a later time. Examples of common software for playing back audio files include the RealPlayer® and the Windows® MediaPlayer ™ software.  A user may organize his or her downloaded audio files in a "personal jukebox" on his or her computer.").  By April 2003, Apple launched the iTunes Store, selling music with "FairPlay DRM" protection for download to Apple portable storage devices like the iPod.  And in 2004, Microsoft launched Windows Media DRM for Portable Devices (WMDRM-PD) which was required to download music to a portable device from Napster To Go.  In 2007, Microsoft also released its own portable storage device, Zune, which utilized WMDRM-PD to download music from Microsoft's Zune Marketshare platform.

**Portable Storage Device Specific Unique Identifiers**

The '400 claims also require that the kiosk obtain from the portable data storage device an identifier that is unique to and concealed by the portable data storage device, and that the portable data storage device is authenticated, using at least the unique identifier, by communicating with a remote trusted server.  This too was a well-known way to authenticate portable data storage devices by the time the '400 patent was filed.  *See*, e.g., U.S. Patent Pub. No. 2002/0152393 (hereinafter, "Thoma") (filed January 8, 2002) ("The CE device 200 and the CE device management  server 202 may share secret information such as a public key certificate or a password in advance, so as to set a safe communication channel and to authenticate the other party.  The CE device 200 transmits a request for issuing a DRM key including the unique identifier ID_Dev to the CE device management server 202 (operation 212). The CE device management server 202 which has received the request for issuing the DRM key, authenticates the CE device 200 by using the identifier ID_Dev or encryption key authentication."); U.S. Patent Pub. No. 2003/0014630 ("Spencer") (filed June 27, 2001 at [0007] ("Advantageous implementations can include one or more of the following features. Obtaining device-identifying information can include obtaining a unique identification number from the digital media playback device. Obtaining device-identifying information can include obtaining a unique identification number of a digital storage medium in the digital media playback device. The unique identification number can be a serial number."); *id.* at [0015] ("[A]uthenticating the

device-identifying information with a client application program; authenticating the client application with a content server application program; and establishing a communication channel between the digital media playback device and the content server if both authentications are successful."); *id.* at [0074] ("The download manager can thus, using the MDM API described above, obtain information from a playback device that uniquely identifies the playback device."); US 2008/0098481 ("Lee 848") (filed September 24, 2007) at [0089]-[0083] ("The TRM area 510 stores DRM security information. That is, the TRM area 510 stores a serial number of the portable storage device 500, a public/private key, a certificate, a device group key, etc. for each DRM. . . . The rights to access the data recorded in the TRM area 510 must be given only to a DRM agent (not shown), and an external user must be prohibited from moving or changing the data."); Ponceleon at 2 ("Access to the protected area requires authentication between devices. A random number is generated every time there is an exchange of data to prevent the man-in-the-middle attack.").

From Plaintiffs' infringement contentions, it appears that they interpret the claim limitation directed to "authenticating the portable data storage device, using at least the unique identifier," to simply require "collect[ing] . . . the unique identifier required to access the services." *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. A ('400 Chart) at 6.   It also appears that Plaintiffs interpret the claim limitation directed to "a unique identifier . . . concealed by the portable data storage device," to be satisfied by "randomizing the MAC address" of a device. *Id.* at   Under such interpretations of the claims, methods and apparatus' engaged in media content distribution existed that met those claim terms by the time the '400 patent was filed.  *See, e.g.*, Ponceleon at 2 ("A random number is generated every time there is an exchange of data to prevent the man-in-the-middle attack."); *see also* DiFonzo at [0014] ("Various embodiments of the invention may be designed to securely distribute and use digital content in a manner that protects the content owner's copyrights as well as the content user's right of fair use.  Digital content may be any work that can be encoded in digital form, such as literature, music, software applications, static images, and video, etc. Various embodiments secure digital rights by encrypting the digital content in such a way (i.e., via public key infrastructure (PKI)) that only a licensed user may access the content. The licensed user may, however, access the content from any playback device and from any location.")

**Exemplary Combinations**

With respect to the prior art references in Exhibits 400-1 through 400-12, a POSITA would have been motivated to combine any of the references identified as prior art to the '400 patent for the additional reasons provided below.

First, the prior art references identified above and the accompanying invalidity claim charts teach similar techniques employed for DRM systems (and within relevant timeframes), and thus the teachings of any one reference are applicable to other references in that same field. *See, e.g.*, Rae at 2:59-67 ("A further embodiment of the invention includes a kiosk configured to receive a portable media drive and to communicate with a headend including a conditional access system via a network and a storage device containing symmetrically pre-encrypted content, and a playback device configured to communicate with a portable media drive and to communicate with the headend via a network, where the playback device includes a processor containing a private key issued to the playback device by the conditional access system."); Buttars at [0020] ("One embodiment of the invention relates to any number of processor-enabled flash-drive memory storage devices (Storage Device) combined with any number of processor-enabled playback devices (Playback Device), and processor-enabled distribution kiosks (Kiosks) used to distribute and play-back motion pictures and other audio/video data, programs or works."); Spencer at [0006] ("In general, in one aspect, this invention provides methods, apparatus, and systems, including computer program products, implementing and using techniques for delivery of media content. . . . Based on the device-identifying information, it is determined whether the requested media content is playable on the digital media playback device."); Leung at 3:50-59 ("[A] portable device couples to a computer for purposes of downloading content and a corresponding sublicense in accordance with one embodiment of the present invention."); U.S. Patent Pub. No. 2005/0027991 ("DiFonzo") was filed on June 23, 2004 ("Various embodiments of the invention may be designed to securely distribute and use digital content in a manner that protects the content owner's copyrights as well as the content user's right of fair use."); Kasahara at [0032] ("In this system, a user may have a personal computer (PC) 10, a SD memory card (SD card) 20, and a handheld terminal 30 (user terminal) or the like. A content provider or the like may have a server 50, which provides, via the Internet N1 or a handheld

1    terminal packet network N2, the content data and various key data for encrypting the content data

2    or the like."); DRM: Secure Content Storage Association Launches Project Phenix (Mar 1, 2012).

3        Given these similarities, a POSITA would have recognized the compatibility between the

4    teachings of the prior art references.  As explained above, it was well known before the alleged

5    invention to distribute or transfer secure data from kiosks to portable data storage devices.

6    Moreover, a DRM system that collects a unique identifier not directly traceable to the storage device

7    and then provides encrypted media content to the storage device, which Plaintiffs contend is

8    sufficient to meet the claim requirements, was even more widely known.  A POSITA would have

9    regarded the combination of such foundational components of a DRM system and/or apparatus as

10   well known in the field at the time the '400 patent was filed.

11       Second, a POSITA would have been motivated and found it obvious to apply references

12   teaching certain specific techniques—*e.g.*, transferring or distributing media content from a kiosk

13   to a portable data storage device, obtaining a specific unique identifier from the portable data storage

14   device that is concealed by the portable data storage device, authenticating the portable data storage

15   device using at least the unique identifier by communicating with the remote trusted server, in

16   response to authentication, providing the portable data storage device with the encrypted media

17   content and an access key—to other references that relate to secure content distribution systems and

18   apparatuses generally because all references teach distributing or transferring secure content for

19   storage or playback, and it would have been a trivial exercise to consult the references that taught

20   more specific aspects of a to fill in less specific disclosures in other references.

21       A POSITA would have also been motivated and found it obvious to replace and/or combine

22   a reference's exact set of features, components, and configurations in a particular secure media

23   distribution system/apparatus with the teachings regarding other features, components, and

24   configurations used in other secure media distribution systems/apparatuses for all the reasons

25   provided above.  These modifications would have been a simple substitution of one known element

26   for another, which would have obtained predictable results because it was already well known in

27   the art of secure media distribution systems. The substitution of one component or configuration for

28   another would not have changed the principle of operation for either reference in any combination

because the references all use similar mechanisms for a similar purpose of: designing a secure media distribution system/apparatus. This is thus a combination of prior art elements (*e.g.*, a kiosk configured to communicate with a portable data storage device and a remote trusted server, a unique storage device-specific identifier, authenticating a portable data storage device using its unique identifier, providing a portable data storage device with encrypted media content and an access key, a kiosk employing local data storage, a kiosk with a network interface, a kiosk located in a public environment). A POSITA would have been motivated to combine these teachings, and to make these replacements, because all of the techniques were widely used for conventional DRM systems or systems for distributing secure media content. Accordingly, a POSITA would have had a reasonable expectation of success given considerations discussed above, the similarities in the teachings and systems, and given that the claimed features, components, and configurations of a media streaming system were all well-known at the time. Implementing the combination and any necessary modifications would have been routine and within the scope of the prior art references' teachings.

As one example, to the extent that Rae, Buttars, Spencer, Leung, DiFonzo, Kasahara, or SCSA does not disclose "[obtain/obtaining] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device," it would have been obvious to combine any of these references with, *e.g.*, Thoma, Lee 481, Ponceleon, Kumar, Ahn, or Mick to arrive at said limitation because those references disclose such limitation, and a POSITA would have been motivated to consult references that disclose known options for securely distributing media content. *See*, e.g., Thoma ("The CE device 200 and the CE device management server 202 may share secret information such as a public key certificate or a password in advance, so as to set a safe communication channel and to authenticate the other party. The CE device 200 transmits a request for issuing a DRM key including the unique identifier ID_Dev to the CE device management server 202 (operation 212). The CE device management server 202 which has received the request for issuing the DRM key, authenticates the CE device 200 by using the identifier ID_Dev or encryption key authentication."); Lee 481 at [0089]-[0083] ("The TRM area 510 stores DRM security information. That is, the TRM

area 510 stores a serial number of the portable storage device 500, a public/private key, a certificate, a device group key, etc. for each DRM. . . . The rights to access the data recorded in the TRM area 510 must be given only to a DRM agent (not shown), and an external user must be prohibited from moving or changing the data."); Ponceleon at 2 ("Access to the protected area requires authentication between devices. A random number is generated every time there is an exchange of data to prevent the man-in-the-middle attack."); Kumar at [0001] ("The integrated circuit (IC) to interface with the storage device uses a unique ID to encrypt or decrypt the content. several embodiments are disclosed herein that maintain the secrecy of the unique ID such that is not easily accessible thereby defeating the encryption scheme."); Ahn at [0037]("The CE device 200 is connected to a network and has a single identifier ID_Dev. The identifier ID_Dev is unique information allocated to the CE device 200 and is identification information for identifying the CE device 200 on a network. The CE device 200 is connected to the CE device management server 202 through the network."); Mick at [0100]-[0104] ("In step 502, the kiosk reads a unique device ID 129 associated with the portable high-speed memory device 131 . . . that may be stored in a portable high-speed memory device.").

As another example, to the extent that Rae, Buttars, Spencer, Leung, DiFonzo, or Kasahara does not disclose does not disclose the "[authenticating/authenticate] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface" limitation, it would have been obvious to combine any of these references with, *e.g.*, Thoma, Lee 481, Ponceleon, Ahn, or Mick to arrive at said limitation because those references disclose such limitation, and a POSITA would have been motivated to consult references that disclose known options for securely distributing media content. *See* Thoma [0058]-[0059] ("To download encrypted content the terminal device 12 sends a request to the content server 18. The request is received 102 by the content server 18 and includes a unique request ID, a unique ID for content requested and a unique ID for the terminal device 12. The content server 18 generates 104 a symmetric key and encrypts the content with the symmetric key. The content server 18 sends 106 a request to key server 16 over a secure connection. The request includes a unique request ID2, a unique ID of device, and the symmetric key. The key server 16 looks up the public key of device by

unique ID of device. If the public key is found, the key server 16 encrypts the symmetric key with the public key and sends a response to content server 18."); Ponceleon at 2 ("An SD-card has a 'Protected Area' and a 'User Area'. Access to the protected area requires authentication between devices. A random number is generated every time there is an exchange of data to prevent the man-in-the-middle attack."); Lee 481 at [0089]-[0083] ("Accordingly, the download server 200 requests a user authentication server (not shown) to authenticate information (provided by, for example, the portable storage device 500) requested by the user. If the portable storage device 500 is not registered with the user authentication server, the user's request for downloading the selected content is rejected. That is, the download server 200 downloads the requested content only after the user registers the portable storage device 500 with the user authentication server."); Ahn at [0041]-[0047] ("The CE device 200 and the CE device management server 202 may share secret information such as a public key certificate or a password in advance, so as to set a safe communication channel and to authenticate the other party."); Mick at [0272] ("The request can also include information needed to verify the authenticity and integrity of the requesting video player 305 and its contents. The information sent by a video player 305 to the central server 118 in the request may include, but is not limited to, the unique device ID of the video player or computer initiating the request, the date and time of the last update of pirated watermarks, and the authentication certificate issued by the central server 118 during the last update.").

Additional obviousness combinations of the references identified here are possible, and Defendant may rely on such combination(s) in this litigation. In particular, Defendant is currently unaware of Plaintiffs' allegations with respect to the level of skill in the art and the qualifications of a POSITA. Defendant is also unaware of the extent, if any, to which Plaintiffs may contend that limitations of the claims at issue are not disclosed in the prior art identified by Defendant as anticipatory, and the extent to which Plaintiffs will contend that elements not disclosed in the asserted patent specifications would have been known to a POSITA. And Defendant does not yet know how the Court will construe terms in the asserted claim. Defendant is also continuing its investigation of the large universe of prior art to identify potential prior art systems, publications related to those systems, and third parties that may have information about those systems. Defendant

reserves the right to amend and supplement these contentions to identify other prior art and combinations rendering the asserted claim obvious.

These motivations to combine are exemplary, and Defendant reserves the right to supplement these contentions as its understanding of the scope and content of prior art develops.

### 2. Secondary Considerations

Defendant is not aware of objective evidence or secondary considerations demonstrating non-obviousness of the asserted claims of the '400 patent. As set forth below, the evidence confirms that the asserted claims would have been obvious to a POSITA at the time of the alleged invention. Defendant reserves the right to supplement or modify these factors to address any evidence or arguments later identified by Plaintiffs.

#### (a) The Alleged Invention Did Not Satisfy a Long-Felt But Unresolved Need

Viasat is not aware of any evidence of a long-felt but unmet need that the asserted claims solve. On the contrary, the concepts and functions described in the asserted claims of the '400 patent were all well-known before the alleged invention date as evidenced by the patent itself, its file history and the references cited therein, and the prior art Defendant has identified in these contentions and accompanying exhibits.

#### (b) The Alleged Invention Did Not Face Skepticism or Teaching Away by Experts

Viasat is not aware of any evidence of a failure of others to invent or use the claimed techniques before the alleged invention dates of the '400 patent. As discussed, the '400 patent recites concepts that were already known in the prior art.

#### (c) The Alleged Invention Was Not Subject to Industry Acceptance

Viasat is not aware of any evidence that Plaintiffs' alleged invention in the '400 patent was subject to additional industry acceptance due to Plaintiffs or the '400 patent. This is at least because the subject matter of the '400 patent already existed in the industry and was used by many entities and individuals prior to the '400 patent.

#### (d) The Alleged Invention Has Not Been Subject to Industry Praise

Viasat is not aware of any evidence of industry praise for any of the alleged inventions of the '400 patent. To the extent any industry praise is related to any functionality that Plaintiffs allege practices the '400 patent, that praise is not due to the allegedly novel features of the '400 patent, but instead only to features present in the prior art, which is not a sufficient nexus for purposes of obviousness. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**(e)    The Alleged Invention Is Not Responsible for Commercial Success**

Viasat is not aware of any evidence of alleged success of any products that is due to the alleged invention claimed in the '400 patent. The patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987). Here, Plaintiffs have not shown (and cannot show) that any commercial success is due to the alleged invention of the '400 patent. *See Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

Moreover, to the extent any commercial success of any products is due to concepts discussed in the '400 patent, those concepts were already present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness. *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**(f)    There Is No Evidence to Show Copying of the Alleged Invention**

Viasat is not aware of any evidence of any aspect of the '400 patent that was copied by any entity or person, much less that any functionality that practices the '400 patent was copied. *See*

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

> **(g)     Simultaneous Development of the Alleged Invention Confirms that the Asserted Claims Were Obvious**

As set forth above, many people and companies independently and simultaneously developed and invented the same technology within a comparatively short space of time of a few years, which further shows that the '400 patent was the product only of ordinary engineering skill. Moreover, the fact that there was relatively simultaneous invention demonstrates that the subject matter of the '400 patent was already well within the level of ordinary skill in the art.

**C.     35 U.S.C. § 112**

**1.     Indefiniteness**

The following limitations are indefinite, particularly as their scope is interpreted by Plaintiffs, because the claims and specification of '400 patent do not define these limitations or provide objective boundaries that would allow a person or ordinary skill in the art to determine, with reasonable certainty, what practices the invention:

- Claims 1 and 9: "[obtain/obtaining] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device";

- Claims 1 and 9: "[authenticating/authenticate] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface";

- Claims 1 and 9: "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key."

A POSITA at the time of the invention would not be able to determine the full scope of the claimed subject matter for the limitations above with reasonable certainty. In particular, Plaintiffs interpret their scope, as demonstrated in their infringement contentions, to indicate that they have no objectively defined meaning. As such, in view of the positions taken by Plaintiffs, the specification of '400 patent does not define these phrase or provide objective boundaries that would allow a person or ordinary skill in the art to determine, with reasonable certainty, what they are.

**2.     Priority and Lack of Written Description Under 35 U.S.C. § 112**

As a preliminary matter, the Asserted Claims of the '400 Patent are entitled to a priority date of no earlier than December 15, 2014, the filing date of the '400 patent. Plaintiffs bear the burden of establishing an earlier priority date, which they cannot do because numerous elements were not present in the earlier applications cited on the face of the '400 patent application sufficient to satisfy Section 112 (the full scope of the invention).

Moreover, the asserted claims of the '400 patent are invalid for lack of written description because the specification does not demonstrate that, at the time of filing, the named inventors were in possession of the full scope of at least the following limitations:

- Claims 1 and 9: "[obtain/obtaining] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device";

- Claims 1 and 9: "[authenticating/authenticate] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface";

- Claims 1 and 9: "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key."

Plaintiffs interpret the above claim requirements beyond the scope of disclosures in the written description. For example, claims 1 and 9 require a "a unique identifier" that is "specific to the portable data storage device and is concealed by the portable data storage device." *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. A ('400 Chart) at 6-8. Claims 1 and 11 also require "authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface." *See id.* at 8-9. Finally, claims 1 and 9 require, "in response to authentication, providing the portable data storage device an encrypted first media content and a corresponding access key." *See id.* at 9-11. Plaintiffs appear to assume that all of these limitations are met by any system/apparatus that collects a randomized unique identifier and thereafter provides a media content and a content key. *See id.* at 6-11. The specification of the '400 patent, however, does not once disclose randomization as sufficient to establish "a unique identifier . . . **concealed by** the portable data storage device." Nor does the '400 patent specification disclose merely collecting a unique identifier as sufficient to

establish "authenticating the portable data storage device, using at least the unique identifier, by communicating over a remote trusted server."  Finally, the '400 patent specification lacks a disclosure of providing to the portable data storage device, in response to authentication, encrypted media content and a corresponding access key.  Under Plaintiffs' overly broad interpretation that improperly conflate distinct claim requirements, all asserted claims of the '400 are invalid for lack of written description.

### 3.    Lack of Enablement Under 35 U.S.C. § 112

The asserted claims of the '400 patent are invalid for lack of enablement because the specification fails to enable a POSITA to practice the full scope of at least the following limitations:

- Claims 1 and 9: "[obtain/obtaining] a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device";

- Claims 1 and 9: "[authenticating/authenticate] the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface";

- Claims 1 and 9: "in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key."

Plaintiffs interpret the above claim requirements beyond the full scope enabled by the written description.  For example, claims 1 and 9 require a "a unique identifier" that is "specific to the portable data storage device and is concealed by the portable data storage device."  *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. B ('667 Chart) at 6-8.  Claims 1 and 11 also require "authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface."  *See id.* at 8-9.  Finally, claims 1 and 9 require, "in response to authentication, providing the portable data storage device an encrypted first media content and a corresponding access key."  *See id.* at 9-11.  Plaintiffs appear to assume that all of these limitations are met by any system/apparatus that collects a randomized unique identifier and thereafter provides a media content and a content key.  *See id.* at 6-11.  The specification of the '400 patent, however, does not provide any disclosure that would enable a POSITA to practice the claimed invention under the Plaintiffs' interpretation without undue

experimentation.  In fact, the specification does not once disclose either randomizing a unique identifier as sufficient to establish a concealed unique identifier, nor does it disclose that merely collecting a randomized unique identifier is sufficient for the claimed authentication, using at least the unique identifier, by communicating with the remote trusted server.  Finally, the specification does not disclose, in response to authentication, providing to the data storage device encrypted media content and a corresponding access key.  Under Plaintiffs' overly broad interpretation that improperly conflate distinct claim requirements, all asserted claims of the '400 are invalid for lack of enablement.

## III.    THE '667 PATENT

### A.    35 U.S.C. § 102

The asserted claims of the '667 patent are invalid as anticipated under 35 U.S.C. § 102 in view of at least each of the prior art references identified below and in Exhibits 667-1 through 667-19 ("the 667 Patent Charts"):

#### 1.    Prior Art Patents / Patent Applications

| Number | Country of Origin | Date of issue | Short name |
|--------|-------------------|---------------|------------|
| US20020152393 | United States | Oct 17, 2002 | Thoma |
| US20030001978 | United States | Jan 2, 2003 | Smith 978 |
| US20030014630 | United States | Jan 16, 2003 | Spencer |
| US20040221118 | United States | Nov 4, 2004 | Slater |
| US20050027991 | United States | Feb 3, 2005 | Difonzo |
| US20050117641 | United States | Jun 2, 2005 | Xu |
| US20050144195 | United States | Jun 30, 2005 | Hesselink |
| US20050144200 | United States | Jun 30, 2005 | Hesselink |
| US20060200848 | United States | Sep 7, 2006 | Baldine-Brunel |
| US20060259431 | United States | Nov 16, 2006 | Poisner |
| US20070011747 | United States | Jan 11, 2007 | Whitfield |
| US20070116268 | United States | May 24, 2007 | Kasahara |
| US20070133795 | United States | Jun 14, 2007 | Kahn 795 |
| US20070265978 | United States | Nov 15, 2007 | Kahn 978 |
| US20080279386 | United States | Nov 13, 2008 | Kahn 386 |
| US20080279533 | United States | Nov 13, 2008 | Buttars |
| US20080098481 | United States | Apr 24, 2008 | Lee |
| US20090006796 | United States | Jan 1, 2009 | Chang |
| US20090113496 | United States | Apr 30, 2009 | Kummer |
| US20090199303 | United States | Aug 6, 2009 | Ahn |
| US20090290709 | United States | Nov 26, 2009 | Macdonald |

| Number | Country of Origin | Date of issue | Short name |
|---|---|---|---|
| US20090295905 | United States | Dec 3, 2009 | Civaniar |
| US20090313122 | United States | Dec 17, 2009 | Funk |
| US20100023974 | United States | Jan 28, 2010 | Shira |
| US20100325675 | United States | Dec 23, 2010 | Smoyer |
| US20110078722 | United States | Mar 31, 2011 | Wendling |
| US20110164686 | United States | Jul 7, 2011 | Lu |
| US20110173653 | United States | Jul 14, 2011 | Arsenault |
| US20110202740 | United States | Aug 18, 2011 | Grisenthwaite |
| US20110271306 | United States | Nov 3, 2011 | Kahn 306 |
| US20110299448 | United States | Dec 8, 2011 | Meier |
| US20120036041 | United States | Feb 9, 2012 | Hesselink |
| US20120226915 | United States | Sep 6, 2012 | Zollinger |
| US20120227066 | United States | Sep 6, 2012 | Woxblom |
| US20120257675 | United States | Oct 11, 2012 | Wang |
| US20120320916 | United States | Dec 20, 2012 | Sebastian 916 |
| US20130212401 | United States | Aug 15, 2013 | Lin |
| US20130243399 | United States | Sep 19, 2013 | Casagrande |
| US20130268749 | United States | Oct 10, 2013 | Blankenbeckler 749 |
| US20130268759 | United States | Oct 10, 2013 | Blankenbeckler 759 |
| US20130268771 | United States | Oct 10, 2013 | Blankenbeckler 771 |
| US20140052810 | United States | Feb 20, 2014 | Osorio |
| US20140095439 | United States | Apr 3, 2014 | Ram |
| US20140169921 | United States | Jun 19, 2014 | Carey |
| US20140173215 | United States | Jun 19, 2014 | Lin |
| US20140195805 | United States | Jul 10, 2014 | Koo |
| US20140250471 | United States | Sep 4, 2014 | Guerra |
| US20140359154 | United States | Dec 4, 2014 | Tripathy |
| US20150281186 | United States | Oct 1, 2015 (PCT filed Dec 24, 2013) | Smith 186 |
| US20150319497 | United States | Nov 5, 2015 (filed Apr 30, 2014) | Rao |
| US20160134602 | United States | May 12, 2016 (filed Nov 6, 2014) | Poornachandran |
| US20120131623 | United States | May 24, 2012 | McDysan |
| US20130254815 | United States | Sep 26, 2013 | Pfeffer |
| US6496980 | United States | Dec 17, 2002 | Tilman |
| US6499054 | United States | Dec 24, 2002 | Hesselink |
| US6510177 | United States | Jan 21, 2003 | De Bonet |
| US6580754 | United States | Jun 17, 2003 | Wan |
| US7055038 | United States | May 30, 2006 | Porter |
| US7120692 | United States | Oct 10, 2006 | Hesselink |
| US7231669 | United States | Jun 12, 2007 | Leung |
| US7454443 | United States | Nov 18, 2008 | Ram |
| US7546353 | United States | Jun 9, 2009 | Hesselink |

| Number | Country of Origin | Date of issue | Short name |
|---|---|---|---|
| US7587467 | United States | Sep 8, 2009 | Hesselink |
| US7860161 | United States | Dec 28, 2010 | Xu |
| US7917628 | United States | Mar 29, 2011 | Hesselink |
| US7934251 | United States | Apr 26, 2011 | Hesselink |
| US7949564 | United States | May 24, 2011 | Hughes |
| US8004791 | United States | Aug 23, 2011 | Szeremeta |
| US8094719 | United States | Jan 10, 2012 | Liu |
| US8126054 | United States | Feb 28, 2012 | Hsiang |
| US8190677 | United States | May 29, 2012 | Myers |
| US8255661 | United States | Aug 28, 2012 | Karr |
| US8285965 | United States | Oct 9, 2012 | Karr |
| US8340177 | United States | Dec 25, 2012 | Ji |
| US8352567 | United States | Jan 8, 2013 | Hesselink |
| US8432808 | United States | Apr 30, 2013 | Dankberg |
| US8504834 | United States | Aug 6, 2013 | Jogand-Coulomb |
| US8516253 | United States | Aug 20, 2013 | Sebastian 834 |
| US8526798 | United States | Sep 3, 2013 | Hesselink |
| US8600062 | United States | Dec 3, 2013 | Rae |
| US8631284 | United States | Jan 14, 2014 | Steve |
| US8646054 | United States | Feb 4, 2014 | Karr |
| US8688797 | United States | Apr 1, 2014 | Hesselink |
| US8713265 | United States | Apr 29, 2014 | Rutledge |
| US8762682 | United States | Jun 24, 2014 | Stevens |
| US8780004 | United States | Jul 15, 2014 | Chin |
| US6640305 | United States | Oct 28, 2003 | Kocher 305 |
| US8055910 | United States | Nov 8, 2011 | Kocher 910 |
| US6853728 | United States | Feb 8, 2005 | Kahn |

### 2.    Prior Art Publications

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| DIRECTV Genie – The Most Advanced Whole Home HD DVR | No later than May 24, 2013 | DirecTV | DirecTV |
| DIRECTV HD + DVR Receiver – HD & DVR Box from DIRECTV | No later than May 26, 2013 | DirecTV | DirecTV |
| DirecTV HR23 Satellite Receiver and HD DVR Reviewed | Mar 4, 2010 | HomeTheater Review.com | HomeTheater Review.com |
| DIRECTV_ DVR Scheduler | No later than May 26, 2010 | DirecTV | DirecTV |
| DIRECTV_ TV on Your Schedule_ Set Your DVR with Any Mobile Phone or Computer | No later than May 26, 2010 | DirecTV | DirecTV |
| DirecTV Non-DVR Receivers User Guide | No later than July 8, 2010 | DirecTV | DirecTV |
| DirecTV Genie whole-home DVR review | Dec 29, 2012 | Ben Drawbaugh | Engadget |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| DirecTV Genie HD DVR | Mar 11, 2013 | J. Brandon | Wired |
| A Personal Mobile DRM Manager for Smart-Phones, Computers & Security, Volume 28, Issue 6, 2009, Pages 327-340, ISSN 0167-4048 | Sep 1, 2009 | S. Bhatt et al | Computer & Security |
| DRM & Security Enabling Mechanisms Leveraging User Centric Multimedia Convergence | Apr 5, 2012 | A. Fragopoulos et al | IntechOpen |
| DRM: Secure Content Storage Association Launches Project Phenix | Mar 1, 2012 | K. Robinson | etcentric |
| Ponceleon et al., "Enabling Secure Distribution of Digital Media to SD-Cards," MM'06, pp. 495-96 (October 23-27, 2006) | Oct 23, 2006 | D. Ponceleon et al | Association for Computing Machinary |
| DISH Network Introduces New High Definition DVR to Complement Nation's Largest HD Package | | Dish Network | Dish Network |
| 722 DVR Product Brochure | No later than Sep 2007 | Dish Network | Dish Network |
| LA Audio File, Product Review (January 2008) – Dish Network ViP 722™ High Definition Satellite DVR | Jan 2008 | K. Nakano | LA Audio File |
| CNET, Dish Network ViP HD DVR review: Dish Network ViP HD DVR (Feb 19, 2008) | Feb 19, 2008 | D. Katzmaier | CNET |
| DISH Network Introduces Video On Demand At Consumer Electronics Show; New DISH Player-DVR 625 Makes Hit Movies Available to Satellite TV Customers (Jan 5, 2005) | Jan 5, 2005 | Dish Network | Dish Network |
| DISH Network™ & Warner Bros. Home Entertainment Group Sign Video On Demand Movie Deal; Video On Demand and Pay-Per-View Movies Now Available on DISH Network (Aug 24, 2006) | Aug 24, 2006 | Dish Network | Dish Network |
| HD Duo DVR – 722k, 722, and 622 receivers | | Dish Network | Dish Network |
| DISH Introduces Hopper and Joey – Next Generation Whole-Home HD DVR Entertainment System (Jan 9, 2012) | Jan 9, 2012 | Dish Network | Dish Network |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Engadget, Dish Hopper whole-home DVR review (Apr 30, 2012) | Apr 30, 2012 | B. Drawbaugh | Engadget |
| Engadget, Dish Network announces Hopper DVR system, Joey set-top box, launches broadband, Test Drive services (Jan 9, 2012) | Jan 9, 2012 | A. Toor | Engadget |
| Dish aims high with new Hopper DVR, high-speed satellite broadband service (Jan 9, 2012) | Jan 9, 2012 | Dish Network | Dish Network |
| DRM: Secure Content Storage Association Launches Project Phenix | Mar 1, 2012 | K. Robinson | etcentric |
| The Secure Content Storage Association (SCSA) Releases VIDITY Licensing Specifications | Aug 26, 2015 | BusinessWire | BusinessWire |
| Secure Content Storage Association (SCSA) Selects Cryptography Research to Provide Security Expertise | Sep 6, 2012 | SCSA | SCSA |
| Leading Companies Join SCSA to Offer Secure Solution for Delivery of Highest-Quality Premium Digital Content | Dec 12, 2013 | SCSA | SCSA |
| How Open Caching Aims To Support Broadcast Grade Streaming | July 8, 2022 | P. Martin | Distribution, Broadcast & Delivery |
| Streaming Video Alliance Trade Group Launches, Without Netflix or YouTube | Nov 14, 2014 | T. Spangler | Variety |
| Faster Netflix streaming coming to Time Warner Cable | Aug 20, 2014 | J. O'Toole | CNN Business |
| WAEA Specification 0395: Content Delivery for In-Flight Entertainment – Version 2.0 | Nov 6, 2001 | WAEA | DMD-TC |
| WAEA Specification 0403: Digital Content Delivery Methodology for Airline In-Flight Entertainment Systems – Version 1.1 | Feb 24, 2009 | WAEA | DCMWG |

### 3.    Prior Art Systems

| Item | Date of Sale/Use/Offer | Person/Entity |
|---|---|---|
| DirecTV VOD Services and the HR23 DVR | Mar 4, 2010 | DirecTV; Raynold M. Kahn, Peter M. Klauss, Stephen P. |

| Item | Date of Sale/Use/Offer | Person/Entity |
|---|---|---|
| | | Dulac, David N. Schlacht, Hanno Basse, Thomas H. James |
| DirecTV VOD Services and the Genie DVR | Dec 29, 2012 | DirecTV; Raynold M. Kahn, Peter M. Klauss, Stephen P. Dulac, David N. Schlacht, Hanno Basse, Thomas H. James |
| TiVo Premiere | No later than Mar 2, 2010 | TiVo |
| Dish ViP622 | Aug 24, 2006 | Dish Network |
| Dish ViP722k Receiver | Sep 9, 2007 | Dish Network |
| Dish Hopper/Joey | Jan 9, 2012 | Dish Network |
| WesternDigital My Book AV DVR Expander | No later than Aug 6, 2010 | WesternDigital |
| WesternDigital TV Live Plus | No later than August 10, 2010 | WesternDigital |
| Secure Content Storage Association (SCSA) | No later than Mar 1, 2012 | SCSA |
| CTERA CloudPlug | Oct 6, 2009 | CTERA |
| Netgear ReadyShare Vault | Feb 26, 2013 | Netgear |
| Netgera Ready NAS Vault | Mar 2, 2009 | Netgear |
| Netgear Ready NAS Ultra 6 | May 4, 2011 | Netgear |
| Netflix | Jan 2007 | Netflix |
| Amazon Unbox | Sep 7, 2006 | Amazon |
| Amazon Video On Demand | Sep 3, 2008 | Amazon |
| Emusic | No later than Apr 27, 2008 | Emusic |
| Open Caching | 2014 | Streaming Video Alliance (SVA) |
| Arconics CloudStore | No later than Apr 3, 2014 | Arconics |

Each of these references qualifies as prior art to the '667 patent under at least 35 U.S.C. §102 (a)(1) and/or (a)(2). Any products that embodied the disclosures of these references also qualify as prior art to the '667 patent under 102 (a)(1). These charts provide exemplary disclosures to identify specifically where and how in each prior art each limitation of each asserted claim is found. Additionally, Defendant incorporates by reference (as though set forth herein) and identifies all references cited on the face of the '667 patent, as well as during the prosecution of the '667 patent, as prior art that Defendant may rely upon.

Unless otherwise noted, the prior art reference(s) anticipate (or the obviousness combinations render obvious) the asserted claims based on Plaintiffs' incorrect interpretation of the claim limitation(s).

To the extent that any of these references is found not to disclose one or more elements of the Asserted Claims, Defendant reserves the right to use one or more of these references as prior art under 35 U.S.C. § 103.

## B.    35 U.S.C. § 103

Prior art references rendering the asserted claims of the '667 patent obvious, alone or in combination with other references, are identified in the 667 Patent Charts, which include exemplary claim charts for the '667 patent showing specific citations to relevant disclosures in those references. Additional prior art references and disclosures that may be combined with each other and/or with one or more of the references charted in the 667 Patent Charts are included in the chart titled "Exhibit 667-20: §103 References."

To the extent any limitation is deemed not to be exactly met, either explicitly or inherently, by an item of prior art listed above and in the aforementioned exhibits, any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103.

### 1.    Obviousness Combinations

The accompanying charts set forth the bases for anticipation and obviousness, identifying the disclosures of each reference that can be combined on a limitation-by-limitation basis.  Each of the 667 Patent Charts demonstrate that the charted reference anticipates and/or renders obvious, based on its disclosures alone or in combination with the knowledge of a POSITA, each asserted claim of the '667 patent.  The chart in "Exhibit 667-20: §103 References" identifies disclosures in additional prior art references, any of which would be obvious to combine with each other and one or more of the references charted in the 667 Patent Charts in a predictable way with a reasonable expectation of success to render obvious the claimed invention at issue.

The independent claims of the '667 patent are directed to a media streaming system transmitting digital content, over a wide area network (WAN), to a secure region in a network attached storage (NAS) device operating in a local area network (LAN), the secure region comprising a buffer for streaming the digital content on a separate display device on the LAN, and controlling streaming access to the digital content stored on the buffer.  The dependent claims add trivial variations to these elements, including the display device comprising a smart TV (claim 2), transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device (claims 3 and 12), the secure region being inaccessible by a user of the NAS device without permission from the media streaming system (claims 4 and 13), causing the NAS device to use encryption that secures the digital content to the secure region (claims 5 and 14), providing instructions to the NAS device for controlling an amount of data stored in the secure region (claims 6 and 15), and providing instructions to the NAS device for controlling an encryption type used in the secure region (claims 7 and 16).

As detailed below, under Plaintiffs' interpretation that all limitations concerning a "secure region" can be met simply by a system that performs "user authentication or subscription verification" (*see* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. B ('667 Chart) at 9, 12), these features are an inherent or obvious part of a media streaming system.  A POSITA would have been motivated to add each of these features to any of the charted references as part of a limited number of design options that confer known benefits while yielding predictable results.

**Media Streaming Over The WAN**

All asserted claims of the '667 patent require media transmission over a wide area network (WAN).  Media transmission over a WAN was known well before the alleged invention of the '667 patent and one of the "basic methods" to distribute content.  *See* US20080279533 ("Buttars"; published November 13, 2008) at [0009].  For example, US20030001978 ("Smith 978"), published in January 2003, describes a networked storage device receiving media content from sources connected via wireless satellite or digital data cable.  Smith '978 at [0026], [0028], Fig. 1:



*Fig. 1*

As another example, US20150281186 ("Smith 186"), filed in December 2013, discloses a content provider transmitting media to computing devices "via a wide area network (WAN) such as the Internet." Smith 186 at [0016], Fig. 1:

As yet another example, US20140250471 ("Guerra"), published in September 2014, discloses a gateway device "positioned between the channel based content delivery network and the network at the customer premise location, e.g., home network," where "[t]he home network may be an Ethernet or other network capable of supporting the communication of IP packets to IP devices

which can act as consumers of content, e.g., which can decode and output content to a user." Guerra at [0010].



FIGURE 1

Internet-based media streaming services were prevalent in the market years before the alleged invention. In 2006, Amazon launched Amazon Unbox, offering video download service with DVD-quality picture, later re-branded as Amazon Video On Demand. *See* https://press.aboutamazon.com/2006/9/amazon-com-launches-amazon-unboxtm-a-digital-video-download-service-with-dvd-quality-picture; https://press.aboutamazon.com/2008/9/amazon-customers-can-now-instantly-watch-ad-free-movies-and-tv-shows-on-macs-pcs-and-compatible-sony-bravia-televisions-starting-today-on-amazon-video-on-demand. Netflix began delivering media content over the Internet in 2007, *i.e.*, 8 years before the alleged invention of the '667 patent. *See* https://arstechnica.com/uncategorized/2007/01/8627/. With the advances in the Internet and media streaming services, client-end devices such as set-top boxes began to incorporate media streaming features to both compete with and supplement third party streaming services such as from Netflix and Amazon. *See, e.g.*, DirecTV HR23 Satellite Receiver and HD DVR Reviewed –

HomeTheaterReview, available at https://hometheaterreview.com/directv-hr23-satellite-receiver-and-hd-dvr-reviewed/; Engadget, TiVo Premiere and Premiere XL usher in a brand new interface, optional QWERTY remote (March 2, 2010) ("TiVo's pitching the Premiere line as a single-box solution for getting content on your TV, so although there's long been support for services like Netflix and Amazon Video on Demand, it's now being pushed to the front -- content will show up in searches and be exposed on the main screen."); Dish Network, HD Duo DVR 722k support, available at https://my.dish.com/support/receivers/vip722k ("Additional Content with Internet Connectivity"; WesternDigital, WD TV Live Plus, *available at* https://web.archive.org/web/20101203184730/http://www.wdc.com/wdproducts/library/AAG/ENG/4178-705112.pdf ("Stream Netflix and other online media").  By 2012, "whole home" solutions such as DirecTV Genie and Dish Network Hopper were commercially available, allowing a subscriber to stream digital content to every TV at home, using secondary receiver devices (*e.g.*, DirecTV Genie, Dish Joey) or, in the case of certain Samsung Smart TVs, their built-in connectivity features.  *See* DISH Introduces Hopper and Joey - Next Generation Whole-Home HD DVR Entertainment System (Jan 9, 2012), *available at* https://about.dish.com/2012-01-09-DISH-Introduces-Hopper-and-Joey-Next-Generation-Whole-Home-HD-DVR-Entertainment-System; DIRECTV Genie - The Most Advanced Whole Home HD DVR (5.24.2013), *archived at* https://web.archive.org/web/20130524082009/http://www.directv.com/technology/genie?lpos=Header:3

**Network Attached Storage (NAS)**

As the Internet became ubiquitous in the 2000s, it was a natural technical progression for storage devices for consumer products to be equipped with Internet connectivity.  *See, e.g.*, Smith 186 at [0016] ("Content provider 102 may include, for example, at least one computing device accessible via a wide area network (WAN) such as the Internet."); *id*. at [0028] ("Network 122 may be a local area network (LAN), a WAN such as the Internet, etc."); Smith 978 at [0008] ("The EDC [enhanced display controller] creates or identifies a secure storage location on a local or networked storage device and stores the data content in that secure location in a secure manner, thereby minimizing unauthorized access."); US20120226915 ("Zollinger") at [0018] ("The mass storage

system may include, without limitation, direct attached storage, network attached file storage, or network attached block-level storage."); US20140250471 ("Guerra") ("the CPE devices at the customer premises are coupled to a home network gateway 108 via a home network 130 , e.g., a Ethernet Network."). Unsurprisingly, a network attached storage integrated into media streaming system was a long matured technology by the time of the alleged invention in 2015.  For example, DirecTV's DVR receivers had internal storage that, in 2013 (Genie), was as large as 1 TB:

See Full Comparison ▶

| Receiver Features | Genie | HD DVR | TiVo | DVR | HD | Standard |
|---|---|---|---|---|---|---|
| Storage capacity* | 1TB | 500GB | 500GB | 250GB | — | — |
| Record 5 shows at once | ✔ | | | | | |
| Watch 2 channels at once with Picture-in-Picture | ✔ | | | | | |
| Record and watch in any room, with just one HD DVR | ✔ | ✔ | | (R22 only) | | |
| Access thousands of On Demand movies and shows | ✔ | ✔ | ✔ | | | |
| Record shows in HD | ✔ | ✔ | ✔ | | | |
| Record shows in Standard Definition | ✔ | ✔ | ✔ | ✔ | | |
| Watch shows in HD | ✔ | ✔ | ✔ | | ✔ | |
| Control what your children can watch | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| | More info ▶ | Current Receiver | More info ▶ | More info ▶ | More info ▶ | More info ▶ |

https://web.archive.org/web/20130526050011/http://www.directv.com/technology/hd_dvr_receiver?lpos=Header:3.  Using a network attached storage for media streaming was so commonplace that, in 2010, a category of products called DVR expanders were commercially available, allowing consumers to add more recording hours to the DVRs.  *See* WesternDigital webpage on My Book AV, archived at https://web.archive.org/web/20100806164108/http://www.wdc.com/en/products/products.asp?driveid=828; *see also* DISH Network Introduces New High Definition DVR to Complement Nation's Largest HD Package, *available at* https://about.dish.com/news-releases?item=123253 ("Those

looking for additional DVR recording capacity just in time for football season and fall season premieres can take advantage of the external hard drive feature now available on the ViP722 and ViP622. The external hard drive feature allows customers to expand their DVR recording capacity and create a virtually unlimited library of favorite TV shows, movies and sports programming."). The WesternDigital My Book AV was compatible with third party DVRs, including the DVRs by Direct TV, Dish Network, and TiVo, and offered as much as 1 TB of networked storage space. *Id.*

## **Secure Region**

The '667 patent claims require a "secure region comprising a buffer for streaming media." Having a secure region in a network attached storage (NAS) was known before the alleged invention. *See, e.g.*, Smith 186 at [0032] ("The encoded data may be stored in secured buffers 408 (e.g., secured buffers 408 may be protected within TEE 112)."); Smith 978 at [0008] ("The EDC creates or identifies a secure storage location on a local or networked storage device and stores the data content in that secure location in a secure manner, thereby minimizing unauthorized access."); US20090290709 ("Macdonald") at [0027] ("Generally, the data-management process includes allocating a region of memory to provide the protected memory segment to accept the identified secure data, and, at least temporarily, storing the content of the secure data at the protected memory segment …"); Zollinger at [0021] ("As shown, the endpoint device 108 includes, without limitation, a central processing unit (CPU) 210, a graphics subsystem 212, an input/output (I/O) device interface 214, a network interface 218, a secure memory space 220, an interconnect 222, a memory subsystem 230, a trusted execution environment (TEE) 242 and an audio/video decoder 244. The endpoint device 108 may also include a mass storage unit 216."); Guerra at [0103] ("In step 340 the DLNA module 137 receives the content and associated information communicated by the communication network interface 124. The DLNA module stores the received content and associated information in DLNA content storage 138. The DLNA content storage may be, and in most embodiments is, secure storage. The content may be, and in at least some embodiments is, stored in an encrypted format. Processing proceeds to step 342."); Smoyer at [0012] ("The first memory is configured to receive and store data from the server and it is accessible by the subscriber. A second memory is also communicatively connected to the server. The second memory is

configured to receive and store data from the server, though the second memory is accessible only by the service provider."); Sebastian 253 at 1:18-32 ("[A] server-side system determines that a user is likely to request a certain web object (e.g., an embedded object on a webpage) in the near future and anticipatorily pushes the object to the user's client-side storage."); S. Bhatt et al, *A Personal Mobile DRM Manager for Smart-Phones*, Computers & Security (Sep 1, 2009) ("Bhatt") at 15 ("If the rules are valid, the DRM agent decrypts the content file into protected storage where the device's user has no access."); A. Fragopoulos et al., *DRM & Security Enabling Mechanisms Leveraging User Centric Multimedia Convergence* (April 5, 2012) ("Fragopoulos") at 200-202 ("Secure storage, is a secure and trusted environment into which the content shall be stored after it's transferred to the DRM platform. In general, the content is stored in an encrypted form.").

Even though the alleged point of novelty is having a "secure region" in a NAS—which, as described above, was a well-known idea before the alleged invention, Plaintiffs appear to interpret the claims to simply require "user authentication or subscription verification."  *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. B ('667 Chart) at 9, 12.  Under such an interpretation, any NAS-supported system that requires user authentication or subscription verification for playback (*e.g.*, Netflix, Amazon Video On Demand, Direct TV VOD, Dish VOD, live television, or any other media streaming) would anticipate the asserted claims, regardless of whether the NAS has a "secure region," the media streaming system receives "an indication of the NAS device having a secure region," "access to the secure region is controlled by the media streaming system," the media streaming system "transmit[s] the digital content to the secure region," and the media streaming system "transmit[s] instructions to the NAS device to control streaming access to the digital content stored on the buffer."  *See* discussion of claim limitations 1[c]-[e] in Exhibits 667-1 through 667-20.

**Content Encryption**

Dependent claims 5 and 7 the '667 patent require encrypting the digital content (in addition to storing the digital content in a secure region).  It was also well established years before the alleged invention (2015) of the '667 patent that content encryption can be performed in communication with a remote trusted server, such as a license server, over a network.  *See* US20080098481 ("Lee," Filed

1   on Sep. 24, 2007) [0060] ("Accordingly, the download server 200 requests a user authentication

2   server (not shown) to authenticate information (provided by, for example, the portable storage

3   device 500) requested by the user. If the portable storage device 500 is not registered with the user

4   authentication server, the user's request for downloading the selected content is rejected.  That is,

5   the download server 200 downloads the requested content only after the user registers the portable

6   storage device 500 with the user authentication server."); *see also* Ponceleon et al., "Enabling Secure

7   Distribution of Digital Media to SD-Cards," MM'06, pp. 495-96 (October 23-27, 2006), available

8   at

9   https://dl.acm.org/doi/pdf/10.1145/1180639.1180742?casatoken=Dza8YIOIAWwAAAAA:JpOYj

10   ncgx6yHT3VFgk-ggEPUgFNsmWjtMz9l931a7fwqr-kj3ETaT5m9ijT32DxoyE7tmqxUgnCN

11   ("Ponceleon") at Fig. 1 (below); Smith 186 at [0019] ("Encrypted data 120 may be transmitted via

12   network 122 to device 104. SDT module 116 in device 104 may then decrypt encrypted data 120

13   received from content provider 102 (e.g., utilizing at least one decryption key provided by SMT

14   module 114 in TEE module 110) to obtain the encoded data, and may then proceed to decode the

15   encoded data to generate at least content 106 and DRM data 118."); Zollinger at [0019] ("The DRM

16   server 106 serves requests for licenses associated with encrypted digital content files received from

17   the endpoint device 108. In operation, an encrypted digital content file downloaded from the

18   CDN 102 by the endpoint device 108 must be decrypted before the digital content file can be played.

19   The license associated with the encrypted digital content file is stored in the DRM server 106 and is

20   transmitted to the endpoint device 108, which in turn uses the license to decrypt the digital content

21   file. FIGS. 2 and 3 describe in detail a technique for securely decrypting encrypted digital content

22   files."); Guerra at [0140] ("In step 464, the DLNA module 137 receives the requested content

23   stream. The DLNA module 137 may, and in some embodiments, does store the content in the DLNA

24   content storage 138. The content may be stored in secure memory and/or may be stored in encrypted

25   format."); *see also* discussion of claims 5 and 7 in Exhibits 667-1 through 667-20.

26        Moreover, Plaintiffs appear to interpret claims 5 and 7 to be met by a system that performs

27   content encryption, regardless of whether such content encryption is caused by the media streaming

28   system (claim 5) or the type of content encryption used in the secure region is controlled by

instructions provided from the media streaming system (claim 7). Under such an interpretation, any pre-2015 digital rights management (DRM) system would disclose these limitations. DRM was a fundamental concept that was widely known, researched, and developed long before the alleged invention (2015) of the '667 patent. "In order to protect digital content, the DRM technology encrypts the digital content and thus prevents the illegal distribution or use of the digital content in all stages (i.e., creation, distribution, use, and disposal) of its life cycle. In addition, the DRM technology enables only an authorized user with an encryption key to decrypt and use encrypted content. Therefore, even if the encrypted content is illegally distributed, it cannot be used without the encryption key." Lee at [0006] (emphasis added).

**Exemplary Combinations**

With respect to the prior art references in Exhibits 667-1 through 667-20, a POSITA would have been motivated to combine the references identified as prior art to the '667 patent for the additional reasons provided below.

First, the prior art references identified above and the accompanying invalidity claim charts teach similar techniques employed for media streaming systems (and within relevant timeframes), and thus the teachings of any one reference are applicable to other references in that same field. *See, e.g.*, Smith 186 at [0001] ("The present disclosure relates to data security, and more particularly, to a scheme for allowing the secure transmission, reception and presentation of content transmitted via DaaS."), *id.* at [0002] ("A substantial area of growth for DaaS is in the provision of multimedia content (e.g., text, images, audio, video, etc.).)"); Smith 978 at [0002] ("The present invention relates to methods and systems for enhancing display functionality in a television set-top box environment and in particular, to methods and systems for the secure storage and display of digital data content, and the creation and display of dynamic floating navigational graphics."); Macdonald at [0010] ("Embodiments of the present invention relate to computer-readable media, computer systems, and computerized methods for providing hardware-based protection of content of streaming media."); Zollinger at [0002] ("Embodiments of the present invention relate generally to digital media and, more specifically, to content playback APIs using encrypted streams."); Guerra at [0001] ("The present invention relates to methods and apparatus relating to content delivery, e.g. streaming of on

1    demand or pay per view content, to devices which are part of a home network …"); Smoyer at

2    [0010] ("The present invention provides an improved system and method for storing data content

3    from a service provider to an electronic device associated with a network subscriber. The claims,

4    and only the claims, define the invention."); Sebastian 253 at 1:16-18 ("The present invention

5    relates, in general, to communications networks and, more particularly, to managing accessibility

6    by clients to pre-pushed content."); Sebastian 916 at [0006] ("Methods, apparatuses, and systems

7    for improving utilization of a communications system (e.g., a satellite communications system) are

8    provided, using delayed reliability techniques as part of a multicast transport protocol."); Dankberg

9    at 1:6-8 ("Embodiments relate generally to communications systems, and, more particularly, to

10   content delivery over satellite communications systems."); Bhatt at 1 ("Here we present a personal

11   digital rights system for mobile devices where the end user has the ability to place DRM protection

12   and controls on his or her own personal content."); Fragopoulos at 192 ("In this book chapter, we

13   describe extensive research that has been done in the areas of DRM management and embedded

14   security, towards the design and deployment of an integrated architecture that exposes security

15   functionalities and DRM mechanisms, focusing on user- centric and nomadic environments.");

16   US20070011747 ("Whitfield") at [0002] ("This application generally relates to pathfinding or

17   routing in multiplex communications and to interactive video distribution systems and, more

18   particularly, to storing and queuing arrangements and to video distribution systems with local

19   interaction."); US201000023974 ("Shira") at [0003] ("The present invention relates to a system for

20   delivering a content comprised of picture or images, sound, and the like and, more particularly, to a

21   method and device for receiving such a content and also to an electronic equipment system for the

22   same."); US20110078722 ("Wendling") at Abstract ("The present invention provides a solution to

23   the problem of displaying enhanced video content from a remote server in situations where a

24   connection to the remote server provides inadequate bandwidth to be able to do so.");

25   US20100325675 ("Smoyer") at [0010] ("The present invention provides an improved system and

26   method for storing data content from a service provider to an electronic device associated with a

27   network subscriber. The claims, and only the claims, define the invention."); DIRECTV HD + DVR

28   Receiver - HD & DVR Box from DIRECTV ("Record and watch in stunning HD in any room, enjoy

1    thousands of VOD titles, and much more."); DISH 722k Receiver Support | MyDISH ("Connect

2    your receiver to the Internet to get access to additional TV shows and movies"); TiVo Premiere and

3    Premiere XL usher in a brand new interface, optional QWERTY remote | Engadget ("[A]lthough

4    there's long been support for services like Netflix and Amazon Video on Demand, it's now being

5    pushed to the front --content will show up in searches and be exposed on the main screen."); WD

6    My Book AV DVR Expanders Product Overview ("Store media for playback on your TV"); WD

7    TV Live Plus HD Media Player Product Overview ("Stream movies and Internet video to your

8    HDTV"); Rae at 1:12-14 ("The present invention generally relates to off-line content delivery and

9    more specifically to the off-line delivery of symmetrically encrypted content to specific playback

10   devices using asymmetric cryptography."); Buttars at [0007] ("The invention relates to a method

11   and apparatus for secure retrieval, storage and playback or use of video, audio, multimedia and other

12   data on a variety of non-volatile storage media.").

13          Given these similarities, a POSITA would have recognized the compatibility between the

14   teachings of the prior art references.  As explained above, it was well known before the alleged

15   invention to stream media content into a secure region in a NAS for playback.  Moreover, a media

16   streaming system that conditions playback on user authentication and subscription verification,

17   which Plaintiffs contend is sufficient to meet the claim requirements, was even more widely known.

18   A POSITA would have regarded the combination of such foundational components of a media

19   streaming system as typical in the field.

20          Second, a POSITA would have been motivated and found it obvious to apply references

21   teaching certain specific techniques—*e.g.*, transmission of digital content over WAN, inclusion of

22   a secure region in a NAS device, use of a secure region as a buffer to stream media to a display,

23   encryption of the digital content, controlling of streaming access—to other references that relate to

24   media streaming generally because all references teach securely transmitting content for playback

25   on an end user's display device in a media streaming system, and it would have been a trivial

26   exercise to consult the references that taught more specific aspects of a media streaming system to

27   fill in less specific disclosures in other references.  A POSITA would have also been motivated and

28   found it obvious to replace and/or combine a reference's exact set of features, components, and

configurations in a particular media streaming system with the teachings regarding other features, components, and configurations used in other media streaming systems for all the reasons provided above.  These modifications would have been a simple substitution of one known element for another, which would have obtained predictable results because it was already well known in the art that multiple techniques of a media streaming system. The substitution of one component or configuration for another would not have changed the principle of operation for either reference in any combination because the references all use similar mechanisms for a similar purpose: designing an efficient and secure media streaming system.  This is thus a combination of prior art elements (*e.g.*, transmission of digital content over WAN, inclusion of a secure region in a NAS device, use of a secure region as a buffer to stream media to a display, encryption of the digital content, controlling of streaming access) according to known methods (a POSITA would understand that these are all available design choices) to yield predictable results (a POSITA would understand the benefits and drawbacks of each design choice, and there are no unexpected results from any particular combination).  A POSITA would have been motivated to combine these teachings, and to make these replacements, because all of the techniques were widely-used for conventional media streaming systems.  Accordingly, a POSITA would have had a reasonable expectation of success given considerations discussed above, the similarities in the teachings and systems, and given that the claimed features, components, and configurations of a media streaming system were all well-known at the time.  Implementing the combination and any necessary modifications would have been routine and within the scope of the prior art references' teachings.

As one example, to the extent that Macdonald, Zollinger, Rae, Smoyer, DirecTV, or Dish does not disclose "wherein the separate display device comprises a smart television" (claim 2), it would have been obvious to combine any of these references with, *e.g.*, Smith 186, Smith 978, Guerra, Dankberg, or Samsung Smart TVs to arrive at said limitation.  A POSITA would have readily recognized that the digital content transmitted from the media streaming system disclosed in these references can be played back with any type of a display device, including a smart TV.  A smart TV was readily available in the market at least since 2008.  *See, e.g.*, https://www.sammobile.com/2015/04/21/samsungs-smart-tvs-have-come-a-long-way-since-the-

1    first-came-out-in-2008/.    By the time of the alleged invention in 2015, it would have been

2    commonplace for consumers of media streaming to display the streamed content on a smart TV.

3    The proposed modification would have simply required connecting a NAS device to an existing

4    smart TV.

5         As another example, to the extent that Smith 186, Smith 978, Macdonald, Zollinger, Guerra,

6    Rae, or Smoyer does not disclose time-shifting the transmission of digital content to "a time with

7    more available bandwidth on a connection to the NAS device" (claim 3), it would have been obvious

8    to combine any of these references with, *e.g.*, Dish, SCSA, Sebastian 253, Dankberg, Whitfield,

9    Shira, or Wendling to arrive at said limitation.   A POSITA would have readily recognized that

10   transmitting digital content in advance for later consumption would improve the bandwidth

11   utilization and consumer experience.  *See* Guerra at [0040] ("The web server application stores a

12   portion of the received video on demand service request message in storage 121 of memory 122 for

13   future use."); Sebastian 253 at 9:5-12 ("It may be desirable to develop an anticipatory download list

14   for clients and/or groups of clients, and to pre-push the content identified on that list during the

15   underutilization periods. This may, for example, help improve network load balancing."); Smoyer

16   at [0041] ("In the above example, B. Wayne will receive and watch 'The Dark Knight' just like any

17   other VOD request. However, server 706 will also send 'The Dark Knight' to H. Dent, and more

18   particularly to the service provider specific memory of STB B 714 b, via multicast stream. In one

19   embodiment, server 706 instructs video 704 to be stored on the service provider specific memory of

20   STB B 714 b. In one version, H. Dent may then be notified that 'The Dark Knight' is ready for

21   immediate viewing. Provider 702 may also allow this 'pushed' video content to be viewed by the

22   additional subscribers at a reduced rate. Later, if H. Dent elects to view 'The Dark Knight,' it will

23   play directly off of the service provider specific memory of STB B 714 b, instead of being streamed

24   from server 706. Therefore, an additional subscriber gets to view the video content with no

25   additional traffic on the network."); Dankberg at 1:27-31 ("Some traditional techniques schedule a

26   predetermined amount of content to be pre-pushed to subscribers over a limited, pre-defined block

27   of off-peak time (e.g., in the middle of the night)."), *id*. at 28:12-15 ("Certain opportunistic

28   techniques can exploit time shifting, for example, by opportunistically delaying delivery of content

1    in one or more ways (e.g., using delaycasting)."), *id*. Fig. 6; Kummer at [0053] ("The processor may

2    thus select one of the scheduled transmissions that will allow a full download by the specified time,

3    for example, to optimize operation of the content provider 2 and/or the client device 12").  Further,

4    the proposed modification would have required little to no modification in hardware, given that

5    these references already disclose using a NAS with a secure region in which the digital content can

6    be transmitted to and stored in advance.  *See* claim limitation 1[c] of the 667 Patent Charts.

7         As yet another example, to the extent Smith 186, Macdonad, Zollinger, Guerra, Rae,

8    DirecTV, or Dish does not disclose "provid[ing] instructions to the NAS device for controlling an

9    amount of data stored in the secure region" (claim 6), it would have been obvious to combine such

10   a reference with, *e.g.*, Smith 978, Smoyer, Sebastian 916, or Dankberg.  Each reference discloses a

11   media streaming system in which digital content is transmitted to a NAS device having a secure

12   region where access to the secure region is controlled by the media streaming system and streaming

13   access to the digital content stored on the buffer is controlled.  *See* claim limitation 1[c] of the 667

14   Patent Charts.  A POSITA would have found it obvious to extend the control of the media streaming

15   system such that it further provides instructions to the NAS for controlling an amount of data stored

16   in the secure region.  For the disclosed media streaming systems to provide such additional

17   instructions, it would have entailed a minor modification in software well within the expertise of a

18   POSITA.  Moreover, a POSITA would have expected to achieve a predictable benefit of increased

19   security and control over the secure region.  *See* Smoyer at [0029] ("Because the subscriber has no

20   control over service provider memory 404 and cannot add any information onto it, the service

21   provider is guaranteed a certain amount of memory is available on STB 400 to the service

22   provider.").

23        Additional obviousness combinations of the references identified here are possible, and

24   Defendant may rely on such combination(s) in this litigation.  In particular, Defendant is currently

25   unaware of Plaintiffs' allegations with respect to the level of skill in the art and the qualifications of

26   a POSITA.  Defendant is also unaware of the extent, if any, to which Plaintiffs may contend that

27   limitations of the claims at issue are not disclosed in the prior art identified by Defendant as

28   anticipatory, and the extent to which Plaintiffs will contend that elements not disclosed in the

asserted patent specifications would have been known to a POSITA.  And Defendant does not yet know how the Court will construe terms in the asserted claim.  Defendant is also continuing its investigation of the large universe of prior art to identify potential prior art systems, publications related to those systems, and third parties that may have information about those systems.  Defendant reserves the right to amend and supplement these contentions to identify other prior art and combinations rendering the asserted claim obvious.

These motivations to combine are exemplary, and Defendant reserves the right to supplement these contentions as its understanding of the scope and content of prior art develops.

### 2.    Secondary Considerations

Defendant is not aware of objective evidence or secondary considerations demonstrating non-obviousness of the asserted claims of the '667 patent.  As set forth below, the evidence confirms that the asserted claims would have been obvious to a POSITA at the time of the alleged invention.  Defendant reserves the right to supplement or modify these factors to address any evidence or arguments later identified by Plaintiffs.

### (a)    The Alleged Invention Did Not Satisfy a Long-Felt But Unresolved Need

Viasat is not aware of any evidence of a long-felt but unmet need that the asserted claims solve.  On the contrary, the concepts and functions described in the asserted claims of the '667 patent were all well-known before the alleged invention date as evidenced by the patent itself, its file history and the references cited therein, and the prior art Defendant has identified in these contentions and accompanying exhibits.

### (b)    The Alleged Invention Did Not Face Skepticism or Teaching Away by Experts

Viasat is not aware of any evidence of a failure of others to invent or use the claimed techniques before the alleged invention dates of the '667 patent.  As discussed, the '667 patent recites concepts that were already known in the prior art.

### (c)    The Alleged Invention Was Not Subject to Industry Acceptance

Viasat is not aware of any evidence that Plaintiffs' alleged invention in the '667 patent was subject to additional industry acceptance due to Plaintiffs or the '667 patent.  This is at least because

the subject matter of the '667 patent already existed in the industry and was used by many entities and individuals prior to the '667 patent.

### (d)    The Alleged Invention Has Not Been Subject to Industry Praise

Viasat is not aware of any evidence of industry praise for any of the alleged inventions of the '667 patent.  To the extent any industry praise is related to any functionality that Plaintiffs allege practices the '667 patent, that praise is not due to the allegedly novel features of the '667 patent, but instead only to features present in the prior art, which is not a sufficient nexus for purposes of obviousness.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

### (e)    The Alleged Invention Is Not Responsible for Commercial Success

Viasat is not aware of any evidence of alleged success of any products that is due to the alleged invention claimed in the '667 patent.  The patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Plaintiffs have not shown (and cannot show) that any commercial success is due to the alleged invention of the '667 patent.  *See Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

Moreover, to the extent any commercial success of any products is due to concepts discussed in the '667 patent, those concepts were already present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

1

        **(f)      There Is No Evidence to Show Copying of the Alleged Invention**

2

      Viasat is not aware of any evidence of any aspect of the '667 patent that was copied by any

3

entity or person, much less that any functionality that practices the '667 patent was copied. *See*

4

*Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly

5

copied feature must be an embodiment of the patented claims).

6

        **(g)      Simultaneous Development of the Alleged Invention Confirms that the Asserted Claims Were Obvious**

7

8

      As set forth above, many people and companies independently and simultaneously

9

developed and invented the same technology within a comparatively short space of time of a few

10

years, which further shows that the '667 patent was the product only of ordinary engineering skill.

11

Moreover, the fact that there was relatively simultaneous invention demonstrates that the subject

12

matter of the '667 patent was already well within the level of ordinary skill in the art.

    **C.    35 U.S.C. § 112**

13

      **1.    Indefiniteness**

14

      The following limitations are indefinite, particularly as their scope is interpreted by

15

Plaintiffs, because the claims and specification of '667 patent do not define these limitations or

16

provide objective boundaries that would allow a person or ordinary skill in the art to determine, with

17

reasonable certainty, what practices the invention:

18

- Claims 1 and 11: "[receive/receiving] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;"

19

20

21

- Claims 1 and 11: "[transmit/transmitting] instructions to the NAS device to control streaming access to the digital content stored on the buffer."

22

23

      A POSITA at the time of the invention would not be able to determine the full scope of the

24

claimed subject matter for the limitations above with reasonable certainty. In particular, Plaintiffs

25

interpret their scope, as demonstrated in their infringement contentions, to indicate that they have

26

no objectively defined meaning. As such, in view of the positions taken by Plaintiffs, the

27

specification of '667 patent does not define these phrase or provide objective boundaries that would

28

allow a person or ordinary skill in the art to determine, with reasonable certainty, what they are.

### 2.    Lack of Written Description Under 35 U.S.C. § 112

The asserted claims of the '667 patent are invalid for lack of written description because the specification does not demonstrate that, at the time of filing, the named inventors were in possession of the full scope of at least the following limitations:

- Claims 1 and 11: "[receive/receiving] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;"

- Claims 1 and 11: "[transmit/transmitting] instructions to the NAS device to control streaming access to the digital content stored on the buffer."

Plaintiffs interpret the above claim requirements beyond the scope of disclosures in the written description. For example, claims 1 and 11 require a "secure region" and controlling of "access to the secure region" by the media streaming system. Claims 1 and 11 also require "transmitting instructions to the NAS device to control streaming access to the digital content stored on the buffer." Plaintiffs appear to assume that all of these limitations are met by any system that performs "user authentication or subscription verification." *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. B ('667 Chart) at 9, 12. The specification of the '667 patent, however, does not once disclose either user authentication or subscription verification as sufficient to establish a "secure region," much less controlling of "access to the secure region" or controlling of "streaming access to the digital content stored on the buffer." Under Plaintiffs' overly broad interpretation that improperly conflate distinct claim requirements, all asserted claims of the '667 are invalid for lack of written description.

### 3.    Lack of Enablement Under 35 U.S.C. § 112

The asserted claims of the '667 patent are invalid for lack of enablement because the specification fails to enable a POSITA to practice the full scope of at least the following limitations:

- Claims 1 and 11: "[receive/receiving] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;"

- Claims 1 and 11: "[transmit/transmitting] instructions to the NAS device to control streaming access to the digital content stored on the buffer."

Plaintiffs interpret the above claim requirements beyond the full scope enabled by the written description. For example, claims 1 and 11 require a "secure region" and controlling of "access to the secure region" by the media streaming system. Claims 1 and 11 also require "transmitting instructions to the NAS device to control streaming access to the digital content stored on the buffer." Plaintiffs appear to assume that all of these limitations are met by any system that performs "user authentication or subscription verification." *See* Plaintiffs' February 24, 2023 Infringement Contentions, Ex. B ('667 Chart) at 9, 12. The specification of the '667 patent, however, does not provide any disclosure that would enable a POSITA to practice the claimed invention under the Plaintiffs' interpretation without undue experimentation. In fact, the specification does not once disclose either user authentication or subscription verification as sufficient to establish a "secure region," much less controlling of "access to the secure region" or controlling of "streaming access to the digital content stored on the buffer." Under Plaintiffs' overly broad interpretation that improperly conflate distinct claim requirements, all asserted claims of the '667 are invalid for lack of enablement.

### D.    35 U.S.C. § 101

As Discovery is ongoing, Defendant reserves the right to provide supplemental contentions concerning patentability of the asserted claims on the ground that the alleged invention was not invented or discovered by another.

DATED: April 19, 2024                    Respectfully submitted,

*/s/ Jodie Cheng*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Steven Cherny (*pro hac forthcoming*)
  stevencherny@quinnemanuel.com
  Patrick Curran (Bar No. 241630)
  patrickcurran@quinnemanuel.com
  Nicola Felice (*pro hac forthcoming*)
  nicolafelice@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Telephone:    (617) 712-7100
Facsimile:    (617) 712-7200

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Jodie Cheng (Bar No. 292330)
  jodiecheng@quinnemanuel.com
  Gyushik (Kevin) Jang(Bar No. 337747)
  kevinjang@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

*Attorneys for Viasat, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been sent to all counsel of record via electronic mail on April 19, 2024.


DATED:  April 19, 2024                    By  */s/ Jake Blecher*
                                                Jake Blecher

VIASAT, INC.'S SUPPLEMENTAL INVALIDITY CONTENTIONS