1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7   SANDISK3D IP HOLDINGS LTD., et al.,        Case No.  22-cv-04376-HSG
8                         Plaintiffs,           **ORDER RE: DEFENDANT'S
                                                MOTIONS TO STRIKE; PLAINTIFFS
9           v.                                  AND DEFENDANT'S *DAUBERT*
                                                MOTIONS, MOTIONS FOR
10  VIASAT, INC.,                               SUMMARY JUDGMENT, AND
                                                MOTIONS TO SEAL; PLAINTIFF'S
11                      Defendant.              MOTION FOR LEAVE TO FILE SUR-
                                                REPLY; AND PLAINTIFFS' MOTION
12                                              TO SUBSTITUTE**
13                                              REDACTED VERSION
14
15                                              Re: Dkt. Nos. 199, 200, 201, 204, 205, 206,
                                                207, 208, 209, 210, 211, 220, 221, 222, 226,
16                                              231, 232, 233, 234, 241, 243, 249, 250, 253,
                                                256, 261, 263, 265, 269

17          Pending before the Court are: (1) Defendant's motions to strike (Dkt. Nos. 199, 200, 204);

18  (2) the parties' motions to exclude expert opinions and testimony (Dkt. Nos. 206, 208); (3) the

19  parties' motions for summary judgment (Dkt. Nos. 205, 210, 222); (4) the parties' motions to seal

20  (Dkt. Nos. 201, 207, 209, 211, 220, 226, 231, 232, 233, 234, 241, 243, 249, 250, 253, 256, 261,

21  263, 265); (5) Plaintiffs' motion for leave to file a sur-reply (Dkt. No. 265); and (6) Plaintiffs'

22  motion to substitute (Dkt. No. 269).  For the following reasons, the Court **GRANTS IN PART**

23  and **DENIES IN PART** Defendant's motion to strike portions of Plaintiffs' expert reports (Dkt.

24  No. 199); **DENIES AS MOOT** Defendant's motion to strike Lauren Kindler's May 5, 2025

25  supplemental expert report (Dkt. No. 200); **GRANTS IN PART** and **DENIES IN PART**

26  Defendant's motion to strike Plaintiffs' '400 patent authenticating theories (Dkt. No. 204);

27  **DENIES AS MOOT** Defendant's motion to exclude certain opinions of Chuck Easttom and

Lauren Kindler (Dkt. No. 206); **DENIES AS MOOT** Plaintiffs' motion to exclude certain opinions of Gareth Macartney (Dkt. No. 208); **GRANTS** Defendant's motion for summary judgment of noninfringement (Dkt. No. 205); **GRANTS IN PART** and **DENIES IN PART AS MOOT** Plaintiffs' motion for summary judgment on Defendant's affirmative defenses (Dkt. No. 210); **GRANTS** Defendant's motion for leave to file a second motion for summary judgment (Dkt. No. 221); **GRANTS** Defendant's motion for summary judgment on standing (Dkt. No. 222); **DENIES** Plaintiffs' motion for leave to file a sur-reply (Dkt. No. 265); **GRANTS** the parties' motions to seal (Dkt. Nos. 201, 207, 209, 211, 226, 231, 232, 233, 234, 241, 243, 249, 256, 261, 263); **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to seal (Dkt. No. 241); **DENIES** Defendant's motions to seal (Dkt. Nos. 220, 250); **DENIES AS MOOT** Plaintiffs' motion to seal (Dkt. No. 253); and **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to substitute (Dkt. No. 269).  Plaintiffs' counsel is **ORDERED TO SHOW CAUSE** why they should not be sanctioned to cover the costs related to Dkt. Nos. 222 and 269.

## I.    BACKGROUND

Plaintiffs Sandisk 3D IP Holdings Ltd. ("SD3D"), Sandisk Technologies LLC ("SDT LLC"), Sandisk Storage Malaysia SDN BHD ("SDSM"), and Sandisk Technologies, Inc. ("SDT Inc.") (collectively, "Sandisk") accuse Defendant Viasat, Inc. ("Viasat") of infringing U.S. Patent Nos. 9,424,400 (the "'400 Patent") and 10,447,667 (the "'667 Patent") (collectively, the "Asserted Patents").[1]  Dkt. No. 73 ("SAC") ¶ 1.  Sandisk specifically accuses Viasat of infringing claims 1–2, 6, 8–10, 13 and 17 of the '400 Patent (the "Asserted Claims of the '400 Patent") and claims 1–7 and 11–16 of the '667 Patent (the "Asserted Claims of the '667 Patent").  Dkt. No. 145.

Sandisk accuses Viasat's in-flight entertainment ("IFE"), wireless IFE ("W-IFE") systems, and WiFi Gateway Modem ("Gateway"), and all products incorporating IFE, W-IFE, and

---

[1] Sandisk previously asserted U.S. Patent No. 8,504,834 (the "'834 Patent").  SAC ¶ 1.  On May 24, 2024, Defendant moved to dismiss Plaintiffs' '834 Patent infringement claim.  Dkt. No. 40. The Court granted Defendant's motion after finding the '834 Patent was "directed to a patent ineligible abstract idea" with "no inventive concept."  Dkt. No. 75 at 10.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Gateway, of infringing the '400 Patent.[2]  Dkt. No. 145-2 at 2.  The IFE and W-IFE systems

2    "include the Mobile Application Server [], the Network Access Unit [], and the Viasat S4 Server

3    []."  *Id*.  The IFE and W-IFE systems connect to the Viasat Content Delivery System ("VCDS"),

4    "which 'supports delivering live video content,' such as 'broadcast television stations being sent

5    OTT, or sporting events, or custom content being broadcast live.'"  *Id*. (citation omitted).  The

6    Gateway "also connects to VCDS and further performs functions similar to W-IFE and IFE."  *Id*.

7        Sandisk accuses the VCDS and Viasat Open Stream ("Open Stream") of infringing the

8    '667 Patent.  Dkt. No. 145-4 at 2.  The VCDS "is a cloud-hosted service that is responsible for

9    transferring content from CMS (via Amazon S3) over a satellite link to a modem device."  *Id*.

10   (citation omitted).  Open Stream "is 'an extension of the Content Delivery Network (CND) into

11   the satellite network' to 'include support for multicasting and caching content over the satellite

12   system.'"  *Id*. (citation omitted).

13       **A.    '400 Patent**

14       The '400 Patent is entitled "Digital Rights Management System Transfer of Content and

15   Distribution" and issued on August 23, 2016.  Dkt. No. 103-1 ("'400 Patent") at 1.  The '400

16   Patent relates to "digital rights management (DRM) for content that may be downloaded and

17   securely transferred from one storage to another storage."  '400 Patent, Abstract.  The claimed

18   invention "performs cryptographic operations and provides a root of trust" which "enables secure

19   copying or transfer of content from one storage device to another storage device."  *Id*.  Essentially,

20   the '400 Patent claims a system that enables secure copying or transfer of media content (e.g.,

21   video streams) to "portable data storage devices" whereby the system authenticates the portable

22   data storage device in question before providing an access key to decrypt the media content.  The

23   '400 Patent has two independent claims—claim 1 and claim 9.  Claim 1 recites:

24           A kiosk for provisioning secure media content to a plurality of
25           portable data storage devices, the kiosk comprising:

26   _____

27   [2] Sandisk previously moved to amend its infringement contentions to add "clarifying
     parentheticals" accusing Viasat's residential products of infringement.  Dkt. No. 146.  The Court
28   denied Sandisk's motion and noted its "skeptic[ism] that [Sandisk] previously identified [Viasat']s
     'residential applications' as infringing products."  Dkt. No. 182 at 7 n.8.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

> a first data interface configured to communicate with a portable data storage device;
>
> a second data interface configured to communicate, over a network, with a remote trusted server; and
>
> a processor configured to:
>
>> obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;
>>
>> authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and
>>
>> in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

11

12

13

14

15

*Id*. cl. 1.[3]  Dependent claims 2, 6, and 8 recite kiosks with additional limitations, including wherein "a local data storage storing a plurality of encrypted media content" (cl. 2), "the second data interface is a network interface (cl. 6), and "the kiosk is located in a public environment" (cl. 8).  Dependent claims 10, 13, and 17 recite the method of independent claim 9 with limitations identical to those in dependent claims 2, 6, and 8.  *See id*. cls. 10, 13, 17.

16

### B.    '667 Patent

17

18

19

20

21

22

23

24

25

The '667 Patent is entitled "Secure Stream Buffer on Network Attached Storage" and issued on October 15, 2019.  Dkt. No. 103-2 ("'667 Patent") at 1.  The '667 Patent relates to "[a] network attached storage ["NAS"] device coupled to a local area network and including a network interface configured to receive digital content from a remote content provider outside the local network."  '667 Patent, Abstract.  The '667 Patent describes a problem whereby internet service providers are incentivized to throttle download speeds for streaming services (e.g., Netflix, Hulu). *Id*. at 15–38.  This throttling creates Quality of Service issues for consumers, as display devices often have very limited buffers and streaming services generally prefer limited buffers.  *Id*.  As a solution, the '667 Patent claims a novel system and method for buffering streaming media content

26

27

28

---

[3] Independent claim 9 recites a method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, but the limitations are substantially identical to the limitations of claim 1.

4

1    (e.g., movies, tv shows) that "maintain smaller sizes of buffers on display device and [] maintain

2    control over content while ensuring that content can be viewed without deterioration due to

3    throttling through the use of a Network Attached Storage (NAS) device having a secure portion

4    for buffering streaming content." *Id.* at 2:30–34.  The '667 Patent has three independent claims—

5    claim 1, claim 11, and claim 20.  Claim 1 of the '667 Patent recites:

6          A media streaming system comprising:

7          a network interface adapter configured to transmit digital content, via
     a wide area network (WAN), to a network attached storage (NAS)

8          device operating on a local area network (LAN); and

9          one or more hardware processors configured to:

10               receive an indication of the NAS device +having a secure region
     comprising a buffer for streaming media on a separate display

11               device on the local area network, wherein access to the secure
     region is controlled by the media streaming system;

12

13               transmit the digital content to the secure region within the NAS
     device for playback by the separate display device from the

14               buffer; and

15               transmit instructions to the NAS device to control streaming
     access to the digital content stored on the buffer.

16   *Id.* cl. 1.[4]  Dependent claims 2–7 recite media streaming systems with additional limitations,

17   including wherein "the separate display device comprises a smart television" (cl. 2), "transmitting

18   the digital content comprises time-shifting to a time with more available bandwidth on a

19   connection to the NAS device" (cl. 3), "the secure region is inaccessible by a user of the NAS

20   device without permission form the media streaming system" (cl. 4), "the one or more processors

21   are further configured to: cause the NAS device to use encryption that secures the digital content

22   to the secure region" (cl. 5), "the one or more processors are further configured to: provide

23   instructions to the NAS device for controlling an amount of data stored in the secure region" (cl.

24   6), "the one or more processors are further configured to: provide instructions to the NAS device

25   for controlling an encryption type used in the secure region" (cl. 7).  Dependent claims 12–16

26   recite the method of independent claim 11 with limitations identical to those in dependent claims

27   _____

28   [4] Independent claim 11 recites a method for transmitting media content from a media streaming
     system, but the limitations are substantially identical to the limitations of claim 1.

United States District Court
Northern District of California

1    3–7.  *See id*. cls. 12–16.

2    **II.    MOTIONS TO SEAL**

3        **A.    Legal Standard**

4        Courts apply different standards when assessing motions to seal depending on whether the

5    materials are contained or attached to a dispositive or nondispositive motion.  Courts generally

6    apply a "compelling reasons" standard when considering motions to seal documents attached to

7    dispositive motions.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).  "This

8    standard derives from the common law right 'to inspect and copy public records and documents,

9    including judicial records and documents.'"  *Id*. (quoting *Kamakana v. City & Cnty. of Honolulu*,

10   447 F.3d 1172, 1178 (9th Cir. 2006)).  "[A] strong presumption in favor of access is the starting

11   point."  *Kamakana*, 447 F.3d at 1178 (quotations omitted).  To overcome this strong presumption,

12   the party seeking to seal a document attached to a dispositive motion must "articulate compelling

13   reasons supported by specific factual findings that outweigh the general history of access and the

14   public policies favoring disclosure, such as the public interest in understanding the judicial

15   process" and "significant public events."  *Id*. at 1178–79 (quotations omitted).  "In general,

16   'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing

17   court records exist when such 'court files might have become a vehicle for improper purposes,'

18   such as the use of records to gratify private spite, promote public scandal, circulate libelous

19   statements, or release trade secrets."  *Id*. at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435

20   U.S. 589, 598 (1978)).

21       The Court must "balance[] the competing interests of the public and the party who seeks to

22   keep certain judicial records secret.  After considering these interests, if the court decides to seal

23   certain judicial records, it must base its decision on a compelling reason and articulate the factual

24   basis for its ruling, without relying on hypothesis or conjecture."  *Id*.  Civil Local Rule 79-5

25   supplements the compelling reasons standard set forth in *Kamakana*: the party seeking to file a

26   document or portions of it under seal "must explore all reasonable alternatives to filing documents

27   under seal, minimize the number of documents filed under seal, and avoid wherever possible

28

1    sealing entire documents . . . ."  Civil L.R. 79-5(a).  The party must further explain the interests

2    that warrant sealing, the injury that will result if sealing is declined, and why a less restrictive

3    alternative to sealing is not sufficient.  See Civil L.R. 79-5(c).

4        Records attached to nondispositive motions must meet the lower "good cause" standard of

5    Rule 26(c) of the Federal Rules of Civil Procedure, as such records "are often unrelated, or only

6    tangentially related, to the underlying cause of action."  *See Kamakana*, 447 F.3d at 1179–80

7    (quotations omitted).  This requires a "particularized showing" that "specific prejudice or harm

8    will result" if the information is disclosed.  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,

9    307 F.3d 1206, 1210–11 (9th Cir. 2002); *see also* Fed. R. Civ. P. 26(c).  "Broad allegations of

10   harm, unsubstantiated by specific examples of articulated reasoning" will not suffice.  *Beckman*

11   *Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotation omitted).

12       **B.    Discussion**

13       The parties seek to seal portions of the briefs and exhibits related to (1) Viasat's motions to

14   strike, Dkt. Nos. 199, 200, 204; (2) the parties' *Daubert* motions, Dkt. Nos. 206, 208; and (3) the

15   parties' motions for summary judgment, Dkt. Nos. 205, 210, 222.

16       Sandisk seeks to seal excerpts of service and assignment agreements contained in Viasat's

17   motion for summary judgment on standing.  Dkt. No. 256.[5]  These include the Research &

18   Development Services Agreement between WDI and WDT and the Assignment Agreement

19   between WDI and SD3D.  *Id*. at 2–3.  Sandisk argues that sealing these materials would "protect

20   [Sandisk's] interests in maintaining the confidentiality of their, and their predecessor's, corporate

21   organizational structure, particularly how various R&D services are allocated among companies in

22   the corporate family."  *Id*. at 3.  Sandisk argues it "would be harmed by the disclosure of the

23   information sought to be sealed because outside observers would be able to access highly

24   confidential inter-company agreements, allowing outsiders to glean details about [Sandisk's] (and

25   their predecessor's) organizational structure that is otherwise valuable, highly confidential, and not

26   disclosed publicly, and use that information to Plaintiffs' detriment."  *Id*.  Sandisk only "seeks to

27

28   [5] This motion supersedes Sandisk's motion to seal at Docket Number 253.  Dkt. No. 256 at 2.  The
     Court therefore **DENIES AS MOOT** that motion to seal.  Dkt. No. 253.

United States District Court
Northern District of California

1    seal the underlying agreements that pertain to R&D services and IP ownership and the allocation

2    of the R&D services and IP ownership as between different companies in the corporate family."

3    *Id*. at 4.  The Court finds Sandisk's request is narrowly tailored and satisfies the compelling

4    reasons standard.  *See Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2019 WL 9443777, at

5    *2 (N.D. Cal. June 18, 2019) (finding "compelling reasons" supported sealing materials

6    containing "highly sensitive non-public information concerning . . . corporate structure").  The

7    Court therefore **GRANTS** Sandisk's motion to seal (Dkt. No. 256).

8        Sandisk also seeks to seal Viasat's "highly confidential source code" and "product

9    operation" information, Dkt. No. 218 at 4; Dkt. No. 239 at 7; Dkt. No. 257 at 14; Dkt. No. 266 at

10   4; "confidential contractual terms of Viasat's agreements with third parties," Dkt. No. 218 at 7;

11   Dkt. No. 239 at 10; Dkt. No. 257 at 13; and references to Viasat's confidential "financial

12   information, internal metrics, security practices, and contractual dealings" contained in Sandisk's

13   various filings. Dkt. No. 239 at 10; Dkt. No. 257 at 13.[6]  Viasat represents that these confidential

14   materials, if filed publicly, "could be used by Viasat's competitors to Viasat's detriment . . . .."

15   Dkt. No. 218 at 6, 8; Dkt. No. 239 at 9, 11; Dkt. No. 257 at 13; Dkt. No. 266 at 4.  The Court finds

16   Viasat has satisfied the compelling reasons standard for dispositive motions and the good cause

17   standard for nondispositive motions.  *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-

18   LHK, 2012 WL 6115623, at *2 (N.D. Cal. Dec. 10, 2012) (finding compelling reasons supported

19   sealing materials containing confidential source code); *Unlockd Media, Inc. Liquidation Tr. v.*

20   *Google LLC*, No. 21-CV-07250-HSG, 2023 WL 2600464, at *1 (N.D. Cal. Mar. 21, 2023)

21   (finding compelling reasons supported sealing confidential business and financial information);

22   *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2023 WL 6558404, at *1 (N.D. Cal. Sept. 21,

23   ———————————————————

24   [6] This information is contained in: (1) portions of Sandisk's *Daubert* motion and attached exhibits,
     Dkt. No. 209; (2) exhibits attached to its motion for summary judgment on validity, Dkt. No. 211;

25   (3) portions of its opposition to Viasat's motion to strike portions of Sandisk's expert reports and
     attached exhibits, Dkt. No. 231; (4) exhibits attached to its opposition to Viasat's motion to strike

26   Lauren Kindler's supplemental expert report, Dkt. No. 232; (5) portions of its opposition to
     Viasat's motion to strike Sandisk's '400 Patent authenticating theories and attached exhibits

27   attached, Dkt. No. 233; (6) portions of its opposition to Viasat's *Daubert* motion and attached
     exhibits, Dkt. No. 234; (7) portions of its reply brief in support of its *Daubert* motion, Dkt. No.

28   243; and (8) portions of its reply brief in support of its motion for summary judgment, Dkt. No.
     263.

2023) ("Courts in this circuit have held that confidential business information in the form of 'license agreements, financial terms, details of confidential licensing negotiations, and business strategies' satisfies the 'compelling reasons' standard.") (citation omitted).  The Court therefore **GRANTS** Sandisk's motions to seal. Dkt. Nos. 209, 211, 231, 232, 233, 234, 243, 263.

Sandisk further seeks to seal "Viasat's highly confidential source code, or [descriptions of] product operations, or financial and contract details" contained in Sandisk's opposition to Viasat's motion for summary judgment on noninfringement and attached exhibits. Dkt No. 241 (motion for summary judgment), Dkt. No. 257 at 10.  Although these materials satisfy the compelling reasons standard, *see Apple*, 2012 WL 6115623, at *2; *Unlockd Media, Inc. Liquidation Tr.*, 2023 WL 2600464, at *1; *Day*, 2023 WL 6558404 at *1,  Sandisk's motion to seal is not narrowly tailored. Dkt. No. 257 at 2–3.  Viasat notes that Sandisk attached 31 exhibits to its opposition brief, totaling over 2,000 pages, but only cited to 200 of those pages.  *Id*.  Viasat argues that Sandisk failed to comply with Civil Local Rule 79-5 "[b]y not minimizing their submission of confidential material" and "unduly burdened Viasat and the Court" in failing to do so.  *Id*. at 2.  Viasat asks the Court to order Sandisk refile certain exhibits "in excerpted form, such that only the portions referenced in their opposition are included."  *Id*.  The Court agrees with Viasat.  The Court **DENIES** Sandisk's motion to seal with respect to Exhibits 14–18, 20, 22, 23–25, 27, and 32 but otherwise **GRANTS** the motion. Dkt. No. 241.  Sandisk shall file an amended motion to seal Exhibits 14–18, 20, 22, 23–25, 27, and 32, which shall be appropriately excerpted, within one week of the date of this order.

Viasat seeks to seal "confidential contractual terms of Viasat's agreement with third parties[,]" and "highly confidential source code and product operation information[,]" Dkt. No. 207 at 6, Dkt No.249 at 4–5; and information about "source code variables and how those variables relate to the way that Viasat's products operate."  Dkt. No. 207 at 5, Dkt. No. 249 at 5, Dkt. No. 261 at 3; *see also* Dkt. No. 201 at 4–5, Dkt. No. 226 at 6–7.[7]  Viasat argued that these

___

[7] These materials were contained in: (1) portions of Viasat's motions to strike portions of Sandisk's expert reports and attached exhibits, Dkt. No. 201; (2) portions of its motions to strike new '400 Patent authenticating theories and attached exhibits, Dkt. No. 207; (3) portions of its motion for summary judgment on noninfringement and attached exhibits, Dkt. No. 207; (4)

United States District Court
Northern District of California

materials "are not publicly available and would provide Viasat's competitors with an unfair advantage in competitive bidding against Viasat." Dkt. Nos. 207 at 6, 249 at 4–5; *see also* Dkt. Nos. 201 at 4–5, 226 at 5–6. Viasat further asserts that "the architecture of Viasat's products, and the source code, operation of, and inner workings of Viasat's products and proprietary technology—including details of how Viasat's system is architected (e.g., where specific pieces of source code run), which third-parties Viasat's products interact with, and how Viasat actually hosts and distributes content—are not apparent from normal consumer operation[,]" and if made public, "malicious actors could try to identify security vulnerabilities, while competitors could try to co-opt Viasat's technical operations and security features for its own competing products." Dkt. No. 249 at 5; Dkt. No. 261 at 2–3. The Court finds there are compelling reasons to seal these materials. *See Apple*, 2012 WL 6115623, at *2; *Unlockd Media, Inc. Liquidation Tr.*, 2023 WL 2600464, at *1; *Day*, 2023 WL 6558404 at *1. The Court therefore **GRANTS** Viasat's motions to seal. Dkt. No. 201, 207, 226, 249, 261.

Viasat also seeks to seal (1) portions of its motion for summary judgment on standing and attached exhibits, Dkt. No. 220, and (2) portions of its opposition to Sandisk's motion for partial summary judgment and an attached exhibit, Dkt. No. 250. These materials reflect information Sandisk has designated "Highly Confidential – Attorneys' Eyes Only." Dkt. Nos. 220, 250. Sandisk did not file a declaration in support of these sealing motions. According, the Court **DENIES** Viasat's motions to seal. Dkt. Nos. 220, 250.

## III.    MOTIONS TO STRIKE

Viasat raises several disputes with respect to Dr. Chuck Easttom and Ms. Lauren Kindler's expert reports. Viasat seeks to strike Dr. Easttom's expert report on five grounds: (1) Dr. Easttom's allegedly new "encryption theory" related to the '667 Patent, Dkt. No. 199; (2) Dr. Easttom's allegedly new "DRM sub-folder / file path theory" related to the '667 Patent, *id*.; (3) Dr. Easttom's allegedly new opinions regarding the "portable storage device" limitation of the '400

portions of its opposition to Sandisk's *Daubert* motion and attached exhibits, Dkt. No. 226; (5) portions of its reply briefs in support of its motions to strike and its reply brief in support of its *Daubert* motion, Dkt. No. 249; and (6) portions of its reply brief in support of its motion for summary judgment on noninfringement, Dkt. No. 261.

United States District Court
Northern District of California

Patent, *id*.; (4) Dr. Easttom's and Ms. Kindler's discussions of Viasat's IPTV product, *id*.; (5) Ms. Kindler's supplemental expert report, Dkt No. 200; and (6) Dr. Easttom's allegedly new "authentication" theories related to the '400 Patent, Dkt. No. 204. These motions highlight the constant shape-shifting in this case, which stands out even in a practice area in which that practice is unfortunately all too common. The Court **GRANTS** the motions, with the exception of portions related to damages, which are **DENIED AS MOOT**.

### A.    Dr. Easttom's Encryption Theory Regarding the '667 Patent (Dkt. No. 199)

Dr. Easttom opines that the "receiving an indication of the NAS device having a secure region" limitation of the '667 Patent is met "█████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████" Dkt. No. 199 at 7.[8] Viasat refers to this theory as the "encryption theory." *Id*. Viasat argues that this theory should be stricken from Dr. Easttom's expert report, because it "is the same theory of infringement that [Sandisk] proposed in their January 2025 request to amend their infringement contentions, and exactly the theory the Court denied leave to add." *Id*. at 8. Sandisk counters that its March 2024 infringement contentions "explicitly disclosed this theory and even cited Viasat's documentation and specific source code files in support." Dkt. No. 227 at 15. Sandisk specifically argues that its March 2024 infringement contentions cited three source code files—

████████████████████████████████████████████████████████████████████ ███████████████████████████—which "are the operative files that contain the ██████ ██████████████ that Viasat alleges was not disclosed." *Id*. at 17. Sandisk further argues that Viasat's argument is contradicted by the fact that it relied on the encryption theory for invalidity and non-infringement. *Id*. at 18-19.

Sandisk's arguments are not persuasive. Sandisk emphasizes that it "identified only three source code files in support of this limitation out of more than 46,000 source code files that Viasat made available for inspection" to suggest that the identification of these source code files was

---

[8] Docket entries in this section refer to the publicly filed versions, even when the quoted material is sealed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "sufficient to put Viasat on notice of Sandisk's infringement theories."  Dkt. No. 227 at 17-18.

2    Sandisk's argument, however, ignores the fact that the three identified source code files include

3    4,600 lines of code defining 136 functions, but the encryption theory only relies on 12 of the 4,600

4    lines of code and 2 of the 136 functions.  Dkt. No. 247 at 5.  It is unreasonable to assert that Viasat

5    should have known that Sandisk was specifically accusing the ███████████ of satisfying

6    the "receiving an indication of the NAS device having a secure region" limitation of the '667

7    Patent, particularly when the ███████████ was not identified in any other part of

8    Sandisk's infringement contentions.  Sandisk's identification of exemplary source code files was

9    not sufficient to put Viasat on notice of Sandisk's encryption theory.  In fact, Sandisk's suggestion

10   that it "was not required to specifically identify the Boolean itself," Dkt. No. 227 at 17, is flatly

11   inconsistent with this District's patent rules, which require "the party claiming infringement to

12   crystallize its theories of the case early in the litigation . . . ."  *Shared Memory Graphics LLC v.*

13   *Apple, Inc.*, 812 F. Supp. 2d 1022, 1024 (N.D. Cal. 2010) (quotations and citation omitted); *see*

14   *also Xiaohua Huang v. Nephos Inc.*, No. C 18-06654 WHA, 2019 WL 2996432, at *2 (N.D. Cal.

15   July 9, 2019), *aff'd sub nom. Xiaohua Huang v. MediaTek USA, Inc.*, 815 F. App'x 521 (Fed. Cir.

16   2020) ("[T]he degree of specificity under Local Rule 3-1 must be sufficient to provide reasonable

17   notice to the defendant why the plaintiff believes it has a reasonable chance of proving

18   infringement.") (citation omitted).[9]

19          Sandisk's argument that Viasat relied on this theory for invalidity and noninfringement

20   also fails to persuade the Court.  Sandisk argues that Dr. Almeroth, Viasat's technical expert,

21   relied on the encryption theory in his expert report, which shows that "Viasat [] knew of this

22   theory well before Sandisk served Dr. Easttom's report on infringement."  Dkt. No. 227 at 18.

23   Sandisk further argues that Viasat's non-infringement interrogatory responses "addressed the same

24   ███████████ that Viasat claims was not disclosed and explained why the file path

25   would, in Viasat's view, not 'result in a true 'encrypted' value[,]'" which further shows that

26

27   ───────────────
     [9] To be clear, the Court does not conclude that the identification of source code files could never
28   be enough to put a defendant on notice of a plaintiff's infringement theory, only that Sandisk did
     not do so in this case.

Viasat's "claims of untimely disclosure are [] baseless." Dkt. No. 231-2 at 22.  The Court disagrees.

In January 2025, Sandisk moved for leave to amend its infringement contentions to add, in part, the following citation and explanation (in blue) to its contentions:



Dkt. No. 145-5 at 48.  This amendment clearly set forth Sandisk's encryption theory, but on March 12, 2025, the Court denied Sandisk's motion, finding Sandisk was "not diligent in seeking to amend [its] infringement contentions . . . ."  Dkt. No. 182 at 7.  However, it was not until the Court decided Sandisk's motion that Viasat knew whether it would need to address the encryption theory.  Viasat therefore decided to preemptively address this theory in its noninfringement interrogatory responses and Dr. Almeroth's opening expert report.  That Viasat took proactive measures in the event the Court permitted Sandisk's amendments does not undermine Viasat's motion to strike.  At bottom, Sandisk's March 2024 infringement contentions failed to set forth its encryption theory.  For that reason, Viasat's motion to strike on this ground is **GRANTED**.

**B.    Dr. Easttom's DRM Subfolder Theory Regarding the '667 Patent (Dkt. No. 199)**

Dr. Easttom also opines that the "receiving an indication of the NAS device having a secure region" limitation of the '667 Patent is met when "movies and TV shows ███████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████"  Dkt. No. 201-2 at 6.  Viasat refers to this theory as the "DRM sub-folder / file path."  *Id*.  Viasat argues that this theory should be stricken from Dr. Easttom's expert report because Sandisk "did not include [it] in their March 2024 contentions, did not try to add [it] in their January 2025 request to amend those contentions, and never disclosed [it] anywhere before serving Dr. Easttom's March 2025 report."  *Id*. at 8.  Sandisk counters that its contentions explained "that access to the ████████
████████████████████████████████████████████████

1  ████████████████████████████████ and

2  therefore, its contentions ████████████████████████

3  ████████████████████████████████████████

4  ██████████    Dkt. No. 227 at 16.

5      Sandisk's arguments essentially amount to an argument of implicit disclosure.  Sandisk

6  argues that Viasat was on notice of the DRM subfolder theory because Sandisk's infringement

7  contentions (1) identified the ████████ as the "claimed 'buffer' of the secure region[,]" (2)

8  explained that the ██████████████, (3) explained that access to the "████████

9  ████████████████████████" and (4)

10 explained "████████████████████████" *Id*.  As an

11 initial matter, Sandisk's infringement contentions nowhere state that the ████████ must be

12 encrypted.  Rather, the contentions state that "██████████████████

13 ████████████████████" Dkt. No. 189-4 at 40.  But, according

14 to the contentions, the ████████ is part of the user hub or Viasat IFEC server(s).  *Id*. at 39.

15 These allegations do not disclose that the VCDS cache itself is encrypted.  Additionally, pages 58–

16 59 and 81–82 of the contentions, on which Sandisk relies to argue that it "████████████

17 ████████████████████" are related to entirely different

18 claim limitations.  For example, pages 58–59 relate to the "transmit instructions to the NAS device

19 to control streaming access to the digital content stored on the buffer" limitation of claim 1, and

20 pages 81–82 relate to claim 6.  *See id*. at 58–59, 81–82.  The Court finds the DRM sub-folder / file

21 path theory was not adequately disclosed in Sandisk's infringement contentions.  Accordingly,

22 Viasat's motion to strike on this ground is **GRANTED**.

23      **C.    Dr. Easttom's "Portable Storage Device" Theories Regarding the '400 Patent**

24         **(Dkt. No. 199)**

25      Viasat moves to strike Dr. Easttom's "new theory regarding the 'portability' of storage

26 devices in the '400 [P]atent[,]" arguing that "the Court previously denied [Sandisk] leave to

27 amend [its] infringement contentions to add this very theory."  Dkt. No. 199 at 10.  Sandisk

28 counters that Dr. Easttom's theories are not new, as the March 2024 infringement contentions

United States District Court
Northern District of California

"explicitly state that 'seatback' devices are 'portable'" and Dr. Easttom "explain[s] why the seatback devices meet the Court's claim construction . . . ." Dkt. No. 227 at 20.

As noted above, Sandisk moved for leave to amend its infringement contentions in January 2025. Dkt. No. 146. Sandisk sought to amend its contentions to "clarify its [doctrine of equivalents] position in view of arguments that were made during claim construction." Dkt. No. 157 at 1. The Court denied Sandisk's motion, finding that Viasat would "suffer undue prejudice" if Sandisk were permitted to amend its contentions at such a late stage of the case. Dkt. No. 182 at 8. Sandisk now seeks to introduce, through Dr. Easttom, the same theories as to which the Court previously denied leave to amend. Sandisk does not address the Court's prior denial of leave to amend and instead argues that "Viasat was clearly on notice of Sandisk's infringement theories." Dkt. No. 227 at 20. The Court reiterates its conclusion that "[e]ven a limited amendment addressing only the Court's construction" of "portable storage device" would prejudice Viasat. Sandisk cannot circumvent the Court's prior ruling by arguing that Viasat "was clearly on notice" of this theory. Accordingly, Viasat's motion to strike on this ground is **GRANTED**.

### D.    Dr. Easttom and Ms. Kindler's Discussion of Viasat's IPTV Product (Dkt. No. 199)

Dr. Easttom, Sandisk's technical expert, and Ms. Kindler, Sandisk's damages expert, both discuss Viasat's IPTV product in their opening expert reports.[10] Dr. Easttom identifies IPTV as one of four use cases in which the accused Viasat systems infringe the '400 Patent, Dkt. No. 201-3 ("Easttom Rep.") ¶¶ 129; and one of two use cases in which the accused Viasat systems infringe the '667 Patent. *Id*. ¶¶ 509–10. Ms. Kindler relies on Dr. Easttom's analysis of Viasat's IPTV product in calculating and apportioning Sandisk's claimed damages. Dkt. No. 201-4 ("Kindler Rep.") ¶¶ 70, 219–21. Viasat argues that "Dr. Easttom's and Ms. Kindler's discussions of Viasat's IPTV product should [] be stricken because [Sandisk] did not identify that IPTV product as an Accused Instrumentality in their infringement contentions, or explain in those contentions

---

[10] According to Viasat, "Viasat's IPTV product delivers live TV broadcasts via satellite to a customer aircraft so that passengers can watch TV in real time on either the aircraft's seatback screens or on their personal devices." Dkt. No. 199 at 15.

United States District Court
Northern District of California

how IPTV purportedly met every limitation of any asserted claim." Dkt. No. 199 at 12. Viasat argues that its IPTV product "is not mentioned at all in [Sandisk's] damages contentions or . . . interrogatory responses[,]" and "nowhere in [Sandisk's] operative infringement contentions (or rejected infringement contentions) do[es] [Sandisk] state that IPTV is an Accused Instrumentality . . . ." *Id*. at 13. Sandisk counters that its infringement contentions "identified the IFE, W-IFE, and VCDS systems as the accused systems and disclosed [its] contention that such systems infringe when they deliver IPTV/Live TV content[,]" and argues that this disclosure was sufficient. Dkt. No. 227 at 13. Sandisk further argues that "[t]here is no distinction between revenue earned by Viasat's delivery of IPTV/Live TV content using the accused systems and the revenue earned by a purported 'IPTV Product.'" *Id*.

The parties' previous discovery disputes regarding Viasat's IPTV product, which "delivers live TV broadcasts via satellite to a customer aircraft so that passengers can watch TV in real time on either the aircraft's seatback screens or on their personal devices," are relevant to this dispute. Dkt. No. 199 at 12. On March 25, 2025, after the February 7, 2025 deadline for fact discovery, Sandisk raised a discovery dispute regarding Viasat's production of documents related to IPTV.[11] Dkt. No. 188. Sandisk specifically sought (1) the deposition of a Viasat witness on the topic of IPTV, (2) the production of IPTV source code, and (3) all technical documents for IPTV. *Id*. at 3. Viasat took the position that IPTV was not identified as an accused product. *Id*. at 5. Sandisk argued there, as it does here, that its March 2024 infringement contentions sufficiently identified IPTV as an accused instrumentality. *Id*. at 2. Sandisk specifically argued that it "expressly identif[ied] the entirety of 'Viasat's in-flight entertainment' offerings as Accused Instrumentalities for the '400 Patent[,]" and IPTV, as "an IFE product," was therefore accused. *Id*. Sandisk further argued that the '667 Patent infringement contentions identified the "Live Video implementation" "for pre-loading content to airplanes," which was sufficient to identify IPTV as an accused product for the '667 Patent.

Judge Kang denied Sandisk's request, finding that neither the '400 Patent infringement

---

[11] Discovery disputes in this case were referred to the Honorable Peter H. Kang, U.S. Magistrate Judge. Dkt. No. 173.

United States District Court
Northern District of California

1    contentions nor the '667 Patent infringement contentions accused the IPTV product of

2    infringement.[12]  Dkt. No. 215.  With respect to the '400 Patent, the court found it "evident" that

3    Sandisk was "accusing the VCDS (and not the IPTV product) of receiving the IPTV content."  *Id.*

4    at 9.  The court found that the infringement contentions "ma[d]e only a passing reference to IPTV

5    as one example (among other listed streaming services) of a media streaming service for purposes

6    of 'provisioning secure media content' as required by the preamble of [] claim 1" and "contain[ed]

7    no accusations as to how any IPTV product infringes any of the hardware or functional claim

8    limitations of the '400 claims."  *Id.* at 8–9.  The court explained that "[t]he contention that IPTV

9    content c[an] be delivered is not the same thing as accusing the IPTV product[,]" as "media

10   content which is configured for distribution through the Internet can be received and decoded by a

11   variety of different devices (set top-boxes, dedicated devices, general purpose computers running

12   apps) . . . ."  *Id.* at 9.  The court found Sandisk's arguments with respect to the '667 Patent "even

13   less compelling[,]" as the '667 Patent infringement contentions "nowhere mention[ed] or use[d]

14   the term IPTV (even as a type of formatted content)."  *Id.*  Sandisk did not seek reconsideration or

15   review of any of these determinations.

16        Now, Sandisk seeks to introduce expert opinions based on Viasat's IPTV product.

17   Specifically, Dr. Easttom's expert report opines that the IPTV product infringes both the '400 and

18   '667 Patents, and Ms. Kindler's expert report provides a damages estimate based on Viasat's

19   IPTV product.  Sandisk once again argues that it identified the IPTV product as accused when it

20   "accurately identified the IFE, W-IFE, and VCDS systems and explained that these systems

21   infringe when they provide Live TV/IPTV content."  Dkt. No. 230 at 14.

22        The Court is not persuaded.  Sandisk's argument again essentially asserts implicit

23   disclosure.  Sandisk does not dispute that IPTV was not expressly identified as an accused product

24   in either the '400 or '667 Patent infringement contentions, but argues that identifying the IFE, W-

25   IFE, and VCDS systems as accused products should have put Viasat on notice that IPTV was

26   accused.  This argument fails for at least two reasons.  First, the infringement contentions for the

27   _____

28   [12] Judge Kang "ma[d]e no findings regarding which products . . . were adequately accused of
     infringement."  Dkt. No. 215 at 10.

United States District Court
Northern District of California

1    '400 Patent appear to distinguish between the Accused Products and IPTV.  For example, in

2    discussing the preamble, the infringement contentions state that "the '400 Accused Products

3    provide access to media streaming services (e.g., IPTV, Disney+, Apple Music and/or Apple TV+)

4    . . . ."  Dkt. No. 145-2 at 4.  The infringement contentions therefore identify IPTV as a type of

5    content that can be accessed via the Accused Products but do not identify IPTV itself as an

6    Accused Product.  As Judge Kang explained, the "contention that IPTV content could be delivered

7    is not the same thing as accusing the IPTV product" of infringement.  Dkt. No. 215 at 9.

8           Second, Sandisk's argument that it adequately disclosed IPTV as an infringing product

9    through its general identification of Viasat's W-IFE and IFE systems is again inconsistent with the

10   Patent Local Rules directives "to require the plaintiff to crystallize its theories of the case early in

11   the litigation and to adhere to those theories once disclosed."  *Geovector Corp. v. Samsung Elecs.*

12   *Co.*, No. 16-CV-02463-WHO, 2017 WL 76950, at *3 (N.D. Cal. Jan. 9, 2017).  Sandisk's

13   infringement contentions required specificity as to the IPTV product.  Accordingly, the Court

14   finds that Dr. Easttom and Ms. Kindler have no basis to opine on infringement and damages,

15   respectively, based on IPTV.  Viasat's motion on this ground is **GRANTED**.  The Court

16   **STRIKES** Paragraphs 91, 129, 133-35, 139, 140, 158, 162-63, 172, 173, 183, 185, 186, 195-97,

17   199-201, 203, 207-08, 213-14, 225-26, 245, 248, 265-69, 277-78, 300-01, 307, 316, 319, 321, 325,

18   327-28, 357-59, 383-85, 387-89, 391, 396, 408-09, 419, 434, 451-55, 463-64, 490-91, 497-98,

19   506, 509-11, 516, 520, 568, 571, 583, 650, 653, 696, 750, 779, 782, 853, 856-59, 864, 889-90,

20   900, 902-03 of the Easttom Report and Paragraphs 70 and 219–21 of the Kindler Report.

21          **E.      Motion to Strike Lauren Kindler's Supplemental Expert Report (Dkt. No. 200)**

22          Viasat moves to strike Ms. Kindler's supplemental expert report under Federal Rules of

23   Civil Procedure 26, 37(c)(1), and 16.  Dkt. No. 200 at 11.  Viasat argue the supplemental report "is

24   neither a timely opening report under Rule 26(a) nor a proper supplemental under Rule 26(e)" but

25   "an unauthorized, untimely reply report" that should be excluded under Rule 37.  As explained

26   below, *see infra* Section IV.B., the Court grants Viasat's motion for summary judgment of

27   noninfringement.  Accordingly, Viasat's motion to strike is **DENIED AS MOOT**.

28

United States District Court
Northern District of California

**F.    Motion to Strike Sandisk's '400 Patent Authenticating Theories (Dkt. No. 204)**

Viasat moves to strike Dr. Easttom's opinions regarding "four 'use cases'" that allegedly satisfy the "authenticate" limitation of claims 1 and 9 of the '400 Patent.[13]  Dkt. No. 204 at 2.  Viasat contends that "[e]ach of th[e] four 'use cases' are based on new theories that [Sandisk] did not disclose in [its] operative . . . infringement contentions."  *Id*.  Sandisk counters that Dr. Easttom's opinions regarding the four use cases "appl[y] the same previously disclosed theory from Sandisk's March 2024 [i]nfringement [c]ontentions."  Dkt. No. 229 at 1.  Sandisk argues that its infringement contentions "identified how a unique identifier such as a token is received by the IFE/W-IFE system or the Gateway server system from a mobile phone or seatback device a [sic] first data interface as required by the claim elements 1[d] and 9[c][,]" and "[t]hen, for the authenticating elements 1[e] and 9[d] . . .  identified that the unique identifier is authenticated based on a communication with a remote trusted server (e.g., on the ground servers of Viasat and others) via a second data interface (e.g., the satellite network)."  *Id*. at 4.  Sandisk argues that the Easttom Report "provides the same infringement theory" and then provides "additional evidentiary proof to support that theory," which is permissible.  *Id*.

For background, Sandisk's infringement contentions identified "Viasat's IFE, W-IFE, Gateway, and all Viasat products incorporating IFE, W-IFE, Gateway, or the functionality described herein" as the accused products.  Dkt. No. 145-2 at 2.  "The IFE and W-IFE systems are 'in-flight' entertainment systems that are installed on commercial airplanes, whereas the 'Gateway' system is Viasat's home internet and entertainment system."  Dkt. No. 229 at 3.  The IFE, W-IFE, and Gateway systems distribute "secure media content" to users.  *Id*.  According to Sandisk, the IFE and W-IFE systems rely on the VCDS client "for obtaining media from remote sources on the ground that include other aspects of the VCDS system."  *Id*.  "The secure media content can be provisioned to various users either from content stored on the airplane or through the VCDS as on-demand media content or Live/IPTV content."  *Id*.  Sandisk contends that the

---

[13] The "authenticate" limitation refers to the claim limitation of claim 1 requiring "a processor configured to . . . authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface . . . ."  '400 Patent cl. 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "use cases" simply "describe how different content is delivered to users."  *Id*. at 4.

2            **i.    Use Case #1**

3        The first use case refers to in-flight S-4 server pre-stored video content using VCDS

4    ("Inflight-Pre-stored").  Viasat argues that Dr. Easttom's opinions regarding the Inflight-Pre-

5    stored use case are "based on two different untimely theories: (1) the 'software update' theory, and

6    (2) the 'HLS/DASH' theory."  Dkt. No. 204 at 4.

7            a.    Software Update Theory

8        Dr. Easttom opines that in the Inflight-Pre-stored use case, the "authentication" limitation

9    is met when the DRM servers for FairPlay and Widevine receive software updates via an SSLK

10   package from a remote trusted server.  Easttom Rep. ¶ 249 ("For Use Case 1, depending on the

11   DRM service, the kiosk . . . ha[s] the onboard DRM server authenticate the token and update

12   DRM server policies as part of software updates by communicating with a remote trusted server

13   over the second data interface (the satellite internet connection) to obtain the software update."),

14   ¶ 252 ("In the case of Fairplay (Apple) and WideView (Google) DRM license servers, the license

15   servers are necessarily updated whenever new media is loaded onboard . . . . . Viasat Updates to

16   the DRM license policy may be done Over The Air as part of the 'SSLK' updates containing

17   Configuration Updates in a bundle.").

18       Viasat argues that this "theory of 'software updates' via 'SSLK' packages, whereby a local

19   'onboard' server somehow infringes by communicating with an unnamed 'update' server, is not

20   disclosed in [Sandisk's] operative infringement contentions[,]" as the contentions "never mention

21   'software updates' or 'SSLK' or updating a 'license policy.'"  Dkt. No. 204 at 5.  Sandisk counters

22   that its infringement contentions "clearly lay out a theory that the 'authenticating element' is met

23   because the accused Viasat IFE/W-IFE system uses an onboard DRM server that communicates

24   with a remote trust server via a second data interface to authenticate the portable data storage

25   using the token."  Dkt. No. 229 at 6.  More specifically, Sandisk argues that its infringement

26   contentions "disclosed that the DRM [s]ervers, which could be part of the onboard servers, []

27   communicate via a satellite network with a remote trusted server, an example of which is a

28   Content Management Server, which can wirelessly update the onboard DRM [s]ervers through the

1    satellite network[,]" and therefore, "[t]h[e] update would be 'software updates' to the DRM

2    [s]ervers, which use license policies to assist in authenticating tokens." *Id*. at 8-9.

3          With respect to the "authenticate" limitation, Sandisk's infringement contentions allege

4    that "Viasat's Sponsored Access Privacy Notice notes that 'to deliver the Sponsored Access

5    services to you, we collect a unique identifier associated with the device that you use to access the

6    Services.'"  Dkt. No. 146-4.  The contentions also cite portions of a technical document, which

7    state that "[d]evice authentication with the DRM server is via a signed token that is unique to the

8    device" and that a "device's unique ID (UID) . . . allows data to be cryptographically tied to a

9    particular device." *Id*.  Notably, the contentions do not expressly state that this limitation is met

10   when the DRM server receives software updates from the Content Management Server.

11         Once again, Sandisk relies on implied disclosure.  Essentially, Sandisk argues that because

12   its infringement contentions cited a document that (1) identified the DRM License Server as one

13   of the onboard servers, (2) "highlighted a satellite network communicating between the ground

14   servers . . . and the onboard servers," and (3) reflected that the "Content Management Server [],

15   which is an example of the remote trusted server, can remotely manage content, provide tools for

16   self or partner administration, and 'update via satellite[,]'" its infringement contentions disclosed a

17   theory in which the DRM servers (i.e., the onboard servers) communicate with the Content

18   Management Server (i.e., the remote trusted server) via a satellite network so that the Content

19   Management Server provides software updates to the DRM servers, which would necessarily "use

20   license policies to assist in authenticating tokens." *Id*. at 9-12.  This again fails to meet the

21   standard demanded by the District's Patent Local Rules.  *Shared Memory Graphics LLC*, 812 F.

22   Supp. 2d at 1025 ("[D]egree of specificity . . . must be sufficient to provide reasonable notice to

23   the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'")

24   (citation omitted).  The Court finds that the software update theory was not disclosed in Sandisk's

25   infringement contentions, and therefore, Dr. Easttom may not provide any opinion based on this

26   theory.  Viasat's motion to exclude on this ground is therefore **GRANTED.**

27              b.   HLS/Dash Theory

28         Dr. Easttom also opines that the Inflight-Pre-stored use case satisfies the "authenticate"

United States District Court
Northern District of California

limitation when "the kiosk authenticates the portable data storage device by communicating with the PlayReady Token API on the ground (a remote trusted server) the token the HLS or DASH string, which is at least based on the unique identifier of the portable data storage device, over the second data interface (satellite network)." Easttom Rep. ¶ 252. Viasat argues that this theory should be stricken, because Sandisk's infringement contentions "never disclose the theory that the 'unique identifier' required by claim 1[e] or 9[d] is an 'HSL or DASH string.'" Dkt. No. 204 at 5. Sandisk argues that the Easttom Report contains an error and is meant to reflect that the unique identifier is the token, not the HLS or DASH string. Dkt. No. 229 at 10 ("Dr. Easttom's report indicates that the unique identifier is the token obtained from the Token API."). Viasat counters that this theory should be stricken nonetheless, because "[a] 'token' is not the same as an HLS or DASH string" and "replacing [HLS or DASH string] with 'token' is a substantive change.'" Dkt. No. 244 at 4.

Sandisk represents that Dr. Easttom will not opine that the "HSL or DASH string" functions as the unique identifier. The issue then is whether Dr. Easttom may opine that the kiosk authenticates the portable data storage device using the token. The Court finds that Sandisk's infringement contentions disclosed a theory that "[d]evice authentication with the DRM server is via a signed token that is unique to the device." Dkt. No. 146-4. The Court will therefore permit Dr. Easttom to opine that the "authenticate" limitation is met when the "kiosk authenticates the portable data storage device by communicating the token to the DRM license server . . . ." Dkt. No. 229-4. Viasat's motion on this ground is therefore **DENIED** as to the token theory and **GRANTED** as to the HLS/DASH string theory.

### ii. Use Cases #2 and #4

The second use case refers to OTT/video on Demand (e.g., Disney+) using VCDS ("Inflight OnDemand"), and the fourth use case refers to Video on Demand via Disney+ provided by Stream for Home ("HomeonDemand"). Under the Inflight OnDemand and HomeonDemand use cases, the "authenticate" limitation is met when the "████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████." Easttom Rep. ¶ 254. Viasat argues that

the ███████████ is "never mentioned in [Sandisk's] infringement contentions for limitations 1[e] or 9[d]." Dkt. No. 204 at 6. Although Viasat acknowledges that Sandisk "mention[ed] '███' [] once in their contentions," its notes that it was "for a different claim limitation—claim 1[b]." *Id*. n.2. Viasat argues that "[d]isclosing this component elsewhere, for a different claim limitation, shows that if [Sandisk] believed it also played a role for claim 1[e] or claim 9[d], [it] w[as] perfectly capable of disclosing this theory in [its] infringement contentions for those claim limitations[,]" but it did not do so. *Id*. Sandisk counters that it "identified ███████████ as a remote trusted server for the 'remote trusted server' limitation. . . namely, in element 1[b][,]" and given the connection between limitation 1[b] and 1[e], such a disclosure was sufficient to put Viasat on notice of this theory. Dkt. No. 229 at 10-11.

The Court agrees with Viasat. With respect to limitation 1[b], Sandisk's infringement contentions identify several possible servers that may function as the "remote trusted server." Dkt. No. 146-4. But identifying certain servers' relation to limitation 1[b] is not the same as identifying them in relation to limitation 1[e]. This is consistent with claims 1 and 9 of the '400 Patent, as the claim language makes clear that there can be more than one "remote trusted server." *See* '400 Patent cls. 1 ("a second data interface configured to communicate . . . with *a* remote trusted server") (emphasis added), 9 ("establishing communications with *a* remote trusted server") (emphasis added). Although the infringement contentions identify the ███████████ as an example of a "remote trusted server" with respect to limitation 1[b], the contentions do not identify the ███████████ as the "remote trusted server" that communicates with the processor to authenticate the portable data storage device. Sandisk's interpretation of the Patent Local Rules would permit it to identify several "remote trusted server(s)" in its infringement contentions without having to identify which of those servers communicates with the processor to authenticate the portable data storage device. If Sandisk intended to allege that the ███████████ is the "remote trusted server" that participates in authenticating the portable data storage device, it should have said so in its infringement contentions.[14] The Court finds that Sandisk's

---

[14] Notably, Sandisk identified the Viasat data center as a "remote trusted server" with respect to limitation 1[b] and 1[e].

███████████ theory was not disclosed in its infringement contentions, and as such, Dr.

Easttom may not opine that "██████████████████████████████████

████████████████████████████████████████████████████.

██████████████████." Easttom Rep. ¶ 254. Accordingly, Viasat's motion on this

ground is **GRANTED**.

### iii.    Use Case #3

The third use case refers to IPTV/Live TV ("IPTV-Live"). As discussed above, *see supra*

Section III.D, the Court finds that Sandisk's infringement contentions failed to identify IPTV as an

accused product. Accordingly, the Court strikes Dr. Easttom's opinions regarding the IPTV-Live

use case. Viasat's motion on this ground is **GRANTED**.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is proper when a "movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence

in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.*

But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

or make credibility determinations." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

*overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court

finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

### B.    Viasat's Motion for Summary Judgment on Noninfringement (Dkt. No. 205)

Viasat moves for summary judgment on three grounds: (1) the Accused Products do not

meet the "receive an indication of the NAS device having a secure region" limitation of the '667

Patent; (2) the Accused Products do not do not meet the "kiosk" limitation of the '400 Patent; and

United States District Court
Northern District of California

1    (3) the Accused Products do not meet the "authenticating the portable data storage device, using at

2    least the unique identifier, by communicating with the remote trusted server over the second data

3    interface" limitation of the '400 Patent.  Dkt. No. 205 at 2-3.[15]

4          **i.   '667 Patent: "receive an indication of the NAS device having a secure region"**

5         Claim 1 of the '667 Patent claims "[a] media streaming system comprising . . . one or more

6    processors configured to: ***receive an indication of the NAS device having a secure region***

7    ***comprising a buffer for streaming media*** on a separate display device on the local area network,

8    wherein access to the secure region is controlled by the media steaming system . . . ."  '667 Patent

9    cl. 1 (emphasis added).  During claim construction, the parties disputed the meaning of the term

10   "receive an indication of the NAS device having a secure region."  Dkt. No. 120 at 18–19.

11   Sandisk argued that this claim term only "require[d] that the processor [] receive an indication of

12   the NAS device (which happens to have a secure region)," but Viasat argued that this term

13   required the processor to "receive an indication of the presence of the secure region itself."  *Id*.

14   The Court agreed with Viasat and adopted the construction "receive an indication of the presence

15   of a secure region ***within*** the NAS device."  *Id*. at 18 (emphasis added).  The Court found that

16   "[t]he focus of the '667 Patent . . . [was] a novel NAS device having a secure region to buffer

17   content from streaming services[,]" and "as such, the claims logically require an indication that the

18   NAS device has such a secure region for this buffer."  *Id*. at 19.

19        Viasat argues that Sandisk has failed to submit any evidence demonstrating that the '667

20   Accused Products "receive an indication of the presence of a secure region within the NAS

21   device." Dkt. No. 205 at 5-10.  More specifically, Viasat argues that (1) Sandisk's operative

22   infringement contentions "never attempt to show that the accused products contain a processor

23   configured to receive an indication of the presence of a secure region" and instead "focus on their

25   ---

     [15] "[A] court may determine infringement on summary judgment 'when no reasonable jury could
26   find that every limitation recited in the properly construed claim either is or is not found in the
     accused device.'"  *EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1200 (Fed. Cir.
27   2014) (*quoting Innovention Toys, LLC v. MGA Entmn't, Inc.*, 637 F.3d 1314, 1319 (Fed. Cir.
     2011).  Accordingly, summary judgment of noninfringement is warranted with respect to each
28   patent if there is no genuine issue of fact as to even one limitation in the asserted claims  In order
     to make a complete record, however, the Court will address each argument.

United States District Court
Northern District of California

1 rejected construction" of this limitation, *id*. at 6; and (2) Sandisk's Encrypted Boolean and DRM

2 Subfolder theories—which Viasat contends were disclosed for the first time in Dr. Easttom's

3 opening expert report, Dkt. No. 199—also fail to satisfy this claim limitation.  Dkt. No. 205 at 7-

4 10.  For the reasons below, the Court **GRANTS** Viasat's motion for summary judgment regarding

5 the '667 patent.

6              a.   Sandisk's March 2024 Infringement Contentions

7        First, Viasat argues that Sandisk's March 2024 infringement contentions "only purport to

8 provide evidence that the accused products contain a processor that 'receive[s] an indication of the

9 NAS device,' not an indication that the NAS device has a secure region."  Dkt. No. 205 at 6.

10 According to Viasat, Sandisk's infringement contentions only allege that VCDS "receives an

11 indication that local storage exists in the form of a user hub—there are no contentions that VCDS

12 receives an indication that the user hub has a secure region to store secure media content as the

13 claims require."  *Id*.  Viasat argues that this deficiency warrants summary judgment of

14 noninfringement of the '667 Patent.  *Id*.  Sandisk counters that the language of claims 1 and 11

15 require that "the secure region comprises . . . a buffer for streaming media" and its infringement

16 contentions identified the ███████████████████████████████████████."  Dkt. No. 240

17 at 5-6.  Sandisk argues that its infringement contentions identified the VCDS terminal "as the

18 claimed NAS device[] and described a secure portion of that storage—the ██████████████

19 ████████████████████████"  Dkt. No. 240 at 6.  Sandisk argues that it "specifically

20 noted [] the ████████████████████████████████████████████████████

21 ████████████████████████████."  *Id*.  According to Sandisk, its

22 infringement contentions "pointed to the fact that the accused system distinguishe[d] between

23 secure (encrypted, hidden) storage areas and public areas by using specific file paths and

24 encryption status as satisfying the indication-of-secure-region element."  *Id*. at 6-7.

25        To resolve this dispute, the Court must first examine the disclosures made in Sandisk's

26 infringement contentions.  Sandisk's infringement contentions break this limitation into three

27 parts: (1) "receive an indication of the NAS device" (2) "having a secure region comprising a

28 buffer for streaming media on a separate display device on the local area network" (3) "wherein

access to the secure region is controlled by the media streaming system." '667 Patent cl. 1. The Court focuses its analysis on the "secure region comprising a buffer" portion of this limitation.

Sandisk's infringement contentions identify "a user hub or within one or more Viasat IFEC servers (*i.e.*, NAS)." Dkt. No. 145-5 at 32–38. The contentions further disclose that "local storage, such as a user hub or within one or more Viasat IFEC servers (i.e., NAS), includes a secure region comprising a buffer for streaming media on a separate display device on the local area network." *Id*. at 40. Sandisk's contentions provide four examples which allegedly meet this limitation: (1) "a user hub or one or more Viasat IFEC services [that] include a ███████████ ████ . . . [which] may receive content multi-casts and subsequently 'serve' that content to one or more 'players viewing the same live video stream'"; (2) "user hubs and/or Viasat IFEC servers include 'attached external storage (e.g., HDD) for caching and serving content,' and are required to 'encrypt the attached external storage device'"; (3) "in an Open Stream implementation, the VCDS (i.e., media streaming system) may perform a number of additional steps to 'ensure the identity of the user requesting the resources [are] trusted' and 'verify that requests made to a[nd] from the system are legitimate"; and (4) "the Open Caching standard . . . requires that opening caching nodes (e.g., Viasat IFEC system) are secure." *Id*. at 40–44.

The Court finds there is no genuine dispute that Sandisk's ███████ theory, as disclosed in Sandisk's infringement contentions, fails to satisfy the "receive an indication of the NAS device having a secure region" limitation. As framed in Sandisk's infringement contentions, Sandisk's ███████ theory does not disclose that the accused processor receives an indication of the presence of a *secure region* within "a user hub or within one or more Viasat IFEC servers" (i.e., the NAS device). Sandisk argues that it "specifically noted that the ██████████████ ███████████████████████████████████, thereby characterizing it as a secure storage region." Dkt. No. 240 at 6. Sandisk's arguments are not persuasive. Identifying the ████████████████████████████████████████████████████ Moreover, even accepting as true Sandisk's contention that the ████████████████ ███████████, Sandisk's infringement contentions are silent as to how *the processor receives an indication of the* ███████████, as required by the Court's construction. Sandisk's infringement

1    contentions fail to set forth a cognizable infringement theory satisfying the "receive an indication

2    of the NAS device having a secure region" claim limitation.  Accordingly, Viasat's motion for

3    summary judgment on this ground is **GRANTED**.

4              b.   Sandisk's Encryption and DRM Subfolder Theories

5         As explained above, *see supra* Section III.B., the Court strikes Sandisk's encryption theory

6    and DRM subfolder theory from Dr. Easttom's expert report.  Accordingly, the Court need not

7    decide whether these theories raise a genuine dispute of material fact precluding summary

8    judgment on the issue of noninfringement.

9         **ii.   '400 Patent: "kiosk" and "authenticating the portable data storage device,**
         **using at least the unique identifier, by communicating with the remote**
10        **trusted server over the second data interface"**

11        The parties presented two separate grounds for summary judgment regarding the '400

12   patent: one related to "kiosk" and another related to "authenticating the portable data storage

13   device, using at least the unique identifier, by communicating with the remote trusted server over

14   the second data interface."

15        Claim 1 of the '400 Patent claims "[a] kiosk for provisioning secure media content to a

16   plurality of portable data storage devices . . . ."  Dkt. No. 205 at 10.  Viasat argues there is no

17   genuine dispute that the Accused Products do not have a "kiosk."  Viasat's argument comes down

18   to an issue of claim construction.  The parties previously disputed the construction of the term

19   "kiosk."  Dkt. No. 120.  Sandisk argued that the term should be construed according to its plain

20   and ordinary meaning (i.e., "any device used to access and distribute content provided by the

21   system"), and Viasat argued that the term should be construed as "[a] device whose user interface

22   is used by consumers."  Dkt. No. 120 at 8.  The Court adopted Sandisk's construction, finding it

23   was "adopted verbatim from the specification . . . ."  *Id*.  Viasat now argues that Sandisk fails to

24   identify a singular device that serves as the claimed "kiosk."  Viasat argues that the Court's

25   construction of "kiosk" "makes clear that 'a kiosk' is a singular device, not a collection of

26   devices[,]" but Sandisk "points to multiple devices—'the VCDS running on the M3 modem in

27   conjunction with the S4 server'—as the claimed 'kiosk.'"  Dkt. No. 205 at 11.  Sandisk contests

28   Viasat's argument that the "kiosk" must be a singular device and further argues that even if the

1    "kiosk" must be a singular device, "summary judgment is not warranted because the evidence of

2    record presents a triable issue of material fact as to whether there is a single device that serves as

3    the kiosk." Dkt. No. 240 at 12.

4         The Court finds Viasat's claim construction arguments untimely.  If Viasat "wanted to tee

5    up summary judgment positions based on particular constructions, they 'could (and should) have

6    sought . . . construction[s] to [those] effect[s].'"  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-

7    00630-LHK, 2014 WL 252045, at *3 (N.D. Cal. Jan. 21, 2014) (quoting *ePlus, Inc. v. Lawson*

8    *Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012)).  The Court finds that Viasat waived this

9    argument by failing to raise it during claim construction.  *Cent. Admixture Pharmacy Servs., Inc.*

10   *v. Advanced Cardiac Sols.*, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found

11   that [defendant] waived any argument with respect to this term by failing to raise it during the

12   claim construction phase. We agree."); *see also Apple*, 2014 WL 252045, at *3 ("The Federal

13   Circuit has held that it can be error to engage in hypertechnical refinements of the meaning of

14   claims following claim construction to support a grant of summary judgment.") (citing *AFG*

15   *Industries, Inc. v. Cardinal IG Co.*, 375 F.3d 1367 (Fed.Cir. 2004)).  Accordingly, Viasat's motion

16   for summary judgment on this ground is **DENIED**.

17        Claim 1 of the '400 Patent claims "[a] kiosk for provisioning secure media content to a

18   plurality of portable data storage devices, the kiosk comprising . . . a processor configured to . . .

19   authenticate the portable data storage device, using at least the unique identifier, by

20   communicating with the remote trusted server over the second data interface . . . ." '400 Patent, cl.

21   1.  During claim construction, the parties disputed the construction of the phrase "authenticating

22   the portable data storage device, using at least the unique identifier, by communicating with the

23   remote trusted server over the second data interface." Dkt. No. 120 at 13–14.  Sandisk argued that

24   the phrase should be construed in accordance with its plain and ordinary meaning and further

25   argued that the plain and ordinary meaning "mean[t] simply to 'confirm the identity' of the

26   portable storage device." *Id*. at 13.  Viasat argued that the term should be construed as

27   "confirming that the portable data storage device is trusted using at least the unique identifier." *Id*.

28   The Court adopted Viasat's construction, explaining that the specification's use of the word

1    "authenticate" was "always for the purpose of confirming the trust level of the devices in

2    question." *Id*. The Court further noted that "the '400 [P]atent's exclusive use of 'authenticat[ion]'

3    to 'prevent unauthorized copying of digital content,' confirm[ed] that the patentee intended for the

4    term 'authenticate' to include confirmation that the portable data storage device is trusted or

5    authorized." *Id*. at 14.

6         Viasat argues that it is entitled to summary judgment of noninfringement for the '400

7    Patent for two reasons: (1) Sandisk does not apply the Court's construction of "authenticate[,]"

8    and (2) Sandisk cannot show a "remote trusted server" that uses the "unique identifier" to

9    "authenticate the portable data storage device." Dkt. No. 205 at 15–17. For the reasons below, the

10   Court **GRANTS** Viasat's motion for summary judgment regarding the '400 patent.

11             a.   "Authenticate"

12        First, Viasat argues that Sandisk's infringement contentions "never address or apply the

13   Court's construction of this term[,]" and "instead treat[] 'authenticate' as mere identification of the

14   device, never discussing whether the device is 'trusted.'" *Id*. at 16. Viasat further argues that "Dr.

15   Easttom likewise never applies, addresses, or even mentions the Court's construction of this

16   term." *Id*. Viasat contends that "[b]ecuase [Sandisk's] contentions and Dr. Easttom's opinions all

17   treat 'authenticating' as simply requiring identification of the portable data storage device, rather

18   than analyzing whether or how Viasat supposedly 'confirm[s] that the portable data storage device

19   is trusted,' [Sandisk] ha[s] not met their burden to show infringement." *Id*. Sandisk counters that

20   Dr. Easttom opines that the "███████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████." Dkt. No. 241-2 (citing Easttom Rep. ¶¶ 195–206, 213–76).

24        As explained above, *see supra* Section III.C., the Court struck Dr. Easttom's opinions

25   regarding the Inflight-Pre-stored, Inflight OnDemand, HomeonDemand, and IPTV use cases.

26   However, the Court declined to strike Dr. Easttom's opinions regarding the token theory under the

27   Inflight-Pre-stored theory. The issue then is whether Sandisk's token theory satisfies the

28   "authenticate" limitation. The Court finds it does not.

United States District Court
Northern District of California

United States District Court
Northern District of California

To satisfy this limitation under the Court's construction, the kiosk must comprise a processor that is "configured to [confirm that the portable data storage device is trusted using at least the unique identifier] by communicating with the remote trusted server over the second data interface." Dkt. No. 120 at 13–14.  It is not enough that the processor is configured to "confirm the identify of the portable data storage device."  *Id*.  Sandisk does not explain how the token provides more than "identification" rather than finding the device is "trusted."  For example, there is no explanation how the token either "███████████████████████████" or indicates how a device is otherwise "trusted."  *Id*. at 21-22. Viasat's motion for summary judgment on this ground is **GRANTED**.

> b.   "Remote Trusted Server"

Viasat argues that Sandisk "never identified a 'remote trusted server' that uses the 'unique identifier' to authenticate the portable storage device. Dkt. No. 205 at 17.  Sandisk explains that Viasat S4 server and the M3 modem communicate with ground servers that are the "remote trusted server." Dkt. No. 240 at 19.  These ground servers include a set of servers with separate functions, including one for "digital rights management" or DRM.  *Id.*  When a playback request message is sent, a token is created based on the unique device identifier, which is then sent to those ground servers.  In reply, Viasat discounts Sandisk's explanation as a "kitchen-sink allegation," but Viasat fails to explain why the "remote trusted servers" identified, specially one for DRM, would not qualify under the patent claim.  The Court finds that Sandisk's explanation of the DRM server's role as the Remote Trusted Server is not a conclusory opinion and adequately raises a genuine issue of material fact. *Id.* at 19-22.  Viasat's motion for summary judgment on this ground is **DENIED**.

> ***

Sandisk had to show a genuine issue of material fact as to every limitation of the patent to prevail at summary judgment on infringement. Viasat prevailed on at least one argument regarding both the '667 and '400 patents.  Therefore, Viasat's motion for summary judgment of noninfringement is **GRANTED.**

**C.    Sandisk's Motion for Summary Judgment on Affirmative Defenses (Dkt. No. 210)**

Sandisk seeks summary judgment on Viasat's first affirmative defense of invalidity of the '400 patent, third affirmative defense of invalidity of the '667 patent, fifth affirmative defense of failure to state a claim and fourteenth affirmative defense of failure to mark.  Dkt. No. 210 at 7.

When invalidity arguments are presented as affirmative defenses rather than counterclaims and the Court finds noninfringement, invalidity arguments are no longer material to the case's outcome.  *See Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939); *Cardinal Chem. Co. v. Morton Intern., Inc.*, 508 U.S. 83, 93-94 (1993) (distinguishing when invalidity is raised as a counterclaim as opposed to an affirmative defense once the court has found noninfringement). Having found that Sandisk is entitled to summary judgment on the issue of noninfringement, *see supra* Section IV.B., Sandisk's motions on these grounds are **DENIED AS MOOT**.

Separately, Sandisk argues that failure to state a claim is not an affirmative defense, such that it is entitled to summary judgment on this ground.  Dkt. No. 210 at 27–28.  Viasat does not address the substance of Sandisk's argument and instead counters that this affirmative defense is proper because Sandisk has not shown standing.  Dkt. No. 248 at 20.  The Court agrees with Sandisk.  "Failure to state a claim is not a proper affirmative defense but, rather, asserts a defect in [the] prima facie case." *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010).  Accordingly, Sandisk's motion for summary judgment on this ground is **GRANTED**.

**D.    Viasat's Motion for Summary Judgment on Standing[16] (Dkt. No. 222)**

Viasat moves for summary judgment on the issue of SDT LLC's standing.  Dkt. No. 222. The Court provides a brief overview of the standing issues in this case.  When this case was initially filed on July 28, 2022, there were five named plaintiffs: Western Digital Technologies, Inc. ("WDT"), Western Digital Ireland Ltd. ("WDI"), SD3D, SDSM, and SDT LLC.  Dkt. No. 1.

---

[16] Viasat moves for leave to file this second motion for summary judgment.  Dkt. No. 221.  Viasat has shown that "[g]ood cause exists to allow a second motion on the distinct issue of patentee standing."  *Id.* at 4.  Therefore, Viasat's motion for leave is **GRANTED**.

1   The original complaint generally alleged that "[o]ne or more Plaintiffs h[e]ld[] title to" the

2   Asserted Patents. *Id*. ¶¶ 17, 35, 47.  Viasat moved to dismiss the complaint for lack of standing.

3   Dkt. No. 27.  The Court granted Viasat's motion, finding "Plaintiffs' claim that 'one or more' of

4   them holds the rights in the asserted patents, without identifying which entity holds which rights to

5   which patents, and why, simply state[d] a conclusion and [was] insufficient" to establish standing.

6   Dkt. 36 at 5.  Plaintiffs amended their complaint on May 9, 2023 to allege facts regarding WDT,

7   WDI, and SD3D's rights in the '400 and '667 Patents and SDT LLC and SDSM's rights in the

8   '834 Patent.  Dkt. No. 38 ¶¶ 20, 37, 50.  Viasat once again moved to dismiss for lack of standing,

9   arguing that the "amended complaint failed to explain how WDI could possibly hold any

10  exclusionary rights in the '400 and '667 [P]atents . . . ."  Dkt. No. 222 at 3; *see also* Dkt. No. 45.

11  On November 8, 2023, the Court denied Viasat's motion.  Dkt. No. 72.  The Court explained that

12  "[w]hile [it] continue[d] to view Plaintiffs' allegations that WDT and WDI 'together are owner

13  and patentee' of the '400 and '667 patents as needlessly cagey, those allegations, taken in the light

14  most favorable to the non-moving party, [were] sufficient to support a plausible inference that

15  WDI holds some exclusionary rights in these patents."  *Id*. at 4.  Although the Court denied

16  Viasat's motion, it noted that "if facts c[a]me to light during discovery that undermine[d]

17  [Plaintiffs' allegations regarding standing], the Court would consider entertaining a partial motion

18  for summary judgment as to issues of patentee standing."  *Id*. at 5.

19          On September 20, 2024, Plaintiffs filed a motion to substitute SDT LLC for WDI and SDT

20  Inc. for WDT.  Dkt. No. 121.  The Court granted Plaintiffs' motion after finding WDT transferred

21  its rights in the Asserted Patents to SDT Inc. and WDI "merged with and into" SDT LLC.  Dkt.

22  No. 130 at 1–2.  WDT and WDI were subsequently terminated from the docket, and SDT Inc. was

23  added as a plaintiff.  *Id*. at 3.  There are currently four named plaintiffs: SDT LLC, SD3D, SDSM,

24  and SDT Inc.  The chart below represents each Sandisk entity's rights in the '400, '667, and '834

25  Patents at the time of the first amended complaint up to July 7, 2025.

26

27

28

*United States District Court*
*Northern District of California*

33

| U.S. Patent No. | May 9, 2023 | July 7, 2025 |
|---|---|---|
| 9,424,400 | WDT – legal title | SDT Inc. – legal title |
| | SD3D – exclusive licensee | SD3D – exclusive licensee |
| | WDI – all other rights and interests | SDT LLC – all other rights and interests |
| 10,447,667 | WDT – legal title | SDT Inc. – legal title |
| | SD3D – exclusive licensee | SD3D – exclusive licensee |
| | WDI – all other rights and interests | SDT LLC – all other rights and interests |
| 8,504,834 | SDT LLC – owner and patentee | SDT Inc. – owner and patentee |
| | SDSM – exclusive licensee | SDSM – exclusive licensee |

Dkt. No. 252 at 4.

Viasat contends that "SDT LLC lacks any exclusionary rights in the '400 and '667 Patents "and thus lacks standing to bring this patent infringement suit." Dkt. No. 222 at 6. Viasat argues that WDI, SDT LLC's predecessor, "passed legal title of the [A]sserted [P]atents to" SDT Inc., "gave an exclusive license to the [A]sserted [P]atents to" SDSM, and left SDT LLC "unspecified 'other rights and interests'" to the Asserted Patents. Viasat argues that these "other rights and interests" are insufficient to establish standing. *Id.* at 10. Sandisk's counters that SDT LLC has standing in each of the '400, '667, and '834 Patents. Dkt. No. 252 at 4-9.

### i. SDT LLC's Rights in the '834 Patent

It is undisputed that SDT LLC transferred its rights in the '834 Patent to SDT Inc. on December 27, 2024. Dkt. No. 252 at 3. Sandisk argues that under Rule 25(c), SDT LLC, having owned the '834 Patent at the onset of this case, may proceed as a plaintiff with SDT Inc.[17] Dkt. No. 252 at 5. Sandisk specifically argues that because "[t]he Court has not substituted SDT Inc. for SDT LLC, nor has it joined SDT Inc. (who is already a party) with SDT LLC as to the '834 Patent . . . the action 'may be continued by' SDT LLC." *Id.* (quoting Fed. R. Civ. P. 25(c)). Viasat counters that SDT LLC divested itself of standing when it assigned its rights in the '834

---

[17] Sandisk argues that "the Court's order dismissing the '834 Patent did not end the action as to that claim[,]" and "[w]hen the Court enters final judgment in this case, SDT LLC—or its successor-in-interest SDT Inc.—will have standing to appeal the decisions as to the '834 Patent, and thus should be kept in the case until that time." Dkt. No. 252 at 5 (quotations and citation omitted). Viasat does not dispute that the Court's order of dismissal does not "end the action" but instead argues that Sandisk has failed to show that SDT LLC owned the '834 Patent. Dkt. No. 259 at 8.

1    Patent to SDT Inc.[18]  Dkt. No. 259 at 8-9.

2          The Court agrees with Viasat.  Viasat relies on two cases, *Pi-Net Int'l, Inc. v. Focus Bus.*

3    *Bank*, No. 5:12-CV-04958-PSG, 2015 WL 1538259, at *1 (N.D. Cal. Apr. 6, 2015), and *Schreiber*

4    *Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 (Fed. Cir. 2005), which the Court finds

5    persuasive.  In *Schreiber Foods*, the plaintiff owned the asserted patent at the onset of the case.

6    402 F.3d at 1200.  But "while the case was being litigated, [the plaintiff] assigned the [] patent,

7    including all claims and causes of action thereunder, to its subsidiary . . . ."  *Id*.  The Federal

8    Circuit found that the plaintiff's assignment to its subsidiary divested it of standing, as the

9    assignment "explicitly included an assignment of all causes of action."  *Id*.  Similarly, in *Pi-Net*

10   *Int'l*, the plaintiff "owned both the asserted patents at the time it initiated the[] suit[][,]" but during

11   the pendency of the lawsuit, the plaintiff "executed agreements which assigned to [third party] 'the

12   entire right, title and interest in and to the [p]atent[s], including all right[s] to sue for past

13   infringement.'"  2015 WL 1538259, at *4.  The Court found that the plaintiff, having "assigned

14   away all substantial rights in the asserted patents, including the right to use for past

15   infringement[,]" "lacke[ed] legal capacity to maintain the[] action[] . . . ."  *Id*.

16         Here, SDT LLC does not dispute that it "assigned away all substantial rights in the asserted

17   patents, including the right to sue for past infringement[,]" 2015 WL 1538259 at *4, like the

18   plaintiffs in *Schreiber Foods* and *Pi-Net*.  In fact, SDT LLC's sur-reply focuses only on the fact

19   that SDT LLC owned the '834 Patent at the time this case was filed and does not identify a single

20   exclusionary right it still holds in the '834 Patent.  Accordingly, the Court finds SDT LLC lacks

21   standing to assert the '834 Patent.  *See Schreiber Foods*, 402 F.3d at 1203 ("Thus, when [plaintiff]

22   transferred the [] patent and became a mere non-exclusive licensee, [plaintiff] lost standing to sue

23   for infringement and the case became moot.").

24

25   [18] Viasat also argues that Sandisk "cite[s] no evidence supporting the assertion that 'SDT LLC had
     standing to assert the '834 [P]atent when this case was filed' or that SDT LLC ever owned the
26   '834 Patent."  Dkt. No. 259 at 9.  In response, Sandisk filed a motion for leave to file sur-reply "to
     address a new argument raised for the first time in Viasat's reply."  Dkt. No. 265 at 1.  Viasat
27   opposed Sandisk's motion for leave, arguing that it pointed out that no evidence supported
     Sandisk's arguments regarding the '834 patent and that Sandisk should not be allowed to use
28   unproduced documents now. The Court agrees with Viasat. Sandisk's motion to file a sur-reply is
     **DENIED.** Dkt. No. 265.

United States District Court
Northern District of California

### ii. SDT LLC's Rights in the '400 and '667 Patents

Having found SDT LLC lacks exclusionary rights in the '834 Patent, the Court next addresses whether SDT LLC has exclusionary rights in the Asserted Patents. The following facts are undisputed and pertinent to the current dispute:



Viasat argues that WDI, and its successor SDT LLC, were left without any exclusionary rights in the Asserted Patents, such that SDT LLC lacks standing in this case. Sandisk counters that "[a]lthough WDT possessed the right to formally enforce the patents or grant licenses, it did so for WDI's benefit, and because WDI is an owner of rights in the patents, its interests are impacted by litigation such that it should be joined as a party." *Id.* Sandisk further argues that "WDI did not assign all substantial rights to WDT nor SD3D and thus 'remain[ed] [an] owner of the patent,' along with WDT which held legal title and enforcement rights." Dkt. No. 252 at 8.

Sandisk's arguments are not persuasive. As stated by the Federal Circuit, "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). Here, the question is whether SDT LLC, through its predecessor WDI, holds any exclusive rights to the Asserted Patents. It is undisputed that WDT transferred legal title of the Asserted Patents to SDT Inc. Dkt. No. 220-2 at 6. It is also undisputed that WDT granted WDI "an exclusive, irrevocable, worldwide, perpetual, royalty-free license" to the Asserted Patents,

which WDI subsequently transferred to SD3D, which SD3D subsequently transferred to SDSM.
*Id.* at 8–9.  It is also undisputed that WDT retained "the right to enforce" the Asserted Patents
"against any third party for the benefit of WDI, WDT, and their respective Affiliates" and WDT
was "solely responsible for the prosecution, settlement and discharge of all infringement claims,
suits, actions and proceedings relating to enforcement of" the Asserted Patents.  Dkt. No. 253-4 at
5–6.

      The Court finds that SDT LLC has failed to establish it has any exclusionary rights in the
Asserted Patents.  Sandisk argues that "Viasat's focus on 'exclusionary rights' misses the point[,]"
Dkt No. 252 at 8, but the Court disagrees.  "The essential issue regarding the right to sue on a
patent is who owns the patent" and possesses "all substantial rights."  *Aspen Eyewear, Inc. v.
Miracle Optics, Inc.,* 434 F.3d 1336, 1338, 1341-42 (Fed. Cir. 2006).  Where those rights are split
through exclusive license agreements, the licensor and the licensee must be joined as parties. *Id.* at
1344.  SDT Inc. and S3SD split legal title and exclusivity.  But SDT LLC possesses neither, only
undefined "rights and interests" in the patents. Dkt. No. 252 at 4.  Accordingly, the Court finds
SDT LLC lacks standing to assert the '400 and '667 Patents.  The Court therefore **GRANTS**
Viasat's motion for summary judgment on standing and dismisses SDT LLC from the case.

## V.    MOTION TO SUBSTITUTE

### A.    Legal Standard

      Federal Rule of Civil Procedure 25(c) states "[i]f an interest is transferred, the action may be
continued by or against the original party unless the court, on motion, orders the transferee to be
substituted in the action or joined with the original party."  Fed. R. Civ. P. 25(c).  "Rule 25(c) is not
designed to create new relationships among parties to a suit but is designed to allow the action to
continue unabated when an interest in the lawsuit changes hands."  *In re Bernal,* 207 F.3d 595, 598
(9th Cir. 2000) (quoting *Collateral Control Corp. v. Deal,* 638 F.2d 1362, 1364 (5th Cir. 1981)).  Rule
25(c) "leaves the substitution decision to the trial court's sound discretion."  *Uniloc USA Inc. v. LG
Elecs. U.S.A. Inc.*, No. 18-CV-06737-JST, 2019 WL 690290, at *1 (N.D. Cal. Feb. 19, 2019) (quoting
*In re Bernal*, 207 F.3d at 598).  Accordingly, the court "may allow the transferee to be substituted for

United States District Court
Northern District of California

the transferor or . . . it may retain the transferor as a party and order that the transferee be made an additional party." *McKesson Info. Sols., Inc. Bridge Med., Inc.*, No. CIVS022669 FCD KJM, 2006 WL 658100, at *2 (E.D. Cal. Mar. 13, 2006).

**B.    Discussion**

On August 22, 2025, two months after Viasat filed its motion for summary judgment on standing, Sandisk filed a motion to substitute SDT LLC with SDT Inc. with respect to the '834 Patent and SD3D with SDSM with respect to the '400 and '667 Patents.  Dkt. No. 269 at 2. Sandisk argues that SDT LLC should be substituted with SDT Inc., because "[p]ursuant to an intellectual property transfer agreement, SDT LLC assigned all of its rights . . . to SDT Inc." *Id*. at 4.  Sandisk also argues that SD3D should be substituted with SDSM, because SD3D transferred its rights in the '400 and '667 Patents to SDSM "by way of an Intellectual Property Assignment Agreement."  *Id*. at 5.

The Court has already dismissed SDT LLC as a plaintiff for lack of standing.  *See supra* Section IV-D.  Accordingly, Sandisk's motion as to SDT LLC is **DENIED AS MOOT**. However, the Court finds it appropriate to substitute SD3D with SDSM.  SD3D no longer holds any rights in the '400 and '667 Patents, and Viasat will not be prejudiced by this substitution. Sandisk's motion as to SD3D is therefore **GRANTED**.

The Court has serious concerns about Sandisk's tactics leading up to the filing of this motion.  On February 13, 2025—nearly three years after initiating this case—Sandisk served a supplemental interrogatory response setting forth each Sandisk entity's exclusionary rights in the '400, '667, and '834 Patents.  Dkt. No. 220-2.  On March 28, 2025, Viasat asked Sandisk to "explain [its] basis for continuing to include SDT LLC as a plaintiff in this action."  Dkt. No. 220-4 at 4.  Sandisk did not respond until May 28, 2025, at which point it offered to stipulate to SDT LLC's dismissal, subject to "Viasat agree[ing] that the remaining Plaintiffs have standing to maintain this action . . . ."  *Id*. at 4.  Viasat refused those terms, explaining that "[s]tanding exists or it doesn't."  *Id*. at 3.  On June 8, 2025, Viasat asked Sandisk to confirm it would "drop SDT LLC as a party . . . ."  *Id*. at 2.  Sandisk did not respond to Viasat.  Dkt. No. 258 at 2.  Not having received a response from Sandisk, Viasat filed its motion for summary judgment on standing on

United States District Court
Northern District of California

June 20, 2025.  Dkt. No. 222.  On June 25, 2025, Sandisk reached out to Viasat to once again propose a stipulation dismissing SDT LLC, premised on Viasat's agreement not to further challenge standing.  Dkt. No. 258-3.  Viasat's motion for summary judgment on standing was fully briefed by July 14, 2025 (Dkt. No. 259), but on August 22, 2025, Sandisk filed the pending motion to substitute.  Dkt. No. 269.

Sandisk's conduct has wasted the parties' and the Court's time and resources.  Despite initially offering to dismiss SDT LLC from this case, Sandisk appears to have reneged on its offer after Viasat declined to agree not to further challenge the standing of other Sandisk entities.  Sandisk's proposed quid pro quo was unjustifiable.  As Viasat stated, "[s]tanding exists or it doesn't."  Dkt. No. 220-4 at 3.[19]  If Sandisk knew that SDT LLC did not have standing—which appears to be the case—Sandisk should have voluntarily dismissed SDT LLC.  Instead, Sandisk subjected the parties and the Court to an unnecessary series of motions regarding SDT LLC's standing.  Accordingly, Sandisk's counsel is **ORDERED TO SHOW CAUSE** why they should not be sanctioned to cover, at a minimum, the costs of Viasat's motion for summary judgment on standing and Viasat's opposition to Sandisk's motion to substitute.  Sandisk's counsel shall file a statement of five pages or less within one week of the date of this order. Once the Court receives Sandisk's response, it may set an in-person show cause hearing.

## VI.    MOTIONS TO EXCLUDE EXPERT OPINIONS AND TESTIMONY

Viasat moves to exclude certain technical and damages opinions disclosed in the Easttom Report and Kindler Report.  Dkt. No. 206 at 3-6.  Viasat specifically seeks to exclude the opinions set forth in Paragraph 97 of the Easttom Report and Paragraphs 12.a., 13.a., 78, 177–82, 213a.i., 218, 220.a., 221.a. and Exhibit 10.2 of the Kindler Report.  *Id.*  Sandisk moves to exclude certain opinions of Viasat's damages expert, Dr. Gareth Macartney.  Dkt. No. 208.  Sandisk specifically seeks to exclude three of Dr. Macartney's opinions: "(1) reliance on an agreement with a company called ███ as comparable to the technology of the '400 patent" ("Opinion 1"); "(2) the use of

---

[19] Further underlining the impropriety of Sandisk's conduct is the fact that SD3D transferred its rights in the '400 and '667 Patents to SDSM in January 2025.  Dkt. No. 269 at 3.  Had Viasat agreed not to challenge the standing of any other Sandisk entities, Viasat would have been left unable to (rightfully) challenge SD3D's standing.

1   an agreement with a company called Arconics as a 'reality check' on the opinions of Sandisk's

2   damages expert, Lauren Kindler" ("Opinion 2"), and "(3) his criticism that Ms. Kindler

3   'disregard[s] standard video compression' in relying on certain Viasat data in her report"

4   ("Opinion 3"). *Id.* at 5.

5        As explained above, *see infra* Section IV.B., the Court grants Viasat's motion for summary

6   judgment of noninfringement.  The Court did not need to rely on any of these materials in granting

7   summary judgment of noninfringement. Accordingly, Sandisk and Viasat's *Daubert* motions are

8   **DENIED AS MOOT**.

9   **VII.    CONCLUSION**

10        The Court **GRANTS IN PART** and **DENIES IN PART** Viasat's motion to strike portions

11   of Plaintiffs' expert reports (Dkt. No. 199); **DENIES AS MOOT** Viasat's motion to strike Lauren

12   Kindler's May 5, 2025 supplemental expert report (Dkt. No. 200); **GRANTS IN PART** and

13   **DENIES IN PART** Viasat's motion to strike Plaintiffs' '400 patent authenticating theories (Dkt.

14   No. 204); **DENIES AS MOOT** Viasat's motion to exclude certain opinions of Chuck Easttom and

15   Lauren Kindler (Dkt. No. 206); **DENIES AS MOOT** Sandisk's motion to exclude certain

16   opinions of Gareth Macartney (Dkt. No. 208); **GRANTS** Viasat's motion for summary judgment

17   of noninfringement (Dkt. No. 205); **GRANTED IN PART** and **DENIED IN PART AS MOOT**

18   Sandisk's motion for summary judgment on affirmative defenses (Dkt. No. 210); **GRANTS**

19   Viasat's motion for leave to file a second motion for summary judgment (Dkt. No. 221);

20   **GRANTS** Viasat's motion for summary judgment on standing (Dkt. No. 222); **DENIES**

21   Sandisk's motion for leave to file sur-reply (Dkt. No. 265); **GRANTS** the parties' motions to seal

22   (Dkt. Nos. 201, 207, 209, 211, 226, 231, 232, 233, 234, 243, 249, 256, 261, 263); **GRANTS IN**

23   **PART** and **DENIES IN PART** Plaintiffs' motion to seal (Dkt. No. 241); **DENIES** Defendant's

24   motions to seal (Dkt. Nos. 220, 250); **DENIES AS MOOT** Sandisk's motion to seal (Dkt. No.

25   253); and **GRANTS IN PART** and **DENIES IN PART** Sandisk's motion to substitute (Dkt. No.

26   269).

27        Sandisk is **DIRECTED** to file an amended motion to seal with respect to Docket Number

28   241 within one week of the date of this order.  The amended motion shall contain excerpted

United States District Court
Northern District of California

versions of Exhibits 14–18, 20, 22, 23–25, 27, and 32 to Sandisk's opposition to Viasat's motion for summary judgment on noninfringement.

Sandisk is further **DIRECTED** to file a statement in response to the Court's order to show cause within one week of the date of this order.

The Clerk is **DIRECTED** to terminate SanDisk3D IP Holdings Ltd. and SanDisk Technologies LLC from the docket.  The Clerk is further **DIRECTED** to update the case caption to "SANDISK TECHNOLOGIES, INC., et. al., v. VIASAT, INC."

The Clerk is **DIRECTED** to enter judgment in favor of Defendant Viasat, Inc. and against Plaintiffs and to close the case.

**IT IS SO ORDERED.**

Dated:     10/21/2025

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge